## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MARY SANDERS** | ) | |
| **As Personal Representative of the** | ) | |
| **Estate Of Benjamin Sanders** | ) | |
| **4354 D Street, SE** | ) | |
| **Washington, DC   20019** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Case No. 07 1169** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

### PLAINTIFF'S F.R.C.P. 26(a)(2) DISCLOSURES

Plaintiff, by counsel, for her F.R.C.P. 26(a)(2) disclosures sets forth as follows:

1.      **Ilene Warner-Maron, RN**
        2 Dundee Mews
        Media, PA 19063
        (610) 917-0255

The attached report is offered as a summary of Ms. Ilene Warner-Maron's opinions and the grounds therefore. Ms. Warner-Maron is anticipated to testify regarding the standard of care for treating/caring for a patient in a nursing home. Ms. Warner-Maron is expected to testify in accordance with her report which is attached hereto. She is also expected to testify regarding the affects of Mr. Sanders' stroke on his ability to use the left size of his body, including his arm and leg. Plaintiff reserves the right to present additional expert testimony by Ms. Warner-Maron on matters raised by testimony at deposition or trial or in rebuttal to opinions raised by expert(s) identified by defendant or where indicated by supplemental responses to this interrogatory

answer. Ms. Warner-Maron's opinions may be supplemented, modified and/or changed as she continues to review this matter on behalf of the plaintiff.

This expert designation is being provided prior to any deposition of Ms. Warner-Maron. If Ms. Warner-Maron's deposition is taken in this case, her deposition will be incorporated by reference in this designation as fully set forth in its entirety.

Ms. Warner-Maron is a registered nurse who specializes in caring for geriatric patients in a long term care setting and administration of long-term care facilities. Ms. Warner-Maron's opinions will be based upon her education, training, knowledge and experience in the area nursing and long term care and her review of the photographs, pertinent medical records, autopsy reports, police and fire investigation reports, fire and safety standards, protocols and regulations – including VA Hospital and CRNC safety standards, Life Code Safety Standards, JCAHO and OBRA regulations and safety standards, witness statements, and the depositions taken in this case. A copy of Ms. Warner-Maron's CV is attached which sets forth her education, training and experience. Ms. Warner-Maron fee for medical/legal work are attached. A list of all her publications in the last four years and her trial and deposition testimony is contained in her CV. Ms. Warner-Maron's opinions are held to a reasonable degree of professional certainty.

   2.     **Richard Stefanacci, DO**
          **600 South 43rd Street**
          **Philadelphia, PA 19104**
          **(215) 596-7466**

The attached report is offered as a summary of Dr. Stefanacci's opinions and the grounds therefore. Dr. Stefanacci is anticipated to testify regarding standard of care, causation, damages, and the cause of Benjamin Sanders' burn injuries, including conscious pain and suffering. Dr. Stefanacci will also testify on the affects of anti-seizure medication on Benjamin Sanders'

cognitive and physical abilities and the ability of Benjamin Sanders to feel pain from his burns. He is expected to testify regarding the nature and extent of Benjamin Sander's medical history, including strokes, paralysis and speech deficits. He is also expected to testify regarding the affects of his stroke on his ability to use the left size of his body, including his arm and leg.

Dr. Stefanacci is expected to testify in accordance with his report which is attached hereto. Plaintiff reserves the right to present additional expert testimony by Dr. Stefanacci on matters raised by testimony at deposition or trial or in rebuttal to opinions raised by expert(s) identified by the defendant or where indicated by supplemental responses to this interrogatory. Dr. Stefanacci's opinions may be supplemented, modified and/or changed as he continues to review this matter on behalf of the plaintiff.

This expert designation is being provided prior to any deposition of Dr Stefanacci. If Dr. Stefanacci's deposition is taken in this case, his deposition will be incorporated by reference in this designation as fully set forth in its entirety.

Dr. Stefanacci is a medical doctor who specializes in pharmacology, internal medicine and geriatrics. Dr. Stefanacci's opinions will be based upon his education, training, knowledge and experience in the areas of internal medicine and geriatrics, and his review of the photographs, pertinent medical records, autopsy reports, fire and police investigation reports, fire and safety standards, protocols and regulations – including VA Hospital and CRNC safety standards, Life Code Safety Standards, JCAHO safety standards, his research on smoking safety in a long-term care settings, witness statements, and depositions in this case. A copy of Dr. Stefanacci's CV is attached which sets forth his education, training and experience. Dr. Stefanacci charges $500/hour for record review, $500/hour for depositions, and $500/hour for trial testimony plus travel time. Attached are a list of cases in which Dr. Stefanacci testified in

the past four years and a list of his publications in the past 10 years. Dr. Stefanacci's opinions are held to a reasonable degree of medical certainty.

3.     **Daniel Lozano, MD**
       **1210 South Cedar Crest**
       **Suite 3000**
       **Allentown, PA 18103**
       **(610) 402-1485**

The attached report is offered as a summary of Dr. Lozano's opinions and the grounds therefore. Dr Lozano is anticipated to testify regarding standard of care, causation, and the cause and nature of Benjamin Sanders' physical abilities and Benjamin Sander's pain and suffering that resulted from his burns. He is also expected to testify regarding the affects of his stroke on his ability to use the left size of his body, including his arm and leg. He is expected to testify regarding the nature and extent of Benjamin Sander's medical history, including strokes, paralysis and speech deficits. Dr. Lozano is expected to testify in accordance with his report which is attached hereto. Plaintiff reserves the right to present additional expert testimony by Dr. Lozano on matters raised by testimony at deposition or trial or in rebuttal to opinions raised by expert(s) identified by the defendant or where indicated by supplemental responses to this interrogatory. Dr. Lozano's opinions may be supplemented, modified and/or changed as he continues to review this matter on behalf of the plaintiff.

This expert designation is being provided prior to any deposition of Dr. Lozano. If Dr. Lozano's deposition is taken in this case, his deposition will be incorporated by reference in this designation as fully set forth in its entirety.

Dr. Lozano is a medical doctor who specializes in internal medicine, surgery, and the treatment of burn injuries. Dr. Lozano's opinions will be based upon his education, training,

knowledge and experience in the areas of internal medicine and geriatrics, and his review of the photographs, pertinent medical records, autopsy reports, medical literature, fire and police investigation reports, photographs, fire and safety standards, protocols and regulations, – including VA Hospital and CRNC safety standards, Life Code Safety Standards, JCAHO safety standards, his research on smoking safety in a long-term care settings, witness statements, and depositions in this case. A copy of Dr. Lozano's CV is attached which sets forth his education, training and experience. Dr. Lozano charges $600/hour for record review, $750/hour for depositions – two hour minimum, and $750/hour for trial testimony plus travel time. Attached are a list of cases in which Dr. Lozano testified in the past four years and a list of his publications in the past 10 years. Dr. Lozano's opinions are held to a reasonable degree of medical certainty.

3.     **David Hammerman, PE**
       **3950 Chaffey Road**
       **Randalstown, PA 21133**
       **(410) 655-6862**

The attached report is offered as a summary of David Hammerman's opinions and the grounds therefore. Dr. Hammerman is anticipated to testify regarding standard of care, causation, and the cause of the fire that caused Benjamin Sanders' burn injuries. Mr. Hammerman is expected to testify in accordance with his report which is attached hereto. Plaintiff reserves the right to present additional expert testimony by Mr. Hammerman on matters raised by testimony at deposition or trial or in rebuttal to opinions raised by expert(s) identified by the defendant or where indicated by supplemental responses to this interrogatory. Mr. Hammerman's opinions may be supplemented, modified and/or changed as he continues to review this matter on behalf of the plaintiff.

This expert designation is being provided prior to any deposition of Mr. Hammerman. If Mr. Hammerman's deposition is taken in this case, his deposition will be incorporated by reference in this designation as fully set forth in its entirety.

Mr. Hammerman, P.E. is a professional engineer with extensive fire safety experience, including Chief Fire Protection Engineer, Office of the Maryland Fire Marshall, who specializes in fire safety issues. Mr. Hammerman's opinions will be based upon his education, training, knowledge and experience in the areas of Fire Safety and engineering, and his review of the photographs, pertinent medical records, autopsy reports, witness statements, fire and police investigation reports, fire and safety standards, protocols and regulations – including VA Hospital and CRNC safety standards, Life Code Safety Standards, JCAHO safety standards, his research on smoking safety in a long-term care settings, and depositions in this case. A copy of Mr. Hammerman's CV is attached which sets forth his education, training and experience. Mr. Hammerman charges $300/hour for his legal consulting work including travel time. Mr. Hammerman has not testified in the past four years but has provided a list of his publications in the past 10 years which is attached. Mr. Hammerman's opinions are held to a reasonable degree of professional certainty.

4.    **Sarah Colvin, MD**
      **Office of Chief Medical Examiner**
      **1910 Massachusetts Avenue, SE**
      **Building 27**
      **Washington, DC 20003**

The Dr. Colvin's deposition and its exhibits are offered as a summary of Dr. Colvin's opinions and the grounds therefore and are in the possession of defendant's counsel. Dr. Colvin is anticipated to testify regarding nature and extent of Benjamin Sander's injuries, including

burns, and the cause of his death.    She is expected to testify regarding the nature and extent of

Benjamin Sander's medical history, including strokes, paralysis and speech deficits.  She is also

expected to testify regarding the affects of his stroke on his ability to use the left size of his body,

including his arm and leg.

Dr. Colvin is also expected to testify to the authentication of photographs taken before,

during and after his autopsy.

Dr. Colvin is expected to testify in accordance with her autopsy report and deposition

which are in the possession of defendant's counsel.  Plaintiff reserves the right to present

additional expert testimony by Dr. Colvin on matters raised by testimony at deposition or trial or

in rebuttal to opinions raised by expert(s) identified by the defendant or where indicated by

supplemental responses to this interrogatory.  Dr. Colvin's opinions may be supplemented,

modified and/or changed as she continues to review this matter on behalf of the plaintiff.

Dr. Colvin is a medical doctor who is board certified in forensic, anatomic and forensic

pathology.  Dr. Colvin's opinions will be based upon her education, training, knowledge and

experience in the areas of pathology, and her review of the photographs, pertinent medical

records, her autopsy of Benjamin Sanders' and her subsequent autopsy reports, fire and police

investigation reports, and witness statements.  Dr. Colvin works for the District of Columbia and,

therefore, does not charge for her testimony.  Dr. Colvin's opinions are held to a reasonable

degree of medical certainty.

3.    Plaintiff reserves the right to call any of plaintiff's health care providers to testify

regarding their care and treatment of Mr. Sanders and their opinions and diagnoses which is

described in their medical records and to authenticate and testify regarding the reasonableness of

the claimed medical bills.

    4.      Plaintiff also reserves the right to call any expert identified by the defendants.

    5.      Plaintiff also reserves the right to identify rebuttal experts.

             Respectfully submitted,

             **THE COCHRAN FIRM**

W. Charles Meltmar, #438870
1100 New York Avenue, NW
Suite 340, West Tower
Washington, DC 20005
Telephone:  (202) 682-5800
Fax:  (202) 408-8851
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Expert Designation, and the CV's and Reports of Drs. Lozano and Stefanacci and Ilene Warner-Maron and David Hammerman were delivered by Courier this February 28, 2008 to:

Claire Whitaker, esq.
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Room E-4204
Washington, DC 20530



_____
W. Charles Meltmar

# ALDEN

GERIATRIC CONSULTANTS, INC.

February 22, 2008

W. Charles Meltmar, Esquire
The Cochran Firm
1100 New York Ave, N.W.
Suite 250-West Tower
Washington, D.C. 20005

**RE: Benjamin Saunders**

Dear Mr. Meltmar,

This report shall serve as an addendum to my original report of December 24, 2006 which includes additional opinions based the production of additional documents and deposition testimony. These additional documents include:

1. Subpoena Responses from the Metropolitan Police Department:
   a. Death Report;
   b. Autopsy Report;
   c. WACIIS Investigative Supplemental Report;
   d. MPD Arson Task Force Fire Fatality Report;
   e. ATF reports;
   f. Incident Based Event Report;
   g. Supplemental Police Report dated April 13, 2006;
   h. Notes of Detective Kim Lawrence;
   i. Floor plan;
   j. Staffing schedule;
   k. Fifteen (15) color photographs of decedent;
   l. Eighty (80) color photographs of smoking room, decedent's wheel chair, sprinklers and fire extinguishers;
   m. Deposition testimony:
   n. Voluntary Witness Statements:
      i. Johnniie M. Belton;
      ii. Moses Oyegbami;
      iii. Yvette Turner;
      iv. Robin Blackmon;
      v. Georgi Moyer;

2 DUNDEE MEWS    MEDIA, PA 19063-1167
(610) 917-0255, FAX (610)325-9197, CELL (610) 322-2865
EMAIL: ALDENGERIATRICS@AOL.COM

     vi.  Jerry L. Phillips;
     vii.  Wanda Smith;
     viii.  Donna Harris-Nwangwu;
     ix.  Jane Njenga;
     x.  Patricia Hamitte;
     xi.  Cobertha Bizzelle;
     xii.  Helen Choi;
     xiii.  Solauye Waller

2. Deposition Testimony:
     a.  Frances Henderson, RN;
     b.  Scott Burgoon;
     c.  Ashraf Alehossein, CRNP;
     d.  Edita Micu;
     e.  Robert Carnevale;
     f.  Raya Kheirbek, MD;
     g.  Jerry Lee Phillips, C.N.A.

**Depositions**

The testimony of certified nursing assistant Jerry Lee Phillips included identification of Benjamin Sander's functional limitations which included a left hand contracture that caused the fingers of the resident's hand to be fixed upon his palm, the left arm contracted across Mr. Sander's abdomen, an inability to raise the left arm, an inability to stand or ambulate and slurred speech. Mr. Phillips described Benjamin Sander's speech as *"it wasn't very clear. I guess after you've been around him a while, you could start to understand him somewhat. But you still had to listen and really pay attention to understand him."* Mr. Phillips testified that he saw Mr. Sanders light two cigarettes in succession prior to Mr. Phillips leaving the smoking room to have his break. As he walked toward the atrium, he testified that a nurse informed him that Benjamin Sanders was on fire. He reported going to the site of the smoking room and finding the resident engulfed in flames with flames above his head. No smoking apron was on Mr. Sanders at the time of this fire. Jerry Lee Phillips further testified that he picked up a fire extinguisher, pulled the pin, but found that nothing came out of the device. He and the staff gathered blankets and attempted to use them to put out the fire, without success. Another unidentified staff member arrived with a fire extinguisher that was functional and Mr. Phillips used this to put out the fire. He reported that Mr. Sanders was on fire but his wheelchair had not been on fire.

The Medical Director of the nursing home unit, Raya Kheirbek, MD testified that was responsible for supervising and implementing the care rendered to Benjamin Sanders by the staff. She testified that *"Definitely, we were very worried about his smoking habits and we made every effort, every effort, to make him stop."* Dr. Kheirbek's concerns focused upon the medical harm caused by smoking, rather than the issue of whether Benjamin Sanders was safe to smoke given his left hemiplegia, cognitive deficits and speech impairment. Similarly, the nurse practitioner who oversaw Mr. Sander's care, Ashraf Alehossein, testified that she regularly counseled the resident about smoking cessation but did not complete a formal assessment of Mr. Sander's smoking abilities to determine if he was safe to smoke unsupervised. She repeatedly stated that Mr. Sanders was a safe smoker but did not complete any formal assessment of his smoking abilities during the five years she had treated

the resident. Nurse Alehossein acknowledged that she was responsible for assessing Benjamin Sander's ability to smoke.

Nurse Alehossein testified that she was aware that in addition to Mr. Sander's left hemiplegia, dysarthria and cognitive issues, he had a seizure disorder and experienced a seizure in the elevator of the facility approximately one year before his death. She acknowledged that a neuropsychologist, Cynthia Sullivan, had signed off on a Mini Mental Status Assessment (MMSE) of the resident that identified the presence of cognitive deficits, however Nurse Alehossein disagreed with this finding. She testified that Benjamin Sander's speech was impaired, characterized by expressive aphasia and dysarthria. Aphasia by definition is the inability to express oneself properly through the use of speech. Dysarthria is defined as difficult and defective speech due to the impairment of the tongue or the musculature essential to speech. She acknowledged that Mr. Sanders had periods of hypoxia, the lack of adequate oxygenation, as a consequence of his smoking and episodes of bronchitis. Clearly, episodes of inadequate oxygen levels in the brain and seizure activity placed Mr. Sanders at increased risk for smoking-related injuries.

The Occupational Safety Specialist, Robert Carnevale, testified that his office was responsible for complying with the NFPA fire safety standards including assuring that the fire extinguishers were maintained monthly. A contractor was required to actually perform the maintenance of the extinguishers, however Mr. Carnevale was unaware of the requirements of this inspection. He acknowledged that at least one of the fire extinguishers that were involved in the fire fighting activities of Benjamin Sanders had an expired monthly inspection sticker.

The DON equivalent and 30(b)(6) witness, Frances Henderson, RN, testified that she found no evidence of a care plan in Benjamin Sander's clinical records regarding his smoking. There was no order in the resident's chart identifying him as a high risk smoker. The interdisciplinary team had not assessed Mr. Sanders' ability to smoke or identify him to be a high, medium or low risk with regard to his smoking. Nurse Henderson acknowledged that the facility's smoking policy was to asses the residents to determine if they could safely smoke, however there was no such documentation contained in the records of Benjamin Sanders.

Nurse Henderson identified that the nursing home was inspected by the Joint Commission for the Accreditation of Health Care Organizations (JCAHO) using the regulatory framework of the Centers for Medicare and Medicaid (CMS) contained in 42 C.F.R. § 483, known as OBRA-87. She acknowledged that the smoking risk assessment must be documented within the clinical record. She testified that OBRA requires facilities to perform assessments of residents with regard to their risk of unsafe smoking. The regulation commonly cited for smoking-related deviations is §483.25(h)(2) which states **The facility must ensure that each resident receives adequate supervision and assistance devices to prevent accidents.** It requires that long term care facilities provide supervision to residents in a designated smoking area and that the facility's policies and procedures be implemented in order to ensure that residents who require supervision while smoking receive the necessary supervision. Smoking policies include the completion of an assessment for all residents who smoke.

– 4 –                                                    February 22, 2008

A variety of smoking assessment forms is available for long term care facilities. One assessment which is available from the ADL website free of charge, includes the following parameters:

1.  Does the resident smoke?
2.  Is the resident alert?
3.  If the resident physically capable of holding a cigarette, matches/lighter and lighting and extinguishing own cigarette without assistance?
4.  Is the resident able to extinguish a lit cigarette ash/cigarette if it falls on his person?
5.  Is the resident able to call for help if lit cigarette or ash falls on his person or on others?
6.  Is the resident able to move without assistance to designated smoking area?
7.  Does the resident have a past history of poor judgment regarding safety of himself or others?
8.  Does the resident have any contraindications to smoking such as syncope, TIA, loss of feeling in fingers, arthritis etc?
9.  Has the resident been instructed in facility policy regarding safety of himself/others?
10. Has the resident signed the Resident Smoking Agreement and the Smoker's Release of Responsibility forms?

Based upon the answers to these questions, a social worker makes the initial assessment of a resident's ability to safely smoke. It is clear that Mr. Sanders was capable of holding his cigarette in his right hand and that he was incapable of calling for help in the event that his cigarette or ashes fall causing injury.

An additional smoking assessment was developed in Canada for use in nursing homes. It includes questions asked of the resident regarding smoking habits and whether he/she has fallen asleep while smoking. Residents are specifically asked what action they would take if there was an emergency in the smoking room. Additionally, risk factors are addressed including the following:

1.  The presence of physical limitations that have implications on the resident's ability to smoke such as arthritis, hand injury or paralysis;
2.  The need for assistive devices that alter the ability to smoke;
3.  Whether the resident engages in unsafe activities such as disposing the ashes/cigarettes in an unsafe manner or shows evidence of burn marks on clothes or self;
4.  The resident is known to attempt to set fires;
5.  The resident consumes excessive amounts of alcohol;
6.  The resident has a history of falling asleep while seated;
7.  The resident takes any medication that could impair safe smoking

In this assessment, the affirmative answer to any one of the questions is sufficient for the staff to place the resident at risk for unsafe smoking and to prevent him/her from smoking independently. Benjamin Sander's records indicated the presence of physical limitations including left hemiplegia and a seizure disorder. It is not known if the resident had a history of falling asleep while seated or whether he used unsafe means of ash and cigarette disposal while smoking. The final portion of the assessment called for direct

observation of the resident regarding the ability to get to the smoking room, obtain cigarettes and lighter, obtain and use a smoking apron, access an ashtray, light a cigarette, hold it securely, dispose of the ashes in the ashtray properly, put out the cigarette, return the cigarettes and lighter to storage and to call for emergency assistance. It is clear from both the clinical records and the deposition testimony that Mr. Sanders did not have a smoking apron in use at the time of his fatal injuries on March 19, 2006 nor was he able to call for help due to his speech deficits.

## Conclusions

Facilities such as the nursing home unit of the Veterans Administration Medical Center are required to comply with the federal regulations governing long term care facilities contained within 42 C.F.R. § 483 which is overseen by the JCAHO. The specific regulations pertaining to resident safety require that facility staff provide supervision and assessment to prevent accidents. It is clear in the case of Benjamin Sanders that the facility staff did not perform any comprehensive smoking assessments, document such assessments or identify any risk factors that would have clearly placed this resident at risk for unsafe smoking. There was no written care plan or interventions to reduce his risk of unsafe smoking. There was no supervision of Benjamin Sanders smoking activities despite his multiple medical problems, inability to call for help and evidence of cognitive decline. Moreover, the facility failed to ensure that its fire extinguishers were in proper working order at the time of the fatal fire.

Therefore, it remains my opinion within a reasonable degree of professional certainty that the staff of the skilled nursing unit (CNRC) of the Veterans Administration Medical Center of Washington, D.C. deviated from accepted standards of care in the treatment of Benjamin Sanders.

This report may be amended should further information become available.

Sincerely,

Ilene Warner-Maron
Ph.D., RN,C CWCN CBN CALA NHA

# *Curriculum Vitae*... ... ... ... ... ... ... ... ... ...

Ilene Warner-Maron, Ph.D., RN,C CWCN CBN CALA NHA
2 Dundee Mews    Media, PA 19063-1167
(610)-917-0255 Office; (610)- 325-9197 FAX; (610) 322-2865 Cellular
Email: aldengeriatrics@aol.com

# *Education*... ... ... ... ... ... ... ... ... ... ... ... ... ... ...

1978- 1980 **Albert Einstein Medical Center School of Nursing**
Philadelphia, PA   Diploma in Nursing

1981-1983 **Philadelphia University**, Philadelphia, PA
Bachelor of Science, Sociology

1983-1985 **University of Pennsylvania**, Philadelphia, PA
Master of Arts, Social Gerontology

1987-1989 **St. Joseph's University**, Philadelphia, PA
Post-Masters Degree in Health Administration

1994-1995 **Bryn Mawr College**, Bryn Mawr, PA
Masters Degree in Law and Social Policy

Jan.-May, 2000  Essentials of Clinical Research,
**Medical College of Pennsylvania/Drexel University**, 54 hours
(Completed training course on the Protection of Human Research Subjects
sponsored by the National Institute of Health Office of Human Subjects
Research, January 30, 2001).

Jan. 2001- December 2007 **University of the Sciences in Philadelphia**
(Formerly Philadelphia College of Pharmacy and Sciences)
Ph.D. in Health Policy Dissertation: "Interventions by Health Professionals for the
Dissemination of HIV Information for Older Adult People in West Philadelphia."

July 23-26, 2007. Basic and Advanced Principles of Patient Safety
**ASHRAM (American Hospital Association)**, Chicago, IL.

# *Professional Credentials*... ... ... ... ... ... ... ... ... ... ... ...

| | |
|---|---|
| RN license Pennsylvania | 242811-L issued April, 1981 |
| RN license Delaware | LI-0024095 issued April, 1995 |
| RN license New Jersey | NR 88527 issued September, 1995 |
| RN license Virginia | 1199139 issued November 2005 |

1

Nursing Home Administrator (NHA) license: Pennsylvania 03664-L 11/91
---Certification in Gerontological (RN,C) Nursing, American Nurse's Association, Oct. 1994, re-certified in 1999, 2004
---Certified Wound Care Nurse (CWCN), Wound, Ostomy and Continence Board, June, 1995, re-certified in 2000, 2005
---Certified Assisted Living Administrator (CALA), American College of Health Care Administration, March 2000; recertification March 2005
---Certified in Bariatric Nursing (CBN), American Society for Metabolic and Bariatric Surgery (ASMBS) June 2007

# Recognition and Awards ... ... ... ... ... ... ... ... ... ... ...

2002 Nancy Tatum Memorial Award for Excellence in Nursing – Delaware Valley Geriatrics Society

# Professional Experience... ... ... ... ... ... ... ... ... ... ...

7/94- present: **Consulting Practice (Alden Geriatric Consultants, Inc. 1998)**
Providing expertise in the field of administration and nursing interventions for home care, nursing home and community-based geriatric clients. Expert testimony regarding standards in long term care settings, Medicare and Medicaid fraud and National lectures on geriatric nursing and wound care. Current clients include the following and the associated date indicates the year the association began:
*Institute for Continuing Education and Research (1994), Technical Advisory Service for Attorneys (1994), Center for Health Care Education (2002), Jeffrey J. Maron, DO PC (2006) Kendal Communities (2007), New Jersey Department of Aging and Senior Services (2005) St. Agnes Center Continuing Care (2007), Crozer Keystone Home Health (2008)*

**University of Pennsylvania Health System:**
08/06-present: **Wissahickon Hospice-**Director of Fifth Stage Wound Program (employee)
10/06- 9/07: **Penn Care at Home-** Disease Management, Quality Assurance (employee)
01/03-01/07- **Penn Presbyterian Medical Center Skilled Nursing Facility-** wound specialist (employee)
09/03-01/04-**Penn Presbyterian Medical Center Skilled Nursing Facility-** Acting Director of Nursing (employee)
04/05-10/06-**LIFE Program**-wound specialist (consultant)
04/05-04/06-**Penn Center for Rehabilitation and Care-** wound specialist (consultant)
08/04-06/05-**Wissahickon Hospice-**Acting Director of Nursing (employee)
02/02-01/04-**Center for Biostatistics and Epidemiology-**Gerontologist for study on medication safety (employee)
02/00-10/01- **Center for Biostatistics and Epidemiology-** researcher for study of the epidemiology of hospital acquired pressure ulcers (employee)

2

9/05-present. **University of the Sciences in Philadelphia.** Philadelphia, PA.
Adjunct Professor, Misher School of Social Sciences

7/03- present. **Philadelphia Corporation for Aging,** Philadelphia, PA
Research/Intervention nurse for AoA grant for the Family Caregiver Support
Program. Nurse for the Family Caregiver Support Program. Performs research
activities under the Director of Research.

9/02-present. **University of Delaware,** Wilmington, DE. Faculty for legal nurse
certification program: introduction to the use of law in society and medical records
review.

2/89-2/03. **Professional Care Management Institute,** Norristown, PA. Wrote
and presented programs on geriatric health issues for employees of Area Agencies on
Aging in Allegheny, Bucks, Chester, Delaware, Montgomery and Philadelphia
Counties as well as the State of New Jersey.

10/02-10/04; **Home Health Corporation of America,** King of Prussia, PA
Wound consultant for home health care agency.

6/00-6/02; **Millenium Home Health Care,** Havertown, PA. Wound consultant
for home health care agency.

8/01-9/01; **Freedom Village,** Brandywine, PA. Interim Administrator for Nursing
Home and Assisted Living Facility in CCRC.

10/99-1/03; **Martin's Run Continuing Care Retirement Community,** Media, PA
Staff nurse in nursing home section with responsibilities for assisted living and
independent living.

10/98-1/99: **Temporary Manager, Greenbelt Nursing and Rehabilitation
Center,** Greenbelt, MD. Appointed by the Department of Justice to direct
mediation of facility under the jurisdiction of the False Claims Act.

12/98-12/00- **Home Health Care Resources,** Bensalem, PA. Wound consultant
for home health care agency in 5 county region.

6/98-12/00- **Genesis Home Health Care,** Broomall, PA. Wound consultant for
home health care agency in 5 county region.

1/98-2/98- **Divine Providence Village,** Springfield, PA. Provided consultation for
community living arrangement of MH/MR population.

9/94-10/96- **Etris Associates,** Philadelphia, PA. Wound care consulting services for
home care and nursing home residents. Created QA program for nursing homes
involving the development and treatment of pressure ulcers.

3

10/94-97 - **U.S. Department of Justice**, Philadelphia, PA. Consultant. Investigated fraud and abuse for False Claims actions.

3/95-11/96- **RHA Pennsylvania.** Consultant for nursing homes (Pembroke and Prospect Park) providing administrative and nursing support.

2/90-4/91 and 6/93-8/94. **Jireh Associates**, Broomall, PA. Quality Assurance consulting firm for long-term care and remediation of adverse licensure actions.

4/93- 12/94. **Quaker Health, Inc.,** Devon, PA. Case Management, Quality Assurance, Utilization Review and education consulting for home care agency.

4/91-3/93. **Haverford Nursing and Rehabilitation Center,** Havertown, PA. Administrator of 110 bed facility. (Assistant Administrator 4/91-11/91, interim administrator 7/98-8/98).

9/90- 5/92. **Philadelphia College of Textiles and Sciences.** Adjunct faculty Evening Division, authored and taught "The Sociology of Health" and graduate courses in health administration.

2/90- 10/90. **Coalition of Advocates for the Infirm Elderly (CARIE),** Philadelphia, PA. Implemented educational grant designed to address abuse in long term care.

3/89-2/90. **Delaware County Office of Services for Aging (COSA)** Media, PA. Supervisor, Adult Protective Services.

