## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MARY SANDERS** | ) | |
| **As Personal Representative of the** | ) | |
| **Estate Of Benjamin Sanders** | ) | |
| **4354 D Street, SE** | ) | |
| **Washington, DC   20019** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Case No. 07 1169** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## PLAINTIFF'S F.R.C.P. 26(a)(2) DISCLOSURES

Plaintiff, by counsel, for her F.R.C.P. 26(a)(2) disclosures sets forth as follows:

1.    **Ilene Warner-Maron, RN**
      2 Dundee Mews
      Media, PA 19063
      (610) 917-0255

The attached report is offered as a summary of Ms. Ilene Warner-Maron's opinions and the grounds therefore. Ms. Warner-Maron is anticipated to testify regarding the standard of care for treating/caring for a patient in a nursing home. Ms. Warner-Maron is expected to testify in accordance with her report which is attached hereto. She is also expected to testify regarding the affects of Mr. Sanders' stroke on his ability to use the left size of his body, including his arm and leg. Plaintiff reserves the right to present additional expert testimony by Ms. Warner-Maron on matters raised by testimony at deposition or trial or in rebuttal to opinions raised by expert(s) identified by defendant or where indicated by supplemental responses to this interrogatory

answer. Ms. Warner-Maron's opinions may be supplemented, modified and/or changed as she continues to review this matter on behalf of the plaintiff.

This expert designation is being provided prior to any deposition of Ms. Warner-Maron. If Ms. Warner-Maron's deposition is taken in this case, her deposition will be incorporated by reference in this designation as fully set forth in its entirety.

Ms. Warner-Maron is a registered nurse who specializes in caring for geriatric patients in a long term care setting and administration of long-term care facilities. Ms. Warner-Maron's opinions will be based upon her education, training, knowledge and experience in the area nursing and long term care and her review of the photographs, pertinent medical records, autopsy reports, police and fire investigation reports, fire and safety standards, protocols and regulations – including VA Hospital and CRNC safety standards, Life Code Safety Standards, JCAHO and OBRA regulations and safety standards, witness statements, and the depositions taken in this case. A copy of Ms. Warner-Maron's CV is attached which sets forth her education, training and experience. Ms. Warner-Maron fee for medical/legal work are attached. A list of all her publications in the last four years and her trial and deposition testimony is contained in her CV. Ms. Warner-Maron's opinions are held to a reasonable degree of professional certainty.

2. **Richard Stefanacci, DO**
**600 South 43rd Street**
**Philadelphia, PA 19104**
**(215) 596-7466**

The attached report is offered as a summary of Dr. Stefanacci's opinions and the grounds therefore. Dr. Stefanacci is anticipated to testify regarding standard of care, causation, damages, and the cause of Benjamin Sanders' burn injuries, including conscious pain and suffering. Dr. Stefanacci will also testify on the affects of anti-seizure medication on Benjamin Sanders'

2

cognitive and physical abilities and the ability of Benjamin Sanders to feel pain from his burns. He is expected to testify regarding the nature and extent of Benjamin Sander's medical history, including strokes, paralysis and speech deficits. He is also expected to testify regarding the affects of his stroke on his ability to use the left size of his body, including his arm and leg.

Dr. Stefanacci is expected to testify in accordance with his report which is attached hereto. Plaintiff reserves the right to present additional expert testimony by Dr. Stefanacci on matters raised by testimony at deposition or trial or in rebuttal to opinions raised by expert(s) identified by the defendant or where indicated by supplemental responses to this interrogatory. Dr. Stefanacci's opinions may be supplemented, modified and/or changed as he continues to review this matter on behalf of the plaintiff.

This expert designation is being provided prior to any deposition of Dr Stefanacci. If Dr. Stefanacci's deposition is taken in this case, his deposition will be incorporated by reference in this designation as fully set forth in its entirety.

Dr. Stefanacci is a medical doctor who specializes in pharmacology, internal medicine and geriatrics. Dr. Stefanacci's opinions will be based upon his education, training, knowledge and experience in the areas of internal medicine and geriatrics, and his review of the photographs, pertinent medical records, autopsy reports, fire and police investigation reports, fire and safety standards, protocols and regulations – including VA Hospital and CRNC safety standards, Life Code Safety Standards, JCAHO safety standards, his research on smoking safety in a long-term care settings, witness statements, and depositions in this case. A copy of Dr. Stefanacci's CV is attached which sets forth his education, training and experience. Dr. Stefanacci charges $500/hour for record review, $500/hour for depositions, and $500/hour for trial testimony plus travel time. Attached are a list of cases in which Dr. Stefanacci testified in

the past four years and a list of his publications in the past 10 years. Dr. Stefanacci's opinions are held to a reasonable degree of medical certainty.

3. **Daniel Lozano, MD**
   **1210 South Cedar Crest**
   **Suite 3000**
   **Allentown, PA 18103**
   **(610) 402-1485**

The attached report is offered as a summary of Dr. Lozano's opinions and the grounds therefore. Dr Lozano is anticipated to testify regarding standard of care, causation, and the cause and nature of Benjamin Sanders' physical abilities and Benjamin Sander's pain and suffering that resulted from his burns. He is also expected to testify regarding the affects of his stroke on his ability to use the left size of his body, including his arm and leg. He is expected to testify regarding the nature and extent of Benjamin Sander's medical history, including strokes, paralysis and speech deficits. Dr. Lozano is expected to testify in accordance with his report which is attached hereto. Plaintiff reserves the right to present additional expert testimony by Dr. Lozano on matters raised by testimony at deposition or trial or in rebuttal to opinions raised by expert(s) identified by the defendant or where indicated by supplemental responses to this interrogatory. Dr. Lozano's opinions may be supplemented, modified and/or changed as he continues to review this matter on behalf of the plaintiff.

This expert designation is being provided prior to any deposition of Dr. Lozano. If Dr. Lozano's deposition is taken in this case, his deposition will be incorporated by reference in this designation as fully set forth in its entirety.