12/87-10/88. **Healthway Home Care,** Havertown, PA. Nursing supervisor for home health care agency.

1/83-12/87- **Rosenfeld and Maron Medical Associates,** Philadelphia, PA. Case manager and patient educator for internal medicine group.

1/82-1/83-**Metropolitan Home Health,** Horsham, PA. Visiting Nurse for five county area.

4/81-1/82-**Rittenhouse Care Center**, Philadelphia, PA. Nursing Supervisor for 180 bed nursing home.

7/80-1/82; **Albert Einstein Medical Center**, Philadelphia, PA. Staff nurse in medical/surgical, alcohol treatment, psychiatry, ICU/CCU and operating room areas.

6/77-7/78; **Metropolitan Home Health**, Horsham, PA. Home health aide.

1/75-6/77; **Chateau**, Bryn Mawr, PA. Nurse's aide in nursing home.

4

# *Professional Organizations*……………………………… .

Board Positions:

Eastern Pennsylvania Geriatrics Society- (Secretary) 1997- present

President-elect 2004-2005

President 2005-2006

Past President 2006-2007

Philadelphia Chapter American Association of Legal Nurse Consultants

Director at Large:  2000-2001

President-elect:    2001-2002

President:          2002-2003

Past President:     2003-2004

Wound, Ostomy and Continence Nursing Society

Newsletter Editor, Delaware Valley Geriatrics Society (1999-2000)

American Geriatrics Society

NAHOF

# *Publications*………………………………

Samuel Rosen, Ilene Warner and Nancy Morrow Editors. Health and Aging Training Manual, 1991. Pennsylvania Care Management Institute.

Ilene Warner. "Pharmacology and the Elderly." Pennsylvania Care Management Institute Perspectives. Winter, 1992 p. 4-5.

Ilene Warner. "Spreadsheets." Nursing Homes-Long Term Care Management. July/Aug. 1993 Vol 42 No. 6 p. 30-31.

Ilene Warner. "The Resident's Rights Quiz." PADONA Journal. Jan/Feb 1994, p. 6-12.

Marie Brown Etris and Ilene Warner. "What Your Nonlicensed Staff May Not Know About Pressure Ulcers." PADONA Journal. July/Aug 1995. P. 9-12.

Ilene Warner. "Why?"  PADONA Journal July/Aug 1996 p. 6.

Ilene Warner. "Telehealth Applications in Home Health Care." Home Healthcare Nurse. Oct. 1996. 790-796.

Ilene Warner. "Telemedicine Applications for Geriatric Care Management." Journal of Geriatric Care Management. Fall, 1996. P 20-23.

Ilene Warner. "Telemedicine Applications for Home Health Care." Journal of Telemedicine and Telecare. 1997; 3 Supp. 1:65-66.

Ilene Warner. "Whose Liability Was This, Anyway?" Home Health Insights, Jan/Feb. 1997 Vol 2 Issue 1. p 8-9.

Ilene Warner and Raymond Albert. "Avoiding Legal Land Mines in Home Health Care Nursing." Home Health Care Management and Practice, 1997. Vol. 9 No. 6, p. 8-16.

Ilene Warner. "Help Prevent Pressure Ulcers... Even While Your Patient is Hospitalized." Clinical Advisor Vol. 1 No. 2 Aug, 1997.

Ilene Warner and Alexander Beller.  "Electronic Home Visits to Improve Care And Decrease Costs." In *Handbook of Home Healthcare Administration, 2nd Ed*. Marilyn Harris, Editor. Gaithersburg: Aspen Press, 1997.

Ilene Warner. "Telehealth in Home Care Practice (Introduction)." In *Home Healthcare: Wired and Ready for Telemedicine*. Audrey Kinsella, Editor. Information For Tomorrow, 1997.

Audrey Kinsella and Ilene Warner. "Telehealth in Home Care Practice." Nurse Educator Vol 23 No. 3, 7-8 1998.

Audrey Kinsella and Ilene Warner. "Telehealth and Managing Congestive Heart Failure." Caring Magazine June 1998 14-18.

Ilene Warner. "Reflections on Care Management from a Health Professional's Perspective." PCMI Perspectives Oct. 1998 Anniversary Issue, 13-14.

Ilene Warner and Raymond Albert. "Liability for Neglect in Nursing Homes." Law and Social Work Practice: A Legal Systems Approach 2nd Ed by Raymond Albert, Springer, 2000.

Ilene Warner. "Talking with Older People about HIV/AIDS."  Nursing Spectrum, July 16, 2001 p. 6-7.

Ilene Warner. "Litigation of Nursing Home and Assisted Living Malpractice Cases." 4th Annual Legal Issues in an Age of Aging. Pennsylvania Bar Institute 2001.

Ilene Warner. "What's Inside the Third Shoebox?" Nursing Spectrum Vol. 11 No. 5PA, March 11, 2000 p. 6.

Ilene Warner, "Nursing and Long Term Care Concerns of Foot Care in the Elderly." In Clinics in Podiatric Medicine and Surgery: Foot Care for the Elderly: Podiatric Assessment, Education and Prevention 20 (2003) pp. 383-394.  Edited by Arthur E. Helfand, DPM, Elsevier Science.

Jack Ryan, Rebecca McMillen and Ilene Warner-Maron. Implementation of Consumer-Directed Services- New Jersey Department of Aging and Senior Services. February 2005.

Joan Klein, Allen Glicksman and Ilene Warner-Maron. Caregiver Nursing Protocol: Integrating Nursing Interventions with Social Work Services. March 2005.

# Presentations... ... ... ... ... ... ... ... ... ... ... ... ... ... .

"Ensuring an Abuse Free Environment." Temple University Seminars in Long Term Care Administration. Philadelphia, March 11, 1994.

"Supervision in Care Management." American Society on Aging. Philadelphia, July 20, 1995. With Bradley LeVan.

"Documentation Skills for the Ombudsman." Northwest Interfaith Movement. Philadelphia, August 14, 1995.

"Clinical and Financial Management of Wounds in Long Term Care." Institute for Continuing Education and Research. Harrisburg, March 20, 1996. With Marie Brown-Etris.

Various programs in Telehealth presented in Washington, D.C., Denver, Lexington, London, UK, Philadelphia, Crystal City, Albany, Atlanta, Ann Arbor, Nashville and Houston 1996-1999.

"Geriatric Emergencies." Numerous sites since 1996. American Healthcare Inst.

"Advanced Assessment and Management of Geriatric Patients." Numerous sites since 1997. American Healthcare Institute.

"The Role of Nursing Services in LTC." Institute on Continuing Education and Research, Philadelphia (multiple dates).

"The Alzheimer's Disease Protocol." American Society on Aging. Philadelphia, August 6, 1997.

"Alzheimer's Disease Update." Joint Aging-MH/MF Conference. Philadelphia, Sept. 26, 1997.

"Alternative Medicine and Care Management." Pennsylvania Care Management Institute. Valley Forge, PA  December 10, 1997. With Ronald Ciccone, MD.

"Malpractice in the Nursing Home." Institute on Continuing Education and Research." Philadelphia and Harrisburg, June 9 and 19, 1998. With Raymond Albert.

"Internet Skills for School Nurses." National Association of School Nurses Conference, Atlantic City, NJ July 22, 1998.

"Consumerism 101: Improving the Access of Consumers to Long Term Care Services." American Society on Aging. Philadelphia, July 29, 1998.

7

"Physical Aspects of Aging: Medical Conditions Common in the Elderly."
Pennsylvania Department of Aging Enrichment Training Conference on Aging
Issues, Hershey, PA. April 7, 1999.

"Racial and Ethnic Differences in the Health of the Elderly." American Society on
Aging. Philadelphia. July 13, 1999.

"Aging and Sexuality." Phila. Corporation on Aging. Philadelphia. July 22, 1999.

"Risk Management Issues Associated with Pressure Ulcers. Knoll Pharmaceuticals
Presentation on Wound Care. Atlantic City, NJ. August 5, 1999.

Certificate Program in Quality Assurance/Risk Management/Utilization Review.
Learning Tree University. (Multiple locations).

"Physical Aspects of Aging." Pennsylvania Department of Aging Enrichment
Conference. Harrisburg, PA. April 25, 2000.

Osteoporosis Training presented to PCA senior centers (10) March- July, 2000.

"Making Sense of Confusion: The Effects of Medications on the Mental Status of
the Elderly." Decision Making Capacity of Older Adults sponsored by the Delaware
County Aging and Behavioral Health Task Force. Aston, PA.  May 18, 2000.

"Sexuality Issues in Aging." Caregivers Support Conference, Toftrees at Penn State,
PA. June 30, 2000, New Jersey Caregivers/Respite Program, Longbranch, NJ,
November 2, 2000.

"Pills, Potions, Patches: A Geriatric Treatment Update." American Society on Aging
Philadelphia, PA. July 20, 2000 and the Pennsylvania Department of Health
Enrichment Conference 5/01.

"Malpractice in Long Term Care." American Association of Legal Nurse
Consultants, Philadelphia Chapter. Plymouth Meeting, PA. November 9, 2000.

Certification Program in Medicare for LTU Extension (Various Locations) 2001.

"HIV/AIDS Prevention" for Senior Citizen Centers, Philadelphia Corporation for
Aging, (10 sites) May-June 2001 and PCA personnel February 8, 2005.

"Health, Aging and Nutrition" Pennsylvania Department of Aging Nutritional
Conference (Pittsburgh and Reading) May 8 and 15, 2001.

"Aging, Disease or Neglect: Determining the cause of Abuse." Pennsylvania Care
Management Institute State College, PA May 16, 2001 and Montgomery County
Aging and Social Services June 6, 2001.

8

"Secrets from the Trenches-Effective Assessment Skills." (With Lois Hayman-El). American Society on Aging 2001 Summer Series on Aging. July 30, 2001.

"The Third Shoebox: Understanding the Reasons Older Adult Use Complementary and Alternative Medicine." American Society on Aging 2001 Summer Series on Aging. August 2, 2001.

"Altering Unhealthy Behaviors." American Society on Aging 2001 Summer Series on Aging. August 2, 2001.

"Litigation of Nursing Home and Assisted Living Negligence Cases." Pennsylvania Bar Institute Oct. 3, 2001 with Jerold Rothkoff, Esq. Philadelphia, PA.

"Nursing Home Malpractice." Pennsylvania Medical Directors Association. Oct. 5, 2001 with Todd Goldberg, MD, Malvern, PA

"Forensic Nursing and Nursing Home Litigation." Tri-State Legal Nurse Consultant Conference. November 15, 2001, New Brunswick, NJ.

"Nursing Home Malpractice." PESI panel discussion. March 1 (Phila.), March 6, 2002 (Pittsburgh), October 24, 2002 (Baltimore), October 25, 2002 (Washington), March 21, 2003 (Pittsburgh) and March 28, 2003 (Phila.).

"Malpractice in Long Term Care." Institute for Continuing Education and Research. April 29, 2002 (Harrisburg), May 7, 2002 (Pittsburgh), June 4, 2002 (Philadelphia), June 19, 2002 (Scranton), June 3, 2004 (Harrisburg), June 22, 2004 (Philadelphia), June 15, 2006 (Harrisburg), June 20, 2006 (Philadelphia).

"Malpractice in Long Term Care." Center for Health Care Education, October 22, 2002 (Somerset, NJ), April 24, 2003 (Edison, NJ), January 17, 2005 onboard the Star Princess.

"Falls Across the Continuum." Philadelphia Chapter of the American Association of Legal Nurse Consultants. May 9, 2002 Plymouth Meeting, PA with Barry Yaches.

"Sexuality and HIV Prevention." With Patricia Bradley, PhD and Shaler Moscovits. American Society on Aging, Philadelphia, PA  July 24 2002.

"Legal Issues Affecting Advanced Practice Nurses." With Michelle Daniel, JD RN. Lorman Education Services. Philadelphia, PA  October 29, 2002.

"Wound Documentation and Assessment in Home Health/Hospice." Penn Care at Home and Hospice. Philadelphia, PA. May 21, 2003.

"The Black Holes of Medicare." American Association of Life Care Planners. Las Vegas, NV. September 13, 2003.

"Litigation Issues of Pressure Ulcers." Delaware State Chapter of the American Association of Legal Nurse Consultants. Newark, DE October 1, 2003.

"Adapting Stephen Covey's Seven Habits of Highly Effective People for Nursing Home Management." Center for Continuing Education. Passaic, NJ October 24, 2003 and January 22, 2005.

"Project to Address the Needs of African American Caregivers." With Joan Klein MSW. International Care Management Conference. Philadelphia, PA. October 26, 2003.

"When Best Practices Meet Urban Realities: Telemedicine and Medical Technology in the Home Environment." With David Kutzik, PhD and "The Future of Applied Research on Older Persons in Urban Settings." (panel discussion). Conference on the Physical and Social Environments of Urban Living. October 31, 2003.

"Sexuality and Aging," Care Consortium of the Delaware Valley, Inc. Haverford, PA. February 10, 2004 and PCA February 8, 2005 and for the Center for Education and Research April 28, 2005, Tinton Fall, NJ.

"The Sexuality of Aging." Southwest Connecticut Agency on Aging. Fairfield University, Fairfield, CT. April 23, 2004 and the Center for Health Care Education aboard the Star Princess January 22, 2005.

"The Effects of Cognitive Impairment and Mental Illness in Late-Life Relationships." Southwest Connecticut Agency on Aging. Fairfield University, Fairfield, CT. April 23, 2004 and Center for Education and Research April 28, 2005, Tinton Falls, NJ.

"Coping for Caregivers- Issues and Strategies for Those Taking Care of Aging Loved Ones." United Behavioral Health (LifeEra). Astra Zeneca Pharmaceuticals. Wilmington, DE. November 9, 2004.

"Supporting African American Caregivers." Administration of Aging Alzheimer's Disease Demonstration Grants to States Grantee' Annual Training Meeting. Washington, D.C. November 17, 2004.

"An Intervention on Behalf of Caregiver's Health." 57th Annual Scientific Meeting of the American Geriatric Society. With Joan Klein, Allen Glicksman and Julie Norstrand. Washington, D.C. November 20, 2004.

"Racial and Ethnic Differences in Geriatric Health." Philadelphia Corporation for Aging. February 15, 2005.

"Integrating Nursing Interventions with Social Work Services" with Joan Klein and Allen Glicksman. American Society on Aging Joint Conference, Philadelphia. March 13, 2005. (Poster Presentation at the Powell Lawton Conference, April 27, 2005).

10

"Consumer Directed Care for the Aging and Disabilities Community." Warren County, NJ. The NJ Department of Health and Senior Services. May 24, 2005.

"The Role of the WOCN in Litigation." Poster presentation to the Northeast Region of the Wound, Ostomy, Continence Nursing Society Conference. Hershey, PA. October 21-23, 2005.

"HIV/AIDS Prevention in the Elderly in West Philadelphia." Poster presentation to the University of the Sciences in Philadelphia Fourth Annual Scholarly Day. Philadelphia, PA, April 20, 2006.

"Update on Current Issues in Long Term Care." Alex Makris, MD, Grace Harrison, NHA, Ilene Warner-Maron. Center for Health Care Education. Tinton Falls, NJ, April 25, 2006.

"End of Life Issues." Center for Health Care Education. Parsipany, NJ. May 2, 2006.

"Sexuality of Aging," "HIV and Aging" and "Drug Diversion in LTC." Institute for Continuing Education and Research June 27, 2006.

"Ethics Standards and Practices." Philadelphia Corporation on Aging, Philadelphia, PA. October 24, 2006.

"Issues of Malpractice in Hospice." Wissahickon Hospice. Bala Cynwyd, PA. April 10, 2007.

"Avoidable Versus Unavoidable Pressure Ulcers." University of Pennsylvania's Living with Dying Series. June 6, 2007.

"The Highly Regulated Nursing Home Industry"9th Annual Nursing Home Negligence Conference, 2007. Las Vegas, NV. September 10, 2007.

"Avoidable Versus Unavoidable Pressure Ulcers". 9th Annual Nursing Home Negligence Conference, 2007. Las Vegas, NV. September 10, 2007.

"Interpreting Medical Records." 14th Annual Garden State Paralegal Convention. Eatontown, NJ. October 12, 2007.

"Clinical Wound Care Update." Crozer-Keystone Home Health and Hospice. January 16, 2008

1/08

11

Ilene Warner-Maron
**Court Appearances- Qualified as an expert in nursing and/or gerontological nursing and/or nursing home administration and/or wound management in:**

| | | | | |
|---|---|---|---|---|
| 1. Federal Court (Phila) | 1993 | *McKee v. Riddle Memorial Hospital* | | |
| Defense witness- Benjamin Post | | Verdict for **Defense** | **Hospital** | |
| 2. Bucks County | 1993 | *Long v. Lower Bucks Hospital* | | |
| Defense witness- Pamela Post | | Verdict for **Defense** | **Hospital** | |
| 3. Delaware County | 1998 | *Pitassi v. Bryn Mawr Hospital* | | |
| Plaintiff witness- Michael Reed | | Verdict for **Plaintiff** | **Hospital** | |
| 4. Chester County | 1998 | *Palmer v. Chester County Hospital* | | |
| Plaintiff witness- Tim Gallogly | | Verdict for **Plaintiff** | **Hospital** | |
| 5. Philadelphia, PA | 1999 | *Saull v. St. Agnes Medical Center* | | |
| Defense witness- Benjamin Post | | Verdict for **Defense** | **Hospital** | |
| 6. Lakawanna County | 1999 | *Prisco v. Allied Nursing Homes* | | |
| Plaintiff witness- Powell and Powell | | Verdict for **Defense** | **NH premises** | |
| 7. Cumberland County, Maine | 2000 | *Blonder v. Casco Inn* | | |
| Plaintiff witness for Brann and Isaacson | | Verdict for **Plaintiff** | **Assisted Living** | |
| 8. New Castle County, DE | 2000 | *Miller v. Manor Care* | | |
| Plaintiff witness -Michael Carr | | Verdict for **Plaintiff** | **Nursing Home** | |
| 9. Middlesex County, NJ | 2001 | *Kretzmer v. Monroe Village* | | |
| Plaintiff witness- Alan Krumholtz | | Verdict for **Defense** | **NH employment** | |
| 10. Philadelphia, PA | 2001 | *Alper v. Wills Eye Hospital* | | |
| Plaintiff witness- Peter McNamara (video) | | | **Psych Hospital** | |
| 11. Delaware County, PA | 2001 | *Vinokur v DCMH* | | |
| Defense witness- Benjamin Post | | Verdict for **Defense** | **Hospital** | |
| 12. Philadelphia, PA | 2002 | *Wolfstern v. Methodist Hospital Nursing Center* | | |
| Plaintiff witness- John Salla | | Verdict for **Plaintiff** | **Nursing Home** | |
| 13. Morgantown, PA | 2002 | *Alwine v. Sugar Creek Rest* | | |
| Plaintiff witness- Zimmer Kunz | | Verdict for **Defense** | **Assisted Living** | |
| 14. Hollidaysburg, PA | 2002 | *Petak v. Connemaugh Hospital* | | |
| Plaintiff witness- Richard Stanko | | Verdict for **Defense** | **Hospital** | |
| 15. Maricopa County, AZ | 2003 | *Kauss v. Plaza Health* | | |
| Defense witness- Garvey Biggers | | **Settled during deliberations** | **Nursing Home** | |
| 16. Tampa, FL | 2003 | *Peeler v. Beverly* | | |
| Plaintiff witness- Julian Sanchez | | Verdict for **Defense** | **Nursing Home** | |
| 17. Queens County, NY | 2003 | *Nicholson v. Beth Israel* | | |
| Plaintiff witness- Eliot Sinel | | Verdict for **Plaintiff** | **Nursing Home** | |
| 18. Camden County, NJ | 2004 | *Winecki v. Olsten Home Health* | | |
| Defense witness- Jay Gebaur | | **Verdict for Defense** | **Home Health** | |
| 19. Franklin County, VT | 2004 | *Fredette v. Verdelle Valley* | | |
| Plaintiff witness- William Miller | | Verdict for **Plaintiff** | **Nursing Home** | |
| 20. Philadelphia, PA | 2004 | *Marker v. Temple University Hospital* | | |
| Plaintiff witness- George Schoener | | Verdict for **Plaintiff** | **Hospital** | |
| 21. Delaware County, PA | 2004 | *Anthony v. Riddle Hospital* | | |
| Defense witness- David Corejo | | Verdict for **Plaintiff** | **Hospital** | |
| 22. Oklahoma City, OK | 2004 | *Price v. South Park* | | |
| Plaintiff witness- Glendell Nix | | Verdict for **Plaintiff** | **Nursing Home** | |

| | | | |
|---|---|---|---|
| 23. Bronx, New York | 2005 | *Harpold v. North Bronx Hospital* | |
| Plaintiff witness- Robert Rosen | | Verdict for **Plaintiff** | Hospital |
| 24. Tulsa, OK | 2005 | *Ashley v. Frances Streital Center* | |
| Plaintiff witness- Ted Sherwood | | Verdict for **Defense** | Nursing Home |
| 25. Los Angeles, CA. | 2005 | *Morris v. Western Conv. Hospital* | |
| Plaintiff witness-Richard Chavez | | Verdict for **Plaintiff** | Nursing Home |
| 26. Delaware County, PA | 2005 | *Schultz v. St. James Place* | |
| Plaintiff witness-Martin Kardon | | Verdict for **Defense** | Assisted Living |
| 27. Maricopa County, AZ | 2005 | *Wheeler (Maynard) v. Pecos* | |
| Plaintiff witness-Martin Solomon | | Verdict for **Defense** | Nursing Home |
| 28. Wicominco County, MD | 2006 | *Copes v. Deers Head* | |
| Plaintiff witness-Charles Meltmar | | Verdict for **Plaintiff** | Nursing Home |
| 29. Green County, PA | 2006 | *Balog v. Guardian et al* | |
| Plaitiff witness-Tammy Harrelson | | Verdict for **Defense** | Nursing Home |
| 30. Lebanon County, PA | 2007 | *Brasher v. Manor Care* | |
| Plaintiff witness-John Zoranarich, JF | | Verdict for **Plaintiff** | Nursing Home |
| 31. Danville, Virginia | 2007 | *Musgrove v. MEA* | |
| Plaintiff witness- Jeffrey Downey | | Verdict for **Plaintiff** | Nursing Home |
| 32. Berks County, PA | | *McCauley v. St. Joseph's Med Center* | |
| Defense witness-Steven Costello | | Verdict for | Hospital |

## Hearings

Delaware County          1989-90          Approximately 15 guardianship and competency hearings as part of my role as supervisor of Adult Protective Services for the County of Delaware

Virginia Beach, VA    2004          Arbitration Hearing- *Selby v. Norfolk Health Care Center* Plaintiff's witness- Robert Guntharp

1985- Appointed Guardian of Person and Estate- Dorothy Berth Phila. Orphan's Court
2006- Appointed Guardian of Person-Pearl Allen- Philadelphia Orphans' Court

## Depositions

| | | | |
|---|---|---|---|
| 1. New Jersey | 1994 | *Mack v. Lisk* | (P)h |
| 2. New Jersey | 1995 | *DeBerto v. Manor Care* | (P)nh |
| 3. Maryland | 1996 | *Epps v. Home Nutrition Support* | (D)hh |
| 4. New Jersey | 1996 | *Labati v. Manor Care* | (D)nh |
| 5. North Carolina | 1998 | *Ely v. Cape Fear Medical Center* | (P)reh |
| 6. Delaware | 1998 | *Miller v. Manor Care* | (P)nh |
| 7. Maine | 1999 | *Blonder v. Casco Inn* | (P)al |
| 8. Arizona | 2000 | *Rauch v. Payson Care Center* | (P)nh |
| 9. New Jersey | 2000 | *Loschin v. Mediplex* | (P)nh |
| 10. Delaware | 2001 | *Farmer v. Courtland Manor* | (D)nh |
| 11. New Jersey | 2001 | *Kretzmer v. Monroe Village* | ()emp |
| 12. New Jersey | 2001 | *Jordan v. Bancroft School* | (P)hi |
| 13. Delaware | 2001 | *McWilliams (Hurschman) v. Manor Care* | (P)nh |

| | | | |
|---|---|---|---|
| 14. New Mexico | 2001 | *Epistacio Mazon v. Belen Health Care* | (P)nh |
| 15. Oklahoma | 2001 | *Ridgway v. Special Care* | (P)hh |
| 16. Oklahoma | 2001 | *Franklin v. Wewoka* | (P)nh |
| 17. Texas | 2001 | *Thomas v. Herman Manor* | (P)nh |
| 18. Oklahoma | 2001 | *Hays v. Mooreland* | (P)nh |
| 19. New Jersey | 2001 | *Rafaele v. Crest Haven* | (P)nh |
| 20. Oklahoma | 2001 | *Spradlin v. Sequoia* | (P)nh |
| 21. Illinois | 2002 | *Gray v. Avenue Care* | (P)nh |
| 22. Oklahoma | 2002 | *Healthstone v. Trinity* | (P)nh |
| 23. Indiana | 2002 | *Woods v. Bethany Village* | (P)nh |
| 24. Washington, D.C. | 2002 | *Pelluzo v. Washington Hosp. Cntr.* | (P)h |
| 25. New Jersey | 2002 | *Lamberton v. South Ocean Co. Hosp* | (P)h |
| 26. Oklahoma | 2002 | *Shram v. Catoosa* | (P)nh |
| 27. Oklahoma | 2002 | *Harness v. Vian* | (P)nh |
| 28. Pennsylvania | 2002 | *Mosser v. MCGC* | (P)nh |
| 29. Maryland | 2002 | *Bennett v. Manor Care* | (D)nh |
| 30. Oklahoma | 2002 | *Franklin v. Wewonka* | (P)nh |
| 31. Arizona | 2002 | *Gregory v. Cameron House* | (P)al |
| 32. Oklahoma | 2002 | *Powell v. Maplewood* | (P)nh |
| 33. Oklahoma | 2003 | *Whitson v. Wentumka* | (P)nh |
| 34. Oklahoma | 2003 | *Hoose v. Wildwood* | (P)nh |
| 35. Oklahoma | 2003 | *Grayson v. Poloco* | (P)nh |
| 36. Arizona | 2003 | *Maynard v. Pecos* | (P)nh |
| 37. Maryland | 2003 | *Duvall v. Lorien-Frankford* | (P)nh |
| 38. Illinois | 2003 | *Schwartz v. Glenview Terrace* | (P)nh |
| 39. Arizona | 2003 | *Coscino v. Scottsdale* | (P)nh |
| 40. Oklahoma | 2003 | *Cough v. Kimberly* | (P)hh |
| 41. Maryland | 2003 | *Ferguson v. Midlantic* | (P)nh |
| 42. Florida | 2003 | *Peeler (Sewell) v. Beverly* | (P)nh |
| 43. Virginia | 2003 | *Chapman v. Rockingham* | (P)nh |
| 44. Maryland | 2003 | *Woodland v. IHC* | (P)nh |
| 45. New Jersey | 2003 | *Markowitz & Franklin* | (D)nh |
| 46. Maryland | 2003 | *Faulkner v. Pineview* | (P)nh |
| 47. New Jersey | 2003 | *Rovner v. Virtua Hospitall* | (P)nh |
| 48. Arizona | 2004 | *Brown v. Heartstone* | (P)nh |
| 49. Maryland | 2004 | *Cichetti v. Manor Care* | (P)nh |
| 50. Ohio | 2004 | *Cook v. MCO & Arbors* | (P)nh |
| 51. New Jersey | 2004 | *Bodner v. Millhouse* | (P)nh |
| 52. Kentucky | 2004 | *Smith v. Spectra Care* | (P)hh |
| 53. Florida | 2004 | *Hall v. Columbia Bartow* | (P)wcc |
| 54. New Jersey | 2004 | *Simon v. Little NH* | (P)nh |
| 55. Ohio | 2004 | *Greenfield v. Heartland* | (P)nh |
| 56. Arizona | 2004 | *Blum v. Kivel Care Center* | (P)nh |
| 57. Washington, D.C. | 2004 | *Gass v. JB Johnson Nsg Center* | (P)nh |
| 58. Maryland | 2004 | *Duvall v. So. Maryland Hosp. Center* | (P)nh |
| 59. Ohio | 2004 | *Burkey v. Pickerington* | (P)nh |
| 60. Virginia | 2004 | *Selby v. Norfolk Care Center* | (P)nh |
| 61. Virginia | 2004 | *Little v. Nansemond Nrsg. Center* | (P)nh |

| | | | |
|---|---|---|---|
| 62. Oklahoma | 2004 | *Neal v. The Lakes* | (P)nh |
| 63. Rhode Island | 2004 | *Richardson v. Riverside* | (P)nh |
| 64. Oklahoma | 2004 | *Peterson v. Peak* | (P)nh |
| 65. Ohio | 2004 | *Chambers (Dorsett) v. Echo Manor* | (P)nh |
| 66. Maryland | 2005 | *Leahy v. Genesis* | (P)nh |
| 67. Arizona | 2005 | *Conklin v. Red Mt. and Life Care Centers* | (P)nh alf |
| 68. Virginia | 2005 | *Kemmer v. Genesis Williamsburg* | (P)nh |
| 69. Oklahoma | 2005 | *Ashley v. Frances Streitel Villa* | (P)nh |
| 70. Florida | 2005 | *Marshall v. I.H.S.* | (P)nh |
| 71. Washington, D.C. | 2005 | *Byrd (Turner) v. Washington Health Care* | (P)nh |
| 72. Oklahoma | 2005 | *Denton v. Evergreen* | (P)nh |
| 73. New Jersey | 2005 | *Budnick (DeGross) v. Regent Care* | (P)nh |
| 74. Maryland | 2005 | *Kirkendall (Cantymagli) v. Key Point* | (P)nh |
| 75. California | 2005 | *Morris v. Western Conv. Hospital* | (P)nh |
| 76. Maryland | 2005 | *Copes v. Deers Head Center* | (P)nh |
| 77. Arizona | 2005 | *Moreno v. Life Care Centers* | (P)nh |
| 78. New Jersey | 2005 | *Lauber v. Cornell Hall* | (P)nh |
| 79. Oklahoma | 2005 | *Henley v. Featherston et al.* | (P)nh |
| 80. New Jersey | 2005 | *Hunter v. Genesis/Kennedy Home Health* | (P)nh hh |
| 81. Rhode Island | 2005 | *Pisini v. Rhode Island Hospital* | (P)hosp |
| 82. Maryland | 2005 | *Brown v. Manor Care Largo* | (P)NH |
| 83. New Jersey | 2005 | *Johnson v Jersey Shore Hospital* | (P)hosp |
| 84. New Jersey | 2005 | *Hoffman v. Hackensack Univ Med Ctr* | (P)hosp |
| 85. Maryland | 2006 | *White v. Manor Care* | (P)NH |
| 86. Iowa | 2006 | *Olsen v. Manor Care* | (P)NH |
| 87. Georgia | 2006 | *Whitlock v. A.G. Rhodes Home* | (P)NH |
| 88. Virginia | 2006 | *Wehler v. Westport* | (P)NH |
| 89. Illinois | 2006 | *Chubinski v. Manor Care* | (P)NH |
| 90. Illinois | 2006 | *Millard (Joyce) v. Manor Care* | (P)NH |
| 91. New Jersey | 2006 | *Kosobucki v. Care One-Holmdel* | (P)NH |
| 92. Arizona | 2006 | *Woodruff v. Meadow Park* | (P)NH |
| 93. South Carolina | 2006 | *Truesdale v. HealthSouth* | (P)Reh |
| 94. New Jersey | 2006 | *Russick v. Virtua and Mediplax* | (P)H/r |
| 95. California | 2006 | *Reed v. Northridge/St. Ann's Hospice* | (P)NH |
| 96. Oklahoma | 2006 | *Cather v. Oklahoma Christian Home* | (P)NH |
| 97. Missouri | 2006 | *Holman v. Plaza Manor* | (P)NH |
| 98. Florida | 2006 | *Kramer v. West Boca Medical Center* | (P)hos |
| 99. New Jersey | 2006 | *DiStabile v. Pascack Valley Hospital* | (D)hos |
| 100. Delaware | 2006 | *Pietlock v. St. Francis Hospital* | (P)hos |
| 101. Illinois | 2006 | *Hodges (Bashara) v. Alden Wentworth* | (P)NH |
| 102. Kansas | 2007 | *Jakes v. Medicalodges* | (P)NH |
| 103. New Jersey | 2007 | *Graziano v. Holiday Care Center* | (D)NH |
| 104. Virginia | 2007 | *Musgrove v. Piney Forest* | (P)NH |
| 105. California | 2007 | *Sims v. Carehouse* | (P)NH |
| 106. Washington, DC | 2007 | *Elliot (Monk) v. WNF* | (P)NH |
| 107. Florida | 2007 | *Loftin v. Woodland Terrace* | (P)NH |
| 108. New Jersey | 2007 | *D'Onfrio v. St. Joseph Wayne Hosp* | (D)hos |
| 109. Arizona | 2007 | *Cox v. Freedom Inn* | (P)ALF |

| | | | |
|---|---|---|---|
| 110. Maryland | 2007 | *Fitzgerald v. Annapolitan* | (P)ALF |
| 111. Maryland | 2007 | *Farren v. Civista* | (P)hos |
| 112. P.A (Federal) | 2007 | *Perry v. Manor Care* | (P)NH |
| 113. Virginia | 2007 | *Thomas v. Manor Care* | (P)NH |
| 114. New Jersey | 2007 | *Rucinski v. Merwick Rehab.* | (P)NH- |
| 115. Illinois | 2007 | *Younglove v. Alexian Brothers* | (P)hos |
| 116. Illinois | 2007 | *Cibon (Conroy) v. Advocate Hospital* | (P)hos |
| 117. Maryland | 2007 | *Cuesta v. Sunrise* | (P)ALF |