Dr. Lozano is a medical doctor who specializes in internal medicine, surgery, and the treatment of burn injuries. Dr. Lozano's opinions will be based upon his education, training,

knowledge and experience in the areas of internal medicine and geriatrics, and his review of the photographs, pertinent medical records, autopsy reports, medical literature, fire and police investigation reports, photographs, fire and safety standards, protocols and regulations, -- including VA Hospital and CRNC safety standards, Life Code Safety Standards, JCAHO safety standards, his research on smoking safety in a long-term care settings, witness statements, and depositions in this case. A copy of Dr. Lozano's CV is attached which sets forth his education, training and experience. Dr. Lozano charges $600/hour for record review, $750/hour for depositions – two hour minimum, and $750/hour for trial testimony plus travel time. Attached are a list of cases in which Dr. Lozano testified in the past four years and a list of his publications in the past 10 years. Dr. Lozano's opinions are held to a reasonable degree of medical certainty.


     3.      **David Hammerman, PE**
              **3950 Chaffey Road**
              **Randalstown, PA 21133**
              **(410) 655-6862**

The attached report is offered as a summary of David Hammerman's opinions and the grounds therefore. Dr. Hammerman is anticipated to testify regarding standard of care, causation, and the cause of the fire that caused Benjamin Sanders' burn injuries. Mr. Hammerman is expected to testify in accordance with his report which is attached hereto. Plaintiff reserves the right to present additional expert testimony by Mr. Hammerman on matters raised by testimony at deposition or trial or in rebuttal to opinions raised by expert(s) identified by the defendant or where indicated by supplemental responses to this interrogatory. Mr. Hammerman's opinions may be supplemented, modified and/or changed as he continues to review this matter on behalf of the plaintiff.

This expert designation is being provided prior to any deposition of Mr. Hammerman.  If Mr. Hammerman's deposition is taken in this case, his deposition will be incorporated by reference in this designation as fully set forth in its entirety.

Mr. Hammerman, P.E. is a professional engineer with extensive fire safety experience, including Chief Fire Protection Engineer, Office of the Maryland Fire Marshall, who specializes in fire safety issues.  Mr. Hammerman's opinions will be based upon his education, training, knowledge and experience in the areas of Fire Safety and engineering, and his review of the photographs, pertinent medical records, autopsy reports, witness statements, fire and police investigation reports, fire and safety standards, protocols and regulations – including VA Hospital and CRNC safety standards, Life Code Safety Standards, JCAHO safety standards, his research on smoking safety in a long-term care settings, and depositions in this case.  A copy of Mr. Hammerman's CV is attached which sets forth his education, training and experience.  Mr. Hammerman charges $300/hour for his legal consulting work including travel time.  Mr. Hammerman has not testified in the past four years but has provided a list of his publications in the past 10 years which is attached.  Mr. Hammerman's opinions are held to a reasonable degree of professional certainty.

 

**4.      Sarah Colvin, MD**
**Office of Chief Medical Examiner**
**1910 Massachusetts Avenue, SE**
**Building 27**
**Washington, DC 20003**

The Dr. Colvin's deposition and its exhibits are offered as a summary of Dr. Colvin's opinions and the grounds therefore and are in the possession of defendant's counsel.  Dr. Colvin is anticipated to testify regarding nature and extent of Benjamin Sander's injuries, including

burns, and the cause of his death.    She is expected to testify regarding the nature and extent of

Benjamin Sander's medical history, including strokes, paralysis and speech deficits.  She is also

expected to testify regarding the affects of his stroke on his ability to use the left size of his body,

including his arm and leg.

Dr. Colvin is also expected to testify to the authentication of photographs taken before,

during and after his autopsy.

Dr. Colvin is expected to testify in accordance with her autopsy report and deposition

which are in the possession of defendant's counsel.  Plaintiff reserves the right to present

additional expert testimony by Dr. Colvin on matters raised by testimony at deposition or trial or

in rebuttal to opinions raised by expert(s) identified by the defendant or where indicated by

supplemental responses to this interrogatory.  Dr. Colvin's opinions may be supplemented,

modified and/or changed as she continues to review this matter on behalf of the plaintiff.

Dr. Colvin is a medical doctor who is board certified in forensic, anatomic and forensic

pathology.  Dr. Colvin's opinions will be based upon her education, training, knowledge and

experience in the areas of pathology, and her review of the photographs, pertinent medical

records, her autopsy of Benjamin Sanders' and her subsequent autopsy reports, fire and police

investigation reports, and witness statements.  Dr. Colvin works for the District of Columbia and,

therefore, does not charge for her testimony.  Dr. Colvin's opinions are held to a reasonable

degree of medical certainty.

3.    Plaintiff reserves the right to call any of plaintiff's health care providers to testify

regarding their care and treatment of Mr. Sanders and their opinions and diagnoses which is

described in their medical records and to authenticate and testify regarding the reasonableness of the claimed medical bills.

4.      Plaintiff also reserves the right to call any expert identified by the defendants.

5.      Plaintiff also reserves the right to identify rebuttal experts.

Respectfully submitted,

**THE COCHRAN FIRM**

W. Charles Meltmar, #438870
1100 New York Avenue, NW
Suite 340, West Tower
Washington, DC 20005
Telephone: (202) 682-5800
Fax: (202) 408-8851
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Expert Designation, and the CV's and Reports of Drs. Lozano and Stefanacci and Ilene Warner-Maron and David Hammerman were delivered by Courier this February 28, 2008 to:

Claire Whitaker, esq.
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Room E-4204
Washington, DC 20530

W. Charles Meltmar

# ALDEN

GERIATRIC CONSULTANTS, INC.

November 27, 2006

W. Charles Meltmar, Esquire
The Cochran Firm
1100 New York Ave, N.W.
Suite 250-West Tower
Washington, D.C. 20005

**RE: Benjamin Saunders**

Dear Mr. Meltmar,

I have had the opportunity to review the records from the Veterans Administration Medical Center-Washington, D.C. The opinions expressed within this report are based upon my education and experience as a Registered Nurse and licensed Nursing Home Administrator. The Joint Commission for the Accreditation of Health Care Organizations (JCAHO) will be used as a source of the standard of care for discussion in this case.