*9/07*



Dr. Richard G. Stefanacci, *Executive Director*
Tel: 215.596.7466
Email: HPI@usip.edu

600 South 43rd Street
Philadelphia, PA 19104
www.usip.edu

February 23, 2008

Charles Meltmar, Esq.
Cochran Firm
1100 New York Avenue, NW
Suite 250 West
Washington, DC 20005

RE: Benjamin Sanders
Civil Case No. 07 1169

Dear Attorney. Meltmar,

I have had the opportunity to review the following documents with regard to the above captioned action:

1. SP Form 95
2. District of Columbia Superior Court Order appointing Mary Sanders as the Personal Representative of the Estate of Benjamin Sanders
3. Retainer agreement between Mary Sanders and The Cochran Firm
4. A supplement of SF Form 95 stating the basis of the Estate of Benjamin Sanders' claim
5. Report from Ilene Warner-Maron.
6. Death certificate
7. Funeral bills
8. Medical records from VA Medical Center's nursing center (CRNC) in Washington, DC
9. Medical records from VA hospital in Washington, DC
10. Fire regulations produced by the VA
11. Autopsy report including photographs
12. District of Columbia Fire & Emergency Medical Services Department Incident Report
13. District of Columbia Metropolitan Police Department Incident-Based Event Report

1

14. Deposition of Frances Henderson
15. Deposition of Dr. Raya Kheirbek
16. Deposition of Jerry Lee Phillips
17. Deposition of Scott Burgoon

The opinions expressed within this report are based upon my education and experience as a licensed Physician licensed in Pennsylvania who practices geriatric medicine after the completion of an internal medicine residency and geriatric fellowship as well as a certified medical director and fellow of the American Geriatric Society. The work completed with regard this case is done as part of my responsibilities as program director for the LTC Management degree program at the University of the Sciences in Philadelphia. In addition the opinions are supported by research with regard the standard of care for resident smoking in nursing facilities in the United States.

## Clinical Review

Benjamin Sanders who was born on May 21st 1941 was admitted to the Veterans Administration Medical Center Nursing Home (CNRC) on February 7th 2005.

Medical conditions included the following:
- Personal history Tobacco Use
- Chronic Obstructive Pulmonary Disease
- Mild cognitive deficit (MMSE 19/25)
- Mobility deficit related to CVA's, left hemiparesis, contractures
- Urinary incontinence
- Fall risks
- Chronic hypertension
- Diabetes mellitus
- Chronic low back
- Anemia
- Chronic Kidney Failure
- Dysphagia
- Mixed conductive and sensorineural hearing loss
- Benign monoclonal gammopathies
- Partial-complex seizure
- Bullous pemphigold

### Abilities

The CNRC monthly medical review documented on February 27th 2006 by Ashraf Alehossein noted Mr. Sanders with CVA/DVT – right MCA infarct with left hemiparesis and mild dysarteria, prior history three CVA's mild oropharangela dysphagia. Diet advanced to soft diet. Also in this note is the statement "Patient continues to smoke 3-4 cigarettes a day, has no plan to quit, reinforced the importance of smoke cessation with his comorbidity, continue to educate and encourage patient to attend smoke cessation class."

There is no documentation noted in the records reviewed that an assessment of Mr. Sanders with regard his risk of smoking was ever completed. On February 27th 2006 a progress note states that "Vet continues to smoke despite of frequent respiratory infection, he has no plan to quit, continue to reinforce and encourage" In the same note the neuro physical exam noted Mr. Sanders with expressive aphasia, speech understandable when he talks slow.

Neuropsychologist review on January 30th 2006 – "Do you often feel helpless? – Yes" On January 25th 2006 the Nursing Transfer / Acceptance Note classified Mr. Sanders as requiring total care with regard his functional status.

The January 25th 2006 Consult Rehab Medicine Inpt note stated that Mr. Sanders who arrived via a stretcher was unable to follow simple commands and not consistent with his responses. Also of note regarding this document is the comments with regard Mr. Sanders' pain.

Nursing RN Assessment completed on January 25th 2006 documents Safety/Risk Factors as being Falls and Seizures although no mention is made with regard Mr. Sanders Smoking Risks. In the same note Mr. Sanders was noted as having a fair level of understanding. An earlier Nursing RN Assessment noted Mr. Sanders to be completely immobile as well as being functional total care.

On January 24th 2006 the Audiology & Speech CNRC Annual Reassessment noted that Mr. Sanders required assistance in inserting/removing his hearing aids as well as maintaining the devices.

A Chaplain CNC Progress Note on January 23rd 2006 is of interest as it states "Patient should be reminded that he is in a safe and secure environment."

The Nutrition Assessment on January 23rd 2006 notes that Mr. Sanders required meal set up and feeding assistance at this time which was as per RN caring for patient.

CNRC Monthly Medical Review in January and December of 2006 as well as monthly notes in 2005 documents that "Patient continues to smoke 3-4 cigarettes a day, has no plan to quit, reinforced the importance of smoke cessation with his comorbidity, continue to educate and encouraged patient to attend cessation class."

The identification of Mr. Sanders as a smoker is consistent with other notes such as the one by Social Worker Nancy Carol Lee on November 11th 2006 that stated that "Veteran is a smoker and smokes cigarettes in the designated areas."

On October 12th 2005 a CNRC Bed Entrapment Assessment note is completed although again this is no documentation as a similar assessment being completed with regard MR. Sanders risk for smoking without supervision.

3

The AEC Nursing Note states that Mr. Sanders extremity strength in his left arm and leg to be absent. The Nursing RN admission Assessment on January 5th 2005 describes Mr. Sander as needing assistance with mobility, transfer, hygiene, oral care, eating, toileting and dressing.

The AEC Nursing Note on January 3rd 2005 notes that Mr. Sanders required oxygen therapy via nasal cannula.

*Pain*
The MICU-Carevue note on January 23rd 2006 notes that Mr. Sanders was moaning and complaining of pain at his IV site.

*Death*
On March 19th 2006 Mr. Sanders was found engulfed in flames in the smoking room. The resident and his electric wheel chair were in flames. This realization was first noted by another resident so there is no evidence that Mr. Sanders was being directly monitored.

Mr. Sanders death certificate note his death on March 19th 2006 as the direct results of second and third degree burns. Soot and smoke inhalation are noted as another condition contributing to his death.

**Standard of Care**
The standard of care for smoking of residents in skilled nursing facilities is that residents are restricted from smoking if they have any of the following:
- Decreased Mental Acuity (i.e. dementing illnesses)
- Physical restrictions (i.e. stroke or similar limitation that would limit resident's ability to extinguish a fire or remove themselves from a fire)
- Equipment Requirements (i.e. those requiring oxygen)

These restrictions are carried out through the following:
- Direct facility staff supervision from an assigned staff member
- Cigarettes are distributed by nursing staff
- There is a written smoking policy in place
- There is designated staff education available to support the facility policies

This Standard of Care is based on protecting residents from themselves as well as toward the entire residential population. This is based on a residents' ability to manage the active smoking task as well as being able to manage a smoking mishap. The later involves the following:
- Self extinguish cigarette or cigarette ashes
  - Ability to recognize situation and know corrective action
  - Ability to physically extinguish cigarette or ashes

- Remove self from an incendiary situation
  - Ability to recognize situation and know corrective action
  - Ability to physically remove self from scene

4

These standards with regard the classification and process for assessing smoking nursing home residents is consistent even beyond the United States. The Jury recommendation concerning the death of Mr. John Wilson stated that "All smokers "assessed as unsafe" must wear a smoking apron and be supervised in person by staff trained in fire safety." While these recommendations were made by a jury in Ontario Canada that point out that the United States Standards with regarding nursing home residents are consistent with those standards utilized outside of the United States as well.

In a letter dated January 6th 2006 Mr. William Bordner, Director Division of Nursing Care Facilities – Bureau of Facility License and Certification noted that "Residents that smoke should be assessed for their ability to safely smoke independently." In addition "Residents found to be incapable of smoking safely should have interventions developed to ensure that the resident smokes in a manner and environment that ensure their safety. Adequate supervision while smoking should be provided for those residents that require it." These statements are consistent with those found in nursing home facilities across the nation as they form the basis of the standard of care.

The Uniform Fire Code, NFPA I, Section 20.4.2.4(3) and Life Safety Code, NFPA 101, Section 19.7.4(3) states that smoking by patients classified as not responsible shall be prohibited. CNRC own Smoking Policy No. 19 notes that the staff is obligated to assess smoking habits of patients and identify high risk smokers.

After conducting an individual assessment, the Nursing Home determines that smoking by a resident poses a danger to him/herself or others, the Nursing Home may confiscate any and all smoking items and paraphernalia from the resident and make it available for use by the resident only at specific times and/or under the supervision of Nursing Home staff.

The records reviewed do not contain any individual assessment of Mr. Sanders' risk for smoking – documentation is limited to that of counseling regarding the risks of smoking without documentation of an individual assessment. Based on Mr. Sanders' medical conditions he meets the standard of care for being considered a resident at high risk for a smoking related accident and therefore would require direct supervision.

**References**
Uniform Fire Code, NFPA I, Section 20.4.2.4(3)
Life Safety Code, NFPA 101, Section 19.7.4(3):

Barker JC, Lewis DE. (1998) Smoking policy in long-term care: A survey of administrators in San Francisco. Journal of Health & Social Policy. 10(1):81-100.

Kochersberger G, Clipp EC. (1996) Resident smoking in long-term care facilities – policies and ethics. Public Health Reports. 111:66-70.

Jury Recommendations Concerning the Death of Mr. John Wilson

5

Letter to Nursing Home Administrators. From William Bordner, Director Division of
Nursing Care Facilities – Bureau of Facility License and Certification. January 6th 2006
on the Subject of Long Term Care Provider Bullentin No. 59. Elopement, Resident
Smoking and Water Temperatures.

Branigin W. Va. Report criticizes care center in fatal fire. Washington Post. December
22, 2000. Page B1.

Stefanacci RG. (2008) *Standard of Care regarding smoking policy in long-term care:
National Survey Data*. The Director. (Under Development)

Model Policy Regulating Smoking in Nursing Homes. Model regulation prepared in
March, 2003 by The Center for Social Gerontology, Inc., Ann Arbor, Michigan.
http://www.tcsg.org  http://www.tcsg.org/tobacco/NHregulating.htm (accessed February
15th 2008)

**Discussion**
Nursing home staff has a responsible to provide for the safety of each and every resident.
In the case of Benjamin Sanders this meant not only assessing and developing and
implementing a care plan around his risk for falls, development of pressure sores and
seizures but also with regard his smoking risk. The safe guarding of Mr. Sanders smoking
was not only a precaution for Mr. Sanders himself but for the entire faculty. An unsafe
smoking is not only a danger to himself but to the entire facility because of the risk of
igniting a fire that would cause damage beyond the smoker themselves.

Mr. Sanders was an older adult that was unable to complete a meal set and required
assistance with feeding. In addition Mr. Sanders was unable to complete the relatively
simple task of inserting/removing and caring for his hearing aids. A task that has less
complex tasks as well as risks then those involved with smoking. These needs were the
result of Mr. Sanders physical and mental illnesses that resulting in him being classified
as being functional total care. As a result of these factors Mr. Sanders was a high risk
smoker under the standards utilized by the vast majority of nursing homes across the
nation.

The issues involved in this case were that despite Mr. Sanders meeting the standard of
care for a long term care resident that should be monitored with regard his smoking – Mr.
Sanders was free to smoke independently. Had the standard of care been followed Mr.
Sanders would have been restricted to only receiving smoking materials from facility
staff and that while smoking that besides direct monitoring that he be outfitted with a fire
resistant apron and that an operational fire extinguish be available in the smoking area.

Mr. Sanders' case with regard his smoking illustrates a clear failure on the part of the VA
nursing home staff to identify a high risk behavior and implement a plan to allow for such
an activity in the safest manner possible. In the case of Mr. Sanders' given his severe
limitation secondary to his left hemipariesis this would have involved the nursing home

staff controlling the access to smoking materials, use of a smoking apron, and direct supervision of nursing home staff to Mr. Sanders when smoking in a designated smoking area. None of these safety measures were following by the VA nursing home staff.

In fact it is surprising that given that during several times during his nursing home admission that Mr. Sanders required oxygen that control over his smoking materials was not required by the VA nursing home staff again to provide for not only Mr. Sanders safety but that of the entire facility.

In summary the following failures by the CRNC staff directed contributed to Mr. Sanders' death.

1. Failure to complete or document an assessment of Mr. Sanders' risk for self managing his smoking while at the same time completing assessment for other risks such as those for falls, seizures, entrapment and pressure sores.

2. Failure to complete or document identification of Mr. Sanders' as a high risk resident for self-managing his smoking despite clear evidences of his risks because of his physical and mental deficits. These deficits resulted in Mr. Sanders being unable to complete a meal set and requiring assistance with feeding. In addition Mr. Sanders was unable to complete the relatively simple task of inserting/removing and caring for his hearing aids.

3. Failure to implement a plan with regard to Mr. Sanders' smoking safety which should have included control of smoking materials, direct supervision as well as wearing of smoking apron.

These failures with regard Mr. Sanders smoking directly contributed to his death and the pain and suffering leading up to that death. Pain and suffering that was not limited because of his medical conditions or age.

## Conclusions

Mr. Sanders' death was the direct result of a deviation from the standard of care with regard the management of nursing home residents' smoking. The staff of VA nursing home deviated from the standard of care with regard resident smoking which calls for assessment and active management of high risk residents just as is done for falls, seizures, entrapment and pressure sores.

These deviations directly resulted in Mr. Sanders' severe burns that were the cause of his death as well as pain and suffering prior to that point. All of the opinions expressed in this report are based on a responsible degree of medical certainty.

Sincerely,

Richard G. Stefanacci, DO, MGH, MBA, AGSF, CMD

7

# Richard G. Stefanacci, D.O., M.G.H., M.B.A., A.G.S.F., C.M.D.
CMS Health Policy Scholar 2003-04
Program Director – LTC Management Degree Program
Executive Director - Center for Medicare Medication Management
University of the Sciences in Philadelphia

As the Executive Director of the University of the Sciences in Philadelphia's **Center for Medicare Medication Management (cm³)**, Dr. Stefanacci continues to build upon his work as Health Policy Scholar at the Center for Medicare and Medicaid Services (CMS), as well as a geriatrician and professor at the first college of pharmacy in the country. At CMS he spent a year working on the policy and implementation of the Medicare Part D Pharmacy Benefit especially regarding access issues for frail elderly.

Dr. Stefanacci has been involved in LTC facilities since childhood and remains active in the LTC facilities today. Having served as Medical Director for several nursing facilities as well as continuing care retirement communities, he is well versed in the needs of these facilities' residents. He completed his clinical training at the University of Medicine and Dentistry of New Jersey in Internal Medicine and a fellowship in geriatrics. Dr. Stefanacci's geriatric experience includes over a decade as a medical director in several roles including a large primary care private practice, a full risk provider group, a Medicare + Choice HMO (M+C), and just recently for a PACE (Program for All-inclusive Care for the Elderly) program in Philadelphia. As a geriatrician for the St. Agnes LIFE program, Dr. Stefanacci is involved not only in direct patient care but in the implementation of quality assurance and utilization managed initiatives for the frail elderly. Currently Dr. Stefanacci is working with Newcourtland on several innovative new programs, including the introduction of an electronic dispensing and prescribing medication system throughout their network of LTC facilities. Newcourtland manages 1500 LTC beds in Philadelphia plus a recently opened LIFE center. Given this strong background in LTC Dr. Stefanacci has been tasked with developing at the university a **LTC Management Degree Program** for both undergraduates and graduate students. The LTC Management Degree Program will not only provide additional experts in this growing area but also serve as be a national and international resource for all stakeholders involved in LTC from facility based care to those based in the community.

He holds two Master's degrees one in Geriatric Health the other Business Administration. He is board certified in Quality Assurance and Utilization as well as being a Certified Medical Director (CMD). Dr. Stefanacci has served on the board of trustees at his alma mater A.T. Still University as well as the National PACE Association as well as participates actively in the American Medical Directors Association (AMDA), Academy of Managed Care Pharmacy, American Society of Consultant Pharmacist (ASCP), and the American Geriatrics Society (AGS). He has achieved recognition as a fellow in both the College of Physicians of Philadelphia and AGS as well as becoming an honorary lifetime member of ASCP. In addition to writing and lecturing extensively, he serves as editor-in-chief of the *Assisted Living Consult* and *Medicare Patient Management* as well as serving on the editorial boards of *Consultant Pharmacist, American Psychiatry News, LTC Interface, Managed Care,* and *Jefferson's Health Policy newsletter*.

Other specific areas of focus include the **Alzheimer's Disease Screening and Treatment Discussion Group** as well as the **Alliance for Advancing Senior Health** which is working with organizations that have common goals to increase the visibility of senior health issues and enhance the public health information infrastructure designed for and available to America's seniors.

Dr. Stefanacci is also using his expertise to serve as executive director of **HepTREC** (www.Heptrec.org). The Delaware Valley Hepatitis Treatment, Research and Education Center (HepTREC) is a not-for-profit organization established in 2002 to reduce the impact of viral hepatitis in the Delaware Valley. HepTREC fosters open communication and cooperation among academic medical institutions, community health care providers, public health workers and the public. The vision includes making accurate and up-to-date information on hepatitis readily available to the general public.

When asked, Dr. Stefanacci will state that his greatest accomplishment is "G4theG" which stands for the **Go4theGoal Foundation** (www.G4theG.org). A 501(c)3 public charity which was founded with his children, family and friends when his oldest son Richard was diagnosised with Ewing Sarcoma in May of 2006 developing an intense focus after his son's death on June 12th 2007. Just in the first year the foundation has raised well over a quarter of a million dollars assisting several hundred child affected by cancer while funding cutting edge research to find a cure.

# RICHARD G. STEFANACCI, DO, MGH, MBA, AGSF, CMD

| | |
|---|---|
| Home Address: | 300 West Maple Avenue |
| | Merchantville, NJ  08109 |
| | 215-266-7509 cell |
| | 856-665-1757 fax |
| | DrStefanacci@aol.com |
| | |
| Office Address: | University of the Sciences in Philadelphia |
| | 600 South 43rd Street |
| | Philadelphia, PA 19104 |
| | 215-596-7466 |
| | 215-596-7614 fax |
| | R.Stefan@usp.edu |
| | |
| Web Site: | http://www.healthpolicy.usip.edu |

Education:

| 1980-84 | B.A. | Boston College (Economics) |
|---|---|---|
| 1984-89 | D.O. | Kirksville College of Osteopathic Medicine |
| 2000-03 | M.G.H. | A.T. Still University of Health Sciences (ATSU) |
| 2000-03 | M.B.A* | Keller Graduate School of Management |
| | | *Graduated with distinction |

Postgraduate Training and Fellowship Appointments:

University of Medicine and Dentistry of New Jersey (UMDNJ)

| 1989-90 | Intern, Medicine |
|---|---|
| 1990-92 | Resident, Medicine |
| 1992-93 | Fellowship, Geriatrics |

Scholar Program

| 2003- 04 | Center for Medicare and Medicaid (CMS) |
|---|---|
| | Health Policy Scholar |

Faculty Appointments:

| 2006- | Associate Professor of Health Policy |
|---|---|
| | University of the Sciences in Philadelphia |
| 2003 - | Adjunct Assistant Professor of Medicine |
| | Department of Medicine, Thomas Jefferson University (TJU) |
| 2004- | Adjunct Assistant Professor |

Department of Pharmacy Practice
Temple University

2003-            Community Preceptor
                RWJ Clinical Scholars Program
                University of Pennsylvania

2003-            Visiting Scholar
                Department of Health Policy, TJU

2005 – 2007     Director Division of Geriatrics
                Department of Medicine, Graduate Health System

2001-02         Assistant Professor of Medicine
                Department of Medicine, UMDNJ

2001- 03        Preceptor in Geriatrics
                Department of Medicine, Graduate Health System

Committee Appointments:
2007   Alzheimer's Disease: A Megacommunity Approach to Prevention, Detection, Treatment, and Care

Executive Director:
2007-           Center for Medicare Medication Management
2007 -          HepTREC

Administrative Appointments:
2006 – 2007     Interim Director
                MPH Program, USP
2000- 2006      Board of Directors, Secretary
                A.T. Still University of Health Sciences
2003- 2005      Board of Directors
                National PACE Association
2002- 2003      Board of Directors, President
                Merchantville CHDO
1996 – 1998     Board of Directors
                South Jersey Alzheimer's Association

Hospital Appointments (Department of Medicine):
2004-  2007     Graduate Hospital – Philadelphia, PA
2000–           St. Agnes Medical Center – Philadelphia, PA
1993 – 2002     Kennedy Memorial Hospital – Stratford, NJ

Specialty Certification:
1993            Geriatrics *(board eligible)*
                American Association Physician Specialist
2000 - 2010     Certified Medical Director *(recertified in 2006)*
                American Medical Director Association
2001            Quality Assurance / Utilization Review
                American Board of QA & UR Physicians

Fellowship:
2004            American Geriatric Society
2005            College of Physicians of Philadelphia

University Ambassador
2006- present  Committee on Admissions *(member)*

<u>Licensure:</u>              Pennsylvania
                            *Certification – CPR (10-14-04) SAMC*

<u>Memberships in Professional and Scientific Societies:</u>
        2006 –          Pharmacy Quality Alliance
        2006 –          Academy of Managed Care Pharmacy
        2006 -          American Consumer Institute
        2004-           American Osteopathic Association
        2003-           American Society of Consultant Pharmacist
                        *Elected Lifetime Honorary Member of the Society (2005)*
                        2005 -      *Education Advisory Committee (EAC)*
        2000 -          American Medical Directors Association
                        2004        *GI Disease Managed CPG Chair*
                        2003 -      *Multidisciplinary Medication Managed*
                        2003 -      *Communications Committee*
                        2000 – 2003  *Clinical Practice Guidelines Committee*
        2001-           American Geriatric Society
                        2007 -      *Health Economics & Technology Committee*
                                    *Chair*
                        2005 – 2007  *Public Policy*
                        2001 - 2007  *Health Delivery Systems Committee*
                        2005        *Recognition as Outstanding Committee Member*
                        2005-  2006  *Vice-chair*
                        2004        *Practice Managed Group*
                        2004 -      *Mentor Program Participant*
                        2004        *Reviewer for AGS Fellowship*
        2000 -          American Board of QA & UR Physicians
        2001 -          National PACE
                        2001 -      *Primary Care Committee*
        2001 -          American Association Physician Specialist
        2001 -          American Association of Home Care Physicians
        2000 -          Pharmacy & Therapeutics Society
                        2003        P&T Institutional Care Working Group


<u>Advisory Boards</u>
        2006 –          Diabetes Stakeholders Group
                        *PA Dept of Health – Diabetes Prevention and Control Program*
        2006 –          Benefit Design Trust (www.bdtrust.org)
        2005            University of Nevada School of Medicine
                        *Office of Geriatric Medicine (Reynolds Grant)*


<u>Expert Clinical Reviewer</u>
        2004 -          HRSA Grant Reviewer
        2003 -          "Omnicare Geriatric Clinical Guidelines"
        2003            "Baseline Therapeutic Categories for Medicare Drug Discount
                        Program" published in Federal Register.

Editor-in-Chief
>    2004 -        *Assisted Living Consult*
>    2005 -        *Medicare Patient Management*

Editor
>    2004 -        Novartis: Senior Care Source
>    2006 -        Wyeth: Medicare Part D Plan Assessment
>    2006 -        Eisai: Senior Health Digest

Editorial Board
>    2007 –        *American Psychiatry News*
>    2007 -        CNS News Neurology
>    2005-         *Managed Care*
>    2005-         *LTC Interface*
>    2004 -        *Consultant Pharmacist*
>    2003 -        *TJU Health Policy Newsletter*
>    2000- 2007    *Caring for the Ages*
>    2001 - 2005   *The Journal of Quality Healthcare*

Advisory Board
>    2000 -        *Journal of American Medical Directors Association*
>    2004 -        "To Your Health" Radio Show – Medical Advisor

Manuscript & Research Reviewer
>    2004 –        Albert Einstein Healthcare Research Competition
>    2000 -        *Journal of American Medical Directors Association*
>    1999 -        *Journal of Clinical Outcomes Management*
>    1999 -        *Clinical Geriatrics*

Clinical Trails:
>    1997          EHR Lipid Managed (Merck)
>    1997-99       LIFE / CHF - Phase IV (Merck)
>    1999          Statins – Post-Marketing (Merck)
>    2000 –01      Diabetes - Phase IV (Takeda)

USP Lecturing Teaching Assignments:
Professor:
HP 809 – Comparative Health System (2006 – active)
Guest Lecturer:
GC 515 – Health Care Quality and Outcomes (2003 - active )
GC 650 – Economic Analysis of Healthcare Interventions (2004 – active)
HP 707 – Issues and Trends in Health Policy (2005 – active)
HP 890 – Health Policy Speakers Series (2005 – active)
HP 808 – Health Services and Policy (2006 – active)
HP 763 – Special Topics in Health Policy (2006 – active)
HP 797 – Research in Health Policy (2006 – active)


Peer Reviewed Lectures:
NY Medical Directors Association (11/12/07) CMS Update

Medicare Health Plans of America (11/01/07) Washington, DC. Improving the Treatment of Depression

Wharton Business School (10/9/07) Philadelphia, PA Entrepreneurial Management of Health Care Service Businesses: LTC / Elder Care

NCGNP (9/15/07) San Diego, CA. ALF: Past, Present and Future, Opportunities for APNs.

Formulary & Reimbursement Strategies for Effective Product Planning (9/10/07) Philadelphia, PA. Managing Today's Formulary Landscape under the Influence of Medicare

South Carolina ASCP (9/7/07) Charleston, SC. Medication Management in LTC

New York Association of Homes & Services for the Aging (NYAHSA) (5/23/07) Medication Management in LTC

Medical Library Association (5/22/07) Philadelphia, PA. Medicare A, B, C, & D.