**Clinical Review**

Benjamin Saunders, date of birth May 21, 1941 was admitted to the Veterans Administration Medical Center Nursing Home on (CNRC) February 7, 2005. Mr. Saunders was a 100 percent service connected veteran with a history of seizure disorder, chronic obstructive pulmonary disease, sensorineural hearing loss, dysphagia, psychosis, schizophrenia, vision impairment, radicular and sciatic nerve involvement, hiatal hernia, chronic renal failure, gout, hypertension, bullous pemphigoid, cerebrovascular accident and diabetes mellitus. As a result of the cerebrovascular accident, the resident had a left hemiparesis.

Mr. Saunders was admitted to the hospital from January 11-13, 2005 from his home after his wife witnessed seizure activity. During that admission, the patient was noted to have left sided weakness. He was regarded as being alert and oriented to person and place only. He was able to follow simple commands.

From January 22-25, 2006, Mr. Saunders was hospitalized at the Veterans Administration Medical Center for the treatment of pneumonia. A psychology reassessment was performed on January 30, 2006 which noted *"a slight decline from prior evaluations and*

2 DUNDEE MEWS    MEDIA, PA 19063-1167
(610) 917-0255; FAX (610)325-9197; CELL (610) 322-2865
EMAIL: ALDENGERIATRICS@AOL.COM

*revealed similar orientation difficulties as in the prior evaluations but also some mild difficulty with working memory. Again, his orientation problems may just reflect the fact that he is living in an inpatient setting, but his cognitive functioning should continue to be monitored for further decline."*

Mr. Saunders was noted to be unresponsive with labored breathing on February 20, 2006, however this issue resolved without hospitalization after he was given a breathing treatment and suctioned.

An assessment of Benjamin Saunders' functional abilities was completed monthly. The assessment dated March 3, 2006 noted the following abilities and deficits:

1. Incontinent of urine;
2. Alert and cooperative;
3. Risk for falls;
4. Speech garbled;
5. Requires complete assistance for hygiene;
6. Turns with assistance;
7. Unable to ambulate;
8. Uses lift equipment to transfer from bed to chair.

While Benjamin Saunders was a resident of the nursing home on March 19, 2006, he apparently was smoking unsupervised in the smoking room. The nurse's notes from the nursing center stated *"At approximately 6:40 p.m., patient Pedro Harley came to me in room 160 and said 'one of your patients is on fire in the smoking room.' I ran to the atrium and looked toward the smoking room and saw a patient in a wheelchair completely engulfed in flames. I entered the anteroom and saw Mr. Saunders. It was impossible to rescue the patient as he and wheelchair were completely on fire. Code Blue and Code Red were initiated and the fire was extinguished with a fire extinguisher. The patient was taken to the MICU."*

Following this event, Benjamin Saunders was transferred to the Veterans Administration Medical Center. According to the hospital records, the patients sustained third degree burns over 100 percent of his body surface. The admission note stated *"Patient was a 64 year old male with unknown past medical history who was brought emergently to the MICU when a Code Blue was called as the patient was escorted from the nursing home after was noted to be burning. On arrival, he was pulseless and unresponsive. He had no blood pressure or pulse.* Mr. Saunders was pronounced dead after 22 minutes of attempts to resuscitate him failed.

## Discussion

The Joint Commission for the Accreditation of Health Care Organizations (JCAHO), provided standards from which nursing homes such as the Veterans Administration Medical Center CNRC provide care. The facility must comply with JCAHO standards in order to be accredited by this body.

The following JCAHO standards are applicable in the care of Benjamin Saunders:

1. EC.130- a. The organization develops a policy regarding smoking in all areas of all buildings under the organization's control.

    b.  The organization's policy prohibits smoking in all building(s) under the organization's control (no medical exceptions allowed) for all children or youth residents.

    c.  The organization's policy may permit residents to smoke in the organization's buildings under the following circumstance: a resident meets criteria developed and approved by the organization's leaders.

    d.  When residents are permitted to smoke in the organization's buildings, they smoke only under the following circumstances: In designated locations environmentally separate from care, treatment or service areas after the organization has taken measures to minimize fire risks.

    e.  Residents who do smoke in the organization's buildings are discouraged from doing so and are provided education including information about options for smoking cessation.

    f.  The organization identifies and implements a process(es) for monitoring compliance with the policy.

    g.  The organization develops strategies to eliminate the incidence of policy violations when identified.

2.  PC.4.10-Development of a plan for care, treatment and services is individualized and appropriate to the resident's needs, strengths, limitations and goals.

    a.  Care, treatment and services are planned to ensure that they are appropriate to the resident's needs.

    c.  The interdisciplinary team identifies and prioritizes each resident's care needs based on the analysis of assessment data.

    l.  Evaluation of the resident is based on the resident care goals and the resident's plan for care, treatment and services.

    m.  The goals of care, treatment and services are revised when necessary.

The regulations require that residents have ongoing assessments of their ability to safely smoke within a facility. There is no documentation in Mr. Saunders's nursing home records that any evaluation of his ability to safely smoke had been performed during his 13-month admission. There are notes contained within Mr. Saunders' records that the staff did try to dissuade him from smoking. He appears to have smoked four-five cigarettes per day.

There was no care plan found within the clinical records providing guidance for the staff in supervising Mr. Saunders' smoking activities, providing him a smoking apron or ensuring that a staff member supervises his smoking activities. The nurse's notes clearly stated that another resident alerted the staff that Mr. Saunders had been fully engulfed in flames. There was no evidence that he had been supervised by the staff.

Although the psychologist who performed an evaluation of Mr. Saunders on January 30, 2006 identified a decline in the resident's cognitive abilities from the previous assessment, there is no evidence that the nursing home staff developed or modified its care plans to ensure that Benjamin Saunders was capable of smoking independently. Serial assessments of his smoking were not contained within the clinical records.

– 4 –                                                November 27, 2006

**Conclusions**

There is no evidence that Veterans Administration Medical Center CNRC assessed Benjamin Saunders' ability to smoke independently at any time during his nursing home stay. No precautions were taken to promote safe smoking despite his left sided weakness, periods of unresponsiveness and his seizure disorder. His garbled speech likely contributed to his inability to summon help from staff when the fire first began. Mr. Saunders was smoking without any supervision from the staff and was discovered fully engulfed in flames by a fellow resident, rather than by a staff member. Moreover, there were no care plans found in Benjamin Saunders' records with regard to his ability to smoke or the need of the facility staff to intervene.