Annual Leadership Summit on Medicare (5/8/07) Washington, DC. Medicare Medication Management in LTC.

AGS (5/6/07) Seattle, WA. Assisted Living Facility Clinical Practice Update.

AGS (5/3/07) Seattle, WA. Medicare Update.

CT ASCP "Senior Symposium" (4/27/07) Foxwoods, CT. Keynote: Medicare Part D Update.

AMDA (3/13/07) Hollywood, FL. Alzheimer's Disease.

University of Missouri Annual Geriatrics Conference (8/18/06) Columbia, MO. Medicare Part D in LTC.

National AGS Conference (5/3/06) Chicago, IL. Geriatrician in the Role for National Quality Improvement, Policy Change, and Advancement of the Geriatric Care Agenda

National AGS Conference (5/8/06) Chicago, IL. Optimizing Outcomes for Patients & Practice: Understanding & Affecting Current Health Policy

New Jersey LTC Administrators Conference. (3/21/06) Atlantic City, New Jersey. Medicare Part D: Impact on New Jersey LTC Facilities

American Medical Directors Association Annual Conference. (3/16/06) Dallas, Texas. Assisted Living Facilities: Innovative Models of Care

American Medical Directors Association Annual Conference. (3/16/06) Dallas, Texas. Management of Polypharmacy Issues in the Care of the Elderly

American Medical Directors Association Annual Conference. (3/18/06) Dallas, Texas. Medicare Part D: Impact on LTC

Pharmacy Society of Wisconsin (10/12/05) Madison, WI. Medicare Rx: Prescription drug plan transforming long term care.

Michigan Medical Directors Association (10/01/05) Troy, MI. Update on Medicare Part D.

WHCOA: Optimizing Medication Therapy Management (MTM) Programs (6/30/05) Philadelphia, PA
http://www.whcoa.gov/about/des_events_reports/PER_PA_06_30_05.pdf

AGS Annual Meeting (5/20/05) Orlando, FL. Understanding and Affecting MMA Implementation for Successful Outcomes. CME Available at www.americangeriatrics.org

ALFA Annual Meeting (5/4/05) Atlanta, GA. MMA Impact on ALFs.

AMCP Annual Meeting (4/21/05) Denver, CO. Mobilizing Efforts in Osteoporosis Management

AMDA Annual Meeting (3/18/05) New Orleans, LO. MMA Impact on LTC.

AMDA Annual Meeting (3/18/05) New Orleans, LO. Best Practices in ALFs

NPA Annual Meeting (10/10/04) Miami, FL. MMA's Impact on PACE

TJU: Disease Managed Colloquium (6/28/04) Philadelphia, PA. Chronic Care Improvement Program.

AGS Annual Meeting (5/20/04) Las Vegas, NV. Residential care communities: Problems & Opportunities

ASCP Annual Meeting (5/14/04) Scottsdale, AZ. A Gut Check – Management of Common GI Disorders in Seniors. www.scoup.net

NPA Annual Meeting (11/11/03) Seattle, WA. Changing Health Care Policies and Their Impact on PACE.

AGS Annual Meeting (5/14/03) Baltimore, MD. Assisted Living Facilities: Medicalization, Regulation and the Role of the Geriatric Health Care Professional.

KCOM Primary Care CME Conference (2/22/03) Las Vegas, NV. Geriatric Preventative Care

AGS Annual Meeting (5/10/02) Washington, D.C. A View from the Hill: An Examination on the Making of Medicare Policy.

KCOM CME Primary Care Update (6/25/01) Orlando, FL. Geriatric Medicine Review.

KCOM CME Primary Care Update (6/25/01) Orlando, FL. Innovative Delivery Systems in Medicine.

Peter Lamy Annual Conference, (5/4/01) Baltimore, MD. The PACE Model: Partnering with Geriatric Pharmacotherapy.

National Council on Aging Annual Conference (3/30/01) Washington, D.C. New Models of Health Care Delivery to Promote Community-Based Care.

AMDA Annual Symposium, (3/16/01) Atlanta, GA. Development and Implementation of Clinical Best Practices in LTC.

The National Managed Care Physician Leadership Conference (2/12/97) Washington, DC. Development of Primary Care-Based Ambulatory Medical Center.

Representative Educational Presentations:
AMCP (4/19/07) San Diego, CA. Medication Therapy Management – Presentation of new Research Findings.

AMCP (4/18/07) San Diego, CA. Medicare Part D Update.

Washington Society of Oncologist. MAC & Medicare Rx Issues (3/9/07) Seattle, WA

Medicare Part D – What is the Future? Strategic Research Institute (10/26/06) Washington, DC. Enrollment of Seniors.

Pharmaceutical Supply Chain Conference (9/19/06) Austin, TX. Understanding the impact of Medicare Part D in the overall supply chain management

ExI – Drug Pricing & Reimbursement [Keynote Speaker] (6/6/06) Philadelphia, PA.

ASCP – Second General Session MMA (11/10/05) Boston, MA.

NJ LTC Association Annual Meeting (11/1/05) Atlantic City, NJ.

PA ASCP – Part D Drug Benefit (6/6/05) King of Prussia, PA

Seniorcare Fellowship Program – MMA Panel (6/2/05) Montréal, Canada

MSNJ –MMA : Interpretive Guidelines (6/1/05) Iselin, NJ

ASCP – Second General Session MMA (5/17/05) Orlando, FL

The Society of Pharmaceutical & Biotech Trainers – MMA Overview (5/11/05) Boston, MA

Third Annual Midwest Geriatrics Symposium – General Session MMA (5/5/05) Champagin, IL

LTC Provider Conference – MMA's Impact on LTC (4/2/05) Honolulu, HI

FamiliesUSA: Conference for State Medicaid Directors -- MMA's Impact on Dually Eligible LTC Residents (1/28/05) Washington, DC.

ALPhA Keynote Speaker -- MMA's Impact on ALFs (1/20/05) Ft. Lauderdale, FL.

AMDA – Advanced Course on Clinical Managed and Medical Direction in LTC [MMA's Impact on LTC, Caring Where Seniors Live] (11/17/04) Houston, TX..

ASCP General Session- MMA impact on Consultant Pharmacist. (11/5/04) San Francisco, CA.

Eisai – MMA (9/21/04) Durham, NC

ASPC -- MMA (9/19/04) Lexington, KY

ManorCare – MMA (8/26/04) Toledo, OH.

Omnicare Annual Conference – MMA (8/16/04) Jacksonville, FL

NeighborCare P&T Committee – MMA (7/21/04) Baltimore, MD.

Philadelphia Corporation on Aging – MMA (6/25/04) Philadelphia, PA.

On Lok – MMA (6/23/04) San Francisco, CA.

John Hopkins University Cooper Ridge Institute – MMA (6/23/04) Sykesville, MD.

Managed Healthcare Fellowship – Breaking the Barriers: Fostering Patient-Centered Care (5/21/04) La Jolla, CA. How Managed Care is Preparing for the Potential Influx of Medicare Beneficiaries.

AGS - Developments and Trends in Managing Senior Care (5/16/04) Las Vegas, NV.

ASCP General Session- MMA impact on Consultant Pharmacist. (5/13/04) Scottsdale, AZ.

ALFA - MMA (5/7/04) Chicago, IL. MMA

Pharmaceutical Managed Care Update (5/6/04) Philadelphia, PA.

Omnicare P&T Committee – MMA (4/19/04) Atlanta, GA.

Seniorcare Fellowship (4/16/04) Tucson, AZ. Practical Strategies for Balancing Care and Cost in Senior Care and Where is the Senior Care Continuum Headed?

ASCP Legislative Update (3/16/04) Washington, DC. MMA Impact on LTC.

Assisted Living Pharmacy Association Annual Meeting (1/23/04) Ft. Lauderdale, FL. Medicare Legislation Impact on Assisted Living Pharmacies.

SCAN Health Plan (1/8/04) Long Beach, CA . Medicare Legislation Impact on SHMOs

Graduate Medical Residency Program (10/26/02) Philadelphia, PA Geriatric Medical Case Review

Institute for Nursing (3/11/98). Atlantic City, NJ. Alzheimer's Disease: Assessment and Treatment.

Primary Care Physician Conference (1/30/98). Paraponee, NY. Primary Care Network Development.

Underwood Hospital Staff Conference (11/11/97). Woodbury, NJ. Lipid Managed Clinical Review.

Primary Care Physician Conference (10/24/97). Philadelphia, PA. Primary Care Network Development.

Primary Care Physician Conference (8/19/97). Atlantic City, NJ. Lipid Managed Clinical Review.

Physician Conference (4/11/97) Kirksville College of Osteopathic Medicine, Kirksville, MO. Ambulatory Medical Center Development.

Hospital Staff Conference (4/1/97) Passaic, NJ St. Mary's Hospital.

MMA Specific Lectures:
*Sample Presentation: http://www.papharmacists.com/MedicareInfoCenter.htm*
Providers: *Every state with the exception of VT, NH, ME, AK, MT, WY, ND, NM (8)*
Senior Groups: PA, NJ, CA
Nat. Assoc: ASCP, AMDA, AGS, NoDONA, NPA, ALPhA, LTCPA, AMCP, ALFA
Legislators: LA, CO, NY, PA
Providers: BCBS (multiple states), AlohaCare, Wellpoint, SCAN, United Healthcare, Aetna, Cigna, Humana, VA
Pharma: Eisai, JnJ, Amgen, Genetech, Pfizer, Sanofi-Aventis, Novartis
LTCPP: Pharmerica, Neighborcare, Omnicare, Innovatrix
LTC Administrators: NJ, CT, MA, WI, NY, CA
LTC MD: NY, PA, NJ, WI, MA, CT, IL
Medcom: Pinnacle Healthcare, MediMedia, VoxMedia, Bimark, Zitter Group, Access Communications
Employer Groups: Palmer&Cay.
PBM: MedImpact.

Speaker Program Development:
Unintended Weight Loss *(Par Pharmaceuticals)*
Mental Health Management *(Forest Pharmaceuticals)*
MMA in LTC *(Pfizer)*
MRPs in Elderly *(Merck & Company)*

Pharmaceutical Product Speaker
Forest Laboratories – Antidepressants (Lexapro)
Par Pharmaceuticals – Weight loss (Megace EC)
Amgen – Anemia (ESA)

Advisory Boards Lead
Neuropathic pain, antidementia agents, antidepressants, diabetes, MTM,

Participant by Invitation:
Strategic Medicare Compliance and Administration Summit. *Medicare's Growing Influence on Physician Prescribing.* (2/11/08) Washington, DC.

Harte-Hanks Annual Pharmaceutical Conference. *Patient Advocacy and Impact on 21st Century Healthcare* (2/5/08) Park City, UT

CEAL – Medication Management in ALF (1/30/08) Washington, DC.

Pain Management in the Elderly – Improving Residents' Quality of Life (11/15/07) Philadelphia, PA

ASCP Product Theater Program: Improving Outcomes in Alzheimer's Disease for LTC-term Care Residents (11/15/07) Philadelphia, PA

The Cost of Alzheimer's Disease to Society. (11/8/07) Washington, DC. Alzheimer's Disease Screening Discussion Group.

Moderator – Politics in Healthcare. (3/22/07) Washington, DC. AstraZeneca's Capital Summit

The Evolving Medicare LTC Pharmaceutical Marketplace. (2/28/07) Orlando, FL. Managed Markets Summit

Evaluating the Effect of Medicare Part D on the Use of Counterfeit Drugs. (1/31/07) Philadelphia, PA. Secure Pharma.

Medicare A,B,C, and D's. (1/14/07) New Brunswick, NJ. University of Medicine and Dentistry of New Jersey Grand Rounds

Medicare A,B,C, and D's. (1/19/07 Philadelphia, PA. University of Pennsylvania Geriatric Grand Rounds

Medicare Part D – What is the Future? Strategic Research Institute (10/26/06) Washington, DC. Enrollment of Seniors.

Eastern Pennsylvania Geriatrics Society. Medicare D: Where Do We Go From Here. (10/14/06)

Pharmaceutical Supply Chain Conference (9/19/06) Austin, TX. Understanding the impact of Medicare Part D in the overall supply chain management

6th Annual Medicare & Medicaid Symposium – Impact of Medicare Part D on LTC (5/12/06) Baltimore, MD

University of Pittsburg: Clinical Update in Geriatric Medicine – Medicare Part D(3/23-3/25/06) Pittsburgh, PA

Chronic Kidney Disease and Anemia (3/16/06) AMDA Annual Meeting, Dallas, TX

ASCP Workgroup on MMA (1/31/05) Washington, DC

FamiliesUSA Health Action – Dual eligibles in LTC and the transition to Part D (1/28/05) Washington, DC

Disease Managed Colloquium – Moderator: Improving Health Outcomes for Medicare Beneficiaries (6/29/04) Philadelphia, PA

Health Policy Update: AGS (5/20/04) Las Vegas, NV

Technical Advisory Group on Physician Practices in Nursing Homes: HHS Office of the Assistant Secretary for Planning and Evaluation (4/29/04) Washington, DC

Clinical Red-Eye-Rounds: AMDA (3/7/04) Phoenix, AZ

Medicare Reform: ASCP (4/5/04) Washington, DC

National Medicare Prescription Drug Congress (2/27/04) Washington, DC

Addressing Racial and Ethnic Disparities in Care: AHRQ (7/9/03). Washington, DC.

Medical Economics Annual Editors Conference (3/24/00). New York, NY. Future Directions of Geriatric Care.

Critical Quotes & Links:
Newsweek, New York Times, Philadelphia Inquirer, Washington Post, Forbes, Investors Business Daily, Kaiser Network ,
(http://www.zwire.com/site/news.cfm?newsid=15396750&BRD=2185&PAG=461&dept_id=415898&rfi=8 ;
www.msnbc.msn.com/id/9712174/site/newsweek/)

Op Editorials
Stefanacci RG. Three simple solutions to cure Medicare prescription-plan ills. Philadelphia Inquirer. April 14, 2006. A15.

Television & Radio Media:
Caucus NJ [PBS NJ/NY], "To Your Health" Philadelphia Talk Radio (Regular guest), Other Talk Radio shows: WI, GA.

White Papers:
The Cost of Being Excluded: Impact of excluded medications under Medicare Part D on the dually eligible nursing home residents (ASCP) 2/16/05.
http://www.ascp.com/medicarerx/docs/ASCPPaperExcludedMeds.pdf
http://www.kaisernetwork.org/daily_reports/rep_index.cfm?DR_ID=28253

http://www.forbes.com/prnewswire/feeds/prnewswire/2005/02/17/prnewswire200502171705PR_NEWS_B_MAT_NY_NYTH158.ht ml
http://www.medicalnewstoday.com/medicalnews.php?newsid=20209#

Anemia in Older Adults: Treating Anemia to improve outcomes through Medicare Part D (Amgen) 11/8/05

Gaining Access to Medications for the Treatment and Prevention of DVTs for Medicare Beneficiaries (Sanofi-Aventis) 11/8/05

Fall Prevention: Starting from the Bed - Improving Treatment of Insomnia through the Medicare Part D Program (Sepracor) 10/12/05

Text Books (chapters)
Stefanacci RG, Lofland JH. (2005) The US Regulator's Perspective in Determining and Improving the Value of Healthcare Interventions. Chapter in Pizzi LT, Lofland JH. Economic Evaluation in US health Care.

Knight TK, Stefanacci RG. (2005) Pharmacist Involvement in Long-Term Care for Seniors. Chapter in Smith MI, Wertheimer AI, Fincham JE. Pharmacy and the US Health Care System.

Articles (peer reviewed journals):
Stefanacci RG, Kasseroler S. Medicare Reimburse Changes Effect on Geriatric Nurse Practitioners. Geriatric Nursing (in print)

Field RI, Stefanacci RG. Beyond Drug Coverage: The Cumulative Effect of Privatization Reforms in the Medicare Modernization Act. Saint Louis University Journal of Health Law & Policy (in press)

Stefanacci RG (2008) Unlocking Patient Power. American Psychiatry News. (in print) April.

Stefanacci RG (2008) Geriatric Medication Management. American Psychiatry News. (in print) March.

Stefanacci RG (2008) Treating Agitation in Dementia. American Psychiatry News. (in print) February.

Stefanacci RG (2008) Opportunities Beyond Traditional Medicare. CNS News Neurology. 1(1):8-10.

Stefanacci RG (2008) Opportunities Beyond Traditional Medicare. American Psychiatry News. 1(1):23-26.

Stefanacci RG (2008) Medicare medication management: Updating issues with Parts A, B, C, and D. Clinical Geriatrics. 16(1):25-27.

Stefanacci RG (2007) Medicare medication management: Updating issues with Parts A, B, C, and D. Clinical Geriatrics. 15(12):13-17.

Stefanacci RG. (2007) Current Implications for the Managed Care of Dementia. American Journal of Managed Care. 13(8):S203-05.

Stefanacci RG (2007) Medication Management in LTC & Beyond. CNS SeniorCare. Fall 2007. 6(4):4-5.

Stefanacci RG (2007) Medicare's LTC Expansion. CNS SeniorCare (in press - August)

Stefanacci RG (2007) Transitions in Transitions of Care. CNS News. November 2007. 9(11):12.

Stefanacci RG (2007) Medicare Access for CNS Prescription. CNS News. October 2007. 9(10): 16-17.

Stefanacci RG (2007) Why Doctors Are Afraid of Needles. CNS News. September 2007. 9(9): 14-15.

Stefanacci RG (2007) Designing a Health System for Good Behavior Annals of Long-Term Care.15(10):42-44.

Stefanacci RG (2007) Designing a Health System for Good Behavior Clinical Geriatrics. 15(10):16-20.

Stefanacci RG (2007) Medicare Part B's Changes Effect on Oncology. Hematology & Oncology News. 6(5): 29-32.
http://www.honionline.com/honi/images/stories/Magazine/May/2007/honi_2007_05_medicare.pdf

Stefanacci RG (2007) Medicare Part D, It Should Be All About Quality….Stupid! JAGS 55(7): 1134-1136.

Stefanacci RG (2007) Why Medicare Matters Allot. CNS News. August 2007. 9(8):13.
http://www.cnsnewsonline.com/index.asp?section_id=235&show=dept&s=d4&issue_id=312&article_id=8363

Stefanacci RG (2007) The Federal Prescription for Alzheimer's Disease. CNS News. July 2007. 9(7): 12-13.
http://www.cnsnewsonline.com/index.asp?section_id=235&show=dept&s=d4&issue_id=303&article_id=8174

Stefanacci RG (2007) Medicare Part D's Appealing Decisions. CNS News. June 2007. 9(6):11-12.
http://www.cnsnewsonline.com/index.asp?section_id=235&show=dept&s=d4&issue_id=297&article_id=7936

Stefanacci RG (2007) Reporting Medicare's CNS Quality Measures Pays. CNS News. May 2007. 9(5):12.
http://www.cnsnewsonline.com/index.asp?section_id=235&show=dept&s=d4&issue_id=279&article_id=7640

Stefanacci RG (2007) Tying Prescribers' Hands. CNS News. 9;4:10.
http://www.cnsnewsonline.com/index.asp?section_id=116&show=dept&issue_id=283&article_id=7553

Stefanacci RG (2007) Getting Paid through Medicare: Today & Tomorrow. CNS SeniorCare Spring 2007. 6(1): 14.
http://www.cnsseniorcare.com/index.asp?section_id=140&show=dept&issue_id=280&article_id=8087

Stefanacci RG (2007) The Medicare Beneficiary of the 21st Century Clinical Geriatrics. 15(8):27-30.

Stefanacci RG (2007) The Medicare Beneficiary of the 21st Century Annals of LTC. 15(8):26-28.

Bodenheimer T, Goodman J, Isham G, Nash D, Popik WC, Stefanacci RG. What now? Practical advice on how to reduce medical and pharmacy costs. Manag Care. 2007 Apr;16(4):36-7.

Stefanacci RG (2007) Medicare Part B's BIG Changes. Clinical Geriatrics. 15(6): 9-15.

Stefanacci RG (2007) Medicare Part B's BIG Changes. Annals of LTC. 15(6): 22-27.

Stefanacci RG (2007) Medicare Team Building. Clinical Geriatrics. 15(4):9-11.

Zarowitz B, Stefanacci RG, Hollenack K, O"Shea TO, Gruber J, Tangolos E. (2007) The Application of Evidence-Based Principles of Care in Older Persons: Alzheimer's Disease. JAMDA. 8:183-193

Stefanacci RG (2007) Medicare: Overtaxing Healthcare Provider. Clinical Geriatrics. 15(3):22-24.

Stefanacci RG (2007) Medicare: Reimbursement Politics, Clinical Geriatrics. 15(2):9-13.

Stefanacci RG (2007) Medicare: Reimbursement Politics, Annals of Long Term Care. 15(2):12-16.

Stefanacci RG (2007) Medicare: Prescribed Guidance, Clinical Geriatrics. 15(1): 21-24.

Stefanacci RG (2007) Medicare: Prescribed Guidance, Annals of Long Term Care. 15(1):41-44.

Stefanacci RG (2007) Medicare Update: Into the Doughnut Hole, P&T. 32(1) 27-28.

Stefanacci RG (2006) Medicare: Medicare Gets Tough, Clinical Geriatrics. 14(12):9-11.

Stefanacci RG (2006) Medicare: Medicare Gets Tough, Annals of Long Term Care. 14(12):16-17.

Stefanacci RG (2006) Implications of Medicare Part D in CKD Anemia Treatment, JAMDA. 7(9):S13-S16.

Stefanacci RG (2006) Is Racial Profiling Valid in Healthcare Today? A Review in General Medicine and LTC LTC Interface.7(9):24-27.

Stefanacci RG (2006) Medicare Part D: Filling in the Donut Hole, Clinical Geriatrics.14(11):15-17.

Stefanacci RG (2006) Medicare Part D: Filling in the Donut Hole, Annals of Long Term Care. 14(11):13-15.

Stefanacci RG (2006) Medicare Part D: Preventing Medication Errors, Clinical Geriatrics. 14(10) 9-11.

Stefanacci RG (2006) Medicare Part D: Preventing Medication Errors, Annals of Long Term Care. 14(10) 15-17.

Stefanacci RG (2006) Medicare Part D: Freedom of Speech, Clinical Geriatrics. 14(9):25-28.

Stefanacci RG (2006) Medicare Part D: Freedom of Speech, Annals of Long Term Care. 14(9):12-14.

Stefanacci RG (2006) Medicare Part D: Who Controls the Prescription?, Clinical Geriatrics. 14(8):6-9.

Stefanacci RG (2006) Medicare Part D: Who Controls the Prescription?, Annals of Long Term Care. .14(8):14-17.

Stefanacci RG (2006) Senior Enrollment in Medicare Part D, Managed Care. 15(7) supplement 3:9-13.

Stefanacci RG (2006) Medicare Part D: Why doesn't CMS understand LTC's difference?, Clinical Geriatrics. 14(7):10-12.

Stefanacci RG (2006) Medicare Part D: Why doesn't CMS understand LTC's difference?, Annals of Long Term Care. 14(7):12-14.

Stefanacci RG (2006) Why LTC Residents' Choice of Medicare Prescription Drug Plan Matters…..Allot LTC Interface.

Stefanacci RG (2006) Clarifying Medicare Part D Enrollment Numbers, Clinical Geriatrics. 14(6):6-8.

Stefanacci RG (2006) Clarifying Medicare Part D Enrollment Numbers, Annals of Long Term Care. 14(6): 13-15.

Stefanacci RG (2006) Medicare Part D: Avoiding a New Liability for Nursing Homes, Clinical Geriatrics. 14(5):11-13.

Stefanacci RG (2006) Medicare Part D: Avoiding a New Liability for Nursing Homes, Annals of Long Term Care. 14(5):10-12.

Stefanacci RG (2006) Medicare Part D: How to choose the 'right' prescription drug plan?, Clinical Geriatrics. 14(4):9-11.

Stefanacci RG (2006) Medicare Part D: How to choose the 'right' prescription drug plan? Annals of Long Term Care. 14(4):17-18.

Stefanacci RG (2006) Medicare Part D: The Danger of Being a Deer Caught in the Headlights. Clinical Geriatrics. 14(3):11-12.

Stefanacci RG (2006) Alleviating Confusion and Preventing Fraud in the Medicare Part D Program *P&T Journal*, 31(3):154-158.

Stefanacci RG (2006) Implementation of the Medicare Prescription Drug Program; Issues & Answers, Clinical Geriatrics. 14(2):6-8.

Stefanacci RG (2006) Implementation of the Medicare Prescription Drug Program; Issues & Answers, Annals of Long-Term Care 14(2)13-15.

Stefanacci RG (2005) Ten Most Asked Questions about the Medicare Prescription Drug Program, Clinical Geriatrics & Annuals of Long-Term Care, 13(12):12-15. http://www.hmpcommunications.com/cg/displayArticle.cfm?articleID=article5094

Stefanacci RG (2006) Are You Health Insurance Literate? A Question for Physicians. *Journal of the American Geriatrics Society* 54(1):166-168.

Zarowitz BJ, Stefanacci RG, Hollenack K, O'Shea T. (2006) The application of evidence-based prinicipals of care in older persons  JAMDA (in press)

Zarowitz BJ, Stefanacci RG, Hollenack K, O'Shea T. Management of Osteoporosis (2005) JAMDA (in press)

Stefanacci RG, Phillips S (2005) A real Y2K for Medicaid P&T Committees. *P&T*. 30(11):670-672. http://www.ptcommunity.com/ptJournal/fulltext/30/11/PTJ3011670.pdf

Stefanacci RG (2005) The Cost of Being Excluded: Impact of excluded medications under Medicare Part D on the dually eligible nursing home residents *JAMDA*, 6(6):415-420.

Stefanacci RG (2005) Creating Artificial Barriers for Vaccinations. *JAMDA*. 6(5):357-358.

Stefanacci RG (2005) Implications of the Medicare Modernization Act for the Care of Osteoporosis *Managed Care*. 14(8):13-17.

Stefanacci RG (2005) It's All About Access *P&T. 30(5): 2; Biotechnology Healthcare; Managed Care*

Stefanacci RG (2005) Strategies for Developing a Successful Medicare Part D Formulary *P&T. 30(5): 3-10; Biotechnology Healthcare; Managed Care* http://www.managedcaremag.com/supplements/0505_partd/MC_0505_PartD_suppl.pdf

Stefanacci RG, Cafiero, A (2005) Antidementia Agents: What Is Important in this Class *P&T*. 30(5):11-16; *Biotechnology Healthcare; Managed Care*

Stefanacci RG (2005) Generic Drugs...Just What the MMA Ordered *P&T Journal*, 30(8):462-466. http://www.ptcommunity.com/ptJournal/fulltext/30/8/PTJ3008462.pdf

Beers MH, Stefanacci RG (2005) The Class Effect: Is It Relevant to Geriatric?, *Journal of the American Geriatrics Society* 53(8): 1402-1405.

Stefanacci RG (2005) The FDA's Advisory Board on Drug Safety: The Right Medicine? *P&T Journal*, 30(3):176-177. http://www.ptcommunity.com/ptjournal/fulltext/30/3/PTJ3003176.pdf

Glass H, Stefanacci R (2005) Follow the Phase III leader *Script* 4:1-3. www.scriptmag.com

Stefanacci RG (2005) Assisted Living Facilities: AGS Position Paper AGS HCSC, *Journal of the American Geriatrics Society* 53(3):536-37.

Stefanacci RG (2005) Assisted Living Facilities: Optimizing Outcomes, *Journal of the American Geriatrics Society* 53(3):538-540.

Stefanacci, R.G. (2004) Medicare Reform's Impact on LTC. *Journal of the American Medical Directors Association* 5(6):418-421. http://download.journals.elsevierhealth.com/pdfs/journals/1525-8610/PIIS1525861004700146.pdf

Stefanacci, R.G. (2004) New Medicare Legislation. *Clinical Geriatrics*; 12(5):14-15. www.mmhc.com

Stefanacci, R.G. (2004) The Implications of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 for P&T Committees. *P&T Journal* 29(2):95-97. http://www.ptcommunity.com/ptjournal/fulltext/29/2/PTJ2902095.pdf

Stefanacci, R.G. (2003) The Expanding Responsibility of P&T Committees in Long-term Care. *P&T Journal*; 28(11):720-723. http://www.ptcommunity.com/ptjournal/fulltext/28/11/PTJ2811720.pdf

Stefanacci, R.G., Gilman, B.A., (2003) Case Study: Optimizing Medication Use in Skilled Nursing Facilities, *Journal of Quality Health Care*; 2(2):1-4

Stefanacci RG, Warden K, Lockett D. (2002) Case Study: Improving Clinical Resource Managed for a Group Practice. *Journal of Quality Health Care*. 1(4): 1-4.

Knight TC, Wertheimer AI, Stefanacci RG (2002) Identification of Potentially Inappropriate Medication Use in a Program of All-inclusive Care for the Elderly. *The Consultant Pharmacist*. 17: 1035-39.

Stefanacci RG, Clinger-DiGangi P, Leary D, Ishaq S.(2002) Using Computer-Based Learning to Get to Best Practices. *Journal of Quality Health Care* 1 (2):3-7.

Stefanacci RG (2002) Will Nurse Practitioners replace Physicians as attendings in LTC? *Journal of the American Medical Directors Association*, 2, 222-224. http://download.journals.elsevierhealth.com/pdfs/journals/1525-8610/PIIS152586100470208X.pdf

Stefanacci RG (2001) The Delivery of Geriatric Health Care *Clinical Geriatrics*, 9(6)13-14. http://www.mmhc.com/engine.pl?station=mmhc&template=cgfull.html&id=795


Abstracts (peer reviewed):
Reifsnyder J, Stefanacci RG, Maxwell T, Weschules D, Bain K. (2005) Optimizing medication management: Medicare Part D, MTMS, and Implications for hospice. 20th Annual National Hospice & Palliative Care – Organization Management & Leadership Conference. September 22-24[th] 2005 Hollywood, FL.