It is my opinion within a reasonable degree of professional nursing and nursing home administration certainty that the staff of the Veterans Administration Medical Center CNRC deviated from accepted standards of care including JCAHO regulations in the delivery of care and services to Benjamin Saunders. As a result of these deviations, Mr. Saunders smoked in an unsafe manner on March 19, 2006. He died on that date as a result of sustaining third degree burns over 100% of his body surface, according to the records. Specifically, the facility deviated from accepted standards of care by:

1. Failing to provide a baseline assessment of his ability to smoke independently;
2. Failing to reassess his smoking ability upon readmission to the facility in January 2006;
3. Failing to reassess his smoking ability after he was evaluated by the psychologist and was found to have increased cognitive deficits;
4. Failing to reassess his smoking ability after he was found unresponsive in February 2006;
5. Failing to devise a care plan to address his smoking risks;
6. Failing to provide a smoking apron or similar material to reduce the risk of unsafe smoking consequences;
7. Failing to provide adequate supervision of his smoking activities by the facility staff

This report may be amended should further information become available.

Sincerely,

Ilene Warner-Maron
RN,C CWCN MA MLSP CALA NHA

# ALDEN

GERIATRIC CONSULTANTS, INC.

December 24, 2006

W. Charles Meltmar, Esquire
The Cochran Firm
1100 New York Ave, N.W.
Suite 250-West Tower
Washington, D.C. 20005

### RE: Benjamin Saunders

Dear Mr. Meltmar,

I have had the opportunity to review the records from the Veterans Administration Medical Center-Washington, D.C. In addition, the following materials were used in order to formulate my opinions in this matter:

1. Two black and white photographs of the VAMC Smoking Shelter dated March 20, 2006;
2. Correspondence from CETROM, Inc. to the VAMC Safety Office dated May 10, 2006;
3. Memorandum from the VAMC dated April 27, 2006 regarding "Report of a Vulnerability Assessment";
4. Report from Underwriters Laboratories, Inc. to the VAMC regarding sprinkler heads dated May 5, 2006;
5. Geriatrics and Extended Care Comprehensive Nursing and Rehabilitation Center (CNRC) Policy Memorandum Number 19-"Smoking Policy" dated February 2005;
6. Department of Veterans Affairs Medical Center Smoking Risk Protocol dated October 2004;
7. Veterans Affairs Medical Center Medical Center Policy Memorandum 138-53- Code Fire Pagers for the Hearing impaired dated September 2006;
8. Veterans Affairs Medical Center Medical Center Policy Memorandum 00-20- Establishment of a Smoke-Free Environment;
9. Veterans Affairs Medical Center Medical Center Policy Memorandum 138-12- Safety Management Plan dated October 2006;

The opinions expressed within this report are based upon my education and experience as a Registered Nurse and licensed Nursing Home Administrator. The Joint Commission

for the Accreditation of Health Care Organizations (JCAHO) will be used as a source of the standard of care for discussion in this case.

## Clinical Review

Benjamin Saunders, date of birth May 21, 1941 was admitted to the Veterans Administration Medical Center Nursing Home on (CNRC) February 7, 2005. Mr. Saunders was a 100 percent service connected veteran with a history of seizure disorder, chronic obstructive pulmonary disease, sensorineural hearing loss, dysphagia, psychosis, schizophrenia, vision impairment, radicular and sciatic nerve involvement, hiatal hernia, chronic renal failure, gout, hypertension, bullous pemphigoid, cerebrovascular accident and diabetes mellitus. As a result of the cerebrovascular accident, the resident had a left hemiparesis.

Mr. Saunders was admitted to the hospital from January 11-13, 2005 from his home after his wife witnessed seizure activity. During that admission, the patient was noted to have left sided weakness. He was regarded as being alert and oriented to person and place only. He was able to follow simple commands.

From January 22-25, 2006, Mr. Saunders was hospitalized at the Veterans Administration Medical Center for the treatment of pneumonia. A psychology reassessment was performed on January 30, 2006 which noted *"a slight decline from prior evaluations and revealed similar orientation difficulties as in the prior evaluations but also some mild difficulty with working memory. Again, his orientation problems may just reflect the fact that he is living in an inpatient setting, but his cognitive functioning should continue to be monitored for further decline."*

Mr. Saunders was noted to be unresponsive with labored breathing on February 20, 2006, however this issue resolved without hospitalization after he was given a breathing treatment and suctioned.

An assessment of Benjamin Saunders' functional abilities was completed monthly. The assessment dated March 3, 2006 noted the following abilities and deficits:

1. Incontinent of urine;
2. Alert and cooperative;
3. Risk for falls;
4. Speech garbled;
5. Requires complete assistance for hygiene;
6. Turns with assistance;
7. Unable to ambulate;
8. Uses lift equipment to transfer from bed to chair.

While Benjamin Saunders was a resident of the nursing home on March 19, 2006, he apparently was smoking unsupervised in the smoking room. The nurse's notes from the nursing center stated *"At approximately 6:40 p.m., patient Pedro Harley came to me in room 160 and said 'one of your patients is on fire in the smoking room.' I ran to the atrium and looked toward the smoking room and saw a patient in a wheelchair completely engulfed in flames. I entered the anteroom and saw Mr. Saunders. It was impossible to rescue the patient as he and wheelchair were completely on fire. Code*

*Blue and Code Red were initiated and the fire was extinguished with a fire extinguisher. The patient was taken to the MICU.*"

Following this event, Benjamin Saunders was transferred to the Veterans Administration Medical Center. According to the hospital records, the patients sustained third degree burns over 100 percent of his body surface. The admission note stated *"Patient was a 64 year old male with unknown past medical history who was brought emergently to the MICU when a Code Blue was called as the patient was escorted from the nursing home after was noted to be burning. On arrival, he was pulseless and unresponsive. He had no blood pressure or pulse.* Mr. Saunders was pronounced dead after 22 minutes of attempts to resuscitate him failed.