Brandt, N., Brodeur, M., Stefanacci, R. (2001). Meeting Pharmaceutical Care Needs of Community Dwelling Older Individuals: A Managed Care Model.

Chvat, J., Hackworth, E., Brandt, N., Stefanacci, R. (2001). Megace Used for Weight Gain in the Elderly: A Retrospective Chart Review of Community Dwelling Individuals presented at the University of Maryland Pharmacy Conference.

Stefanacci R, Cavalieri TA, Flynn J, Forman LJ, Pomerantz S. (1989) Physicians attitudes toward the use of advance directives. *The Gerontologist*, 34(Special Issue 1): 181-182, 1994.

Cavalieri TA, Denny A, Mohammad Z, Stefanacci R, Erde E, Forman LJ. (1989) Impact of the Patient Self Determination Act (PSDA) on adult patients admitted to an acute care facility. *The Gerontologist*, 33(Special Issue 1): 145, 1993.


Clinical Practice Guidelines
GI Disorders in LTC (2006) AMDA [chair]

Dementia (2006) AMDA

Anticoagulation Management in LTC (2006) AMDA

LTC Physician Information Kit: Determination of Medical Necessity of Rehabilitation Therapy Services (2003) AMDA

Multidisciplinary Medication Management (M3) Tool Kit (2003) AMDA

Dehydration and Fluid Maintenance (2002) AMDA


Position Statements Principle Author

Pay-for-performance (2005) AGS
*Under final review*

Managed Care Organizations (2003) AGS
http://www.americangeriatrics.org/products/positionpapers/AGS_MCO_final.shtml

Assisted Living Facilities (2004) AGS
http://www.americangeriatrics.org/products/positionpapers/ags_alf.shtml

Monograms Primary Author
Envisioning the Future of Senior Care: New Models, Improved Outcomes (2004)

The Senior Care Source: Facts, Figures, & Forecasts (2005, 2006)

Website Contributing Author
Philadelphia Inquirer Medicare Part D Q & A (2005)
http://www.philly.com/mld/philly/news/special_packages/phillytalk/qa_forum.htm

AGS Webcast Educational Session (2005) Medicare Part D Overview (in production)
www.americangeriatrics.org

Foundation for Health in Aging: Medicare Modernization Act Q&A (2004)
http://www.healthinaging.org/public_education/medicarePrescDrug_bill.php

Articles (non-peer reviewed journals):

Maxwell T, Stefanacci RG, Bain K, Weschules D. (2008) Evidence Based Prescribing in End-of-Life Care: The Gaps in Practice. Medicare Patient Management, (in press)

Stefanacci RG. (2008) Extending the Caregivers Reach, *Assisted Living Consult.* (in press)

Stefanacci RG (2008) Eliminating Barriers to Vaccination, Managed Care Magazine, (in press)

Stefanacci RG (2008) Implications of the Medicare Modernization Act for the Treatment of Osteoporosis, Managed Care Magazine, (in press)

Stefanacci RG. (2008) The changing politics of health care, *Assisted Living Consult.* 4(1):7-9.

Stefanacci RG. (2008) More than sticks and stones break bones, *Assisted Living Consult.* 4(1):29-32.

Stefanacci RG. (2008) Paying for the Right Stuff *Medicare Patient Management.*3(1):10-13.

Stefanacci RG. (2008) Vaccination Access Today *Medicare Patient Management*.3(1):38-40.

Stefanacci RG. (2007) Medicare Part D: Protection for Those Requiring Mental Health Drugs *ElderCare* 7(2):1-4.

Stefanacci RG. (2007) Who Should Define Us? Assisted Living Consult. 3(5):7-8.

Stefanacci RG. (2007) Quality Matters... In Fact It's All That Matters! *Medicare Patient Management*.2(5):6-7.

Stefanacci RG. (2007) The Rapidly Changing Face of Medicare  *Medicare Patient Management*.2(4):6-7.

Stefanacci RG. (2007) Extending the Caregiver's Reach  *Assisted Living Consult*. 3;4:6-8.

Stefanacci RG. (2007) Diagnosis and Treatment of DVT: New Guidelines, *Medicare Patient Management*. 2;3:17-21

Corso MT, Stefanacci RG. (2007) An Ounce of Prevention is Worth a Pound of Malpractice, *Medicare Patient Management*. 2;3:36-38.

Stefanacci RG. (2007) Creating a Caring Community, *Medicare Patient Management*. 2;3:8-11.

Stefanacci RG. (2007) Let's Not Lose Sight of Residents' Visual Health, *Assisted Living Consult*. 3;2:23-26.

Stefanacci RG. (2007) Check Please!, *Assisted Living Consult*. 3;2:9-11.

Stefanacci RG. (2007) Why many American children won't being seeing a Geriatrician, *Medicare Patient Management*. 2;2:26-29.

Stefanacci RG. (2007) Consumer Driven Primary Healthcare *Medicare Patient Management* 2;2:8-11.

Stefanacci RG (2007) Catered Living *Assisted Living Consult*, 3(1):8-9.

Stefanacci RG. (2007) Beyond 2007: A Very Different Medicare *Medicare Patient Management* 2;1:6-10.

Stefanacci RG. (2007) Managing the Donut Hole *Medicare Patient Management* 2;1:22-25..

Stefanacci RG (2006) Your Future in Geriatrics, AGS Fellows-in-Training Newsletter. (Fall 2006)

Stefanacci RG (2006) Editorial: Resident Safety is Everyone's Responsibility, *Assisted Living Consult*, 2;6:7-8.

Stefanacci RG (2006) Automatic External Defibrillators: Should Your Facility Have One? *Assisted Living Consult*, 2;6:31-32.

Stefanacci RG (2006) Residents, Facilities, and Providers Benefit from Change in Reimbursements for AL Visits, *Assisted Living Consult*, 2;6:33-34.

Stefanacci RG. (2006) Medicare's Push for Quality Health Care *Medicare Patient Management* 1(6):14-18.

Stefanacci RG. (2006) Editorial: Getting Value *Medicare Patient Management* 1(6):11-12.

Simonson W, Stefanacci RG (2006) Better Ways to Fall Asleep: The Danger of Benzodiazepines, *Assisted Living Consult*, 2;5:29-33.

Stefanacci RG (2006) Editorial: Good Behavior, *Assisted Living Consult*, 2;5:6-7.

Stefanacci RG, Pouliot D. (2006) Medicare Part D: Legislative Help for Patients, Pharmacists, and Physicians *Medicare Patient Management* 1(5):22-27.

Stefanacci RG. (2006) Editorial: Special Opportunity *Medicare Patient Management* 1(5):6-8.

Stefanacci RG (2006) Medicare Fraud & Confusion, *Assisted Living Consult*, 2;4:20-23.

Stefanacci RG (2006) Editorial: Impact, *Assisted Living Consult*, 2;4:6-7.

Stefanacci RG (2006) Medicare Part D: Where Do We Stand? Where Are We Going?, *Assisted Living Consult*, 2;4:12-16.

Stefanacci RG. (2006) Learning from Experience *Medicare Patient Management* 1(4):28-30.

Stefanacci RG. (2006) Where is Medicare Part D Headed Now? *Medicare Patient Management* 1(4):11-16.

Stefanacci RG. (2006) Editorial: End of Life Care *Medicare Patient Management* 1(4):6-7.

Stefanacci RG (2006) Medicare Part D and Medically Necessary Medications *ElderCare* 6(1): 10-11.

Stefanacci RG. (2006) Editorial: Really Being Resident Focused *Assisted Living Consult* 2(3):6-7.

Stefanacci RG. (2006) Medicare's Cliff *Medicare Patient Management* 1(3):6-7.

Stefanacci RG. (2006) Oh the Places You'll Go,... *Medicare Patient Management* 1(3):8-9.

Stefanacci RG. (2006) From Profession to Business: The Corporatizing of American Medicine *Medicare Patient Management* 1(3):10-13.

Stefanacci RG. (2006) Medicare Finances 101 *Medicare Patient Management* 1(3):15-24.

Stefanacci RG. (2006) Opting Out of Medicare *Medicare Patient Management* 1(3):32-35.

Stefanacci RG. (2006) Reading the Tea Leaves for Medicare Part D *Medicare Patient Management* 1(3):44-48

Stefanacci RG (2006) P4P: Long-Term Care's Needs Are Unique, *Caring for the Ages*, 7(4):15

Stefanacci RG (2006) Preventing Falls Assisted Living Consult, 2(2):6-7.

Stefanacci RG (2006) Fall Prevention Starts in Bed Assisted Living Consult, 2(2):17-19.

Stefanacci RG. (2006) Reading the Tea Leaves for Medicare Part D *Medicare Patient Management* 1(2):44-48.

Stefanacci RG. (2006) Medicare – Another Etiology for Dizziness. *Medicare Patient Management* 1(2):6-8.

Stefanacci RG. (2006) Medication Rx Coverage: The A, B, C, and Ds *Medicare Patient Management* 1(2):8-17.

Glass H, Stefanacci RG, Sevgen F, Barnett K, Morrow B, Smith W, Resnick J. (2006) The Medicare Modernization Act and Its Implications for Pharmaceutical Marketing, Product Management Today. 17(2):14-21.

Stefanacci RG (2006) Medicare Part D and Your Patient, Pennsylvania Medical Society Journal Newsletter. February 2006.

Stefanacci RG, Connelly SB, Cavallaro B, Gerbino P. (2006) A Primer for Medicare Part D Plan P&T Committees. *Medicare Patient Management* 1(1):31-37.

Stefanacci RG (2006) Disparity in Assisted Living: An Honest Self-Assessment Assisted Living Consult, 2(1):14-17.

Stefanacci RG (2006) Clinical Marketing Assisted Living Consult, 2(1):6-7.

Stefanacci RG. (2006) The Real 800-Pound Gorilla *Medicare Patient Management* 1(1):5-6.

Stefanacci RG. (2006) Medicare Prescription Drug Coverage – What It Means for Today and Tomorrow *Medicare Patient Management* 1(1):7-12.

Stefanacci RG (2005) Ethical Dilemmas – Caring to Know *(physician attitude about Medicare Part D)*, *Caring for the Ages*, 6(12):26.

Stefanacci RG (2005) Healthcare Tipping Points Assisted Living Consult, 1(6):6-7.

Stefanacci RG (2005) Managing Parkinson's Disease: The impact of Medicare's new prescription drug benefit, *Schwarz Pharma Parkinson's Report*, Winter: 4-6.

Stefanacci RG (2005) The Best ALF Prescription Drug Plans Assisted Living Consult, 1(5)20-22.

Stefanacci RG (2005) Disaster Preparedness: Planning Now Can Prevent Tragedy Later Assisted Living Consult, 1(5):6-7.

Stefanacci RG (2005) Ethical Dilemmas – Donut Holes *(coverage options during gap in Medicare Part D coverage)*, *Caring for the Ages*,6(11):33.

Stefanacci RG (2005) Caring in Crisis, *Caring for the Ages*, 6(11):3.

Stefanacci RG (2005) Ethical Dilemmas – Boundaries *(nursing facility assistance of resident enrollment in Medicare Part D)*, *Caring for the Ages*, 6(10):24.

Stefanacci RG (2005) Ethical Dilemmas – Benevolent Neglect *(limits of care)*, *Caring for the Ages*, 6(9):23.

Stefanacci RG (2005) Really Caring Where Seniors Live Assisted Living Consult, 1(4):6-7. http://www.assistedlivingconsult.com/issues/01-04/ALC1-4_Editor.pdf

Bringewatt R, Stefanacci RG (2005) The Medicare Modernization Act May Help ALFs Assisted Living Consult, 1(4):8-19. http://www.assistedlivingconsult.com/issues/01-04/ALC1-4_MMA.pdf

Stefanacci RG (2005) The New Medicare Prescription Drug Benefit........What You Need to Know Now Caring Today.

Stefanacci RG (2005) Ethical Dilemmas – News Unworthy *(end of life care)*, *Caring for the Ages*, 6(8):9.

Bringewatt R, Stefanacci RG (2005) Special Needs Plan Provisions of Medicare Modernization Act may help ALFs Assisted Living Consult, 1(3):12-14.

Stefanacci RG (2005) What a Pain! Assisted Living Consult, 1(3):6-7. http://www.assistedlivingconsult.com/issues/01-03/ALC1-3_Editor.pdf

Stefanacci RG (2005) MTMS and the Million Dollar Question: How Will ALF Residents Benefit? Assisted Living Consult, 1(3):19-21. http://www.assistedlivingconsult.com/issues/01-03/ALC1-3_MTMS.pdf

Stefanacci RG (2005) Interview with Dr. Richard Stefanacci, Managed Care, 14(5): 53-58.

Stefanacci RG (2005) Caring Where Seniors Live, USP Magazine, 94(4):12-13.

Stefanacci RG (2005) Choosing a Medicare Drug Discount Card and Beyond......, Senior Resource Guide.

Stefanacci RG (2005) Ethical Dilemmas – You've Got Mail *(physician email)*, *Caring for the Ages,* 6(6):13.

Stefanacci RG (2005) Ethical Dilemmas – Weight....Numbers Can Lie *(quality measures)*, *Caring for the Ages,* 6(4): 7.

Stefanacci RG (2005) Moving Beyond Commodity Pricing.....Pay-for-Performance, *Jefferson University Health Policy Newsletter,* (in press)

Stefanacci RG (2005) The Benefit of Staying Put, Assisted Living Consult, 1(2):6-7. http://www.assistedlivingconsult.com/issues/01-02/ALC1-2_Editor.pdf

Stefanacci RG (2005) Acute Change of Condition, Assisted Living Consult, 1(2):22-24. http://www.assistedlivingconsult.com/issues/01-02/ALC1-2_AMDA.pdf

Podrazik PM, Stefanacci RG (2005) Negotiating the Complexities of the LTC Continuum, Assisted Living Consult, 1(2):8-17. http://www.assistedlivingconsult.com/issues/01-02/ALC1-2_Negotiating.pdf

Stefanacci RG (2005) As the MMA Storm Moves Toward Us...... Assisted Living Consult, 1(2):15-17. http://www.assistedlivingconsult.com/issues/01-02/ALC1-2_MMAStorm.pdf

Stefanacci RG (2005) Ethical Dilemmas – Pay me now or *later (Provision of non-covered drugs under Medicare Part D)*, *Caring for the Ages,* 6(3):19.

Stefanacci RG (2005) Ethical Dilemmas – Driving Miss Daisy *(driving restrictions)*, *Caring for the Ages,* 6(2):11.

Stefanacci RG (2005) Falls & Fall Risk, Assisted Living Consult, 1(1):26-32. http://www.assistedlivingconsult.com/issues/01-01/ALC1-1_FallsRisk.pdf

Stefanacci RG, Bolhack S. (2005) Networking the Assisted Living Facility with the Community, Assisted Living Consult, 1(1):14-18. http://www.assistedlivingconsult.com/issues/01-01/ALC1-1_Networking.pdf

Stefanacci RG (2005) Storm Warning: MMA's Impact on ALFs, Assisted Living Consult, 1(1):19-21. http://www.assistedlivingconsult.com/issues/01-01/ALC1-1_StormWarning.pdf

Stefanacci RG (2005) Assisted Living Consult: What's in a name?. Assisted Living Consult, 1(1):6-7. http://www.assistedlivingconsult.com/issues/01-01/ALC1-1_Editorial.pdf

Stefanacci RG (2005) Ethical Dilemmas – Give me a shot *(restrictions on vaccinations)*, *Caring for the Ages*, 6(1):28.

Stefanacci RG (2004) Ethical Dilemmas – Extortion *(malpractice settlements)*, *Caring for the Ages*, 5(12):25.

Stefanacci RG (2004) Ethical Dilemmas – My Wishes *(following patient end of life care)*, *Caring for the Ages*, 5(11):20.

Stefanacci RG (2004) Ethical Dilemmas – More Hanging Chads *(seniors right to vote)*, *Caring for the Ages,* 5(10)10.

Stefanacci RG (2004) Ethical Dilemmas – Fire Control *(Pharmaceutical representatives' involvement in NFs)*, *Caring for the Ages,* 5(9) 9.

Stefanacci RG (2004) Assuring Individualized Pharmacotherapy for the Elderly, *Jefferson University Health Policy Newsletter*, September 2004; 10. (Reprinted in Senior Care Managed)

Stefanacci RG (2004) The Health Policy Debate Regarding Long-term Care Hospitals, *Jefferson University Health Policy Newsletter*, September 2004; 4.

Stefanacci RG (2004) Ethical Dilemmas – Just a Joke…..Right, *Caring for the Ages,* 5(8):19.

Stefanacci RG (2004) Ethical Dilemmas – A Little Something Extra, *Caring for the Ages,* 5(7):22.

Stefanacci RG (2004) Ethical Dilemmas – Disparities, *Caring for the Ages,* 5(6):12.

Stefanacci RG (2004) Ethical Dilemmas – The Oath, *Caring for the Ages,* 5(5):7.

Stefanacci RG (2004) Ethical Dilemmas – Do No Harm, *Caring for the Ages,* 5(4):11.

Stefanacci RG (2004) The Impact of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003. *Jefferson University Health Policy Newsletter*, 17(1): 7. http://www.jefferson.edu/dhp/HPN/HPN-03-04.pdf

Stefanacci RG (2004) Hospital Quality Measures, *Jefferson University Health Policy Newsletter*, 17(1): 4. http://www.jefferson.edu/dhp/HPN/HPN-03-04.pdf

Stefanacci RG (2004) Ethical Dilemmas – Unsafe Discharge, *Caring for the Ages,* 5(3):25.

Stefanacci RG (2004) Ethical Dilemmas - Adversaries, *Caring for the Ages,* 5(2):18-19.

Stefanacci RG (2004) Ethical Dilemmas – Disagreeable Payers, *Caring for the Ages,* 5(1):4-6.

Stefanacci RG (2003) The Interdisciplinary Team, *Jefferson University Health Policy Newsletter*, 16(3):8-9. http://www.tju.edu/ohp/HPN/HPN-09-03.pdf

Stefanacci RG (2003) CMS Health Policy Scholar Program, *Jefferson University Health Policy Newsletter*, 16(3):4. http://www.tju.edu/ohp/HPN/HPN-09-03.pdf

Stefanacci RG (2002) "Non-Chemical" Therapies Reduce ADRs, *Caring for the Ages*, *3(10):32-33.* http://www.amda.com/caring/october2002/technology.htm [Utilized for the AMDA Curriculum on Geriatric Clinical Practice for LTC Faculty Training Kit]

Stefanacci RG (2002) Bring Your Team Together through Technology, *Caring for the Ages*, 3(60): 18 http://www.amda.com/caring/june2002/technology.htm

Stefanacci RG (2001) Reducing Medical Mistakes with Technology, *Caring for the Ages*, 3, 12. http://www.amda.com/caring/december2001/technology.htm

Stefanacci RG (2001) Technology in LTC: Getting a Jump Start at the Bedside, *Caring for the Ages*, 2, 20.

Stefanacci RG (2001) Time for Technology in LTC, *Caring for the Ages*, 8, 3-4. http://www.amda.com/caring/august2001/technology.htm

Stefanacci, R.G. (2001). Managed Care Principles that Work for LTC, *Caring for the Ages*, 2, 3 - 4.

Stefanacci, R.G. (2001). The EMR Solution. *Physicians and Computers*, 18, 36-27.

Stefanacci, R.G. (2000). Two Doctors Add Spice to Their Careers. *The Medical Economics Audio Digit*, 3.

Stefanacci, R.G. (2000). The Future of Electronic Records. *Physicians and Computers*, 18, 36 –37.

Stefanacci, R.G. (1999). We're a Group, But We Feel Like Soloists. *Medical Economics*, 216-225.

Stefanacci, R.G. (1998). Developing an Ambulatory Medical Center. *Building the Foundations*, 2-8.

Stefanacci, R.G. (1987). From Profession to Business: The Corporatization of American Medicine. *Student Doctor*, 16-18.

Career History

University of the Sciences in Philadelphia, Center for Medicare Medication Management
   2004 -

### FOUNDING EXECUTIVE DIRECTOR

Building upon its pharmaceutical expertise, University of the Sciences is extending its reach by launching the USP Center for Medicare Medication Management (CM³). The Center for Medicare Medication Management is meant to address the problems the United States is facing caused by the increasing number of seniors, growing number of geriatric medications available, and anticipated surge in pharmaceutical costs from both increased prices and utilization increases resulting from the introduction of the Medicare Part D benefit. While many have referred to this as the coming together of forces to develop a perfect storm, USP believes this is the perfect opportunity to provide the assistance needed to lead sound pharmaceutical policy.

The mission of the Center for Medicare Medication Management is to improve health care systems regionally, nationally, and internationally. This will be accomplished primarily through facilitating the implementation of systems of care based on a clear understanding of the relevant health policy as well as paying careful attention to affecting health policy through supportive services to public policy leaders. The major focus is in the area of drug therapy especially with regard to frail elders and the Medicare Prescription Drug Benefit. A secondary focus is the efficient and effective use of interdisciplinary care teams which includes an occupational therapist, a physical therapist, a physician assistant, and a pharmacist. This will build upon USP's strength as the first college of pharmacy as well as a leader in health related graduate studies.

Center for Medicare and Medicaid Services                                    2003 - 2004

### HEALTH POLICY SCHOLAR

The CMS Health Policy Scholars Program is a cooperative agreement between CMS, four professional medical associations, and the institutions employing selected scholars. The program aligns with CMS's goal to reach out to constituency groups with a particular focus on provider organizations. Through the program, CMS hopes to improve communications with providers, making it easier to understand CMS programs and comply with Medicare regulations and instructions. Scholars have the opportunity to bring provider perspectives and concerns to CMS at the crucial stages of policy development.

*Recommending Medical Association:* American Geriatrics Society
*Length of Assignment:* 1 year – July 2003 through June 2004
*CMS Health Policy Scholar Assignment:*
Dr. Stefanacci works in the front office of the Health Plan Policy Group, Center for Beneficiary Choices, reporting to the Director and the Associate Director. He is assigned a range of responsibilities related to the Group's activities, including:

-   Policy and guidance related to Managed care formulary issues;
-   Research and analysis related to Medicare competition and drug proposals;
-   Application evaluation of LTC Transitional Assistance sponsors;

- Policy development and oversight related to Managed care plans designed to meet the needs of special populations (e.g., dual eligibles, frail elderly, etc.);
- Clinical perspectives on beneficiary rights and appeals activities.

Dr. Stefanacci's tasks will involve researching and writing papers and memoranda, review of legislation and other proposals, participation in workgroups related to areas within the Group's purview, and briefing Group and Agency leadership.

New Courtland (www.NewCourtland.org)                                     2007 - Current

### CLINICIAN CONSULTANT

- Assessment of the pharmaceutical utilization and the development and implementation of a plan to address any areas of concern that arise
- Working with the team in evaluating and implementing an automated pharmaceutical distribution system to include automated physician order entry for 7 facilities representing 1400 SNF beds
- Working with the PACE program to identify, recruit and train a medical director

Catholic Health East, PACE (Program of All – inclusive Care for the Elderly)    2001 - Current

### MEDICAL DIRECTOR (2001-2005)

- Instrumental in transformation of the PACE program from a demonstration to full risk provider group of both Medicare and Medicaid services as contracted through the state and CMS
- Developed innovative delivery systems, Disease State Managed programs, and educational initiatives.
- Managed of Pharmaceutical Formulary both clinically and financially

- Clinical Support
  - primary physician resource to PACE clinical staff
  - oversight responsibility for ensuring appropriate patient treatment/Managed activities
  - available to clinical team for telephone, on-site and case specific consultation
  - Holds weekly rounds and meetings at each PACE Primary Care Health Suite.
  - Supports clinical team decisions and activities at contracted/participating facilities and provides physician-to-physician communication with respect to these activities.
  - Responsible for clinical decisions regarding medical necessity for specific exceptions and special circumstances.

- Pharmaceutical Managed
  - Developed research alliance with University of Medicine and Dentistry of New Jersey
  - Developed Pharmacy Consulting Program in Coumdain, CHF and Pre-& ESRD
  - Developing Risk Stratification tool to identify high risk members for efficient and effective pharmacy consulting intervention

- Quality Assurance

- Chair Quality Advisor Committee to resolve issues regarding treatment/dispositions plan of care and other clinical/patient related issues.
- Ensure clinical competence and coordination, appropriate standards of care and medical necessity.
- Participates in clinical performance review applicable to employed staff and contracted providers.
- Identification and assessment of medical high-risk issues/areas of practice.
- Conducts Q&A Rounds with the Regional Director of Clinical Services at PACE facilities and participating nursing homes to survey standards/regulatory compliance.
- Clinical Guidelines
  - Assists in identifying, reviewing, approving, implementing and monitoring clinical guidelines adopted at the regional and corporate levels.
  - Provides support in ensuring general, system-wide adherence to established policies and procedures governing PACE clinical practices and medical necessity.
  - Brings clinically relevant issues and concerns to appropriate PACE staff and committees for review and disposition.
- Education and Supervision
  - Provides Monthly Staff Grand Rounds (in-service to include morbidity and mortality reviews) in conjunction with PACE Nurse Practitioner.
  - Identifies and circulates relevant clinical/educational material applicable to PACE clinical staff.
  - Actively participated in Preceptor Programs, Peer Review Actions and other supplemental education requirements for PACE staff and affiliated providers, as needed.

HepTREC (www.HepTREC.org)                          2007 – present
       Executive Director
The Delaware Valley Hepatitis Treatment, Research and Education Center (HepTREC) is a not-for-profit organization established in 2002 to reduce the impact of viral hepatitis in the Delaware Valley.

Gericalls (www.gericalls.com)                      2002 - 2006
       Clinical Advisor
Nurse practitioner home care system for frail elders.

Health Network America (www.healthnetworkamerica.com)    2002 - 2003
       Medical Director
- Lead clinician achieving the first International URAC Full Accreditation.
- Developed and implemented Disease State Managed programs [diabetes, cardiovascular, chronic urologic conditions] through system design and educational initiatives with patients and providers
- Medication Formulary design to reduce overall medical expenditures through appropriate medication use

Evercare, United Healthcare                        2001 - 2002
       Medical Advisor
- Advise on Hospital Utilization improvement initiatives

- Advise clinical providers on geriatric medical Managed techniques
- Provide education to efficient and effective geriatric medical Managed through a Care Team appropriate

Forrest Hill Nursing Center [120 bed SNF]                    2001 - Current
     Partner
Responsible for development of expansion of assisted living beds

Elder Health HMO Inc., [Medicare + Choice HMO]              1997 – 2001
     Medical Director
- Instrumental in transformation of full risk provider group into Medicare + Choice HMO.
- Developed innovative delivery system utilizing NPs, full EMR and DSM program.
- Specializing in care of the frail elderly living in the inner city and nursing home facilities.
- During tenure plan grew membership consistently while developing and implementing processes to reduce medical losses and maintaining profitability.
- Similar role and responsibilities as PACE program Medical Director in key areas: Clinical Support, Pharmaceutical Managed, Utilization Managed, Authorization, Quality Assurance, Regulatory, Provider Relations, Organizational Support, Education and Supervision.

Sicklerville Internal Medicine Associates                   1994 – 2000
     Managing Partner & Practicing Internist
- Developed largest primary care group in region from 5000 patients one office to 8 physicians over 20000 patients 3 offices
- Orchestrated the construction of a new Ambulatory Medial Center to provide one-stop full service. Including pharmacy, radiology, diagnosed services, specialists, and physical therapy, as well as a large primary care center.
- Also developed a hospitalist program to provide 24/7 in house coverage to deliver a better level of care to our patients.
- Developed several decisions including office based, urgent care, nursing home, hospital medical team, homecare, clinical research, and disease state Managed center.

Care Inn of Voorhees [260 bed SNF/10 bed Residential]        1995 – 1999
     Medical Director
Medical Director and Staff Physician -- grow practice from 4 patients to over 100. One of first physicians to utilize a Nurse Practitioner permanently stationed within facility full time.

Harvest Villages [300 unit Residential/60 bed SNF -- Continuous Care Retirement Community] 1995 – 1999
     Medical Director
Medical Director and Staff Physician – grew resident loyalty to assume care for over 97% of the residents. Utilized a full time dedicated Nurse Practitioner. Developed systems and process to have a successful Health Suite within a senior center.

Southern New Jersey Medical Services [Virtua Health System]   1997 - 1998
     Assistant to the CMO

Responsible for network development of PHO & MSO.


## Other Activities:

University Housing Company *(www.trumanrentals.com )*            1985 – Current
          Founder / Managing Partner
Developer & managing partner of over 160 student housing units.


Camp Woodward (*www.campwoodward.com* )            2002 – 2006
          Counselor
Supervise young campers at an extreme sports camp one week each summer


Go4theGoal Foundation *(www.G4theG.org)*            2006 - current
          Founder
Foundation dedicated to assisting children affected by cancer realize their goals.



**LEHIGH VALLEY**
**PHYSICIAN GROUP**

Affiliated with Lehigh Valley Hospital and Health Network

Surgical Specialists of the Lehigh Valley
Burn Center

1210 South Cedar Crest Boulevard
Suite 3000
Allentown, Pennsylvania 18103
Phone: 610-402-1485
Fax: 610-402-8868

Daniel D. Lozano, M.D., FACS
Sigrid Blome-Eberwein, M.D.
Pamela A. Howard, M.D., FACS, CIME

February 25, 2008

W. Charles Meltmar, Esq.
The Cochran Firm
1100 New York Ave, NW
Suite 340, West Tower
Washington, DC

Supplemental Report

RE: Mary Sanders as Personal Representative of the Estate of Benjamin Sanders vs.
United States of America.