## Discussion

The Joint Commission for the Accreditation of Health Care Organizations (JCAHO), provided standards from which nursing homes such as the Veterans Administration Medical Center CNRC provide care. The facility must comply with JCAHO standards in order to be accredited by this body.

The following JCAHO standards are applicable in the care of Benjamin Saunders:

1.  EC.130- a. The organization develops a policy regarding smoking in all areas of all buildings under the organization's control.
    b.  The organization's policy prohibits smoking in all building(s) under the organization's control (no medical exceptions allowed) for all children or youth residents.
    c.  The organization's policy may permit residents to smoke in the organization's buildings under the following circumstance: a resident meets criteria developed and approved by the organization's leaders.
    d.  When residents are permitted to smoke in the organization's buildings, they smoke only under the following circumstances: In designated locations environmentally separate from care, treatment or service areas after the organization has taken measures to minimize fire risks.
    e.  Residents who do smoke in the organization's buildings are discouraged from doing so and are provided education including information about options for smoking cessation.
    f.  The organization identifies and implements a process(es) for monitoring compliance with the policy.
    g.  The organization develops strategies to eliminate the incidence of policy violations when identified.
2.  PC.4.10-Development of a plan for care, treatment and services is individualized and appropriate to the resident's needs, strengths, limitations and goals.
    a.  Care, treatment and services are planned to ensure that they are appropriate to the resident's needs.
    c.  The interdisciplinary team identifies and prioritizes each resident's care needs based on the analysis of assessment data.
    l.  Evaluation of the resident is based on the resident care goals and the resident's plan for care, treatment and services.
    m.  The goals of care, treatment and services are revised when necessary.

– 4 –                                                December 24, 2006

The regulations require that residents have ongoing assessments of their ability to safely smoke within a facility. There is no documentation in Mr. Saunders's nursing home records that any evaluation of his ability to safely smoke had been performed during his 13-month admission. There are notes contained within Mr. Saunders' records that the staff did try to dissuade him from smoking. He appears to have smoked four-five cigarettes per day.

There was no care plan found within the clinical records providing guidance for the staff in supervising Mr. Saunders' smoking activities, providing him a smoking apron or ensuring that a staff member supervises his smoking activities. The nurse's notes clearly stated that another resident alerted the staff that Mr. Saunders had been fully engulfed in flames. There was no evidence that he had been supervised by the staff.

Although the psychologist who performed an evaluation of Mr. Saunders on January 30, 2006 identified a decline in the resident's cognitive abilities from the previous assessment, there is no evidence that the nursing home staff developed or modified its care plans to ensure that Benjamin Saunders was capable of smoking independently. Serial assessments of his smoking were not contained within the clinical records.

A review of the VAMC policies and procedures regarding smoking safety contained within CNRC Policy Memorandum Number 19 dated February 2005 included the provisions that the Smoking Shelter adjoining the CNRC atrium and the CNRC Patio were the only locations approved for smoking for residents of the unit. Further, the policy stated *"The CNRC staff (Medical and Nursing Service) assess smoking habits on admission and identify those residents considered "High Risk" smokers. "High Risk" smokers are those residents who pose a threat to themselves or others due to their reluctance to following smoking regulations and/or those individuals with a medical condition that prevents them from fully understanding the smoking policy."* A second provision in the policy requires that *"The physician/nurse practitioner will write an order indicating "High Risk Smoker-Supervised Smoking Only." A list of "High Risk" residents will be posted on each unit and documented as "high risk smoker" in the interdisciplinary Plan of Care. These High Risk Residents will only smoke under the direct supervision of CNRC staff or volunteers (or when a family member/significant other is present). Cigarettes for high risk residents may be kept at the nursing station and issued by CNRC staff."* There are references in the chart that Mr. Saunders had been asked by the staff regarding his desire for smoking cessation interventions, however there is no documentation in Benjamin Saunders' VAMC record that he was assessed regarding his safety in smoking. There were no care plans devised to address his smoking risk, despite the fact that this policy was in effect for over one year prior to his fatal incident.

Of note, an evaluation of the sprinklers in place in the Smoking Shelter at the time of Mr. Saunder's fatal fire revealed no inherent problems with the devises, however in a report to the VAMC by Cetrom, Inc., it was stated that *"the sprinklers were initially developed as a means of property protection and even the advances such as quick response sprinklers do not promise to prevent a fire or extinguish at an incipient stage. Instead, they are designed to control the initial fire and its spread."* Therefore, the fire sprinkler system is primarily designed to minimize the loss of property rather than to provide a significant intervention in the event that a resident has become involved in a fire.

December 24, 2006

A memorandum generated by the VAMC dated April 27, 2006 acknowledged that video camera surveillance of the Smoking Shelter was not in place on the day of Benjamin Saunder's fire. The policies and procedures in place called for residents to be smoking under the direct supervision of CNRC staff, volunteers, family or significant others, however there was no evidence that the room was under direct observation on March 19, 2006.

## Conclusions

There is no evidence that Veterans Administration Medical Center CNRC assessed Benjamin Saunders' ability to smoke independently at any time during his nursing home stay. No precautions were taken to promote safe smoking despite his left sided weakness, periods of unresponsiveness and his seizure disorder. His garbled speech likely contributed to his inability to summon help from staff when the fire first began. Mr. Saunders was smoking without any supervision from the staff and was discovered fully engulfed in flames by a fellow resident, rather than by a staff member. Moreover, there were no care plans found in Benjamin Saunders' records with regard to his ability to smoke or the need of the facility staff to intervene.

It is my opinion within a reasonable degree of professional nursing and nursing home administration certainty that the staff of the Veterans Administration Medical Center CNRC deviated from accepted standards of care including JCAHO regulations in the delivery of care and services to Benjamin Saunders. As a result of these deviations, Mr. Saunders smoked in an unsafe manner on March 19, 2006. He died on that date as a result of sustaining third degree burns over 100% of his body surface, according to the records. Specifically, the facility deviated from accepted standards of care by:

1. Failing to provide a baseline assessment of his ability to smoke independently;
2. Failing to reassess his smoking ability upon readmission to the facility in January 2006;
3. Failing to reassess his smoking ability after he was evaluated by the psychologist and was found to have increased cognitive deficits;
4. Failing to reassess his smoking ability after he was found unresponsive in February 2006;
5. Failing to devise a care plan to address his smoking risks;
6. Failing to provide a smoking apron or similar material to reduce the risk of unsafe smoking consequences;
7. Failing to provide adequate supervision of his smoking activities by the facility staff;
8. Failing to follow the facility's own policies and procedures which were in effect at the time of his fatal injuries.