Dear Mr. Meltmar:

At your request I have reviewed the additional documents that you provided on behalf of
Benjamin Sanders in connection with the above mentioned matter. They include the
following:

Deposition of Dr. Sarah M. Colvin
Deposition of Jerry Lee Phillips
Deposition of Robert Carnevale
MPD Arson Task Force Case Log and Files
ATF-BATS Incident Report
VA Police Uniform Offense Report
Voluntary Witness Statements of VA Employees
Photographs

As you are well aware, Mr. Sanders died from injuries sustained at the Washington, DC
Veterans Administration Medical Center Comprehensive Nursing and Rehabilitation
Center on March 19, 2006. After reviewing the deposition of Dr. Colvin, the Medical
Examiner of the District of Columbia, there are inconsistencies not only with the
classification of the depth of burn injury but also with the cause of death in Mr. Sanders.
On page 17 of the deposition there is an inaccurate description of second and third degree
burns. A second degree burn is a burn that involves various depths of the dermis and is
classified as either superficial, involving the papillary dermis or deep second degree
involving the reticular dermis. A third degree burn involves the entire depth of the
dermis, not the musculature as Dr. Colvin states in the deposition (1). Color of the burn
injury is also not a reliable indicator of burn depth since clinicians who treat burns on a

regular basis know that many third degree burns have a red appearance, which has also been the case in my clinical experience. The accurate depth measurement of a burn would require a histological evaluation of the tissue in question to determine the extent of dermal injury. It is also stated in the deposition that the charring of the burned skin may be post mortem, which assumes that Mr. Sanders continued to burn after he already died. This would not be possible since Mr. Sanders was noted to be moving prior to having the flames extinguished; therefore, he was still alive while burning. This was confirmed in a statement by Jerry Lee Phillips, CNA given to Detective Todd Gray of the Metropolitan Police Department that was submitted after the incident on March 22, 2006. Since Mr. Sanders was alive when the fire was extinguished it would not be possible for the skin to continue to sustain post mortem charring. It therefore stands to reason that Mr. Sanders was alive throughout the entire time he was burned.

Dr. Colvin also incorrectly states that Mr. Sanders' cause of death was the burn injury due to hemodynamic instability because of the rapid fluid losses that occur during the initial moments of injury. Although there are fluid losses that occur with large burn injuries, they not are rapidly occurring in the early moments of a burn injury and do not achieve significance for 2-3 hours (1). In fact during the initial moments of a burn injury, the exact opposite is the case and high blood pressure and a rapid heart rate occur as a result of the painful injury. The low blood pressure or hemodynamic instability that occurs as result of a burn injury does not manifest itself for at least 1-2 hours post injury (1).

Inhalation injuries occur as a result of the inhalation of smoke and/or heat and can be limited to the airway above the epiglottis or can involve both the area above the epiglottis and below the epiglottis (2). Inhalation injury is the main factor responsible for mortality in thermally injured patients (3,4). High carboxyhemoglobin levels come from breathing in carbon monoxide in an enclosed space usually come from a structure fire, not from a person being on fire themselves. Inhalation injuries from heat can occur from breathing in hot air without resulting in an elevated carboxyhemoglobin (2). This was confirmed on the autopsy report that demonstrated the burning of the mucosa of the trachea and larynx but no injury to the lungs. The mechanism of injury is to cause spasm of the vocal cords thereby limiting the injury to the lower airway. The upper airway as a result of the thermal injury will become edematous or swollen. The lower airway will respond by becoming bronchospastic from the irritants (1). There is no initial outpouring of fluid into the trachea or lungs that cause hemodynamic instability as stated on page 22 of Dr. Colvin's deposition. The autopsy report stated that there was no fluid in the lungs.

The injury that resulted in Mr. Sanders' death was not the burn to the skin but rather the burn to his airway. This type of injury made it difficult to breathe. Once someone sustains an injury that compromises the ability to breathe, then it is imperative that the airway be immediately addressed. Basic Life Support (BLS) and/or Advanced Cardiovascular Life Support (ACLS) certification is required by hospital employees and requires that during the primary survey of the patient you must check for responsiveness and the patency of the airway as well as determine if the patient is breathing. The first order of business is to ensure an adequate airway and respiration. If not then oxygen and immediate ventilation is required. Circulation is then assessed. This evaluation of the airway, breathing, and circulation or ABC's is initial component of the ACLS protocol (1,5). This is required to be instituted immediately to prevent irreversible brain injury due

to a lack a patent airway. In Mr. Sanders' case the airway was not addressed until sixteen minutes after his injury occurred. Instead he was transported to another location in the facility, and not until he arrived at the Medical Intensive Care Unit, was his airway finally addressed where ACLS protocol was instituted as stated in the deposition of Robert Carnevale, the former Safety and Occupational Specialist at the VA Medical Center. It was confirmed in the medical record that a code blue was called at 6:56 p.m., sixteen minutes after the fire alarm was triggered. Mr. Sanders did not die from the injury to his burned skin; he died from being unable to breathe after his airway was burned. With no initial attempt to address his airway in a timely fashion Mr. Sanders asphyxiated while in his wheel chair. He was not removed from his wheel chair nor was his airway addressed in a timely fashion. There was no hemodynamic instability that may have occurred early in the post burn injury phase, and no myocardial infarction on autopsy that would indicate that such an event had occurred.

In the time that Mr. Sanders was left unattended in his wheel chair to the time he was noted to be engulfed in flames, he would have had to been on fire somewhere from 8-10 minutes. This estimate is based on the time it took Mr. Phillips to walk to the locker room, obtain his lunch, walk to the quiet room, place the food in the microwave for two minutes, go back to the locker room to obtain money, walk to the atrium, run to the smoking room, and then wait until a properly functioning fire extinguisher was obtained. In addition, it is evident that while Mr. Sanders was on fire he was struggling to try and put himself out with his right arm since he had no function of the left arm. Since the right arm could move it was not as badly burned as his left arm. In addition, as he struggled to try and put out the fire, his hat fell off and was not burned even though his head was badly burned. During the time that Mr. Sanders was on fire he was in severe intense pain that is virtually unbearable and is well established to occur with severe burn injuries (6,7,8,9,).

It is clear from the medical records and documents reviewed in this case that Mr. Sanders died from respiratory arrest as a result of a thermally injured airway. Although he may have sustained a life threatening burn injury which may have ultimately taken his life, it was the injury to his airway and the lack of timely intervention that resulted in his death. While he was conscious, he would have suffered not only due to pain but his inability to breathe. He was alive during the entire time he was on fire and in severe pain; in addition even in an unconscious state burn patients routinely sense pain that requires the administration of pain medication, as has been my experience in clinical practice. He would have sensed pain for an additional 5-7 minutes while he was unconscious until he died from a lack of oxygen.

I hold these opinions within a reasonable degree of medical certainty and reserve the right to file a supplemental report should additional information regarding this case become available. If you have any additional questions or concerns please do not hesitate to contact me.

Daniel D. Lozano, M.D., FACS
Medical Director, Burn Unit
Lehigh Valley Hospital Regional Burn Center
Associate Professor of Surgery

Penn State Medical College

Bibliography

1. Herndon, et al. *Total Burn Care*: Sanders Publ. 1997.

2. Advanced Burn Life Support Course, Publ. 2000.

3. Herndon D N, Thompson P B, Traber D L. Pulmonary injury in the burned patient. *Crit Care Clin* 1985:1: 79-96.

4. Thompson P B et al. Effect on mortality of inhalation injury. *J Trauma* 1986:26: 163-165.

5. Advanced Cardiovascular Life Support Course, Publ. 2006.

6. Marvin JA. Pain management. *Top Acute Care Trauma Rehabil* 1987: 1(4): 15-24.

7. Martyn JAS. Clinical pharmacology and drug therapy in the burn patient. *Anesthesiol Clin North Am* 1989; 7(1): 211-19.

8. Ahrenholtz DH, Solem LD. Management of pain after thermal injury. Adv Clin Rehabil 1987; 1: 215-29.

9. Judkin KD. Pain control in burns. *Clin Anaesth* 1987;1(3): 635-48.

List of Depositions and Court Testimonies for Last Four Years for Daniel D. Lozano, M.D.

1. Court testimony October 22, 2007 for Schuylkill County Children and Youth Services vs. Ms. Debra Cadet in the matter of minor child Elijah Aiken.

# DANIEL D. LOZANO, MD, FACS

# Curriculum Vitae

## BIOGRAPHICAL DATA:

Date of Birth: 01/01/61
Los Angeles, CA

## BUSINESS ADDRESS & TELEPHONE:

Surgical Specialists of the Lehigh Valley - Burn
Medical Director, Regional Burn Center
Chief, Division of Burn
Lehigh Valley Hospital & Health Network
1210 S. Cedar Crest, Suite 3000
Allentown, PA 18103
Phone:  (610) 402-1485
Fax:     (610) 402-8868

## HOME ADDRESS :

5571 Covered Bridge Circle
Orefield, PA 18069

## EDUCATION:

| | |
|---|---|
| 1986 – 1988 | Rio Hondo College<br>Whittier, California |
| 1988 – 1990 | Whittier College<br>Whittier, California<br>B.A., Summa Cum Laude, Class Rank #1 |
| 1990 – 1994 | University of California San Francisco<br>School of Medicine<br>Doctor of Medicine |

## PROFESSIONAL EXPERIENCE:

1994 – 2000        Surgical Training
                   University of Nevada, School of Medicine
                   Department of Surgery
                   University Medical Center
                   Las Vegas, Nevada

07/00 – 05/01      Burn Fellow
                   University of California, San Diego Medical Center
                   Regional Burn Center
                   San Diego, California

06/01 – 10/04      Director, Clinical Burn Care
                   Clinical Instructor
                   UCSD Regional Burn Center
                   San Diego, California

07/02 –10/04       Assistant Clinical Professor of Surgery
                   UCSD Regional Burn Center
                   San Diego, California

10/04 – Present    Medical Director, Regional Burn Center
                   Clinical Instructor
                   Chief, Division of Burn
                   Lehigh Valley Hospital & Health Network
                   Allentown, Pennsylvania

## HONORS AND AWARDS:

1989 and 1990      John Stauffer Science Fellowship, Whittier College

1990               Beta Beta Beta Biological Honor Society

1990               Summa Cum Laude, Class Rank #1, Whittier College

1990 – 1994        University of California Regents Scholar
                   University of California San Francisco
                   School of Medicine

2

## APPOINTMENTS:

| | |
|---|---|
| 01/07 – Present | Member, Burn Committee<br>Pennsylvania Trauma Systems Foundation<br>Mechanicsburg, Pennsylvania |
| 02/06 – Present | Member, Surgical Executive Committee<br>Lehigh Valley Hospital<br>Allentown, Pennsylvania |
| 04/05 – Present | Burn Committee Member<br>PA Trauma Systems Foundation<br>Mechanicsburg, Pennsylvania |
| 07/05 – Present | Assistant Professor of Surgery<br>Penn State College of Medicine<br>Hershey, Pennsylvania |
| 11/05 – Present | Representative of LVH, Division of Surgery<br>Board of Governors<br>Lehigh Valley Physician Group<br>Allentown, Pennsylvania |
| 10/04 – Present | Board Member<br>Burn Prevention Foundation<br>Allentown, Pennsylvania |

## CERTIFICATIONS:

United States Medical Licensing Examination
Step 1, passed 9/92
Step 2, passed 9/93
Step 3, passed 6/95

American Board of Surgery In-Training Surgical Basic Science Exam
Chief Resident Score: 96 Percentile

Advanced Trauma Life Support Certification
Advanced Burn Life Support Certification
Board Certified, Surgery, 06/01, American College of Surgeons

## RESEARCH EXPERIENCE:

| | |
|---|---|
| 1989 | NASA, Space Life Sciences Research Training Program<br>Kennedy Space Center, Cape Canaveral, Florida.<br>Responsibilities included development of research protocols for life<br>sciences experiments on space shuttle flights. |
| 1996 – 1997 | Research Resident, Microsurgery and Hyperbaric Laboratory<br>Division of Plastic Surgery<br>University of Nevada School of Medicine<br>Las Vegas, Nevada |
| 07/00 – 05/01 | Research Fellow, Regional Burn Center Laboratory<br>University of California San Diego, Medical Center |

## MEMBERSHIPS:

| | |
|---|---|
| 1990 – 1999 | American Medical Association |
| 1996 – 1999 | Candidate Group, American College of Surgeons |
| 1999 – 2000 | Council Member, American College of Surgeons, Nevada Chapter |
| 1999 – Present | American Burn Association |
| 2001 - Present | American Association of Tissue Banks |
| 2001 - Present | International Society for Burn Injuries |
| 2001 - Present | Shock Society |
| 2001 - Present | The Wound Healing Society |
| 2002 - Present | Association for Academic Surgery |
| 2001 - 2003 | Associate Fellow, American College of Surgeons |
| 2001 – 2004 | American College of Surgeons, San Diego Chapter |
| 2003 – Present | Fellow, American College of Surgeons |
| 2005 – Present | Fellow, Keystone Chapter, American College of Surgeons |
| 2005 – Present | Pennsylvania Trauma Systems Foundation |

## PA HOSPITAL COMMITTEES:

LVH Surgical Executive Committee
LVPG Board of Governors
Burn Prevention Foundation Board
Spirit of Courage Awards

## CA HOSPITAL COMMITTEES:

UCSD Medical Director's Committee
UCSD Brave Heart Kids Program (Youth Burn Survivor Service Group)
UCSD Critical Care Committee
UCSD Burn ICU Users Group

## PUBLICATIONS:

## Abstracts:

**Lozano DD**, Zamboni WA, Stephenson LL: *Effect of Hyperbaric Oxygen and Medicinal Leeching on Survival of Axial Skin Flaps Subjected to Total Venous Occlusion.* Presented at the Annual Mtg of the Undersea and Hyperbaric Medicine Society in Cancun, Mexico. June 1997.

**Lozano DD**, Rutkowski ER, Noordenbos JM, Dore' CA, Hansbrough JF: *The Use of Fibroblast Derived Temporary Skin Substitute for Prolonged Wound Coverage.* Presented at the 33rd Annual American Burn Association Mtg, Boston, MA. Proceedings of the American Burn Association; Supplement to J. Burn Care & Rehab. 22(2):S73. April 2001.

Rutkowski ER, **Lozano DD**: *Debridement of Burns in Mice Treated with Different Formulations of Collagenase SANTYL® Ointment.* Presented at the 34th Annual American Burn Association Mtg, Chicago, IL. Proceedings of the American Burn Association; Supplement to J. Burn Care & Rehab. 23(2):S43. April 2002.

**Lozano DD**, Noordenbos J, Hansbrough JF: *The Use of Glucan II in the Treatment of Donor Sites.* Presented at the 34th Annual American Burn Association Mtg, Chicago, IL. Proceedings of the American Burn Association; Supplement to J. Burn Care & Rehab. 23(2):S81. April 2002.

**Lozano DD**, Noordenbos J, Muller P, Fuchs S, Hansbrough JF: *Metabolic Requirements in Patients with Inhalation Injuries.* Presented at the 34th Annual American Burn Assoc Mtg, Chicago, IL. Proceedings of the American Burn Association; Supplement to J. Burn Care & Rehab. 23(2):S112. April 2002.

Molnar JA, Heimbach DM, Tredger EE, Hickerson WL, Still Jr JM, Luterman A, **Lozano DD**, Mozinga DW: *Prospective, Randomized, Controlled, Multicenter Trial Applying Subatmospheric Pressure to Acute Hand Burns: An Interim Report.* Presented at the 36th Annual American Burn Association Mtg, Vancouver, British Columbia. Proceedings of the American Burn Association; Supplement to J. of Burn Care & Rehab. 25(2):S79. March/April 2004.

**Lozano DD:** *Are CDC Guidelines for the Prevention of Intravascular Catheter-Related Blood Stream Infections Effective in Burn Patients?* Presented at the 38th Annual American Burn Association Meeting, Las Vegas, Nevada. April 2006.

**Lozano DD**, Fry DA, Konstantinova S, Blome-Eberwein S, Howard P.: *Are CDC Guidelines for Prevention of Intravascular Catheter-Related Blood Stream Infections (CRBSI) Effective in Burn Patients.* Presented at the 13th Congress International Society for Burn Injuries, Fortaleza, Brazil. September 24-29, 2006.

**Lozano DD.:** *The Effect of a Fibroblast Derived Skin Substitute on Keratinocyte Proliferation.* Presented at the 13th Congress International Society for Burn Injuries, Fortaleza, Brazil. September 24-29, 2006.

## JOURNAL PUBLICATIONS:

Gingrass MK, **Lozano DD**, Brown RE, Stephenson LL, Zamboni WA: <u>Assessment of Intraneural Oxygen Tension and Blood Flow in a Mobilized Peripheral-Nerve Model.</u> *Journal of Reconstructive Microsurgery,* 14(5):355-358, 1998.

Zamboni WA, **Lozano DD**, Vitkus K, Roth AC, Stephenson LL, Kenneaster D, Suchy H, Russell RC, Corcoran J, Yen L: <u>Single-Vessel Arteriovenous Revascularization of the Amputated Ear.</u> *Journal of Reconstructive Microsurgery,* 15(1):9-13, 1999.

**Lozano DD**, Kahl EA, Wong HP, Stephenson LL, Zamboni WA: <u>L-Selectin and Leukocyte Function in Skeletal Muscle Reperfusion Injury.</u> *Archives of Surgery,* 134:1079-1081, 1999.

**Lozano DD**, Stephenson LL, Zamboni WA: <u>Effect of Hyperbaric Oxygen and Medicinal Leeching on Survival of Axial Skin Flaps Subjected to Total Venous Occlusion.</u> *Plastic and Reconstructive Surgery,* 104(4):1029-1032, 1999.

**Lozano DD:** <u>The use of a Dermal Regeneration Template for the Repair of Degloving Injuries: A Case Report.</u> *Wounds,* 15(12): 395-398, 2003.

Muller P, **Lozano DD**: <u>Control of Blood Loss in the Treatment of a Jehovah's Witness With Massive Thermal Injuries Using a Fibroblast Derived Temporary Skin Substitute.</u> *Burns,* (5):483-7, 2004.

Karamanoukian RL, Kilani M, **Lozano DD**, Sundline M, Karamanoukian HL, Delarosa J, Behnam S, Evans GRD: <u>Pediatric Burns With Snap-Cap Fireworks.</u> *Journal of Burn Care & Research,* 27 (2): 218-220, 2006.

Gibran N, Luterman A, Herndon D, **Lozano DD**, Greenhalgh DG, Grubbs L, Schofield N, Hantak E, Callahan JD, Schiestl N, Riina LH; and the FS 4IU Clinical Study Group: <u>Comparison of Fibrin Sealant and Staples for Attaching Split-Thickness Autologous Sheet Grafts in Patients with Deep Partial- or Full-Thickness Burn Wounds:  A Phase ½ Clinical Study.</u> *Journal of Burn Care & Research,* 28 (3): 401-408, 2007.

## PRESENTATIONS/LECTURES:

**Lozano DD**, Zamboni WA, Stephenson LL: *Effect of Hyperbaric Oxygen and Medicinal Leeching on Survival of Axial Skin Flaps Subjected to Total Venous Occlusion.* Presented at the Annual Mtg of the Undersea and Hyperbaric Medicine Society in Cancun, Mexico. June 1997.

**LOZANO DD**: *Advancements in Modern Burn Care.* Presented at Grand Rounds, University of Nevada School of Medicine, Las Vegas, NV. November 14, 1999.

**Lozano DD**, Rutkowski ER, Noordenbos JM, Dore' CA, Hansbrough JF: *The Use of Fibroblast Derived Temporary Skin Substitutes for Prolonged Wound Coverage*. Presented at the 33rd Annual American Burn Association Mtg, Boston, MA. April 2001.

**Lozano DD**: *Tissue Engineering in the Treatment of Full-thickness Burns*. Presented at the 33rd Annual American Burn Association Mtg, Boston, MA. April 2001.

Rutkowski E, **Lozano DD**, Hansbrough JF: *A Comparison of the Debridement of Full-Thickness Burns in Mice Treated with Collagenase SANTYL Ointment Versus Accuzyme Papain – Urea Ointment*. Presented at the 14th Annual Symposium on Advanced Wound Care, Las Vegas, NV. May 2001

**Lozano DD**: *Major Thermal Injuries: The First Hours*. Presented at Trauma Conference, UCSD Trauma/Burn Division, San Diego, CA. June 19, 2001.

**Lozano, DD:** *Thermal Injuries in the Pediatric Patient*. Presented at Pediatric Grand Rounds, Scripps Mercy Hospital, San Diego, CA. September 27, 2001.

**Lozano, DD:** *Evaluation and Initial Treatment of Burn Injuries in the Military*. Presented at Miramar Marine Air Station, San Diego, CA. November 6, 2001.

**Lozano, DD:** *Evaluation and Initial Treatment of Burn Injuries*. Presented at UCSD Medical Center, San Diego, CA. November 21, 2001.

**Lozano, DD**: *The Use of TransCyte in Partial and Full-thickness Burns*. Presented at the Region IX Burn Conference, Orange, CA. February 9, 2002.

**Lozano DD**, Rutkowski ER, Rennekampff HO, Hansbrough JF: *The Effect of a Fibroblast Derived Skin Substitute on Keratinocyte Proliferation*. Presented at the John A. Boswick, M.D. Burn & Wound Care Symposium, Maui, HI. February 2002.

**Lozano, DD**: *Burns and the Tissue Bank*. Lecture at the Lifesharing/UCSD Tissue Bank, San Diego, CA. February 14, 2002.

Rutkowski ER, **Lozano DD**: *Debridement of Burns in Mice Treated with Different Formulations of Collagenase SANTYL® Ointment*. Presented at the 34th Annual American Burn Association Mtg, Chicago, IL. April 2002.

**Lozano DD**, Noordenbos J, Hansbrough JF: *The Use of Glucan II in the Treatment of Donor Sites*. Presented at the 34th Annual American Burn Association Mtg, Chicago, IL. April 2002.

**Lozano DD**, Noordenbos J, Muller P, Fuchs S, Hansbrough JF: *Metabolic Requirements in Patients with Inhalation Injuries*. Presented at the 34th Annual American Burn Association Mtg, Chicago, IL. April 2002.

**Lozano, DD**: *The Use of Integra for Treatment of Pediatric Burns in Areas of Critical Function*. Presented at the 34th Annual American Burn Association Mtg, Chicago, IL. April 2002.

**Lozano, DD**: *The Use of TransCyte in the Treatment of a Jehova Witness Patient with Massive Thermal Injuries*. Presented at the 34th Annual American Burn Association Mtg, Chicago, IL. April 2002.

**Lozano, DD:** *What's New in Burns?* Presented at the UCSDMC Trauma Conference, San Diego, CA. May 14, 2002.

**Lozano, DD:** *What's New in Burns?* Presented at Kern Medical Center Grand Rounds, Bakersfield, CA. June 11, 2002.

**Lozano, DD**, Dalakrishnan C, Hebra A, Mozingo DW, Cross J, Hardin WD, Molnar J, Schiller H Hargroder AG, Speilvogel RL, Paul MM, Gentzkow, GD: *Diagnosis of Burn Wound Infection-Clinical Criteria vs. Biopsy.* Presented at the 11th Quadrennial Congress of the International Society for Burn Injuries. August 2002.

**Lozano, DD:** *What's New in Burns?* Presented at the Neuro/Trauma Conference at UCSDMC, San Diego, CA. October 14, 2002.

**Lozano, DD**: *Indirect Calorimetry – A Comparison of Intermittent vs. Continuous Monitoring.* Presented at the John A. Boswick, M.D, Burn and Wound Care Symposium, Maui, HI, February 2003.

**Lozano, DD:** *The Use of TransCyte in Partial and Full Thickness Burns.* Presented at 35th Annual American Burn Association meeting, Miami Beach, FL, April 2003.

**Lozano, DD:** *Inhalation and Chemical Injuries,* Presented at the UCI ABLS Course, University of California Irvine, CA, April 30, 2003.

**Lozano, DD:** *What's New in Burns?* Presented at the Trauma/Neuro Conference, UCSD Medical Center, San Diego, CA, May 2003.

**Lozano, DD:** *What's New in Pediatric Burns?* Presented at the Kern Grand Rounds, Kern Medical Center, Bakersfield, CA, May 28, 2003.

**Lozano, DD:** *No Skin Off My Nose: Techniques of Wound Closure*. Presented at the Critical Care Conference, San Diego, CA, July 24, 2003.

**Lozano, DD:** *Pediatric Burns.* Presented at the Grand Rounds, Mercy Scripps Hospital, San Diego, CA, December 4, 2003.

**Lozano, DD:** *Treatment of Toxic Epidermal Necrolysis with TransCyte®.* Presented at The John A. Boswick M.D. Burn and Wound Healing Symposium, Maui, HI, February 2004.

**Lozano, DD:** *San Diego Firestorm 2003.* Presented at the 36th Annual American Burn Association Meeting, Vancouver, BC, March 2004.

**Lozano, DD:** *Management of a Natural Disaster Using an Artificial Skin Substitute.* Presented at the 12th Congress of the International Society for Burn Injuries, Yokohama, Japan, August 2004.

**Lozano, DD:** Gentzkow, GD. *Use of a Cultured Skin – Substitute Results in a Lower Incidence of Infection.* Presented at the 12th Congress of the International Society for Burn Injuries, Yokohama, Japan, August 2004.

**Lozano, DD:** *One Step Beyond – Discovery Channel Television Presentation.* Los Angeles, CA, August 3, 2005.

**Lozano, DD:** *LVHHN Regional Burn Center.* Presented to the LVHHN Board of Associates, Lehigh Valley Hospital & Health Network, Allentown, PA, August 10, 2005.

**Lozano, DD:** *TransCyte and Acticoat for the Treatment of Burns.* Presented at the Grand Rounds. Connecticut Children's Medical Center, Hartford, CT, August 16, 2005.

**Lozano, DD:** *Stop, Drop and Roll – PBS Channel 39 Television Presentation and School CD.* Made in conjunction with Lehigh Valley Hospital, PBS Channel 39, Burn Prevention Foundation & The Philadelphia Eagles, Allentown, PA, August 30, 2005.

**Lozano, DD:** *Initial Assessment of the Burn Patient and What's New in Burns.* Presented at the Grand Rounds, Moses Taylor Hospital, Scranton, PA, September 7, 2005.

**Lozano, DD:** *No Skin Off My Nose!: Options for Burn Wound Closure.* Presented at the Tenth Annual Penn State Trauma Symposium, Penn State College of Medicine, Harrisburg, PA, September 9, 2005.

**Lozano, DD:** *Burn Awareness.* Emergency Medical Services Instruction. George E. Moerkirk Emergency Medicine Institute, Allentown, PA, October 1, 2005.

**Lozano, DD:** *Exfoliating Skin Disorders.* Presented at the Grand Rounds, Lehigh Valley Hospital & Health Network, Allentown, PA, November 8, 2005.

**Lozano, DD:** *San Diego Wildfires: Management of National Disasters.* Presented at the Disaster Response and Burn Trauma Program, The Hospital & Healthsystem Association of Pennsylvania/Pennsylvania Trauma Systems Foundation, Harrisburg, PA, November 15, 2005.

**Lozano, DD:** *Initial Management of the Burn Patient.* Presented at the Emergency Room Residents Grand Rounds, St. Luke's Hospital, Bethlehem, PA, January 26, 2006.

**Lozano, DD:** *No Skin Off My Nose.* Presented at the DaVinci Discovery Center, Allentown, PA, March 5, 2006.

**Lozano, DD:** Featured in "*Movers and Shapers*" article in **Lehigh Valley Magazine**, Allentown, PA, March-April 2006

**Lozano, DD:** *Are CDC Guidelines for the Prevention of Intravascular Catheter-Related Blood Stream Infections Effective in Burn Patients?* Presented at the 38th Annual American Burn Association meeting, Las Vegas, NV, April 6, 2006.

**Lozano, DD:** *Initial Management and Treatment of Thermal Injuries.* Presented at EMS Trauma Grand Rounds at Reading Hospital, Reading, PA, September 20, 2006.

**Lozano, DD**: *The Effect of a Fibroblast Derived **Skin Substitute** on Keratinocyte Proliferation.* Presented at the 13th Congress of International Society for Burn Injuries, Fortaleza, Brazil, September 28, 2006.

**Lozano, DD**: *Are CDC Guidelines for Prevention of Intravascular Catheter-Related Blood Stream Infections (CRBSI) Effective in Burn Patients?* Presented at the 13th Congress of International Society for Burn Injuries, Fortaleza, Brazil, September 29, 2006.

**Lozano, DD:** *Acute Management of Thermal Injuries.* Presented at Pocono EMS Conference, Pocono Manor, PA, October 21, 2006.

**Lozano, DD:** *Necrotizing Fascitis.* Presented at St Luke's Hospital & Health Network Grand Rounds, Bethlehem, PA, January 31, 2007.

**Lozano, DD**: *What's Hot—What's Not in Burns.* Presented at Berwick Hospital Pre-Hospital Grand Rounds, Berwick, PA, March 7, 2007.

**Lozano, DD**: *Initial Treatment and Management of Thermal Injuries.* Presented at Evangelical Community Hospital Pre-Hospital Grand Rounds, Lewisburg, PA, March 29, 2007.

**Lozano, DD**: *Burn Care—What's Hot, What's Not.* Presented at Hunterdon Medical Center Grand Rounds, Flemington, NJ, April 4, 2007.

***Lozano, DD***: *Stop, Drop, Roll, Cool and Call.* Presented at Moravian Academy for students, Bethlehem, PA, April 10, 2007.