– 6 –                                    December 24, 2006

This report may be amended should further information become available.


Sincerely,

Ilene Warner-Maron
RN,C CWCN MA MLSP CALA NHA

# MARSHALL A. KLEIN & ASSOCIATES, INC.
## FIRE PROTECTION    •    BUILDING CODE
## ENGINEERS    CONSULTANTS

<table>
<tr><td>3950 Chaffey Road<br>Randallstown, Maryland 21133<br>410-655-6862   Fax: 410-655-9456<br>Email: davidh10@verizon.net</td><td>6815 Autumn View Drive<br>Eldersburg, Maryland 21784-6304<br>410-781-6474   Fax: 410-795-7360<br>Email: maklein@adelphia.net</td></tr>
</table>

December 26, 2006

To:    W. Charles Meltmar, Esq.
       The Cochran Firm
       1100 New York Avenue, NW
       Suite 340, West Tower
       Washington, DC  20005

From:  David M. Hammerman, Fire Protection Engineer, P.E.
       MAK & Assoc, Inc.

Re:    Saunder's Case
       Preliminary Analysis
       Applicable Fire Code/Smoking Regulations
       Veterans Administration Hospitals

The purpose of this report is to identify the applicable fire codes and smoking regulations adopted by the Veterans Administration (VA) hospitals and any apparent violations that likely were contributory to the fatality associated with this case.  The conclusions reached herein are based upon the information obtained from various sources noted in this report.

Initially, it is important to mention that the Department of Veteran Affairs has a primary goal to provide an environment for occupants that is reasonably safe from fire and products of combustion.  To achieve this goal, the Veterans Administration Fire Protection Design Manual states: "The objectives are to protect occupants who are not intimate with initial fire development for the time needed to take appropriate action, and to improve the survivability of occupants who are intimate with initial fire development.

The secondary goal is to provide a reasonable level of building usability and property protection from the effects of fire and products of combustion."

In support of these goals, the VA has adopted the National Fire Codes published by the National Fire Protection Association including the Life Safety Code, NFPA 101, 2006 edition, and the Uniform Fire Code, NFPA 1, 2006 edition.

## Life Safety Code, NFPA 101, 2006 Edition

The Life Safety Code (LSC) establishes minimum acceptable levels of life safety from fire for all VA hospitals.  For existing Health Care Facilities, the Life Safety Code states the basic criteria to minimize or prevent fatalities or injuries from smoking materials.

Conditions for allowing Smoking in Health Care Facilities  can be found in the "Life Safety Code" (LSC) in Chapter 19 – Existing Health Care Facilities,  Section 19.7.4 where the LSC establishes smoking regulations that shall be adopted  with  specific conditions as mandated in Sections 19.7.4(3) and 19.7.4(4), as excerpted below:

> *"19.7.4 (3)   Smoking by patients classified as not responsible shall be prohibited.*
>
> *19.7.4 (4)      The requirement of 19.7.4(3) shall not apply where the patient is under direct supervision."*

## Uniform Fire Code, NFPA 1, 2006 Edition

Conditions for allowing Smoking in Health Care Facilities are extracted from the NFPA 101 and placed in the NFPA 1. They can be found in Chapter 20 – Existing Health Care Facilities, Section 20.4.2.4, where the Uniform Fire Code establishes Smoking regulations that shall be adopted with specific conditions as mandated in Sections 20.4.2.4 (3) and 20.4.2.4 (4) as excerpted below:

> *"20.4.2.4 Smoking regulations shall be adopted and shall include not less than the following provisions:*

2

**(3)     Smoking by patients classified as not responsible shall be prohibited.**

**(4)     The requirement of 20.4.2.4(3) shall not apply where the patient is under direct supervision."**

## VA Smoking Policy

In support of these adopted National Fire Codes and Standards; and to meet their fire safety goals relevant to smoking materials and patient safety, VA policies have been established and updated periodically.

The VHA Directive 2003-035 published the "Smoke Free Policy for VA Health Care Facilities." This policy emphasizes a smoke-free environment within the VA health care facility, and smoking is allowed only in designated smoking areas. This policy states: "The Health Care Facility Director is responsible for ensuring that smoking on facility grounds is allowed to the extent that it does not interfere with safety and public access. Entrances, including primary main entrances, to a health care building are not to be used as an approved smoking area. Only the detached building, or designated open areas on the grounds, is to be used for smoking."

Enforcement of this Policy includes written instructions to communicate life safety aspects of the Smoke Free Policy, both verbally and in writing, to patients, visitors and staff. Additionally, all employees are requested to assist in the enforcement of the Smoke Free Policy.

Another example is Medical Center Policy Memorandum No. 138-12, which establishes a Safety Management Plan. One of the purposes of this plan is to assure a safe, functional, supportive and effective environment for patients, based upon applicable laws and regulations maintaining safe conditions for patients.

**Violations of the VA Adopted Policies/Protocol and Fire Codes that likely were contributory to the fatality associated with this case are irrefutable for the following reasons:**

    1.    It is necessary to critique the benefit of the report of tests on automatic sprinkler field samples, which were removed from the room of fire origin.

The 4 sprinklers tested by Underwriters Laboratories apparently were the ones removed from the ceiling of the "smoking room," above the fatally injured cigarette smoking patient. Although the actual Fire Incident report was not available at the writing of this report, it was concluded that these 4 sprinklers were inside the room of fire origin.

The fire test report offers no correlation between the laboratory testing protocol of standard sprinklers and the level of protection a sprinkler system is intended to afford to an unattended patient smoking unsafely in a "Smoking Room." Historically, single fatalities of this kind are not uncommon in a sprinklered building. Sprinkler protection has always been most effective to prevent multiple fatalities in a fully sprinklered building, as opposed to this scenario of events causing this single fatality.