## CONTRACTS AND GRANTS:

| | |
|---|---|
| 02/02 – 07/02 | SMITH & NEPHEW |
| Title: | The Effect of Enzymatic Debridement of Eschar in Full Thickness Burn Wounds in Mice by a Collagenase Ointment. |
| Total Award: | $41,080 |
| Status: | Co-Investigator |
| | |
| 11/01 – 04/02 | ADVANCED TISSUE SCIENCES |
| Title: | Equivalency Testing of Dried TransCyte vs. TransCyte in the Athymic Mouse Model. |
| Total Award: | $50,000 |
| Status: | Co-Investigator |

10

| 04/02 – 06/02 | ADVANCED TISSUE SCIENCES/SMITH & NEPHEW JOINT VENTURE |
|---|---|
| Title: | Effects on Wound Healing when Dermagraft and Acticoat are Used in Combination on Excised Wounds in Athymic Mice. |
| Total Award: | $15,737 |
| Status: | Co-Investigator |

| 03/03 – 08/04 | BURN INSTITUTE |
|---|---|
| Title: | Regulation and Secretions of Growth Factors from Neonatal Fibroblasts and Their Effects on Keratinocyte Proliferation and Wound Healing. |
| Total Award: | $15,000 |
| Status: | Investigator |

| 03/03 – 03/04 | BAXTER HEALTHCARE, INC |
|---|---|
| Title: | A Study to Assess the Safety and Efficacy of Fibrin Sealant     (FS 41U) for Wound Healing in Subjects with Burn Wound Requiring Skin Grafting Procedures. |
| Total Award: | $30,775 |
| Status: | Investigator |

| 07/05 – 07/06 | DOROTHY RIDER POOL HEALTH CARE TRUST |
|---|---|
| Title: | Juvenile Fire Setter Prevention/Intervention Program – Grant #7022 |
| Total Award: | $70,000 |
| Status: | Primary Investigator |

## CLINICAL RESEARCH:

| 1999 – 2002 | ADVANCED TISSUE SCIENCE |
|---|---|
| Protocol Number: | 99-1003 |
| Title: | TransCyte® Infections Surveillance. |

| 2000 – 2002 | BRENNEN MEDICAL |
|---|---|
| Protocol Number: | 00-1018 |
| Title: | Glucan II vs. Biobrane. |

| 2001 – 2002 | SYNTHES |
|---|---|
| Protocol Number: | 00-1199 |
| Title: | A Multicenter Clinical Trial of the Effects of Topical Application Of Cerium Nitrate/Silver Sulfadiazine Cream Versus Silver Sulfadiazine Cream Alone in the Treatment of Burn Patients. |

| 2002 – 2003 | KINETIC CONCEPTS, INC. |
|---|---|
| Protocol Number: | 01-1074 |

| | |
|---|---|
| Title: | Evaluation of the Efficacy of the V.A.C. on Management of Acute Hand Burns. |

| | |
|---|---|
| 2002 – 2003 | ADVANCED TISSUE SCIENCES |
| Protocol Number: | 02-0221 |
| Title: | A Randomized, Controlled, Within-Patient-Paired Study to compare the Effectiveness of TransCyte and Biobrane in the Treatment of Mid-Dermal to Indeterminate Depth Burn Wounds. |

| | |
|---|---|
| Pending | SPONSOR NOT DISCLOSED AT THIS TIME |
| Protocol Number: | Pending |
| Title: | A Pharmacogenetic Case-Control Study of Drug Induced Stevens-Johnson Syndrome (SJS) and Toxic Epidermal Necrolysis (TEN). |

## POSTERS:

**Lozano DD,** Rutkowski ER, Noordenbos JM, Dore' CM, Hansbrough JF: *The Use of Fibroblast Derived Temporary Skin Substitutes for Prolonged Wound Coverage.* Presented at the Fourteenth Annual Symposium on Advanced Wound Care & Medical Research Forum on Wound Repair in Las Vegas, NV, May 2001.

**Lozano DD,** Noordenbos JM**:** *Indirect calorimetry: A comparison of intermittent versus continuous monitoring.* Presented at the 63rd Annual Meeting of the American Association for the Surgery of Trauma in Minneapolis, MN, September 2003.

04/26/07

## MARSHALL A. KLEIN & ASSOCIATES, INC.
### FIRE PROTECTION ENGINEERS  •  BUILDING CODE CONSULTANTS

**3950 Chaffey Road**
**Randallstown, Maryland 21133**
**410-655-6862  Fax: 410-655-9456**
**Email: davidh10@verizon.net**

**6815 Autumn View Drive**
**Eldersburg, Maryland 21784-6304**
**410-781-6474   Fax: 410-795-7360**
**Email: makleinfpe@comcast.net**

February 21, 2008

**To:**      W. Charles Meltmar, Esq.
             The Cochran Firm
             1100 New York Avenue, NW
             Suite 340, West Tower
             Washington, DC  20005

**From:**    David M. Hammerman, Fire Protection Engineer, P.E., FSFPE

**Re:**      **Analysis of Nationally recognized Fire/ Life Safety Codes, (VA) Adopted**
             **Policies and Regulations having a Profound impact on Benjamin Sander's**
             **Loss of Life at the Veterans Administration Hospital**

The purpose of this report is to identify the applicable nationally recognized Fire Codes and
Standards, Policies and Smoking Regulations that were adopted and not properly enforced by
the Veterans Administration (VA) hospitals; and violations of those Policies, Codes and
Standards that were contributory to the life loss of Benjamin Sanders on March 19, 2006.

## Summary of Conclusions

1. The VA had the absolute duty and responsibility to implement and enforce their adopted
   life safety policies and smoking regulations to assure fire safe conditions for patients in
   the smoking room.  This could only have been accomplished by direct staff supervision
   of Benjamin Sanders when he used smoking materials.

2. The VA had a duty and responsibility to assure that this VA Health Care Facility had
   properly maintained portable fire extinguishers on the premises for use by Phillips and
   other trained staff to extinguish the fire that engulfed patient Benjamin Sanders and to
   minimize and/or eliminate the ensuing tragedy.

3. The result of this tragedy was the identification of serious fire and life safety violations of
   VA adopted Policies.  The VA adopted Codes and Standards represent nationally
   recognized minimum level of protection from fire and life safety hazards associated with
   the use and occupancy of health care facilities.

4. It is my opinion, based upon my review of the Applicable Referenced Documents in the
   Preparation of this Report, that the cause of the fire fatality was attributed to

unsupervised smoking by Benjamin Sanders. If the patient had been supervised while smoking, the fire would have been detected in its incipient stage and easily extinguished with little or no injury to anyone.

## VA Policies Regarding National Codes and Standards

Initially, it is important to mention that the Department of Veteran Affairs has a primary goal to provide an environment for patients and occupants that is reasonably safe from fire and products of combustion. To achieve this goal, the Veterans Administration Fire Protection Design Manual states: "The objectives are to protect occupants who are not intimate with initial fire development for the time needed to take appropriate action, and to improve the survivability of occupants who are intimate with initial fire development. The secondary goal is to provide a reasonable level of building usability and property protection from the effects of fire and products of combustion."

The Facilities Management Policy, as stated in Memorandum No. 10 dated 09/09/05, is to make every effort to ensure a safe and healthful environment for patients by adhering to operating procedures and guidance from the National Fire Protection Association (NFPA), American National Standards Institute (ANSI), Joint Commission Accreditation of Hospitals (JCAHO) and the Department of Veterans Affairs Directives and Guidelines.

In support of this Policy, the VA has adopted nationally recognized National Fire Codes published by the National Fire Protection Association including NFPA 101- Life Safety Code, 2006 edition, NFPA 1-Uniform Fire Code, 2006 edition and NFPA 10-Standard for Portable Fire Extinguishers, 2002 edition. These Codes and Standards apply to all VA Hospitals and Health Care Facilities. Apparently, the VA uses a "team approach" for fire safety inspections to assure compliance with these Codes and standards covered in the Medical Center Policy 13842 as mentioned in the deposition of Robert Carnevale on pages 89 through 98 and specifically, page 95, lines 19 – 22; page 96, lines 1 – 10 and page 98, lines 2 - 11.

## Applicable NFPA Codes and Standards Referenced by VA

**A. NFPA 101-The Life Safety Code (LSC), 2006 Edition** is a national standard of care used for the protection of all health care facilities nationwide by the JCAHO and has been adopted statewide in 39 states. The LSC sets minimum building design, construction, operation, and maintenance requirements necessary to protect building occupants and patients from dangers caused by fire, smoke, and toxic fumes. The Life Safety Code also provides prompt escape requirements for new and existing buildings.

The LSC addresses those construction, protection and occupancy features necessary to minimize danger to life from the effects of fire, including smoke, heat and toxic gases created during a fire in a building.

Since the LSC establishes minimum acceptable levels of life/fire safety for all existing VA hospitals, each health care facility is required to implement their specific emergency procedures, so that, upon the discovery of fire, personnel will immediately take appropriate action to prevent life loss and/or injury to patients. (LSC, Section 19.7.2.3)

2

For example, if any patient is involved in fire, the hospital staff should go to the aid of that person and execute their duties as required in the Facility Fire Safety Plan. (LSC, Section 19.7.2.3.3)

The LSC controls or prohibits smoking by requiring smoking regulations to be adopted and enforced by the health care facility. The extent of smoking privileges for patients depends upon their ability and the facilities ability to maintain a fire safe environment. Section 19.7.4 requires Smoking Regulations to be adopted and they must include the prohibition of smoking by patients classified as not responsible unless the patient is under direct supervision.

**B. NFPA 1-Uniform Fire Code 2006 Edition** addresses conditions for allowing Smoking in Health Care Facilities. The substance of the requirements is extracted from the NFPA 101 and placed in the NFPA 1. The information can be found in Chapter 20 – Existing Health Care Facilities, Sections 20.4.2.4(3) and (4), where the Uniform Fire Code establishes Smoking Regulations that shall be adopted and shall include not less than provisions to prohibit smoking by patients classified as not responsible unless the patient is under direct supervision.

Given the life loss of Benjamin Sanders on March 19, 2006, and the conclusions presented in the Report prepared byAlden Geriatric Consultants, Inc., dated December 24, 2006, this patient should have been continuously supervised when smoking, or prohibited from smoking in order to comply with the Code.

**C. NFPA 10-Standard for Portable Fire Extinguishers 2002 edition** is published by the National Fire Protection Association. The provisions of this standard apply to the selection, installation, inspection, maintenance, and testing of portable extinguishing equipment. Portable fire extinguishers are intended as a first line of defense to cope with fires of limited size. They are needed even if the hospital is equipped with automatic sprinklers and standpipes.

It is essential that all portable equipment provided for hospital fire safety, is maintained and available for trained staff to operate in the event of a fire occurrence. The LSC, Section 19.7.2.1 recognizes that the proper protection of patients requires the prompt and effective response of trained hospital personnel in the event of a fire occurrence. Section 19.3.5.10 requires portable fire extinguishers to be provided in all health care occupancies in accordance with the requirements of Section 9.7.4.1 and NFPA Standard 10.

Ultimately, the VA bears the responsibility for inspection, maintenance, and servicing fire extinguishers. Fire extinguishers are required to be inspected when initially placed in service and thereafter at approximately 30-day intervals and at more frequent intervals when circumstances require. When an inspection of any fire extinguisher reveals a deficiency, NFPA 10 requires immediate corrective action.

Although the Veterans Administration (VA) may delegate their responsibilities identified in NFPA 10 to a private agency, the VA bears the ultimate responsibility for compliance with the Standard as required in DVA Medical Center, Facilities Management Service Policy, Memorandum No. 26, dated 10/15/02 and The Facilities Management Policy Memorandum No.

10 dated 09/09/05.

This VA responsibility was identified, explained and reaffirmed by Robert Carnevale, Safety and Occupational Health Specialist in his deposition. Reference is made to pages 5 to 8, 10, 11, 14, 17, 20, 21 and page 108, lines 21 and 22; and page 109, lines 1 to 7 and the Life Safety Code, Section 19.7.4 and most importantly, page 122, lines 9 to 17 and page 123, lines 3 and 4, page 125, lines 19 to 22 and page 126, lines 7 to 12. See referenced Document No. 17 below.

## Violations of Veterans Administration (VA) Policies and Adopted NFPA Codes and Standards

### A. Portable Fire Extinguishers and Patient Safety:

The Metropolitan Police Department (MPD) report, Case Log CNN 06-035963, MPD Arson Task Force Remarks clearly identified a VA violation of NFPA 101-Life safety Code, Sections 19.3.5.10 and 9.7.4.1 and NFPA Standard 10, "Standard for Portable Fire Extinguishers". Also, a violation occurred of DVA Medical Center; Facilities Management Service Policy, Memorandum No. 26 dated 10/15/02.

Reference is made to MPD Report, page 10031 which states that a member of the hospital staff, "Phillips ran to the area and got a fire extinguisher outside on the wall of the smoking room. He pulled the pin and it (fire extinguisher) did not work". Reference is made to MPD Report, page 10032 which states that a member of the hospital staff, "Phillips said that the victim and the wheelchair(were) on fire ; someone came into the room with another fire extinguisher in which Phillips used to put out the fire". "Philips recalls seeing flames at least 3 feet in height coming from the victim". Phillips reaffirms this again in his deposition on January 31, 2008; pages 21 and 22.

Referring to the DVA Medical Center; Facilities Management Service Policy, Memorandum No. 26, dated 10/15/02, assuring all fire extinguishers are inspected monthly and necessary maintenance is done when required; and keeping a copy of all fire extinguisher test records, are the responsibilities of the VA Safety Officer. Procedures require all fire extinguishing devices/systems to be tested and maintained per NFPA Standards. The Safety Office and the Environmental Inspection Teams are required to perform spot inspections on portable fire Extinguishers to assure they are in operation condition.

### B. VA Adopted Smoking Policies

In support of adopted National Fire Codes and Standards; and to meet their fire safety goals relevant to smoking materials and patient safety, VA policies have been established and updated periodically. Because of the expected adherence to adopted NFPA Codes, it would be expected that the VA would comply with the Smoking restrictions of the LSC; namely, to establish Smoking Regulations that shall be adopted and shall include not less than provisions to prohibit smoking by patients classified as not responsible unless the patient is under direct supervision.

4

Contrary to this nationally recognized standard of care, it was stated by Jerry Lee Phillips in his deposition dated January 31, 2008, that Sanders was lighting another cigarette just before Phillips left the room to get his dinner. Minutes later Phillips returned to see Sanders engulfed in flames. See Phillip's comments stating that the fire enveloped Sanders; pages 17,18,19 and 26.

Referring to the Smoking Risk Protocol of the Department of Veterans Affairs Medical Center, the purpose of the Protocol is to have an outcome "...to prevent injuries related to smoking." Item 19 states: "There will not be an injury to patient, others or property secondary to smoking." The smoking fatality referenced in this report was evidence of the failure of this protocol.

Referring to the CNRC Smoking Policy No. 19, the staff is obligated to assess smoking habits of patients and identify "High Risk" Smokers, who are those residents who pose a threat to themselves or others due to their reluctance to follow smoking regulations and/or those individuals with a medical condition that prevents them from fully understanding the smoking policy.

DVA Medical Center; Facilities Management Service Policy,Memorandum No. 44 dated 10/23/01, Statement of Conditions (SOC) and Medical Center Policy Memorandum No. 138-12 dated October 2006, Safety Management Plan, both recognize VA responsibilities and procedures that apply to the fire/life safety of patients. The Policy states: " The Medical Center will assure a safe, functional, supportive, and effective environment for patients, employees, visitors, students and volunteers. This plan will be based on monitoring and evaluation of organizational experience , applicable laws and regulations, and accepted practice." VHA Directive 2003-035 published the "Smoke Free Policy for VA Health Care Facilities." This policy emphasizes a smoke-free environment within the VA health care facility, and smoking is allowed only in designated smoking areas. This policy states: "The Health Care Facility Director is responsible for ensuring that smoking on facility grounds is allowed to the extent that it does not interfere with safety and public access. Entrances, including primary main entrances, to a health care building are not to be used as an approved smoking area. Only the detached building, or designated open areas on the grounds, is to be used for smoking."

Enforcement of this Policy includes written instructions to communicate life safety aspects of the Smoke Free Policy, both verbally and in writing, to patients, visitors and staff. Additionally, all employees are requested to assist in the enforcement of the Smoke Free Policy.

Fire Safety Guidebook, Criteria Statement 4-4-1-2 Patient Fire Safety refers to a written Policy which addresses patient safety. This includes a facility policy to use only flame retardant pajamas for patients designated as a "smoking risk" for any patient allowed to smoke in the hospital; MP-3, Part III, 32.36(b) & (d); VA Circ. 10-90-035).

It appears from observation of the photographs 10157, 10158 and 10159, of the burned Sanders body, that he was not wearing flame retardant pajamas at the time of the fire incident. Actually, it was confirmed that he was wearing ordinary sweat pants as mentioned on page 20 of Jerry Lee Phillip's deposition.

## Limitation of Sprinkler Protection to Protect Patients in a Smoking Room

The fire caused by the unattended hospital patient and smoker, Mr. Sanders, did not actuate any sprinklers in the Smoking Room. The 4 sprinklers tested by Underwriters Laboratories apparently were the ones removed from the ceiling of the Smoking Room, above the fatally injured cigarette smoking patient. It was concluded that these 4 sprinklers were the only ones inside the room of fire origin.

The U.L. test report offered no correlation between the Laboratory testing protocol of standard or quick response sprinklers and the level of protection a sprinkler system is intended to afford to an unattended patient smoking unsafely in a "Smoking Room." Historically, single fatalities of this kind are not uncommon in a sprinklered building. Sprinkler protection has always been most effective to prevent multiple fatalities in a fully sprinklered building, as opposed to this scenario of events causing this single fatality.

This opinion was reaffirmed by Robert Carnevale, Safety and Occupational Health Specialist in his deposition, pages 75 and 76. See Reference No. 17 below.

Hospital smoking policies established for patient safety should be based upon the ability of the patient to manage the smoking task with due diligence for fire safety and for the staff to provide an effective fire safe environmental protocol within the designated Smoking Area within the hospital. The installation of fire sprinklers for the protection of the patient smoker should not be the sole basis for determining a fire safe environment or whether a patient should be allowed to smoke unattended.

**Basis for these Conclusions** The contents and opinions expressed in this Report are based upon the plethora of information obtained from perusing the Witness Statements, Metropolitan Police Reports, Facilities Management Service Policy Memorandums, Deposition Transcripts, Defendant's Discovery Responses; NFPA 1, NFPA 101, NFPA 10 and other relevant nationally recognized Codes and Standards applicable to fire and life safety in Health Care Facilities; and 14 years as a State Fire Code Official, 18 years as a State Government Code Administrator and Local Government Building Regulatory Official in the State of Maryland and a long standing past member of the Automatic Sprinkler Committee and the Safety to Life Committee of the NFPA.

## Applicable Referenced Documents Reviewed in the Preparation of this Report:

1. **Codes, Standards and Executive Orders,** VHA Program Guide PG-18-3, Topic 1, July 2006.
2. **NFPA 101-Life Safety Code**, 2006 edition; published by the National Fire Protection Association.
3. **NFPA 1-Uniform Fire Code**, 2006 edition, published by the National Fire Protection Association.

6

4. **Smoke Free Policy for VA Health Care Facilities,** VHA Directive 2003-035 Publication, July 1, 2003. This VHA Directive expires July 31, 2008.

5. **Establishment of a Smoke - Free Environment,** Department of Veterans Affairs Medical Center, 50 Irving Street, NW Washington, DC 20422. Medical Center Policy Memorandum No. 00-20, January, 2005.

6. **Safety Management Plan,** Department of Veterans Affairs Medical Center, 50 Irving Street, NW Washington, DC 20422. Medical Center Policy Memorandum No. 138-12, October, 2006.

7. **Smoking Risk Protocol,** Department of Veterans Affairs Medical Center, Washington, DC Nursing Service, Last dated October, 2006

8. **Smoking Policy,** Geriatrics and Extended Care Comprehensive Nursing and Rehabilitation Care (CNRC), Washington, DC, CNRC Policy Memorandum No. 19, February, 2005.

9. **Report on Tests on Automatic Sprinkler Field Samples,** May 05, 2006, Underwriters Laboratories Inc. for Veterans Affairs Medical Center, 50 Irving St. NW, Washington, DC 20422

10. **NFPA 25 - Standard for Inspection, Testing and Maintenance of Water Based Fire Protection Systems**, referenced by the Life Safety Code, NFPA 101, National Fire Protection Association; Facilities Management Service Policy Memorandum No. 26 dated 10/15/02; and Underwriters Laboratories Inc. in its "Report on Tests on Automatic Sprinkler Field Samples"

11. **NFPA 10-Standard for Portable Fire Extinguishers**, 2002 edition; published by the National Fire Protection Association. See excerpts of NFPA 10 below.

12. **Subpoena responses from the Metropolitan Police Department,** The Metropolitan Police Department (MPD) report, Case Log CNN 06-035963, MPD Arson Task Force Remarks and selected Voluntary Witness Statement Subpoena Responses:

   - 10099, 10057 "…I could see a person in the wheelchair totally engulfed in high yellow flames…Someone was yelling that the fire extinguisher was not working…." by Robin Blackman.
   - 10100, 10058 " Sanders was sitting in his wheelchair totally consumed by fire except for his face….Mr. Phillips was behind    and picked up a fire extinguisher which did not work" ….by George Moyer
   - 10130, 10080, 10059, 10114, 10104 "I grabbed the fire extinguisher for the wall next to the door of the entry of the smoke room. I pulled the pin and attempted to discharge the fire extinguisher, nothing happened…." by Jerry Phillips.
   - 10081, 10060, 10101, 10126 " Sanders upper body mostly in flames while sitting in a wheelchair; totally consumed by fire" by Wanda Smith
   - 10082, 10061, 10125 "Sanders on fire…engulfed in flames." by Donna Kay Harris
   - 10068 " four sprinklers in room, none were activated , two closest to the entrance door of the smoking room are obviously clogged by dust debris"

13. **Deposition transcript** of Frances B Henderson Conducted on Monday, December 10, 2007.

14. **Deposition transcript** of Scott Burgoon Conducted on Monday, December 10, 2007.

15. **Deposition transcript** of Ashraf Alehosseim Conducted on Wednesday, January 30, 2008.

16. **Deposition transcript** of Edita Micu Conducted on Wednesday, January 30, 2008.

17. **Deposition transcript** of Robert Carnevale Conducted on Wednesday, January 30, 2008.
18. **Deposition transcript** of Jerry Lee Phillips Conducted on Wednesday, January 30, 2008.
19. **Deposition transcript** of Raya Kheirbek Conducted on Wednesday, January 31, 2008.
20. **NFPA 99 Standard for Health Care Facilities**, 2005 Edition, Chapters 13 and 17.
21. **Environmental Surveillance Program,** Medical Center Policy Memorandum No. 138-42. January 2005
22. **Sprinkler System Valve supervision DVA,** Medical Center; FMS Service Policy, Memorandum No. 1   9/14/05
23. **Testing & Maintaining Fire Alarm/Suppression Systems DVA,** Facilities Management Service Policy, Memorandum No. 26  10/15/02
24. **Statement of Conditions (SOC)** Department of Veterans Affairs Medical Center; FMS Service Policy, Memorandum No. 44, dated 10/23/01
25. **Environment of Care Plan for Facilities Management Service**, DVA Medical Center, Facilities Management Policy Memorandum No. 10, Dated 09/09/05
26. **Alden Geriatric Consultants, Inc Report** regarding Benjamin Saunders (Sanders) sent to W. Charles Meltmar, Esquire from Ilene Warner-Maron, Dated December 24, 2006
27. **Fire Safety Guidebook,** General Fire Safety, pages 153, 154 and 155, published by VA National Engineering Service Center, St. Louis, Missouri dated June 2001.
28. **Cetrom Review of Fire Protection System Performance Relative to Fatal Fire at Nursing Home Smoking Shelter,** Cetrom, Inc dated May 10, 2006
29. **SPC Fire Extinguisher Inspection Invoices,** Feb. & March 2006

30. **NFPA 10 Portable Fire Extinguishers- 2002 Edition**

Selected Sections and references:

**1.1\* Scope.** The provisions of this standard apply to the selection, installation, inspection, maintenance, and testing of portable extinguishing equipment. The requirements given herein are minimum. Portable fire extinguishers are intended as a first line of defense to cope with fires of limited size. They are needed even if the property is equipped with automatic sprinklers, standpipe and hose, or other fixed protection equipment (see 4.3.2, 5.1.1, 5.2.1, and 5.2.3). They do not apply to permanently installed systems for fire extinguishment, even where portions of such systems are portable (such as hose and nozzles attached to a fixed supply of extinguishing agent).

*A.1.1  Many fires are small at origin and can be extinguished by the use of proper portable fire extinguishers. It is strongly recommended that the fire department be notified as soon as a fire is discovered. This alarm should not be delayed by awaiting results of the application of portable fire extinguishers.*
*Fire extinguishers can represent an important segment of any overall fire protection program. However, their successful functioning depends upon the following conditions having been met:*
*(1)   The fire extinguisher is properly located and in working order.*
*(2)   The fire extinguisher is of the proper type for a fire that can occur.*
*(3)   The fire is discovered while still small enough for the fire extinguisher to be effective.*
*(4)   The fire is discovered by a person ready, willing, and able to use the fire extinguisher.*

*A.1.2 The owner or occupant of a property in which fire extinguishers are located has an obligation for the care and use of these extinguishers at all times. The nameplate(s) and instruction manual should be read and thoroughly understood by all persons who could be expected to use the fire extinguishers.*

*To discharge this obligation, the owner or occupant should give proper attention to the inspection, maintenance, and recharging of this fire-protective equipment and should also train personnel in the correct use of fire extinguishers on the different types of fires that could occur on the property.*

*An owner or occupant should recognize fire hazards on his or her property and plan in advance the exact means and equipment with which a fire will be fought. The owner/occupant should ensure that everyone knows how to call the fire department and stress that they do so for every fire, no matter how small.*

**1.2\* Purpose.** This standard is prepared for the use and guidance of persons charged with selecting, purchasing, installing, approving, listing, designing, and maintaining portable fire-extinguishing equipment. The fire protection requirements of this standard are general in nature and are not intended to abrogate the specific requirements of other NFPA standards for specific occupancies.

**5.1.1\*  The minimum number of fire extinguishers needed** to protect a property shall be determined as outlined in this chapter. Frequently, additional extinguishers can be installed to provide more suitable protection. Fire extinguishers having ratings less than specified in Table 5.2.1 and Table 5.3.1 can be installed, provided they are not used in fulfilling the minimum protective requirements of this chapter.

*A.5.1.1 The following are items that affect distribution of portable fire extinguishers:*
*(1)    Area and arrangement of the building occupancy conditions*
*(2)    Severity of the hazard*
*(3)    Anticipated classes of fire*
*(4)    Other protective systems or devices*
*(5)    Distances to be traveled to reach fire extinguishers*
*In addition, the following factors should be considered:*
*(1)    Anticipated rate of fire spread*
*(2)    Intensity and rate of heat development*
*(3)    Smoke contributed by the burning materials*
(4)    Accessibility of a fire to close approach with portable fire extinguishers

**5.1.2\* Fire extinguishers shall be provided for the protection of both the building structure and the occupancy hazards contained therein.**

*A.5.1.2 Most buildings have Class A fire hazards. In any occupancy, there could be a predominant hazard as well as special hazard areas requiring supplemental protection. For example, a hospital will generally have need for Class A fire extinguishers covering patients' rooms, corridors, offices, and so forth, but will need Class B fire extinguishers in laboratories, and where flammable anesthetics are stored or handled, Class C fire extinguishers in electrical switch gear or generator rooms, and Class K extinguishers in kitchens.*

5.1.2.1  Required building protection shall be provided by fire extinguishers suitable for Class A fires.

5.1.2.2*  Occupancy hazard protection shall be provided by fire extinguishers suitable for such Class A, B, C, D, or K fire potentials as might be present.

*A.5.1.2.2  If fire extinguishers intended for different classes of fires are grouped, their intended use should be marked conspicuously to aid in the choice of the proper fire extinguisher at the time of a fire. In an emergency, the tendency is to reach for the closest fire extinguisher. If this fire extinguisher is of the wrong type, the user could endanger himself or herself and the property he or she is endeavoring to protect. Wherever possible, it is preferable to have only those fire extinguishers available that can be safely used on any type of fire in the immediate vicinity.*

5.1.2.3  Fire extinguishers provided for building protection can be considered also for the protection of occupancies having a Class A fire potential.

## Chapter 6 Inspection, Maintenance, and Recharging
### 6.1 General.
**6.1.1  This chapter is concerned with the rules governing inspection, maintenance, and recharging of fire extinguishers.** These factors are of prime importance in ensuring operation at the time of a fire.

**6.1.2  The procedure for inspection and maintenance** of fire extinguishers varies considerably. Minimal knowledge is necessary to perform a monthly "quick check" or inspection in order to follow the inspection procedure as outlined in Section 6.2. A trained person who has undergone the instructions necessary to reliably perform maintenance and has the manufacturer's service manual shall service the fire extinguishers not more than 1 year apart, as outlined in Section 6.3.

**6.1.3  The owner or designated agent or occupant of a property in which fire extinguishers are located shall be responsible for such inspection, maintenance, and recharging. (See 6.1.2 and 6.1.4.)**

**6.1.4*  Maintenance, servicing, and recharging** shall be performed by trained persons having available the appropriate servicing manual(s), the proper types of tools, recharge materials, lubricants, and manufacturer's recommended replacement parts or parts specifically listed for use in the fire extinguisher.

*A.6.1.4  A fire equipment servicing agency is usually the most reliable means available to the public for having maintenance and recharging performed. Large industries could find it desirable to establish their own maintenance and recharge facilities, training personnel to perform these functions. Service manuals and parts lists should be obtained from the fire extinguisher manufacturer.*

### 6.2 Inspection.
**6.2.1*  Frequency.**  Fire extinguishers shall be inspected when initially placed in service and thereafter at approximately 30-day intervals. Fire extinguishers shall be inspected, manually or by electronic monitoring, at more frequent intervals when circumstances require.