A cigarette fire caused by an unattended hospital patient, likely will not actuate a sprinkler in the same quickness of time, compared to sprinkler operation in a controlled laboratory test protocol.

    2.    Hospital smoking policies established for patient safety should be based upon the ability of the patient to manage the smoking task with due diligence, and for the staff to provide an effective fire safe environmental protocol within the hospital. Sprinkler protection, for sole protection of the smoker, should not be the basis for deciding whether a patient should be allowed to smoke in a fire safe environment.

    3.    Reference is made to the Uniform Fire Code, NFPA 1, Section 20.4.2.4 (3) and the Life Safety Code, NFPA 101, Section 19.7.4(3):

"Smoking by patients classified as not responsible shall be prohibited."

Given the outcome of this episode, this patient should have been continuously supervised when smoking, or prohibited from smoking in order to comply with the adopted Fire Code.

4.      Referring to the Smoking Risk Protocol of the Department of Veterans Affairs Medical Center, the purpose of the Protocol is to have an outcome "…to prevent injuries related to smoking." Item 19 states: "There will not be an injury to patient, others or property secondary to smoking."

The smoking fatality referenced in this report was evidence of the failure of this protocol.

5.      Referring to the CNRC Smoking Policy No. 19, the staff is obligated to assess smoking habits of patients and identify "High Risk" Smokers, who are those residents who pose a threat to themselves or others due to their reluctance to follow smoking regulations and/or those individuals with a medical condition that prevents them from fully understanding the smoking policy.

The smoking fatality referenced in this report was evidence of the failure to strictly enforce this Smoking Policy.

I believe that this preliminary analysis will be helpful to your case.  As more information is disclosed to us, a final report will be prepared per your request and any assumptions or conclusions that need revising will be done.

If you have any further questions/issues, please call me or reply by email.

## References:

1.      **Codes, Standards and Executive Orders,** VHA Program Guide PG-18-3, Topic 1, July 2006.

2.      **Life Safety Code**, NFPA 101, 2006 edition; published by the National Fire Protection Association.

3.     **Uniform Fire Code**, NFPA 1, 2006 edition, published by the National Fire Protection Association.

4.     **"Smoke Free Policy for VA Health Care Facilities,"** VHA Directive 2003-035 Publication, July 1, 2003. This VHA Directive expires July 31, 2008.

5.     **"Establishment of a Smoke - Free Environment,"** Department of Veterans Affairs Medical Center, 50 Irving Street, NW Washington, DC 20422. Medical Center Policy Memorandum No. 00-20, January, 2005.

6.     **"Safety Management Plan,"**, Department of Veterans Affairs Medical Center, 50 Irving Street, NW Washington, DC 20422. Medical Center Policy Memorandum No. 138-12, October, 2006.

7.     **"Smoking Risk Protocol,"** Department of Veterans Affairs Medical Center, Washington, DC Nursing Service, Last dated October, 2006

8.     **"Smoking Policy,"** Geriatrics and Extended Care Comprehensive Nursing and Rehabilitation Care (CNRC), Washington, DC, CNRC Policy Memorandum No. 19, February, 2005.

9.     **"Report on Tests on Automatic Sprinkler Field Samples,"** May 05, 2006, Underwriters Laboratories Inc. for Veterans Affairs Medical Center, 50 Irving St. NW, Washington, DC 20422

10.    **"The Standard for Inspection, Testing and Maintenance of Water Based Fire Protection Systems,"** NFPA 25, referenced by Underwriters Laboratories Inc. in its "Report on Tests on Automatic Sprinkler Field Samples"

Final preliminary report applicable fire codes 12-26-06 (C:\Documents and Settings\Marshall Klein\My Documents\My Old Laptop Documents\My Word Files for 2006\Final Preliminary report applicablefire codes 12-26-06 edited by MAK.doc)

6



**LEHIGH VALLEY**
**PHYSICIAN GROUP**
Affiliated with Lehigh Valley Hospital and Health Network

**Surgical Specialists of the Lehigh Valley**
**Burn Center**
1210 South Cedar Crest Boulevard
Suite 3000
Allentown, Pennsylvania 18103
Phone: 610-402-1485
Fax: 610-402-8868

**Daniel D. Lozano, M.D., FACS**
**Sigrid Blome-Eberwein, M.D.**
**Pamela A. Howard, M.D., FACS, CIME**

October 12, 2007

W. Charles Meltmar, Esq.
The Cochran Firm
1100 New York Avenue, NW
Suite 340, West Tower
Washington, D.C.

RE:   Mary Sanders as Personal Representative of the Estate of Benjamin Sanders vs.
United States of America

Dear Mr. Meltmar:

At your request I have reviewed the documents on behalf of Benjamin Sanders in
connection with the above mentioned matter.  They include the following:

> Plaintiff's Complaint
> Report of Ilene Warner-Maron
> Medical record of Veterans Administration Medical Center
> Report of Marshall A. Klein and Associates
> Report of Centrom Incorporated
> Report of Vulnerability Assessment
> Report of Test on Automatic Sprinkler Field Samples
> CNRC Smoking Policy Memorandum no. 19
> Autopsy report
> Washington D.C. Fire & EMS Dept. report

As you are well aware, Mr. Sanders was a 63 year old male who was admitted to the
Veterans Administration Medical Center Comprehensive Nursing and Rehabilitation
Center (CNRC) on 2/7/05.  Mr. Sanders' past medical history was significant for a
previous cerebrovascular accident (stroke) that resulted in a left sided hemiparesis, or
paralysis.  Other significant medical problems include seizure disorder, chronic
obstructive pulmonary disease, hearing loss, vision impairment, diabetes, psychosis
and schizophrenia, hypertension, and chronic renal failure.

Admission to the nursing home was for long term care, which was required after Mr.
Sanders suffered a stroke in January of 2005.  The last assessment of Mr. Sanders
abilities, dated 3/3/2006, states that he was at risk for falls, unable to ambulate, needs

assistance to turn, requires lift equipment to transfer from bed to chair, requires complete assistance for hygiene, and has garbled speech.