*A.6.2.1  Frequency of fire extinguisher inspections should be based on the need of the area in which fire extinguishers are located. The required monthly inspection is a minimum. An inspection should be more frequent if any of the following conditions exist:*
*(1)    High frequency of fires in the past*
*(2)    Severe hazards*
*(3)    Susceptibility to tampering, vandalism, or malicious mischief*
*(4)    Possibility of, or experience with, theft of fire extinguishers*
*(5)    Locations that make fire extinguishers susceptible to mechanical injury*
*(6)    Possibility of visible or physical obstructions*
*(7)    Exposure to abnormal temperatures or corrosive atmospheres*
*(8)    Characteristics of fire extinguishers, such as susceptibility to leakage*
*Due to these conditions, more frequent inspections might be enhanced through electronic monitoring of the fire extinguisher.*

### 6.2.2* Procedures. Periodic inspection of fire extinguishers shall include a check of at least the following items:
(1)    Location in designated place
(2)    No obstruction to access or visibility
(3)    Operating instructions on nameplate legible and facing outward
(4)*   Safety seals and tamper indicators not broken or missing
(5)    Fullness determined by weighing or "hefting"
(6)    Examination for obvious physical damage, corrosion, leakage, or clogged nozzle
(7)    Pressure gauge reading or indicator in the operable range or position
(8)    Condition of tires, wheels, carriage, hose, and nozzle checked (for wheeled units)
(9)    HMIS label in place

*A.6.2.2  The following procedure permits rapid removal of the hose by one person without kinking and obstruction of flow of extinguishing agent.*

**6.2.3 Corrective Action.** When an inspection of any fire extinguisher reveals a deficiency in any of the conditions listed in 6.2.2, immediate corrective action shall be taken.

6.2.3.1 Rechargeable Fire Extinguishers. When an inspection of any rechargeable fire extinguisher reveals a deficiency in any of the conditions listed in 6.2.2(3), (4), (5), (6), (7), and (8), it shall be subjected to applicable maintenance procedures.

6.2.3.2 Nonrechargeable Dry Chemical Fire Extinguisher. When an inspection of any nonrechargeable dry chemical fire extinguisher reveals a deficiency in any of the conditions listed in 6.2.2(3), (5), (6), and (7), it shall be removed from further use, discharged, and destroyed at the direction of the owner or returned to the manufacturer.

6.2.3.3 Nonrechargeable Halon Agent Fire Extinguisher. When an inspection of any nonrechargeable fire extinguisher containing a halon agent reveals a deficiency in any of the conditions listed in  6.2.2(3), (5), (6), and (7), it shall be removed from service, not discharged, and returned to the manufacturer. If the fire extinguisher is not returned to the manufacturer, it shall be returned to a fire equipment dealer or distributor to permit recovery of the halon.

### 6.2.4 Inspection Recordkeeping.
6.2.4.1 Personnel making inspections shall keep records of all fire extinguishers inspected, including those found to require corrective action.

6.2.4.2  At least monthly, the date the inspection was performed and the initials of the person performing the inspection shall be recorded.

6.2.4.3  Records shall be kept on a tag or label attached to the fire extinguisher, on an inspection checklist maintained on file or by an electronic method that provides a permanent record.

## 6.3* Maintenance.

*A.6.3  Persons performing maintenance operations usually come from two major groups:*

*(1)     Fire extinguisher service agencies*

*(2)     Trained industrial safety or maintenance personnel*

*Fire extinguishers owned by individuals are often neglected because there is no planned periodic follow-up program. It is recommended that such owners become familiar with their fire extinguishers so they can detect telltale warnings during inspection that could suggest the need for maintenance. When maintenance is indicated, it should be performed by trained persons having proper equipment. (See 6.1.4.)*

*The purpose of a well-planned and well-executed maintenance program for a fire extinguisher is to maximize the following probabilities:*

*(1)     The extinguisher will operate properly between the time intervals established for maintenance examinations in the environment to which it is exposed.*

*(2)     The extinguisher will not constitute a potential hazard to persons in its vicinity or to operators or rechargers of fire extinguishers.*

*Any replacement parts needed should be obtained from the manufacturer or a representative.*

**6.3.1 Frequency**. Fire extinguishers shall be subjected to maintenance at intervals of not more than 1 year, at the time of hydrostatic test, or when specifically indicated by an inspection or electronic notification.

**6.3.4* Maintenance Recordkeeping**. Each fire extinguisher shall have a tag or label securely attached that indicates the month and year the maintenance was performed and that identifies the person performing the service.

*A.6.3.4  In addition to the required tag or label (see 6.3.4), a permanent file record should be kept for each fire extinguisher. This file record should include the following information, as applicable:*

*(1)     The maintenance date and the name of the person or agency performing the maintenance*

*(2)     The date when last recharged and the name of the person or agency performing the recharge*

*(3)     The hydrostatic retest date and the name of the person or agency performing the hydrostatic test*

*(4)     Description of dents remaining after passing a hydrostatic test*

*(5)     The date of the 6-year maintenance for stored-pressure dry chemical and halogenated agent types (See 6.3.3.)*

File: Sanders VA Case February 21-2008 Rev14 final and Word protected (This Report is an update of previous Report dated February 20, 2008)

12

Page 1 of 2

# MARSHALL A. KLEIN & ASSOCIATES, INC.

### FIRE PROTECTION
### ENGINEERS

•

### BUILDING CODE
### CONSULTANTS

**3950 Chaffey Road**
**Randallstown, Maryland 21133**

**410-655-6862  Fax: 410-655-9456**

**Email: davidh10@verizon.net**

**6815 Autumn View Drive**
**Eldersburg, Maryland 21784-6304**

**410-781-6474   Fax: 410-795-7360**

**Email: makleinfpe@comcast.net**

February 27, 2008

**To:**       W. Charles Meltmar, Esq., The Cochran Firm

**From:**    David M. Hammerman, Fire Protection Engineer, P.E., FSFPE

**Re:**    Supplemental Report - Sanders Evidence Inspection on February 26, 2008 at the Metropolitan Police Department Facility located at 2235 Shannon Place SE, Washington DC

Please consider this report as an addendum to my previous report sent to you, dated February 21, 2008, titled:  Analysis of Nationally recognized Fire/ Life Safety Codes, (VA) Adopted Policies and Regulations having a profound impact on Benjamin Sander's Loss of Life at the Veterans Administration Hospital.

. The conclusions in this supplemental report are based upon the fire damage and charring observed on the wheelchair and observed on Sanders charred clothing and paraphernalia.  There was no evidence of fire originating or spreading on the underside of the wheelchair or any evidence of fire originating or spreading from the battery located behind the seat at the lower back of the wheelchair.

The fire damage and charring was most evident and severe along the left side of the top surface of the wheelchair seat and arm rest.  This indicated that the fire originated from a burning cigarette that ignited the wheelchair rigid plastic side material, soft cushion material and clothing predominately on the left side of sanders while he was sitting in the wheelchair.

The observed evidence included the following burned and charred clothing and paraphernalia:

1.   Jacket shell made of 55% cotton and 45% polyester.

2. Padding made of 100% polyester.
3. Shirt made of 60% cotton and 40% polyester.
4. Pants made of 60% cotton and 40% polyester
5. Fanny pack burned on one side, closest to Sanders left side where he was seated in the chair.
6. Belt melted to the pants where it apparently was holding the fanny pack.

Page 2 of 2

A tag attached to the rear of the wheelchair included this statement: "Care should be exercised near open flame or with burning cigarettes".

The conclusions reached as a result of the inspection on February 26, 2008 at the Metropolitan Police Department Facility, reaffirm that the fire fatality involving Benjamin Sanders was the result of a fire ignited by a burning cigarette and unsupervised cigarette smoking. The fire accelerated in intensity because of the flammability of his clothing and the fact that he was without direct staff supervision during the smoking activity and during the incipient stages of the fire.

Saved as: Veterans Hospital Sanders Case/Evidence Inspection 02-26-08

# DAVID M. HAMMERMAN, P.E., FSFPE

3950 Chaffey Road                                                                  Tel:  410-655-6862
Randallstown, Maryland 21133-4037                                                  Fax:  410-655-9456
E-mail:  davidh10@verizon.net

## Experience

| | |
|---|---|
| Overview: | **Fire Protection Engineer and Codes Consultant** specializing in Building/Fire Codes application and regulatory compliance for building design and construction.  Expertise on Egress and Exits, Fire Detection and Suppression Systems, Height & Area Limitations and other standards primarily related to the International Building Codes and the National fire Codes.  Expert witness on fire injuries and building losses related to fire and life safety standards of the built environment. |
| 2000 to Present | **Consultant, Marshall A. Klein and Associates, Inc.** Providing Fire Protection Engineering Consulting Services relevant to fire and life safety in the design and construction of buildings and structures. |
| 1989 – 2000 | **Director, Department of Inspections Licenses and Permits, Howard County, Maryland**. Department head, executive staff position. Reported directly to the County Executive of a prominent municipality located between Baltimore and Washington. Managed 72 employees, including professional engineers, plans examiners, and building, plumbing, electrical, fire, housing, and sediment control inspectors.  Responsible for building permits, licenses, review and approval of construction documents and inspections of buildings and sites for compliance with national model performance building codes, fire codes and standards. |
| | Also responsible for the application and enforcement of national model building performance standards, including  National Building Code, Life Safety Code, National Electrical Code, National Standard Plumbing Code, National Energy Code, Maryland Accessibility Code, and State Erosion and Sediment Control Standards. |
| 1980 - 1989 | **Director, Maryland Codes Administration, Department of Housing and Community Development, State of Maryland.** Responsible for the uniform State Model Performance Building Code, Industrialized Modular Building Construction Program, Mobile Home Program, Statewide Building Code for the Handicapped and Energy Conservation Code. |
| | Managed staff of architects and professional engineers, liaison with local government officials,  design professionals,  independent testing agencies  and  manufacturers  of industrialized modular buildings. |
| 1966 - 1980 | **Chief Fire Protection Engineer, Department of Public Safety, Office of the Maryland Fire Marshal.** Responsible for the application and enforcement of professional fire protection engineering principles and practices to achieve compliance with Maryland adopted National Fire Codes, applicable to design, construction and use of buildings and processes. |
| | Supervised a staff of fire protection engineers responsible for fire protection engineering consultation services to State Agencies, Design Professionals and Local Government Officials. |

1

## Professional Licenses and Development

Member of the Maryland Governor's Building Performance Standards Task Force, 1992 - 1997.

Elected member of the **National Institute of Building Sciences** (NIBS) Consultative Council, 1995-2001. NIBS reviews new methods, regulations and streamlining techniques and prepare an annual report to the President of the United States.

President, **National Conference of States on Building Codes and Standards**, 1985-1986; Executive Committee and Board of Directors, 1982-1989. Chairman, Standards and Evaluation Committee, 1990-1992; current Associate Member in good standing.

President, **Maryland Building Officials Association**, a recognized chapter of Building Officials and Code Administrators International (BOCA), served two terms: 1996-1997, 1998-1999.

President, Maryland Chapter, **Society of Fire Protection Engineers,** two terms: 1973 and 1974. Life Member of the National Society of Fire Protection Engineers.

Life member of the **National Fire Protection Association** (NFPA). Committees include Safety to Life, Fire Protection Features and Residential Occupancies; Automotive and Marine Service Stations; Automatic Sprinkler Systems; Private Water Supply Piping Systems. Certificate of Appointment from 2001 to 2004 (serving as alternate for Marshall A. Klein and Associates, Inc.).

Chairman, **Advisory Commission on Industrialized Buildings and Mobile Homes**, Maryland Department of Economic and Community Development, 1974-1981.

Served on the Technical Advisory Committee on the **National Fire Risk Assessment Research Project, National Fire Protection Research Foundation**, 1986.

Participation in the **First World Congress of Building Officials**, London, 1987.

Member, **Salamander Honorary Fire Protection Engineering Society**.

## Awards

**Fellow of the Society of Fire Protection Engineers, June 2007**. Elected to the grade of Fellow of the National Society of Fire Protection Engineers in recognition of outstanding achievements in the field of Fire Protection Engineering.

**Founders Award Recipient 2006.** Recipient of the distinguished Founders Award presented by the Chesapeake Chapter of the Society of Fire Protection Engineers in recognition of fire protection achievements and dedicated service to the Chapter as President for two terms.

**Governor's Salute to Excellence.** Awarded for dedicated efforts and strong commitment to quality and affordable housing; January, 1994.

**Governor's Citation.** Awarded for contribution as a Member of the Task Force on Uniform Maryland Building Performance Standards; 1992.

**Executive Proclamation.** Awarded by the Howard County Executive, declaring July 1, 2000 as David Hammerman Day in Howard County Maryland.

**Senate of Maryland Resolution 518.** Awarded in recognition of commitment in support of building, plumbing, electrical and fire protection compliance. Awarded by the President and members of the State Senate on June 20, 2000.

**Award for Excellence.** Received from the MCB University Press Literati Club, 1997.

Publication Highlights

**Pedestal Building Design Under 2003 International Building /code, Section 508.2**
Featured article published in the Building Safety Journal of the International Codes Council in February, 2006. The article, co-authored with Marshall A. Klein, provided guidance to design professionals attempting to meet the unique requirements of Section 508.2 of the International Building code.

**Public/Private Partnership Ensures Building Code Compliance**
Featured article published by the BOCA Building Officials and Code Administrators Magazine, July/August 1997. Article published by the MCB University Press Ltd., West Yorkshire, England, October/November 1996:

- Presented at World Workplace '95, Miami Beach, Florida; 1995.
- Presented at Joint Technical and Research Conference, "Streamlining the Nation's Building Regulatory Process, NCSBCS/NIST, Herndon, Virginia; September 1997.

**A Second Look at Fire Protection Code Criteria**
Paper presented at the National Bureau of Standards (National Institute of Standards and Technology) & National Conference of States on Building Codes and Standards, Joint Technical Conference on Research and Innovation in the Building Regulatory Process, Denver, Colorado; September 1984.

Education

**University of Maryland, College of Engineering Degree in Fire Protection Engineering, 1962. Baltimore Polytechnic Institute, 1954.**
Ongoing credits for attending or presenting educational programs offered by the National Fire Protection Association, Building Officials and Code Administrators, International Codes Council, Maryland Building Officials Association and Society of Fire Protection Engineers.

**Registered Professional Engineer**
State of Maryland, License No. 7769

**Registered Professional Fire Protection Engineer**
Commonwealth of Pennsylvania, License No. PE016972E.

Last revised 10-07



Dr. Richard G. Stefanacci, *Executive Director*
Tel: 215.596.7466
Email: HPI@usip.edu

600 South 43rd Street
Philadelphia, PA 19104
www.usip.edu

# Clinical Reviews

| Case Defendant | Attorney | Issues | Status |
|---|---|---|---|
| Schulz v. Water's Edge DEFENDANT | Marshall, Dennehey, Warner, Coleman & Goggin 200 Lake Drive East, Suite 300 Cherry Hill, NJ 08002 Bozena Klodnicki | Ankle fracture Pressure Ulcer | Report Received 9/07 Reviewed Records 10 & 11/07 Draft Report Sent 11/24/07 |
| Estate of Saturna v. Marcella Center 07133-00265 SAC DEFENDANT | Marshall, Dennehey, Warner, Coleman & Goggin 200 Lake Drive East, Suite 300 Cherry Hill, NJ 08002 Sharon Campbell saconnors@mdweg.com | Hospice Pressure Ulcer | Report Received (9/11/07) Reviewed Records (9/23/07) Draft Report Sent (11/20/07) |
| Toplan v. Shore Meadows Ocean County New Jersey. DEFENDANT | Marshall, Dennehey, Warner, Coleman & Goggin 200 Lake Drive East, Suite 300 Cherry Hill, NJ 08002 Lynn Nahmani – 856-414-6022 LNNahmani@mdweg.com | cardiac arrest due to sepsis related to a sacral decubitus ulcer. | Attorney Letter (8/3/06) Draft report (9/30/06) |
| Awrachow v. Burlington Woods BUR-L-2047-05 DEFENDANT | Marshall, Dennehey, Warner, Coleman & Goggin 200 Lake Drive East, Suite 300 Cherry Hill, NJ 08002 Sharon Camplbell saconnors@mdweg.com | EOL Care Issues | Records Received (12/04/06) Draft Report (12/18/06) |
| Noon v. Water's Edge 03029-00230/LNN MER-L-000586-05 DEFENDANT | Marshall, Dennehey, Warner, Coleman & Goggin 200 Lake Drive East, Suite 300 Cherry Hill, NJ 08002 Lynn Nahmani - 856-414-6022 LNNahmani@mdweg.com | Weight loss Actively dying | Records Received (11/6/06) Draft Report (11/27/06) Final Report Supplemental Report (2/5/08) |
| Walters v. Water's Edge DEFENDANT | Marshall, Dennehey, Warner, Coleman & Goggin 200 Lake Drive East, Suite 300 Cherry Hill, NJ 08002 Lynn Nahmani – 856-414-6022 LNNahmani@mdweg.com | Difficulty with wound prevention, identification, and treatment | Records Received (7/6/06) Draft Report (8/1/06) |

| | | | |
|---|---|---|---|
| Wentworth v. ManorCare Health Services-Pottstown, et. al. (File No: 50213) DEFENDANT | O'Brien & Ryan, LLP Pennsylvania office 2250 Hickory Road, Suite 300 Plymouth Meeting, PA 19462-1047 Stephanie Hohing | EOL Care Issues | Records Received Draft Report (11/14/06) Phone Update (11/06) |
| Queen Ester Smith v. Millhouse-Trenton Convalescent Center (File No: 85506) DEFENDANT | O'Brien & Ryan, LLP Pennsylvania office 2250 Hickory Road, Suite 300 Plymouth Meeting, PA 19462-1047 Direct Dial: (610) 834-6279 Fax: (610) 834-1749 ($400/hr) Eric D. Heicklen, Esquire eheicklen@obrlaw.com | ARF – Cipro | Records Received (6/30/06) Draft Report (8/21/06) Phone Update (10/20/06) |
| Plaintiff | | | |
| Estate of Martha Sample PLAINTIFF | Robert P. Weiner, Esquire 1500 Walnut St. Suite 1340 Philadelphia, PA 19102 | Foley infection | Reviewed Records (1/18/08) Draft Report Sent (1/25/08) |
| Patricia Holdsworth v. St James Place PLAINTIFF | Ronald Lebovits 1515 Market Street 12th Floor Philadelphia, PA | | Records received 12/21/07 Reviewed 12/23/07 |
| Lester Smith v. Manor Care PLAINTIFF | Denis DiLoreto DiLoreto Costentino Bolinger 330 Lincoln Way East PO Box 866 Chambersburg, PA 17201 ddiloreto@dcblaw.com | NPO order | Records recived 1/15/08 |
| Sanders v. VA Nursing Home | Charles Meltmar Cochran Firm 1100 New York Avenue NW Suite 250 West Washington, DC 20005 | Smoking | Records received Discussion (2/6/08) Report Due (2/27/08) |
| Marjorie Groleau PLAINTIFF | Charles Meltmar Cochran Firm 1100 New York Avenue NW Suite 250 West Washington, DC 20005 | Coumdain mismanagement INR 4 no adjustment or monitoring | Records received 12/3/07 |
| Estate of Jo Beth Parks v. Grand Lake Villa (Delaware Co. (OK) District Court PLAINTIFF | Glen Mullins Durbin, Larimore & Bialick 920 North Harvey Oklahoma City, OK 73102-2610 | Sacral pressure sore - sepsis | Records received 10/07 Additional Records 12/14/08 Records Reviewed 1-2/08 |
| Lucille Mastrangelo PLAINTIFF | Carl A. Secola, Jr. Esquire Kinney, Secola & Gunning, LLC 685 State Street, Second Floor New Haven, CT 06511 nfazz@aol.com | Fall | Records Received 11/30/07 Draft report 12/3/07 |

| | | | |
|---|---|---|---|
| George Coughanour<br>*PLAINTIFF* | Charles Meltmar<br>Cochran Firm<br>1100 New York Avenue<br>NW Suite 250 West<br>Washington, DC 20005 | Seroquel MD thought not getting increased dose -- fell - died | Statement Completed<br>Records Received 10/11/07 |
| Michael ski v. Manor Care -- Arden Assisted Living<br>*PLAINTIFF* | Kanter Bernstein & Kardon<br>Martin Kardon<br>1617 JFK Blvd<br>Suite 1150<br>Philadelphia, PA 19103<br>Kardon@kbklaw.com<br>215-568-5885 | ALF admission mismatch<br>Traumatic Fall | Records Received (7/27/07)<br>Reviewed (8/10/07) |
| Annette Hall v. Manor Care<br>*PLAINTIFF* | Doug Murray<br>M. Mark Mendel<br>1620 Locust Street<br>Philadelphia, PA 19103 | 46y/o trach inappropriate transfer -- exceeded abilities of SNF | Records Received (5/7/07)<br>Certification |
| Gertrude Clark<br>*PLAINTIFF* | Robert Sachs<br>Shrager, Spivey & Sachs<br>Two Commerce Square<br>32nd Floor<br>2001 Market Street<br>Philadelphia, PA 19103<br>215-568-7771 | assessment and management of falls and medication, the failure to notify her attending physician which resulted in her hip fx. | Records Received 11/29/07<br>Reviewed 12/20/07<br>Draft sent 1/9/08<br>Final 1/24/08 |
| Eleanor Brooks<br>*PLAINTIFF* | Robert Sachs<br>Shrager, Spivey & Sachs<br>Two Commerce Square<br>32nd Floor<br>2001 Market Street<br>Philadelphia, PA 19103<br>215-568-7771 | assess and administer ordered treatments in a timely manner | Records Received (5/14/07)<br>Certification |
| Alfred Perrotti v. Courtyard Nursing Care Center<br>*PLAINTIFF* | Gallant & Ervin<br>One Olde North Road<br>Suite 103<br>Chelmsford, MA 01824 | Fall -> Fracture | Statement completed (4/17/06)<br>Records Received (12/23/05) |
| Robin Litkea v. Little Pine Valley, Inc. et al.<br>*PLAINTIFF* | Jason T. Studinski, JD<br>Kammer & Studinski, Chartered<br>314 DeWitt Street, Box 233<br>Portage, WI 53901 | Elopement (hypothermia) | Statement Completed (9/18/05)<br>Review<br>Records Received |
| Rachel Paul v. Woodland Center for Nursing<br>*PLAINTIFF* | Michael Navitsky<br>Navitsky, Olson & Wisneski<br>2040 Linglestown Road<br>Suite 303<br>Harrisburg, PA 17110 | | Statement Completed (5/2/05)<br>Reviewed (4/2/05)<br>Records Received |
| Peter Longo v. Yale-New Haven Hospital<br>*PLAINTIFF* | Carl A. Secola, Jr. Esquire<br>Kinney, Secola & Gunning, LLC<br>685 State Street, Second Floor<br>New Haven, CT 06511 | Pressure Ulcers | Report Submitted (4/27/06)<br>Reviewed<br>Records Received |
| Helen Marciniszyn<br>*PLAINTIFF* | Robert Sachs<br>Shrager, Spivey & Sachs<br>Two Commerce Square<br>32nd Floor<br>2001 Market Street<br>Philadelphia, PA 19103<br>215-568-7771 | Beers' List meds related to falls<br>PCP<br>ALF active involvement in clinical management | Records Received<br>Draft Report -- discussed over the phone (requested PCP records)<br>Additional Note Received (7/13/06) |

| | | | |
|---|---|---|---|
| Dorothy Cox v. Freedom Inn *PLAINTIFF* | Steven J. German, Esq.Adelman German, P.L.C.5665 North Scottsdale Rd., Suite F-105Scottsdale, Arizona 85250<br>Tel. 480-607-9166<br>Fax. 480-607-9031<br>E-Mail: Steve@AdelmanGerman.Com | diagnosed at the ED with Rhabdomyolysis, sores all over the left side of her body, dehydration, etc. | **Deposition (3/1/07)**<br>Records Review<br>Records Received (9/13/06) |
| Dale Gjermo v. Skaalen Sunset House Case No 06 CV 868 *PLAINTIFF* | Terry Polich<br>Clifford & Raihala, SC<br>44 East Mifflin Street<br>Suite 800<br>Madison, Wisconsin 53703-2800<br>608-257-7900<br>608-257-7009 fax | Development of a stage IV pressure ulcer | Case Received (8/30/06)<br>Draft Report (9/28/06) |
| **CLOSED** | | | |
| Mary Brown *PLAINTIFF* | Charles Meltmar<br>Cochran Firm<br>1100 New York Avenue<br>NW Suite 250 West<br>Washington, DC 20005 | Case not pursued<br>? delay in antibiotic therapy | *Case Not Pursued*<br>Verbal Report 11/07 |
| Dorothy Cox v. Freedom Inn *PLAINTIFF* | Steven J. German, Esq.Adelman German, P.L.C.5665 North Scottsdale Rd., Suite F-105Scottsdale, Arizona 85250<br>Tel. 480-607-9166<br>Fax. 480-607-9031<br>E-Mail: Steve@AdelmanGerman.Com | ALF fall - diagnosed at the ED with Rhabdomyolysis, sores all over the left side of her body, dehydration. | *Case Settled*<br>**Deposition (3/1/07)**<br>Records Review<br>Records Received (9/13/06) |
| Richard Ziemba v. Senior Lifestyles, Inc. (Victoria Manor of Chalfont) *PLAINTIFF* | Robert C. Beck, Jr. Esquire<br>Neil A. Morris Associates. PC<br>Mellon Bank Building 43rd Floor<br>1735 Market Street<br>Philadelphia, PA 19103 | Elopement (vehicular trauma) | *Case Settled (4/18/07)*<br>Report Submitted (4/27/06)<br>Reviewed<br>Records Received |
| Essie Young / Francis Payne v. Montgomery Village Health and Vinu Ganti, MD *PLAINTIFF* | Charles Meltmar<br>Cochran Firm<br>1100 New York Avenue<br>NW Suite 250 West<br>Washington, DC 20005 | Pain management<br>EOL care<br>Wound care<br>Role of Medical Director | *Case Settled (2/21/06)*<br>**Deposition (12/22/05)**<br>Statement Completed (6/28/05)<br>Records Received |
| Mary Ellen Stoltzfus v. Health South *PLAINTIFF* | Villari, Brandes & Kline, PC<br>8 Tower Bridge<br>161 Washington Street<br>Suite 400<br>Conshohocken, PA 10428 | Frail senior developed an aspiration pneumonia – no indication that an earlier diagnosis would have changed outcome – Recommendation not to proceed as no malpractice evident | *Case Not Advanced*<br>Case Received (Aug 06)<br>Case Reviewed (Aug 06)<br>Decision Discussed (Sept 06) |
| Angelita Torres v. Canal Side Care Manor *PLAINTIFF* | Soloff & Zervanos<br>1525 Locust Street<br>8th Floor<br>Philadelphia, PA 19102 | Elopement (drowning) | *Case Settled (10/19/06)*<br>Statement Completed (2/13/06)<br>Review<br>Records Received |
| Lawrence Groholski, Sr. v. Care Partners Assisted Living *PLAINTIFF* | Jason T. Studinski, JD<br>Kammer & Studinski, Chartered<br>314 DeWitt Street, Box 233<br>Portage, WI 53901 | Elopement (vehicular trauma)<br><br>*Jury found for plaintiff / damages of $207,000 | *Case Won-Plaintiff (6/24/06)*<br>**Testified (6/22/06)**<br>**Deposition (2/1/06)**<br>Records Received (10/29/05) |
| Felice Melendez v. Hospice *PLAINTIFF* | Charles Meltmar<br>1100 New York Avenue<br>NW Suite 250 West<br>Washington, DC 20005 | Burns | *Case Settled (*<br>Verbal Review Given<br>Reviewed<br>Records Received |

| Lucy Pietlock v. St. Francis Hospital *PLAINTIFF* | Robert Jacobs, Esquire Jacobs & Crumplar, PA 2 East 7th Street Wilmington, DE 19899 | Prevention and treatment of Pressure Sores | *Case Settled (2/7/07)* **Deposition (12/18/06)** Statement Completed (3/10/05) Review (3/10/05) Records Received |
|---|---|---|---|
| Ella Tuckerson *PLAINTIFF* | Charles Meltmar Cochran Firm 1100 New York Avenue NW Suite 250 West Washington, DC 20005 | G-tube infection | *Case Closed* Report (3/23/07) |
| Alice Montague *PLAINTIFF* | Charles Meltmar Cochran Firm 1100 New York Avenue NW Suite 250 West Washington, DC 20005 | Fall | *Case Closed* Report (3/23/07) |
| Walter *PLAINTIFF* | Charles Meltmar Cochran Firm 1100 New York Avenue NW Suite 250 West Washington, DC 20005 | Choking | *Case Closed* Report (3/23/07) |
| Benjamin Saunders *PLAINTIFF* | Charles Meltmar Cochran Firm 1100 New York Avenue NW Suite 250 West Washington, DC 20005 | Burns | *Case Closed* Verbal Review Given (11/06) |
| George Elliott v. Washington Nursing Center *PLAINTIFF* | Charles Meltmar Cochran Firm 1100 New York Avenue NW Suite 250 West Washington, DC 20005 | Elopement Hypothermia | *Case Settled* **Deposition (2/26/07)** Report (12/18/06) Comment re: Pain & Suffering (12/12/06) Reviewed (6/17/06 - brief) Records Received (6/16/06) |
| Sack v. Select Specialty Hospital(target) and Thomas Jefferson (nursing only) *PLAINTIFF* | Anita L. Pitock, Esquire Abrahams, Loewenstein & Bushman, P.C. Three Parkway - Suite 1300 16th & Cherry Streets Philadelphia, PA 19102-1321 Phone (215) 561-1030 Direct: (215) 587-0807 Fax (215) 587-0888 E-mail apitock@e-alb.com | Guillain-Barre Syndrome developed pressure ulcers secondary to failure to move patient | *Case Settled* Records Received Final Report (9/11/06) |

Depositions – 6 /  Testified – 1 / Defendants – 8 / Plaintiff - 34