On March 19, 2006, at approximately 6:40pm, another patient notified the nursing staff that Mr. Sanders was on fire. The nurse noted that Mr. Sanders was engulfed in flames, a Code Blue and Code Red were initiated, and the fire was extinguished with a fire extinguisher. The patient was then taken to the medical intensive care unit (MICU). Resuscitation was attempted, and Mr. Sanders was pronounced dead at 7:18pm after a 22 minute Code Blue that was initiated at 6:56pm.

In examining the timeline of events, the nursing documentation is consistent with the Washington D.C. Fire & EMS incident report, the alarm was activated at 6:40pm. The fire service was directed to the scene on the 2nd floor of the nursing home and ensured that there was no structural fire. They were then directed to the MICU on the 4th floor of the main hospital building. The fire service noted that there was a smoldering wheelchair in the hallway outside the MICU, which was then moved outside of the building.

Multiple reports in the medical record document Mr. Sanders' burn as being 100% total body surface area. This is inconsistent with the true extent of the injuries, from viewing the autopsy report and photographs, the correct estimate of the burn is approximately 50-55% total body surface area, which is potentially survivable. Dr. Kao, who attended to the patient during the Code Blue, was the only individual that reasonably estimated the correct burn size at 55% TBSA.

What is concerning is that once Mr. Sanders had the fire extinguished, there was not an appropriate medical response to his condition. The appropriate response should have been to access the ABC's for basic emergency care. The airway, breathing, and circulation should have been assessed immediately. In addition the patient should have had the burning process stopped. Instead, the patient was transported from the 2nd floor of the nursing home to the 4th floor of the main hospital in a still-smoldering wheelchair with an unsecured airway (not breathing). There was a sixteen minute delay from the time the fire alarm was activated and the institution of the code blue in the Medical Intensive Care Unit (MICU). There was a sixteen minute period where no one addressed Mr. Sanders' inability to breathe after being burned. When he arrived at the MICU, he was without a pulse and unresponsive. Once emergent intubation was performed there is also question as to whether the tube was appropriately placed in the airway. Despite hearing bilateral breath sounds on auscultation, the $CO_2$ indicator did not respond appropriately. This could be a result of inability to appropriately ventilate a burn patient due to the eschar (burned skin) on the chest that becomes inelastic. The correct treatment is to perform surgical incisions on the chest, called escharotomies. Incisions would be placed on the lateral chest walls, extending from the clavicles (collar bone) and extending down to the abdomen. The incision would then be connected across the middle of the chest. A small 6cm (< 2.5 inches) incision was placed on the left chest, which was a completely inadequate attempt at performing an escharotomy by Dr. Kao.

The VAMC has well-defined policies with regard to smoking safety.  Nowhere in the medical record is this issue addressed as it relates to Mr. Sanders.  It would seem obvious that a history of seizures and stroke after subsequent paralysis would deem Mr. Sanders high risk.  In addition, the most current functional assessment of Mr. Sanders on 3/3/2006, well documented his inability to care for himself.  For the last several decades, one of the popular and familiar teachings in burn prevention across the United States is "Stop, Drop and Roll".  These are the steps that one should follow if caught on fire.  This most basic fire prevention teaching is intended to limit the amount of burning that occurs, should someone catch on fire.  Once Mr. Sanders was on fire, he did not have the physical ability to extinguish himself.  Although Mr. Sanders was burned on many areas of the body, on examination of the autopsy photographs it is apparent that Mr. Sanders' left arm was severely burned because of his inability to move.  Allowing Mr. Sanders to smoke unsupervised placed him at undue risk of injury.

The autopsy report and photographs show the burn is estimated at 50-55%, as previously mentioned.  In addition the report documents a burned epiglottis, which is consistent with inhaling flames and/or heat. This finding demonstrates a burn injury to Mr. Sanders' airway.  Many of the burns on Mr. Sander's body demonstrate charring, which is consistent with prolonged exposure to flame or heat.  To progress from a small smoldering fire to being fully engulfed in flames required that Mr. Sanders had to have been on fire for quite an extended period of time, all the while unable to move or call for help. Although it is difficult to estimate how long Mr. Sanders was on fire, it is clear from the photographs of the deep burns that he was on fire for many minutes. The skin had actually begun to char, bubble and pop. The photographs also demonstrate that Mr. Sanders never had the burning clothes completely removed from his body which is basic first aid initiated to stop the burning process.

The initial reaction that one has to the idea of being burned is severe pain.  It cannot be questioned that burn injuries are extremely painful.  The normal response to being burned is to attempt to remove one's self from the heat source.  Mr. Sanders' inability to remove himself from the flames resulted in a slow, agonizing, torturous death.  It cannot be argued that burning to death is one of the most horrific concepts imaginable.  Once someone is burned, the first order of treatment is to ensure an adequate airway and respiration for the burn victim.  Patients with respiratory problems, notably Mr. Sanders, must be identified immediately and intubation and ventilation are required at the scene.  Instead, Mr. Sanders was transported from one building to another with clothes and wheelchair that continued to burn.  In addition to the suffering that he incurred from the burn injury, he also suffered while he was being transported to the MICU without a secure airway, essentially suffocating to death along the way. Although Mr. Sanders' age and size of burn would have resulted in a high mortality rate, the lack of addressing his airway at the scene of injury ensured that he could not have survived the injury.

It is clear from the examination of medical records that there were significant breeches in the standard of care that Mr. Sanders received during his stay at the VAMC. Allowing Mr. Sanders to smoke unsupervised resulted in Mr. Sanders burning to death in a

wheelchair unable to move or call for help. In addition, there was a profoundly inadequate response by initial responders at the VAMC to the incident. Emergency care was not initiated until after a prolonged transport time, and as a result Mr. Sanders arrived at the MICU without a pulse and not breathing.

I hold these opinions within a reasonable degree of medical certainty and reserve the right to file a supplemental report should additional information regarding this case become available. If you have any additional questions or concerns please do not hesitate to contact me.

Daniel D. Lozano, M.D., FACS
Medical Director, Burn Unit
Lehigh Valley Regional Hospital
Associate Professor of Surgery
Penn State Medical College