## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**MARY SANDERS,**                       )
                                        )
      **Plaintiff,**   )
                                        )
      **v.**          )        **Civil Action No. 07-01169 (ESH)**
                                        )
**UNITED STATES OF AMERICA,**           )
                                        )
      **Defendant.**   )
_____ )

### DEFENDANT UNITED STATES' MOTION TO DISMISS
### OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant, United States, on behalf of the U.S. Department of Veterans[1] Affairs, respectfully moves this Court to dismiss this Federal Tort Claims Act case against the United States for failure to state a claim as Plaintiff has failed to set forth a *prima facie case* of medical malpractice.   In the alternative, Defendant moves this Court, pursuant to Fed. R. Civ. P. 56(c), for summary judgment as there is no genuine issue as to any material fact and Defendant is entitled to judgment as a matter of law. In support of this motion, the Court is respectfully referred to the accompanying supporting documents, memorandum of points and authorities, and statement of material facts not in dispute.  A proposed order consistent with this motion is also attached.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR , D.C. Bar # 498610
United States Attorney

_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

_____/s/_____
CLAIRE WHITAKER, D.C. Bar # 354530
ASSISTANT UNITED STATES ATTORNEY
Office of the U.S. Attorney - District of Columbia
Civil Division
555 4th Street
Washington, D.C. 20530
(202) 514-7137

OF COUNSEL:
PATRICIA TRUJILLO
Staff Attorney
U.S. Department of Veterans Affairs
Regional Counsel Office

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
MARY SANDERS,                           )
                                        )
            Plaintiff,                   )
                                        )
      v.                                 )        Civil Action No. 07-01169 (ESH)
                                        )
UNITED STATES OF AMERICA,                )
                                        )
            Defendant.                   )
_____ )

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS,
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

I. PRELIMINARY STATEMENT

Mary Sanders, Personal Representative of the Estate of Benjamin Saunders, has brought

this wrongful death action alleging medical malpractice against the United States of America.

Plaintiff claims that the U.S. Department of Veterans Affairs ("VA") Comprehensive Nursing

and Rehabilitation Center ("CNRC") failed to assess Mr. Saunders's cigarette smoking ability,

and such  failure allegedly resulted in his burning death on March 19, 2006, while alone in the

CNRC's smoking room.  Compl. ¶ 6.3.  Until that day, Mr. Saunders never had a smoking

accident known to either his family or the VA.  Indeed, neither his family nor anyone at the

VA's CNRC found him to be an unsafe smoker.

To succeed in this action, Plaintiff must establish: (1) that there was a "national" standard

of care for determining whether a resident of a long term care facility was a safe or unsafe

smoker, (2) that the VA deviated from that national standard of care, and (3) that there was a

causal relationship between the deviation and the harm complained of.  *See Nwaneri v.*

*Sandidge*, 931 A.2d 466, 470 (D.C. 2007).  Plaintiff has not established that there is a national

standard of care regarding the methods of assessment of smokers in nursing homes. Even if Plaintiff could establish a national standard of care, she cannot show that the VA deviated from that standard. Accordingly, this case should be dismissed with prejudice for failure to state a claim, or in the alternative, summary judgment should be entered in Defendant's behalf.[1]

## II. STATEMENT OF FACTS

Benjamin Saunders, a 64-year old Army veteran, had a stroke in 1992 and, as a result, his left side had some level of paralysis. Deposition of Mary Sanders (Mr. Saunders's widow) ("Dep."), 13:15, June, 11 2008 (Attachment 1); Deposition of Ashraf Alehossein (CNRC Nurse Practitioner who cared for Mr. Saunders), Dep. 112:18-22; 113:1-10, Jan. 30, 2008 (Attachment 6). He used a motorized wheelchair. *Id.* at 68:6-7.[2]

Mr. Sanders smoked cigarettes before and after the stroke without incident—in all, for over 38 years. Mary Sanders Dep. 21:12-14; *see also* Deposition of Temega Sanders (Mr. Sanders's daughter who had lived at her parents' home her entire life (for 33 years as of March 2006), Dep.11:20-12:4, May 30, 2008 (Attachment 2); and Deposition of Frances Henderson (Associate Chief Nurse for Geriatrics and Extended Care, who oversaw Mr. Sanders's care at the VA's CNRC), Dep. 62:17-20, Dec. 10, 2007 (Attachment 5).

---

1

Defendant submits that there are other grounds for dismissal of this lawsuit, including the lack of a causal relationship between the alleged deviation and the harm, contributory negligence and assumption of the risk. Since failure to set forth a national standard is a seminal requirement in this jurisdiction (the District of Columbia), Defendant limits its argument here to that defense. Should the Court deny this motion, Defendant reserves the right to present further argument on the other grounds. Moreover, should Plaintiff not amend her complaint to aver a "survival action" as opposed to a "wrongful death" action, Defendant will move to dismiss on exhaustion grounds as well.

2

Mr. Saunders/Mr. Sanders are used interchangeably. According to his widow, the Army misspelled her husband's name and never corrected it. (Attachment 1 at 9:15.)

Neither Mr. Sanders's daughter nor her mother ever witnessed Mr. Sanders have a smoking accident. Temega Sanders Dep. 26:1-7; Mary Sanders Dep. 21:12-14.  Indeed, in 38 years, Mary Sanders admitted that she only saw one burn hole in his pants and when she commented on it, he said "that was there for a long time." *Id.* at 21:17-20.  Mr. Sanders's two daughters and his wife gave him cigarettes and "had no problem with him smoking." Temega Sanders Dep. 26:15-18.   In fact, his family stated that he enjoyed smoking.  Beverly Sanders Dep. 18:18-19, May 30, 2008 (Attachment 3).  He said it was his "only pleasure." Mary Sanders Dep. 15:11-12.  He smoked as many as eight to ten cigarettes each day (Mary Sanders Dep. 67:22-68:2), and at least three or four cigarettes per day at the VA's CNRC.  Attachment 4 at 410.

During the first 13 years after his stroke, Mr. Sanders lived at home.  Mary Sanders Dep. 14:1-6.  During that time, Mr. Sanders came to the VA's CNRC twice a year for a period of two weeks each, for "respite" care.   Temega Sanders Dep. 18:7-12.  The purpose of the respite care was not due to any change in Mr. Sanders's condition, rather it was to give Mary Sanders "a break." *Id*. at 18:14.  Accordingly, the CNRC staff was very familiar with his medical conditions and smoking abilities. Alehossein Dep. 56:4; 62:17-20; 69:9.

When Mr. Sanders was admitted to the VA CNRC in January 2005, it was for a longer respite.  Beverly Sanders Dep. 16:20-17:1.   After his admission, his wife became ill and was hospitalized herself.  Temega Sanders Dep. 22:12-15 and Beverly Sanders Dep. 17:1-5 ("so that made the respite part be permanent because at that point she was not going to be able to care for him anymore").  In sum, Mr. Sanders was admitted to the CNRC because his wife could no longer care for him and not due to any change in his own condition.  Mary Sanders Dep. 22:13-20; *see also* Attachment 4 at 706 (medical records showing that Mr. Sanders's medical records

reflect that the reason for his admission was because his "wife is sick and cannot take care of [him]").

Upon admission to the CNRC in 2005, Mr. Sanders was evaluated and a "care plan" developed. Attachment 4 at 705-22.   Mr. Sanders's medical problems included benign hypertension, cerebrovascular effects, chronic kidney failure, diabetes, gout, monoclonal gammopathy, some hearing loss, seizures, and periodontitis. *Id.* at 716.  Due to his stroke, he had contractures of three fingers of the left hand (Deposition of Raya Kheirbek (Medical Director of the CNRC) Dep. 65:2-4, Jan. 31, 2008) (Attachment 7), which left him with movement in his thumb and pointing finger.  *Id.* at 65:10-11.  His left arm was not totally out of function (*id.* at 65:6-8), and "he could do passive range of motion with assistance."  Henderson Dep. 99:2-5. He had a history of seizures, for which he was taking anti-seizure medication.  *Id.* at 112:9-14. He was documented as having a "mild cognitive impairment" (*id.* at 146:18), but he was still "able to articulate himself and able to make his needs known."   Kheirbek Dep. 64:16-17.  He also had slurred speech, but a loud voice. Alehossein Dep. 27:10-15; Deposition of Jerry Lee Phillips (Nursing Assistant at CNRC who cared for Mr. Sanders) Dep. 14:2, Jan. 31, 2008 (Attachment 8).  These conditions were the same as existed while Mr. Sanders lived at home. Mary Sanders Dep. 22:13-20.

The CNRC admission evaluation did not identify Mr. Sanders as a high-risk smoker. Attachment 4 at 712 (Excerpts from CNRC medical records).  His care plan indicated that he was a smoker (*id.* at 709; 716), and that he had been counseled to quit smoking multiple times during his stay at the VA.  *E.g.*, Attachment 4 at 334; 552; 603; 737.  The Interdisciplinary Treatment Team determined that Mr. Sanders was not a high risk smoker.  Henderson Dep. 38:20-21.  Under the "Safety/Risk Factors" section in his care plan, only "falls" and "seizures" were checked, not "smoking."  Attachment 4 at 712.

Mr. Sanders smoked in the same safe manner at the CNRC as he did at home. Temega Sanders Dep. 75:7-11. Jerry Lee Phillips, one of the nursing assistants who had assisted Mr. Sanders with his activities of daily living (Phillips Dep. 6:17-19), never saw him smoking in an unsafe manner. *Id*. at 50:18-21. Mr. Sanders was able to light his own cigarettes (*Id*. at 16:3-5), and Phillips never saw a cigarette fall out of his mouth. *Id*. at 43:9-12. CNRC Nursing Director Frances Henderson never saw "any evidence of him dropping things beforehand on his clothing…prior to the accident." Henderson Dep. 102:17-20. Mr. Sanders always smoked in the designated smoking area. *Id*. at 123:20-124:1. He had no record of breaking the rules and "if he did something that was not appropriate then [the CNRC staff] would have made him a high risk smoker." *Id*. at 126:21-127:1. He was observed many times during his residency at the CNRC by Nurse Practitioner Alehossein, who testified he was able to manage the task of smoking safely. Alehossein Dep. 60:9-22, 61:1-8; *see also* 128:4-12. There was no documented decline in Mr. Sanders's physical ability of his upper extremities between May 2005 and March 2006. *Id.* at 124:5-22.

Plaintiff's expert in nursing home care noted that, "individuals that [sic] are competent to make their own decisions have a right to smoke in [nursing home facilities] that allow it . . . It is considered that right is given up front, and the resident can choose not to go into that facility." Deposition of Richard Stefanacci, Dep. 94:11-17, April 21, 2008 (Attachment 11). The VA is required by statute to establish and maintain an area in which patients who desire to smoke tobacco products may do so. 38 U.S.C. § 1715. Plaintiff's own expert stated that Mr. Sanders's cognitive abilities were not at issue (Stefanacci Dep. 60:17-22; 61:1-3), and therefore he had a right to smoke. *Id*. at 95:1-22.

When asked if she was "happy with [Benjamin Sanders's] care at the VA," Mary Sanders replied, "It was good. It was really good. I wasn't, you know, displeased with it at all." Mary

Sanders Dep. 32:8-10. Mr. Sanders's family never asked the VA to limit his smoking. Beverly

Sanders Dep. 35:18-19. In fact, Benjamin Sanders's daughters and wife all gave him cigarettes

and "had no problem with him smoking." Temega Sanders Dep. 26:15-18. Temega Sanders

brought him lighters as well. *Id*. at 53:17-21. Temega Sanders stated she would sit with

Benjamin Sanders at the VA while he smoked, and he never had any problems when he smoked.

*Id*. at 32:16-19. Beverly Sanders stated she also never observed Benjamin Sanders having any

smoking accidents at the VA. Beverly Sanders Dep. 40:20-41:3.

Mary Sanders, Benjamin Sanders's widow stated that the primary reason for bringing this

lawsuit is to find out what "really happened to him." Mary Sanders Dep. 73:14:20.

On March 19, 2006, the day of the accident, Mr. Sanders was in the CNRC designated

smoking room talking to nursing assistant Jerry Lee Phillips just before the accident. Phillips

Dep. 18:21-19:2. Phillips left the room and was gone from four to five minutes (*id*. at 18:17)

while he went to get dinner, went to his locker, and went to get a soft drink from the drink

machine. *Id.* at 19:4-17. When Phillips was passing by the designated smoking area, Phillips

heard a nurse gasp, looked into the room, and saw Benjamin Sanders on fire. *Id*. at 19:19-21.

Phillips stated that the flames had totally engulfed Sanders and were shooting above his head.

*Id*. at 20:3-4; 26:7. The flames were reported to be three feet above his head. Alehossein Dep.

70:17-20.[3] Mr. Sanders was not moving or making any noise at the time. Phillips Dep. 26:8-11.

---

[3] During her deposition and in response to questioning by Plaintiff's counsel, Ms. Alehossein testified
that from her knowledge of Mr. Sanders's abilities, she would have expected him to roll out of his
wheelchair before the flames engulfed him and did not know why he did not do so. Alehossein Dep.
71:14-22; 72:1-19; *see also* 74:1-10. Plaintiff's counsel, dissatisfied with this testimony, asked for
evidence that showed that Mr. Sanders could self--manage himself if he caught on fire. He asked:
"Did you ever put him on fire to see if he could self-manage." *Id.* at 76:14-15.

Phillips and other employees tried to put the fire out with wet blankets, and Phillips then put the fire out with a fire extinguisher. *Id.* at 21:18-22:3.

Within minutes, Mr. Sanders was dead due to thermal inhalation injury or asphyxiation due to the fire. Deposition of Gregory Compton (Defendant's Geriatric Care Expert), Attachment 9 at Ex. 1, p. 4. Because of the speed of its acceleration, it is clear that the fire was caused by something other than a lit cigarette. Deposition of Defendant's Fire Investigation Expert Hart Kerlin Dep. 46:14-15, May 20, 2008) (stating that a damaged lighter was the primary cause of the fire.) (Attachment 12)[4] "[G]iven Benjamin Sanders's age, the extent of the burns, the inhalation thermal injury, in the context of his baseline COPD, [the] probability of his survival was zero." Compton Dep., Attachment 9 at Ex. 1 at 4.

In December 2005, Plaintiff, Mary Sanders as the personal representative of the Estate of Benjamin Sanders, filed an administrative tort claim with the VA, alleging medical malpractice. In the Supplement to SF Form 95, Plaintiff specifically made a "survival claim for the personal injuries sustained by Mr. Sandersbut is NOT making a wrongful death claim." Compl. 1, Admin. Claim at 5. Plaintiff then filed a "wrongful death" claim in this Court seeking relief under the Federal Tort Claims Act ("FTCA") against the United States of America for medical malpractice. *See* Compl., ¶ 1.1.

Defendant, the United States, now moves to dismiss this case, or in the alternative, moves for summary judgment on the Defendant's behalf, for failure to establish two of the three requirements for a *prima facie* case of medical malpractice in the District of Columbia.

---

4

The interior of the fanny pack is believed to have traces of an accelerant in it that caused an uncontrollable conflagration from which Mr. Sanders could not escape. Arrangements have been made, pursuant to this Court's order, to open the fanny pack and determine its contents. Defendant in this motion will not argue causation, but respectfully reserves the right to do so at a later date should this litigation continue.

III. <u>ARGUMENT</u>

A.  <u>Summary of Argument.</u>

Plaintiff argues that Defendant (VA) improperly assessed Benjamin Saunders as a safe smoker while he was a resident of the CNRC from January 2005 to his death on March 19, 2006. As more fully set forth below, Plaintiff's claim fails because Plaintiff cannot establish that there is a national standard of care regarding the method of assessment of residents who smoke in nursing homes, and, therefore, cannot show that the VA's CNRC deviated from a standard recognized under District of Columbia law.  Even if Plaintiff could establish a national standard by relying on the guidelines such as those set forth by Joint Commission for the Accreditation of Health Care Organizations ("JCAHO"), an organization that inspects long term care facilities for patient safety and quality of care, JCAHO had inspected the VA's CNRC only a few months before the accident and found it to be in full compliance with its standards (since October 22, 2005),  [http://www.qualitycheck.org/qualityreport.aspx?hcoid=4629].    Thus,  even  assuming arguendo that the JCAHO guidelines established a national standard of care, Plaintiff has not shown that the VA's CNRC has deviated from the standard of care in this case.

Because expert discovery is now closed and Plaintiff's experts have failed to establish a national standard of care or deviation therefrom, dismissal or summary judgment should be granted in Defendant's behalf. *See infra*, pp. 9-21. However, should this Court deny this motion or should Plaintiff raise a new theory of her case, Defendant respectfully requests that the Court view this as a motion for partial dismissal.  Defendant also respectfully reserves the opportunity in a dispositive motion to address any other claims for relief Plaintiff asserts in defense of total dismissal of the complaint. *See e.g.*, n. 1, *supra*.

B.   Jurisdictional Basis for this Lawsuit.

This matter is before the Court on Plaintiff's claim of injury pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2679 *et seq.*  Under the FTCA, the government of the United States has consented to be sued in tort for money damages arising from the negligent acts or omissions of its employees acting within the scope of their employment.  28 U.S.C. § 1346(b).  Employees of the VA's CNRC, Washington, D.C. are within the purview of the FTCA.  *See* 38 U.S.C. § 7316 *et seq*; 38 C.F.R. § 14.514 (2008).  Its employees were, at all relevant times, acting within the scope of their employment.

The United States' liability in tort is governed by the law of the place where the act or omission allegedly occurred.  28 U.S.C. § 1346(b); *see also Nelson v. United States*, 838 F.2d 1280, 1286 (D.C. Cir. 1988); *Beattie v. United States*, 756 F.2d 91, 104 (D.C. Cir. 1984); *Bazuaye v. United States*, 41 F. Supp. 2d 19, 23 (1999).  The alleged events in this case occurred in the U.S. Department of Veterans Affairs Medical Center in the District of Columbia.

C.   Standard of Review.

Under the law of the District of Columbia, "the elements of an action for professional negligence are the same as those of an ordinary **negligence** action. The plaintiff bears the burden of presenting evidence which establishes the applicable **standard of care**, demonstrates that this standard has been violated, and develops a causal relationship between the violation and the harm complained of."  *Battle v. Thornton*, 646 A.2d 315, 319 (D.C. 1994) (quoting *Morrison v. MacNamara*, 407 A.2d 555, 560 (D.C. 1979)) (emphasis added).  All three conditions must be met, and failure to meet one of these conditions is fatal to the plaintiff's case.  *See Battle*, 646 A.2d at 319.  In this motion for dismissal, Defendant moves this Court to dismiss Plaintiff's lawsuit for failure to meet and establish the first and second conditions: (a) an applicable

9

standard of care regarding the methods of assessment of residents who smoke in nursing homes and; (b) a deviation from that standard by the VA's CNRC.

     D.   This Case is Appropriate for Dismissal, or
              in the Alternative, for Summary Judgment

     Under Fed R. Civ. P. 12(b)(6), the court can dismiss a complaint for "failure to state a claim upon which relief can be granted." The plaintiff's factual allegations must be accepted as true when reviewing the adequacy of the complaint pursuant to Fed. R. Civ. 12(b)(6). *Buckley v. Fiotzsimmons*, 509 U.S. 259 (1993). However, factual allegations "must be enough to raise a right to relief above the speculative level," and that a plaintiff must make "a 'showing,' rather than a blanket assertion, of entitlement to relief.'" *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007). "If on a motion under 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. (12)(d).

     Under Fed. R. Civ. P. 56(c), a court must enter summary judgment when "there is no genuine dispute as to any material fact" and the "moving party is entitled to judgment as a matter of law." Summary judgment is proper when the nonmoving party fails to establish the existence of an essential element to his case and for which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Specific material evidentiary facts, not unsupported speculation, must be shown to overcome summary judgment. *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998); *see also Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993) (plaintiff "must support his allegations . . . with facts in the record; a mere unsubstantiated allegation . . . creates no genuine issue of fact and will not withstand summary judgment."). Once the moving party presents a properly supported motion, the non-moving party must go beyond the pleadings to identify evidence that would allow a reasonable jury to

find for the non-moving party. Any inferences drawn in favor of the non-moving party must be reasonable, and the non-moving party defeats a motion for summary judgment only by responding with some factual showing that creates a genuine issue of material fact. *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993).

E. <u>Defendant's Duty to Conform to a National Standard of Care.</u>

In a medical malpractice case, the plaintiff bears "the burden of establishing, through expert testimony, the applicable standard of care, deviation from that standard, and a causal relationship between the deviation and the injury." *Nwaneri v. Sandidge*, 931 A.2d at 470 (quoting *Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C. 1996)). The applicable standard of care is the "course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." *Strickland v. Pinder*, 899 A.2d 770, 773 (D.C. 2006) (quoting *Meek v. Shepard*, 484 A.2d 579, 581 (D.C. 1984)). This standard is applicable to all health care professionals and facilities. *See Morrison*, 407 A.2d at 561 (stating that the standard is "the degree of reasonable care and skill expected of members of the medical profession in the same or similar circumstances"); *see also Bunn v. Urban Shelters & Health Care Sys.*, 672 A.2d 1056, 1061 (D.C. 1996) (showing that a standard of care is also applicable to nursing homes and their employees).

1. <u>The Standard of Care is a National Standard.</u>

"In the District of Columbia, the applicable standard of care … is a **national** standard, not just a local custom." *Nwaneri*, 931 A.2d at 470 (quoting *Travers*, 672 A.2d at 568) (emphasis added). An expert must "explicitly indicate the *basis* for his or her knowledge of the national standard of care." *Hill v. Medlantic Health Care Group*, 933 A.2d 314, 328 (D.C. 2007). Specifically, "the expert must establish 'that a particular course of treatment is followed *nationally* either through reference to a published standard, discussion of the described course of

11

treatment with practitioners outside the District at seminars or conventions, or through presentation of relevant data.'" *Hill*, 933 A.2d at 325 (quoting *Strickland*, 899 A.2d at 773-74).

An expert's personal opinion alone as to what he or she would have done in a particular case, even coupled with the recitation of the words "national standard of care," is insufficient to prove the national standard of care. *Nwaneri*, 931 A.2d at 473 (citing *Hawes v. Chua*, 769 A.2d 797, 799 (D.C. 2001)). Educational and professional qualifications by themselves are likewise insufficient to prove a national standard of care. *Nwaneri*, 931 A.2d at 473. A witness can meet the qualifications of an expert witness and still not be qualified to testify as to the national standard of care. *Id.* at 477.

### 2. A Deviation from the Applicable Standard of Care Must be Established by Expert Testimony.

The plaintiff must prove that the defendant deviated from an applicable national standard of care. *See Nwaneri*, 931 A.2d at 470. In a medical malpractice case, expert testimony also is required to prove deviation from the standard of care. *Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 181 (D.C. 1990).

Therefore, the pertinent inquiries are whether Plaintiff's experts have provided a legally sufficient basis for their opinions as to the national standard of care, whether they have established the existence of a national standard of care regarding the methods of assessment of residents who smoke in nursing homes, and whether Plaintiff can prove that Defendant deviated from a national standard of care.

### F. Plaintiff's Experts Cannot Establish a Legally Sufficient Basis for their Opinions as to the National Standard of Care.

Before Plaintiff discusses the lack of evidence of a national standard of care (Section G), Defendant points out to the Court that Plaintiff's experts, who are required to establish a basis for their testimony under the law in the District of Columbia, have failed to do so in this case.

12

An expert's educational and professional background is insufficient to establish a basis for knowledge of a national standard of care. *Hill*, 933 A.2d at 322.

1. <u>Ilene Warner-Maron, Plaintiff's Expert in Nursing Care.</u>

Ilene Warner-Maron ("Warner-Maron"), Plaintiff's expert in the fields of nursing home management and nursing (Warner-Maron Dep. 4:22-5:1, Apr. 8, 2008) (Attachment 10), stated that "my opinions are based up my education and experience as a Registered Nurse and licensed Nursing Home Administrator." Warner-Maron Ex. 1 at 1; Warner-Maron Ex. 2 at 1 (Attachment 10). As noted above, education and experience alone are insufficient to establish a national standard. *Hill*, 933 A.2d at 322.

Reference to peer-reviewed literature published in the field can be sufficient to establish a basis for a national standard of care. *See Hawes*, 769 A.2d at 807 (showing that the doctor could base his knowledge on the national standard of care on "literature in his specialty"). Warner-Maron points to none.

Although Warner-Maron referred to federal regulations under 42 C.F.R. § 483 and the JCAHO guidelines as a basis for her opinions, in doing so, she frequently admitted that neither source specifically provides a method of assessing or supervising smokers. *See, e.g.*, Warner-Maron Dep. 51:15-52:13, 82:20-83:1, 84:7-17. Warner-Maron also referred to the "Watermelon Book," which allegedly gives an interpretation of the federal regulations. However, Warner-Maron admitted that the book she was referring to was published in 2007, a year *after* Benjamin Sanders's death, and she stated the book represented "new and additional guidelines." Warner-Maron Dep. 121:14. Therefore, even if the "Watermelon Book" contained a national standard of care for the assessment of smokers, Warner-Maron's reliance on it is misplaced because it was published after the events at issue in this case.[5]

---

5

 During Warner-Maron's deposition it became clear that she had relied on numerous documents not

13

In addition, although Warner-Maron provided several exhibits, they are insufficient to establish a basis for her knowledge of a national standard of care. *See* Attachment 10. For example, Warner-Maron provided documents concerning "people dying in fires and nursing homes and things of that nature, secondhand smoke and things like that … developed … for various kinds of facilities" (Warner-Maron Dep. 110:1-5) (referring to Warner-Maron Ex. 5), a printout regarding preventing fires as related to home care, not nursing homes (Warner-Maron Dep. 116:9) (referring to Warner-Maron Ex. 7), and a policy related to "protect[ing] employees and other residents from secondhand smoking and to discourage residents from continuing to smoke once they're admitted to a nursing home." Warner-Maron Dep. 120:1-4 (referring to Warner-Maron Ex. 8). Warner-Maron also agreed that the smoking assessment forms she provided were just "samples of assessments." Warner-Maron Dep. 116:5-6 (referring to Warner-Maron Ex. 6.) Since she did not establish that the exhibits are peer-reviewed literature specifically in the field of management of smokers in nursing homes, they are irrelevant and inapplicable to use as a basis for Warner-Maron's knowledge of a national standard of care.

An expert can also provide a basis of knowledge of the national standard of care by demonstrating that he or she has discussed the national standard at seminars or conventions with practitioners outside of the District, or "through presentation of relevant data." *Hill*, 933 A.2d at 325 (quoting *Strickland*, 899 A.2d at 773-74). Here, there is no indication, either from Warner-Maron's deposition or her curriculum vitae, that she ever attended seminars or conventions where she discussed a national standard of care regarding assessment and supervision of smokers in nursing homes. *See, e.g.*, Warner-Maron Ex. 3 at 6-16. None of her publications concern smoking in nursing homes. *See* Warner-Maron Ex. 3 at 10-12. Furthermore, although she has

provided to Defendant's counsel, if at all, until the eve of the deposition. *See* Warner-Maron Dep. 49-57, 60-61. Indeed, the guidelines from the "2006 Watermelon Book" have never been provided to Defendant during this litigation.

given lectures at national conferences, they concerned geriatric nursing and wound care, not the assessment of smokers in nursing homes. *See* Warner-Maron Ex. 3 at 7. Most significantly, in her deposition, Warner-Maron never indicated that she relied upon any discussions or presentation of relevant data in forming her opinion on a national standard of care. Warner-Maron Dep. 57:7-12 (stating that she is "using the interpretation of the federal regulations "as an employee, as someone who works in these facilities, who has the responsibility to teach others who work in these facilities what the requirements are."). Since Warner-Maron has not relied upon peer-reviewed literature in the field, discussions with other practitioners outside the District, or a presentation of relevant data, she is unqualified to establish a national standard of care regarding assessment and supervision of smokers in nursing homes.

2.  Richard Stefanacci, Plaintiff's Expert in Geriatric Care.

Richard Stefanacci, Plaintiff's expert in geriatric care and long-term care, (Stefanacci Dep. 10:8, Apr. 21, 2008), is likewise unqualified to give his opinion on a national standard of care based on his reports and testimony. When asked where the standard of care was set forth as the national standard, Stefanacci replied, "in my draft article, and the literature we reviewed and the survey results. Other than that, it is not written anywhere else." Stefanacci Dep. 115:10-12. However, Stefanacci's draft article (Stefanacci Ex. 3) was based on the results of a survey that Stefanacci himself began conducting in January 2008, *two years after* Benjamin Sanders's accident. Stefanacci Dep. 72:18-19. There was no question on the survey regarding the length of time the policies that participants were reporting on had been in place. Stefanacci Dep. 79:16-19. Likewise, there was no question asking participants how long they had been with that particular facility or what the participant was doing in 2006. Stefanacci Dep. 79:12-15. When asked what states were represented in the survey responses, Stefanacci claimed that every state was represented, even though he does not know the identities or locations of the respondents.

15

Stefanacci Dep. 78:9, 115:18-116:5.  Without knowing the answers to those questions, it is impossible to know whether the survey's results are reflective of a national standard of care of assessment and supervision of smokers in nursing homes at the time of Benjamin Sanders's death in 2006, and therefore, the survey is immaterial to this case.  *See Messina v. District of Columbia*, 663 A.2d 535, 538-39 (D.C. 1995) (holding that when the expert "relied on the chart that he had developed, there was no evidence that it constituted any kind of national standard, that it had been promulgated, or was generally known before [the plaintiff] was injured, or that the District should have been aware of its existence").

Stefanacci claimed that his opinion as to a national standard of care is also based on literature he reviewed for his draft article.  Stefanacci Dep. 115:10-12.  However, until this draft article, Stefanacci had not written any papers, given any lectures, or presented any data related to the assessment and supervision of smokers in nursing homes.  *See* Stefanacci Ex. 1 at 13-34. Significantly, the majority of the literature cited in the draft article does not refer to a standard of care, but is instead used as background information on the general dangers of smoking.  *See* Stefanacci Ex. 3 at 1-2.  In referring to a standard of care, Stefanacci cites jury instructions from Canada, which are inapplicable as a national standard of care for the United States.  Stefanacci Ex. 3 at 4.  Stefanacci also cites Pennsylvania Department of Health regulations (Stefanacci Ex. 3 at 4-5), but again, there is no evidence that Pennsylvania's regulations are representative of a national standard of care.  When there is no evidence that the organization has adhered to a national standard of care, that organization's regulations cannot be used as a basis for an expert's opinion as to the national standard of care.  *See Nwaneri*, 931 A.2d at 475 (stating that although the expert had given presentations at various conventions, the court was left to "impermissibly speculate as to whether these societies adhered to a national standard of care, and therefore, formed the basis for [the expert's] knowledge of the national standard of care").  Stefanacci

16

relied upon his 2008 survey and literature from organizations that cannot be said to be representative of a national standard of care. He admitted that his report is "Under Development." Stefanacci Dep., Ex. 1 at 6. Thus, he is unqualified to render an opinion as to a national standard of care.

G. Plaintiff Cannot Establish that there is a National Standard of Care with Regard to Assessment of Residents who Smoke in Nursing Homes.

1. Plaintiff Cannot Establish that there is a National Standard of Care with regard to the Methods of Assessing Residents who Smoke in Nursing Homes.

Even if Plaintiff's experts were qualified to render an opinion, they must set forth the existence of a national standard of care with regard to the methods of assessing smokers in nursing homes by referring to a published standard, discussing the standard with other nursing home administrators outside the District, or presenting relevant data. *Hill*, 933 A.2d at 325 (quoting *Strickland*, 899 A.2d at 773-74). However, neither of Plaintiff's experts have done this.

Although Plaintiff's experts both referred to the JCAHO guidelines as the national standard of care for assessment, both Warner-Maron and Stefanacci both admit that those guidelines do not actually state any standardized method for assessing a patient. Warner-Maron Dep. 84:14; Stefanacci Dep. 70:4-8.

Warner-Maron states that "[s]ince JCAHO is the only agency that is surveying the Veterans Administration [sic] nursing home, . . . [it is] the only body that's responsible for [establishing a standard with regard to smoking assessment]" Warner-Maron Dep. 59-60. But, since a smoking assessment standard is not specifically stated in the JCAHO guidelines, Warner-Maron extrapolates that one is "inherent" in the guidelines under policies that JCAHO permits the facility to implement. *See* Warner-Maron Dep. 84:14; *see also id.* at 78:3-10. When asked the location in the JCAHO standards of the requirement that a smoking risk assessment be documented in clinical records, Warner-Maron pointed to E.C. 130(c), which states, "The

17

resident meets criteria developed and approved by the organization's leaders."  Warner-Maron

Dep. 84:7-17.  Regarding this provision, Warner-Maron stated:

> Where it says a resident meets criteria developed and approved by the organization's leaders, that *in my interpretation* means that there's some kind of assessment that's performed that goes through an algorithm that determines if people are safe smoking….

(Warner-Maron Dep. 71:21-72:3) (emphasis added.).

Stefanacci, likewise, could not point to a regulation or guideline that required a specific method of assessing smokers.  When asked the basis for saying that specific documentation needed to be done, Stefanacci stated, "The standard in nursing homes as well as all long-term care is that if it is not documented, it is not done, *because if it is not in the chart, you have absolutely no leg to stand on in a court of law* that you could say that you had done it, but you just didn't document it." Stefanacci Dep. 123:15-22 (emphasis added).  When asked about the need for documentation outside of a court of law, Stefanacci stated, "The only way to communicate that to the interdisciplinary team [in his opinion] is through documentation, so there is a requirement there or a need there." Stefanacci Dep. 124:1-6.  Stefanacci did not relate this opinion to any literature, discussions with other practitioners, or relevant data.

The District of Columbia repeatedly has held that the expert's personal opinion of what he or she would do in a particular situation is insufficient to establish a national standard of care. *See Travers*, 672 A.2d at 570 (showing that when the expert was asked "Whether 'it was his testimony…that [the giving of aspirin] [was] mandatory,'" the expert's response of, "For me it is" was insufficient to establish a national standard of care); *see also Meek*, 484 A.2d at 582 (holding that the expert was unable to establish a national standard of care by stating what he would do under similar circumstances).  Since neither Warner-Maron nor Stefanacci can show a published standard, relevant data, or discussions related to requiring assessment of smokers,

neither expert can establish that they are giving anything more than their personal opinion of what is inherent in regulations and guidelines, and this case should accordingly be dismissed. [55] Plaintiff's failure to establish a controlling standard of care is "fatal to [this] negligence claim." *Briggs v. WMATA*, 481 F.3d 839, 841 (D.C. Cir. 2007) (quoting *Scott v. District of Columbia*, 101 F.3d 748, 757 (D.C. Cir. 1996).

In any event, the only common standard alluded to by Warner-Maron and Stefanacci is JCAHO.  Both experts admitted that if JCAHO inspected and found the facilities to be in compliance with its standards, then there would be no deviation from that standard of care. Warner-Maron Dep. 78:3-20; Stefanacci Dep. 70:16-19.  In this case, that is precisely what happened.  JCAHO inspected the VA's CNRC in about October 2005, and on October 22, 2005, and since then to present day, the VA's CNRC has been in full compliance with that standard. *See*  http://www.qualitycheck.org/qualityreport.aspx?hcoid=4629.

   2.  Even if Plaintiff could Establish that there is a National Standard of Care with Regard to Assessment of Residents who Smoke in Nursing Homes, Plaintiff <u>Cannot Show that the VA's CNRC Breached its Duty to Benjamin Sanders.</u>

As noted above, to be successful in this medical malpractice action, Plaintiff must use expert testimony to prove that Defendant's employees deviated from an applicable national standard of care.  *See Nwaneri*, 931 A.2d at 470.  As shown above, Plaintiff has not shown that a national standard exists and therefore cannot show a deviation from such a standard.  However,

---

55

   Of additional note is that Defendant's expert in geriatrics and nursing home care opined that there was no national standard for assessment of smokers in long term care/nursing facilities. Compton Dep. 32:2-4. Attachment 9. Dr. Compton states that the VA's CNRC employees had a duty to "[use] their judgment to determine who the unsafe smokers are and act on it" *Id.* at 113:17-19.   "[T]here is no national standard on how to best assess a smoker," (Compton Dep. 35: 17-18) because there is "not a documentable [sic], well-qualified standard" *Id.* at 113:19-20.

even if there were such a standard, Plaintiff has provided no evidence to show that it was breached in this case.

At most, the VA's CNRC had a duty to "identify those high-risk smokers and in some form protect those high-risk smokers." Compton Dep. 146:1-2. Upon admission to the CNRC, a comprehensive assessment of Mr. Sanders was done and he was determined to be a safe smoker. Alehossein Dep. 12:15-22; 23:4-10. As Nurse Practitioner Alehossein testified, no notation is made when the patient is a "safe smoker." *Id.* at 23:9-10.[5] This is because the assessment form used by VA contained a check-off box for "smoking risk" and he was assessed not to be at risk. The VA's CNRC did not breach its duty to Mr. Sanders because he was assessed, and the VA's "interdisciplinary treatment team had not determined that he was a high risk smoker." Henderson Dep. 38:20-21. Mr. Sanders was "multidimensionally assessed by multiple providers, and they actually had formal meetings about him, and at no time during those assessments was he designated an unsafe smoker." Compton Dep. 156:18-22.; *see also* Attachment 4 at 712 (medical records showing that under the "Safety/Risk Factors" section in Mr. Sanders's care plan, only "falls" and "seizures" were checked not "smoking.") Mr. Sanders's chart indicated that he was a smoker and that he smoked multiple cigarettes each day. *E.g.*, Attach. 4 at 308. His nurse practitioner, who was responsible for his well being up to the day he died, testified that he was a safe smoker. Alehossein Dep. 39:16-22; 17:1-2; 62:17-20; 63:1-6 and 65:3-9. The record shows that Mr. Sanders "understand the smoking regulation, [had] the ability to handle smoking material safely, and [was] in compliance with the established smoking policy." *See* Henderson Dep. 122:16-22; *see also id.* at 98:6-15. As Plaintiff's nursing

---

5

Note: Page 23:2 should read "He was a safe smoker," as the remainder of the section indicates. *See also* Alehossein Dep. 30:13-15; 31:17-22; 62:17-20 and 128:20-22.

home medical expert, Dr. Stefanacci opined, in such cases patients have the right to smoke. Stefanacci Dep. 94:11-17; 95:2-7.

Plaintiff's experts agree that as long as a smoking assessment is done, the VA does not have a duty to use a specific form or format to perform that assessment. Warner-Maron Dep. 128:19-129:3; Stefanacci Dep.112:14-16. Stefanacci states that "an assessment form does not need to be used" (Stefanacci Dep. 112:15), and in his survey, Stefanacci did not ask if responding facilities used an assessment form *Id.* at 101:7-10. Warner-Maron stated that there was, "no specified assessment to be done other than the person is to be assessed." Warner-Maron Dep. 106:14-15. Even assuming that JCAHO sets a national standard for requiring an assessment of smokers, the JCAHO guidelines do not specify the type of assessment that must be done. "JCAHO allows facilities to develop their own policy of how that assessment, how often it needs to be done, how often a person gets reassessed. JCAHO allows individual organizations to do that and then they survey them based on their compliance with that JCAHO survey requirement." *Id.* at 78:4-10. Although Warner-Maron again stated that it is "inherent" in ⁻JCAHO guideline E.C. 1.30(c) that some form be provided (*id.* at 71:3-4), Warner-Maron later stated that, "JCAHO doesn't require a particular smoking form to be used." *Id.* at 128:19-20. As noted above, the VA's CNRC, using its own assessment policy, was in full compliance with JCAHO standards during Mr. Sanders's residency. Compton Dep. 34:11-14. "[T]he VA passed the JCAHO survey in October of 2005. So they didn't find any deviations from their rules in October of 2005 at the VA." *Id.* at 154:3-6. Since the VA was in compliance with JCAHO guidelines, even if they did form the basis for a national standard of care for smoking assessments, the VA did not breach its duty to Benjamin Sanders.

As long as Mr. Sanders's smoking risk was assessed, the VA did not have a duty to document in a particular manner that Mr. Sanders was a safe smoker. Doctors routinely do not

document problems that the patient does not have. *See* Compton Dep. 58:16-19 (stating "you can't document everything, you would become psychotic writing all the false negatives down."); *see also* Alehossein Dep. 47:4-8. The VA's CNRC documented a smoking risk only when a patient was a high risk smoker. "[I]f [Mr. Sanders] were deemed unsafe it would be documented. It if was felt that he was safe and its documented in the record that he is a smoker and if they felt that he was safe there wouldn't be a document in there that speaks to the fact that he is a safe smoker." Henderson Dep. 75:20-76:7. The VA's CNRC had a duty to identify high risk smokers but had no duty to use a specific assessment form or document. The VA's CNRC identified Benjamin Sanders as a safe smoker by not checking the "smoking risk" section of their assessment form. Thus, VA met its duty to assess his risk when the assessment identified him as a safe smoker.

Finally, even assuming that the VA's CNRC's smoking policies constituted a national standard of care, which Defendant does not concede,[6] the VA's CNRC did not deviate from its own policy. The VA's CNRC's "smoking policy does, indeed, identify that people who are high-risk smokers should be identified as such and that they have an interdisciplinary care plan developed that will identify their needs and their interventions and that tobacco use is screened at least annually and documented under the clinical reminder section." Warner-Maron Dep. 68:6-12. This internal policy places an obligation on the VA's CNRC to identify high-risk smokers. *Id.* at 68:18-22. However, again, the CNRC's smoking policy does not require any particular form of documentation of an assessment if the patient is deemed to be a safe smoker. CNRC Policy 19 (Attachment 13). When discussing the implementation of this policy, Frances Henderson said, that if there were "residents that [sic] were identified as high risk smokers there

---

[6] An institutional policy cannot be a national standard of care. *See Clark v. District of Columbia*, 708 A.2d 632, 636 (D.C. 1997).

would be an order in the medical record as well as a listing that would stay posted on the nursing station." Henderson Dep. 38:6-12. However, since "there is no order for Mr. Sanders to be a high risk smoker, nor is there a document that reflects that he is a high risk smoker, nor was there one at the time of the accident," then Mr. Sanders was deemed to be a safe smoker by the VA CNRC. *Id.* at 38:13-16.

Since the VA's CNRC assessed Mr. Sanders and determined that he was a safe smoker, the VA's CNRC did not breach its duty to Mr. Sanders, and this case should accordingly be dismissed.

IV. <u>CONCLUSION</u>

Defendant respectfully requests that its motion to dismiss, or in the alternative, for summary judgment, on the standard of care and breach issues be granted.

Respectfully submitted,

_____/s/_____

JEFFREY A. TAYLOR , D.C. Bar # 498610
United States Attorney


_____/s/_____

RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/_____

CLAIRE WHITAKER, D.C. Bar # 354530
Assistant United States Attorney
United States Attorney's Office
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
(202) 514-7137

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| MARY SANDERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-01169 (ESH) |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

<u>STATEMENT OF MATERIAL FACTS NOT IN DISPUTE</u>

1.  Benjamin Sanders, an Army veteran, had a stroke in 1992 and, as a result, his left side had some level of was paralysis.  Deposition of Mary Sanders (Mr. Sanders's widow) 13:15, June 11, 2008 (Attachment 1); Deposition of Ashraf Alehossein, Dep. 112:18-22; 113:1-10 (Attachment 6).

2.  Mr. Sanders smoked cigarettes before and after the stroke without incident—in all, for over 38 years.  Mary Saunders Dep. 21:12-14; *see also* Deposition of Temega Sanders, Dep.11:20-12:4, May 30, 2008 (Attachment 2.); and Deposition of Frances Henderson, Dep. 62:17-20, December 10, 2007 (Attachment 5).

3.  Neither Mr. Sanders's daughter nor her mother witnessed Mr. Sanders have a smoking accident. Temega Sanders Dep. 26:1-7; Mary Sanders Dep. 21:12-14.

4.  Mr. Sanders's two daughters and his wife gave him cigarettes and "had no problem with him smoking."  Temega Sanders Dep. 26:15-18.   He enjoyed smoking.  Beverly Sanders Dep. 18:18-19, May 30, 2008 (Attachment 3).  He said it was the "only pleasure that he had." Mary Sanders Dep. 15:11-12.

5.   Mr. Sanders smoked as many as eight to ten cigarettes each day.  Mary Sanders Dep. 67:22-68:2.  And at least three or four cigarettes per day at the VA's CNRC.  Attachment 4 at 410.

6.   During the first 13 years after his stroke, Mr. Sanders lived at home.  (*Id*. 14:1-6.) During that same period, twice a year for a period of two weeks each time, Mr. Sanders was admitted into the VA's CNRC for "respite" care.  Temega Sanders Dep. 18:7-12. The staff at the CNRC were very familiar with his conditions and smoking abilities. Alehossein Dep. 56:4; 62:17-20; 69:9, Jan. 30, 2008 (Attachment 6).

7.   Mr. Sanders was admitted to the CNRC in January 2005, for an extended period. Beverly Sanders Dep. 16:20-17:1.    After he was admitted into the CNRC, his wife, Mary Sanders, got sick and went to the hospital herself.  Temega Sanders Dep. 22:12-15 and Beverly Sanders Dep. 17:1-5 ("so that made the respite part be permanent because at that point she was not going to be able to care for him anymore"); *see also* Attachment 4 at 706 (medical records showing that Mr. Sanders's medical records reflect that the his reason for admission was because his "wife is sick and cannot take care of [him]".)

8.   Upon admission to the CNRC in 2005, Mr. Sanders was evaluated and a "care plan" developed.   Attachment 4 at 705-22.   Mr. Sanders's medical problems included benign hypertension, cerebrovascular effects, chronic kidney failure, diabetes, gout, monoclonal gammopathy, some hearing loss, seizures, and periodontitis.  *Id.* at 716.  He was documented for having a "mild cognitive impairment" (*id.* at 146:18), but he was still "able to articulate himself and able to make his needs known" Kheirbek Dep. 64:16-17 (Attachment 7).

9.   He also had slurred speech, but a loud voice. Alehossein Dep. 27:10-15; Deposition of Jerry Lee Phillips, Dep. 14:2, Jan. 31, 2008. (Attachment 8)

10.    When Mr. Saunders was evaluated, he was not identified as a unsafe smoker. Attachment 4 at 712 (CNRC medical records).  His care plan did indicate that he was a smoker (*id.* at 709; 716), and that he had been counseled to quit smoking multiple times during his stay at the VA.  *E.g.*, Attachment 4 at 334; 552; 603; 737.  The Interdisciplinary Treatment Team determined that Mr. Sanders was not a high risk smoker.  Henderson Dep. 38:20-21.  Under the "Safety/Risk Factors" section in his care plan, only "falls" and "seizures" were checked, not "smoking."  Attachment 4 at 712.

11.    Mr. Sanders smoked in the same safe manner at the VA's CNRC as he did at home. Temega Sanders Dep. 75:7-11.

12.    Jerry Lee Phillips a nursing assistant who assisted Mr. Sanders with his activities of daily living (Phillips Dep. 6:17-19), and smoked with him, never saw him smoking in an unsafe manner.  *Id.* at 50:18-21; 18:21-19:2.

13.    Mr. Sanders was able to light his own cigarettes (*Id.* at 16:3-5), and Frances Henderson (Henderson Dep. 8:12-13), testified that he always smoked in the designated smoking area.  *Id.* at 123:20-124:1.  He had no record of breaking the rules and "if he did something that was not appropriate then [the VA's CNRC] would have made him a high risk smoker."  *Id.* at 126:21-127:1.

14.    Mr. Sanders was observed smoking many times during his residency at the CNRC by Nurse Practitioner Alehossein, who testified he was able to manage the task of smoking safely. Alehossein Dep. 60:9-22, 61:1-8; *see also* 128:4-12.

15.    There was no decline in the physical ability of Mr. Sanders's upper extremities between May 2005 and March 2006. *Id.* at 124:5-22.

16.    "[I]ndividuals that are competent to make their own decisions have a right to smoke in [nursing home facilities] that allow it . . . It is considered that right is given up front, and the

resident can choose not to go into that facility."  Deposition of Plaintiff's Expert, Richard Stefanacci, Dep. 94:11-17, April 21, 2008 (Attachment 13).

17.  The VA permits smoking by veterans in the VA Medical Center by statute. 38 U.S.C. § 1715.

18.  Ms. Sanders  was "happy with [Benjamin Sanders's] care at the VA," . . , "It was good.  It was really good.  I wasn't, you know, displeased with it at all."  Mary Sanders Dep. 32:8-10.

19.  Mr. Sanders's family never asked the VA to limit his smoking. Beverly Sanders Dep. 35:18-19.

20, Mr. Sanders's daughters and wife all gave him cigarettes and "had no problem with him smoking."  Temega Sanders Dep. 26:15-18.  Temega Sanders brought him lighters as well. *Id*. at 53:17-21.  Temega Sanders would sit with Benjamin Sanders at the VA while he smoked, and he never had any problems when he smoked.  *Id*. at 32:16-19.  Beverly Sanders also never observed Benjamin Sanders having any smoking accidents at the VA.  Beverly Sanders Dep. 40:20-41:3.

21.  On March 19, 2006, just before the accident, Mr. Sanders was smoking with and talking to Nursing Assistant Jerry Lee Phillips in the CNRC designated smoking room.  Phillips Dep. 18:21-19:2.

22.  Phillips left the room and was gone from four to five minutes (*id*. at  18:17) while he went to get dinner, went to his locker, and went to get a soft drink from the drink machine.  *Id.* at 19:4-17.

23.  When Phillips was passing by the designated smoking area, Phillips heard a nurse gasp, and Phillips looked into the room and saw Benjamin Sanders on fire.  *Id*. at 19:19-21.  The flames had totally engulfed him and were shooting above his head.  *Id*. at 20:3-4; 26:7.

24.  Mr. Sanders was not moving or making any noise at the time. Phillips Dep. 26:8-11. Phillips and other employees tried to put the fire out with wet blankets, and Phillips then put the fire out with a fire extinguisher.  *Id.* at 21:18-22:3.

25.  On March 19, 2006, the VA's CNRC was in full compliance with the Joint Commission for the Accreditation of Health Care Organizations ("JCAHO"), a nationally recognized organization that inspects long term care facilities, effected October 22, 2005. http://www.qualitycheck.org/qualityreport.aspx?hcoid=4629.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR , D.C. Bar # 498610
United States Attorney

_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

_____/s/_____
CLAIRE WHITAKER, D.C. Bar # 354530
CLAIRE WHITAKER, D.C. Bar #354530
Assistant United States Attorney
United States Attorney's Office
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
(202) 514-7137

# ATTACHMENT 1

# EXCERPTS FROM

# DEPOSITION OF
# MARY SANDERS

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - -x
                              :
MARY SANDERS, as Personal     :
Representative of the Estate  :
of BENJAMIN SANDERS,          :
                              :
        Plaintiff,            :
                              :
    vs.                       :  Civil Action No. 071169
                              :
UNITED STATES OF AMERICA,     :
                              :
        Defendant.            :
                              :
- - - - - - - - - - - - - - -x


                    Clinton, Maryland
                    Wednesday, June 11, 2008


        The deposition of MARY SANDERS, called for

examination by counsel for Defendant in the above-entitled

matter, pursuant to Notice, at The Clinton Nursing and

Rehabilitation Center, 9211 Stuart Lane, Clinton, Maryland,

convened at 10:37 a.m., before Jennifer M. O'Connor, notary

public in and for the State of Maryland, when were present

on behalf of the parties:

1   point?  I have a fundamental question that's been

2   bothering me.  Why is your name Sanders and your

3   husband's name is Saunders?

4      A.  My husband told me that when he went into

5   the service, for some reason, they would call him

6   Saunders and that's the way the record was,

7   Saunders, instead of Sanders.  But it's Sanders and

8   a slash, with Sanders right on it in his record.

9      Q.  Oh really?

10     A.  Hmm-hmm.

11     Q.  You mean in his --

12     A.  In his record.  That's what he told me, you

13   know.  Other than that --

14     Q.  So he always considered his name Sanders?

15     A.  Sanders.

16     Q.  He -- do you -- you know what service he

17   was in?

18     A.  The army.

19     Q.  And you know how long he was in the army?

20     A.  No, not exactly.  When I met my husband he

21   was out of the service.

22     Q.  He was?

1    33 or 34.

2    Q.    Did he have -- when you met him, did he

3    have any serious disability issues; I mean, what

4    were his problems at the time, if you recall?

5    A.    I don't recall.

6    Q.    When did he begin to have serious problems

7    that required some care?

8    A.    After he had a stroke.  After he had a

9    stroke.

10    Q.    Stroke?  And do you remember when that

11    stroke was; do you remember what year that was?

12    A.    No, I don't, not the exact --

13    Q.    That's okay.  Was it 10 years before he

14    became --

15    A.    No, he had a stroke, now I remember, 1992.

16    Q.    1992.  So you were married for about 20

17    years when he had his stroke?

18    A.    Something like that.

19    Q.    Did he have more than one stroke?

20    A.    I don't know, because he said that the

21    doctor said he told -- he didn't want to know, so if

22    he had any little -- I didn't know.

1    Q.   I see.  And at that point in 1992, did you

2  have to start taking care of him?

3    A.   Yes, I did, after he came home.

4    Q.   Did you continue to take care of him until

5  he went into the VA?

6    A.   Yes, I did.

7    Q.   Nursing Home?

8    A.   Yes, I did.

9    Q.   Were you yourself employed?

10    A.   No, I didn't.

11    Q.   You didn't work?

12    A.   I didn't work.

13    Q.   When you were married, were you working?

14    A.   No, I didn't.

15    Q.   When, if you recall, did Mr. Sanders begin

16  smoking?

17    A.   When I met Mr. Sanders he was smoking.

18    Q.   Did he continue to smoke after he had the

19  stroke in 1992?

20    A.   Yes, he did.

21    Q.   Was he advised not to smoke?

22    A.   Beg your pardon?

15

1    Q.   Did anyone advise him not to smoke, or do

2  you know?

3    A.   Yes, he was advised by his doctor.

4    Q.   And why did he continue to smoke?

5    A.   I guess like everybody else, liked to

6  smoke.

7    Q.   Did you ever have conversations with him

8  about smoking?

9    A.   Yes, I did.

10    Q.   Did you try to convince him to stop?

11    A.   Yes, I did, but he told me that was the

12  only pleasure that he had, so I grant it to him.

13    Q.   Did you smoke?

14    A.   I smoked a little, but not as much as he

15  did.

16    Q.   Did you ever smoke with him?

17    A.   No.

18    Q.   How long have you lived in the -- did you

19  say it was D -- I'm sorry?

20    A.   D Street.

21    Q.   D Street house, how long have you lived

22  there?

1    the pack?

2    　　A.　He would lay the cigarette on the table and

3    take the cigarette out of the pack.

4    　　Q.　And would he light it himself?

5    　　A.　There is some -- somebody would open the

6    pack of cigarettes for him.

7    　　Q.　And after he lit the cigarette?

8    　　A.　He would always use the lighter.

9    　　Q.　And did he ever set anything on fire at the

10    house?

11    　　A.　No, he didn't.

12    　　Q.　Did he ever have any accidents with the --

13    while he was smoking?

14    　　A.　Not to my knowledge.

15    　　Q.　Did you wash his clothes?

16    　　A.　Yes.  Yes, I did.

17    　　Q.　Did you see any burn holes in his clothes?

18    　　A.　Maybe one pair of pants he had a burn hole

19    in it, but he said that was there for a long time,

20    so other than that, no.

21    　　Q.　So he could handle smoking?

22    　　　　MR. MELTMAR:  Objection.  You can answer.

1      THE WITNESS: Well, I would say he couldn't

2 unless someone was around him.

3      BY MS. WHITAKER:

4   Q.   And what do you mean by that?

5   A.   If he would drop it on the floor, he

6 couldn't pick it up unless he would learn over like

7 that.  Somebody would have to pick it up for him.

8   Q.   So he -- if -- once he got the cigarette

9 lit, he could smoke with no problems?

10   A.   Hmm.

11   Q.   Is that yes?

12   A.   Yes.

13   Q.   Let me see, in 19 -- you took care of him

14 for how long?

15   A.   At least a good 12 years.

16   Q.   Twelve years.  And then what happened; why

17 did you stop?

18   A.   Because I started getting a shortness of

19 breath real bad and -- not feeling bad, but getting

20 a shortness of breath.  And his nurse's name was

21 Elaine.  She asked -- she said, Ms. Sanders, I think

22 you should put Mr. Sanders in a nursing home for

1    asking us, did we have any questions; that was about

2    it.   Any concern about his ability.   That's all I

3    remember.

4         Q.   Do you remember ever expressing any

5    concerns about his ability -- I mean his care with

6    the VA?

7         A.   No, I didn't.

8         Q.   Were you happy with his care at the VA?

9         A.   It was good.   It was really good.   I

10   wasn't, you know, displeased with it at all.

11        Q.   You mention Beverly.   Did Beverly live at

12   home with you continuously from 1992 until --

13        A.   Beverly was away at school.   Beverly went

14   to school in '92, and she stayed in school for five

15   years before she came back home.

16        Q.   So when she came home in '97, she and you

17   would go to meetings at the VA hospital?

18        A.   Right.   Beverly wasn't living at home when

19   she came back, but she and I did been to the -- to

20   the veterans for the meetings.

21        Q.   Okay, but roughly that started about 1997?

22        A.   Something like that.

1    had that general concern about him?

2        A.   Yeah, he was my husband.

3        Q.   Of course.  Of course.  How long had Mr.

4    Sanders smoked cigarettes; I think you answered

5    that?

6        A.   I don't know.  I couldn't tell you that.

7        Q.   Longer than you knew him.  And how many

8    cigarettes did he smoke a day?

9        A.   I know he didn't smoke a pack, that I know.

10       Q.   Do you know if he ever changed the number

11   of cigarettes that -- I mean, did he ever smoke more

12   heavily at one point in time than another?

13       A.   Say that again.

14       Q.   Did he smoke -- did he ever change his

15   smoking habits; did he always smoke about less than

16   a pack a day or was there a time where he was

17   smoking two packs a day?

18       A.   He never smoked two packs of cigarettes a

19   day.

20       Q.   It was always less than one pack?

21       A.   Less than one pack a day.

22       Q.   In your answer it says about 10 cigarettes

1    a day; that's a half a pack?

2        A.   Hmm-hmm, or like eight, sometimes 10.

3        Q.   So about a half a pack a day?

4        A.   A little over a half.

5        Q.   Now the next question is, did you and your

6    children visit Mr. Sanders between January 20 and

7    January 30, 2006 -- 2006?

8        A.   Yes, we did.  I know my daughters did.

9        Q.   So you think that's when you may have sat

10   outside?

11       A.   Huh?

12       Q.   You?

13       A.   Did what?

14       Q.   Is that when you sat outside in the car, he

15   came to see you?

16       A.   When he came to see me.

17       Q.   In the car, is that what you're referring

18   to?

19       A.   It could have been.

20       Q.   Could have been?  Did you participate in

21   any monthly assessments or meetings with regard to

22   Mr. Sanders' care after January 25, 2006?

```
1        Q.   And they ask you if you've been -- if
2   you've remarried or whatever they ask, but they ask
3   questions, you have to send it back in to continue
4   your survivor annuity; is that correct?
5        A.   I don't recall.
6        Q.   You do have that?
7        A.   I do have that, but I don't have it --
8             MR. MELTMAR: Objection.  It's not
9   discoverable.
10            BY MS. WHITAKER:
11       Q.   Please produce a copy of Mr. Sanders' will;
12  did he have a will?
13       A.   He didn't have a will.
14       Q.   What motivated you to file this lawsuit?
15            MR. MELTMAR: Objection.  You can answer.
16            THE WITNESS:  Because I wanted -- being
17  honest with you, I wanted to know what happened to
18  my husband; that's my honest question.  I wanted to
19  know and yet today I haven't found out what
20  happened, really happened to him.
21       Q.   I have no further questions.
22       A.   Okay.
```

# ATTACHMENT 2

# EXCERPTS FROM

# DEPOSITION OF
# TEMEGA SANDERS

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
MARY SANDERS, as Personal      :
Representative of the Estate   :
of BENJAMIN SANDERS,           :
         Plaintiff,            :
                               :
    vs.                        : Civil Action
                               : No. D71169
UNITED STATES OF AMERICA,      :
         Defendant.            :
- - - - - - - - - - - - - - - x

Washington, D.C.
Friday, May 30, 2008

The deposition of TEMEGA SANDERS, called for

examination by counsel for Defendant in the

above-entitled matter, pursuant to Notice, in the

offices of U.S. Department of Justice, 501 Third

Street, N.W., Fourth Floor, Washington, D.C.,

convened at 10:06 a.m., before Cathy Jardim, a notary

public in and for the District of Columbia, when were

present on behalf of the parties:

JARDIM REPORTING ASSOCIATES
(703) 867-0396

---

CONTENTS

EXAMINATION BY COUNSE

WITNESS          DEFENDANT        PLAI

TEMEGA SANDERS             4

E X H I B I T S

NONE.

---

2

APPEARANCES:

On behalf of the Plaintiff:

W. CHARLES MELTMAR, ESQ.
The Cochran Firm       :
1100 New York Avenue, N.W.
Suite 340, West Tower
Washington, D.C.  20005
(202) 682-5800

On behalf of the Defendant:

CLAIRE WHITAKER, ESQ.
U.S. Department of Justice
501 Third Street, N.W.
Fourth Floor
Washington, D.C.  20001
(202) 514-7137

---

1              P R O C E E D I N G S

10.08:16  2     Whereupon,

3                    TEMEGA SANDERS

4     was called for examination by counsel for Def

5     and, having been first duly sworn by the nota

6     public, was examined and testified as follows

10:07:06  7          EXAMINATION BY COUNSEL FOR DEFENDANT

8          BY MS. WHITAKER:

10:07:10  9     Q.  Can you state your name for the recor

10:37:11 10     A.  Temega Sanders.

11     Q.  And address for the record?

10:87:14 12     A.  4354 D Street, Southeast.

13:07:18 13     Q.  Have you ever had your deposition tak

10:07:20 14     before?

10:07:30 15     A.  No.

10:07:30 16     Q.  Let me just give you some ground rule

13:02:23 17     that you understand.  I am going to ask you a

16 of 26 18     of questions, and you have to give an oral an

10:07:26 19     because we have a court reporter here who is

10:07:32 20     down everything you say.

18:07:33 21     A.  Okay.

10:87:33 22     Q.  You have sworn to tell the truth.  O-

**9**

Yes.

Who was taking care of your parents?

A.   Me and my sister.

So you sort of switched off?

Right.

You didn't need any other caregivers, you shared the responsibility?

A.   No, not at that time.

I understand that your father had a service-connected disability.  Can you tell me what that was?

He was paralyzed on his right side -- on his side.

Was that -- when did that occur?

About maybe 15 or 16 years ago.

So, roughly 1992?

'92.

Was he in the military at that point?

No.

So he had already retired?

Yes.

And then had something that caused the

**10**

paralysis?

A.   He had a stroke.

But he was not in the military at the time?

No.

I am a little confused about that.  You -- or do you know, you can have a disability ration, a military disability determination you are retired, if you know?

MR. MELTMAR:  Objection.

BY MS. WHITAKER:

You didn't participate in any of the work?

No.

Before we leave, one point.  When you were home two or three months ago with your mother and sister and Mr. Meltmar, what was the discussion at that point?

A.   About court dates and what should we prepare for.

Q.   What were you told?

Just to explain my father's condition, observe how he was at home, in the nursing home, and

**11**

| | | |
|---|---|---|
| 10:13:42 | 1 | that is about it. |
| 10:13:50 | 2 | Q.   Was there a discussion about whether or not |
| 10:13:53 | 3 | he smoked and who gave him cigarettes? |
| 10:13:56 | 4 | A.   Yes. |
| 10:13:56 | 5 | Q.   What was that? |
| 10:13:58 | 6 | A.   Just that, how often did we bring him |
| 10:14:02 | 7 | cigarettes, did we give the cigarettes to anyone |
| 10:14:15 | 8 | else. |
| 10:14:16 | 9 | Q.   Anything else that you can remember? |
| 10:14:20 | 10 | A.   No. |
| 10:14:29 | 11 | Q.   Can you tell me about your father's military |
| 10:14:33 | 12 | career? |
| 10:14:38 | 13 | A.   No. |
| 10:14:38 | 14 | Q.   Do you know if he served -- |
| 10:14:34 | 15 | A.   I know he was in Vietnam.  That is about it. |
| 10:14:44 | 16 | Q.   How about what rank he was when he retired? |
| 10:14:48 | 17 | A.   No, I don't. |
| 10:14:50 | 18 | Q.   How about any medals or awards? |
| 10:14:53 | 19 | A.   Don't know. |
| 10:14:57 | 20 | Q.   How long did you live at home? |
| 10:15:01 | 21 | A.   For 33 years. |
| 10:15:02 | 22 | Q.   Is that how old you are? |

**12**

| | | |
|---|---|---|
| 10:15:04 | 1 | A.   Yes. |
| 10:15:04 | 2 | Q.   You basically lived with your mother and |
| 10:15:07 | 3 | your father until he left for -- to live in the -- |
| 10:15:13 | 4 | A.   Yes, yes. |
| 10:15:15 | 5 | Q.   And then you stayed with your mother and now |
| 10:15:20 | 6 | she is gone, so you are the only one at the home? |
| 10:15:22 | 7 | A.   No, my sister. |
| 10:15:23 | 8 | Q.   And your sister is Beverly? |
| 10:15:25 | 9 | A.   Yes. |
| 10:15:26 | 10 | Q.   Anyone else? |
| 10:15:28 | 11 | A.   My uncle Robert. |
| 10:15:38 | 12 | Q.   Who is he related to? |
| 10:15:31 | 13 | A.   He is my mother's brother. |
| 10:15:33 | 14 | Q.   Does he know anything about the case? |
| 10:15:35 | 15 | A.   No. |
| 10:15:38 | 16 | Q.   Did you ever talk to him about the case? |
| 10:15:44 | 17 | A.   No. |
| 10:15:44 | 18 | Q.   Do you have any other siblings? |
| 10:15:55 | 19 | A.   No. |
| 10:15:56 | 20 | MR. MELTMAR:  I don't know that she |
| 10:15:00 | 21 | understood the question.  When you say other |
| 10:16:05 | 22 | siblings, what do you mean by that? |

**17**

A.   At home or in the nursing home?

Q.   Why don't we talk at home?

A.   At home it was mainly my mother.  By the time she got sick, he was in the nursing home.

Q.   Was one of the reasons that he went to the nursing home because your mother got sick?

A.   Temporarily, yes.

Q.   So the thought was that he would be temporarily in the nursing home?

A.   Yes, but he didn't go to VA nursing home.

Q.   Where did he go?

A.   Clinton Nursing Home for maybe about two weeks, and then he came home.

Q.   And she was better and he came home?

A.   Yes.

Q.   I see.  And then what was --

A.   Maybe three, four months after that, he went to VA nursing home.

Q.   Do you remember what year that was?

A.   No.

Q.   Did you make any of the arrangements?

A.   To --

**18**

Q.   To take him to Clinton Nursing Home?

A.   Yes.

Q.   And why did you decide to take him to --

A.   I went to VA.  They referred him to Clinton because they didn't have any openings.  Because it was only temporary, it wasn't permanent.

Q.   Now, it is my understanding that he would go to the VA nursing home for a period of maybe two weeks every year; is that correct?

A.   Right.

Q.   And they called it respite care?

A.   Yes.

Q.   What was that all about?

A.   That was to kind of give my mother a break.

Q.   And then in, I guess it was about '05, 2005, it was just too much for your mother; is that basically --

A.   Around that area, that time.

Q.   So he waited three or four months and then got into VA when there was a space available?

A.   Right.

Q.   At the time, was there some discussion that

**19**

10:21:58  1   he would just be temporarily at the VA nursing home
10:22:01  2   or that he --
10:22:03  3       A.   He would be there long-term.
10:22:04  4       Q.   Because she was just simply too ill?
10:22:07  5       A.   Because of his status with the Veterans.
10:22:10  6       Q.   What do you mean by that?
10:22:12  7       A.   I am not sure exactly.  I just know it was
10:22:15  8   because of his status and how long she has been
10:22:19  9   taking care of him.
10:22:20 10       Q.   You don't know any of the details?
10:22:22 11       A.   Right.
10:22:22 12       Q.   And she arranged it yourself or did your
10:22:29 13   sister?
10:22:29 14       A.   Her and his social worker.
         15       Q.   Who was his social worker?
         16       A.   I am not sure.
10:22:32 17       Q.   Was this a social worker at the VA or was
10:22:35 18   this a social worker that came to the house?
10:22:37 19       A.   This would probably be -- her first name is
10:22:41 20   Elaine, I don't know if that is his social worker,
10:22:46 21   but that is one of the main people my mom talked to.
10:22:51 22   Elaine or Ms. Rice.

**20**

10:23:52  1       Q.   These are the people she would consult --
10:22:55  2       A.   These are the people that normally came out
10:22:58  3   to the house, and they had discussions about putting
10:23:00  4   him --
10:23:01  5       Q.   They were social workers, not nurses?
10:23:03  6       A.   No.
10:23:05  7       Q.   Did he have nurses that came to the house?
10:23:08  8       A.   Yes.
10:23:07  9       Q.   Who were they?
10:23:13 10       A.   I can say it was maybe about six of them.
10:23:17 11       Q.   Six different people over the --
10:23:20 12       A.   The course of years, yes.
10:23:22 13       Q.   How long was respite care going on?
10:23:27 14       A.   I am not sure exactly.
10:23:28 15       Q.   Ten years?
10:23:32 16       A.   Between 10 and six years.
10:23:34 17       Q.   You said your mother did the caregiving.
10:23:37 18   What responsibilities did you have, if any?
10:23:39 19       A.   I did all the outside work.
10:23:43 20       Q.   What does that mean?
10:23:44 21       A.   Like grocery shopping.  My mother don't
10:23:46 22   drive, so I did all the caretaking like that.

21

Did you take him places?

Maybe twice. Only if it was like a church function or something like that. He didn't go out unless he went to -- We Care, I guess you call that, center, or something, for the elderly.

Q. And this was during the 15 years that he was incapacitated?

A. Yes.

Q. Was he 15 years in a wheelchair?

A. Yes.

Q. And when you say you did the outside work and she took care of him, what did she do?

A. Bathe him, clothe him, prepared his meals.

Q. Anything else?

A. That is about it.

Q. And can you tell me what the living arrangement was, could he go in his wheelchair outside or was he on the top floor --

A. Within the last ten years, he was able to go outside because we had another room for him in the back and he had a ramp to go outside.

Q. So you had a yard in the back or something

22

1  that he could go outside?

2  A. Right, right.

3  Q. And what happened that made it too much for

4  her to take care of him in -- I know it was around

5  2005 because that is what the medical records show?

6  A. For him to go in the nursing home?

7  Q. Yes, full-time.

8  MR. MELTMAR: Objection. You can answer.

9  Go ahead.

10  THE WITNESS: I can answer?

11  MR. MELTMAR: Yes.

12  THE WITNESS: She got sick for one day and

13  went in the hospital and came out the next day, so

14  within them three days, we put him in Clinton Nursing

15  Home. So it wasn't like she -- it wasn't long.

16  BY MS. WHITAKER:

17  Q. You just said this is -- she just can't do

18  it any more and we can't do it?

19  A. Right.

20  Q. And what was the hospitalization for,

21  respiratory again, or something else?

22  A. The first time it was because of the heart

23

10:26:12  1  attack, and the second time it was a stroke.

10:26:15  2  Q. So she was hospitalized twice, but he was --

10:26:18  3  A. By the time she went in the hospital for

10:26:23  4  long-term, he was already in VA. In other words, she

10:26:26  5  came home and --

10:26:28  6  Q. He was gone --

7  A. No.

10:26:30  8  Q. She came home after the heart attack --

10:26:33  9  A. No, the first time she got sick, the three

10:26:35  10  days, she came home. I know this was in December, I

10:26:39  11  am not sure what year, but it was in December. She

10:26:43  12  came home maybe about March or April, maybe he went

10:26:50  13  in VA nursing home. And she probably got sick like

10:27:00  14  year after that, after she had the heart attack.

10:27:03  15  Q. So the first time was not a heart attack?

10:27:06  16  A. No.

10:27:08  17  Q. And then she continued to have problems

10:27:10  18  after he was gone?

10:27:11  19  A. Right.

10:27:14  20  Q. Tell me, what could he do for himself when

10:27:19  21  he was home?

10:27:20  22  A. Basically feed himself. That is about it.

24

10:27:23  1  Q. Did he have an electric wheelchair at home?

10:27:27  2  A. Yes.

10:27:28  3  Q. So -- did he have the same chair?

10:27:31  4  A. Yes.

10:27:37  5  Q. Could he do anything else?

10:27:39  6  A. No, not really.

10:27:41  7  Q. So for 15 years he was in a wheelchair. He

10:27:44  8  could mobilize himself around in the wheelchair?

10:27:47  9  A. In the wheelchair, yes.

10:27:49  10  Q. And he could feed himself?

10:27:51  11  A. Yes.

10:27:51  12  Q. Did he do any assisting in bathing himself?

10:27:57  13  A. No.

10:27:58  14  Q. Did you ever observe him smoking?

10:28:00  15  A. Yes.

10:28:00  16  Q. Do you smoke?

10:28:01  17  A. No.

10:28:02  18  Q. Did you smoke?

10:28:03  19  A. Used to.

10:28:04  20  Q. When did you quit?

10:28:10  21  A. About 15 years ago.

10:28:11  22  Q. Did you ever smoke with him?

(703) 867

**25**

A. No.

Q. Why did you decide to quit?

A. To me, I never really started. It was just something you tried.

Q. Did you ever observe him smoke?

A. Yes.

Q. How did he smoke?

A. Only with his right hand.

Q. Can you demonstrate, if you can remember, can you visualize how he smoked?

A. The cigarettes and ashtray normally laying on the table, and from here, just like that. That is about it.

Q. Could he lit his own cigarette?

A. Yes.

Q. How did he do that?

A. Put the cigarette in his mouth and lit it.

Q. Did he use lighters?

A. Yes.

Q. Did you and your sister and your mother or anybody ever caution him about not smoking?

A. No.

**26**

Q. Did he ever have accidents when he smoked?

A. No, not from my record.

Q. You didn't see like burns on his clothes or anything?

A. No.

Q. He didn't drop cigarettes?

A. I didn't see it personally.

Q. Did he carry his cigarettes on his person?

A. In his fanny pack.

Q. He had that fanny pack a long time?

A. Well, not when he was home.

Q. He didn't use that, he just kept them on the table?

A. Right.

Q. Who gave him the cigarettes?

A. Me, my sister, my mother.

Q. So you all had no problem with him smoking?

A. No.

Q. And he didn't use a fanny pack when he was home?

A. No.

Q. How long, do you know -- how long did your

**27**

1  father -- how long was he a smoker?

2  A. For 33 years, and probably longer than that.

3  Q. Did he enjoy smoking?

4  A. I guess.

5  Q. Did he ever say anything to you, I really

6  don't want to quit, or -- nobody ever questioned him?

7  A. No.

8  Q. Does your sister smoke?

9  A. No.

10  Q. How about your mom?

11  A. She used to.

12  Q. When did she stop?

13  A. I guess around the time she got sick.

14  Q. So, what do you know about your father's

15  non-military career?

16  A. That he worked for U.S. Customs. That is

17  about it.

18  Q. Do you know what he did for Customs?

19  A. No.

20  Q. Did you get along with your father?

21  A. Yes.

22  Q. Who were his friends when he was home?

**28**

1  A. Mainly -- some of his co-workers and members

2  of the church.

3  Q. He was pretty active in the church?

4  A. Yes.

5  Q. Do you have any names?

6  A. Julius Signor.

7  Q. Signal?

8  A. Signor.

9  Q. Julius, that is like J-U-L-I-U-S?

10  A. Yes.

11  Q. And Signer?

12  A. Signor.

13  Q. Is he a neighbor?

14  A. No. He is a member of the church.

15  Q. What is the name of the church?

16  A. Mount Lebanon--

17  Q. Or his church -- did you go to the same

18  church?

19  A. Yes, at that time.

20  Q. Mount Lebanon?

21  A. Yes, Baptist Church.

22  Q. Where is that?

## 29

A.  1219 New Jersey Avenue.

Q.  Northeast?

A.  Northeast, yes.

Q.  Do you know any other names of his friends?

A.  Ernest Simms.

Q.  Okay.  Was he a member of the church too?

A.  Yes, all these are church members.

Mr. Lewis, that is a neighbor.  I think his first name is Eugene Lewis.

Q.  Anybody else?

A.  Norman King.

Q.  He had a lot of friends.

A.  Yes.

Q.  He was a social guy?

A.  Yes.

Q.  How about after he went into the nursing home?

A.  His friends?

Q.  Yes.

A.  Probably the same.  Those are the ones that came to see him on a regular basis.

Q.  Really.  They did come visit him?

## 30

A.  Yes.

Q.  How often did you visit him?

A.  At least -- about three times out of the week.

Q.  Three times a week?

A.  Yes.

Q.  When was it, mostly weekends or during the week?

A.  During the week and weekends.

Q.  Did your mother come with you?

A.  She did before she got sick.  When she got sick, she only came one time.

Q.  That was when she had the heart attack?

A.  Yes.

Q.  And she didn't come after that?

A.  Right.

Q.  How about your sister?

A.  I am not sure.

Q.  What would you do when you would visit with him?

A.  Basically, sit with him, ask him how he was feeling, and that was about it.  Normally he would

## 31

1  call to say he wanted something.  That is about it.

2  Q.  Then you would come and bring him something?

3  A.  Right.

4  Q.  Did he call about three times a week?

5  A.  No, not usually.  He called if he wanted

6  something to eat like Popeye's, if he had a taste fo

7  something like that.

8  Q.  Did he call when he wanted cigarettes?

9  A.  Sometimes.

10  Q.  And when you would bring him cigarettes, dic

11  you bring him cartons or just packs?

12  A.  Packs.

13  Q.  And how often did you bring the cigarettes?

14  A.  Maybe about twice a month.

15  Q.  How much did he smoke?  Some say three or

16  four cigarettes a day, some say --

17  A.  Well, at home, yes, I would say four to five

18  cigarettes in the day, but at the VA, I am not sure

19  because I wasn't there.

20  Q.  When you would come and sit with him, how

21  long would you stay?

22  A.  Well, normally no more than like an hour and

## 32

1  a half.

2  Q.  Would you go in the smoking room with him?

3  A.  No.

4  Q.  Why not?

5  A.  Because they had no ventilation in there.

6  Q.  And you didn't want to go in there?

7  A.  Right.

8  Q.  Since you are not a smoker?

9  A.  And he understood that.

10  Q.  Did you go outside on the deck?

11  A.  Yes.

12  Q.  Or the roof?

13  A.  Yes.

14  Q.  The rooftop.  Could he smoke out there?

15  A.  Yes.

16  Q.  When you would sit with him, would he smok

17  A.  Yes.

18  Q.  And did he have any problems when he smoke

19  A.  No.

20  Q.  Did you ever discuss smoking with anybody

21  the VA, his smoking?

22  A.  With the social worker.

53

Q.  Did he ever express that to you?

A.  Yes.

Q.  Did he have any suicidal tendencies?

A.  No.

Q.  Not at all?

A.  No.

Q.  You don't think there would be any reason to suspect that maybe he --

A.  No.

Q.  -- was so unhappy --

A.  No, no.

Q.  How about lighters, did you bring him lighters?

A.  Usually, no.  Usually -- he normally had like two he used to keep.  I would just bring the cigarettes.

Q.  And when you brought him lighters, what kind of lighters would you bring him?

A.  Just regular lighters.

Q.  Like Bic?

A.  Yes, just a regular lighter.

Q.  Did you ever do any paperwork for your

54

father?

A.  No, not when he was living, no.

Q.  Excuse me.

A.  Not when he was living.

Q.  What did you do afterwards?

A.  I just signed the papers at the funeral home and stuff, and the cemetery.  That is about it.

Q.  So you made the arrangements?

A.  They were already made.  All we had to do was sign the papers.

Q.  Who made the arrangements?

A.  Him and my mother.  Everything was basically already paid for.  Everything had been paid for.

Q.  It had been paid for?

A.  Yes.

Q.  Mr. Meltmar has provided me with funeral expenses of more than $15,000.  You are saying it was all paid for in advance?

A.  I know the burial spot was.  I am not sure of the rest of the stuff.

Q.  What kind of funeral did he have?

A.  A typical Baptist funeral in a Baptist

55

church.

Q.  What is that like?

A.  Like a funeral would be.

Q.  Did you have flyers made up?

A.  Flyers for?

Q.  For the funeral.

A.  Programs.

Q.  Did you bring some to the nursing home, the VA nursing home?

A.  Yes, about two or three of them.

Q.  Did you give them to anybody specifically?

A.  Elaine got one and Ms. Rice got one, and probably the nurse -- the heavyset, light-skinned nurse.

Q.  It is tough.  You don't remember names?

A.  It has been so long.

Q.  You think you did know the names at one point?

A.  No, I probably didn't.

Q.  I could name some of the names.

A.  No.  I would know them by face.

Q.  Heavyset, light-skinned?

56

A.  Light-skinned.

Q.  And why did you give her one?

A.  I think she was one of his favorites too.

Q.  She and the one that you described with the braids and five-six and glasses and medium size, those two were his favorites?

A.  Yes.

Q.  Do you know the wings, H wing, K wing?

A.  I am not sure.  I know they were on my father's side.

Q.  These nurses were two nurses that were on your father's side, and you would see them in the nurses' --

A.  Yes.

Q.  Station?

A.  Right.

Q.  And that is how you knew them?

A.  Yes.

Q.  And you knew your father was friendly with them?

A.  Right.

Q.  But you never got any names?

(703) 867-0396

**73**

He didn't say where he was, like, I was
ing right here or sitting right here.

Q. But he was a resident there?

A. Yes.

Q. Was he in a wheelchair?

A. Yes.

Q. And you don't know what room he was in?

A. No.

Q. And he didn't give you his name?

A. Yes. All of them gave me their name. I
don't remember what their names was.

Q. Do you have anything that would show what
r names are?

A. No. I know the guy who put him out, he said
room is right here, I said, The detective might
talk to you. He said, Tell them my name is --
tever he said, and my room is right here. I am
first room on this hall.

Q. And did you write it down?

A. I probably did.

Q. Did you tell Mr. Meltmar?

A. Not a name. I told the detective.

**74**

Q. Det. Gray?

A. Yes.

Q. Det. Gray had all of the names?

A. He had Albert Cole's name. He called maybe
about two or three months ago. He and him was
supposed to go --

Q. Two or three months ago?

A. Yes. We were supposed to go up there, and
we never went up there.

Q. About how Keisha Crist or Tiffany Wilson,
would they remember, or would you be able to find the
pieces of paper?

A. No. I could look. Maybe it is still in my
father's stuff.

Q. Would you do that?

A. Yes.

Q. Of course, tell Mr. Meltmar and he will tell
me.

MR. MELTMAR: About what?

MS. WHITAKER: About the piece of paper that
has the names on it.

BY MS. WHITAKER:

**75**

1    Q. I asked you before, I just want to make

2 sure, you described how he smoked at home, that he

3 get his cigarettes on the table and his lighter on

4 the table, and then you mentioned that when he was in

5 the VA, he had a fanny pack?

6    A. Yes.

7    Q. Can you describe how he smoked at the VA --

8 was it different than the way he smoked at home?

9    A. I wouldn't think so, no.

10    Q. You didn't notice any difference?

11    A. No.

12    Q. He just kept his --

13    A. One was on the table, and the ashtray was

14 down here. That is about it.

15    Q. And he kept his cigarettes and the

16 lighter --

17    A. In the fanny pack.

18    Q. Did he usually use the armrest --

19    A. On the right side?

20    Q. For the side that is paralyzed.

21    A. No. He was totally paralyzed on the left

22 side.

**76**

1    Q. As I recall seeing his wheelchair, he had an

2 armrest?

3    A. Yes.

4    Q. Did he usually use it to rest his left arm,

5 or do you remember?

6    A. Yes, but probably not when he was smoking.

7    Q. But this is his left arm, the one that was

8 not used for smoking -- or did he use his left arm

9 for smoking?

10    A. No. I don't think he ever used the armrest.

11    Q. You don't think his --

12    A. Left arm.

13    Q. His left arm that was paralyzed, there

14 was -- looking at the wheelchair, there was a rest

15 for the arm --

16    A. That should be on the right side, not left

17 side, because he couldn't extend out to put it on

18 there. I don't remember it being on the left.

19    Q. If I told you it was on the left?

20    A. It might have been. I just don't remember

21 it.

22    Q. You just don't remember if he used it or

# ATTACHMENT 3

# EXCERPTS FROM

# DEPOSITION OF
# BEVERLY SANDERS

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - - x
                              :
MARY SANDERS, as Personal     :
Representative of the Estate  :
of BENJAMIN SANDERS,          :
                              :
        Plaintiff,            :
                              :
  vs.                         : Civil Action
                              : No. 071169
UNITED STATES OF AMERICA,     :
                              :
        Defendant.            :
                              :
- - - - - - - - - - - - - - - x
```

Washington, D.C.
Friday, May 30, 2008


The deposition of BEVERLY R. SANDERS, called

for examination by counsel for Defendant in the

above-entitled matter, pursuant to Notice, in the

offices of U.S. Department of Justice, 501 Third

Street, N.W., Fourth Floor, Washington, D.C.,

convened at 12:35 p.m., before Cathy Jardim, a notary

public in and for the District of Columbia, when were

present on behalf of the parties:

JARDIM REPORTING ASSOCIATES
(703) 867-0396

**16**

```
1        A.    My mother?

2        Q.    Yes.

3        A.    I think she coped pretty well.

4        Q.    At some point in time, somebody decided she

5    could not take care of him any longer?

6        A.    Yes.

7        Q.    Were you there?

8        A.    Yes, because she had gotten sick a couple of

9    years ago, and I guess just with her age and things

10   like that, the subject came up that if she needed to

11   give some respite, a longer period of respite,

12   because she would get respite during the year and he

13   would go to the VA for like four weeks out of the

14   whole year.  He would go in two-week increments and

15   that was a little respite for her, but then they

16   talked to her that if she needed to do long-term

17   respite, she could do that.

18       Q.    They would work with her?

19       A.    Yes.

20       Q.    When he went in, I think it was January of

21   '05, was it with the idea that it would be longer

22   respite or permanent?
```

1    A.    Probably a longer respite, but then a few

2    months after he went in, my mom had a heart attack

3    and had open heart surgery, so that made the respite

4    part be permanent because at that point she was not

5    going to be able to care for him any more.

6    Q.    How often did you see him that year?

7    A.    That year?  Not that often because of my

8    schedule and then -- because my sister, she gets off

9    earlier and I don't get off until 8:00, so if I would

10   see him it would be on the weekends, like after

11   church on Sunday or on a Saturday.

12   Q.    Do you have names of any of the people you

13   dealt with at the VA?

14   A.    No.

15   Q.    He didn't have any favorite nurses?

16   A.    I don't remember their names.  My sister was

17   there much more often than I, so, no, not really,

18   because when I would go there to see him, I would

19   just see him, or whatever.  I didn't talk to,

20   really --

21   Q.    When you would go, how long would you stay?

22   A.    Sometimes an hour, hour and a half, depends

18

1   if I was just stopping by, because my schedule is

2   really, really hectic sometimes and so sometimes it

3   would be long, sometimes it would depend.

4        Q.    What would you be doing when you stopped by,

5   what did you all do?

6        A.    We would sit and talk, whatever, I may bring

7   him something to eat, some cookies, or get some

8   snacks out of the vending machine.  Sit there and

9   talk.

10       Q.    Did you sit inside, outside?

11       A.    Inside, sometimes outside.  It depends on

12   the weather.

13       Q.    Did he smoke in front of you?

14       A.    Yes.

15       Q.    How long did your father smoke?

16       A.    I don't know.  Probably 30, 40 years, I am

17   not sure.

18       Q.    Do you think he enjoyed smoking?

19       A.    Yes.

20       Q.    Was he ever advised to stop smoking?

21       A.    Not that I am aware of.  He wouldn't tell me

22   anyway, or any of us, that they said to him stop

35

1  hand them to him?

2      A.    I would put them in his pack.

3      Q.    In his pack?

4      A.    He had a little pack he would wear.

5      Q.    Fanny pack?

6      A.    Yes.

7      Q.    What did he have in the fanny pack, if you

8  know?

9      A.    Cigarette, lighter, money, his watch, candy,

10  cookies sometimes, maybe, tissues.

11      Q.    Anything else?

12      A.    No.

13      Q.    You did have an opportunity to look inside

14  of it, and you know generally what was there?

15      A.    Yes.

16      Q.    Did he carry multiple lighters?

17      A.    Not that I know of.

18      Q.    Did you ever ask his caregivers to dole out

19  the cigarettes to him, one at a time?

20      A.    No.

21      Q.    Like you were describing you would try to

22  limit his smoking at home?

40

1    and your family were relieved that your father was

2    now full-time permanently at the nursing home?

3        A.    No.

4        Q.    Did you ever take your father out while he

5    was at the nursing home?

6        A.    Yes.

7        Q.    When and how often?

8        A.    We took him out one Thanksgiving when he had

9    gone in, so he came out for Thanksgiving, and he may

10   have come home for a cookout that summer.

11       Q.    So, twice?

12       A.    Yes, maybe, something like that.

13       Q.    Did you ever tell anybody at the nursing

14   home that you couldn't get your father to stop

15   smoking?

16       A.    No.

17       Q.    Did you ever tell anybody there that you

18   didn't want him to smoke?

19       A.    No.

20       Q.    Did you ever observe him have any accidents

21   at the VA facility, accidents in terms of mishandling

22   cigarettes?

41

1      A.    No.

2      Q.    Or lighters or anything like that?

3      A.    No.

4      Q.    Now, your sister testified that there was a

5  family friend who reported to her that he witnessed

6  the accident.  Are you familiar with that?

7      A.    Yes.

8      Q.    Who was that?

9      A.    Anthony Cole, I think that is his name.

10     Q.    And where is he?

11     A.    I don't know where he is right now.  I think

12 he may be at the nursing home my mother is in.

13     Q.    Did you talk to him?

14     A.    No.

15     Q.    Who did?

16     A.    I guess my sister may have.

17     Q.    Did you talk to anybody at the facility

18 about the accident?

19     A.    No.

20     Q.    Did you go to the accident?

21     A.    No.

22     Q.    The scene, at all?

# ATTACHMENT 4

# EXCERPTS FROM

# VA MEDICAL RECORDS OF BENJAMIN SANDERS

# Progress Note

Printed On Sep 08, 2006

| EGFR | 50.1 | 54.8 | 50.2 | 53.9 |

PHYSICAL ACTIVITY:Pt wheel chair bound moves around the nucu and particitapte in unit activity.

PLAN/Recommendation : no concentrated sweet.
　　　　　　　　　adjust diet card for food preferences.
　　　　　　　　　continue hs snack.
　　　　　　　　　encouraged compliance to diet.
　　　　　　　　　suggest mvi or as approprite.-d/c pt on feso4.
　　　　　　　　　continue with fiber slash.

GOALS:　　　　　Po intake at least 75%.met continue.
　　　　　　　　BS<140-continue
　　　　　　　　monotor intake via meal round, tolerance,lab and wt.
　　　　　　　　pt to be free of constipation-continue.


/es/ TSEDEKEWORK BEKELE
Dietitian
Signed: 01/19/2006 16:09

---

　　　　　TITLE: CNRC MONTHLY MEDICAL REVIEW (LONG TERM CARE)
DATE OF NOTE: JAN 19, 2006@14:20　　ENTRY DATE: JAN 19, 2006@14:20:33
　　　AUTHOR: ALEHOSSEIN,ASHRAF　　EXP COSIGNER: KHEIRBER,RAYA E
　　　URGENCY:　　　　　　　　　　　STATUS: COMPLETED

BRIEF HISTORY:

　64 y/o　veteran　with complicated medical history including h/o
CVA left hemiplegia,, Bullous pemphigoid, DM, HTN, seizure d/o since child hood
　BPH/ Gout/ Asthma, Allergies and aspiration hx. he has been resident of
nursing home since 2/05


EVENTS OF THE PAST MONTH:
 - Right hearing aid replacement.　hearing aid　fits well, stated he hears
well.
 - Missed podiatry appointemnt in room as he was not in the room
 Intermitent shortness of breath and wheezing for which he takes nebulization
with improvement, Vet continues to smoke despite of numerus teaching on the
consequences　of smoking
- MMSE　26/30　GDS　4/15

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA　20019 | Printed at WASHINGTON
225647315

# Progress Note

Printed On Sep 08, 2006

ON GOING EDUCATION ON
- Encouraged to keep head of the bed elevated at all time or preferebly when eating or taking medicine
- Encouraged to avoid scratching the open lesions
- Instructed to eat his snack instead of cookies to keep his blood sugur in a good range

- Patient continues to smoke 3 cigarett a day , has no plan to quit, reinforced the importance of smoke cesation with his comorbidity, continue to educate and encouraged patient to attend smoke cesation class.

/es/ ASHRAF ALEHOSSEIN
CRNP
Signed: 12/15/2005 12:01

/es/ Raya E. Kheirbek,MD, CMD
Medical Director,NHCU
Cosigned: 12/16/2005 06:02

---

        TITLE: NURS CNRC PROGRESS NOTE
DATE OF NOTE: DEC 14, 2005@16:21    ENTRY DATE: DEC 14, 2005@16:21:43
        AUTHOR: JONES,LESA W        EXP COSIGNER:
        URGENCY:                    STATUS: COMPLETED

Vitals:
    BP: 115/85 (12/09/2005 06:37)

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | VISTA Electronic Medical Documentation

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019 Printed at WASHINGTON
225647315

# Progress Note

Printed On Sep 08, 2006

Geriatric Clinical Educator
Signed: 11/14/2005 09:07

---

TITLE: CONSULT ENT OUTPT
DATE OF NOTE: NOV 12, 2005@13:28    ENTRY DATE: NOV 12, 2005@13:28:17
AUTHOR: SAVAGE-BARKSDALE,S    EXP COSIGNER:
URGENCY:                          STATUS: COMPLETED

pt. was seen 2KWing

/es/ S M SAVAGE-BARKSDALE
Program Assistant / Analyst
Signed: 11/12/2005 13:28

---

TITLE: NURSING NOTE
DATE OF NOTE: NOV 11, 2005@08:35    ENTRY DATE: NOV 11, 2005@14:21:06
AUTHOR: SANDLAIN,MELISSA    EXP COSIGNER:
URGENCY:                          STATUS: COMPLETED

advised per CNA resident was wheezing-audible wheezing-N.P. advised -oral
inhalers given per order with no relief-albuterol neb given with relief-p/o 94%-
no c/o at this time-appears to be in no acute distress-chest xray done-cont to
monitor

/es/ MELISSA SANDLAIN
LPN
Signed: 11/11/2005 14:24

---

TITLE: GERIATRIC MEDICINE CNRC PROGRESS NOTE
DATE OF NOTE: NOV 11, 2005@09:01    ENTRY DATE: NOV 11, 2005@09:01:58
AUTHOR: TRAIL,LAURENCE L    EXP COSIGNER: KHEIRBEK,RAYA E
URGENCY:          :              STATUS: COMPLETED

*** GERIATRIC MEDICINE CNRC PROGRESS NOTE Has ADDENDA ***

PROBLEM:Wheezing/Asthma-Bronchitis

BRIEF HISTORY:64 year old male with multiple medical problems including
hypertension, s/p CVA, deafness, diabetes, Seizure disorder, smoker, Asthma, and
bullous pemphigoid.

PERTINENT REVIEW OF SYSTEMS:Wheezing/cough with white productive sputum. Vital
signs stable, Albuterol Neb x1 given with relief. Pt. c/o register and cold air
above his bed.  Routine cxr ordered and z-pack ordered for bronchitis. Smoking
cessation urged during exacerbation.

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA   20019
225647315

VISTA Electronic Medical Documentation

Printed at WASHINGTON

Page 334

# Progress Note

Partial-complex Seizure
Pemphigoid, Bullous (Icd-9-cm 694.5)
Periodontitis
Personal History of Tobacco Use
Xerosis (Icd-9-cm 706.8)
elevated alkaline phosphatase since 1/92

| | |
|---|---|
| Patient on antipsychotic: | ( ) yes (x ) no |
| Patient on antidepressant: | ( ) yes ( x) no |
| Patient on anxiolytic or hypnotic | ( ) yes ( x) no |

IF YLearns best by:
ES:
Evidence of tardive dyskinesia, extrapyramidal symptoms,
or other untoward effects?                        ( ) yes ( ) no
Evidence of sedation or other untoward effects?   ( ) yes ( ) no
Medication effective in treating target behaviors? ( ) yes ( ) no
Medication remains appropriate in clinical treatment? ( ) yes ( ) no
Medication reviewed for discontinuation, reduction, or increase with
recommended: ( ) no change ( ) discontinue ( ) decrease dose ( ) increase
dose
Behaviors not able to be managed with behavioral interventions alone? ( )
yes ( ) no

| | |
|---|---|
| Urinary incontinence? | ( ) yes ( x) no |
| Indwelling urinary catheter? | ( ) yes ( x) no |
| If yes, treatment plan: | |

PATIENT EDUCATION: (use appropriate template)
 ON GOING EDUCATION ON

- Encouraged to avoid punch and cookies hours in the atrium and if offerd to say
he is diabetic and uses sweet/low and  diabetic cookies
-   Encouraged to keep head of the bed elevated at all time or preferebly when
eating or taking medicine
- Encouraged to avoid scrathing the open lesions
- Instructed to eat his snack instead of cookies  to keep his blood sugur in a
good range

 - Patient continues to smoke 3-4 cigarett a day , has no plan to quit,
reinforced the importance of smoke cesation with his comorbidity, continue to
educate and encouraged patient to attend smoke cesation class.

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA   20019 Printed at WASHINGTON
225647315

Page 410

# Progress Note

Printed On Sep 08, 2006

PATIENT EDUCATION: (use appropriate template)
instructed patient not to use scooter for safety  and use WC for mobility.

Instructed to eat his snack instead of cookies  to keep his blood sugur in a
good range. blood sugur slightly improved compare to last month.


 - Patient continues to smoke 3-4 cigarett a day , has  no plan to quit,
reinforced the importance of smoke cesation with his comorbidity, continue to
educate and encouraged patient to attend smoke cesation class.


/es/ ASHRAF ALEHOSSEIN
CRNP
Signed: 06/02/2005 14:18

/es/ Raya E. Kheirbek,MD, CMD
Medical Director,NHCU
Cosigned: 06/03/2005 08:37

---

         TITLE: PHARMACY MONTHLY CNRC REVIEW
DATE OF NOTE: JUN 01, 2005@09:28    ENTRY DATE: JUN 01, 2005@09:28:38
      AUTHOR: WASHINGTON,TERRILL    EXP COSIGNER:
     URGENCY:                         STATUS: COMPLETED


PHARMACY MONTHLY CNRC REVIEW

ACTIVE PROBLEM LIST:
  Acquired Absence of teeth, unspecified
  Chronic Kidney Failure
  Dental Caries extending into pulp
  Diabetes II, Uncomp
  Late effects of cerebrovascular disease, unspecified  (Icd-9-cm 438.9)
  Monoclonal Gammopathy
  Mixed conductive and sensorineural hearing loss (Icd-9-cm 389.2)
  Other Late Effect Of Cerebrovascular Disease, Dysphagia
  Partial-complex Seizure
  Pemphigoid, Bullous (Icd-9-cm 694.5)
  Periodontitis
  Personal History of Tobacco Use
  Xerosis (Icd-9-cm 706.8)
  elevated alkaline phosphatase since 1/92

VITALS:

---

| PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation |
| --- | --- |

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019 | Printed at WASHINGTON
225647315

# Progress Note

- Patient continues to smoke 3-4 cigarett a day , has no plan to quit, reinforced the importance of smoke cesation with his comorbidity, continue to educate and encouraged patient to attend smoke cesation class.


/es/ ASHRAF ALEHOSSEIN
CRNP
Signed: 05/05/2005 14:01

/es/ Raya E. Kheirbek,MD, CMD
Medical Director,NHCU
Cosigned: 05/06/2005 09:34

05/06/2005 ADDENDUM                     STATUS: COMPLETED
Chart reviewed, meds reviewed and renewed, ACP is updated. Ptaient is medically stable with no major events from the last month.  I agree with above assessment and plan. Wt has been stable the last month.

/es/ Raya E. Kheirbek,MD, CMD
Medical Director,NHCU
Signed: 05/06/2005 09:35


        TITLE: HBPC SOCIAL WORK NOTE
DATE OF NOTE: MAY 03, 2005@14:51    ENTRY DATE: MAY 03, 2005@14:51:40
     AUTHOR: RICE,SHEILA          EXP COSIGNER:
     URGENCY:                          STATUS: COMPLETED

Home Address     : 4354 D ST SE
                   WASHINGTON, DISTRICT OF COLUMBIA, 20019
Home Phone Number: 202-581-8317

Next of Kin      : MARY SAUNDERS
Home Phone Number: 202-581-8317
SWS NOTE
    Pts dtr (Tamika) presented in HBPC office 4-26-05 to request restart of counseling that was discontinued per her request once pt/father placed in NHCU (she explained that she was feeling better after strain of caring for father resolved).
    As her mothers/pts wifes health continues to become more tenuious Tamika's stress level increasing (self report of a 9 on scale of 1 to 10). During todays session Tamika reported a max SUDs level of 4.
    She was given a homework assignment and plans to return 5-10-05.

/es/ SHEILA RICE
SOCIAL WORKER
Signed: 05/03/2005 15:31

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019 | Printed at WASHINGTON
225647315

# Progress Note

behalf should he not be able to do so. At the time of cardiopulmonary arrest, Mr
saunders  desires to prolong his life by  transfering to ICU setting and provide
ventilation support/ CPR/ invasive procedures.therfore,  the order written as
FULL CODE


ADVANCE DIRECTIVE      FULL CODE

/es/ ASHI ALEHOSSEIN
CRNP
Signed: 02/07/2005 14:44

Receipt Acknowledged By:
02/07/2005 15:40          /es/ Raya E. Kheirbek,MD, CMD
                              Medical Director,NHCU


          TITLE: PRESSURE SORE RISK ASSESS: BRADEN SCALE
DATE OF NOTE: FEB 07, 2005@13:45    ENTRY DATE: FEB 07, 2005@13:46:12
    AUTHOR: FRASER,NORMA S        EXP COSIGNER:
    URGENCY:                         STATUS: COMPLETED


Frequency of Assessment: admission

RISK FACTORS:

Sensory Perception : 2 - very limited
Moisture           : 3 - occasionally moist
Activity           : 2 - chairfast
Mobility           : 2 - very limited
Nutrition          : 3 - adequate
Friction and Stress: 2 - potential problem

Braden Score (total): 14
Patient's Risk      :

/es/ NORMA S FRASER
RN
Signed: 02/07/2005 13:49


          TITLE: NURSING CNRC ADMISSION ASSESSMENT
DATE OF NOTE: FEB 07, 2005@12:16    ENTRY DATE: FEB 07, 2005@12:17:34
    AUTHOR: FRASER,NORMA S        EXP COSIGNER:
    URGENCY:                         STATUS: COMPLETED

NURSING CNRC ADMISSION ASSESSMENT

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | **VISTA Electronic Medical Documentation**

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019 | Printed at WASHINGTON
225647315

# Progress Note

Printed On Sep 08, 2006

```
Age: 63     Sex: MALE          Race: BLACK OR AFRICAN AMERICAN
Religion: BAPTIST

VITAL SIGNS:
HT: 68 in [172.7 cm] (09/26/2004 23:55)
WT: 160.8lb (02/07/2005 1:00)
T: 97.6 F [36.4 C] (02/07/2005 12:16)     P: 80 (02/07/2005 12:16)
R: 20 (02/07/2005 12:16)     BP: 146/73 (02/07/2005 12:16)
PAIN: 0 (02/07/2005 12:16)
   Pain:  0 (02/07/2005 12:16)

MARITAL STATUS:    [] patient cannot respond
          [] single  [x] married  [] divorced  [] widower  [] separated
          [] significant other

EMERGENCY NOTIFICATION: [] no one identified by patient
Person:        MARY SAUNDERS
Address:       4354 D ST SE
               WASHINGTON DC 20019
Relationship: WIFE
Phone (h):    202-581-8317
Phone (w):

ITEMS BROUGHT TO CNRC:  [] no items brought to CNRC
     [x] money (list):0-$1
     [] jewelry (list):
     [x] clothing (list):10pr sweai pants,12 sweat shirts ,1 T-shirts,2 long
john
tops,3 slippers socks,6prs socks and 2 half pr,1 black jacket,1 nylon
jacket,1
electric toothbrush,1hat,1 nylon sweat pants,1pj red plaid,1 black bag,1
suite
case,1 electric wheel chair,1 wheelchair and battery.1 hearing  amplifier
     [x] glasses     [] contact lens   [} hearing aids
     [] dentures    [x] partials -at home        [] upper [] lower
     [] walker   [] cane          [x] wheelchair-eletric
     [] other:

DISPOSITION OF VALUABLES: [x] no items for disposition
     [] Agent cashier [] MAO [] Patient  []  Family/Home

ALLERGIES: LATEX

REASON FOR ADMISSION: (list in patient/families words)
Wife is sick and cannot take care of pt.
```

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | **VISTA Electronic Medical Documentation**

```
SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019  Printed at WASHINGTON
225647315
```

# Progress Note

CHRONIC HEALTH PROBLEMS:          [] None
    [] Cancer          [] COPD          [] Dementia
    [x] Diabetes       [] Dialysis       [] Heart disease
    [x] Hypertension [] Parkinson's    [] PVD
    [] TB              [x] Seizures      [] Mental illness
    [x] Stroke         [] Other (list):

ADVANCED DIRECTIVES:    [] patient cannot respond
    Has an Advanced Directive:    [x] Yes [] No  [] Unknown
    Location of Advanced Directive: On record
    Wants and Advanced Directive:    [] Yes  [] No
    Information/pamphlet provided:  [] Yes  [] No, refused

SENSORY STATUS: [] patient cannot respond
    Vision:  [] normal   [x] glasses: [x] reading   [] distance
                     [] blind     [] contact lens
                     [] other (list):

    Hearing: [] normal   [] deaf        [x] impaired
                    [] hearing aids: [] right [] left pt wears an
amplifier.

    Speech:  [] normal   [x] slurred   [] aphasic
                    [] foreign language (list):

    Comments:

FUNCTIONAL STATUS:
    Movement: [] moves all extremities
              [x] limitations (describe):Rt side weakness.

    Needs Assistance With: [] independent in all ADLs
                     [] patient cannot respond
        [] mobility   [x] transfer  [x] hygiene
        [x] oral care  [x] eating    [x] toileting
        [x] dressing   [] ostomy care

    Assistive devices needed: [] None
                     [] patient cannot respond
        [] cane          [] walker     [] wheelchair
        [] scooter     [x] trapeze   [] bedrails
        [] electric razor            [] electric toothbrush
        [] long wash brush          [] special eating utensils
        [] raised lipped bowl        [] raised toilet seat
        [] bedside commode          [] sock tool

    Personal Preferences Regarding: [x] None
                        [] patient cannot respond

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019 | Printed at WASHINGTON
225647315

# Progress Note

```
                    [] clothing  [] bathing  [] sleep time
                    [] other:

        Customary Routine:   [] None [] patient cannot respond
            [x] stays up late at night (e.g. after 9 pm)
            x[] naps regularly during day (at least 1 hour)
            [x] goes out 1+ days a week
            [x] stays busy with hobbies, reading, or fixed daily routine
            [x] moves independently indoors (with appliances, if used)
            [] in bedclothes much of day
            [x] daily contact with relatives/close friends
            [] daily animal companion/presence
            [x] finds strength in faith
            [x] usually attends church, temple, synagogue, (etc.)

    Comments:

INTEGUMENTARY:

    Braden Risk Score: [] low risk > 18  [x] high risk  < 19

    Skin Condition:
        amputations:     [x] none [] R BKA  [] R AKA  [] L BKA  [] L AKA
                                  [] R TMA  [] L TMA
                         [] other (list):
        bruises:         [x] none [] (list):
        contractures:    [x] none [] RLE     [] LLE     [] RUE     [] LUE
        diabetic ulcer:  [x] none [] R foot [] L foot [] other (list):
        edema:           [x] none [] RLE     [] LLE     [] other (list):
        lacerations:     [x] none [] other (list):
        pressure ulcer:  [x] skin intact w/o redness
                                  [] sacrum [] R hip  [] L hip
                                  [] R knee [] L knee [] RLE    [] LLE
                                  [] R heel/foot      [] L heel/foot
                                  [] other (list):
        rash:            [x] none
            location:
            describe:
        surgical site:   [x] none
            location:
            describe:
        vascular ulcer:  [x] none [] RLE     [] LLE    [] other (list):

    Feet:    [] no problems
                        [x] dry/scaling
                        [x] elongated/thickened/ingrown nails

    Comments:Pt has open areas on Lt side  of face,Rt  side of back.groins
```

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019
225647315

VISTA Electronic Medical Documentation

Printed at WASHINGTON

# Progress Note

and
penis

PULMONARY:      [] no problems    [] pt. cannot respond
   Breath Sounds: [] clear    {x] congested    [] wheezing
   Pattern:        [] normal   [] mild dyspnea   [] mod/severe dyspnea
   Cough:          [] none     [] non-productive [x] productive
   Smoker:         [] no       [x] yes              [] pt cannot respond

   Comments:

CARDIOVASCULAR:    {x] no problems    [] patient cannot respond
       [] irregular pulse    [] exertional chest pain
       [] chest pain at rest  [] pedal edema  [] leg pain  [] PVD

    Comments:

GENITOURINARY:      [] no problems    [] patient cannot respond
      {x] incontinence [] dysuria      [] burning
      [] discharge    [] frequency    [] hematuria
      [] infection    [] ostomy
      [] wakens to toilet at night

   Female: [] patient cannot respond/remember
       Last pap smear (date):
       Last breast exam (date):
       Last mammogram (date):

    Comments:

GASTROINTESTINAL:  [] no problems    [] patient cannot respond
     [x] bowel pattern (list frequency):
     [] constipation  (last date of BM):
     [] incontinence    [] nausea      [] vomiting
     [] hemorrhoids     [] ostomy      [] diarrhea
     [] bloody stool
     [x] bowel program (explain):stool softener, and a laxative.

    Comments:

MENTAL HEALTH:
   Appearance:       [] well groomed     [] unkempt
   Behavior:         [x] appropriate     [] inappropriate
            x[] cooperative     [] withdrawn
             [] agitated    [] bizarre
             [] combative   [] other:
   Speech:           [x] appropriate
             [] disorganized

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019
225647315

VISTA Electronic Medical Documentation

Printed at WASHINGTON

# Progress Note

```
                              [] delusional
          Hallucinations:   [x] none           [] patient cannot respond
                              {} auditory       [] visual
                              [] tactile
          Cognitive         [x] no problems    [} needs assistance
          Abilities:        [] unable to make own decisions
          Sleep:            [x] no problems    [] patient cannot respond
                              [] other (list):
           Alcohol/Drug Use: [x] denies        [] patient cannot respond
                              {} other (list):
          Religious/cultural concerns:
                              [x] none          [] patient cannot respond
                              [] other (list):
          Response to CNRC admission:
                              [x] accepting     {} patient cannot respond
                              [] not accepting

      Comments:

PAIN ASSESSMENT:
      [x] no pain within last three days
          [*If no pain, skip to Safety/Risk Factors section]
      [] pain currently relieved by medication
      [] pain currently present

      [] patient cannot verbalize pain
           *(complete the following information based on
            subjective signs and symptoms and
            family/SO impressions)

   Location: [] patient cannot respond
             [] head   [] neck    [] trunk  [] abdomen [} back
             [] R arm  [] R hand  [] L arm  {} L hand  [] shoulders
             [] R leg  {} R foot  [] L leg  [] L foot
             [] other (list):

   Origin of Pain:             [] patient cannot respond
        [] surgical site    [] tumor    [] wound
        [} fracture         [] other (list):

   What does the pain feel like?  [] patient cannot respond
        [} aching      [] heavy     [] tender    [] splitting
        [} hot/burning [] shooting  [] stabbing  [} sharp
        [} cramping    [} throbbing [] other: (describe)

   Frequency of pain interfering with patient ADL:
        [} Pain does not interfere with ADL
        [] Less often than daily
```

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)    VISTA Electronic Medical Documentation

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019   Printed at WASHINGTON
225647315

# Progress Note

```
      [] Daily, but not constantly
      [] All the time
      [] patient cannot respond
```

Pain Intensity (use 0-10 scale; if patient is demented or cannot
                respond, use the PAINAD scale)
   Pain now:        []0 []1 []2 []3 []4 []5 []6 []7 []8 []9 []10
   Worst pain gets: []0 []1 []2 []3 []4 []5 []6 []7 []8 []9 []10
   Best pain gets:  []0 []1 []2 []3 []4 []5 []6 []7 []8 []9 []10
   Patient's pain intensity goal:
                    []0 []1 []2 []3 []4 []5 []6 []7 []8 []9 []10

PAIN ASSESSMENT IN ADVANCED DEMENTIA (PAINAD)
  (Use for demented patients or those who cannot respond)

BREATHING (independent of vocalization):
   0 = Normal
   1 = Occasional labored breathing.
       Short periods of hyperventilation
   2 = Noisy, labored breathing.
       Long periods of hyperventilation.
       Cheyne-stokes respirations          [ ]
NEGATIVE VOCALIZATION
   0 = None
   1 = Occasional moan or groan.
       Low level speech with a negative
       or disapproving quality.
   2 = Repeated troubled calling out.
       Loud moaning or groaning. Crying.
                                           [ ]
FACIAL EXPRESSION
   0 = Smiling, or inexpressive
   1 = Sad. Frightened. Frown.
   2 = Facial grimacing.                    [ ]
BODY LANGUAGE
   0 = Relaxed
   1 = Tense. Distressed pacing.
       Fidgeting.
   2 = Rigid. Fists Clenched.
       Knees pulled up. Pulling or
       pushing away. Striking out.          [ ]
CONSOLABILITY
   0 = No need to console
   1 = Distracted or reassured by
       voice or touch
   2 = Unable to console, distract
       or reassure                          [ ]
                       TOTAL SCORE:     [    ]
```

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019
225647315

**VISTA Electronic Medical Documentation**

Printed at WASHINGTON

# Progress Note

Printed On Sep 08, 2006

SCORING:
    0 = No evidence of pain
1- 3 = Mild pain
4- 6 = Moderate pain
7-10 = Severe pain

What causes or increases the pain?
   [] movement  [] temperature  [] food  [] other (explain):
   [] patient cannot respond

What relieves the pain:
   [] medication      [] heat      [] breathing techniques
   [] positioning     [] ice pack  [] divisional activities
   [] other (list):
   [] patient cannot respond

What treatment/interventions has the patient most recently been
receiving prior to admission:
   [] medication [] other (list):
   [] patient cannot respond

Effectiveness of current treatment:
   [] Pain totally relieved
   [] Pain partially relieved
   [] No relief
   [] patient cannot respond

Manner of expressing pain:
   [] verbal              [] crying
   [] nausea              [] pallor
   [] facial grimace      [] guarding/protecting
   [] muscle tension      [] muscle spasm
   [] sweating           [] refuses turning/positioning
   [] increased VSs       [] restless/irritable
   [] flushed face        [] rubbing area
   [] moaning            [] groaning
   [] changes in gait
   [] other (list):

Comments:


SAFETY/RISK FACTORS:    [] none identified at this time
   [x] falls        [] smoking risk   [] wandering
   [x] seizure      [] suicide risk   [] assaultive behavior
   [] elopement     [] other (list):

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA   20019 | Printed at WASHINGTON
225647315

# Progress Note

Comments:

NUTRITION:        [] patient cannot respond/remember
                  [x] regular diet
        special diet (list):
        tube feeding (list):
        religious/cultural food preferences: [] none []list:

Problems:        [] patent cannot respond
                  [] none          [] chewing
                  [x] swallowing -liquids      [] loose dentures
                  [x loose or missing teeth/dentures missing.
                  [] inflamed gums or ulcers

CONSULT DIETITIAN FOR ANY OF THE FOLLOWING: (page dietitian on call any
time other than weekdays)
        [] recent significant appetite change
        [] recent significant weight change
        [x] difficulty swallowing-liquids
        [] tube feeding
        [] stage III-IV pressure sore
        [] geriatric surgical patients over the age of 75 years
        [] alteration in nutrition r/t :
              [] symptoms of bowel obstruction
              [] newly diagnosed diabetic
              [] malnutritin/failure to thrive
              [] eating disorders
              [] acute renal failure
              [] other:
General comments:

PATIENT EDUCATION:
  Orientation to unit given to patient/significant other:
        [] patient cannot understand/tour
        [x] ward routine/tour       [x] smoking regulations
        [x] bed controls            [x] call bell
        [x] visiting hours          [x] ID Team Members
        [x] pain management
        [x] Ethics Advisory Committee
        [x] patient rights and responsibilities


  Patient's level of understanding of above:
        [] patient cannot respond
        [x] Pt verbalizes/demonstrates understanding
        [x] Family verbalizes/demonstrates understanding
        [] Needs additional teaching (specify in note)
        [] Unable to comprehend (explain):

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019 | Printed at WASHINGTON
225647315

# Progress Note

Interim educational needs:
    [] none                    []patient cannot understand
    [x] wheelchair safety     [x] transfer safety
    [] dietary compliance     [] medications
    [x] pain management      [] self care
    [] treatments
    [] other (list):

  Comments:

DISCHARGE PLANNING:    [] patient cannot respond
  Living situation:
    [x] house/apartment
    [] homeless          [] nursing home
                   [] other:
  Family/Significant Other:
    [] lives alone
    [] lives with SO/friend    [x] lives with family
  Patient's Discharge Goal:

  Comments:

SOURCE OF INFORMATION:
    [x] patient   [] family    [] significant other/friend
    [] medical record
    [] other:

SUMMARY:Admitted to R152-2 a black male with DM, Seziures,CVA.He is alert and
responding. He has Lt. side weakness.He has open areas  on his Lt face and
head,Both groins and penis.Lt side of upper back partially  healed and Lt great
toe.He is incontinent of urine. Needs assistance to get  on commode.He needs a
lift for transfer, and two persons is required for care.He requires sezuire
precaution. His appetite is good.Feeds self,needs setup.Nails need clipping

INTERIUM PLAN OF CARE (Nursing):

Problem:Hygeine deficit
Goals:Pt will be kept clean and tidy while in the Nh
Approaches:Complete care is required.

Problem:Alt in nutrition
Goals:Pt will be kept clean  and dry while in the NH
Approaches:Change pt as need and wash peri rectal areas after applying barrier
cream.

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019 | Printed at WASHINGTON
225647315

# Progress Note

Problem:Alt in skin integrity
Goals.Open areas will be improved.
Approaches:Open areas in groin , penis.Lt face, and Lt toe will be improved.
and
Lt. side


/es/ NORMA S FRASER
RN
Signed: 02/07/2005 13:54


         TITLE: CNRC MEDICAL ADMIT H AND P
DATE OF NOTE: FEB 07, 2005@11:51    ENTRY DATE: FEB 07, 2005@11:52:48
       AUTHOR: ALEHOSSEIN,ASHRAF    EXP COSIGNER: KHEIRBEK,RAYA E
      URGENCY:                       STATUS: COMPLETED

CNRC MEDICAL ADMISSION HISTORY AND PHYSICAL EXAMINATION


HISTORY OBTAINED FROM:
 cprs and patient
CHIEF COMPLAINT:
 medication management, care giver support, wound management, seizure control
and DM management.


HISTORY OF PRESENT ILLNESS:

Mr Saunders  is a 63 y.o veteran  with complicated medical history including h/o
 CVA left hemiplegia, also bullous pemphigoid, DM, HTN seizure d/o, BPH, gout,
asthma, also allergies and aspiration hx.  Most significant recent  medical
events  is short hospitalization on 1/3/05  for
 uncontrolled DM brought in by ambulance s/p likely GTC witnessed by
duaughter: he stare blankly, look to the left, and proceed to generalized
jerking movement of upper and lower extremities, no observerd fall from chair,
and hospitalization for seizure on 10/04 .

Pt reportis feeling well generally.  He denies SOB or chest pain.  Says he does
have a cough that is worse when he lies flat, also mild SOB if lies flat
(generally lies on 2 pillows).  No PND or leg swelling.

He is able to feed himself, he uses motorize scooter, needs assisstance on all
other ADL's


PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019 Printed at WASHINGTON
225647315

# Progress Note

PAST MEDICAL HISTORY: (Include surgeries/hospitalizations/injuries)
- 1/3/05.  hospitalization for GTC
- 10/14/04   hospitalization for seizure
- perior to date above pt would attended respite care at NHCU every 6 months


PROBLEM LIST: (Active and Verified)
  Benign Hypertension
  Cerebrovascular Effects
  Chronic Kidney Failure
  Diabetes II, Uncomp
  Full code as per pt CC
  Gout
  Late effects of cerebrovascular disease, unspecified (Icd-9-cm 438.9)
  Monoclonal Gammopathy
  Mixed conductive and sensorineural hearing loss (Icd-9-cm 389.2)
  Partial-complex Seizure
  Pemphigoid, Bullous (Icd-9-cm 694.5)
  Periodontitis
  Personal History of Tobacco Use
  Stroke (Icd-9-cm 436.)
  Unspecified Psychosocial Circumstance (Icd-9-cm V62.9)
  Xerosis (Icd-9-cm 706.8)
  elevated alkaline phosphatase since 1/92

IMMUNIZATIONS:
    Last PPD: PPD done on  2/7/05
    Last PNEUMO-VAC Vaccine APR 11, 2003@18:14:09
    Last TD-ADULT Vaccine MAY 15, 2003@13:00
    Last INFLUENZA Vaccine OCT 25, 2004@10:30

ALLERGIES:
  LATEX



OVER-THE-COUNTER MEDICATIONS/ALTERNATIVE MEDICATIONS: [x] None

PERTINENT MILITARY HISTORY:   (Service connected information)

FAMILY HISTORY:

SOCIAL HISTORY:   (Include: alcohol, tobacco [pack-years], illicit drug
  lives with wife and daughter  his wife has developed serious health
issues that have impacted on her ability to provide the level of care he
requires and he was referred to LTC placement.
 denise etoh abuse, but continue to smoke despite of severe

---

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019
225647315

**VISTA Electronic Medical Documentation**

Printed at WASHINGTON

# Progress Note

Printed On Sep 08, 2006

circomstances.


ADVANCED CARE PLAN:
     CODE STATUS:  full code
  Organ donation discussed:
     [] Patient agreed, form completed.
     [x] Patient decline.
     [] Not applicable.

REVIEW OF SYSTEMS

GENERAL:
 63 y/o male sitting in motorized scooter with severe dysartheria, and open skin
 lesions, appeatrs comfortable
PAIN: [x] NO  [] YES (if yes, complete the following)
   Location:
   Intensity (0-10 scale):
   Character:
   Duration:
   What relieves the pain:
   What makes the pain worse:
   Treatment prior to this admission:
   Response to this treatment:

HEENT:
  loss of hearing to left ear, needs dental w/u
MOUTH/TEETH:(Include ability to chew, dental difficulties)
   mild chewing problem, eats mechanical food

RESPIRATORY:
   Exposure to TB:
         []yes
         [x]no

CARDIOVASCULAR:
 no known cardiovascular disaese
GASTROINTESTINAL:
 no known GI disease
GENITOURINARY:
   High risk sexual behavior:
         []yes
         []no

ENDOCRINE:
 + brittle DM
SKIN:
  Multiple Pamphigoids  open lesions on cheek, scalp, back,  chest, groin, distal

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | **VISTA Electronic Medical Documentation**

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019 | Printed at WASHINGTON
225647315

# Progress Note

penis on admission

MUSCULOSKELETAL:
 + CVA, left hemiparasis
NEUROLOGICAL:
 +  seizure
PERIPHERAL VASCULAR:
 + PVD
HEMATOLOGIC:
 + anemia, renal failure
PSYCHIATRIC:
 no known psychiatric disorder


PHYSICAL EXAMINATION

T. 97.6  p 82  bp  135/80  rr 22 pulse ox 95% on ra


GENERAL APPEARANCE:
 63 y/o male known to staff for previous respite admission, sitting in motorized
scooter, appears comfortable
HEENT:

Mouth/Teeth:
 + yellowish teeth from smoking
Chest:
 coarse breath sound, prolonged expiratory phase
Heart:
 rrr, split s1 s2
Breasts:
 nl male
Abdomen:
 obese, nt nd
Genitalia:
 distal penis with open wound ( pamphigoid) and groin
Rectal:
      Occult blood:
        [] positive
        [x] negative

Male:
      Prostate:
 + bph
Back/Spine:
 open lesion to mis back , no tenderness
Skin:
 w/d

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019
225647315

VISTA Electronic Medical Documentation

Printed at WASHINGTON

# Progress Note

Extremities:
 1+ edema, distal pulses weakly palpable, left toe nail with open area, discolored skin and  minimal dried blood around distal toe nail

Musculoskeletal:
 no tenderness
Lymphatics:
 no lymphadenopathy

Neurological:
 h/o seizur, the most recent one on 10/04
Mental Status:
 awake, alert, severe dysartheria, oriented to person, place, situation, able to describe his illness

LABORATORY DATA:

CBC:
    WBC:      7.4 K/cmm   1/11/2005@09:33   blood
    RBC:      4.2 Mil/cm  1/11/2005@09:33   blood
    HGB:     11.1 g/dl    1/11/2005@09:33   blood
    HCT:     34.1 %       1/11/2005@09:33   blood
    PLT:    550.0 K/cmm   1/11/2005@09:33   blood

Chemistry 7:
    GLUCOSE:  81.0 mg/dl  1/11/2005@10:20   serum
    BUN:      13.0 mg/dl  1/10/2005@21:55   serum
    CREAT-S:   1.4 mg/dl  1/10/2005@21:55   serum
    URIC ACID: 7.2 (NOV 18, 2004)
    NA:      139.0 mmol/L 1/10/2005@21:55   serum
    K:         4.3 mmol/L 1/10/2005@21:55   serum
    CO2:      29.0 mmol/L 1/10/2005@21:55   serum

Coagulation:
    PT :      16.4 sec.   10/15/1999@14:52 plasma
    PTT: No lab data available
    INR :      1.2 Ratio  8/26/2003@17:28  plasma

Mineral Panel:
    CA:       8.5 mg/dl   11/23/2004@21:11 serum
    PO4:      3.1 mg/dl   11/23/2004@21:11 serum
    MG:       2.1 mg/dl   1/4/2005@11:31   serum

Liver Functions:
    PROTEIN,TOTAL:  7.1 (1/4/2005) SERUM
    ALBUMIN:  2.6 g/dl    1/4/2005@11:31   serum
    SGOT:    27.0 U/L @3  1/4/2005@11:31   serum
    ALT:     14.0 U/L     1/4/2005@11:31   serum

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019 | Printed at WASHINGTON
225647315

# Progress Note

```
    T. BIL:    0.4 mg/dl  1/4/2005@11:31    serum
    D BILI:   <0.1 mg/dl  1/4/2005@11:31    serum

Cholesterol:
    CHOL:    164.0 mg/dl  7/19/2004@11:51   serum
    HDL-CHO:  64.0 mg/dl  7/19/2004@11:51   serum
    LDL:        61 mg/dl  5/6/2004@11:27    serum

TSH VA:    0.5 mcIU/m 6/8/2004@12:23    serum
B12 (VA) (9/97):
HCO3 a:    26.8 mEq/L  11/20/2003@15:16 arterial
PROSTATIC SPECIFIC ANTIGEN: 3.5  12/10/2003@13:49:31
HGBA1C:     7.4 %        11/18/2004@15:49 blood
VDRL: Nonreactive (03/06/03 12:14)
```

PLAN:

A/P:
1. BULLOUS PEMPHIGOID.   open lesions to back and   cheecks and scalp which was treated with Bacitracin and genital area with   traim 0.5 % with relatively good result, continue same management

2. Bronchitis    continue to smoke  despite of the symptoms of cough, sputum  ,  will start  Fluticasone inhaler BID and Combivent inhaler QID prn.
       Echo 3'04: Normal EF with Mild aortic regurgitation

3. Anemia History of MGUS (monoclonal gammopathy). has been   tried to complete

       barium enema on 2-1-05 but patient unable to hold contrast; radiologist
          recommended colonoscopy.     recent H/H wnl. will do iron study to evaluate the type of anemia , has been on iron in the past.

3.   HTN     admission bp 146/73 , Has been on alpha
          blocker;Terazosin 3mg HS. Beta blocker not a good choice due to history wheezing; HCTZ not good choice due to history of gout. Plan to start Felodipine 2.5 mg if BP remained elevated.

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019
225647315

VISTA Electronic Medical Documentation

Printed at WASHINGTON

# Progress Note

4.   CVA/DVT. Right MCA infarct with left hemiparesis and mild dysarteria,  prior
h/o three CVA's  mild oropharangeal dysphagia.has been evaluated by
 Dr Pam Harman , will emphasise to keep pt in up right position while eating .

5. h/o Seizure since chilhood.
   Has had several hospitalizations for seizures, currently receiving
        Dilantin 350 mg HS and Keppra 500mg BID and Phenobarbital 65 mg QD. EEG
        done in January'05:right hemisphere slowing consistent with right
        MCA infarct. CT head in 9'04: " Multiple old infarcts-there is some
        cerebral atrophy."

6. SNHL-wear  hearing aid to left ear.

7. NIDDM. Will repeat HBA1C and do daily finger stick, continue no
concenterated sweets and glyburide 10 mg bid.

8.. GOUT. left foot ulceration, no pain, daily dressing change with curasol
jel.

9. CONSTIPATION   continue colace

10. CRI   BUN / CRET  14   1.2.   will treat if he becomes symptomatic.

11.  psychosocial circomstances.   pt has been on zoloft in the past, presently
denise.depression, will  monitor him for any sign of depression.

12.   CODE STATUS.   has decision making capacity   FULL CODE

PT EDUCATION
Motivated to learn
Learns best by:
  Listening, Hands on, Pictures/videos
Learning barriers:
  Language, Physical, Phychosocial
encouraged to not touch the open wound to prevent sec infection,

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019
225647315

**VISTA Electronic Medical Documentation**

Printed at WASHINGTON

# Progress Note

~ keep finger nail short

~ encouraged smoke cesation, pt is not commited to quit yet.

FALL RISK ASSESSMENT

   MORSE FALL SCALE - Choose highest applicable score from each category.

|  |  | SCORE |  |
|---|---|---|---|
| HISTORY OF FALLING | NO | [x] 0 |  |
|  | YES | [] 25 |  |
| SECONDARY DIAGNOSIS (more than 1 diagnosis) | NO | [] 0 |  |
|  | YES | [x] 15 |  |
| AMBULATORY AID | NONE | [] 0 | - on bedrest, uses W/C, nurse assists |
|  | CRUTCHES | [] 15 | - crutches, cane(s),walker |
|  | FURNITURE | [] 30 |  |
| IV/HEPARIN LOCK OR SALINE | NO | [] 0 |  |
|  | YES | [] 20 |  |
| GAIT/TRANSFERRING | NORMAL | [] 0 | - on bedrest, immobile |
|  | WEAK | [] 10 | - uses touch for balance |
|  | IMPAIRED | [x] 20 | - unsteady, difficulty rising to stand |
| MENTAL STATUS | ORIENTED | [x] 0 | - oriented to own ability |
|  | FORGETS | [] 15 | - forgets limitation |

TOTAL SCORE:30

| RISK LEVEL | MFS SCORE | ACTION |
|---|---|---|
| Standard Risk | 0-44 | Standard Fall Risk Interventions |
| High Risk | = or >45 | High Fall Risk Interventions |

      ***WRITE A NURSING ORDER INDICATING THE SAFETY RISK LEVEL***

/es/ ASHI ALEHOSSEIN
CRNP
Signed: 02/07/2005 14:46

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA   20019
225647315

VISTA Electronic Medical Documentation

Printed at WASHINGTON

# Progress Note

PAIN TOPICS DISCUSSED:
Cause(s) of pain
Risk for pain related to health problem(s)
Assessing and reporting pain
Pain intensity scale
Importance of effective pain management
Level of understanding.
  Level of Understanding: Good
TOBACCO USE COUNSELING:
  TOBACCO USE/SMOKING CESSATION COUNSELING:
  Tobacco Use/Smoking Cessation Counseling given.  Counseled on risk of
    tobacco use.  Encouraged to stop using tobacco.  Patient declined
    referral to a tobacco use/smoking cessation program.
ALCOHOL ABUSE SCREENING (AUDIT-C):
  Alcohol Use Disorders Identification Test (AUDIT-C) Screen excluded
    due to:
  Has not used alcohol within past year.  AUDIT-C not required.
  Last month/year patient drank alcohol:
    Date: 2005
    Comment: years ago
Patient Education (Provider):
  Medication. Verbal instructions about the name, purpose, action, dose,
    route, and significant side effect if any, was provided to the
    patient for the medication below: all current meds
  Level of understanding.
    Level of Understanding: Good
  Disease Process. This diagnosis/health problem(s) were discussed with
    patient including (Specify below): UTI,bullous lesions and
    candida,sz
  * Contributory Factors included
  * Signs and Symptoms included
  * Treatment Options Discussed
  * Possible Complications discussed
  Level of understanding.
    Level of Understanding: Good

FUTURE APPOINTMENTS:   Transportation Wheelchair Van - Jan 27, 2005 at 09:00  ()
  Podiatry High Risk Diabetic - Jan 27, 2005 at 09:30  ()
  Audiology-hollins - Jan 27, 2005 at 11:00  ()

/es/ ELAINE (SUPPL) SNODDY
RN, HBPC
Signed: 01/28/2005 16:30

        TITLE: HBPC SOCIAL WORK NOTE
DATE OF NOTE: JAN 21, 2005@14:49        ENTRY DATE: JAN 21, 2005@14:49:30
        AUTHOR: RICE,SHEILA        EXP COSIGNER:

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available) | VISTA Electronic Medical Documentation

SAUNDERS, BENJAMIN
4354 D ST SE
WASHINGTON, DISTRICT OF COLUMBIA  20019 | Printed at WASHINGTON
225647315

# ATTACHMENT 5

# EXCERPTS FROM

# DEPOSITION OF
# FRANCES HENDERSON

1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLUMBIA

3   - - - - - - - - - - - - - - x
                                :
4   MARY SANDERS, as Personal   :
                                :
5   Representative of the Estate :
                                :
6   of BENJAMIN SANDERS,        :
                                :
7            Plaintiff          :
                                :
8            V.                 :  Civil No. 071169
                                :
9   UNITED STATES OF AMERICA,   :
                                :
10           Defendant          :
                                :
11  - - - - - - - - - - - - - - x
12              :
13            Corporate Deposition of
14          UNITED STATES OF AMERICA
15      By and through its corporate designee,
16            FRANCES B. HENDERSON
17             Washington, D.C.
18          Monday, December 10, 2007
19               10:40 a.m.
20  Job No.: 1-116346
21  Pages 1 - 153
22  Reported by:  Jane L. Vaughan



DEPOSITION OF FRANCES B. HENDERSON
CONDUCTED ON MONDAY, DECEMBER 10, 2007

8

1          MR. MELTMAR:  All right.

2          BY MR. MELTMAR:

3     Q.    Who is your current employer?

4     A.    Department of Veterans Affairs, Washington,

5     D.C. VA Medical Center.

6     Q.    How long have you worked at the VA?

7     A.    For the VA 25 years.

8     Q.    How long have your worked at this facility

9     the CNRC -- CNRC?

10    A.    Two years and 10 months.

11    Q.    In what capacity?

12    A.    The associate chief nurse for geriatrics and

13    extended care.

14    Q.    Is that role similar to assistant DON?

15    A.    It's consistent with the director of nursing

16    for the comprehensive nursing and rehabilitation

17    center which is the CNRC.

18    Q.    So in the private sector your job would be

19    equivalent to a DON of a nursing home?

20    A.    Correct.

21    Q.    And what is your degree of education, your

22    level of education?

DEPOSITION OF FRANCES B. HENDERSON
CONDUCTED ON MONDAY, DECEMBER 10, 2007

38

asking you to find documents that indicate whether or not he was a high risk smoker, an independent smoker, a safe smoker, a nonresponsible smoker, an independent smoker or otherwise a smoker who needed or did not need to be supervised while he smoked.

A.    Based on the smoking policy that we had at the time CNRC policy number 19 as well as the smoking risk protocol if we had patients that were -- residents that were identified as high risk smokers there would be an order in the medical record as well as a listing that would stay posted on the nursing station.

There is no order for Mr. Sanders to be a high risk smoker, nor is there a document that reflects that he is a high risk smoker, nor was there one at the time of the accident.

Q.    Would it be fair to say that at the time of Mr. Sanders's death that the CNRC had not determined that he was a high risk smoker?

A.    The interdisciplinary treatment team had not determined him to be a highest risk smoker.

Q.    Had anyone else?

62

1   the information from the medical record and

2   incorporates it into our MDS assessments for

3   transition to Austin.

4          He does not have firsthand face-to-face

5   interaction with the resident in putting the

6   assessments into the computer.  And he only does that

7   when the specific discipline has not put it into the

8   computer.

9        Q.    All right.  Would it be fair to say that

10  every quarter the resident's MDS information needs to

11  be updated?

12       A.    Yes.  There is a quarterly assessment.

13       Q.    Okay.  So it would be fair to say that every

14  member of the interdisciplinary team is required to

15  perform an assessment on a resident and give that

16  information to the MDS coordinator who puts it into

17  the system; is that right?

18       A.    Everyone is a required to do the quarterly

19  assessment, which they place into the medical record.

20  The information that's in the medical record is then

21  entered into MDS, the Acu-Care system, either by that

22  discipline, the social -- I forgot to add social

DEPOSITION OF FRANCES B. HENDERSON
CONDUCTED ON MONDAY, DECEMBER 10, 2007

75

A.    The CNRC does have a duty to look at obvious violations of safety and prevent that -- you know, prevent injury of our residents.

Q.    Would you agree that the CNRC had a duty to supervise residents who were at risk from injury from smoking while they smoked?

A.    CNRC does a duty to supervise residents who are high risk smokers while they are smoking.

Q.    All right, let's go to paragraph 16.

The question is whether the VA Hospital and CNRC knew Benjamin Sanders had been smoking in the smoking room unsupervised prior to March 19, 2006.

And it's my understanding from your previous testimony that the answer to that question is yes?

A.    Yes.

Q.    Are there any documents in Mr. Sanders's medical records or anywhere else that indicates that he was someone who could smoke in the smoking patio or in the smoking room?

A.    The documents in the medical record do not reflect anything that speaks to Mr. Sanders being a danger to self or others based on his smoking habits.

DEPOSITION OF FRANCES B. HENDERSON
CONDUCTED ON MONDAY, DECEMBER 10, 2007

76

And in most instances if the documentation reflects --

does not reflect -- it reflects exceptions -- excuse

me -- if he was deemed unsafe it would be documented.

If it was felt that he was safe and it's documented in

the record that he is a smoker and if they felt that

he was safe there wouldn't be a document in there that

speaks to the fact that he is a safe smoker.

    Q.    I understand.

        Only under circumstances where an individual

resident has been determined to be a high risk smoker

would you find an entry in the chart reflecting a

limitation or reference to his smoking habits; is that

correct?

    A.    Repeat that.

    MR. MELTMAR:  Madam Court Reporter, could

you repeat that.

        (The reporter read the record at page 76,

lines 9 through 13, inclusive.)

    THE WITNESS:  Yes, that if he was deemed a

high risk smoker it could be documented why he was a

high risk smoker.

    MR. MELTMAR:  Let me just go through this

DEPOSITION OF FRANCES B. HENDERSON
CONDUCTED ON MONDAY, DECEMBER 10, 2007

98

that he was a smoker two to three to four to five cigarettes a day.

Q.    Was there any indication in his record or is there any indication in his medical record indicating that an assessment was performed on him?

A.    There is nothing in the medical record that reflects that the assessment was done in regards to his abilities.  However, the identification of cigarette smoking, the fact that he goes in and out of the smoking shelter, was able to do that, the lack of evidence of -- the lack of his ability to be able to handle the paraphernalia is not documented in the record so -- and based on the fact that those things are not documented in the record allowed us to determine that he could smoke on his own.

Q.    You would agree with me that Mr. Sanders was confined to a wheelchair, had left side paralysis, had difficulty speaking, required an electric wheelchair to get around on March 19, 2006; is that correct?

A.    I would state that he was confined to a wheelchair.  He did not have left sided paralysis as I stated as the 30 --

DEPOSITION OF FRANCES B. HENDERSON
CONDUCTED ON MONDAY, DECEMBER 10, 2007

99

Q.   -- (b)(6) witness?

A.   -- (b)(6) witness.  He had left sided weakness.  Based on the medical record he could do passive range of motion with assistance.

When I would see him he rarely used his left arm but he did use his right arm.

Q.   All right.  Would it be fair to say that Mr. Sanders was unable to voluntarily move his left arm at the time of his death on March 19th?

A.   Prior to the accident he could voluntarily move his left arm.

Q.   And what could he do with his left arm to your knowledge?

A.   I can't go into that.

Q.   Okay.  It's my understanding that your testimony is that although there was no document or there is no formal documentation indicating that Mr. Sanders was assessed to be a smoker safe or otherwise that the totality of his chart indicates that he was a safe smoker; is that your testimony?

A.   Yes, it is.

Q.   Okay.  Now, do you have or can you point to

DEPOSITION OF FRANCES B. HENDERSON
CONDUCTED ON MONDAY, DECEMBER 10, 2007

102

1  saying that they know how to light a match and hold a

2  cigarette; is that correct?

3      A.    Correct.

4      Q.    So when you say that Mr. Sanders was a safe

5  smoker you are not saying that he was able to self

6  help or self manage himself had he caught on fire; is

7  that correct?

8      A.    Well, there are a lot of residents that

9  probably could not if they had caught on fire.

10     Q.    Self manage?

11     A.    Correct.

12     Q.    And what I mean by self manage --

13     A.    And when I talk about being a safe smoker

14 it's not just a matter of lighting a cigarette, being

15 able to handle a lighter, put the cigarette in the

16 mouth, light the cigarette but I am also talking about

17 the fact that there was no evidence of him not being

18 able to handle the cigarette.  There was no evidence

19 of him dropping things beforehand on his clothing or

20 what have you prior to the accident.

21     Q.    I would like you to look at I believe it's

22 Henderson 4 which is a smoking risk protocol.

DEPOSITION OF FRANCES B. HENDERSON
CONDUCTED ON MONDAY, DECEMBER 10, 2007

112

1    assessments that members of the team have identified

2    page 105 for pharmacy, 108 for nursing.

3                    Did you say 127?

4         Q.    I said -- yeah, I want to go to 127.

5         A.    127 is a continuation of his care plan.

6         Q.    All right.  If you go to the bottom you will

7    see potential seizure related to history of seizures?

8         A.    Correct.

9         Q.    Now my interpretation of that is that Mr.

10   Sanders had a history of seizures?

11        A.    Yes, he did.

12        Q.    And in fact he was taking anti-seizure

13   medication at the time he died; is that correct?

14        A.    Yes.

15        Q.    He was taking Dilantin; is that right?

16        A.    I believe so.

17        Q.    Phenobarbital; is that correct?

18        A.    Yes.

19        Q.    All right.  Now I ask you to identify all of

20   the assessments for Mr. Sanders.

21                    The first one we came to I believe was on

22   page 123.

DEPOSITION OF FRANCES B. HENDERSON
CONDUCTED ON MONDAY, DECEMBER 10, 2007

122

1    or unsafely during his residency; is that correct?

2        A.    They did not sit down as a group.  However,

3    if there was any evidence at any time we do not wait

4    for a team meeting to talk about it.  If at any time

5    that it was deemed that Mr. Sanders was not safe to

6    smoke on his own it would have been brought up by

7    nursing, by any member of the team.  And there was at

8    least one member of the team that possibly would have

9    been face-to-face with him while smoking in that

10   room.

11       Q.    Now to be a safe smoker at the CNRC during

12   Mr. Sanders's residency what did that mean?

13             What did that -- what did a resident need to

14   be able to establish in order to be determined a safe

15   smoker?

16       A.    In the policy statement for smoking risk

17   protocol it would have stated that he understands the

18   smoking regulation, has the ability to handle the

19   smoking material safely, and he can -- he is in

20   compliance with the established smoking policy.  And

21   that would be under part A assessment, numbers three,

22   four and five.

DEPOSITION OF FRANCES B. HENDERSON
CONDUCTED ON MONDAY, DECEMBER 10, 2007

123

1    Q.   Now you would agree with me that Mr. Sanders

2  had cognitive deficits that required that people speak

3  slowly to him as of February 2006; is that correct?

4    A.   Yes.

5    Q.   And that these same individuals needed to

6  stress their consonants when speaking to him; is that

7  correct?

8    A.   As reflected in the care plan.

9    Q.   And that they needed to stand directly in

10 front of him when they were communicating; is that

11 correct?

12   A.   Those were the interventions identified in

13 the plan of care.

14   Q.   All right.  And can you tell me whether or

15 not anyone determined whether or not Mr. Sanders was

16 able to understand the smoking regulations in February

17 of 2006?

18   A.   It's not based on just talking with him at

19 one particular time.  It's based on the observations

20 of his habits, which would include -- since he had

21 been here for almost a year it would include him

22 appropriately smoking in the appropriate spots such as

DEPOSITION OF FRANCES B. HENDERSON
CONDUCTED ON MONDAY, DECEMBER 10, 2007

124

1    the smoking shelter or on the patio.

2        Q.    Now can you tell me whether or not at the

3    time of Mr. Sanders's residency whether or not a

4    smoker was deemed to be a safe smoker when a resident

5    had a history of seizures that required that he take

6    two prescription medications?

7        A.    Most people who have a history of seizures

8    are on medications to prevent seizures, two of which

9    are what Mr. Sanders was on and it does not take away

10   Mr. Sanders's right -- right is not the correct word.

11   It would not deem him that he cannot smoke because he

12   has seizures and that he is on those two medications.

13       Q.    I agree with you.  I am not saying that Mr.

14   Sanders couldn't smoke.  What I want to find out is

15   was he able to be or did the policies allow you to

16   deem him a safe smoker even though he had a history of

17   seizures and was taking anti-seizure medications?

18       A.    He had a history of seizures when he was

19   admitted into the CNRC in February of -- or whatever

20   the date was in 2005.

21             He had already been well known to the staff

22   because he would come in for respite care and he was

## DEPOSITION OF FRANCES B. HENDERSON
### CONDUCTED ON MONDAY, DECEMBER 10, 2007

126

1        BY MR. MELTMAR:

2        Q.    All right.  So I guess what you are saying

3    is, and tell me if I am wrong, it's not that there was

4    a foreseeable risk to Mr. Sanders from his cognitive

5    impairment and his history of seizures.

6             It was simply that he had demonstrated that

7    he was able to smoke safely for over a year which

8    allowed the facility to place him into a safe smoker

9    category; is that what you are saying?

10            MS. WHITAKER:  Objection.

11            BY MR. MELTMAR:

12       Q.    You can answer.

13            MR. MELTMAR:  She is an adverse witness.

14            I mean you are not really an adverse

15   witness.  It's a term of art.

16            MS. WHITAKER:  That's okay.

17            THE WITNESS:  He is -- based on the

18   observations that are done on Mr. Sanders on a daily

19   basis would determine whether or not we would

20   discontinue his label of a safe smoker.

21            If something -- if he did something that was

22   not appropriate then we would have made him a high

DEPOSITION OF FRANCES B. HENDERSON
CONDUCTED ON MONDAY, DECEMBER 10, 2007

127

1    risk smoker.

2              BY MR. MELTMAR:

3        Q.   Would you agree with me that Mr. Sanders's

4    history of seizures put him into a category of

5    residents at the CNRC in March of 2006 that suggested

6    that he could have another seizure in the future?

7        A.   If he was not stable on his medications, if

8    he had had a history of frequent seizures, if he had

9    had a history of seizures within the past several

10   months may have deemed him at risk.

11             However, to my recollection none of those

12   took place.  His lab values as I remember them were

13   appropriate.  He had had some history of seizure

14   activity which I think even brought him into the

15   hospital to begin with but his medications appeared

16   not to have been absorbed.

17       Q.   I am going to ask you one more question and

18   we will move on.

19             You would agree with me that just because

20   Mr. Sanders was taking Dilantin and Phenobarbital in

21   March of 2006 didn't preclude him from having another

22   seizure?

DEPOSITION OF FRANCES B. HENDERSON
CONDUCTED ON MONDAY, DECEMBER 10, 2007

146

1        MS. WHITAKER:  From you?

2        MR. MELTMAR:  No.  From my burn specialist.

3        THE WITNESS:  I can just speak to what is in

4   the medical record.  As I stated before I did not see

5   him use his left side.  However, in the medical record

6   there is documentation that he could move it.

7        BY MR. MELTMAR:

8        Q.    So you would agree with me that Mr. Sanders

9   was significantly physically impaired on March 19,

10   2006; is that correct?

11        A.    I will agree with you that he was physically

12   impaired on his left side on March of 2006.

13        Q.    And you would agree with me that he was at

14   least moderately cognitively impaired on March 19,

15   2006?

16        A.    I will agree that there is documentation in

17   the medical record regarding the fact that he had some

18   mild cognitive impairment.

19        Q.    And you would agree with me that he had

20   garbled speech on March 19, 2006?

21        A.    Yes, he did.

22        Q.    And you would agree with me that in order

ATTACHMENT 6

EXCERPTS FROM

DEPOSITION OF
ASHRAF ALEHOSSEIN

DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

1 (Pages 1 to 4)

| | |
|---|---|
| 1 | |

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF COLUMBIA
 3    ----------------------------------x
 4    MARY SANDERS, as Personal        :
 5    Representative of the Estate of  :
 6    BENJAMIN SANDERS,                : Civil Case No.
 7              Plaintiff   :    07 1169
 8         v.                :
 9    UNITED STATES OF AMERICA,        :
10              Defendant.  :
11    ----------------------------------x
12
13         Deposition of ASHRAF ALEHOSSEIN
14              Washington, D.C.
15           Wednesday, January 30, 2008
16                 4:11 p.m.
17    Job No.: 1-119718
18    Pages 1 - 84
19    Reported by:  Alda Mandell, RPR
20
21
22
```

3

```
 1             A P P E A R A N C E S
 2
 3    ON BEHALF OF PLAINTIFF:
 4          W. CHARLES MELTMAR, ESQUIRE
 5          THE COCHRAN FIRM
 6          1100 New York Avenue, Northwest
 7          Suite 340 - West Tower
 8          Washington, D. C. 20005
 9          (202) 682-5800
10
11    ON BEHALF OF DEFENDANT:
12          CLAIRE WHITAKER, ESQUIRE
13          Assistant United States Attorney
14          UNITED STATES ATTORNEY'S OFFICE
15          Civil Division
16          555 4th Street, Northwest
17          Room E-4204
18          Washington, D.C. 20530
19          (202)514-7137
20
21
22
```

2

```
 1        Deposition of ASHRAF ALEHOSSEIN, held at
 2    the offices of:
 3
 4          VETERANS ADMINISTRATION HOSPITAL
 5          50 Irving Street, Northwest
 6          Washington, D.C. 20422
 7          (202)745-8000
 8
 9        Pursuant to agreement, before Alda Mandell,
10    Registered Professional Reporter and Notary Public of
11    the District of Columbia.
12
13
14
15
16
17
18
19
20
21
22
```

4

```
 1             C O N T E N T S
 2    EXAMINATION OF ASHRAF ALEHOSSEIN          PAGE
 3        By Mr. Meltmar              5
 4        By Ms. Whitaker             138
 5
 6             E X H I B I T S
 7    (Exhibits 1-5 Attached to the Transcript,
 8          Exhibit 6 retained)
 9    PLAINTIFF'S                    PAGE
10      1  Scope of Practice for Nurse Practitioner  8
11      2  Smoking Risk Protocol - Approved 2/07  23,30
12      3  Smoking Policy - 2/05           23
13      4  Smoking Risk Protocol - Approved 10/04   24
14      5  Smoking Policy - 1/07           24
15      6  Binder with records            53
16
17
18
19
20
21
22
```

DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

2 (Pages 5 to 8)

5

1    PROCEEDINGS
2    ASHRAF ALEHOSSEIN
3    having been duly sworn, testified as follows:
4    EXAMINATION BY COUNSEL FOR THE PLAINTIFF
5    BY MR. MELTMAR:
6    Q    Would you please state your name and address
7    for the record.
8    A    My real name is Ashraf Alehossein and I go
9    by Ashi. In the hospital and family members, they
10   know me by Ashi. And 50 Irving Street, Northwest,
11   Washington, D.C. 20422.
12   Q    Are you giving me your work address?
13   A    Yes.
14   Q    I need your home address.
15       MR. MELTMAR:  Unless you're going to agree
16   to produce her at trial.
17       MS. WHITAKER:  Yes. We will produce her if
18   you give us the subpoena.
19       MR. MELTMAR:  All right.
20   BY MR. MELTMAR:
21   Q    What is your current occupation?
22   A    My current occupation is certified nurse

6

1    practitioner.
2    Q    And how much education do you have?
3    A    I have post master's certificate from
4    Catholic University of America in Washington, D.C. and
5    I have a master's degree nursing from Catholic
6    University in Washington, D.C. And I'm a certified
7    adult nurse practitioner.
8    Q    How long have you worked for the VA?
9    A    Since February 2001.
10   Q    And have you been a certified nurse
11   practitioner since 2001?
12   A    Yes, sir.
13   Q    When did you receive your certificate?
14   A    From American Nurses Credentialing Center in
15   D.C., ANCC. May 2000.
16   Q    May 2000. Before February of 2001, where
17   did you work?
18   A    I had only two jobs, Providence Hospital and
19   VA.
20   Q    How long did you work at Providence?
21   A    25 years.
22   Q    Why did you leave?

7

1    A    Because I became nurse practitioner. They
2    have no job for me over there at that time. But now
3    they're hiring nurse practitioners. Those days they
4    wouldn't hire.
5    Q    Okay.
6    A    That's why I came to the VA.
7    Q    Okay. Have you practiced in geriatrics
8    since you came to the VA?
9    A    Since I came to VA I've been practicing the
10   same place.
11   Q    In the CNRC?
12   A    CNRC.
13   Q    On May 19th, 2006, what were your job
14   responsibilities?
15   A    May 19th, 2006?
16   Q    No. March 19th.
17   A    March 19th, 2006, I believe it was Sunday.
18   Q    No. No. What were your responsibilities at
19   that time?
20   A    Working as a nurse practitioner.
21   Q    All right. Were you responsible for
22   performing assessments on residents?

8

1    A    Yes, sir.
2    Q    Were you responsible for providing treatment
3    to residents?
4    A    Yes.
5        (Exhibit 1 was marked for identification and
6    was attached to the transcript.)
7    BY MR. MELTMAR:
8    Q    I'll handing you what's been marked as
9    Alehossein 1. I hope I'm pronouncing your last name
10   right.
11   A    What one is?
12   Q    It's just the first exhibit.
13   A    Oh.
14   Q    Okay. Can you tell me what that document
15   is?
16   A    This is Scope of Practice.
17   Q    And is that your scope of practice?
18   A    Yes.
19   Q    And was the scope of practice in effect --
20   well, was the scope of practice that you're holding in
21   effect on March 19th, 2006?
22   A    Yes.

Case 1:07-cv-01169-ESH    Document 27-7    Filed 06/30/2008    Page 4 of 20
DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

3 (Pages 9 to 12)

9

1    Q    The effective date of this document is
2    12/6/05 through 12/5/07, is that correct?
3    A    Yes.  Usually scope of practice is checked
4    on your anniversary and this office here, they usually
5    take care of the scope of practice.  So it's annual.
6    Q    Now, does this document delineate or
7    identify your responsibilities at the VA CNRC?
8    A    It's my scope of practice at the VA.
9    Q    Okay.  What does that mean, scope of
10   practice?
11   A    It means what I can do and what I cannot do.
12   Q    Okay.  Well, let's go through it by turning
13   to page two.  Can you tell me anywhere in this
14   document responsibilities where it identifies what
15   treatment you can or cannot perform?
16   A    For instance, I cannot give narcotic.
17   Q    Where is that indicated?  Is that -- what
18   page?
19   A    Scheduled drugs.
20   Q    First of all, what you've got to do is tell
21   me what page you're on.
22   MS. WHITAKER:  You told her to turn to page

10

1    two.
2    MR. MELTMAR:  Page two.  That is the second
3    page.
4    MS. WHITAKER:  It's marked as page two on
5    page two.
6    BY MR. MELTMAR:
7    Q    Let's just start all over, okay?  I'd like
8    you to turn to page two.
9    A    You mean this page.  That's your page two.
10   Q    All right.
11   MS. WHITAKER:  Page two is at the top of the
12   page.  That's what she's looking at.
13   BY MR. MELTMAR:
14   Q    All right.  Page two at the top of the page.
15   All right.  Where on page two, the second page of this
16   document, do you see page any specific limitations or
17   duties to perform medical care on residents?
18   A    This page is for -- as an employee status
19   which is full time.
20   Q    Okay.
21   A    And how often this is reviewed and then here
22   there's a blank area for conference attendance or --

11

1    Q    Continuing education?
2    A    Yeah.  Continuing education.  That's all it
3    is.
4    Q    Can you tell for me what continuing
5    education classes you took?
6    A    I've gone to PRIMA conference in
7    Washington -- in Baltimore.
8    Q    Okay.
9    A    And I've gone to liver cirrhosis conference
10   in VMAC, which is here.  Noon conference.  I went to
11   endocrinology update conference, which is at VMAC.  I
12   went to Edgar Mistreatment which is at VMAC.  I went
13   to -- the new trend I believe -- there was a new --
14   what is a new -- oh, news.  Yeah.  It was media
15   report.
16   Q    Okay.
17   A    It was done at the VA.  And then medical
18   rehabs, there was a VA conference.  Those I attended.
19   Q    Let's turn to page three.
20   A    Okay.  Let me clarify.  Page three means
21   this one, which is page two.
22   Q    Right.  For the record, when I say page

12

1    three, I'm referring to not the number on the page --
2    A    Okay.
3    Q    -- but the actual sheet that we're looking
4    at.
5    MS. WHITAKER:  The third page.
6    MR. MELTMAR:  The third page.  Not the
7    number.  I know it's probably a little confusing but
8    this is how we got the documents.
9    THE WITNESS:  Okay.  Third.
10   BY MR. MELTMAR:
11   Q    At the top of the third page of this exhibit
12   we see medications.  Is this section of the document,
13   eight, limitation, does it contain a limitation on
14   what medications you can and cannot prescribe?  For
15   example, you can prescribe or administer
16   anticoagulants?
17   A    I can.
18   Q    Can you order them?
19   A    Yes, I can.
20   Q    And you can ask other people to administer
21   them?
22   A    Yes.

DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

5 (Pages 17 to 20)

17

1  feeding, who would make that --
2      A    Clinical nurse specialist.
3      Q    Let me finish -- who would make that entry
4  into the chart?
5      A    Clinical nurse specialist.
6      Q    All right.
7      A    Sometimes I do too but the formal note for
8  MDS is done by clinical nurse specialist.
9      Q    Who was in charge of making the nursing plan
10 of care for Benjamin Sanders?
11     A    At that time when he was there, the person
12 who was clinical nurse specialist, she's gone. She's
13 no longer here.
14     Q    What was her name?
15     A    Donna Bellis.
16     Q    How do you spell the last name?
17     A    B-E-L-L-I-S. She was a certified clinical
18 nurse specialist.
19     Q    So how does the medical plan of care differ
20 from the nursing plan of care?
21     A    Medical plan of care you really focus on
22 medications, medical diagnosis, preventive plan. But

18

1  nursing plan of care is basically nursing. Activity
2  of daily living. Supports. And feeding.
3  Socializations. Emotional. The art is nursing.
4      Q    The so the medical plan of care, would that
5  include performing smoking assessments?
6      A    We assess patients when they come in.
7      Q    OK. But would the medical plan of care
8  include performing smoking assessments?
9      A    Both. I would say both.
10     Q    Well, did your job responsibility require
11 that you perform a smoking assessment of Benjamin
12 Sanders?
13     A    He had an assessment upon arrival.
14     Q    Hold on. I'm going to get to that.
15     A    Yeah.
16     Q    Did your job responsibilities include
17 performing a smoking assessment on Benjamin Sanders?
18     A    You look at the patient holistically.
19 Smoking is not excluded. You look at the entire --
20 the whole patient as one and smoking is part of it.
21 When you assess the patient, you assess everything --
22     Q    I understand.

19

1      A    -- as a health care provider.
2      Q    So the answer's yes then?
3      A    Yes, it --
4      Q    Let's start from the beginning. During the
5  course of this deposition, you're going to know the
6  answer to a question before I finish asking it.
7  You've got to wait until I finish asking the
8  question --
9      A    I apologize.
10     Q    -- or the record isn't going to be clear and
11 I'm going to have to keep repeating myself, okay? And
12 the reason I'm asking the question over again is
13 because I need a clear answer and I can lead you by
14 saying isn't it true that part of your job
15 responsibilities included performing a smoking
16 assessment and that answer would be yes or no. Or I
17 could ask the question open-ended is part of your job
18 responsibilities performing a smoking assessment. And
19 you can either answer it or choose not to but if you
20 don't answer, I've got to ask leading questions or
21 repeat myself. So my question is as part of your job
22 responsibilities, were you responsible for performing

20

1  a smoking assessment on Benjamin Sanders?
2      A    Like I said, you know, we look at the
3  patient holistically and he's been evaluated for all
4  the issues that he's had. One was smoking.
5      Q    And that was your job responsibility?
6      A    That was my -- and everyone else. Not just
7  me.
8      Q    Okay.
9      A    Everyone's responsibility.
10     Q    Forget about everyone else. I'm just asking
11 about you.
12     A    Yes. It's my responsibility to evaluate his
13 smoking.
14     Q    Let's get the record clear and we'll move
15 on. As part of your job responsibilities as an
16 employee of the VA CNRC, you were responsible for
17 performing smoking assessments on Benjamin Sanders.
18 Is that correct?
19     A    Yes.
20     Q    All right. Now I can move on. Now, I've
21 looked through this scope of practice which has been
22 marked as Exhibit 1. Does this document contain any

DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

6 (Pages 21 to 24)

21

1  reference to a smoking assessment?
2      A   No.
3      Q   Now I'm just going to ask you some general
4  questions about what you believe at the time that you
5  provided care to Benjamin Sanders -- what your
6  responsibilities were.  At the time that you afforded
7  care to Benjamin Sanders, did you have responsibility
8  to perform initial and periodic and comprehensive
9  assessments of his functional capacity?
10     A   In monthly note.  Yes.  And any acute issue,
11 if he has any acute event, yes, he has been assessed.
12     Q   Okay.  I didn't understand what you just
13 said.  I'm sorry.
14     A   Like I said, we do monthly assessment, full
15 assessment.  And he may have more acute events going
16 on with him; for instance, seizures or high blood
17 sugars or bronchitis.  We call it acute event.  Then
18 he was assessed.
19     Q   My question's a little different.  My
20 question is -- well, let me ask you this.  Did
21 Benjamin ever have any seizures that you're aware of
22 when he was at the VA?

22

1      A   I witnessed one seizure only.
2      Q   And when was that?
3      A   It was in the elevator and he was in the
4  hospital.  I guess he was coming back from the
5  hospital and he was found in the elevator when he was
6  coming up.  Somebody saw him.  I don't remember who
7  saw him.  I believe it was a year before he died.
8      Q   Did you make a note of that?
9      A   There is a note.  Yes.
10     Q   Can you show me where that is?
11     A   Well --
12     Q   All right.  Fine.  we'll come back to that.
13 We're going to go through this.
14     A   I believe it was March '05.  I'm not sure
15 but I believe it was March '05.
16     Q   All right.  Now, did you have a
17 responsibility to make a comprehensive assessment of
18 Benjamin Sanders when he was admitted?
19     A   Yes.
20     Q   And did you do that?
21     A   Yes.
22     Q   Did that assessment include a finding

23

1  whether or not he was a safe smoker?
2      A   He wasn't safe smoker.
3      Q   Did you make a note of that in the record?
4      A   We don't put notes when patient is safe.
5      Q   Okay.
6      A   You only put notes when they are not safe.
7      Q   Did you make a note that you performed the
8  assessment in his chart?
9      A   We do not put any notes when patient is
10 safe.
11         (Exhibit 2 was marked for identification and
12 was attached to the transcript.)
13 BY MR. MELTMAR:
14     Q   All right.  This is as good a time as any to
15 talk about this.  I'm handing you what's been marked
16 as Alehossein 2 and this is the Smoking Risk Protocol?
17         MS. WHITAKER:  Are we finished with one?
18         MR. MELTMAR:  No.  Not yet.  But you can
19 look at it if you want it.
20         (Exhibit 3 was marked for identification and
21 was attached to the transcript.)
22

24

1  BY MR. MELTMAR:
2      Q   I'm handing you Alehossein 3 which is the
3  smoking policy.  We'll talk about the protocol first.
4  Were you aware of the Smoking Risk Protocol, which is
5  Exhibit 2, during the time that Benjamin Sanders was a
6  resident at the VA CNRC?
7          MS. WHITAKER:  Objection.  It's dated 2007.
8  Is this what you meant to give her?
9          MR. MELTMAR:  The protocol I have is dated
10 2006.
11         MS. WHITAKER:  Where?  The one you gave
12 me --
13         MR. MELTMAR:  I'll give you another exhibit.
14 Hold on.
15         MS. WHITAKER:  This is going to be three I
16 suppose?
17         MR. MELTMAR:  I don't know what it's going
18 to be.  Just hold on.
19         (Exhibits 4 and 5 were marked for
20 identification and were attached to the transcript.)
21         MR. MELTMAR:  Let's just go off the record
22 for one minute.

DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

7 (Pages 25 to 28)

25

1      (Discussion off the record.
2  BY MR. MELTMAR:
3      Q  I'm handing you Alehossein 3 and 5.  Can you
4  tell me what those are?
5          MR. MELTMAR:  I'm going to give you a copy.
6  BY MR. MELTMAR:
7      Q  Can you tell me what those are?
8          MS. WHITAKER:  What is this, 3 or 2 or --
9          MR. MELTMAR:  I don't know what number they
10  are.
11          MS. WHITAKER:  You don't know?
12  BY MR. MELTMAR:
13      Q  What is Number 3?
14      A  It's 2005.  February 2005.
15          MS. WHITAKER:  So that's Number 3.
16          MR. MELTMAR:  Yes.
17          MS. WHITAKER:  And five?
18          THE WITNESS:  Number 5 is 2001, January.
19          MS. WHITAKER:  2001?
20          MR. MELTMAR:  Seven.
21          THE WITNESS:  2007.  I'm sorry.
22          MS. WHITAKER:  What's Number 2 and Number 4?

26

1          MR. MELTMAR:  Two and four are protocols.
2          MS. WHITAKER:  Okay.  You're going to give
3  those to me later when you ask questions.
4  BY MR. MELTMAR:
5      Q  Looking at the smoking policy dated 2005,
6  were you aware of that at the time of Benjamin
7  Sanders' residency?
8      A  We had a smoking policy that residents are
9  entitled to smoke but they can smoke in designated
10  area.
11      Q  All right.  Here's the deal.  I'm asking you
12  whether or not you were aware of this document.
13      A  Yes, I was.
14      Q  All right.  Did you, as part of your job
15  responsibilities, have a duty to comply with it while
16  Benjamin Sanders was a resident at the CNRC?
17      A  Yes.
18      Q  Okay.  Did Benjamin Sanders have a cognitive
19  deficit in March of 2006 before his death?
20      A  He was alert, oriented, intelligent.  Even
21  though he had dysarthria, I understood him very well.
22      Q  Did Benjamin Sanders have a physical

27

1  impairment?
2      A  He's had a stroke on the left side.
3      Q  Was he able to move his left leg?
4      A  I do not remember if he was able.  A lot of
5  residents, they have stroke, they are able to move it
6  partially.  But I don't remember if he was able to.
7      Q  Was he able to move his left arm?
8      A  Vaguely remember, maybe partially.  I don't
9  remember fully.
10      Q  Was he able to speak clearly?
11      A  He wasn't able to speak clearly but he was
12  comprehensible when you give him time and be patient
13  with him.
14      Q  Was he able to scream or yell?
15      A  Yes.  He was singing in the chorus.
16      Q  Okay.
17      A  Beautifully.
18      Q  There's a statement given by Jerry Philips
19  after the fire that says while Mr. Sanders was
20  engulfed in flames, he wasn't making any noise, that
21  he wasn't screaming or calling out for help.  He was
22  just moving.  So do you have any reason to believe

28

1  that he could have screamed or called out for help at
2  the time that he caught on fire?
3      A  I have no idea.
4      Q  Now, you say that he was alert, oriented and
5  intelligent.  Did he have any cognitive deficits?
6      A  Probably mild.
7      Q  Mild?
8      A  Mild cognitive deficit after a stroke.  Some
9  atrophy.  But he was able to make decisions for
10  himself.  He was very feisty and very demanding and he
11  would make his needs known.
12      Q  After Mr. Sanders' death at the VA, a new
13  smoking policy was put into place and that's Exhibit
14  Number 5.  Are you aware of any changes in the smoking
15  policy that were made after Benjamin Sanders' death
16  after?
17      A  Yes.
18      Q  And what were those changes?
19      A  I don't know about the mechanic -- about the
20  sprinkler or other mechanical issues, but I know that
21  they do have monitor -- there is a monitor in the
22  nursing station to observe patients.  They go to a

DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

8 (Pages 29 to 32)

29

1    smoking room.
2        Q    I'd like you to look at -- and unfortunately
3    I don't have a copy, it's in the binder here --
4    Exhibit 4, Alehossein 4. It's a smoking protocol in
5    effect --
6        MS. WHITAKER: Okay. Let me see if he can
7    find a copy of that, okay?
8        MR. MELTMAR: All right.
9        MS. WHITAKER: And what is this? This is
10   the protocol?
11       THE WITNESS: Smoking Risk Protocol.
12       MS. WHITAKER: And the date is 2004?
13       MR. MELTMAR: Let me see. Is that 2004?
14       THE WITNESS: Yes.
15       MS. WHITAKER: Actually -- do you have a
16   copy of that?
17       MR. MELTMAR: I do have a copy for you.
18   What I've done is put the exhibit sticker on the wrong
19   one.
20       MS. WHITAKER: Oh. It is not in your binder
21   by the way. So I don't have it independently.
22       (Exhibit 2 was re-marked.)

30

1    BY MR. MELTMAR:
2        Q    I'd like you to look at Alehossein 4. What
3    is that document?
4        A    The assessment of smoking intervention.
5        Q    Is that the Smoking Risk Protocol?
6        A    Smoking Risk Protocol.
7        Q    Okay. So Exhibit 4 is the smoking Risk
8    Protocol, is that correct?
9        A    Smoking Risk Protocol. Yes.
10       Q    Okay. Now, at the time of Benjamin's
11   residency, were you responsible for complying with the
12   Smoking Risk Protocol?
13       A    I was responsible to assess him whether he
14   was able to smoke on his own or not. And he was able
15   to smoke.
16       Q    I understand and we're going to get to that.
17   The question's different. Were you responsible for
18   complying with the smoking risk protocols in effect
19   during Benjamin Sanders's residency?
20       A    Nursing home is interdisciplinary team.
21       Q    Okay.
22       A    It's a group of clinicians. They work

31

1    together. It's a responsibility of everyone to
2    observe patient and monitor him if he's smoking
3    safely. And he was.
4        Q    Okay. You know, you can tell me that he was
5    a safe smoker until the cows come home. The question
6    I have is different. Were you responsible for
7    complying with this document, the Smoking Risk
8    Protocol, during Benjamin Sanders' residency?
9        MS. WHITAKER: Objection. Asked and
10   answered. You can answer if you can.
11       THE WITNESS: Pardon?
12       MS. WHITAKER: You can go ahead and answer
13   it again.
14       A    I was one of those people who were
15   responsible.
16       MR. MELTMAR: Okay.
17       A    Everyone's responsible in the nursing home
18   to observe the patient. I was one of the person who
19   is responsible to observe him whether he was smoking
20   safely or not. And he was smoking safely --
21       MR. MELTMAR: Okay.
22       A    -- up to March 19, '06.

32

1    BY MR. MELTMAR:
2        Q    So part of your responsibilities included
3    under A to identify high-risk smokers, is that
4    correct?
5        A    He was evaluated and he was seen and he was
6    smoking safely.
7        Q    Here's the deal. You've got to answer my
8    questions, okay? I only get to depose you once. I
9    don't get to come back next week or next month. I
10   only get one shot. I'm asking a question and we're
11   going through the document and you've got to answer my
12   question. You can either say yes or no. So the
13   question is was part of your job responsibility to
14   identify high-risk smokers?
15       A    Yes, it was.
16       Q    All right. Was part of your job
17   responsibility to determine whether or not a resident
18   needs supervision or assistance to smoke safely?
19       A    Yes, it was.
20       Q    Okay. I'm just following this outline. You
21   can just look at it and agree or not agree. Was it
22   part of your job responsibility to assess a patient's

DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

10 (Pages 37 to 40)

37

1    A   He was seen and safe to smoke.
2    Q   You can tell me that until next Christmas.
3    A   Okay.
4    Q   You've got to answer my questions. Okay.
5   You can tell me that he was a safe smoker for the next
6   12 months or you can answer me questions. My question
7   is did you have a duty to provide supervision to a
8   resident who's cognitively and physically impaired?
9    A   I do not have a duty but I've seen. I did
10   not have a duty but I've seen it.
11   Q   Did the VA have a duty to provide
12   supervision to a resident that was cognitively
13   impaired?
14   A   Usually nurses -- RN's on the floor, they
15   usually take the patients to the room or watch them
16   and bring them back. I don't do --
17   Q   You know what? In a 30(b)(6) deposition
18   about a month ago, for lack of a better word, the DON
19   testified as an officer -- as a representative of the
20   United States Government that you were responsible for
21   overseeing his care. Henderson testified under oath
22   that you were the one that was responsible for

38

1   supervising Benjamin Sanders' care. Are you now
2   telling me that's not true?
3    A   I was responsible to supervise him and when
4   I saw him, he was smoking safely. We do not record if
5   patient is smoking safely.
6    Q   You know, again we're not talking about
7   smoking safely now.
8        MS. WHITAKER: Just ask her another
9   question.
10       MR. MELTMAR: Well, I am but she's not
11   answering my question.
12   BY MR. MELTMAR:
13   Q   As the person that Ms. Henderson, who was in
14   charge of the nursing care at this facility, testified
15   that you were responsible for overseeing Benjamin
16   Sanders' care, is that a true statement or a false
17   statement?
18   A   I really don't know how to answer this
19   question. I don't know.
20       MS. WHITAKER: You want to show her?
21       THE WITNESS: I'm one of the clinicians. I
22   work under the attending physicians. And all of a

39

1   sudden I'm the only responsible person.
2        MR. MELTMAR: No. Trust me. Everyone else
3   is going to be deposed. Trust me. I'm going to
4   depose other people.
5        MS. WHITAKER: If you want to ask her a
6   question --
7        MR. MELTMAR: I am --
8        MS. WHITAKER: If you want to show her --
9        MR. MELTMAR: I don't have to show her
10   anything.
11       MS. WHITAKER: Let's just move on.
12       MR. MELTMAR: Fine.
13   BY MR. MELTMAR:
14   Q   Were you responsible for overseeing the
15   care for --
16   A   I was responsible for his medical conditions
17   and his well-being and up to that day when I saw
18   him -- I worked on Sunday, March 19 -- he was in his
19   usual state of health, meaning that I've known this
20   gentleman for five years. He was doing fine. He was
21   moving around in his wheelchair and he was singing.
22   He was doing just fine that day. There was no

40

1   difference on his status and he's been smoking every
2   single day over there safely.
3    Q   We're going to get to whether or not your
4   opinion that he was a safe smoker is valid or not in
5   about 45 minutes.
6    A   Okay.
7    Q   But for right now I want to get into this
8   document and I want you to answer the question either
9   yes or no. And I can lead you because you have
10   difficulty answering the questions. Isn't it true --
11   A   My observation is that he was smoking
12   safely.
13   Q   You're not letting me finish my question.
14   You keep saying the same thing over and over again.
15   Look at line 11 on this document. Did you have a
16   responsibility to make sure that people with cognitive
17   slash physical impairments were supervised while
18   smoking?
19   A   Again this is for RN, LPN and NA. This
20   report is for -- it's not for nurse practitioners.
21   Q   So your testimony --
22   A   It's for nursing.

DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

12 (Pages 45 to 48)

45

1  was at high risk?
2      MS. WHITAKER: Asked and answered.
3      MR. MELTMAR: Where?
4      A  I did answer the question. I said I put a
5  text order for the nurses or I put in my patient
6  education. I think I answered the question before.
7  BY MR. MELTMAR:
8      Q  If he was a high-risk smoker, would you put
9  a note at the nurses station?
10      MS. WHITAKER: Asked and answered. You can
11  answer.
12      A  No.
13  BY MR. MELTMAR:
14      Q  Would you take the cigarettes away from the
15  resident?
16      A  Definitely.
17      Q  Would you tell the resident's family not no
18  bring him any cigarettes?
19      A  Definitely.
20      Q  Would you take his away his lighter?
21      A  Definitely.
22      Q  Would you tell other residents not to give

46

1  him cigarettes unless he was being supervised?
2      A  Yes.
3      Q  Let's go to Alehossein 4 which is the
4  Smoking Risk Protocol. Let's go down to the
5  documentation at the end of page two.
6      MS. WHITAKER: We're back on four again?
7  BY MR. MELTMAR:
8      Q  You see that documentation? Now, this
9  documentation indicates the documentation must be done
10  when there's an assessment given, is that correct?
11      A  Yes. That's correct. But like I said, I
12  said, when they are not high risk, you don't write any
13  notes.
14      Q  Are there any instructions that you can
15  refer me to that say you don't document a finding that
16  a resident is a safe smoker or a non high-risk smoker?
17  Are there any instructions you can refer to?
18      A  If it is high risk -- for instance, if
19  patient falls, we say patient is high fall risk. We
20  write it in the notes. Same thing with smoker,
21  high-risk smoker. But when they are now -- we don't
22  say patient is safe to walk or patient is safe to

47

1  smoke. We don't write any notes like that.
2      Q  Is that the current policy now?
3      A  I believe so.
4      Q  So when you have determined that a resident
5  is a safe smoker, you wouldn't put any notations in
6  the chart?
7      A  No.
8      Q  Okay.
9      A  Then you would have to write for everyone.
10      Q  Now, if you find that a resident is a
11  high-risk smoker, it appears by looking at this
12  document -- I'd like you to go back to page two --
13  that you need to put that in the progress notes, the
14  flow sheets, the MDS, is that right?
15      A  I don't do that part of MDS. MDS is done by
16  interdisciplinary team.
17      Q  Okay.
18      A  Everyone has different part to do, their own
19  part.
20      Q  So you wouldn't put a finding of a high-risk
21  smoker in the progress notes?
22      A  No.

48

1      Q  And you wouldn't put them in the flow sheet,
2  is that correct?
3      A  If they are high smoker, yes, you do, but if
4  they are not high smoker, you don't put anything.
5      Q  When I asked where you would put the
6  finding, you said text order and patient education?
7      A  Education. Yes.
8      MS. WHITAKER: And I think she said alert to
9  nurses.
10  BY MR. MELTMAR:
11      Q  And in your alert to nurses. But that's not
12  the flow sheet? Okay. Did you follow me? Also on
13  interventions. Would you indicate on the flow sheets
14  what interventions were taken, in the plan of care
15  what interventions were taken, in the progress notes
16  what intervention s were taken? Is that correct?
17      A  Repeat your question?
18      Q  In other words, if you determined that
19  someone was a high-risk, smoker, you would indicate
20  the interventions taken in the flow sheet, the plan of
21  care and the progress notes. is that right?
22      A  Yes.

DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

14 (Pages 53 to 56)

53

1    was retained by counsel.)
2    Q    You're looking at what's been marked
3    Alehossein 6 and this is a collection of documents
4    that were provided to the federal government pursuant
5    to the discovery requirements of the court.  And in
6    this document under tab eight I believe are a complete
7    set of the medical records.  And you're looking at
8    page number 182.
9        MS. WHITAKER:  And what was the exhibit?
10   What is it?  Exhibit Number 6?
11       MR. MELTMAR:  Yes.  And we're going to use
12   this exhibit for the remainder of this case.
13   BY MR. MELTMAR:
14   Q    You were aware of this, correct?
15   A    Yes, I was.
16   Q    Did you order this consult?
17   A    I don't remember.
18   Q    Well, where would you find out?
19   A    I don't know how --
20   Q    Okay.
21   A    -- to find it.  But I must have consulted
22   them.  I don't know.

54

1    Q    Okay.  Now, you would agree with me that --
2    A    I do not agree with this test.
3    Q    Okay.  So let's make that clear.
4    A    Uh-huh.
5    Q    You disagree with the neuropsychological --
6    A    Yeah.
7    Q    Let me just finish the question.  You
8    disagree with the neuropsychology extern's findings
9    dated January 30th, 2006, is that correct?
10   A    That's extern.  And you know what extern is.
11   Q    I just want to make it clear that you
12   disagree with the findings, is that correct?
13   A    Yes.
14   Q    And you also disagree with the findings of
15   Cynthia L. Sullivan who signed off on that finding as
16   well?
17   A    Cynthia may not -- did the test herself.
18   She just signed the note.
19   Q    So you're stating that Cynthia signed a note
20   without understanding what it meant?
21   A    I don't know.  I'm just saying that mini
22   mental status or MMSE just a test and it's not 100

55

1    accurate and it has -- I mean it doesn't have 100
2    percent objectivity.  Everybody can do it in a
3    different way.  I was seeing the guy every day on the
4    floor.  I was the one that I did -- other nurses that
5    work in the CNRC, they observe this man every day.
6    This test is done within 10 minutes, very quick for
7    somebody like Mr. Sanders that you have to be patient
8    with him to be able to understand him, to be able to
9    comprehend him.  10 minutes test, I don't rely on 10
10   minutes test.  I rely on day-by-day observation of
11   this gentleman.
12   Q    Now, this test also indicates that he would
13   likely continue to require assistance with ADL's?
14   A    He was assisted with ADL.
15   Q    So you don't disagree with that, do you?
16   A    No.  He was assisted from day one to ADL.
17   Q    And what ADL's were he assisted with?
18   A    Activity of daily living.  He came in with
19   activity of daily living assistance.
20   Q    Because he had a stroke?
21   A    Because he was a burden to his family
22   because his family were not able to care for him at

56

1    home.  He was coming every time -- let me just -- can
2    I elaborate this?
3    Q    Sure.
4    A    Okay.  I know Mr. Sanders since June '01.
5    He was coming for respite care.  Respite care meaning
6    for -- it was a burden to his family.  He would come
7    here twice a year for two weeks and stay in our
8    nursing home so his family could get rest because his
9    daughter had nervous breakdown of taking care of his
10   father -- her father at home.  Tameka Sanders, she had
11   nervous breakdown to take care of her father at home.
12   So he came here only for two weeks and sometimes his
13   family, they asked us to extend it because they were
14   not ready to take him back home.  The reason he came
15   to long-term care is because they are not able to care
16   for him at home.  So every time he came here he was
17   ADL support, activity of daily living.  I remember he
18   was assisted with activity of daily living in '01 I
19   remember.
20   Q    And the activities of daily living he needed
21   assistance with would be feeding and bathing, is that
22   correct?

DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

15 (Pages 57 to 60)

57

1     A   Well, feeding and bathing is partial.  Again
2  these are questions the nurses can answer you well.
3  My role is not on nursing issues, because nurses will
4  do those better -- I mean they give you better answer
5  than I do.  But activity of daily living meaning he
6  had extensive wound care.  He had open wound all over
7  his body.  So that was the total care -- when you see
8  some notes that says total care, that was it, because
9  he wasn't able to do his wounds.  He was able to use
10  urinal but he wasn't able, you know, to control
11  himself real well or he was feeding himself.  So he
12  needed partial assistance to his activity of daily
13  living.
14     Q   So he needed assistance with his feeding?
15     A   But he was able to go everywhere, to move
16  around, to even go to the parking lot alone, by
17  himself.
18     Q   I understand what you are aware of his
19  condition but what I want to find out is I just want
20  to narrow down whether or not he needed help with
21  eating.
22     A   No.  He was self fed -- actually on

58

1  March 19th when I made round the last time I saw
2  Mr. Sanders, it was when he was eating his breakfast
3  and he was feeding himself.
4     Q   With his right hand he was feeding himself?
5     A   With his right hand.  Yes.
6     Q   Is that the hand he smoked with?
7     A   Yes.
8     Q   Is that the hand that he lit his cigarette
9  with?
10     A   I haven't seen.  I don't remember.  But I've
11  seen him smoking.  I haven't seen -- or maybe -- I
12  can't remember.  I don't know how he did it but he was
13  smoking.  I've seen that he was smoking with his right
14  hand.
15     Q   But you have never seen him light the
16  cigarette with his right hand?
17     A   I might have.  I vaguely remember.  I mean I
18  don't remember exactly how he did it.  But I mean how
19  he finished the task.  I can't remember it but I do
20  remember that he had cigarette in his hand.
21     Q   Did he need assistance with bathing?
22     A   Yes.  He had wound all over the place.

59

1     Q   Did he need assistance getting dressed?
2     A   Partial.
3     Q   Did he need assistance moving around in his
4  wheelchair?
5     A   He just needed to put in the wheelchair but
6  he was on his own.
7     Q   So he needed assistance getting in and out
8  of bed?
9     A   Yes.  And nurses will do those things.  I
10  don't do transfer or get him out of bed or any of
11  those activities.  Nurses will do those.  I mean my
12  role is different.
13     Q   Sure.  I understand.  But I'm just asking
14  what you knew about him.  Did he need to be turned and
15  positioned in his bed or could he do it by himself?
16     A   Nurses would do it.  He was able to do some
17  but like I said, he was extensive, extensive wound
18  problem.  Especially because his genitalia had no
19  skin.  It was all open wound when he came to us.
20     Q   Yeah.  I've seen that.
21     A   So that's why he was on toileting program
22  and toileting program is very difficult to manage it

60

1  on this gentleman.  So that was the only way that his
2  skin could heal.  So he had to be turned every two
3  hours or as frequent as possible.
4     Q   He needed assistance toileting too, right?
5     A   Yes.  He was on toileting program.
6     Q   You never assisted him with toileting, did
7  you?
8     A   No.
9     Q   No.  Do you remember how many times you ever
10  saw him smoking?
11     A   Oh.  Many times.
12     Q   Many times?
13     A   Many times.
14     Q   In the smoking room?
15     A   In the smoking room.  And I've seen him in
16  the parking lot.  Even one time he was in the parking
17  lot.  He would roam everywhere.  We've seen him in the
18  fourth floor auditorium in the hospital.  Because he
19  had friends, he would go and talk to them.  He was
20  friends with chaplain and he had his iPhone and
21  listening to music and he would roam everywhere.
22     Q   When you made the determination that

· 61

1 Benjamin Sanders was a safe smoker, when did you do
2 that?
3    A   He was able to smoke.
4    Q   No. But when --
5    A   He was able to manage the task. When he
6 came in on respite and he came on admission and then
7 periodically when I was checking him, he was smoking
8 safely without any problem.
9    Q   What did you do to make that determination?
10 What kind of process do you did you go through --
11    A   That he's cognitively intact and he's able
12 to manage the task. Doesn't mean someone has to be
13 completely cognitively intact. Sometimes maybe they
14 have mild cognitive problem but they are able to
15 manage the task. And he was able to manage the task.
16    Q   What about physical impairment?
17    A   He had physical impairment. Left side he
18 was weak. He does -- he did have disability. He was
19 physical impairment. But mentally he was intelligent.
20    Q   So part of the factor or some of the factors
21 that you used to determine that he was a safe smoker
22 was that he was cognitively intact?

62

1    A   Cognitively intact, mild impairment.
2    Q   What about physical impairment?
3    A   He had physical impairment but he was able
4 to manage it.
5    Q   He was able to light a cigarette?
6    A   Right.
7    Q   Was there anything else that played a role
8 in your determination he was a safe smoker?
9    A   I was teaching him every day to stop
10 smoking, every single day. And he said smoking makes
11 me relax, don't ask me to quit smoking. I do not
12 want. And I put it in all of my notes numerous times.
13    Q   So the answer is yes or no. Were there any
14 other factors besides his physical and cognitive
15 abilities that played a role in your determination
16 that he was a safe smoker?
17    A   He was a safe smoker because I've seen him.
18 He was not in danger to burn himself or do anything
19 that causes him, you know, not to be able to. He was
20 able to smoke.
21    Q   Okay. I understand that.
22    A   The last day I saw him he was in his usual

63

1 state of health. There was no changes on his status.
2 His vital signs, which is temperature, blood pressure,
3 pulse, everything was within normal limit and
4 acceptable range everything. So he hasn't had any
5 medical issue to say that this guy cannot smoke
6 because he's been smoking for five years.
7    Q   Okay.
8    A   As far as I remember him when he was coming
9 to the VA. And that last day was the same.
10    Q   Okay. Other than his cognitive and physical
11 status, was there anything else that played a role in
12 your determination that he was a safe smoker when he
13 first came in?
14    A   That he was able -- he was able to manage
15 the tasks. I look at that and I say, yeah, he's safe
16 to smoke.
17    Q   Now, you would agree with me that he was
18 unable to self-manage himself in the event that he
19 caught on fire?
20       MS. WHITAKER: Objection.
21 BY MR. MELTMAR:
22    Q   Given his cognitive impairment and his

64

1 physical limitations due to his left side stroke,
2 would you agree with me --
3    A   No.
4    Q   Let me finish the question -- would you
5 agree with me that if Benjamin Sanders caught on fire,
6 he would be unable to put the fire out given the
7 fact -- given his paralysis and given that he couldn't
8 walk on his own?
9    A   Could you repeat your questions again?
10    Q   Sure. Given his overall physical
11 limitations, his left-side paralysis, given the fact
12 that he couldn't get around other than on a mechanized
13 or motorized wheelchair, given that he couldn't stand
14 on his own without the assistance of someone else,
15 given that he had cognitive impairments due to the
16 same stroke, did you believe that Benjamin Sanders
17 could self-manage himself in the event that he caught
18 on fire?
19       MS. WHITAKER: Objection.
20    A   I don't know how he caught on fire.
21 BY MR. MELTMAR:
22    Q   That wasn't my question. Do you think he

Case 1:07-cv-01169-ESH    Document 27-7    Filed 06/30/2008    Page 14 of 20
DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

17 (Pages 65 to 68)

65

1    could self-manage himself in the event that he caught
2    on fire?
3        A   Like I said, I don't know how he caught on
4    fire but he -- in terms of cognitive impairment and
5    disability, the day I saw him, he had no changes from
6    previous day or the day before. The day before he was
7    smoking. The day before he was smoking safely and he
8    could come back from the smoking room going back to
9    his room.
10       Q   Okay.
11       A   That day to me was the same. I wasn't
12   there. I don't know how he got fire. I don't know.
13       Q   All right. Well, we're going to get to that
14   in a minute, okay? But I'm not asking you whether or
15   not you think he's a safe smoker because I know the
16   answer. You've answered that 5 times. He's a great
17   safe smoker.
18       A   I didn't say great.
19       Q   Well, it seemed like he's a great safe
20   smoker because you keep talking about it.
21       MS. WHITAKER: Let's move on.
22

66

1    BY MR. MELTMAR:
2        Q   Given Mr. Sanders' overall physical
3    impairment which included left-side paralysis which
4    means he couldn't stand on his own -- do you agree
5    with that?
6        MS. WHITAKER: You've gone through it. Why
7    don't you just ask the question---
8        MR. MELTMAR: Because she doesn't answer the
9    question. We're going to do it piece by piece.
10       A   Let me -- it's veteran's right to smoke and
11   they are all disabled --
12       MR. MELTMAR: You've got to answer my
13   questions.
14       THE WITNESS: Your questions's general?
15       MR. MELTMAR: My question is general because
16   you're responsible for his overall care.
17       A   It's general. Yeah. It's general and in
18   general, all veterans are entitled to smoke in
19   designated area and he was one of them. And majority
20   of all veterans are disabled.
21       MR. MELTMAR: I understand that.
22       A   Some of them --

67

1    BY MR. MELTMAR:
2        Q   Have you seen the photos of Benjamin Sanders
3    by the way?
4        A   Yes.
5        Q   Now I want you to answer my question.
6        A   Yes, I did.
7        Q   Was Benjamin Sanders able to stand on his
8    own?
9        A   No.
10       Q   Was he able to move his left hand and bring
11   a cup of water or piece of fruit to his mouth?
12       A   Could be partially. I don't remember well.
13   Partially I would say.
14       Q   He had a pretty significant left-side
15   stroke. Are you aware of that?
16       A   Yes.
17       MS. WHITAKER: Objection.
18   BY MR. MELTMAR:
19       Q   And you were aware of that before he died,
20   right?
21       A   I knew this gentleman since 2001.
22       Q   You've just got to answer my questions. He

68

1    had a stroke since then?
2        A   Yes.
3        Q   And you're aware of that/
4        A   Yes. I'm aware that he had left-sided
5    weakness.
6        Q   And you're aware that he could only get
7    around in a motorized wheelchair, is that correct?
8        A   Yes. But independently.
9        Q   And you're aware that he couldn't speak
10   clearly. He had garbled speech, is that correct?
11       A   Garbled is the wrong word. Garbled is the
12   wrong word. He wasn't garbled.
13       Q   What was it?
14       A   He had dysarthria. He wasn't garbled. Or
15   expressive aphasia. They use intermittently both
16   words. But he wasn't garbled. You might have looked
17   at some notes that maybe a nursing assistant wrote,
18   said garbled. She didn't spend enough time to
19   understand what he was saying. But his speech wasn't
20   garbled. Like I said, and I say again, he was an
21   intelligent man.
22       Q   I'm talking about his speech, not whether he

DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

18 (Pages 69 to 72)

69

1 was smart.
2    A    He was intelligent and he was able to -- his
3 speech was comprehensible if you gave him time to
4 understand him.
5    Q    If you gave him a lot of time.
6    A    Not a lot of time. Just -- if you knew the
7 person like I did, I could understand him 100 percent.
8    Q    Could I?
9    A    He was in my door every day.
10    Q    Could I have understood him if I would have
11 walked in and listened to him speak to him for the
12 first time?
13    A    Well, the way you're asking the question, I
14 wonder because you're going fast. But if you take
15 your time, you would definitely.
16    Q    How would you describe his speech?
17    A    I would describe his speech as dysarthria.
18    Q    And what did does that mean?
19    A    That means usually when you have a stroke,
20 you have a stroke, you get some slurred, slurred
21 speech. And --
22    Q    Would it be fair to say that he had slurred

70

1 speech?
2    A    Yes. It's okay to say slurred.
3    Q    All right.
4    A    A little stutter. Combination of a stutter
5 and slurred. You know.
6    Q    Okay. Now, given all of these facts, the
7 slurred speech, his left-side paralysis, his cognitive
8 impairment, was Benjamin Sanders able to self-manage
9 himself in the event that he caught on fire prior to
10 March 19th, 2006?
11    A    Yes.
12    Q    Okay. Now, you would agree with me that
13 Benjamin Sanders caught on fire on March 19th, 2006,
14 correct?
15    A    Yes. I heard the next day when I came to
16 work.
17    Q    And he was found in his wheelchair with
18 flames three feet over his head. Are you aware of
19 that?
20    A    Yes.
21    Q    And you're aware that at the time they found
22 him, he was moving his left arm and his right arm but

71

1 he was not speaking or screaming or yelling or making
2 any sound. Are you aware of that?
3    A    You said that he was moving his left arm?
4    Q    That's what the statement is, he was moving
5 his left arm and his right arm. His arms.
6    MS. WHITAKER: Do you want to show her what
7 your referring no?
8    MR. MELTMAR: No.
9 BY MR. MELTMAR:
10    Q    Are you aware of that or not?
11    A    I read the report.
12    Q    So are you aware of it?
13    A    Yes. I'm aware of it.
14    Q    All right. Now, given the fact that
15 Mr. Sanders was engulfed in fire and the flames were
16 three feet over his head, if he was able to
17 self-manage himself, would you expect that he would
18 have gotten out of the wheelchair and rolled around on
19 the ground to put the flames out before they got that
20 high?
21    A    Yes.
22    Q    Then why didn't he do it if he could

72

1 self-manage himself?
2    A    I have no idea.
3    Q    Was it because he was cognitively and
4 physically impaired and couldn't do it?
5    A    He was able to do it. He smoked the day
6 before. He smoked in the morning of that day. He
7 smoked in the afternoon of that day.
8    Q    The question isn't -- this case is not about
9 whether or not he could smoke safely on one day or 100
10 days. This case is about the eventuality when he
11 could not smoke safely, something very bad would
12 happen to him if he was not supervised. That's the
13 issue.
14    A    This could have happened anywhere. It could
15 have happened in the house. It could have happened in
16 the adult day care where he used to go. But it just
17 happened here and he was transferred to ICU. It just
18 happened here. It just happened here in a nursing
19 home and it was a freak accident.
20    Q    Okay. Let's get back to the whole
21 self-management thing. Would you agree with me that
22 someone who's a safe smoker can manage a fire when

DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

19 (Pages 73 to 76)

73

1   they catch on fire, that they can put the fire out,
2   they can drop to the ground and put the fire out, they
3   can call for help, they can walk away from the fire?
4       MS. WHITAKER: Objection. Speculation.
5   Come on. Let's ask questions --
6       MR. MELTMAR: You can make your objection
7   and I'll move on.
8       A   It has to be a regulation. You need to talk
9   to administrative people for VA regulations.
10      MR. MELTMAR: No. I'm asking for your
11  definition --
12      A   My definition is ban smoking. That's my
13  definition. I'm totally against smoking but these are
14  regulations that are done by administrative and I'm
15  not the person to respond to those questions.
16  BY MR. MELTMAR:
17      Q   Well, I'm not -- when you determine that
18  someone is a safe smoker, is part of that analysis a
19  determination that if they caught on fire, they could
20  self-manage themselves?
21      A   He was able to self-manage up to the end but
22  that day, that particular day at that particular time,

74

1   I don't know what happened to him. But he was -- I
2   saw him in the morning. He was at his usual state of
3   health, meaning that he's had no infections to cause
4   him to be more impaired. He's had no urinary tract to
5   cause him to be more impaired. He did not have
6   bronchitis that usually had a lot. Usually with
7   the smoking he was prone to have bronchitis a couple
8   of times every year. He did not have any of those.
9   And actually he was stable in the past month.
10      Q   All right. Let's go get back to my
11  question.
12      MS. WHITAKER: Well, are you going to ask
13  that question until you get the answer you want to
14  hear?
15      MR. MELTMAR: No. She can answer yes or no
16  and we'll move on.
17  BY MR. MELTMAR:
18      Q   I just need to know for the record whether
19  or not the staff member in charge who was caring for
20  Benjamin Sanders believed that being able to
21  self-manage a fire was part of the analysis in
22  determining whether a resident was a safe smoker or

75

1   not.
2       MS. WHITAKER: Objection. You can answer.
3       A   He was a safe smoker up to the end and I
4   don't know what happened to him on that moment because
5   I was not here.
6   BY MR. MELTMAR:
7       Q   My question is different. Does an
8   individual who is deemed to be a safe smoker at the VA
9   have to be able to demonstrate that they can
10  self-manage themselves in the event that they caught
11  on fire? Is that a prerequisite or not?
12      A   When they come in, they seen by nurses, by
13  providers. They observe them and they see. If they
14  are high risk, they would identify it and if they are
15  not, they won't identify it.
16      Q   Did you believe --
17      A   I've answered these question before.
18      Q   You didn't answer my question. You need to
19  answer my question. It's either yes or no.
20      MS. WHITAKER: Let her finish what she was
21  going to say.
22      MR. MELTMAR: She's not giving me a

76

1   responsive question. I'll put it in the form of a
2   leading question and you can answer it yes or no.
3   BY MR. MELTMAR:
4       Q   Isn't it true that for a resident to be
5   deemed a safe smoker at the VA up until March 19th,
6   2006, they had to demonstrate that they can
7   self-manage themself in the event that they caught on
8   fire?
9       MS. WHITAKER: Objection.
10      MR. MELTMAR: Yes or no.
11      A   He has been managing himself. He has been
12  managing safely up until that day that he --
13  BY MR. MELTMAR:
14      Q   Did you ever put him on fire to see if he
15  could self-manage?
16      MS. WHITAKER: Objection.
17      A   You don't put him on fire.
18  BY MR. MELTMAR:
19      Q   Let me ask you this. Did you believe that
20  Benjamin Sanders, at anytime that you determined that
21  he was a safe smoker, could have stood up in his
22  wheelchair?

DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

28 (Pages 109 to 112)

109

1  and you're the only person speaking to him, he could
2  hear you?
3      A    Exactly. That's why he was using pocket
4  talker for daily communication but one on one, you
5  were able to hear him with hearing aid.
6      Q    And the date of that note was what?
7      A    I believe it's September that he went out
8  for -- labor holiday, yes -- with his family for
9  cookout.
10     Q    All right. Let's go to the next note.
11     A    Page 494. That's August note.
12     Q    Let's go to the bottom of 497. It says
13  psychosocial circumstances. Recent GDS 6 out of 15
14  which reveals borderline depression mostly due to
15  physical limitations. Did you write that down?
16     A    Yes. And he denied being depressed and he
17  said the reason that he got this number is because of
18  physical limitation.
19     Q    Where's your next note?
20     A    524 on the bottom.
21     Q    This is just a monthly note again?
22     A    Yes.

110

1      MS. WHITAKER:  Just a monthly note?
2      MR. MELTMAR:  Just a monthly note.
3  BY MR. MELTMAR:
4      Q    Can you tell me during the course of your
5  treatment of Mr. Sanders what involvement Dr. Kheirbek
6  had in recommending care or treatment for Mr. Sanders?
7      A    Well, she will tell tomorrow. She will tell
8  you.
9      Q    But you can tell me now.
10     A    She will tell you.
11     Q    No. You need to tell me. What did she do?
12     A    I mean she's a medical director. She's an
13  attending physician. We make round together.
14     Q    Uh-huh.
15     A    Every week we round together, every Monday.
16     Q    Okay.
17     A    But I do write the notes and she signed the
18  notes for me.
19     Q    So you would draft them and she would review
20  them and sign them?
21     A    She sees the patient herself and she signs
22  them. Yeah.

111

1      Q    But you would draft them?
2      A    If I come up with some problem, I would ask
3  her for assistance.
4      Q    Okay. Was she the attending physician for
5  all of the CNRC residents?
6      A    No. She's the medical director but she's
7  attending physician for particular group of patients.
8  We have other geriatrician as well. There's two more
9  geriatricians, one for hospice palliative and the
10  other one for --
11     Q    Now, if Rita Kheirbek or Dr. Kheirbek
12  decided that Mr. Sanders was an unsafe smoker, she
13  could have written a note making him a high-risk
14  smoker, couldn't she?
15     A    Absolutely. And again let me elaborate.
16  I'm sure you have experience. You know how a nursing
17  home works. The way nursing home works, it's
18  definitely teamwork. When we admit the patient, when
19  patient comes in, I put the physical and history and
20  sometimes I don't know the family and I haven't seen
21  the family. When I leave the unit, then the evening
22  shift or nurse on call, she will see the family or she

112

1  sees something on the patient and she will bring it to
2  my attention. Or social worker, when they see
3  something on patient that is unusual, they will bring
4  it to my attention or Dr. Kheirbek's attention.
5  That's how we operate and that's how we work. It's
6  teamwork.
7      I have never ever heard from anyone during
8  these past five years that I had Mr. Sanders as a
9  patient someone to come up to me and saying that he's
10  a high -- he's dangerous smoker. Nobody ever told me.
11  I have observed him myself and other people have
12  observed him and we work as a team. It's not the
13  responsibility of one. We all work together.
14     Q    And no one's blaming you. You were just
15  identified by Henderson. So that's why I'm deposing
16  you.
17     A    No, because -- yeah.
18     Q    Where in the chart of Benjamin Sanders is
19  there an indication that he had left-side paralysis
20  and the extent of that left-side paralysis?
21     A    Well, if you look at some urology note,
22  actually they give numbers to paralysis. Like they

Case 1:07-cv-01169-ESH    Document 27-7    Filed 06/30/2008    Page 18 of 20
DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

29 (Pages 113 to 116)

**113**

1  say motor and motor comes from 5 over 5. It's 5 the
2  highest, 0 is the lowest. Some note you look at they
3  give him 2 over 5 on the left side and some doctors --
4  it's very subjective -- they put 0 over 5. So on the
5  right side he had 5 over 5, definitely 5 over 5,
6  because I've seen him myself. He was a chaplain and
7  he loved music and when he was singing gospel, he had
8  to move and shake himself so he was raising his hand.
9  But left side, when you look at the note, some people
10  they put 2 over 5, some people put 0 over 5.
11    Q   Okay.
12    A   So he had some partial movement.
13    Q   And you were aware at the time of his death
14  that some neurologists have given him 0 over 5 or 2
15  over 5, is that correct?
16    A   No. I don't remember.
17    Q   Well, I'm not asking whether you remember.
18  But you were aware of it.
19      MS. WHITAKER:  Objection.
20  BY MR. MELTMAR:
21    Q   Were you aware that some people had felt
22  that Mr. Sanders had complete left-side paralysis at

**114**

1  the time of his death?
2    A   He's had left-side paralysis but I'm just
3  used to reading notes and seeing discrepancy from two
4  different physicians. They all write different notes
5  so --
6    Q   Well, where are the neurology notes in here?
7      MS. WHITAKER:  You're asking her to find
8  some other notes?
9      MR. MELTMAR:  Yeah.
10  BY MR. MELTMAR:
11    Q   Where are the neurology notes? Would they
12  be in the progress notes?
13    A   Must have been consult or --
14    Q   Can you show me where?
15    A   I have to look for all of them. I don't
16  remember.
17    Q   I just need to see one or two.
18    A   I have to turn pages till I find it.
19    Q   Well, that's good because it will give me a
20  chance to formulate more questions.
21    A   Is this the entire chart including consult
22  and discharge summary?

**115**

1    Q   I have no idea. It's what we got.
2    A   So I don't know.
3    Q   Are you not seeing things like neurology
4  consults where you would expect to see them?
5    A   I have to turn pages. I don't know where
6  the note is.
7      (Discussion off the record)
8  BY MR. MELTMAR:
9    Q   What page number is that?
10    A   593.
11    Q   All right. Let's go to page 593. If you go
12  to the sentence beginning muscle tone is increased in
13  the left upper and left lower extremities. Passive
14  range of motion is decreased in the left shoulder.
15  Keeps left hand flexed at the wrist but it can be
16  extended passively. He has contractures of the PIP
17  joints of the third, fourth, and fifth fingers of the
18  left hand. Range of motion is -- range of motion is
19  WFL in the right upper and lower extremities. Left
20  upper extremities nonfunctional. Muscle strength is
21  WFL in the right upper extremity and the right lower
22  extremity. So let's go back and talk about what this

**116**

1  means. What does it mean, the PIP joints of the
2  third, fourth and fifth fingers of the left hand?
3      (Discussion off the record)
4  BY MR. MELTMAR:
5    Q   Let's just go down to the PIP. What is that
6  the proximal?
7    A   Joint. Proximal joint. I don't know
8  exactly at this moment what -- which joint exactly is.
9  But what she meant, that these three fingers were
10  contracted but these two he was able to move some.
11    Q   Does that mean that the fingers were bent
12  over towards the palm?
13    A   Flexed. Flexed. He was flexed. That's
14  what she meant. And then he can use these two maybe,
15  partially.
16    Q   So what we see here in this progress note is
17  that someone has found that Mr. Sanders' left hand,
18  his pinky, his index and his middle finger were
19  contracted so that the fingertips touched the palm of
20  his hand. Is that correct?
21    A   According to this --
22      MS. WHITAKER:  Wait a second. Where does it

DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

31 (Pages 121 to 124)

**121**

1  Q  Do you have any reason to disagree with
2  that?
3  A  He's had -- my examination on him was on the
4  right side he always had full strength. On the right
5  side.
6  Q  All right. The last sentence or last two
7  sentences, he is not a candidate for PT. He has
8  received extensive PT in the past without making any
9  functional gains.
10  A  Because he was refusing to go to the PT most
11  of the time. And when they sent him, they assess him
12  and usually if patient doesn't want to have PT, so he
13  doesn't want to have, he won't come back. That's why
14  she wrote that he had extensive PT in the past.
15  Q  To your recollection, in March of 2006 had
16  Mr. Sanders' condition, his physical condition,
17  changed any from May of 2005?
18  A  From May 2005 to --
19  Q  March 2006.
20  A  It could be very minimal decline. Not
21  really aggressive. No. Minimal decline could be
22  because of his wound conditions and because he was

**122**

1  continuing to smoke.
2  Q  So your recollection is that from May 2006
3  to March of 2006 he would have had a mild physical
4  decline?
5  A  Not really. Mild physical decline.
6  Actually overall he was doing better, his blood sugar
7  was better controlled, his wound was better, but he
8  was smoking and the older you get, the worst condition
9  will get. So --
10  Q  Other than his skin condition and his
11  diabetes, did his physical condition, his ability to
12  move his extremities, decline from May of 2006 to
13  March of 2006?
14  (Reporter interruption)
15  BY MR. MELTMAR:
16  Q  I'm sorry. From May of 2005 to March of
17  2006 would it be fair to say that Mr. Sanders'
18  physical condition declined --
19  A  No.
20  Q  Let me finish my question.
21  A  Because he was using toileting program. He
22  was still on toileting program. No.

**123**

1  Q  Okay. Other than the toileting program, was
2  his ability to use his extremities from May of 2005 to
3  March of 2006 --
4  A  He was -- he was on his wheelchair all over
5  the hospital and even the parking lot. No.
6  Q  All right. I'll ask the question
7  differently. Was he able to use his left upper
8  extremity to a greater degree in March of 2006 than in
9  May of 2005?
10  A  Left upper extremity?
11  Q  Yes.
12  A  Left upper extremity we said that he had
13  hemiparesis.
14  Q  I understand.
15  A  So I think I answered the question earlier.
16  Q  As no, right?
17  MS. WHITAKER: What was the question?
18  BY MR. MELTMAR:
19  Q  You know, I don't want to keep you here
20  until 9:00 o'clock -- we're all tired -- but I just
21  need an answer.
22  A  I answered that question earlier.

**124**

1  Q  No, you didn't.
2  A  He had hemiparesis, left-side weakness.
3  Your question was if he used his left upper
4  extremities.
5  Q  That's not -- the question's different. The
6  question is did he have a decline in the ability to
7  use his left upper extremity from May of 2005 to March
8  of 2006. That's a different question.
9  A  He hasn't had any decline to use his right
10  upper extremities.
11  Q  But what about his left?
12  A  His left extremity was hemiparesis. He's
13  had hemiparesis. But he hasn't had any decline on the
14  right side. His right side was fine.
15  Q  I'm not going to give up. So the question
16  is did his left upper extremity have a decrease in
17  mobility or usefulness from May of 2005 to March of
18  2006 --
19  A  He was the same.
20  Q  Okay.
21  A  -- on the left side.
22  Q  That's all I want to know. What about his

DEPOSITION OF ASHRAF ALEHOSSEIN
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

32 (Pages 125 to 128)

---

125

1   lower left extremity from May of 2005 to March of
2   2006?
3       A   I do not remember, sir.
4       Q   Okay.  In March of 2006 was there a plan to
5   discharge Benjamin Sanders?
6       A   Home?
7       Q   Yes.
8       A   No.  Never.  Because they wouldn't want him
9   home.
10      Q   Okay.
11      A   His wife was sick, his daughter had nervous
12  breakdown, and Tameka Sanders, his wife -- I mean his
13  daughter, she would come and say -- every time they
14  invited him to meeting they are really happy that he's
15  here.  They were really thankful and grateful for what
16  we were doing at the VA for him and she would say to
17  me that my stress level from 10 to 0 is 0 now since my
18  father has been in the hospital.  They would not want
19  him home.
20          But I personally would call them and ask
21  them to take him out on pass because he was a very
22  social person and he would like to see his friends and

---

126

1   family.  That's why they took him to wedding and also
2   he went to cookout and couple of other passes.  So no,
3   they did not want him at home.  And the reason for
4   long-term care admission was lack of care at home.
5   Because he was getting worse.  His condition was
6   getting worse.  And they saw him in the home, this
7   home, head nurse, that his condition was worsening so
8   they brought him to long-term care admission.
9       Q   So his condition was worsening and they
10  brought him into the CNRC and from that point on his
11  condition basically stabilized with the exception of
12  his diabetes and his skin condition?  Is that right?
13      A   Overall condition got better.  He'd had --
14  if I had taken those pictures the day that he came --
15  we didn't have camera that day I remember -- and those
16  lesions were really, really gross.
17      Q   Now, given Mr. Sanders' overall condition,
18  which we've identified and talked about, his hypoxia
19  from smoking, his left-side weakness in the lower
20  extremity and the upper extremity, and his cognitive
21  impairment which we've seen identified in the
22  psychological evaluation and the effects of the stroke

---

127

1   on his ability to think, did you at anytime make a
2   determination that Mr. Sanders could self-manage
3   himself in the event that he caught on fire?
4           MS. WHITAKER:  Objection.  Asked and
5   answered.
6           MR. MELTMAR:  You can answer the question.
7       A   Based on my observation, he was safe and
8   he's had -- and he was intelligent, he was alert,
9   oriented.  He was able to make decisions.  He roamed
10  all over the hospital.  He wasn't in one place.  Who
11  knows.  Maybe he smoked in the street, because I've
12  seen him personally couple of times in the parking
13  lot.
14          MR. MELTMAR:  Okay.
15      A   He would go everywhere.  And that's the
16  policy of the VA Medical Center, veterans are entitled
17  to smoke.  And he was mobile.
18          MR. MELTMAR:  All right.
19      A   He was disabled but he was very mobile.  He
20  would go everywhere.
21          MR. MELTMAR:  What part --
22      A   And he was away from my eyesight or other

---

128

1   peoples' eyesight.  So he was everywhere in the
2   hospital.
3   BY MR. MELTMAR:
4       Q   My question's different.  My question
5   doesn't deal with whether he could use his wheelchair
6   and go out in the parking lot or go all over the VA
7   facilities.  That's not my question.  My question is
8   given his overall physical condition, did you ever
9   come to the opinion that he could have self-managed
10  himself, had he caught on fire?
11      A   He could self-manage up to that day to smoke
12  independently.
13      Q   So how can Mr. Sanders have self-managed
14  himself if his pants caught on fire?
15          MS. WHITAKER:  Objection.
16          MR. MELTMAR:  You can answer.
17          MS. WHITAKER:  It calls for speculation.
18      A   I wasn't here.  I don't know.
19  BY MR. MELTMAR:
20      Q   You made the determination that he was a
21  safe smoker?
22      A   He was a safe smoker.

---

# ATTACHMENT 7

# EXCERPTS FROM

# DEPOSITION OF RAYA KHEIRBEK

1 (Pages 1 to 4

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF COLUMBIA
 3   -------------------------------x
 4   MARY SANDERS, as Personal      :
 5   Representative of the Estate of  :
 6   BENJAMIN SANDERS,              : Civil Case No.
 7            Plaintiff    :   07 1169
 8        v.              :
 9   UNITED STATES OF AMERICA,      :
10            Defendant.   :
11   -------------------------------x
12
13        Deposition of RAYA KHEIRBEK
14            Washington, D.C.
15        Thursday, January 31, 2008
16               a.m.
17   Job No.: 1-119721
18   Pages 1 - 92
19   Reported by: Alda Mandell, RPR
20
21
22
```

**Page 3**

```
 1              A P P E A R A N C E S
 2
 3   ON BEHALF OF PLAINTIFF:
 4        W. CHARLES MELTMAR, ESQUIRE
 5        THE COCHRAN FIRM
 6        1100 New York Avenue, Northwest
 7        Suite 340 - West Tower
 8        Washington, D. C. 20005
 9        (202) 682-5800
10
11   ON BEHALF OF DEFENDANT:
12        CLAIRE WHITAKER, ESQUIRE
13        UNITED STATES ATTORNEY'S OFFICE
14        Civil Division
15        Assistant United States Attorney
16        555 4th Street, Northwest
17        Room E-4204
18        Washington, D.C. 20530
19        (202)514-7137
20
21
22
```

**Page 2**

```
 1        Deposition of RAYA KHEIRBEK, held at the
 2   offices of:
 3
 4
 5        VETERANS ADMINISTRATION HOSPITAL
 6        50 Irving Street, Northwest
 7        Washington, D.C. 20422
 8        (202)745-8000
 9
10        Pursuant to agreement, before Alda Mandell,
11   Registered Professional Reporter and Notary Public of
12   the District of Columbia.
13
14
15
16
17
18
19
20
21
22
```

**Page 4**

```
 1              C O N T E N T S
 2   EXAMINATION OF RAYA KHEIRBEK        PAGE
 3   By Mr Meltmar              5
 4
 5
 6              E X H I B I T S
 7        (None)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

DEPOSITION OF RAYA KHEIRBEK
CONDUCTED ON THURSDAY, JANUARY 31, 2008



2 (Pages 5 to 8

**PROCEEDINGS**

1  PROCEEDINGS
2  RAYA KHEIRBEK
3  having been duly sworn, testified as follows:
4  EXAMINATION BY COUNSEL FOR THE PLAINTIFF
5  BY MR. MELTMAR:
6      Q   Good morning.  My name's Charles Meltmar and
7  I'm an attorney with The Cochran Firm and I represent
8  the Estate of Benjamin Sanders in a claim against the
9  United States Government.  Are you aware of that?
10     A   Yes.
11     Q   I'm here to ask you some questions about the
12  care that was provided to Ben Sanders at your facility
13  and also to ask you some questions about the policies
14  and procedures that were in place at the time.  All
15  right?
16     A   Okay.
17     Q   If you don't understand a question that I
18  ask, just ask me to rephrase it --
19     A   Sure.
20     Q   -- or repeat it and I will.  Also if you
21  know the answer to my question, you need to give me a
22  verbal response.  You can't shake your head.  All

1  right?
2      A   All right.
3      Q   Would you please state your name and address
4  for the record.
5      A   My name is Raya Kheirbek.  My address is 50
6  Irving Street, Northwest, Washington, D.C.
7      MR. MELTMAR:  Will you produce her at trial?
8  You need to answer.
9      MS. WHITAKER:  Yes, we will.
10     MR. MELTMAR:  Okay.
11     MS. WHITAKER:  This is in order to avoid
12  having to put your home address on the record.  If you
13  are subpoenaed, we will guarantee that you will
14  attend.
15     MR. MELTMAR:  Otherwise you need to give me
16  your home address.
17     THE WITNESS:  Sure.
18     MR. MELTMAR:  I mean I don't need it because
19  counsel will produce you at trial.
20     THE WITNESS:  I don't need to give you my
21  home address, do I?  All right.  If by law I need to
22  give you the home address, then I'll be more than

5 / 7

1  happy to.
2      BY MR. MELTMAR:
3      Q   What was your occupation on March 19, 2006?
4      A   I am Medical Director of the Comprehensive
5  Nursing and Rehabilitation Center.
6      Q   Was that the case on --
7      A   And Associate Chief of Geriatrics and
8  Extended Care as well.
9      Q   Was that the case on March 19th, 2006?
10     A   Yes.
11     Q   And how long had you been the Medical
12  Director of the CNRC at that time?
13     A   Since 2001.
14     Q   Is that when you began working for the VA?
15     A   No.  I began working for the VA in
16  December 1999.
17     Q   Before that, where did you work?
18     A   I worked at Georgetown University Medical
19  Center as an attending physician.
20     Q   Where did you receive your medical degree?
21     A   Damascus University.
22     Q   Where is that?

8

1      A   Damascus, Syria.
2      Q   And when did you graduate?
3      A   1986.
4      Q   Where did you do your residency?
5      A   I did my internship at Boston City Hospital,
6  Boston University.
7      Q   Okay.
8      A   And my internal medicine residency at the
9  Washington Hospital Center.  I did my geriatric
10  fellowship at the George Washington University
11  Hospital.  And then I did the hospice and palliative
12  care.
13     Q   And where did you do that, at GW?
14     A   Part in GW and part here in the VA when I
15  first joined.
16     Q   All right.  Are you board certified in any
17  areas of medicine?
18     A   I am board certified in internal medicine.
19  I am board certified in geriatric medicine.  I am also
20  board certified in hospice and palliative care.
21     Q   Has your medical license ever been adversely
22  acted upon?

DEPOSITION OF RAYA KHEIRBEK
CONDUCTED ON THURSDAY, JANUARY 31, 2008

16 (Pages 61 to 6

61

1  potential risk of injury from smoking as a result of
2  that paralysis?
3      A  Okay.  Are you -- you're not talking about
4  Mr. Sanders.  You're talking about general -- you're
5  asking me a general -- you're talking about physical
6  function.  You're talking about cognitive, right,
7  status?  Two-part question.  Isn't it true?
8      Q  The question is what it is.  Do you
9  understand it?
10     A  What it is?
11     Q  Uh-huh.
12     A  The cognitive deficit per se.  In general,
13  right?  You're not talking about Mr. Sanders.
14     Q  This is not a question about Mr. Sanders.
15     A  Then ask the question again.
16     Q  All right.
17     THE WITNESS:  Can you -- no.  Can you please
18  say the question again?
19     THE COURT REPORTER:  Sure.
20     THE WITNESS:  I'm sorry.
21     THE COURT REPORTER:  "And if someone had,
22  for example, left-side paralysis due to a stroke, did

6

1      Q  Did the ability of a resident to self-manage
2  themself in an instance where they caught on fire, was
3  that a factor in the consideration of whether or not a
4  resident was a safe or unsafe smoker?
5      MS. WHITAKER:  Objection.
6      THE WITNESS:  I cannot answer general
7  questions, sir.  You've got to give me a scenario.
8  You've got to be specific.
9  BY MR. MELTMAR:
10     Q  All right.  Fine.  We'll use Benjamin
11  Sanders.  From now on we're talking about Benjamin
12  Sanders.
13     A  Very good.
14     Q  Did Benjamin Sanders have left-side
15  paralysis?
16     A  Yeah.  He had hemiparesis on the left side.
17     Q  Did he have a cognitive deficit as a result
18  of his stroke?
19     A  Just very mild.
20     Q  Very mild?
21     A  Very mild cognitive deficit because of the
22  stroke.

62

1  those guidelines indicate that staff members of the
2  CNRC should recognize that there was a potential risk
3  of injury from smoking as a result of that paralysis?"
4      A  I can't really say yes or no to this
5  question.  It really depends on the history, depends
6  on the recent or not recent smoke, the ability of the
7  person to smoke.  You know, you're asking me a very
8  difficult question here.  I can't really answer it
9  with yes or no.
10     MR. MELTMAR:  Then explain your answer.
11     MS. WHITAKER:  I think she has.
12  BY MR. MELTMAR:
13     Q  Well, you said you can't explain it with yes
14  or no, so explain it without yes or no.
15     A  I already did.  I just said I can't explain
16  it with yes or no.  I can't explain it with yes or no
17  because it really depends on what you mean by
18  cognitive decline or cognitive deficit.  It's not --
19  you know, what do you mean by hemi -- depends on the
20  ability of the person rather than the disability.
21  Otherwise I'd be barring everyone in CNRC.  All of my
22  patients, they come with disabilities.

64

1      Q  Was Benjamin Sanders able to speak clearly?
2      A  To me he was.
3      Q  So your recollection is that Benjamin
4  Sanders spoke clearly without any slurring or garbled
5  effect?
6      A  To me he was.  To me.
7      Q  Uh-huh.  Okay.
8      A  To me.  He -- you know, so you direct him,
9  you tell him to speak slowly.  You tell him to --
10  yeah, to me he was very articulate.  Actually very
11  intelligent.
12     Q  Was he able to articulate himself if he did
13  not speak slowly, if he spoke --
14     A  Yes.
15     Q  Okay.
16     A  Yes.  He was able to articulate himself and
17  he was able to make his needs known.
18     Q  Did he have any hearing deficits?
19     A  He had mild hearing deficits but it's
20  interesting because sometimes you can't even tell.
21  It's conductive and sensorial.  But it was mild.
22     Q  Did he have contractures in any of his

DEPOSITION OF RAYA KHEIRBEK
CONDUCTED ON THURSDAY, JANUARY 31, 2008

17 (Pages 65 to 6

65

1  fingers in his left hand?
2      A   He had -- let me just picture him.  He had
3  contractures of I think three fingers of the left
4  hand.  I think.
5      Q   Uh-huh.  And was his left arm flaccid?
6      A   What do you mean by flaccid?  He had some
7  movement in his left arm so it wasn't totally out of
8  function.  He had a little bit of movement.  He had a
9  little bit of -- he had movement in his fingers.
10     Q   His thumb and his pointing finger?
11     A   Yes.
12     Q   Any other fingers?
13     A   In that --
14     Q   Hand.  We're talking about the left hand.
15     A   You know, this has been long time but -- you
16  know, I've known him inside out between 2001 and 2006.
17  He could move his wrist a bit, his left wrist a bit.
18  These three were -- he could not do with the three
19  hands -- with the three fingers.  I'm sorry.  I'm
20  sorry.  I'm just trying to picture him.  His wrist can
21  passively -- you can passively move it.  Yeah.  Just a
22  little bit of movement.  But he wasn't 100 percent

66

1  dysfunctional on that side.  He had some residual
2  movement.
3      Q   Had you ever seen him lift his left hand
4  above his head?
5      A   Above his head?  No.
6      Q   Have you ever seen him lift his left elbow
7  parallel to his chin?
8      A   I don't remember.
9      Q   Had you ever seen him pick up an object
10  heavier than a pencil with his left arm?
11     A   Yes.  With those two fingers.
12     Q   What would he pick up?
13     A   A pencil.  Little cup.  You know, these
14  plastic also cups that we pass medications with.
15     Q   He could hold that?
16     A   Yeah.
17     Q   Could he bring the cup to his mouth with his
18  left hand?
19     A   I don't really remember.  I can't comment on
20  that.
21     Q   Was Benjamin Sanders able to walk?
22     A   No.  He wasn't able to walk unfortunately.

67

1  He came to us unable to walk from home.
2      Q   Was he able to use a --
3      A   But he was able to wiggle his toes.
4      Q   Was he able to use a non mechanical
5  wheelchair to move around the CNRC?
6      A   I really don't know the answer to that
7  because I have few patients who are able to wheel
8  themselves with one hand, the strong hand -- the
9  strong arm.  That would be the right for Benjamin, the
10  right side for Benjamin.  So I don't really remember
11  if we tested him for that and I cannot really answer
12  the question.
13     Q   Okay.
14     A   If he would have.  I don't know the answer
15  to that.
16     Q   Was he able to get around with a mechanical
17  wheelchair or motorized wheelchair?
18     A   Oh, yes.  Yes.  He was all over the place.
19     Q   Okay.  Now, in light of all of those
20  characteristics, did you believe that Benjamin Sanders
21  was able to self-manage himself in the event that he
22  caught on fire from smoking?

68

1      MS. WHITAKER:  Objection.
2      MR. MELTMAR:  You can answer.
3      A   I can't answer this with yes or no.  It
4  really depends on the fire.  Depends on where he's at.
5  You know, I can't answer that with yes or no.
6  BY MR. MELTMAR:
7      Q   All right.  Well, let's look at the facts
8  that we know that existed on March 19th.
9      A   That would be wonderful.
10     Q   On March 19th he was in the smoking room by
11  himself.
12     A   Okay.
13     Q   Seen smoking by a VA employee by the name of
14  Jerry Philips just minutes before they found him on
15  fire.  Was Benjamin Sanders able to self-manage
16  himself on March 19th, 2006 when he caught on fire?
17     MS. WHITAKER:  Objection.
18     A   I wasn't available that time.  I don't know
19  the answer to that.
20  BY MR. MELTMAR:
21     Q   Okay.  Well, was Benjamin Sanders able to
22  self-manage himself in the event that he caught on

ATTACHMENT 8

EXCERPTS FROM

DEPOSITION OF
JERRY LEE PHILLIPS

Case 1:07-cv-01169-ESH    Document 27-9    Filed 06/30/2008    Page 2 of 9
DEPOSITION OF JERRY LEE PHILLIPS
CONDUCTED ON THURSDAY, JANUARY 31, 2008

1 (Pages 1 to 4)

1

1    IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF COLUMBIA
3    ----------------------------x
4    MARY SANDERS, as Personal       :
5    Representative of the Estate of  :
6    BENJAMIN SANDERS,               : Civil Case No.
7         Plaintiff    :   07 1169
8         v.          :
9    UNITED STATES OF AMERICA,       :
10        Defendant.   :
11   ----------------------------x
12
13      Deposition of JERRY LEE PHILLIPS
14         Washington, D.C.
15       Thursday, January 31, 2008
16           2:17 p.m.
17   Job No.: 1-119721
18   Pages 1 - 56
19   Reported by: Alda Mandell, RPR
20
21
22

2

1       Deposition of JERRY LEE PHILLIPS, held at
2    the offices of:
3
4        VETERANS ADMINISTRATION HOSPITAL
5        50 Irving Street, Northwest
6        Washington, D.C. 20422
7        (202)745-8000
8
9       Pursuant to agreement, before Alda Mandell,
10   Registered Professional Reporter and Notary Public of
11   the District of Columbia.
12
13
14
15
16
17
18
19
20
21
22

3

1          APPEARANCES
2
3    ON BEHALF OF PLAINTIFF:
4        W. CHARLES MELTMAR, ESQUIRE
5        THE COCHRAN FIRM
6        1100 New York Avenue, Northwest
7        Suite 340 - West Tower
8        Washington, D. C. 20005
9        (202) 682-5800
10
11   ON BEHALF OF DEFENDANT:
12       CLAIRE WHITAKER, ESQUIRE
13       UNITED STATES ATTORNEY'S OFFICE
14       Civil Division
15       Assistant United States Attorney
16       555 4th Street, Northwest
17       Room E-4204
18       Washington, D.C. 20530
19       (202)514-7137
20
21
22

4

1          CONTENTS
2    EXAMINATION OF JERRY LEE PHILLIPS       PAGE
3        By Mr. Meltman              5
4
5          EXHIBITS
6        (Retained by Counsel)
7    PLAINTIFF'S                 PAGE
8    Exhibit No. 1    Statement           37
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Case 1:07-cv-01169-ESH     Document 27-9     Filed 06/30/2008     Page 3 of 9
DEPOSITION OF JERRY LEE PHILLIPS
CONDUCTED ON THURSDAY, JANUARY 31, 2008

2 (Pages 5 to 8)

5

1     PROCEEDINGS
2     JERRY LEE PHILLIPS
3     having been duly sworn, testified as follows:
4        EXAMINATION BY COUNSEL FOR THE PLAINTIFF
5     BY MR. MELTMAR:
6        Q   Good afternoon. My name's Charles Meltmar.
7     I represent the Estate of Benjamin Sanders against the
8     United States Government for his conscious pain and
9     suffering. I'm here to ask you some questions about
10    what it is that you saw and heard on the day that
11    Mr. Sanders died. Are you aware of that?
12       A   Yes.
13       Q   Have you ever been deposed before?
14       A   What's that?
15       Q   We're in a deposition right now. It's just
16    a formal question-and-answer session.
17       A   No.
18       Q   The court reporter to my right is taking
19    down everything that you're saying and I'm saying.
20       A   Okay.
21       Q   And it's important that during the course of
22    this examination that when you hear a question, that

6

1     you give me a verbal response so she can write it
2     down. Because she can't write down the nod of a head.
3     All right?
4        A   Okay.
5        Q   Also you may know an answer before I finish
6     my question but just wait until I finish speaking
7     before you talk. All right?
8        A   Yes.
9        Q   And thirdly, if you don't understand a
10    question that I ask, just ask me to rephrase it or
11    repeat it. Okay? If you don't ask me to rephrase it
12    or repeat it, I'll assume you understood my question.
13    All right?
14       A   Okay.
15       Q   Tell me about your job here. What do you
16    do?
17       A   I'm a nursing assistant. My job is to
18    assist the patients with their activities of daily
19    living. That's pretty much it.
20       Q   So are you a CNA?
21       A   Yes.
22       Q   And how long have you been a CNA at the VA?

7

1        A   Four years. Almost four years. It will be
2     four years in March.
3        Q   Prior to March 19th, did you assist Benjamin
4     Sanders with his ADL's?
5        A   Yes.
6        Q   What ADL's did you assist him with?
7        A   Dressing. Washing up, giving baths, bed.
8     Showers.
9        Q   Feeding?
10       A   Opening. Opening foods. He could feed
11    himself.
12       Q   Like when you say opening foods, what do you
13    mean by that?
14       A   Like milk, cereal.
15       Q   Got it. Could you tell me what you observed
16    about his ability to use his left arm?
17       A   I'm not sure if it was the left or right but
18    I know one of them -- one of them he had very little
19    use of.
20       Q   Could he lift that arm above his head?
21       A   Not that I'm aware of. No.
22       Q   Could he hold anything larger than a pencil

8

1     in his left hand?
2        A   No.
3        Q   Were the fingers of his left hand contracted
4     against the palm of his hand?
5        A   Yes.
6        Q   Did he generally keep his left arm in front
7     of his --
8        A   Yes.
9        Q   -- belly button, his abdomen like this?
10       A   Yes.
11       Q   So what I'm showing, just so the record's
12    clear, is his left arm would be across the front of
13    his stomach, right?
14       A   Yes.
15       Q   And his hands would be contracted, is that
16    correct?
17       A   Yes.
18       Q   Did you ever see him lift his elbow -- his
19    left elbow parallel to his shoulder?
20       A   No.
21       Q   When you got him dressed, could he help
22    guide the shirt sleeve with his left arm or did you

Case 1:07-cv-01169-ESH    Document 27-9    Filed 06/30/2008    Page 4 of 9
DEPOSITION OF JERRY LEE PHILLIPS
CONDUCTED ON THURSDAY, JANUARY 31, 2008

4 (Pages 13 to 16)

13

1  I'll say, okay we're going to stand now. I'd count to
2  three; one, two, three, we'd stand. I'd pivot him and
3  set him down.
4      Q   Was he able to stand up on his own?
5      A   Not that I'm aware of. No.
6      Q   Have you ever see him stand up on his own?
7      A   No.
8      Q   Let's talk about his right arm. Was he able
9  to move his right arm in such a way that his hand
10 could go over his head?
11     A   Yes.
12     Q   Could he move his left -- I mean right elbow
13 parallel to his right shoulder?
14     A   Yes. His right arm was functional.
15     Q   It was?
16     A   Yeah.
17     Q   How was his speech?
18     A   It was slurred. It was -- it wasn't very
19 clear. I guess after you've been around him a while,
20 you could start to understand him somewhat. But you
21 still had to listen and really pay attention to
22 understand him.

14

1      Q   How did he talk, in a loud or a soft voice?
2      A   It was loud.
3      Q   It was loud?
4      A   Yeah.
5      Q   Like how loud? Could you give me an
6  example?
7      A   He would be like -- when he'd talk to me he
8  would be like, Jerry, me and Miss -- he'd be talking
9  about another staff member -- I ran the wheelchair
10 over her leg and da da da da da. And he'd laugh.
11 Because they didn't really get along. But his voice
12 was loud. And plus you hear it a little while, you
13 get to understand him a little bit more.
14     Q   Okay. How long did you know Benjamin
15 Sanders prior to March 19th, 2006?
16     A   When he initially came -- I'm not sure how
17 long it was because he initially came -- when he got
18 to the hospital, I don't know, but when he came to our
19 side, he was there for a while before he went to the
20 other nursing -- other side of the nursing home. He
21 came to H wing first and then later on, K wing.
22     Q   What's the difference between the H and the

15

1  K wing?
2      A   We're rehab over on our side.
3      Q   Which is what side? I'm sorry?
4      A   H wing we're basically rehab and long-term
5  care.
6      Q   K wing is what?
7      A   Long-term care.
8      Q   But the H wing is rehab and long-term care?
9      A   Uh-huh.
10     Q   What wing was he in?
11     A   He initially came to H. That's where I
12 initially met him at. And K later on.
13     Q   Is there any distinction in terms of, you
14 know, what kind of residents go to H and K wing other
15 than the potential for rehab?
16     A   They have rehab and H wing -- I mean K wing
17 has hospice as well.
18     Q   K wing has hospice as well?
19     A   Right.
20     Q   Was Benjamin Sanders in hospice care?
21     A   I'm not sure what his status was when he was
22 over there.

16

1      Q   Did you ever see Benjamin Sanders smoke?
2      A   Yes.
3      Q   Okay. Can you tell me was he able to light
4  his own cigarettes?
5      A   Yes.
6      Q   What did he use to light cigarettes?
7      A   A lighter.
8      Q   Cigarette lighter?
9      A   Yes.
10     Q   Can you explain to me, because you've seen
11 him do it before, how he would light a cigarette, the
12 process of him lighting a cigarette?
13     A   He would take the cigarette, he would take
14 the pack out, shake the pack like this or hit it on
15 his leg, bring the -- sometimes he would pull the
16 cigarette out the pack and just lay it on his lap and
17 pull it out, or either he would bring the pack up to
18 his mouth and put the cigarette there, put the pack
19 down.
20     Q   And then how would he light it?
21     A   He would put the cigarette pack back into
22 either his shirt pocket or the bag -- or bag that he

Case 1:07-cv-01169-ESH    Document 27-9    Filed 06/30/2008    Page 5 of 9
DEPOSITION OF JERRY LEE PHILLIPS
CONDUCTED ON THURSDAY, JANUARY 31, 2008

5 (Pages 17 to 20)

**17**

1  used to wear, he would reach in the pouch, get the
2  cigarette lighter, and light the cigarette.
3      Q   And then what would he do with the lighter?
4      A   Stick it back in the bag or either in a
5  shirt pocket.
6      Q   Now, when he smoked, what would he do with
7  the ashes of the cigarette?  I mean how would he flick
8  the ashes?
9      A   He'd just flick them.
10     Q   On the floor, in a --
11     A   Floor, ashtrays.  Depending on what he was
12  near.
13     Q   And then how would he put the cigarette out?
14     A   Same way.  Either ashtray or just -- most of
15  the time he used the ashtray when he put them out.
16     Q   Did he carry the cigarettes with him in his
17  wheelchair?
18     A   Yeah.  He would have them on him, on his
19  person.
20     Q   Either in the black pouch or his pocket?
21     A   Yes.
22     Q   On the day that he caught on fire, did you

**18**

1  see him prior to the fire?
2      A   Yes, I did.
3      Q   And where were his cigarettes?
4      A   I'm not sure exactly where he had the
5  cigarettes but I do remember -- I do remember him
6  lighting -- I do remember him lighting a cigarette.
7      Q   Okay.
8      A   He was smoking one initially when I went in
9  the room.  And I do believe he lit another one right
10  before I left.
11     Q   Okay.  Did he tend to smoke more than one
12  cigarette at that time?
13     A   Yes.
14     Q   Now, I'd like you to focus in on March 19th,
15  okay?  Can you tell me when is last time you saw him
16  was before he caught on fire?
17     A   It was maybe four or five minutes prior.
18     Q   Tell me what you saw.
19     A   We were in the smoke room.  Actually I
20  walked in the smoke room and he was in there by
21  himself.  I set down in the corner of the room and he
22  and I was talking and he was talking to me about when

**19**

1  he used to go walking, different things.  And we
2  talked for a few minutes.  And then I said -- I looked
3  at my watch and I said, well -- I said I'll see you
4  later, Mr. Sanders, I'm going to get me some dinner.
5  I got up.  I walked out.  I went to the refrigerator,
6  got my food out, walked over to H wing, the quiet
7  room, put my food on about two minutes, and the rest
8  of the staff thought -- debating about where I got the
9  food from.  And I was working overtime that day so
10  earlier during the day me and another worker had gone
11  to a church and gotten this food.  And I remember
12  getting a flyer from that church.  While they was
13  debating I said -- I said you know what?  I said wait
14  a minute.  I can check out where I got it from.  I got
15  up, I walked back to my locker, I got the flyer out my
16  coat pocket.  I walked back down the hall.  I said I
17  might as well get me a soft drink before I go back.  I
18  walked up to the drink machines towards the atrium and
19  as I got to the opening of the atrium, I saw the nurse
20  from K wing gasp and went ah.  And when she did that,
21  I looked and that's when I saw Mr. Sanders on fire.
22     Q   What did you see at that moment?  Before you

**20**

1  went in there, what did you see when you first saw
2  him?
3      A   I saw flames, flames above his head.  He was
4  just engulfed in flames.
5      Q   What was he wearing that day?
6      A   He had on some sweat pants and like a sweat
7  top I believe.  Like a sweatsuit, pants and a hat.
8      Q   What color was the --
9      A   I want to say blue or black.  I think it was
10  blue or black.
11     Q   Do you know what it was made out of,
12  polyester or cotton?
13     A   I couldn't say.  I'd have to guess.  I
14  wouldn't know.
15     Q   Was he wearing a smoking apron --
16     A   No.
17     Q   -- at the time he was on fire?
18     A   No.
19     Q   Now, how far were you from him when you
20  first saw him?
21     A   I don't know how far that is.  I wouldn't --
22  I don't know how far that's from -- from where I wa

**21**

1  standing to where he was at.

2  Q  How many steps did you take approximately to

3  get from where you were to him?

4  A  I was running so -- I'm going to say

5  maybe -- maybe 30 feet maybe? I'm not sure.

6  Q  Okay.

7  A  Maybe 30 feet.

8  Q  Now, when you saw him on fire, what did you

9  do next?

10  A  I ran toward him. I went through the doors

11  and as I went through the doors, there was a fire

12  extinguisher to the right. I grabbed the fire

13  extinguisher, pulled the pin and attempted to

14  extinguish him and nothing happened. So the fire

15  extinguisher didn't work. I set it down, I took off

16  running back to the unit, to my unit. I opened the

17  door and I said Mr. Sanders is on fire, Mr. Sanders is

18  on fire. So we gathered -- we got blankets and I went

19  back -- as I went back, I used the blankets to try to

20  fight the fire and it just wasn't -- it wasn't

21  working. They wouldn't hold -- put it out. And

22  eventually someone came up with a fire extinguisher

**22**

1  and I just reached and grabbed it. I remember just

2  seeing red and I reached and grabbed it and put him

3  out.

4  Q  Now, did you empty that fire extinguisher?

5  A  Did I empty it?

6  Q  Yeah. Did you --

7  A  I couldn't say.

8  Q  Okay.

9  A  I was just glad it was out.

10  Q  Okay. Now, how much time elapsed from the

11  time that you tried to use the first fire extinguisher

12  to put the fire out and to the time you went to get

13  the blankets?

14  A  I couldn't say.

15  Q  Well, how far is it? If you want, we can

16  take a break and you can show me.

17  A  Yeah. That would be a good idea. You can

18  look and see for yourself. I'd have to be guessing

19  and I don't want to guess.

20  Q  Why don't we do that.

21  MS. WHITAKER: Why don't we go through the

22  whole thing and take a break and that will be the end

**23**

1  of it.

2  MR. MELTMAR: What do you mean? I mean I

3  need to see the distances that he traveled.

4  MS. WHITAKER: Now? Okay.

5  MR. MELTMAR: I mean why don't we do it. It

6  will just be easier.

7  (A recess was taken.)

8  BY MR. MELTMAR:

9  Q  What I'd like to find out now is the

10  distance from the smoking room to the microwave where

11  you heated up the food.

12  A  How would I know the distances?

13  Q  In terms of the paces.

14  A  I believe we did -- you said from where to

15  where?

16  Q  From the smoking room to the microwave where

17  you heated up the food.

18  A  I believe we did 88 or 85.

19  Q  Eighty-eight is what I put down. So how

20  many paces was it from the smoking room to the

21  microwave?

22  A  Eighty-eight.

**24**

1  Q  Okay. It's got to be on the record. Now,

2  it's my understanding that when you left Benjamin

3  Sanders, you went to get something to eat, is that

4  right?

5  A  Initially, yes.

6  Q  And where did you go to get that food?

7  A  To the locker room.

8  Q  And then from the locker room, where did you

9  go?

10  A  To the quiet room on the other side.

11  Q  In the quiet room is there a microwave?

12  A  Yes.

13  Q  Was the locker room where you kept your food

14  between the smoking room and the microwave?

15  A  Yes.

16  Q  Now, did you stop in the locker room on the

17  way to the microwave to get your food?

18  A  Excuse me?

19  Q  On the way to heat your food up in the

20  microwave, did you stop in the locker room to get your

21  food?

22  A  Yes.

DEPOSITION OF JERRY LEE PHILLIPS
CONDUCTED ON THURSDAY, JANUARY 31, 2008

7 (Pages 25 to 28)

**25**

1    Q    Okay. And after you got your food out of
2  the locker room, you went to the microwave?
3    A    Yes.
4    Q    Okay. And then from there where did you go?
5    A    Back to the locker room.
6    Q    Okay. And then when you got to the locker
7  room, what did you do?
8    A    I went in the locker room, got the flyer
9  that I went for, got some money out of my coat pocket
10 and headed towards the drink machine, which is up by
11 the atrium.
12   Q    When you got to the atrium, what did you do
13 or what did you see?
14   A    I saw the nurse from K wing gasp and looked
15 towards the smoke room. And I looked in that
16 direction as well.
17   Q    And then what did you do?
18   A    I took out running towards the smoke room.
19   Q    Okay. And when you got to the smoke room,
20 what did you do?
21   A    I reached to the right and grabbed a fire
22 extinguisher and pulled the pin and attempted to put

**27**

1  trying to put him out when I got back.
2    Q    All right. Now, where did you get the
3  blankets, what location?
4    A    I don't recall. Things were going -- I mean
5  it was -- things was happening so fast, I do not
6  remember.
7    Q    Now, when you got the blankets, where did
8  you take them?
9    A    To the smoke room.
10   Q    And what did you do with them?
11   A    I attempted to put Mr. Sanders out with
12 them.
13   Q    And did that work?
14   A    No.
15   Q    What happened with the blankets?
16   A    It was like -- it was like the flames were
17 catching to the blanket but it wasn't -- the blankets
18 wasn't burning but the flames was sticking to the
19 blankets. It really wasn't doing a lot.
20   Q    All right. And then what happened?
21   A    And then somebody came up behind me with a
22 fire extinguisher and I grabbed it and pulled the pin

**26**

1  Mr. Sanders out.
2    Q    And what happened?
3    A    Nothing happened with the fire extinguisher.
4    Q    Did you see Mr. Sanders at that time?
5    A    Yes.
6    Q    And what did he look like?
7    A    He was engulfed in flames.
8    Q    Was he moving at all?
9    A    Not that I recall.
10   Q    Was he making any noise?
11   A    Not that I recall.
12   Q    And then what did you do?
13   A    I set the fire extinguisher down and went
14 back towards the unit.
15   Q    And then where did you go from the unit?
16   A    Where did I go from?
17   Q    Once you got to the unit, what did you do?
18   A    I grabbed some blankets and ran back towards
19 the smoke room. When I got to the unit, I told the
20 rest of the staff, I said Mr. Sanders is on fire. I
21 went, I grabbed blankets. As I -- as I headed back, I
22 grabbed blankets and I put him -- I mean I started

**28**

1  and I sprayed it and put him out.
2    Q    Was anyone else in the room with you?
3    A    Another patient from K wing I recall.
4    Q    Was he in the smoking room with Mr. Sanders?
5    A    He came in at the point when I was fighting
6  with the blankets.
7    Q    Now, up to the time that you came into the
8  room with the blankets, was anyone else in that room
9  other than Mr Sanders?
10   A    Ever?
11   Q    No. From the point where you entered the
12 room with the blankets to put the fire out, up to that
13 point was there anyone else in the room?
14   A    I was aware of the other patient from K wing
15 being in there and I couldn't say, because I was too
16 busy fighting the fire, to see who was where, you
17 know.
18   Q    After you tried to put the fire out with the
19 blankets, what happened next?
20   A    Someone came up with the fire extinguisher
21 from behind me.
22   Q    And what did you do with that fire

DEPOSITION OF JERRY LEE PHILLIPS
CONDUCTED ON THURSDAY, JANUARY 31, 2008

11 (Pages 41 to 44)

**41**

1 I showed you where we went out where I backed into the
2 pole at?
3    Q   Sure.
4    A   I went through there but I didn't go
5 directly into -- when one of the people questioned me
6 I remember -- I remember going back through there.
7 But that's about it.
8    Q   Now, was there a camera, a video camera,
9 surveillance camera, outside of the smoking room at
10 the time of his burning injury?
11    A   I don't know.
12    Q   Is there one now?
13    A   Inside of there, yes.
14    Q   Inside the smoking room?
15    A   Yes.
16    Q   Can you tell me were you ever part of any
17 team that determined whether or not patients were
18 high-risk smokers? Did you ever have that
19 responsibility?
20    A   No.
21    Q   No? Have you ever been instructed on what
22 to look for when a patient is a high-risk smoker?

**42**

1    A   Not so -- no. Not really. No. I mean you
2 kind of know. You look to see if you see things,
3 holes in their clothes. Different things. That
4 wouldn't necessarily mean high risk either. That
5 would be -- that would be really basically our policy
6 for safety. That would be somebody else's area.
7    Q   Okay. Had you ever seen Benjamin Sanders
8 drop his cigarettes before he lit them, like when he
9 was trying to light one, he'd drop one?
10    A   I don't remember.
11    Q   Did you ever see him like drop his lighter?
12    A   I've seen him drop -- yeah. I've seen him
13 drop a lighter. He dropped a lighter before. I
14 mean -- sure. Him. Every other patient.
15    Q   You've seen him like lose control and let it
16 go and it fell, right?
17    A   Well, not so much lose control as when you
18 flick it -- me, when I was smoking, if you'd try to
19 flick a cigarette lighter sometimes it doesn't -- the
20 wheel on the cigarette lighter is not always as smooth
21 as it is sometimes and so you'll lose control. I mean
22 that happens to anybody that smokes.

**43**

1    Q   Sure. And I'm not commenting on this.
2    A   I'm saying okay, you're asking if I ever saw
3 that. Yeah. I've seen him do that. I've seen him
4 drop the lighter before.
5    Q   Have you ever seen him drop a pack of
6 cigarettes on his lap, like lose control of a pack of
7 cigarettes?
8    A   I've seen him lay them on his lap.
9    Q   Did you ever see a cigarette fall out of his
10 mouth before he lit it or in an attempt to light it,
11 knock it out of his mouth?
12    A   No.
13    Q   When you saw him prior to the time that he
14 caught on fire, was he wearing any oxygen? Did he
15 have an oxygen bottle with him?
16    A   Not that I recall.
17    Q   Did he have any source of ignition or flame
18 with him other than his lighter?
19    A   No. Not that I recall.
20    Q   Were there any extension cords or any form
21 of electrical circuit connected to his wheelchair the
22 last time that you saw him?

**44**

1    A   Not that I recall.
2    Q   He didn't have any explosives on him that
3 you saw at that time, did he?
4    A   Not that I recall.
5    Q   All right. Did you see his wheelchair
6 smoking or sparking at anytime prior to --
7    A   No.
8    Q   -- the time you saw him on fire?
9    A   No.
10    Q   Did he indicate in any way to you that his
11 wheelchair was malfunctioning?
12    A   No.
13    Q   Did you see him light the cigarette that he
14 lit immediately before you left the room?
15    A   I believe so.
16    Q   You did?
17    A   I'm almost sure he did.
18    Q   Did you watch him light it with his lighter?
19    A   I'm almost sure I did.
20    Q   Did the lighter malfunction in any way?
21    A   No.
22    Q   You didn't see any weird spark or flame come

Case 1:07-cv-01169-ESH    Document 27-9    Filed 06/30/2008    Page 9 of 9
DEPOSITION OF JERRY LEE PHILLIPS
CONDUCTED ON THURSDAY, JANUARY 31, 2008

13 (Pages 49 to 52

**49**

1    Q   Let me discuss two more questions. Did you
2 sign a lease to live there or --
3    A   No. I just got married and that was my
4 wife's home.
5    Q   Does she own the home?
6      MS. WHITAKER: Objection.
7      MR. MELTMAR: I just want to know if he's
8 going to move or not.
9      MS. WHITAKER: Come on. You've got his
10 address.
11 BY MR. MELTMAR:
12    Q   Do you plan on staying there for the
13 foreseeable future?
14    A   Yeah. I'm not going anywhere.
15      MR. MELTMAR: I'm done.
16      EXAMINATION BY COUNSEL FOR THE DEFENDANT
17 BY MS. WHITAKER:
18    Q   Mr. Meltmar asked you some questions about
19 your assistance. He called it an ADL and I guess that
20 means --
21    A   Activity of daily living.
22    Q   And that you assisted him. How often in

**51**

1 couldn't put a time on how long it took you to respond
2 once you saw Mr. Sanders engulfed in flames, but did
3 you have any physical impairments or conditions on
4 March 19th, 2006 that would have impaired your ability
5 to run?
6    A   No.
7    Q   And once you saw Mr. Sanders, were you
8 running?
9    A   Yes.
10    Q   And all your reactions were as fast as
11 possible?
12      MR. MELTMAR: Objection.
13    A   Yes.
14      MS. WHITAKER: I guess I don't have any
15 other questions.
16      MR. MELTMAR: Okay. Thank you very much.
17      (Signature having not been waived, the
18 deposition was concluded at 3:22 p.m.)
19
20
21
22

**50**

1 2006 did you assist him with his daily living?
2    A   I don't think I did in 2006 because he was
3 already a patient over on the other wing at that time.
4 So I don't think I did in '06.
5    Q   And how often did you speak with him?
6    A   That was whenever -- whenever -- if he
7 happened to be in the smoke room when I was in there,
8 then I smoked. Or if I'd see him outside, he'd be
9 outside smoking, we smoked and talked.
10    Q   Was it fairly often?
11    A   Yeah. It was fairly often.
12    Q   And if you had seen him smoking in an unsafe
13 manner, what were your responsibilities?
14    A   It was to stop it, correct it. Let him
15 know, let the staff know over on the side where he
16 worked, to let the nurses over there know what was
17 going on or what I witnessed.
18    Q   Did you ever see him smoking in an unsafe --
19    A   No.
20    Q   In an unsafe manner?
21    A   No.
22    Q   Now, I know you testified earlier that you

**52**

1      ACKNOWLEDGMENT OF DEPONENT
2      I, JERRY LEE PHILLIPS, do hereby acknowledge
3 that I have read and examined the foregoing testimony,
4 and the same is a true, correct and complete
5 transcription of the testimony given by me and any
6 corrections appear on the attached Errata sheet signed
7 by me.
8
9
10 _____    _____
11    (DATE)        (SIGNATURE)
12
13
14
15
16
17
18
19
20
21
22

# ATTACHMENT 9

# EXCERPTS FROM

# DEPOSITION AND EXHIBITS
OF
GREGORY COMPTON

VIDEOTAPED DEPOSITION OF GREGORY A. COMPTON, M.D.
CONDUCTED ON WEDNESDAY, MAY 28, 2008

1 (Pages 1 to 4)

---

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------
MARY SANDERS, as Personal   :
Representative of the Estate :
of BENJAMIN SANDERS,        :
                            :
       Plaintiff,    :
                     :
  -vs-        : Civil Case No.
              :  07 1169
              :
UNITED STATES OF AMERICA,   :
              :
       Defendant.    :
------------------------------

VIDEOTAPED DEPOSITION OF
GREGORY A. COMPTON, M.D.
Washington, D.C.
Wednesday, May 28, 2008
10:22 a.m.

Job No.: 1 - 129339
Pages: 1 - 173
Reported by: Paula M. Flint

---

**2**

Videotaped Deposition of GREGORY A.
COMPTON, M.D., held at the law offices of:

THE COCHRAN FIRM
1100 New York Avenue, Northwest
Suite 340 - West Tower
Washington, D.C.  20005
(202) 682-5800

Pursuant to agreement, before Paula M.
Flint, Notary Public of the District of Columbia.

---

**3**

APPEARANCES

On behalf of the Plaintiff:
  BY:  W. Charles Meltmar, Esquire
     THE COCHRAN FIRM
     1100 New York Avenue, Northwest
     Suite 340 - West Tower
     Washington, D.C.  20005
     (202) 682-5800

On behalf of the Defendant:
  BY:  Claire Whitaker, Esquire
     ASSISTANT UNITED STATES ATTORNEY
     UNITED STATES ATTORNEY'S OFFICE
     555 4th Street, Northwest
     Room E-4204
     Washington, D.C.  20001
     (202) 514-7137

ALSO PRESENT:  Scott Pickering, Videographer

*   *   *

---

**4**

CONTENTS

EXAMINATION OF GREGORY A. COMPTON, M.D.    PAGE

Mr. Meltmar         6
Ms. Whitaker        151
Mr. Meltmar         159
Ms. Whitaker        168

EXHIBITS

COMPTON DEPOSITION EXHIBIT NO.        PAGE:
(Exhibits subsequently attached
to the deposition transcript.)

1   Invoice with Attachment       13
2   Report              28
3   Smoking Risk Protocol         30

*   *   *

---

VIDEOTAPED DEPOSITION OF GREGORY A. COMPTON, M.D.
CONDUCTED ON WEDNESDAY, MAY 28, 2008

8 (Pages 29 to 32)

29

1    A.    I think it was the burn doctor at Hopkins,
2  if I'm not mistaken.
3    Q.    Do you agree with the findings that
4  Dr. Milner put into his report?
5    A.    Yes.  In fact, what he did for me — I was
6  trying to be very conservative in my estimation of
7  the burn surface area in this particular gentleman.
8  I had photographs and I had testimony, but I
9  never — I didn't examine the patient, so I was
10  trying to be conservative.  So I followed the lead,
11  if you will, of Dr. Lozano.  I think he said
12  55 percent or thereabouts.  But Dr. Milner said 90,
13  maybe 100 percent.
14        It looked like from the photographs that
15  Mr. Sanders was burned greater than 55 percent.  So
16  that was the piece that, among other things in his
17  report, that I — it gave me some reassurance that
18  my greater-than-55-percent estimate had some basis.
19    Q.    Okay.  Now, let me see here.  Did you
20  review the policies and procedures that were in
21  place at the time of Benjamin Sanders' residency?
22    A.    Yes.  I have in my hand the policies that

30

1  I reviewed.
2    Q.    Could I take a quick look at those?
3    A.    Yes.  While you're doing that, I'm going
4  to check the box, make sure there's not another one,
5  but I'll hand this to you.
6    Q.    All right.  Now, is that a complete set of
7  the policies and procedures you've looked at in this
8  case?  The reason why I ask you is I just quickly
9  glanced through it and I don't know that I saw —
10  here it is, smoking policy.
11        What we're going to do is mark this now
12  and then we'll make a copy of it later.  All right?
13    A.    I understand.  Thank you.
14        (Document marked Deposition Exhibit 3 for
15  identification and subsequently attached to the
16  deposition.)
17        MS. WHITAKER:  Are you going to ask him
18  questions about it?
19        MR. MELTMAR:  I'm not.  Not now.  I'm
20  going to ask him questions in detail once we get a
21  copy.
22  BY MR. MELTMAR:

31

1    Q.    I just want to make sure that Compton
2  Exhibit 3 is a complete list of the protocols,
3  smoking policies and other documents related to the
4  assessment and interventions and treatments of
5  patients smoking at the VA during Benjamin Sanders'
6  residency.
7    A.    Yeah, this is what I was provided.
8    Q.    Fine.  It's not a trick question.  I just
9  wanted to make sure we got it clear for the record.
10    A.    I understand.  Thank you.
11    Q.    I'm going to obviously ask you what your
12  opinions are in this case.  I just want to make sure
13  that you have reviewed all of the materials that you
14  need to give your final opinion in this case.
15    A.    I feel comfortable that I have enough
16  material to render the opinions that I've
17  articulated here.  If there's other material that
18  comes forward and it changes my opinion, I would
19  be — everyone would know about it.
20    Q.    I got it.
21        In your field of expertise, which I'm
22  going to assume for the sake of this case is

32

1  geriatrics -- obviously you have expertise in wound
2  care, but that's not an issue in this case, correct?
3    A.    Correct.  It's in -- geriatrics in the
4  care of nursing home patients.
5    Q.    What textbooks or guidelines do you
6  believe are authoritative?
7    A.    I think guidelines are helpful in guiding
8  practice, but I don't — and textbooks and training
9  and literature is useful in understanding the
10  changes in practice, but authoritative is a word
11  that I don't use.
12    Q.    So you don't know of any textbooks or
13  guidelines that are authoritative?
14        MS. WHITAKER:  Objection.
15    A.    It's not that -- you know, I know the
16  literature.  I know – but in terms of
17  authoritative, I think authoritative pins one down
18  so that it doesn't give you any room to manage
19  individual patients.  So I don't use the term
20  "authoritative" in – in this kind of context.
21    Q.    Can you identify any leading authors in
22  the field of geriatrics?

VIDEOTAPED DEPOSITION OF GREGORY A. COMPTON, M.D.
CONDUCTED ON WEDNESDAY, MAY 28, 2008

9 (Pages 33 to 36)

---

**33**

1    A.   Oh, my goodness. Thomas Fenukin, George

2  Tower. David Johnson. Alan Altman. I mean --

3    Q.   All these are leading authors in the

4  area --

5    A.   Yes.

6    Q.   -- area of geriatrics, correct?

7    A.   Yes. Hopkins, Washington Hospital Center,

8  Maryland University.

9    Q.   That's where all these --

10    A.   Yeah. And University of St. Louis. It's

11  not Washington, but University of St. Louis. Those

12  names came out of those big geriatric centers.

13    Q.   Can you identify any leading texts in the

14  field of geriatrics?

15    A.   I think that the most useful and often

16  edited guide in tool -- learning tools of Geriatric

17  Review Syllabus. It's called GRS. And it's a

18  textbook that's edited every two years. And it's

19  used to help train people in geriatrics, but it

20  keeps you abreast of what's going on. And it's

21  edited more rapidly and changes -- updated more

22  rapidly than, say, the Cassell, C-A-S-S-E-L-L,

---

**34**

1  textbook and other things. Textbooks tend to be

2  outdated.

3    Q.   Rather quickly?

4    A.   Yes.

5    Q.   You had said the GRS. Is that correct?

6    A.   Yeah, capital G, capital R, capital S.

7  And it stands for Geriatric Review Syllabus. And

8  it's an 8-and-a-half-by-11, two-inch book,

9  paperbound, and it has question modules and answers

10  to the questions. And it comes out every two years.

11    Q.   To your knowledge, was the VA CNRC JCAHO

12  accredited during Benjamin Sanders' residency?

13    A.   Yes. In 2005, October, I went on to their

14  Website and found that it was JCAHO accredited.

15    Q.   Do you believe that JCAHO in part

16  establishes a standard of care that applied to the

17  VA CNRC during Benjamin Sanders' residency?

18    A.   No.

19    Q.   You don't believe JCAHO has anything to do

20  with the standard of care in this case?

21    A.   No.

22    Q.   Do you believe that the CNS guidelines

---

**35**

1  have established -- or let me rephrase the question.

2    Do you believe OBRA regulations in part

3  established the standard of care that applied to the

4  VA CNRC during Benjamin Sanders' residency?

5    A.   No. The OBRA guidelines are for more

6  fiscal sort of guidance.

7    Q.   What do you believe established the

8  standard of care for the VA CNRC during Benjamin

9  Sanders' residency?

10    A.   In all aspects of his care?

11    Q.   Well, as it relates to the issues in this

12  case.

13    A.   Oh, the burn issues?

14    Q.   Yes.

15    A.   And assessment of a smoker?

16    Q.   Correct.

17    A.   Interestingly there is no national

18  standard as how to best assess a smoker. The

19  standard would be for the providers to identify

20  who's at high risk and then, based on the level of

21  risk, modify the patient's environment or control

22  the smoking implements.

---

**36**

1    Q.   Just we'll get this out of the way.

2    You would agree that had Benjamin Sanders

3  been identified as a high-risk smoker -- in other

4  words, assuming for the sake of these questions that

5  Benjamin Sanders was a high-risk smoker on March 19

6  2006 -- the standard of care would have required

7  that he either be supervised while he was smoking or

8  smoking materials taken from him?

9    MS. WHITAKER: Objection.

10    A.   Yes -- yeah, if we assume that he had been

11  identified as a high-risk smoker --

12    Q.   All right.

13    A.   -- that he would have had -- somebody

14  would have had to have been with him or, even a

15  higher level, they would control the cigarettes and

16  the lighters. I think I'm answering your question.

17    Q.   Yeah, you are. So let's just get this

18  really clear for the record.

19    On March 19, 2006, if Benjamin Sanders had

20  been identified as a high-risk smoker -- and in fact

21  assuming that he was a high-risk smoker for the

22  purpose of this question -- the standard of care

---

VIDEOTAPED DEPOSITION OF GREGORY A. COMPTON, M.D.
CONDUCTED ON WEDNESDAY, MAY 28, 2008

15 (Pages 57 to 60)

**57**

1    Q.    Do you agree that documentation is
2  important?
3    A.    Yes.
4    Q.    What is the purpose of documentation?
5    A.    You've done a very -- the last four or
6  five questions have pretty much defined. To
7  communicate among providers, to document
8  contemporaneously patients' status that you may not
9  remember one day to the next.
10       Your last four questions, very articulate
11  description of what the chart's for.
12    Q.    What is the purpose of performing an
13  assessment on a resident?
14    A.    In a general sense I guess you're asking
15  me.
16    Q.    Yes.
17    A.    Assessments are usually done in domains.
18  I mean you do it when one does a history and
19  physical, you assess the entire patient: history,
20  physical, examination, laboratory.
21       But if you assess a domain it's to try to
22  determine abnormalities in that particular domain.

**58**

1    Q.    Like, for example, a nutritional
2  assessment would determine whether or not the
3  patient is nutritionally compromised?
4    A.    Yeah. Their height, their weight, maybe
5  some blood tests. Their appearance, their -- the
6  muscle mass, yes.
7    Q.    Would you agree with me that assessments
8  should be documented in the chart?
9    A.    If the assessment's done it should be
10  documented.
11    Q.    So if a skin assessment's done it should
12  be documented, correct?
13    A.    Correct.
14    Q.    And if a fall assessment is done it should
15  be documented, correct?
16    A.    Correct. Again, the whole -- the old
17  concept of charting by exception. I mean you can't
18  document everything, you would become psychotic
19  writing all the false negatives down.
20    Q.    Right. But in terms of assessing
21  residents for risks for falls or skin breakdown or
22  even elopement, you would agree with me that the

**59**

1  standard of care requires that those assessments be
2  documented in the chart?
3    A.    If they're done.
4    Q.    If they're done?
5    A.    Right.
6    Q.    Now, would you agree with me that
7  smoking risk assessment needs to be documented in
8  the chart?
9    A.    No.
10    Q.    And why not?
11    A.    Again, it goes back to -- if it's done and
12  a particular facility has the assessment and the
13  policy says you should do this, you know, fill out
14  this form, just like you would for -- nursing homes
15  have a Braden and the nurse's job on admission is to
16  fill out the Braden. But there's no national
17  standard that says you must use a form or a certain
18  form or even certain domains of assessment.
19    Q.    With the exception -- I mean we're not --
20  getting ahead of myself.
21       Let's exclude the use of any assessment
22  tool for smoking risks. You would agree with me

**60**

1  that if an assessment is done for a smoking risk, it
2  should be documented in the chart?
3    A.    If a patient is identified as a high-risk
4  smoker, that should be documented and action taken.
5    Q.    Now, let's get back to my skin breakdown
6  hypothetical.
7       If a resident is not at risk for skin
8  breakdown, it's your testimony that the assessment
9  need not be documented in the chart?
10    A.    If you've done the assessment and there's
11  a tool that's required by the facility, it should be
12  in the chart. The question is -- I guess I'm not
13  fully understanding the question.
14    Q.    You would agree with me that a resident
15  upon admission to a nursing home needs to have a
16  skin risk assessment completed, correct?
17    A.    It's part of the full multi-dimensional
18  assessment of a patient.
19    Q.    Now, you would agree with me that not
20  every resident in a nursing home is at risk for skin
21  breakdown, correct?
22    A.    That is correct.

VIDEOTAPED DEPOSITION OF GREGORY A. COMPTON, M.D.
CONDUCTED ON WEDNESDAY, MAY 28, 2008

29 (Pages 113 to 116)

**113**

1  national standard of care that existed during
2  Benjamin Sanders' residency?
3      A.   Well, I don't believe there is an
4  articulated national standard.
5      Q.   So in other words, you'd agree with me
6  that an unsafe smoker needs to have -- needs to
7  be supervised while they're smoking, correct?
8      A.   Yes.
9      Q.   But how one determines or how a facility
10  determines whether a resident is an unsafe smoker or
11  safe smoker is dependent upon a facility's own
12  practices and not a national standard.  Is that what
13  you're testifying to?
14      A.   In essence there is not one national
15  standard that anyone can identify to say this is --
16  well, let me state it this way.
17          The national standard is, using their
18  judgment to determine who the unsafe smokers are and
19  act on it.  There's not a documentable,
20  well-qualified standard.
21      Q.   All right.  Now, would you agree with me
22  that individuals that have physical impairment are

**114**

1  at increased risk for smoking-related injuries?
2      A.   Yeah, those are -- yes.
3      Q.   Would you agree with me that residents
4  that have cognitive deficits are at increase for
5  smoking-related injuries?
6      A.   Yes, and those are the things you take
7  into account when you're -- when you're doing the
8  assessment.
9      Q.   Now, you didn't mention those two factors
10  or categories when you enunciated the five factors
11  that helped you determine whether or not Mr. Sanders
12  was a safe or unsafe smoker, correct?
13      A.   Not with those words.  I guess it's just
14  buried in the -- in the assessment.  In other words,
15  if someone had a physical impairment that didn't
16  allow them to manage a smoking task, that physical
17  disability would preclude them from smoking safely.
18  You know, a tremor or --
19      Q.   Paralysis?
20      A.   -- discoordination.  You know, they
21  couldn't get the cigarette to their mouth, that kind
22  of thing.

**115**

1          So I -- I didn't use the general terms, I
2  used specific acts that would be -- that would be
3  identified to put them in a category of safe or
4  unsafe.
5      Q.   How about this.  What about an ability to
6  self-manage a fire crisis or fire incident started
7  by dropped smoking materials, is that a factor that
8  comes into play?
9      A.   That's something that a provider may take
10  into account, yes.
11      Q.   Well, is -- is the ability of a resident
12  to self-manage themself in the event they catch on
13  fire from smoking a factor that you believe is
14  relevant in determining whether or not someone is a
15  safe or unsafe smoker?
16      A.   That I believe, yes.
17      Q.   You do believe that, all right.
18          Now -- we might as well just do this now.
19  Could Benjamin Sanders call for help?
20      A.   We don't know the volume of his voice, but
21  he could shout out or -- or make audible --
22      Q.   Noises?

**116**

1      A.   -- noises.
2      Q.   Could he use a fire extinguisher to put
3  out a fire?
4      A.   No.  I'm sorry, I interrupted you.
5      Q.   No, no.  Could he use a fire extinguisher
6  to get -- to put out the fire?
7      A.   No.
8      Q.   Could he get out of his wheelchair without
9  assistance?
10      A.   We talked about this earlier.  I think
11  this is consistent with my earlier answer, that I
12  believe he could have thrown himself out of the
13  wheelchair.
14      Q.   Could he -- could he throw himself out of
15  the wheelchair to the ground and roll to put the
16  fire out?
17          MS. WHITAKER:  Objection.
18      A.   No.
19          THE WITNESS:  I'm overtalking.  I'm sorry.
20      A.   I don't believe he could roll like you see
21  in Boy Scout training, where you're supposed to
22  roll -- drop, roll, whatever that thing is.  He

VIDEOTAPED DEPOSITION OF GREGORY A. COMPTON, M.D.
CONDUCTED ON WEDNESDAY, MAY 28, 2008

37 (Pages 145 to 148)

145

1    that area. But again, I didn't look for, you
2    know -- there are often errors in care that don't
3    lead to harm. I didn't look for all those.
4        MR. MELTMAR: Let me just take a
5    five-minute break. If you want to ask him some
6    questions --
7        MS. WHITAKER: Oh, no. I'll wait until
8    you're finished.
9    BY MR. MELTMAR:
10       Q.   Let's go to your -- your opinion -- your
11   report on page three.
12       A.   I have it.
13       Q.   Number one, you state that there's no
14   national standard that requires a use of a
15   specialized form to assess hospital patients or
16   nursing home residents for safe smoking, right?
17       A.   Yes.
18       Q.   But there is a national standard that
19   requires that facilities assess a resident in
20   regards to smoking risk or smoking injuries,
21   correct?
22       A.   Yeah. I do believe that they are -- that

146

1    they have a duty to identify those high-risk smokers
2    and in some form protect those high-risk smokers.
3        Q.   On number six you say Mr. Sanders had a
4    hospital admission on 1/22/06 and was discharged
5    back to the nursing home on 1/25/2006. "He was
6    hypoxic during that stay and was thought to have had
7    pneumonia."
8        Was he hypoxic due to the pneumonia?
9        A.   Yes, that's my understanding.
10       Q.   And can you tell me whether or not
11   Mr. Sanders had decreased cognitive function as a
12   result of that hypoxia?
13       A.   Permanent?
14       Q.   Temporary.
15       A.   Temporary, yes.
16       Q.   Number eight, you say nurse practitioner
17   Ashraf Alehossein testified based on her knowledge
18   of the patient, he could self-manage in case of a
19   fire. Do you see that?
20       A.   Eight?
21       Q.   Numbered paragraph eight.
22       A.   Oh, there it is. Sorry.

147

1        Yeah, that was -- that's -- I wrote this
2    contemporaneous with reading her deposition.
3        Q.   Okay, I got it. Then you would agree with
4    me that Nurse Practitioner Alehossein couldn't
5    identify what he could do to self-manage himself?
6        MS. WHITAKER: Objection, asked and
7    answered.
8        A.   Not that I recall sitting here exactly,
9    that she gave specifics. But if it got down to nut
10   cutting I'd have to read her deposition again.
11       Q.   Would you agree with me that the medical
12   director is responsible for the medical and nursing
13   care that's provided to residents in a nursing
14   facility?
15       A.   Yeah, she's one of the parties that are
16   responsible.
17       Q.   And would you agree with me that she does
18   not recall either way if Mr. Sanders had the ability
19   to self-manage himself in the case of a fire?
20       A.   That's how I read her testimony. That's
21   why I put it in my report.
22       Q.   Would you agree with me that Dr. Kheirbak

148

1    deviated from the standard of care in not knowing
2    whether or not he could self-manage himself in the
3    event of a fire?
4        A.   No.
5        Q.   And why not?
6        A.   It goes back to my previous answer, is
7    that their assessment -- by "their" meaning the team
8    assessment was global and that there's no national
9    standard that says that component has to be in
10   the -- in the assessment.
11       Q.   In other words, Dr. Kheirbak allowed and
12   knew that Mr. Sanders kept cigarettes and lighters
13   on himself, but she was unaware of his ability to
14   self-manage himself in the event of a smoking
15   mishap, correct?
16       MS. WHITAKER: Objection.
17       A.   I don't know if she was unaware, but she
18   didn't articulate that she had assessed his ability
19   to manage.
20       Q.   Is it -- is it appropriate for a medical
21   director and attending physician of a nursing home
22   resident to not know whether or not one of their

VIDEOTAPED DEPOSITION OF GREGORY A. COMPTON, M.D.
CONDUCTED ON WEDNESDAY, MAY 28, 2008

39 (Pages 153 to 156)

153

1    action's taken after that you're not saying that
2    there's a set way of approaching it?
3       A.    No, I -- yeah, I think that's a clear way
4    of articulating what I was trying to say.
5       Q.    And then you testified about the JCAHO
6    standard not being a national standard. I believe
7    that's what you said.
8       A.    Yes, I don't believe JCAHO's -- here's the
9    funny -- the term that JCAHO uses for their rules
10   are standards. And in legal proceedings we do talk
11   about standards of care. So the problem with JCAHO
12   as we talk about it, is that we're using the word
13   "standard."
14         So let's -- JCAHO has guidelines or rules
15   and they call them standards. So I believe that
16   JCAHO's rules, open paren standard close paren,
17   don't define the standard of care.
18      Q.    But isn't it correct that JCAHO does say
19   precisely what you've identified as the standard of
20   care, that high-risk smokers should be identified?
21      A.    Yeah. JCAHO's standard for the smoking
22   says identify high risk.

154

1       Q.    And that's all?
2       A.    And they don't tell you how. And the
3    other thing is that JCAHO -- the VA passed JCAHO
4    survey in October of 2005. So they didn't find any
5    deviations from their rules in October of 2005 at
6    the VA there.
7       Q.    So if JCAHO is considered a national
8    standard, they met the JCAHO standard?
9       A.    If, that's your hypothetical. I don't
10   believe that any of those bodies define the standard
11   of care. But if that will be considered, and that's
12   hypothetical, the standard of care, they met it
13   because that's a JCAHO rule.
14      Q.    Well, assuming for a moment that the JCAHO
15   standard is exactly what you've articulated the --
16   as the national standard, then by passing the JCAHO
17   survey they have met the national standard for
18   long-term care facilities in the smoking area?
19          MR. MELTMAR: Objection.
20   BY MS. WHITAKER:
21      Q.    Correct, or not?
22      A.    I would agree with that statement.

155

1       Q.    And they did pass it --
2          MR. MELTMAR: Objection.
3    BY MS. WHITAKER:
4       Q.    -- only a few months before?
5       A.    Yes. I saw that on their Website.
6       Q.    Now, you were asked some questions about
7    what went into the factors that you considered that
8    led you to your expert opinion that Mr. Sanders was
9    a safe smoker, and you mentioned being able to
10   manage the task of smoking, and I won't repeat the
11   five different factors. And then Mr. Meltmar noted
12   that you had mentioned cognitive and -- and physical
13   issues and then you talked about that.
14         But also, wasn't the fact that, at least
15   in your report it appears as if the fact that
16   Mr. Sanders was assessed on numerous occasions by
17   multiple providers and not found to be an unsafe
18   smoker, something that went into your analysis?
19          MR. MELTMAR: Objection.
20      A.    Yeah, Mr. Sanders was --
21          MS. WHITAKER: What's the basis?
22          MR. MELTMAR: Yeah. There's not a single

156

1    sheet of paper, pursuant to your own expert's
2    testimony, that there was a smoking assessment done.
3          MS. WHITAKER: Just give me a one-word
4    objection. That's all. What was it, speculation?
5    What is it?
6          MR. MELTMAR: You're assuming facts not in
7    evidence.
8    BY MS. WHITAKER:
9       Q.    Do you have -- well, go ahead and answer.
10      A.    Can you ask the question again? I'm
11   sorry. Or to repeat the question?
12      Q.    You did take into consideration the fact
13   that on multiple times through this multi -- this
14   dimensional review process that the VA had in place,
15   that he was assessed and -- by multiple providers
16   and found -- not found to be an unsafe smoker?
17          MR. MELTMAR: Objection.
18      A.    Correct. Correct. He was -- he was
19   multidimensionally assessed by multiple providers,
20   and they actually had formal meetings about him, and
21   at no time during those assessments was he
22   designated an unsafe smoker.

VIDEOTAPED DEPOSITION OF GREGORY A. COMPTON, M.D.
CONDUCTED ON WEDNESDAY, MAY 28, 2008

39 (Pages 153 to 156)

153

1  action's taken after that you're not saying that
2  there's a set way of approaching it?
3      A.  No, I -- yeah, I think that's a clear way
4  of articulating what I was trying to say.
5      Q.  And then you testified about the JCAHO
6  standard not being a national standard.  I believe
7  that's what you said.
8      A.  Yes, I don't believe JCAHO's -- here's the
9  funny -- the term that JCAHO uses for their rules
10  are standards.  And in legal proceedings we do talk
11  about standards of care.  So the problem with JCAHO,
12  as we talk about it, is that we're using the word
13  "standard."
14      So let's -- JCAHO has guidelines or rules
15  and they call them standards.  So I believe that
16  JCAHO's rules, open paren standard close paren,
17  don't define the standard of care.
18      Q.  But isn't it correct that JCAHO does say
19  precisely what you've identified as the standard of
20  care, that high-risk smokers should be identified?
21      A.  Yeah.  JCAHO's standard for the smoking
22  says identify high risk.

154

1      Q.  And that's all?
2      A.  And they don't tell you how.  And the
3  other thing is that JCAHO -- the VA passed JCAHO
4  survey in October of 2005.  So they didn't find any
5  deviations from their rules in October of 2005 at
6  the VA there.
7      Q.  So if JCAHO is considered a national
8  standard, they met the JCAHO standard?
9      A.  If, that's your hypothetical.  I don't
10  believe that any of those bodies define the standard
11  of care.  But if that will be considered, and that's
12  hypothetical, the standard of care, they met it
13  because that's a JCAHO rule.
14      Q.  Well, assuming for a moment that the JCAHO
15  standard is exactly what you've articulated the --
16  as the national standard, then by passing the JCAHO
17  survey they have met the national standard for
18  long-term care facilities in the smoking area?
19      MR. MELTMAR:  Objection.
20  BY MS. WHITAKER:
21      Q.  Correct, or not?
22      A.  I would agree with that statement.

155

1      Q.  And they did pass it --
2      MR. MELTMAR:  Objection.
3  BY MS. WHITAKER:
4      Q.  -- only a few months before?
5      A.  Yes.  I saw that on their Website.
6      Q.  Now, you were asked some questions about
7  what went into the factors that you considered that
8  led you to your expert opinion that Mr. Sanders was
9  a safe smoker, and you mentioned being able to
10  manage the task of smoking, and I won't repeat the
11  five different factors.  And then Mr. Meltmar noted
12  that you had mentioned cognitive and -- and physical
13  issues and then you talked about that.
14      But also, wasn't the fact that, at least
15  in your report it appears as if the fact that
16  Mr. Sanders was assessed on numerous occasions by
17  multiple providers and not found to be an unsafe
18  smoker, something that went into your analysis?
19      MR. MELTMAR:  Objection.
20      A.  Yeah, Mr. Sanders was --
21      MS. WHITAKER:  What's the basis?
22      MR. MELTMAR:  Yeah.  There's not a single

156

1  sheet of paper, pursuant to your own expert's
2  testimony, that there was a smoking assessment done.
3      MS. WHITAKER:  Just give me a one-word
4  objection.  That's all.  What was it, speculation?
5  What is it?
6      MR. MELTMAR:  You're assuming facts not in
7  evidence.
8  BY MS. WHITAKER:
9      Q.  Do you have -- well, go ahead and answer.
10      A.  Can you ask the question again?  I'm
11  sorry.  Or to repeat the question?
12      Q.  You did take into consideration the fact
13  that on multiple times through this multi -- this
14  dimensional review process that the VA had in place,
15  that he was assessed and -- by multiple providers
16  and found -- not found to be an unsafe smoker?
17      MR. MELTMAR:  Objection.
18      A.  Correct.  Correct.  He was -- he was
19  multidimensionally assessed by multiple providers,
20  and they actually had formal meetings about him, and
21  at no time during those assessments was he
22  designated an unsafe smoker.



**OPENDELTA**
CONSULTING, Inc.
Internal Medicine
Geriatric Medicine
Wound Care

GREGORY A. COMPTON, MD
2781 Westminster Rd.
Ellicott City, MD  21043
410.303.9972
gacompton@comcast.net

April 28, 2008

Claire Whitaker, Esquire
United States Attorney's Office
District of Columbia
555 4th Street, NW
Room E-4204
Washington, DC 20530

RE: Mary Sanders v. United States
    Civil Action No. 07 1169

Dear Ms. Whitaker:

I have been a duly licensed physician in the United States since 1978. I received my
undergraduate degree in Engineering from the University of Virginia, Charlottesville. VA in
1973. I graduated from Howard University College of Medicine with a Doctor of Medicine
degree in 1976. I completed a three-year residency in Internal Medicine in 1979. I became
Board certified in Internal Medicine by the American Board of Internal Medicine in 1980. I
became Board certified in Geriatric Medicine with a Certificate of Added Qualifications in
Geriatric Medicine in 1988, the first year this certification was offered. I am in good standing
with these Boards and my status is current.

I am a certified Medical Director by the American Medical Director's Association. I am a
certified Wound Specialist by the American Academy of Wound Care. I have been in active
practice of Geriatric and Internal Medicine continuously since 1979.

I have professional training, extensive experience and possess knowledge in the medical and
nursing care of complex hospitalized and nursing home patients as well as special knowledge
and training in wound care. I have cared for complex medical patients continuously since 1979.

I spend less than ten percent of my professional time reviewing legal cases for plaintiffs and
defendants. I have given 21 depositions as an expert since 2003 and testified in five trials since
20005.

In preparation for the opinions expressed herein I have reviewed the following documents and
photographs:
1. Medical Records from Washington DC VA medical center printed from VISTA.
2. Report of Richard G. Stefanacci, DO of the USP Health Policy Institute dated 2/23/2008.
3. Reports of Ilene Warner-Maron, PhD, RN, C dated 11/27/2006, 12.24/2006 and
   2/22/2008.

4. Report of Daniel D. Lozano, MD dated 10/12/2007 and 2/25/2008.
5. Reports of David M. Hammerman, Fire Protection Engineer, PE dated 12/26/2006 and 2/28/2008.
6. Autopsy Report and photographs conducted by Office of Chief Medical Examiner, Government of the District of Columbia March 20, 2006.
7. Metropolitan Police Department Death Report dated 3/20/2006.
8. Metropolitan Police Department Incident Report dated 12/19/2007
9. VA CNRC Smoking Policy (CRNC Policy Memorandum No. 19) and other related Policies.
10. Department of Veterans Affairs Medical Center, Washington, DC Nursing Service Smoking Risk Protocol, Approved 10/204 and updated 10/2006.
11. Metropolitan Police Department Death Report
12. Various Photographs taken by MPD.
13. Deposition testimony of William Kao, MD taken March 17, 2008.
14. Nursing Home Resident Smoking Policies, an unpublished article written by Richard G. Stefanacci, DO
15. Deposition testimony of Frances B. Henderson taken December 11, 2007.
16. Deposition testimony of Sarah M. Colvin,MD taken December 13, 2007.
17. Deposition testimony of Raya Kheirbek taken 1/31/2008.
18. Deposition testimony of Jerry Lee Philips taken 1/31/2008.
19. Deposition testimony of Edita MICU taken 1/30/2008.
20. Deposition testimony of Sarah Reese-Stremtan, MD taken 3/5/2008.
21. Deposition testimony of Cleveland Walls taken 3/5/2008.
22. Deposition testimony of Robert Carnevale taken 1/30//2007.
23. Deposition testimony of Scott Burgoon taken 1/10/2007.
24. Deposition testimony of David M. Hammerman taken 4/16/2008.
25. Deposition testimony of Daniel D. Lozano, MD taken 4/15/2008.
26. Deposition testimony of Richard Stefanacci, DO taken 4/21/2008

**Pertinent Background Information**

Mr. Benjamin Sanders was 64 years old at the time of his death on 3/19/2006. He had been a resident of the VA CNRC. His medical providers had known him as early as 2001. He had a left hemiparesis due to a previous right MCA stroke. Additional diagnoses included: Diabetes, Type II on insulin, hypertension, Chronic Obstructive Lung Disease with continued cigarette smoking, Monoclonal Gammopathy, chronic renal failure, seizure disorder without any recent seizures and Bullous Pemphigoid. Additionally the record states that he had mild cognitive deficit (MMSE 26/30 on 2/27/2006), that he had garbled speech and was able to operate a motorized wheelchair without difficulty.

There was no mention in the medical records that Mr. Sanders had a progressive dementia such as Alzheimer 's Disease. On an assessment dated 2/27/2006, signed by Sonika Pandey, MD he "had decision making capacity"; indicating that he was his own agent. On his last monthly assessment, on 3/3/2006 Mr Sanders was continent of bowel and incontinent of bladder, but could use a urinal. He could feed himself a soft diet, only needing set-up of his trays.

Gregory A. Compton, MD

Benjamin Sanders Report
Page 2

A Nurse Practitioner and a physician formally assessed Mr. Benjamin Sanders on at least a monthly basis. These providers were full time employees of the VA. There was an interdisciplinary care team process in place at the CNRC. No care provider deemed him an unsafe or high-risk smoker. He was permitted to smoke unsupervised. I saw no episodes of smoking accidents or attempts to smoke in other than designated areas. There were no documented incidents where ash or cigarettes were dropped on his clothing or chair. He was not using oxygen at the time of the fire and no oxygen tank was in the smoking area.

He chose to smoke against the advice of his doctor. His family provided the cigarettes and lighters. There is no mention in medical record that any family member expressed concern to staff about unsafe smoking practices by Mr. Sanders. The family was invited to, and often attended quarterly team conferences where care plans were discussed the interdisciplinary team.

**Brief Summary of Pertinent Autopsy Findings:**

Mr. Sanders had second and third degree burns over at least 55% of his body as autopsy photos demonstrate. The medical examiner did not estimate the percentage of body surface area burned. Mr. Sander's carboxy-hemoglobin was 3%, suggesting that he inhaled the products of combustion for a short period of time. The lungs were slightly heavier than normal, but were not filled with fluid. The upper airway was edematous; the epiglottis and the trachea showed signs of thermal injury. There were no autopsy findings to suggest another cause of death other than the fire (i.e. acute stroke or heart attack).

**Conclusions**

I have analyzed the above listed materials in this matter. Based on the analysis I conclude, to a reasonable degree of medical certainty, that:

1. There is no national standard that requires the use of a specialized form to assess hospital patients or nursing home residents for safe smoking.
2. Neither the CNRC at the VA in Washington, DC nor JCAHO, an accrediting agency for LTC facilities require the use of a specialized form or format to screen for unsafe smokers. Each resident is assessed individually for clinical factors that impact smoking safety. There is no template in the VA electronic medical record to assess for safe (or unsafe) smoking behaviors.
3. The level of attention and medical supervision of residents at the Washington, DC CNRC is more robust than in a community nursing home in that the nurse practitioners and doctors are on site all day and employed by the system. Through daily observation and interaction, the providers had detailed knowledge of the residents under their care. This fact lends support to the testimony that if the medical and nursing staff felt Mr. Saunders to be an unsafe smoker, they would have acted.
4. Mr. Saunders was frequently assessed by many members of the geriatric healthcare team while a resident at the CNRC. There are no medical record entries or deposition testimony that states he was an unsafe smoker.

Gregory A. Compton, MD

Benjamin Sanders Report
Page 3

5. There is no evidence in the medical record that Mr. Sanders had functionally or cognitively declined leading up to the incident of 3/19/2006. Mr. Saunders's cognitive impairment was vascular in nature and not progressive.

6. Mr. Sanders had a hospital admission on 1/22/06 and was discharged back to the nursing home on 1/25/2006. He was hypoxic during that stay and was thought to have had pneumonia. He returned to his baseline state after that event.

7. Mr. Sanders had been smoking in the CNRC, without incident, for at least one year prior to 3/19/2006. He had the ability to manage the active smoking task. Therefore it follows that he had the mental capacity to find the cigarette, put it in his mouth, find the lighter, and light the cigarette. It also follows that he was able to safely dispose of the ash and extinguish the smoking device. He had the capacity to know to smoke only in designated smoking areas and complied with the rule.

8. Mr. Sanders had full use of his right hand and arm such that he could operate a motorized wheelchair and manage the smoking task. There was no indication that he could not self-manage a smoking mishap such as dropped ash or dropped cigarette. Nurse practitioner Ashraf Alehossein testified that, based on her knowledge of the patient, he could self manage in case of a fire. Dr. Raya Kheirbek, the unit Medical Director, does not recall either way if she assessed Mr. Sanders as to his ability to self-manage in case of a fire.

9. Given that he was not deemed an unsafe smoker and could handle a smoking mishap, Mr Sanders did not require staff supervision while smoking.

10. Mr. Sanders had intact path-finding ability. He could, without assistance, once in his motorized chair, move about the facility and find the smoking room/deck. Given the use of his right hand and the capacity to operate the chair, there is no reason to suspect that Mr. Saunders could not have motored to an area with staff if there was smoldering fire in his chair.

11. The Plaintiff's fire expert is of the opinion that the fire started on the patient's left side in the cushion. This would have allowed Mr. Sanders to use his right hand to operate the chair and move out of the room at the start of the smoldering fire process.

12. The most likely cause of Mr. Saunders death was thermal inhalational injury or asphyxiation due to the fire. I share this opinion with Dr. Daniel D. Lozano, the Plaintiff's burn expert.

13. Given the extent of the fire described by the eye witnesses and the extent of the burns in photographs, Mr. Sanders would have died due to the thermal inhalational injury or asphyxiation no matter the manner or timing of any resuscitative efforts.

14. The exact time of Mr. Sander's death is indeterminate. The testimony of the eye witnesses is that Mr. Sanders was not moving at the point the fire was extinguished. There is no testimony that he was breathing at that instant. Given the extent of the burns and the description of the fire it is extremely likely that he died during the fire.

15. I agree with Dr. Lozano that given Mr Sander's age, the extents of the burns, the inhalation thermal injury, in the context of his baseline COPD, that the probability of survival was zero.

Based on my review of the records, my training and experience, it is my opinion, that Mr. Saunders was assessed on numerous occasions by multiple providers and not found to be an unsafe smoker. He was formally assessed by his medical team on 2/27/2006. It was proper to allow him to maintain possession of cigarettes and lighters. Furthermore, it was not a breach of

Gregory A. Compton, MD

Benjamin Sanders Report
Page 4

the standard of care to allow Mr. Benjamin Sanders to smoke unsupervised. The bulk of the medical evidence supports the contention that Mr. Saunders could self manage a smoking mishap.

The standard of care, as reflected in JCAHO, does not require a formal safe smoking assessment tool. The standard requires that nursing home residents be evaluated so that unsafe smokers can be identified. Once identified as an unsafe smoker then appropriate measures are taken.

Based on my review of the records, my training and experience, it is my opinion, that Mr. Saunders was not alive at the time the fire was extinguished. Therefore the manner and timing of how his resuscitation was conducted is mute.

All the opinions expressed herein are true to reasonable degree of medical certainty. I reserve the right to amend or offer additional opinions on this matter, if subsequent discovery yields additional information.

Respectfully submitted,

Gregory A. Compton, MD

ATTACHMENT 10

EXCERPTS FROM

DEPOSITION AND EXHIBITS
OF
ILENE WARNER-MARON



1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - x
                   :
MARY SAUNDERS, as Personal  :
Representative of the Estate  :
of BENJAMIN SAUNDERS,     :
                   :
      Plaintiff,     :
                   :
  vs.                : Civil Action
                   : No. 071169
UNITED STATES OF AMERICA,  :
                   :
      Defendant.     :
                   :
- - - - - - - - - - - - - - x


                    Washington, D.C.
                    Tuesday, April 8, 2008


        The deposition of ILENE WARNER-MARON, called

for examination by counsel for Defendant in the

above-entitled matter, pursuant to Notice, in the

offices of U.S. Department of Justice, 501 Third

Street, N.W., Fourth Floor, Washington, D.C.,

convened at 10:15 a.m., before Catherine B. Crump, a

notary public in and for the District of Columbia,

when were present on behalf of the parties:

4

```
 1              P R O C E E D I N G S
 2      Whereupon,
 3                ILENE WARNER-MARON
 4   was called for examination by counsel for Defendant
 5   and, having been first duly sworn by the notary
 6   public, was examined and testified as follows:
 7           EXAMINATION BY COUNSEL FOR DEFENDANT
 8   BY MS. WHITAKER:
 9      Q.    Would you state your name and address for
10   the record, please.
11      A.    Ilene Warner-Maron, 2 Dundee Mews, Media,
12   Pennsylvania, 19063.
13      Q.    And do you prefer to be called Warner-Maron
14   or just Warner?  I notice sometimes Mr. Meltmar
15   refers to you as just Warner.
16      A.    Actually, it's Maron.
17      Q.    So you'd prefer to be called Maron?
18      A.    Maron is fine, yes.
19      Q.    All right.  And you are here to testify on
20   behalf of the plaintiff as an expert.  As an expert
21   in what field?
22      A.    In the field of nursing home management and
```

5

1    nursing.

2        Q.    All right.  And I won't give you any ground

3    rules about depositions because I have a feeling

4    you've probably been very much versed on taking a

5    deposition.  So I'll just skip that.

6        A.    Okay.

7        Q.    How many depositions have you participated

8    in?

9        A.    One hundred twenty-six.

10        Q.    And how many trials?

11        A.    Thirty-five.

12        Q.    All right.  Now let me ask you:  I know I

13    have your list of cases and I'd like go through the

14    ones that are applicable to our case, but what is

15    your understanding of our case?

16            MR. MELTMAR:  Objection.  You can answer.

17            THE WITNESS:  Mr. Saunders was a resident in

18    a V.A. nursing home section.  He was on supervised

19    smoking in March of 2006, March 19th, I believe, and

20    he became fully engulfed in flames and died as a

21    result of his injuries from the fire.  So the issues

22    involve the nursing standard of care for residents

49

1   do her own testimony.

2       MR. MELTMAR:  I'm not testifying.  I'm

3   actually showing her whether or not her copy is

4   complete.

5   BY MS. WHITAKER:

6       Q.   Do you have another copy with you that we

7   can take a look at?

8       A.   No.  This is fine.  Here it is.

9       Q.   You've found it with the help of Mr.

10  Meltmar?

11      A.   Right.  Yours is not in the order that mine

12  is in, unfortunately.  On page 20 --

13      Q.   How is yours different from this?  This

14  looks like a printout, you know.

15      A.   I use a book that actually has all of the

16  federal regulations as well as the governance for

17  surveyors.  So it gives you much more detail.

18      Q.   So you're talking about the JCAHO book?

19      A.   No.  It's not a JCAHO book.  It's put out by

20  a nursing home group.  I don't have it in front of

21  me.  It's updated every year and it includes the

22  federal regulations and the interpretative

50

```
 1  guidelines.  This just has the federal regulations
 2  without the interpretive guidelines.
 3       Q.    Okay.  Well, I think it would be a good idea
 4  if you could tell me what book that is.  Obviously,
 5  you're using it.
 6            MR. MELTMAR:  It's called "The Watermelon
 7  Book".
 8            MS. WHITAKER:  What is it?  Do you want to
 9  testify?
10            MR. MELTMAR:  Sure.  It's called "The
11  Watermelon Book".
12  BY MS. WHITAKER:
13       Q.    It's a book put out by Watermelon?
14       A.    No.  It's a book put out -- it's on my shelf
15  and I'm sorry that I can't tell you the source of the
16  publication, but it's --
17            MR. MELTMAR:  I can have a courier bring it
18  over if you'd like.
19            MS. WHITAKER:  How quickly?  Because we're
20  not going to be here all day.  That would be great.
21            MR. MELTMAR:  Yeah.  How long are we going
22  to be here?  I'll call my secretary and have her
```

51

1    courier it over right now.

2            MS. WHITAKER:  Great.

3            THE WITNESS:  I'm sorry.  What was the

4    question?

5    BY MS. WHITAKER:

6        Q.    We're talking about you say here:  "OBRA

7    requires facilities to perform assessments of

8    residents with regard to their risk of unsafe

9    smoking."  Where is the requirement in OBRA?

10       A.    That's what Nurse Henderson testified, but

11   when you look under accidents under Part H, it says

12   that the resident environment remains as free of

13   accident hazards as possible.  Accidents includes

14   falls, elopements.  It includes burns, scalding.

15       Q.    So this is a general provision?  It doesn't

16   say smoking.  Correct?

17       A.    No, it doesn't say smoking.  It doesn't say

18   falls.  It says accidents.  So unsafe smoking leading

19   to fires and all of those things involve accident

20   prevention.

21       Q.    Okay.  So you have read in smoking; it's not

22   in there; is that correct?  The language is not

52

1   there?

2       A.    The specific language doesn't include the

3   word "fire" or "smoking" or "fall" or "elopement",

4   but that, indeed, is what the regulation requires,

5   that we're looking at causes of accidents and the

6   minimization of those accidents through the use of

7   sufficient supervision.

8       Q.    But the regulation does not say all of that;

9   it says what it says?

10      A.    The regulation refers to the general

11  umbrella of accidents.  It doesn't say specifically

12  what kind of accidents, but obviously being on fire

13  would be one of those particular accidents.

14      Q.    All right.  Let's go back to your report.

15  "It requires that long-term care facilities provide

16  supervision to residents in a designated smoking area

17  and that the facility's policies and procedures be

18  implemented in order to ensure that the residents who

19  require supervision while smoking receive the

20  necessary supervision."

21          Okay.  Where is that in OBRA?

22      A.    If you look at Part II, under "H", you'll

53

1   see where it says:  "Each resident receives adequate

2   supervision and assistive devices to prevent

3   accidents."  That refers to the need for supervision.

4   Each jurisdiction has its own regulations with regard

5   to smoking inside, indoor smoking, and policies and

6   procedures governing the residents who do smoke

7   inside.

8       Q.   Each jurisdiction?  What are you referring

9   to there?

10      A.   If you have -- for example, in the

11  Commonwealth of Pennsylvania, we have a Life Safety

12  Code that's interpreted by the State statute that has

13  a separate inspection by the Department of Health,

14  looking at firewalls and smoking policies and fire

15  extinguisher use, and things of that nature.  So in

16  addition to the federal regulation, local

17  jurisdictions would have input into the Life Safety

18  Code.

19      Q.   So are you speaking here of other

20  jurisdictions?

21      A.   I'm referring here to that one paragraph on

22  page 3 as the federal regulations regarding accident

1    prevention and supervision.

2        Q.    Okay.  I just want to go back.  You just

3    mentioned each jurisdiction has policies.  I'm just

4    talking about this one sentence, "requires that

5    long-term care facilities provide supervision of

6    residents in a designated smoking area and that the

7    facility's policies and procedures be implemented in

8    order to ensure that the residents who require

9    supervision while smoking receive the necessary

10   supervision."

11           Just I'm asking where is that in the

12   standard?

13       A.    That's inherent in these two standards and

14   it's also part of the JCAHO regulation for

15   environment of care.

16       Q.    So it's inherent in the federal regulations;

17   that's what your testimony is?

18       A.    Right, because the federal regulations that

19   we have in front of us now just simply spell out what

20   the regulation is.  The guidance for the surveyors

21   and interpretive guidelines call for looking at falls

22   and fires and smoking safety and other inherent risks

1    within a nursing home.

2        Q.    Okay.  And the guidelines for surveyors and

3    the interpretive, where are they?  Are we going over

4    to another standard now?

5        A.    No.  They're in part of that "Watermelon

6    Book" that Mr. Meltmar referred to.

7        Q.    Are they part of federal regulations, the

8    Code of Federal Regulations?

9        A.    Let me try it again.  The federal

10   regulations are what you have in front of you.  There

11   is an additional book that the surveyors who go to

12   the facilities use as guidance.  They give them a

13   little bit more detail in terms of how to

14   understand --

15           MR. MELTMAR:  Let's just take a quick break

16   for just one minute.

17           MS. WHITAKER:  This is my deposition.

18           MR. MELTMAR:  Do you want the interpretive

19   guidelines or not, Ms. Whitaker?

20           MS. WHITAKER:  I think it's kind of strange

21   that we don't have them if she's relying on them now.

22   This is the first time I've heard this.

56

1           MR. MELTMAR:  No.  She's relying on the

2     regulations.  Quit interrupting me.

3           MS. WHITAKER:  You're interrupting this

4     deposition.

5           We're off the record.

6           [Discussion held off the record.]

7     BY MS. WHITAKER:

8     Q.    All right.  So going back to this last

9     paragraph on page 3 of the February 22, 2008 letter,

10    opinion letter that you have, your testimony so far

11    is that the Code of Federal Regulations provides

12    guidance, and inherent in the language is something

13    else, some other specifics which are reflected in

14    "The Watermelon Book"; is that correct?

15    A.    Let me try it again.

16    Q.    And "The Watermelon Book", you use, but it

17    is not here.  Correct?

18    A.    That's correct, because all you really have

19    here in these regulations are the listings of the

20    regulations, and the interpretive guidelines are

21    helpful to understand what the issues are that the

22    surveyors as well as the people who work in the

57

1  nursing home need to understand in terms of what does

2  that regulation actually mean.

3      Q.   I understand that, but under Federal Rule of

4  Civil Procedure 26(a)(2), everything that you rely on

5  is supposed to be in your report.

6          MR. MELTMAR:  Objection.

7          THE WITNESS:  And it is.  The federal

8  regulations are there and the interpretation of the

9  federal regulation is not only in "The Watermelon

10 Book", but in my experience as a nurse and a nursing

11 home administrator and an educator in nursing home

12 administration.

13 BY MS. WHITAKER:

14     Q.   But we have to go to some other document to

15 see those guidelines?

16     A.   I'm telling you, Ms. Whitaker, what the

17 regulations mean and how they're interpreted.  You've

18 asked to go to that other source, but I can tell you

19 what 483.25(h)(1) and (2) means when you're working

20 in a nursing home.

21     Q.   Whose interpretation are you using?

22     A.   I'm using the interpretation as an employee,

59

1   and do their reassessments.

2        Q.    So this last sentence does not have anything

3   to do with OBRA or JCAHO?

4        A.    It absolutely does.  It is inherent in both

5   OBRA and in JCAHO in terms of being able to identify

6   who is at risk for a particular kind of accident and

7   to care plan and provide interventions for the

8   prevention of a negative outcome.

9        Q.    Okay.  And you said this is the national

10  standard.  Who endorses this national standard?  Is

11  it the JCAHO group that does?

12       A.    It's JCAHO.  It's CMS.

13       Q.    Or anybody else who --

14       A.    It's the accepted standard of care across

15  the country to perform these assessments.

16       Q.    But in this case, we're talking about JCAHO?

17       A.    JCAHO is --

18       Q.    Because JCAHO is the only one that is

19  involved in this?

20            MR. MELTMAR:  Objection.  That's not what

21  she's testified to.

22  BY MS. WHITAKER:

60

1    Q.    Well, you can tell me.

2    A.    Since JCAHO is the only agency that is

3    surveying the Veterans Administration nursing home,

4    in this instance, JCAHO is the only body that's

5    responsible for this.

6         MR. MELTMAR:  My assistant is calling to

7    tell me something.

8         MS. WHITAKER:  Okay.  We can take a break.

9         [Recess.]

10        MS. WHITAKER:  Okay.  We'll go back on the

11   record.

12   BY MS. WHITAKER:

13   Q.    Is it your opinion that the following

14   statement reflects a JCAHO standard?  "It requires

15   that long-term care facilities provide supervision to

16   residents in a designated smoking area."

17   A.    The JCAHO EC 1.30 standard -- that's the

18   environment of care standard -- says that:  "The

19   organization develops and implements a policy to

20   prohibit smoking except in specified circumstances."

21   Q.    Okay.  What are you reading from?

22   A.    I'm reading from JCAHO long-term care

61

1  facilities.

2      Q.    Could I copy the whole thing?  Are these all

3  the things that you printed out today?

4      A.    No.  I printed them out either last night or

5  I looked at them before and then printed them out.

6      Q.    So this is what you referred to earlier?

7      A.    Yes.

8      Q.    Is this everything?

9      A.    Here is the rest.

10     Q.    And you have a -- they all go together?

11     A.    Well, I printed them all out.

12         MS. WHITAKER:  All right.  Why don't we just

13 take a break until your messenger comes so I can have

14 a chance to copy these, because these are obviously

15 new to us too.

16         MR. MELTMAR:  I think what she's referring

17 to are the JCAHO regulations.

18         [Discussion held off the record.]

19 BY MS. WHITAKER:

20     Q.    Show it to me.  Where is it in your report?

21     A.    It's the report of December 24, 2006.

22     Q.    Okay.

68

1    Q.    All right.  So let's talk about that.

2    You're saying that they did not develop a smoking

3    policy with criteria in it?

4    A.    Hold on for a second, please.

5         [Witness peruses document.]

6         THE WITNESS:  The smoking policy does,

7    indeed, identify that people who are high-risk

8    smokers should be identified as such and that they

9    have an interdisciplinary care plan developed that

10   will identify their needs and their interventions and

11   that tobacco use is screened at least annually and

12   documented under the clinical reminder section.

13        MR. MELTMAR:  Could you identify the

14   document by its title?

15        THE WITNESS!  Yes.  It's called the "CMRC

16   Policy Memorandum No. 19", entitled "Smoking Policy".

17   BY MS. WHITAKER:

18   Q.    All right.  Now, the language of that that

19   you just read says that there is an obligation, a

20   criteria required, of the identification of high-risk

21   smokers; is that correct?

22   A.    Yes.

1  that some kind of a form be provided?

2      A.    Well, it says that the resident has to meet

3  criteria that's developed.   Inherent in that is a

4  form, an algorithm, a process, by which people go

5  through and look at does the person have the manual

6  dexterity, the cognition to be able to smoke, can

7  they yell for help, what kinds of assistance do they

8  need in order to effect safe smoking.

9          So all of those things that you see that I

10  printed out and brought with me today from a variety

11  of sources that are forms for resident smoking

12  assessments, that's really the expectations that

13  someone will go through and determine based on a set

14  of criteria whether someone is at risk or not.

15      Q.    So what you just said is that it's not

16  specifically here, but it's inherently here.   That's

17  your view, that it's inherently here?

18      A.    I don't think so.

19          MR. MELTMAR:  Objection.

20          THE WITNESS:  Okay.  I don't think so.

21  Where it says a resident meets criteria developed and

22  approved by the organization's leaders, that in my

1 | interpretation means that there's some kind of

2 | assessment that's performed that goes through an

3 | algorithm that determines if people are safe smoking

4 | or not, if people need some supervision, if they need

5 | anything that's going to be contained, also, on the

6 | care plan. That's the second piece that's missing.

7 | BY MS. WHITAKER:

8 |     Q.   Okay. Well, let's just --

9 |     MR. MELTMAR: No. Objection. Let her

10 | finish. You can't cut her off and then say she

11 | didn't testify to it in her deposition. Let her

12 | finish.

13 |     MS. WHITAKER: Oh, I'm not going to pass up

14 | the opportunity to ask about the care plan.

15 |     MR. MELTMAR: You can do whatever you want.

16 |     Are you done, Ms. Warner?

17 |     THE WITNESS: That's fine. Go ahead.

18 | BY MS. WHITAKER:

19 |     Q.   You can go ahead. I didn't want to cut you

20 | off.

21 |     A.   That's fine.

22 |     MR. MELTMAR: You have been cutting her off.

1  notation.  I mean, if it does, tell me where it says

2  that.

3      A.    No.  It just says the resident meets

4  criteria developed, and I think that JCAHO allows

5  facilities to develop their own set of assessments

6  and their own policy of how that assessment, how

7  often it needs to be done, how often a person gets

8  reassessed.  JCAHO allows individual organizations to

9  do that and then they survey them based on their

10  compliance with that JCAHO survey requirement.

11      Q.    And when you say they survey them, they give

12  them accreditation?

13      A.    They go to the facility.  They do an

14  inspection, and then they determine if the facility

15  should be accredited.

16      Q.    And they would determine during that

17  inspection whether there was any deviation from the

18  JCAHO standard?

19      A.    If they looked at that particular issue,

20  yes.

21      Q.    What is the Cheers Award?

22      A.    The what?

82

1      Q.    All right.  Let's go back to the care plan

2   issue.  Remember we talked about that?

3      A.    Yes.

4      Q.    Where in JCAHO does it talk about a care

5   plan?

6      A.    It's under PC, which is Provision of Care,

7   4.10.

8      Q.    And where does it talk about a care plan for

9   unsafe smoking?

10     A.    It says that the care plan should be

11  developed and individual and appropriate resident's

12  needs, strengths, limitations, and goals will be

13  identified and that the care and treatment and

14  services are planned to ensure that they are

15  appropriate to the resident's needs.  There is

16  nothing specific that says smoking, but obviously

17  smoking is a physical issue.  It's a safety issue and

18  those kinds of things need to be care planned for

19  someone like Benjamin Saunders.

20     Q.    So, again, this is inherent, as you see it,

21  an inherent requirement?

22     A.    Yes.  It doesn't specifically say "and

83

1   smoking care plan is developed".  It's that when

2   you've identified those high-risk big ticket issues

3   like pressure ulcers, falls, elopement, and smoking,

4   that that leads to an identification of particular

5   interventions for a particular resident.

6       Q.    And you know that they did have a care plan

7   for Mr. Saunders?

8       A.    They had many care plans for Mr. Saunders,

9   but none were about smoking.

10      Q.    Where in the JCAHO standard does it talk

11  about residents having ongoing assessments of their

12  ability to safely smoke within a facility?

13      A.    Under PC 4.10(m), it says that:  "The goals

14  of care, treatment, and services are revised when

15  necessary."  And that means that the resident is

16  being assessed over a period of time.  Obviously,

17  people in nursing homes tend to deteriorate over time

18  because of their underlying medical problems.  So a

19  patient in 2005 may be very different than they were

20  in 2006, which requires reassessment.

21      Q.    And you're not suggesting that they didn't

22  reassess Mr. Saunders periodically?

84

1    A.    No.    They do -- they did do MDSes and care

2    plans.    The issue, though, is there still weren't any

3    smoking care plans devised.

4    Q.    And no reflection of it in the clinical

5    record?

6    A.    Right.

7    Q.    Can you point to where in the JCAHO

8    standards that there is a requirement that there be a

9    smoking risk assessment that's documented in the

10    clinical records?

11    A.    Well, again, back to your previous question,

12    it says under EC 1.30(c):    "The resident meets

13    criteria developed and approved by the organization's

14    leaders."    So inherent in that is an assessment

15    that's performed by someone looking at these issues,

16    physical cognitive issues, the ability to yell for

17    help, those things.

18    Q.    So it seems to me that you -- I don't want

19    to put words in your mouth, but you have used the EC

20    1.30(a)(c) as sort of the catchall provision; is that

21    correct?

22    A.    Yes.    It's the primary issue identified in

1   the resident been instructed in facility policy

2   regarding safety of himself or others?"  That is an

3   assessment that is done sometimes, but not all the

4   time?

5       A.    Well, these are -- Points 1 through 10 are

6   what's supposed to be done for people who are

7   smokers.  So I don't think that you pick and choose

8   which ones you want.  I think that if you've

9   identified the person smokes, then you're supposed to

10  complete all of those.

11      Q.    Okay.  But this particular assessment is not

12  a required assessment under JCAHO or OBRA or any

13  other?

14      A.    No.  There is no specified assessment to be

15  done other than the person is to be assessed.

16      Q.    And let's go down to the Canadian one.  You

17  did provide that.  This is another assessment, and

18  the reason for these assessments was so that you

19  could show what an assessment looked like?

20      A.    To simply give you some examples of what's

21  contained within accepted and reasonable smoking

22  safety assessments.  As you can see, they have a lot

1   on the front page, that talks about people dying in

2   fires and nursing homes and things of that nature,

3   secondhand smoke and things like that; but they

4   developed these model regulations for various kinds

5   of facilities, not just nursing homes, which I

6   thought was interesting, and it did include the JCAHO

7   standards.

8       Q.    Okay.   I didn't number the pages, but I

9   think it's about the sixth or seventh page back.

10  It's page 5 of 7 at the top of the page.   That's

11  where the JCAHO standards, we first looked at these

12  because you were looking for the JCAHO standards even

13  though they were actually in your December opinion

14  letter.

15      A.    Right.

16      Q.    The standards appear, from my point of view,

17  to start at the bottom of the page where it says

18  Elements of Performance for EC 1.30.

19      A.    Environment of Care, right.

20      Q.    And that seems to be verbatim what's in your

21  report.   Correct?

22      A.    Right.

116

```
 1                         [Warner Exhibit No. 6 was

 2                         marked for identification.]

 3    BY MS. WHITAKER:

 4        Q.    So these, like the two that you've got in

 5    your opinion letter are samples of assessments?

 6        A.    That's correct.

 7        Q.    Okay.  Next?

 8        A.    You have a printout from JCAHO regarding

 9    preventing fires as related to home care.  This is

10    not a home care case, but if you go to page 2, it

11    does contain a patient assessment, and I'll just read

12    it for the record:

13              "Patient's vision and reflexes,

14    communication skills, and ability to use equipment

15    properly should also be assessed.  A decrease in

16    vision or depth perception, slower reflexes and

17    difficulty moving can increase the patient's chances

18    of being injured or killed in a fire.  A patient with

19    communication deficits may have difficulty

20    understanding verbal or written instruction."

21              That is applicable to any patient in any

22    setting.  That would be part of an assessment for the
```

1    A.    I think this policy is more to protect

2  employees and other residents from secondhand smoking

3  and to discourage residents from continuing to smoke

4  once they're admitted to a nursing home.

5    Q.    And TCSG, what does that stand for?

6    A.    I don't know.

7    Q.    Do you know the organization?

8    A.    No, I don't.  Tobacco Cessation -- I just

9  would be guessing.

10    MS. WHITAKER:  Okay.  Well, let's mark it as

11  the last exhibit.

12                    [Warner Exhibit No. 8 was

13                     marked for identification.]

14  BY MS. WHITAKER:

15    Q.    Well, I shouldn't say that.  Let's look at

16  the other thing that you've just provided me, which

17  is the excerpt from "The Watermelon Book".

18    A.    I don't want to interrupt you, but did you

19  do the Canadian one yet?

20    Q.    I did everything I copied.  Maybe I didn't

21  get that one.

22    A.    Was the Canadian one with this resident

1    smoking assessment?

2        Q.    I think maybe it was.

3        A.    If it was, I don't know why it would still

4    be in my pile.

5        Q.    Okay.  So this is being added to Exhibit 6

6    as another sample.

7              All right.  Now, again, tell me what this

8    "Watermelon Book" is and how it is used.

9        A.    This gives you all of the federal

10   regulations that are currently in effect, and the

11   regulations are contained on the left-hand side of

12   the margin.  The right-hand side is what's called "A

13   Guidance to Surveyors", which if you see it written

14   in red, those are new and additional guidances.

15       Q.    I don't have red, unfortunately, but I guess

16   we should mark it.

17       A.    It looks like --

18       Q.    We started at page 295.

19       A.    Right, and it's red, the entire grouping.

20       Q.    Okay.  So this is all new?

21       A.    This is an old regulation that has new

22   things expounded upon it.

1   that there are smoking assessments.  There are formal

2   assessments that are done that lead the assessor

3   through a variety of cognitive, physical, and

4   mobility issues that would cause them to come to the

5   conclusion whether someone was at high risk for

6   smoking, and we see that there was no baseline

7   assessment done in Benjamin Saunders' chart using any

8   kind of formal smoking assessment.

9       Q.   But we have talked about the fact that there

10  is no specific requirement in JCAHO?

11      A.   We have talked --

12      Q.   Or 42 CFR 483?

13      A.   We've talked about it, and I guess this is

14  where you and I differ, that the intent of the

15  regulation is that assessments of unsafe behaviors,

16  including smoking, would be performed serially by the

17  nursing home staff and that no such formal assessment

18  is contained within the records.  I think what we do

19  agree upon is that JCAHO doesn't require a particular

20  smoking form be used.

21      Q.   Or a specific format be used?

22      A.   That's correct, but that a smoking

1   assessment would be performed and the resident would

2   be care planned for the risk, if the risk does,

3   indeed, exist.

4       Q.   That's fine.  Just tell me again where that

5   is in the JCAHO since this is important.

6       A.   Right.

7       Q.   Is that Section C, that it's inherent?

8       A.   Yes.

9       Q.   Section C, that's what you rely on?

10      A.   That's right.

11      Q.   That the facility has an obligation under

12  JCAHO to develop criteria --

13      A.   That's right.

14      Q.   -- approved by its leaders?

15      A.   Right, and implement those policies, yes.

16      Q.   It does not say assessment?

17      A.   Well, you can't implement the smoking

18  policies if you don't do the assessment.  The

19  assessments is the key.

20      Q.   All right.  Let's take a look at the next

21  one.

22      A.   It says:  "Failing to reassess his smoking

# ALDEN

GERIATRIC CONSULTANTS, INC.

November 27, 2006

W. Charles Meltmar, Esquire
The Cochran Firm
1100 New York Ave, N.W.
Suite 250-West Tower
Washington, D.C. 20005

RE: Benjamin Saunders

Dear Mr. Meltmar,

I have had the opportunity to review the records from the Veterans Administration Medical Center-Washington, D.C. The opinions expressed within this report are based upon my education and experience as a Registered Nurse and licensed Nursing Home Administrator. The Joint Commission for the Accreditation of Health Care Organizations (JCAHO) will be used as a source of the standard of care for discussion in this case.

## Clinical Review

Benjamin Saunders, date of birth May 21, 1941 was admitted to the Veterans Administration Medical Center Nursing Home on (CNRC) February 7, 2005. Mr. Saunders was a 100 percent service connected veteran with a history of seizure disorder, chronic obstructive pulmonary disease, sensorineural hearing loss, dysphagia, psychosis, schizophrenia, vision impairment, radicular and sciatic nerve involvement, hiatal hernia, chronic renal failure, gout, hypertension, bullous pemphigoid, cerebrovascular accident and diabetes mellitus. As a result of the cerebrovascular accident, the resident had a left hemiparesis.

Mr. Saunders was admitted to the hospital from January 11-13, 2005 from his home after his wife witnessed seizure activity. During that admission, the patient was noted to have left sided weakness. He was regarded as being alert and oriented to person and place only. He was able to follow simple commands.

From January 22-25, 2006, Mr. Saunders was hospitalized at the Veterans Administration Medical Center for the treatment of pneumonia. A psychology reassessment was performed on January 30, 2006 which noted *"a slight decline from prior evaluations and*

2 DUNDEE MEWS    MEDIA, PA 19063-1167
(610) 917-0255; FAX (610)325-9197, CELL (610) 322-2865
EMAIL ALDENGERIATRICS@AOL.COM

– 2 –                                                    November 27, 2006

*revealed similar orientation difficulties as in the prior evaluations but also some mild difficulty with working memory. Again, his orientation problems may just reflect the fact that he is living in an inpatient setting, but his cognitive functioning should continue to be monitored for further decline."*

Mr. Saunders was noted to be unresponsive with labored breathing on February 20, 2006, however this issue resolved without hospitalization after he was given a breathing treatment and suctioned.

An assessment of Benjamin Saunders' functional abilities was completed monthly. The assessment dated March 3, 2006 noted the following abilities and deficits:

1. Incontinent of urine;
2. Alert and cooperative;
3. Risk for falls;
4. Speech garbled;
5. Requires complete assistance for hygiene;
6. Turns with assistance;
7. Unable to ambulate;
8. Uses lift equipment to transfer from bed to chair.

While Benjamin Saunders was a resident of the nursing home on March 19, 2006, he apparently was smoking unsupervised in the smoking room. The nurse's notes from the nursing center stated *"At approximately 6:40 p.m., patient Pedro Harley came to me in room 160 and said 'one of your patients is on fire in the smoking room.' I ran to the atrium and looked toward the smoking room and saw a patient in a wheelchair completely engulfed in flames. I entered the anteroom and saw Mr. Saunders. It was impossible to rescue the patient as he and wheelchair were completely on fire. Code Blue and Code Red were initiated and the fire was extinguished with a fire extinguisher. The patient was taken to the MICU."*

Following this event, Benjamin Saunders was transferred to the Veterans Administration Medical Center. According to the hospital records, the patients sustained third degree burns over 100 percent of his body surface. The admission note stated *"Patient was a 64 year old male with unknown past medical history who was brought emergently to the MICU when a Code Blue was called as the patient was escorted from the nursing home after was noted to be burning. On arrival, he was pulseless and unresponsive. He had no blood pressure or pulse.* Mr. Saunders was pronounced dead after 22 minutes of attempts to resuscitate him failed.

## Discussion

The Joint Commission for the Accreditation of Health Care Organizations (JCAHO), provided standards from which nursing homes such as the Veterans Administration Medical Center CNRC provide care. The facility must comply with JCAHO standards in order to be accredited by this body.

The following JCAHO standards are applicable in the care of Benjamin Saunders:

1. EC.130- a. The organization develops a policy regarding smoking in all areas of all buildings under the organization's control.

November 27, 2006

    b.  The organization's policy prohibits smoking in all building(s) under the organization's control (no medical exceptions allowed) for all children or youth residents.

    c.  The organization's policy may permit residents to smoke in the organization's buildings under the following circumstance: a resident meets criteria developed and approved by the organization's leaders.

    d.  When residents are permitted to smoke in the organization's buildings, they smoke only under the following circumstances: In designated locations environmentally separate from care, treatment or service areas after the organization has taken measures to minimize fire risks.

    e.  Residents who do smoke in the organization's buildings are discouraged from doing so and are provided education including information about options for smoking cessation.

    f.  The organization identifies and implements a process(es) for monitoring compliance with the policy.

    g.  The organization develops strategies to eliminate the incidence of policy violations when identified.

2.  PC.4.10-Development of a plan for care, treatment and services is individualized and appropriate to the resident's needs, strengths, limitations and goals.

    a.  Care, treatment and services are planned to ensure that they are appropriate to the resident's needs.

    c.  The interdisciplinary team identifies and prioritizes each resident's care needs based on the analysis of assessment data.

    l.  Evaluation of the resident is based on the resident care goals and the resident's plan for care, treatment and services.

    m.  The goals of care, treatment and services are revised when necessary.

The regulations require that residents have ongoing assessments of their ability to safely smoke within a facility. There is no documentation in Mr. Saunders's nursing home records that any evaluation of his ability to safely smoke had been performed during his 13-month admission. There are notes contained within Mr. Saunders' records that the staff did try to dissuade him from smoking. He appears to have smoked four-five cigarettes per day.

There was no care plan found within the clinical records providing guidance for the staff in supervising Mr. Saunders' smoking activities, providing him a smoking apron or ensuring that a staff member supervises his smoking activities. The nurse's notes clearly stated that another resident alerted the staff that Mr. Saunders had been fully engulfed in flames. There was no evidence that he had been supervised by the staff.

Although the psychologist who performed an evaluation of Mr. Saunders on January 30, 2006 identified a decline in the resident's cognitive abilities from the previous assessment, there is no evidence that the nursing home staff developed or modified its care plans to ensure that Benjamin Saunders was capable of smoking independently. Serial assessments of his smoking were not contained within the clinical records.

– 4 –                                                    November 27, 2006

**Conclusions**

There is no evidence that Veterans Administration Medical Center CNRC assessed Benjamin Saunders' ability to smoke independently at any time during his nursing home stay. No precautions were taken to promote safe smoking despite his left sided weakness, periods of unresponsiveness and his seizure disorder. His garbled speech likely contributed to his inability to summon help from staff when the fire first began. Mr. Saunders was smoking without any supervision from the staff and was discovered fully engulfed in flames by a fellow resident, rather than by a staff member. Moreover, there were no care plans found in Benjamin Saunders' records with regard to his ability to smoke or the need of the facility staff to intervene.

It is my opinion within a reasonable degree of professional nursing and nursing home administration certainty that the staff of the Veterans Administration Medical Center CNRC deviated from accepted standards of care including JCAHO regulations in the delivery of care and services to Benjamin Saunders. As a result of these deviations, Mr. Saunders smoked in an unsafe manner on March 19, 2006. He died on that date as a result of sustaining third degree burns over 100% of his body surface, according to the records. Specifically, the facility deviated from accepted standards of care by:

1. Failing to provide a baseline assessment of his ability to smoke independently;
2. Failing to reassess his smoking ability upon readmission to the facility in January 2006;
3. Failing to reassess his smoking ability after he was evaluated by the psychologist and was found to have increased cognitive deficits;
4. Failing to reassess his smoking ability after he was found unresponsive in February 2006;
5. Failing to devise a care plan to address his smoking risks;
6. Failing to provide a smoking apron or similar material to reduce the risk of unsafe smoking consequences;
7. Failing to provide adequate supervision of his smoking activities by the facility staff

This report may be amended should further information become available.


                         Sincerely,



                         Ilene Warner-Maron
                         RN,C CWCN MA MLSP CALA NHA

# ALDEN

## GERIATRIC CONSULTANTS, INC.

December 24, 2006

W. Charles Meltmar, Esquire
The Cochran Firm
1100 New York Ave, N.W.
Suite 250-West Tower
Washington, D.C. 20005

**RE: Benjamin Saunders**

Dear Mr. Meltmar,

I have had the opportunity to review the records from the Veterans Administration Medical Center-Washington, D.C. In addition, the following materials were used in order to formulate my opinions in this matter:

1. Two black and white photographs of the VAMC Smoking Shelter dated March 20, 2006;
2. Correspondence from CETROM, Inc. to the VAMC Safety Office dated May 10, 2006;
3. Memorandum from the VAMC dated April 27, 2006 regarding "Report of a Vulnerability Assessment";
4. Report from Underwriters Laboratories, Inc. to the VAMC regarding sprinkler heads dated May 5, 2006;
5. Geriatrics and Extended Care Comprehensive Nursing and Rehabilitation Center (CNRC) Policy Memorandum Number 19-"Smoking Policy" dated February 2005;
6. Department of Veterans Affairs Medical Center Smoking Risk Protocol dated October 2004;
7. Veterans Affairs Medical Center Medical Center Policy Memorandum 138-53- Code Fire Pagers for the Hearing impaired dated September 2006;
8. Veterans Affairs Medical Center Medical Center Policy Memorandum 00-20- Establishment of a Smoke-Free Environment;
9. Veterans Affairs Medical Center Medical Center Policy Memorandum 138-12- Safety Management Plan dated October 2006;

The opinions expressed within this report are based upon my education and experience as a Registered Nurse and licensed Nursing Home Administrator. The Joint Commission

2 DUNDEE MEWS    MEDIA, PA 19063-1167
(610) 917-0255, FAX (610)325-9197, CELL (610) 522-2865
EMAIL ALDENGERIATRICS@AOL.COM

– 2 –                                                                December 24, 2006

for the Accreditation of Health Care Organizations (JCAHO) will be used as a source of the standard of care for discussion in this case.

**Clinical Review**

Benjamin Saunders, date of birth May 21, 1941 was admitted to the Veterans Administration Medical Center Nursing Home on (CNRC) February 7, 2005. Mr. Saunders was a 100 percent service connected veteran with a history of seizure disorder, chronic obstructive pulmonary disease, sensorineural hearing loss, dysphagia, psychosis, schizophrenia, vision impairment, radicular and sciatic nerve involvement, hiatal hernia, chronic renal failure, gout, hypertension, bullous pemphigoid, cerebrovascular accident and diabetes mellitus. As a result of the cerebrovascular accident, the resident had a left hemiparesis.

Mr. Saunders was admitted to the hospital from January 11-13, 2005 from his home after his wife witnessed seizure activity. During that admission, the patient was noted to have left sided weakness. He was regarded as being alert and oriented to person and place only. He was able to follow simple commands.

From January 22-25, 2006, Mr. Saunders was hospitalized at the Veterans Administration Medical Center for the treatment of pneumonia. A psychology reassessment was performed on January 30, 2006 which noted *"a slight decline from prior evaluations and revealed similar orientation difficulties as in the prior evaluations but also some mild difficulty with working memory. Again, his orientation problems may just reflect the fact that he is living in an inpatient setting, but his cognitive functioning should continue to be monitored for further decline."*

Mr. Saunders was noted to be unresponsive with labored breathing on February 20, 2006, however this issue resolved without hospitalization after he was given a breathing treatment and suctioned.

An assessment of Benjamin Saunders' functional abilities was completed monthly. The assessment dated March 3, 2006 noted the following abilities and deficits:

1. Incontinent of urine;
2. Alert and cooperative;
3. Risk for falls;
4. Speech garbled;
5. Requires complete assistance for hygiene;
6. Turns with assistance;
7. Unable to ambulate;
8. Uses lift equipment to transfer from bed to chair.

While Benjamin Saunders was a resident of the nursing home on March 19, 2006, he apparently was smoking unsupervised in the smoking room. The nurse's notes from the nursing center stated *"At approximately 6:40 p.m., patient Pedro Harley came to me in room 160 and said 'one of your patients is on fire in the smoking room.' I ran to the atrium and looked toward the smoking room and saw a patient in a wheelchair completely engulfed in flames. I entered the anteroom and saw Mr. Saunders. It was impossible to rescue the patient as he and wheelchair were completely on fire. Code*

*Blue and Code Red were initiated and the fire was extinguished with a fire extinguisher. The patient was taken to the MICU."*

Following this event, Benjamin Saunders was transferred to the Veterans Administration Medical Center. According to the hospital records, the patients sustained third degree burns over 100 percent of his body surface. The admission note stated *"Patient was a 64 year old male with unknown past medical history who was brought emergently to the MICU when a Code Blue was called as the patient was escorted from the nursing home after was noted to be burning. On arrival, he was pulseless and unresponsive. He had no blood pressure or pulse.* Mr. Saunders was pronounced dead after 22 minutes of attempts to resuscitate him failed.

## Discussion

The Joint Commission for the Accreditation of Health Care Organizations (JCAHO), provided standards from which nursing homes such as the Veterans Administration Medical Center CNRC provide care. The facility must comply with JCAHO standards in order to be accredited by this body.

The following JCAHO standards are applicable in the care of Benjamin Saunders:

1. EC.130- a. The organization develops a policy regarding smoking in all areas of all buildings under the organization's control.
    b. The organization's policy prohibits smoking in all building(s) under the organization's control (no medical exceptions allowed) for all children or youth residents.
    c. The organization's policy may permit residents to smoke in the organization's buildings under the following circumstance: a resident meets criteria developed and approved by the organization's leaders.
    d. When residents are permitted to smoke in the organization's buildings, they smoke only under the following circumstances: In designated locations environmentally separate from care, treatment or service areas after the organization has taken measures to minimize fire risks.
    e. Residents who do smoke in the organization's buildings are discouraged from doing so and are provided education including information about options for smoking cessation.
    f. The organization identifies and implements a process(es) for monitoring compliance with the policy.
    g. The organization develops strategies to eliminate the incidence of policy violations when identified.
2. PC.4.10-Development of a plan for care, treatment and services is individualized and appropriate to the resident's needs, strengths, limitations and goals.
    a. Care, treatment and services are planned to ensure that they are appropriate to the resident's needs.
    c. The interdisciplinary team identifies and prioritizes each resident's care needs based on the analysis of assessment data.
    l. Evaluation of the resident is based on the resident care goals and the resident's plan for care, treatment and services.
    m. The goals of care, treatment and services are revised when necessary.

–4–    December 24, 2006

The regulations require that residents have ongoing assessments of their ability to safely smoke within a facility. There is no documentation in Mr. Saunders's nursing home records that any evaluation of his ability to safely smoke had been performed during his 13-month admission. There are notes contained within Mr. Saunders' records that the staff did try to dissuade him from smoking. He appears to have smoked four-five cigarettes per day.

There was no care plan found within the clinical records providing guidance for the staff in supervising Mr. Saunders' smoking activities, providing him a smoking apron or ensuring that a staff member supervises his smoking activities. The nurse's notes clearly stated that another resident alerted the staff that Mr. Saunders had been fully engulfed in flames. There was no evidence that he had been supervised by the staff.

Although the psychologist who performed an evaluation of Mr. Saunders on January 30, 2006 identified a decline in the resident's cognitive abilities from the previous assessment, there is no evidence that the nursing home staff developed or modified its care plans to ensure that Benjamin Saunders was capable of smoking independently. Serial assessments of his smoking were not contained within the clinical records.

A review of the VAMC policies and procedures regarding smoking safety contained within CNRC Policy Memorandum Number 19 dated February 2005 included the provisions that the Smoking Shelter adjoining the CNRC atrium and the CNRC Patio were the only locations approved for smoking for residents of the unit. Further, the policy stated *"The CNRC staff (Medical and Nursing Service) assess smoking habits on admission and identify those residents considered "High Risk" smokers. "High Risk" smokers are those residents who pose a threat to themselves or others due to their reluctance to following smoking regulations and/or those individuals with a medical condition that prevents them from fully understanding the smoking policy."* A second provision in the policy requires that *"The physician/nurse practitioner will write an order indicating "High Risk Smoker-Supervised Smoking Only." A list of "High Risk" residents will be posted on each unit and documented as "high risk smoker" in the interdisciplinary Plan of Care. These High Risk Residents will only smoke under the direct supervision of CNRC staff or volunteers (or when a family member/significant other is present). Cigarettes for high risk residents may be kept at the nursing station and issued by CNRC staff."* There are references in the chart that Mr. Saunders had been asked by the staff regarding his desire for smoking cessation interventions, however there is no documentation in Benjamin Saunders' VAMC record that he was assessed regarding his safety in smoking. There were no care plans devised to address his smoking risk, despite the fact that this policy was in effect for over one year prior to his fatal incident.

Of note, an evaluation of the sprinklers in place in the Smoking Shelter at the time of Mr. Saunder's fatal fire revealed no inherent problems with the devises, however in a report to the VAMC by Cetrom, Inc., it was stated that *"the sprinklers were initially developed as a means of property protection and even the advances such as quick response sprinklers do not promise to prevent a fire or extinguish at an incipient stage. Instead, they are designed to control the initial fire and its spread."* Therefore, the fire sprinkler system is primarily designed to minimize the loss of property rather than to provide a significant intervention in the event that a resident has become involved in a fire.

– 5 –                                December 24, 2006

A memorandum generated by the VAMC dated April 27, 2006 acknowledged that video camera surveillance of the Smoking Shelter was not in place on the day of Benjamin Saunder's fire. The policies and procedures in place called for residents to be smoking under the direct supervision of CNRC staff, volunteers, family or significant others, however there was no evidence that the room was under direct observation on March 19, 2006.

**Conclusions**

There is no evidence that Veterans Administration Medical Center CNRC assessed Benjamin Saunders' ability to smoke independently at any time during his nursing home stay. No precautions were taken to promote safe smoking despite his left sided weakness, periods of unresponsiveness and his seizure disorder. His garbled speech likely contributed to his inability to summon help from staff when the fire first began. Mr. Saunders was smoking without any supervision from the staff and was discovered fully engulfed in flames by a fellow resident, rather than by a staff member. Moreover, there were no care plans found in Benjamin Saunders' records with regard to his ability to smoke or the need of the facility staff to intervene.

It is my opinion within a reasonable degree of professional nursing and nursing home administration certainty that the staff of the Veterans Administration Medical Center CNRC deviated from accepted standards of care including JCAHO regulations in the delivery of care and services to Benjamin Saunders. As a result of these deviations, Mr. Saunders smoked in an unsafe manner on March 19, 2006. He died on that date as a result of sustaining third degree burns over 100% of his body surface, according to the records. Specifically, the facility deviated from accepted standards of care by:

1. Failing to provide a baseline assessment of his ability to smoke independently;
2. Failing to reassess his smoking ability upon readmission to the facility in January 2006;
3. Failing to reassess his smoking ability after he was evaluated by the psychologist and was found to have increased cognitive deficits;
4. Failing to reassess his smoking ability after he was found unresponsive in February 2006;
5. Failing to devise a care plan to address his smoking risks;
6. Failing to provide a smoking apron or similar material to reduce the risk of unsafe smoking consequences;
7. Failing to provide adequate supervision of his smoking activities by the facility staff;
8. Failing to follow the facility's own policies and procedures which were in effect at the time of his fatal injuries.

-- 6 --                                    December 24, 2006

This report may be amended should further information become available.


Sincerely,

*Ilene Warner-Maron*

Ilene Warner-Maron
RN,C CWCN MA MLSP CALA NHA

# ALDEN

GERIATRIC CONSULTANTS, INC.

February 22, 2008

W. Charles Meltmar, Esquire
The Cochran Firm
1100 New York Ave, N.W.
Suite 250-West Tower
Washington, D.C. 20005

**RE: Benjamin Saunders**

Dear Mr. Meltmar,

     This report shall serve as an addendum to my original report of December 24, 2006 which includes additional opinions based the production of additional documents and deposition testimony. These additional documents include:

1. Subpoena Responses from the Metropolitan Police Department:
    a. Death Report;
    b. Autopsy Report;
    c. WACIIS Investigative Supplemental Report;
    d. MPD Arson Task Force Fire Fatality Report;
    e. ATF reports;
    f. Incident Based Event Report;
    g. Supplemental Police Report dated April 13, 2006;
    h. Notes of Detective Kim Lawrence;
    i. Floor plan;
    j. Staffing schedule;
    k. Fifteen (15) color photographs of decedent;
    l. Eighty (80) color photographs of smoking room, decedent's wheel chair, sprinklers and fire extinguishers;
    m. Deposition testimony:
    n. Voluntary Witness Statements:
        i. Johnniie M. Belton;
        ii. Moses Oyegbami;
        iii. Yvette Turner;
        iv. Robin Blackmon;
        v. Georgi Moyer;

      vi.  Jerry L. Phillips;
     vii.  Wanda Smith;
    viii.  Donna Harris-Nwangwu;
      ix.  Jane Njenga;
       x.  Patricia Hamitte;
      xi.  Cobertha Bizzelle;
     xii.  Helen Choi;
    xiii.  Solauye Waller

2.  Deposition Testimony:
    a.  Frances Henderson, RN;
    b.  Scott Burgoon;
    c.  Ashraf Alehossein, CRNP;
    d.  Edita Micu;
    e.  Robert Carnevale;
    f.  Raya Kheirbek, MD;
    g.  Jerry Lee Phillips, C.N.A.

## Depositions

The testimony of certified nursing assistant Jerry Lee Phillips included identification of Benjamin Sander's functional limitations which included a left hand contracture that caused the fingers of the resident's hand to be fixed upon his palm, the left arm contracted across Mr. Sander's abdomen, an inability to raise the left arm, an inability to stand or ambulate and slurred speech. Mr. Phillips described Benjamin Sander's speech as *"it wasn't very clear. I guess after you've been around him a while, you could start to understand him somewhat. But you still had to listen and really pay attention to understand him."* Mr. Phillips testified that he saw Mr. Sanders light two cigarettes in succession prior to Mr. Phillips leaving the smoking room to have his break. As he walked toward the atrium, he testified that a nurse informed him that Benjamin Sanders was on fire. He reported going to the site of the smoking room and finding the resident engulfed in flames with flames above his head. No smoking apron was on Mr. Sanders at the time of this fire. Jerry Lee Phillips further testified that he picked up a fire extinguisher, pulled the pin, but found that nothing came out of the device. He and the staff gathered blankets and attempted to use them to put out the fire, without success. Another unidentified staff member arrived with a fire extinguisher that was functional and Mr. Phillips used this to put out the fire. He reported that Mr. Sanders was on fire but his wheelchair had not been on fire.

The Medical Director of the nursing home unit, Raya Kheirbek, MD testified that was responsible for supervising and implementing the care rendered to Benjamin Sanders by the staff. She testified that *"Definitely, we were very worried about his smoking habits and we made every effort, every effort, to make him stop."* Dr. Kheirbek's concerns focused upon the medical harm caused by smoking, rather than the issue of whether Benjamin Sanders was safe to smoke given his left hemiplegia, cognitive deficits and speech impairment. Similarly, the nurse practitioner who oversaw Mr. Sander's care, Ashraf Alehossein, testified that she regularly counseled the resident about smoking cessation but did not complete a formal assessment of Mr. Sander's smoking abilities to determine if he was safe to smoke unsupervised. She repeatedly stated that Mr. Sanders was a safe smoker but did not complete any formal assessment of his smoking abilities during the five years she had treated

the resident. Nurse Alehossein acknowledged that she was responsible for assessing Benjamin Sander's ability to smoke.

Nurse Alehossein testified that she was aware that in addition to Mr. Sander's left hemiplegia, dysarthria and cognitive issues, he had a seizure disorder and experienced a seizure in the elevator of the facility approximately one year before his death. She acknowledged that a neuropsychologist, Cynthia Sullivan, had signed off on a Mini Mental Status Assessment (MMSE) of the resident that identified the presence of cognitive deficits, however Nurse Alehossein disagreed with this finding. She testified that Benjamin Sander's speech was impaired, characterized by expressive aphasia and dysarthria.    Aphasia by definition is the inability to express oneself properly through the use of speech. Dysarthria is defined as difficult and defective speech due to the impairment of the tongue or the musculature essential to speech. She acknowledged that Mr. Sanders had periods of hypoxia, the lack of adequate oxygenation, as a consequence of his smoking and episodes of bronchitis. Clearly, episodes of inadequate oxygen levels in the brain and seizure activity placed Mr. Sanders at increased risk for smoking-related injuries.

The Occupational Safety Specialist, Robert Carnevale, testified that his office was responsible for complying with the NFPA fire safety standards including assuring that the fire extinguishers were maintained monthly. A contractor was required to actually perform the maintenance of the extinguishers, however Mr. Carnevale was unaware of the requirements of this inspection. He acknowledged that at least one of the fire extinguishers that were involved in the fire fighting activities of Benjamin Sanders had an expired monthly inspection sticker.

The DON equivalent and 30(b)(6) witness, Frances Henderson, RN, testified that she found no evidence of a care plan in Benjamin Sander's clinical records regarding his smoking.  There was no order in the resident's chart identifying him as a high risk smoker. The interdisciplinary team had not assessed Mr. Sanders' ability to smoke or identify him to be a high, medium or low risk with regard to his smoking.  Nurse Henderson acknowledged that the facility's smoking policy was to asses the residents to determine if they could safely smoke, however there was no such documentation contained in the records of Benjamin Sanders.

Nurse Henderson identified that the nursing home was inspected by the Joint Commission for the Accreditation of Health Care Organizations (JCAHO) using the regulatory framework of the Centers for Medicare and Medicaid (CMS) contained in 42 C.F.R. § 483, known as OBRA-87. She acknowledged that the smoking risk assessment must be documented within the clinical record. She testified that OBRA requires facilities to perform assessments of residents with regard to their risk of unsafe smoking.   The regulation commonly cited for smoking-related deviations is §483.25(h)(2) which states **The facility must ensure that each resident receives adequate supervision and assistance devices to prevent accidents.**  It requires that long term care facilities provide supervision to residents in a designated smoking area and that the facility's policies and procedures be implemented in order to ensure that residents who require supervision while smoking receive the necessary supervision.   Smoking policies include the completion of an assessment for all residents who smoke.

A variety of smoking assessment forms is available for long term care facilities. One assessment which is available from the ADL website free of charge, includes the following parameters:

1. Does the resident smoke?
2. Is the resident alert?
3. If the resident physically capable of holding a cigarette, matches/lighter and lighting and extinguishing own cigarette without assistance?
4. Is the resident able to extinguish a lit cigarette ash/cigarette if it falls on his person?
5. Is the resident able to call for help if lit cigarette or ash falls on his person or on others?
6. Is the resident able to move without assistance to designated smoking area?
7. Does the resident have a past history of poor judgment regarding safety of himself or others?
8. Does the resident have any contraindications to smoking such as syncope, TIA, loss of feeling in fingers, arthritis etc?
9. Has the resident been instructed in facility policy regarding safety of himself/others?
10. Has the resident signed the Resident Smoking Agreement and the Smoker's Release of Responsibility forms?

Based upon the answers to these questions, a social worker makes the initial assessment of a resident's ability to safely smoke. It is clear that Mr. Sanders was capable of holding his cigarette in his right hand and that he was incapable of calling for help in the event that his cigarette or ashes fall causing injury.

An additional smoking assessment was developed in Canada for use in nursing homes. It includes questions asked of the resident regarding smoking habits and whether he/she has fallen asleep while smoking. Residents are specifically asked what action they would take if there was an emergency in the smoking room. Additionally, risk factors are addressed including the following:

1. The presence of physical limitations that have implications on the resident's ability to smoke such as arthritis, hand injury or paralysis;
2. The need for assistive devices that alter the ability to smoke;
3. Whether the resident engages in unsafe activities such as disposing the ashes/cigarettes in an unsafe manner or shows evidence of burn marks on clothes or self;
4. The resident is known to attempt to set fires;
5. The resident consumes excessive amounts of alcohol;
6. The resident has a history of falling asleep while seated;
7. The resident takes any medication that could impair safe smoking

In this assessment, the affirmative answer to any one of the questions is sufficient for the staff to place the resident at risk for unsafe smoking and to prevent him/her from smoking independently. Benjamin Sander's records indicated the presence of physical limitations including left hemiplegia and a seizure disorder. It is not known if the resident had a history of falling asleep while seated or whether he used unsafe means of ash and cigarette disposal while smoking. The final portion of the assessment called for direct

– 5 –                                            February 22, 2008

observation of the resident regarding the ability to get to the smoking room, obtain cigarettes and lighter, obtain and use a smoking apron, access an ashtray, light a cigarette, hold it securely, dispose of the ashes in the ashtray properly, put out the cigarette, return the cigarettes and lighter to storage and to call for emergency assistance. It is clear from both the clinical records and the deposition testimony that Mr. Sanders did not have a smoking apron in use at the time of his fatal injuries on March 19, 2006 nor was he able to call for help due to his speech deficits.

## Conclusions

Facilities such as the nursing home unit of the Veterans Administration Medical Center are required to comply with the federal regulations governing long term care facilities contained within 42 C.F.R. § 483 which is overseen by the JCAHO. The specific regulations pertaining to resident safety require that facility staff provide supervision and assessment to prevent accidents. It is clear in the case of Benjamin Sanders that the facility staff did not perform any comprehensive smoking assessments, document such assessments or identify any risk factors that would have clearly placed this resident at risk for unsafe smoking. There was no written care plan or interventions to reduce his risk of unsafe smoking. There was no supervision of Benjamin Sanders smoking activities despite his multiple medical problems, inability to call for help and evidence of cognitive decline. Moreover, the facility failed to ensure that its fire extinguishers were in proper working order at the time of the fatal fire.

Therefore, it remains my opinion within a reasonable degree of professional certainty that the staff of the skilled nursing unit (CNRC) of the Veterans Administration Medical Center of Washington, D.C. deviated from accepted standards of care in the treatment of Benjamin Sanders.

This report may be amended should further information become available.

Sincerely,

Ilene Warner-Maron
Ph.D., RN,C CWCN CBN CALA NHA

# *Curriculum Vitae ... ... ... ... ... ... ... ... ...*

Ilene Warner-Maron, Ph.D., RN,C CWCN CBN CALA NHA
2 Dundee Mews    Media, PA 19063-1167
(610)-917-0255 Office; (610)- 325-9197 FAX; (610) 322-2865 Cellular
Email: aldengeriatrics@aol.com

# *Education ... ... ... ... ... ... ... ... ... ... ... ... ... ...*

**1978- 1980 Albert Einstein Medical Center School of Nursing**
Philadelphia, PA  Diploma in Nursing

**1981-1983 Philadelphia University**, Philadelphia, PA
Bachelor of Science, Sociology

**1983-1985 University of Pennsylvania**, Philadelphia, PA
Master of Arts, Social Gerontology

**1987-1989 St. Joseph's University**, Philadelphia, PA
Post-Masters Degree in Health Administration

**1994-1995 Bryn Mawr College**, Bryn Mawr, PA
Masters Degree in Law and Social Policy

Jan.-May, 2000  Essentials of Clinical Research,
**Medical College of Pennsylvania/Drexel University**, 54 hours
(Completed training course on the Protection of Human Research Subjects
sponsored by the National Institute of Health Office of Human Subjects
Research, January 30, 2001).

Jan. 2001- December 2007 **University of the Sciences in Philadelphia**
(Formerly Philadelphia College of Pharmacy and Sciences)
Ph.D. in Health Policy Dissertation: "Interventions by Health Professionals for the
Dissemination of HIV Information for Older Adult People in West Philadelphia."

July 23-26, 2007. Basic and Advanced Principles of Patient Safety
**ASHRAM (American Hospital Association), Chicago, IL.**

# *Professional Credentials ... ... ... ... ... ... ... ... ... ...*

| | |
|---|---|
| RN license Pennsylvania | 242811-L issued April, 1981 |
| RN license Delaware | LI-0024095 issued April, 1995 |
| RN license New Jersey | NR 88527 issued September, 1995 |
| RN license Virginia | 1199139 issued November, 2005 |

Nursing Home Administrator (NHA) license: Pennsylvania 03664-L 11/91
---Certification in Gerontological (RN,C) Nursing, American Nurse's Association, Oct. 1994, re-certified in 1999, 2004
---Certified Wound Care Nurse (CWCN), Wound, Ostomy and Continence Board, June, 1995, re-certified in 2000, 2005
---Certified Assisted Living Administrator (CALA), American College of Health Care Administration, March 2000; recertification March 2005
---Certified in Bariatric Nursing (CBN), American Society for Metabolic and Bariatric Surgery (ASMBS) June 2007

# *Recognition and Awards* ... ... ... ... ... ... ... ... ... ...

2002 Nancy Tatum Memorial Award for Excellence in Nursing – Delaware Valley Geriatrics Society

# *Professional Experience*... ... ... ... ... ... ... ... ... ...

**7/94- present: Consulting Practice (Alden Geriatric Consultants, Inc. 1998)**
Providing expertise in the field of administration and nursing interventions for home care, nursing home and community-based geriatric clients. Expert testimony regarding standards in long term care settings, Medicare and Medicaid fraud and National lectures on geriatric nursing and wound care. Current clients include the following and the associated date indicates the year the association began:
*Institute for Continuing Education and Research (1994), Technical Advisory Service for Attorneys (1994), Center for Health Care Education (2002), Jeffrey J. Maron, DO PC (2006) Kendal Communities (2007), New Jersey Department of Aging and Senior Services (2005) St. Agnes Center Continuing Care (2007), Crozer Keystone Home Health (2008)*

**University of Pennsylvania Health System:**
08/06-present: **Wissahickon Hospice-Director of Fifth Stage Wound Program** (employee)
10/06- 9/07: **Penn Care at Home- Disease Management, Quality Assurance** (employee)
01/03-01/07- **Penn Presbyterian Medical Center Skilled Nursing Facility**- wound specialist (employee)
09/03-01/04-**Penn Presbyterian Medical Center Skilled Nursing Facility**- Acting Director of Nursing (employee)
04/05-10/06-**LIFE Program**-wound specialist (consultant)
04/05-04/06-**Penn Center for Rehabilitation and Care**- wound specialist (consultant)
08/04-06/05-**Wissahickon Hospice**-Acting Director of Nursing (employee)
02/02-01/04-**Center for Biostatistics and Epidemiology**-Gerontologist for study on medication safety (employee)
02/00-10/01- **Center for Biostatistics and Epidemiology**- researcher for study of the epidemiology of hospital acquired pressure ulcers (employee)

2

9/05-present. **University of the Sciences in Philadelphia.** Philadelphia, PA. Adjunct Professor, Misher School of Social Sciences

7/03- present. **Philadelphia Corporation for Aging,** Philadelphia, PA Research/Intervention nurse for AoA grant for the Family Caregiver Support Program. Nurse for the Family Caregiver Support Program. Performs research activities under the Director of Research.

9/02-present. **University of Delaware,** Wilmington, DE. Faculty for legal nurse certification program: introduction to the use of law in society and medical records review.

2/89-2/03. **Professional Care Management Institute,** Norristown, PA. Wrote and presented programs on geriatric health issues for employees of Area Agencies on Aging in Allegheny, Bucks, Chester, Delaware, Montgomery and Philadelphia Counties as well as the State of New Jersey.

10/02-10/04; **Home Health Corporation of America,** King of Prussia, PA Wound consultant for home health care agency.

6/00-6/02; **Millenium Home Health Care,** Havertown, PA. Wound consultant for home health care agency.

8/01-9/01; **Freedom Village,** Brandywine, PA. Interim Administrator for Nursing Home and Assisted Living Facility in CCRC.

10/99-1/03; **Martin's Run Continuing Care Retirement Community,** Media, PA Staff nurse in nursing home section with responsibilities for assisted living and independent living.

10/98-1/99: **Temporary Manager, Greenbelt Nursing and Rehabilitation Center,** Greenbelt, MD. Appointed by the Department of Justice to direct mediation of facility under the jurisdiction of the False Claims Act.

12/98-12/00- **Home Health Care Resources,** Bensalem, PA. Wound consultant for home health care agency in 5 county region.

6/98-12/00- **Genesis Home Health Care,** Broomall, PA. Wound consultant for home health care agency in 5 county region.

1/98-2/98- **Divine Providence Village,** Springfield, PA. Provided consultation for community living arrangement of MH/MR population.

9/94-10/96- **Etris Associates,** Philadelphia, PA. Wound care consulting services for home care and nursing home residents. Created QA program for nursing homes involving the development and treatment of pressure ulcers.

3

10/94-97 -U.S. Department of Justice, Philadelphia, PA. Consultant. Investigated fraud and abuse for False Claims actions.

3/95-11/96- RHA Pennsylvania. Consultant for nursing homes (Pembroke and Prospect Park) providing administrative and nursing support.

2/90-4/91 and 6/93-8/94. Jireh Associates, Broomall, PA. Quality Assurance consulting firm for long-term care and remediation of adverse licensure actions.

4/93- 12/94. Quaker Health, Inc., Devon, PA. Case Management, Quality Assurance, Utilization Review and education consulting for home care agency.

4/91-3/93. Haverford Nursing and Rehabilitation Center, Havertown, PA. Administrator of 110 bed facility. (Assistant Administrator 4/91-11/91, interim administrator 7/98-8/98).

9/90- 5/92. Philadelphia College of Textiles and Sciences. Adjunct faculty Evening Division, authored and taught "The Sociology of Health" and graduate courses in health administration.

2/90- 10/90. Coalition of Advocates for the Infirm Elderly (CARIE), Philadelphia, PA. Implemented educational grant designed to address abuse in long term care.

3/89-2/90. Delaware County Office of Services for Aging (COSA) Media, PA. Supervisor, Adult Protective Services.

12/87-10/88. Healthway Home Care, Havertown, PA. Nursing supervisor for home health care agency.

1/83-12/87- Rosenfeld and Maron Medical Associates, Philadelphia, PA. Case manager and patient educator for internal medicine group.

1/82-1/83-Metropolitan Home Health, Horsham, PA. Visiting Nurse for five county area.

4/81-1/82-Rittenhouse Care Center, Philadelphia, PA. Nursing Supervisor for 180 bed nursing home.

7/80-1/82; Albert Einstein Medical Center, Philadelphia, PA. Staff nurse in medical/surgical, alcohol treatment, psychiatry, ICU/CCU and operating room areas.

6/77-7/78; Metropolitan Home Health, Horsham, PA. Home health aide.

1/75-6/77; Chateau, Bryn Mawr, PA. Nurse's aide in nursing home.

# *Professional Organizations*... ... ... ... ... ... ... ... ... ... •

Board Positions:

Eastern Pennsylvania Geriatrics Society- (Secretary) 1997- present
President-elect 2004-2005
President 2005-2006
Past President 2006-2007

Philadelphia Chapter American Association of Legal Nurse Consultants
Director at Large: 2000-2001
President-elect:    2001-2002
President:         2002-2003
Past President:    2003-2004

Wound, Ostomy and Continence Nursing Society
Newsletter Editor, Delaware Valley Geriatrics Society (1999-2000)
American Geriatrics Society
NAHOF

# *Publications*... ... ... ... ... ... ... ... ... ... ... ...

Samuel Rosen, Ilene Warner and Nancy Morrow Editors. Health and Aging Training Manual, 1991. Pennsylvania Care Management Institute.

Ilene Warner. "Pharmacology and the Elderly." Pennsylvania Care Management Institute Perspectives. Winter, 1992 p. 4-5.

Ilene Warner. "Spreadsheets." Nursing Homes-Long Term Care Management. July/Aug. 1993 Vol 42 No. 6 p. 30-31.

Ilene Warner. "The Resident's Rights Quiz." PADONA Journal. Jan/Feb 1994, p. 6-12.

Marie Brown Etris and Ilene Warner. "What Your Nonlicensed Staff May Not Know About Pressure Ulcers." PADONA Journal. July/Aug 1995. P. 9-12.

Ilene Warner. "Why?" PADONA Journal July/Aug 1996 p. 6.

Ilene Warner. "Telehealth Applications in Home Health Care." Home Healthcare Nurse. Oct. 1996. 790-796.

Ilene Warner. "Telemedicine Applications for Geriatric Care Management." Journal of Geriatric Care Management. Fall, 1996. P 20-23.

Ilene Warner. "Telemedicine Applications for Home Health Care." Journal of Telemedicine and Telecare. 1997; 3 Supp. 1:65-66.

Ilene Warner. "Whose Liability Was This, Anyway?" Home Health Insights. Jan/Feb. 1997 Vol 2 Issue 1. p 8-9.

Ilene Warner and Raymond Albert. "Avoiding Legal Land Mines in Home Health Care Nursing." Home Health Care Management and Practice. 1997. Vol. 9 No. 6, p. 8-16.

Ilene Warner. "Help Prevent Pressure Ulcers... Even While Your Patient is Hospitalized." Clinical Advisor Vol. 1 No. 2 Aug, 1997.

Ilene Warner and Alexander Beller. "Electronic Home Visits to Improve Care And Decrease Costs." In Handbook of Home Healthcare Administration, 2nd Ed. Marilyn Harris, Editor. Gaithersburg: Aspen Press, 1997.

Ilene Warner. "Telehealth in Home Care Practice (Introduction)." In Home Healthcare Wired and Ready for Telemedicine. Audrey Kinsella, Editor. Information For Tomorrow, 1997.

Audrey Kinsella and Ilene Warner. "Telehealth in Home Care Practice." Nurse Educator Vol 23 No. 3, 7-8 1998.

Audrey Kinsella and Ilene Warner. "Telehealth and Managing Congestive Heart Failure." Caring Magazine June 1998 14-18.

Ilene Warner. "Reflections on Care Management from a Health Professional's Perspective." PCMI Perspectives Oct. 1998 Anniversary Issue, 13-14.

Ilene Warner and Raymond Albert. "Liability for Neglect in Nursing Homes." Law and Social Work Practice: A Legal Systems Approach 2nd Ed by Raymond Albert. Springer, 2000.

Ilene Warner. "Talking with Older People about HIV/AIDS." Nursing Spectrum. July 16, 2001 p. 6-7.

Ilene Warner. "Litigation of Nursing Home and Assisted Living Malpractice Cases." 4th Annual Legal Issues in an Age of Aging. Pennsylvania Bar Institute 2001.

Ilene Warner. "What's Inside the Third Shoebox?" Nursing Spectrum Vol. 11 No. 5PA, March 11, 2000 p. 6.

Ilene Warner, "Nursing and Long Term Care Concerns of Foot Care in the Elderly." In Clinics in Podiatric Medicine and Surgery: Foot Care for the Elderly: Podiatric Assessment, Education and Prevention 20 (2003) pp. 383-394. Edited by Arthur E. Helfand, DPM, Elsevier Science.

Jack Ryan, Rebecca McMillen and Ilene Warner-Maron. Implementation of Consumer-Directed Services- New Jersey Department of Aging and Senior Services. February 2005.

Joan Klein, Allen Glicksman and Ilene Warner-Maron. Caregiver Nursing Protocol: Integrating Nursing Interventions with Social Work Services. March 2005.

# *Presentations... ... ... ... ... ... ... ... ... ... ... ... ... ... ... .*

"Ensuring an Abuse Free Environment." Temple University Seminars in Long Term Care Administration. Philadelphia, March 11, 1994.

"Supervision in Care Management." American Society on Aging. Philadelphia, July 20, 1995. With Bradley LeVan.

"Documentation Skills for the Ombudsman." Northwest Interfaith Movement. Philadelphia, August 14, 1995.

"Clinical and Financial Management of Wounds in Long Term Care." Institute for Continuing Education and Research. Harrisburg, March 20, 1996. With Marie Brown-Etris.

Various programs in Telehealth presented in Washington, D.C., Denver, Lexington, London, UK, Philadelphia, Crystal City, Albany, Atlanta, Ann Arbor, Nashville and Houston 1996-1999.

"Geriatric Emergencies." Numerous sites since 1996. American Healthcare Inst.

"Advanced Assessment and Management of Geriatric Patients." Numerous sites since 1997. American Healthcare Institute.

"The Role of Nursing Services in LTC." Institute on Continuing Education and Research, Philadelphia (multiple dates).

"The Alzheimer's Disease Protocol." American Society on Aging. Philadelphia, August 6, 1997.

"Alzheimer's Disease Update." Joint Aging-MH/MF Conference. Philadelphia, Sept. 26, 1997.

"Alternative Medicine and Care Management." Pennsylvania Care Management Institute. Valley Forge, PA December 10, 1997. With Ronald Ciccone, MD.

"Malpractice in the Nursing Home." Institute on Continuing Education and Research." Philadelphia and Harrisburg, June 9 and 19, 1998. With Raymond Albert.

"Internet Skills for School Nurses." National Association of School Nurses Conference, Atlantic City, NJ July 22, 1998.

"Consumerism 101: Improving the Access of Consumers to Long Term Care Services." American Society on Aging. Philadelphia, July 29, 1998.

"Physical Aspects of Aging: Medical Conditions Common in the Elderly."
Pennsylvania Department of Aging Enrichment Training Conference on Aging
Issues, Hershey, PA. April 7, 1999.

"Racial and Ethnic Differences in the Health of the Elderly." American Society on
Aging. Philadelphia. July 13, 1999.

"Aging and Sexuality." Phila. Corporation on Aging. Philadelphia. July 22, 1999.

"Risk Management Issues Associated with Pressure Ulcers. Knoll Pharmaceuticals
Presentation on Wound Care. Atlantic City, NJ. August 5, 1999.

Certificate Program in Quality Assurance/Risk Management/Utilization Review.
Learning Tree University. (Multiple locations).

"Physical Aspects of Aging." Pennsylvania Department of Aging Enrichment
Conference. Harrisburg, PA. April 25, 2000.

Osteoporosis Training presented to PCA senior centers (10) March- July, 2000.

"Making Sense of Confusion: The Effects of Medications on the Mental Status of
the Elderly." Decision Making Capacity of Older Adults sponsored by the Delaware
County Aging and Behavioral Health Task Force. Aston, PA. May 18, 2000.

"Sexuality Issues in Aging." Caregivers Support Conference, Toftrees at Penn State,
PA. June 30, 2000, New Jersey Caregivers/Respite Program, Longbranch, NJ,
November 2, 2000.

"Pills, Potions, Patches: A Geriatric Treatment Update." American Society on Aging
Philadelphia, PA. July 20, 2000 and the Pennsylvania Department of Health
Enrichment Conference 5/01.

"Malpractice in Long Term Care." American Association of Legal Nurse
Consultants, Philadelphia Chapter. Plymouth Meeting, PA. November 9, 2000.

Certification Program in Medicare for LTU Extension (Various Locations) 2001.

"HIV/AIDS Prevention" for Senior Citizen Centers, Philadelphia Corporation for
Aging, (10 sites) May-June 2001 and PCA personnel February 8, 2005.

"Health, Aging and Nutrition" Pennsylvania Department of Aging Nutritional
Conference (Pittsburgh and Reading) May 8 and 15, 2001.

"Aging, Disease or Neglect: Determining the cause of Abuse." Pennsylvania Care
Management Institute State College, PA May 16, 2001 and Montgomery County
Aging and Social Services June 6, 2001.

"Secrets from the Trenches-Effective Assessment Skills." (With Lois Hayman-El). American Society on Aging 2001 Summer Series on Aging. July 30, 2001.

"The Third Shoebox: Understanding the Reasons Older Adult Use Complementary and Alternative Medicine." American Society on Aging 2001 Summer Series on Aging. August 2, 2001.

"Altering Unhealthy Behaviors." American Society on Aging 2001 Summer Series on Aging. August 2, 2001.

"Litigation of Nursing Home and Assisted Living Negligence Cases." Pennsylvania Bar Institute Oct. 3, 2001 with Jerold Rothkoff, Esq. Philadelphia, PA.

"Nursing Home Malpractice." Pennsylvania Medical Directors Association. Oct. 5, 2001 with Todd Goldberg, MD, Malvern, PA

"Forensic Nursing and Nursing Home Litigation." Tri-State Legal Nurse Consultant Conference. November 15, 2001, New Brunswick, NJ.

"Nursing Home Malpractice." PESI panel discussion. March 1 (Phila.), March 6, 2002 (Pittsburgh), October 24, 2002 (Baltimore), October 25, 2002 (Washington), March 21, 2003 (Pittsburgh) and March 28, 2003 (Phila.).

"Malpractice in Long Term Care." Institute for Continuing Education and Research. April 29, 2002 (Harrisburg), May 7, 2002 (Pittsburgh), June 4, 2002 (Philadelphia), June 19, 2002 (Scranton), June 3, 2004 (Harrisburg), June 22, 2004 (Philadelphia), June 15, 2006 (Harrisburg), June 20, 2006 (Philadelphia).

"Malpractice in Long Term Care." Center for Health Care Education, October 22, 2002 (Somerset, NJ), April 24, 2003 (Edison, NJ), January 17, 2005 onboard the Star Princess.

"Falls Across the Continuum." Philadelphia Chapter of the American Association of Legal Nurse Consultants. May 9, 2002 Plymouth Meeting, PA with Barry Yaches.

"Sexuality and HIV Prevention." With Patricia Bradley, PhD and Shaler Moscovits. American Society on Aging, Philadelphia, PA July 24 2002.

"Legal Issues Affecting Advanced Practice Nurses." With Michelle Daniel, JD RN. Lorman Education Services. Philadelphia, PA October 29, 2002.

"Wound Documentation and Assessment in Home Health/Hospice." Penn Care at Home and Hospice. Philadelphia, PA. May 21, 2003.

"The Black Holes of Medicare." American Association of Life Care Planners. Las Vegas, NV. September 13, 2003.

"Litigation Issues of Pressure Ulcers." Delaware State Chapter of the American Association of Legal Nurse Consultants. Newark, DE  October 1, 2003.

"Adapting Stephen Covey's Seven Habits of Highly Effective People for Nursing Home Management." Center for Continuing Education. Passaic, NJ  October 24, 2003 and January 22, 2005.

"Project to Address the Needs of African American Caregivers." With Joan Klein MSW. International Care Management Conference. Philadelphia, PA. October 26, 2003.

"When Best Practices Meet Urban Realities: Telemedicine and Medical Technology in the Home Environment." With David Kutzik, PhD and "The Future of Applied Research on Older Persons in Urban Settings." (panel discussion). Conference on the Physical and Social Environments of Urban Living. October 31, 2003.

"Sexuality and Aging." Care Consortium of the Delaware Valley, Inc. Haverford, PA. February 10, 2004 and PCA February 8, 2005 and for the Center for Education and Research April 28, 2005, Tinton Fall, NJ.

"The Sexuality of Aging." Southwest Connecticut Agency on Aging. Fairfield University, Fairfield, CT. April 23, 2004 and the Center for Health Care Education aboard the Star Princess January 22, 2005.

"The Effects of Cognitive Impairment and Mental Illness in Late-Life Relationships." Southwest Connecticut Agency on Aging. Fairfield University, Fairfield, CT. April 23, 2004 and Center for Education and Research April 28, 2005, Tinton Falls, NJ.

"Coping for Caregivers- Issues and Strategies for Those Taking Care of Aging Loved Ones." United Behavioral Health (LifeEra). Astra Zeneca Pharmaceuticals. Wilmington, DE. November 9, 2004.

"Supporting African American Caregivers." Administration of Aging Alzheimer's Disease Demonstration Grants to States Grantee' Annual Training Meeting. Washington, D.C. November 17, 2004.

"An Intervention on Behalf of Caregiver's Health." 57th Annual Scientific Meeting of the American Geriatric Society. With Joan Klein, Allen Glicksman and Julie Norstrand. Washington, D.C. November 20, 2004.

"Racial and Ethnic Differences in Geriatric Health." Philadelphia Corporation for Aging. February 15, 2005.

"Integrating Nursing Interventions with Social Work Services" with Joan Klein and Allen Glicksman. American Society on Aging Joint Conference, Philadelphia. March 13, 2005. (Poster Presentation at the Powell Lawton Conference,  April 27, 2005).

"Consumer Directed Care for the Aging and Disabilities Community." Warren County, NJ. The NJ Department of Health and Senior Services. May 24, 2005.

"The Role of the WOCN in Litigation." Poster presentation to the Northeast Region of the Wound, Ostomy, Continence Nursing Society Conference. Hershey, PA. October 21-23, 2005.

"HIV/AIDS Prevention in the Elderly in West Philadelphia." Poster presentation to the University of the Sciences in Philadelphia Fourth Annual Scholarly Day. Philadelphia, PA, April 20, 2006.

"Update on Current Issues in Long Term Care." Alex Makris, MD, Grace Harrison, NHA, Ilene Warner-Maron. Center for Health Care Education. Tinton Falls, NJ, April 25, 2006.

"End of Life Issues." Center for Health Care Education. Parsipany, NJ. May 2, 2006.

"Sexuality of Aging," "HIV and Aging" and "Drug Diversion in LTC." Institute for Continuing Education and Research June 27, 2006.

"Ethics Standards and Practices." Philadelphia Corporation on Aging, Philadelphia, PA. October 24, 2006.

"Issues of Malpractice in Hospice." Wissahickon Hospice. Bala Cynwyd, PA. April 10, 2007.

"Avoidable Versus Unavoidable Pressure Ulcers." University of Pennsylvania's Living with Dying Series. June 6, 2007.

"The Highly Regulated Nursing Home Industry" 9th Annual Nursing Home Negligence Conference, 2007. Las Vegas, NV. September 10, 2007.

"Avoidable Versus Unavoidable Pressure Ulcers". 9th Annual Nursing Home Negligence Conference, 2007. Las Vegas, NV. September 10, 2007.

"Interpreting Medical Records." 14th Annual Garden State Paralegal Convention. Eatontown, NJ. October 12, 2007.

"Clinical Wound Care Update." Crozer-Keystone Home Health and Hospice. January 16, 2008

1/08

11

Ilene Warner-Maron
**Court Appearances- Qualified as an expert in nursing and/or gerontological nursing and/or nursing home administration and/or wound management in:**

| | | | | |
|---|---|---|---|---|
| 1. Federal Court (Phila) | 1993 | *McKee v. Riddle Memorial Hospital* | | |
| Defense witness- Benjamin Post | | Verdict for **Defense** | **Hospital** | |
| 2. Bucks County | 1993 | *Long v. Lower Bucks Hospital* | | |
| Defense witness- Pamela Post | | Verdict for **Defense** | **Hospital** | |
| 3. Delaware County | 1998 | *Pitassi v. Bryn Mawr Hospital* | | |
| Plaintiff witness- Michael Reed | | Verdict for **Plaintiff** | **Hospital** | |
| 4. Chester County | 1998 | *Palmer v. Chester County Hospital* | | |
| Plaintiff witness- Tim Gallogly | | Verdict for **Plaintiff** | **Hospital** | |
| 5. Philadelphia, PA | 1999 | *Sauli v. St. Agnes Medical Center* | | |
| Defense witness- Benjamin Post | | Verdict for **Defense** | **Hospital** | |
| 6. Lakawanna County | 1999 | *Prisco v. Allied Nursing Homes* | | |
| Plaintiff witness- Powell and Powell | | Verdict for **Defense** | **NH premises** | |
| 7. Cumberland County, Maine | 2000 | *Blonder v. Casco Inn* | | |
| Plaintiff witness for Brann and Isaacson | | Verdict for **Plaintiff** | **Assisted Living** | |
| 8. New Castle County, DE | 2000 | *Miller v. Manor Care* | | |
| Plaintiff witness -Michael Carr | | Verdict for **Plaintiff** | **Nursing Home** | |
| 9. Middlesex County, NJ | 2001 | *Kretzmer v. Monroe Village* | | |
| Plaintiff witness- Alan Krumholtz | | Verdict for **Defense** | **NH employment** | |
| 10. Philadelphia, PA | 2001 | *Alper v. Wills Eye Hospital* | | |
| Plaintiff witness- Peter McNamara (video) | | | **Psych Hospital** | |
| 11. Delaware County, PA | 2001 | *Vinokur v DCMH* | | |
| Defense witness- Benjamin Post | | Verdict for **Defense** | **Hospital** | |
| 12. Philadelphia, PA | 2002 | *Wolfstern v. Methodist Hospital Nursing Center* | | |
| Plaintiff witness- John Salla | | Verdict for **Plaintiff** | **Nursing Home** | |
| 13. Morgantown, PA | 2002 | *Alwine v. Sugar Creek Rest* | | |
| Plaintiff witness- Zimmer Kunz | | Verdict for **Defense** | **Assisted Living** | |
| 14. Hollidaysburg, PA | 2002 | *Petak v. Connemaugh Hospital* | | |
| Plaintiff witness- Richard Stanko | | Verdict for **Defense** | **Hospital** | |
| 15. Maricopa County, AZ | 2003 | *Kauss v. Plaza Health* | | |
| Defense witness- Garvey Biggers | | **Settled during deliberations** | **Nursing Home** | |
| 16. Tampa, FL | 2003 | *Peeler v. Beverly* | | |
| Plaintiff witness- Julian Sanchez | | Verdict for **Defense** | **Nursing Home** | |
| 17. Queens County, NY | 2003 | *Nicholson v. Beth Israel* | | |
| Plaintiff witness- Eliot Sinel | | Verdict for **Plaintiff** | **Nursing Home** | |
| 18. Camden County, NJ | 2004 | *Winecki v. Olsten Home Health* | | |
| Defense witness- Jay Gebaur | | **Verdict for Defense** | **Home Health** | |
| 19. Franklin County, VT | 2004 | *Fredette v. Verdelle Valley* | | |
| Plaintiff witness- William Miller | | Verdict for **Plaintiff** | **Nursing Home** | |
| 20. Philadelphia, PA | 2004 | *Marker v. Temple University Hospital* | | |
| Plaintiff witness- George Schoener | | Verdict for **Plaintiff** | **Hospital** | |
| 21. Delaware County, PA | 2004 | *Anthony v. Riddle Hospital* | | |
| Defense witness- David Corejo | | Verdict for **Plaintiff** | **Hospital** | |
| 22. Oklahoma City, OK | 2004 | *Price v. South Park* | | |
| Plaintiff witness- Glendell Nix | | Verdict for **Plaintiff** | **Nursing Home** | |

| | | | |
|---|---|---|---|
| 23. Bronx, New York | 2005 | *Harpold v. North Bronx Hospital* | |
| Plaintiff witness- Robert Rosen | | Verdict for **Plaintiff** | **Hospital** |
| 24. Tulsa, OK | 2005 | *Ashley v. Frances Streital Center* | |
| Plaintiff witness- Ted Sherwood | | Verdict for **Defense** | **Nursing Home** |
| 25. Los Angeles, CA. | 2005 | *Morris v. Western Conv. Hospital* | |
| Plaintiff witness-Richard Chavez | | Verdict for **Plaintiff** | **Nursing Home** |
| 26. Delaware County, PA | 2005 | *Schultz v. St. James Place* | |
| Plaintiff witness-Martin Kardon | | Verdict for **Defense** | **Assisted Living** |
| 27. Maricopa County, AZ | 2005 | *Wheeler (Maynard) v. Pecos* | |
| Plaintiff witness-Martin Solomon | | Verdict for **Defense** | **Nursing Home** |
| 28. Wicomico County, MD | 2006 | *Copes v. Deers Head* | |
| Plaintiff witness-Charles Meltmar | | Verdict for **Plaintiff** | **Nursing Home** |
| 29. Green County, PA | 2006 | *Balog v. Guardian et al* | |
| Plaitiff witness-Tammy Harrelson | | Verdict for **Defense** | **Nursing Home** |
| 30. Lebanon County, PA | 2007 | *Brasher v. Manor Care* | |
| Plaintiff witness-John Zoranarich, JF | | Verdict for **Plaintiff** | **Nursing Home** |
| 31. Danville, Virginia | 2007 | *Musgrove v. MFA* | |
| Plaintiff witness- Jeffrey Downey | | Verdict for **Plaintiff** | **Nursing Home** |
| 32. Berks County, PA | | *McCauley v. St. Joseph's Med Center* | |
| Defense witness-Steven Costello | | Verdict for | **Hospital** |

## Hearings

Delaware County          1989-90          Approximately 15 guardianship and competency hearings as part of my role as supervisor of Adult Protective Services for the County of Delaware

Virginia Beach, VA     2004          Arbitration Hearing- *Selby v. Norfolk Health Care Center* Plaintiff's witness- Robert Guntharp

1985- Appointed Guardian of Person and Estate- Dorothy Berth Phila. Orphan's Court
2006- Appointed Guardian of Person-Pearl Allen- Philadelphia Orphans' Court

## Depositions

| | | | |
|---|---|---|---|
| 1. New Jersey | 1994 | *Mack v. Lisk* | (P)h |
| 2. New Jersey | 1995 | *DeBerto v. Manor Care* | (P)nh |
| 3. Maryland | 1996 | *Epps v. Home Nutrition Support* | (D)hh |
| 4. New Jersey | 1996 | *Labati v. Manor Care* | (D)nh |
| 5. North Carolina | 1998 | *Ely v. Cape Fear Medical Center* | (P)rch |
| 6. Delaware | 1998 | *Miller v. Manor Care* | (P)nh |
| 7. Maine | 1999 | *Blonder v. Casco Inn* | (P)al |
| 8. Arizona | 2000 | *Rauch v. Payson Care Center* | (P)nh |
| 9. New Jersey | 2000 | *Loschin v. Mediplex* | (P)nh |
| 10. Delaware | 2001 | *Farmer v. Courtland Manor* | (D)nh |
| 11. New Jersey | 2001 | *Kretzmer v. Monroe Village* | ()emp |
| 12. New Jersey | 2001 | *Jordan v. Bancroft School* | (P)hi |
| 13. Delaware | 2001 | *McWilliams (Hurschman) v. Manor Care* | (P)nh |

| | | | |
|---|---|---|---|
| 14. New Mexico | 2001 | *Epistacio Mazon v. Belen Health Care* | (P)nh |
| 15. Oklahoma | 2001 | *Ridgway v. Special Care* | (P)hh |
| 16. Oklahoma | 2001 | *Franklin v. Wewoka* | (P)nh |
| 17. Texas | 2001 | *Thomas v. Herman Manor* | (P)nh |
| 18. Oklahoma | 2001 | *Hays v. Mooreland* | (P)nh |
| 19. New Jersey | 2001 | *Rafaele v. Crest Haven* | (P)nh |
| 20. Oklahoma | 2001 | *Spradlin v. Sequoia* | (P)nh |
| 21. Illinois | 2002 | *Gray v. Avenue Care* | (P)nh |
| 22. Oklahoma | 2002 | *Fealthstone v. Trinity* | (P)nh |
| 23. Indiana | 2002 | *Woods v. Bethany Village* | (P)nh |
| 24. Washington, D.C. | 2002 | *Peiluzo v. Washington Hosp. Cntr.* | (P)b |
| 25. New Jersey | 2002 | *Lambertson v. South Ocean Co. Hosp* | (P)b |
| 26. Oklahoma | 2002 | *Shram v. Catoosa* | (P)nh |
| 27. Oklahoma | 2002 | *Harness v. Vian* | (P)nh |
| 28. Pennsylvania | 2002 | *Mosser v. MCGC* | (P)nh |
| 29. Maryland | 2002 | *Bennett v. Manor Care* | (D)nh |
| 30. Oklahoma | 2002 | *Franklin v. Wewonka* | (P)nh |
| 31. Arizona | 2002 | *Gregory v. Cameron House* | (P)al |
| 32. Oklahoma | 2002 | *Powell v. Maplewood* | (P)nh |
| 33. Oklahoma | 2003 | *Whitson v. Wentumka* | (P)nh |
| 34. Oklahoma | 2003 | *Hoose v. Wildwood* | (P)nh |
| 35. Oklahoma | 2003 | *Grayson v. Poloco* | (P)nh |
| 36. Arizona | 2003 | *Maynard v. Pecos* | (P)nh |
| 37. Maryland | 2003 | *Duvall v. Lorien-Frankford* | (P)nh |
| 38. Illinois | 2003 | *Schwartz v. Glenview Terrace* | (P)nh |
| 39. Arizona | 2003 | *Coscino v. Scottsdale* | (P)nh |
| 40. Oklahoma | 2003 | *Cough v. Kimberly* | (P)hh |
| 41. Maryland | 2003 | *Ferguson v. Midlantic* | (P)nh |
| 42. Florida | 2003 | *Peeler (Sewell) v. Beverly* | (P)nh |
| 43. Virginia | 2003 | *Chapman v. Rockingham* | (P)nh |
| 44. Maryland | 2003 | *Woodland v. JHC* | (P)nh |
| 45. New Jersey | 2003 | *Markowitz & Franklin* | (D)nh |
| 46. Maryland | 2003 | *Faulkner v. Pineview* | (P)nh |
| 47. New Jersey | 2003 | *Rovner v. Virtua Hospitall* | (P)nh |
| 48. Arizona | 2004 | *Brown v. Heartstone* | (P)nh |
| 49. Maryland | 2004 | *Cichetti v. Manor Care* | (P)nh |
| 50. Ohio | 2004 | *Cook v. MCO & Arbors* | (P)nh |
| 51. New Jersey | 2004 | *Bodner v. Millhouse* | (P)nh |
| 52. Kentucky | 2004 | *Smith v. Spectra Care* | (P)hh |
| 53. Florida | 2004 | *Hall v. Columbia Bartow* | (P)wcc |
| 54. New Jersey | 2004 | *Simon v. Little NH* | (P)nh |
| 55. Ohio | 2004 | *Greenfield v. Heartland* | (P)nh |
| 56. Arizona | 2004 | *Blum v. Kivel Care Center* | (P)nh |
| 57. Washington, D.C. | 2004 | *Gass v. JB Johnson Nsg Center* | (P)nh |
| 58. Maryland | 2004 | *Duvall v. So. Maryland Hosp. Center* | (P)nh |
| 59. Ohio | 2004 | *Burkey v. Pickerington* | (P)nh |
| 60. Virginia | 2004 | *Selby v. Norfolk Care Center* | (P)nh |
| 61. Virginia | 2004 | *Little v. Nansemond Nrsg. Center* | (P)nh |

| | | | | |
|---|---|---|---|---|
| 62. Oklahoma | 2004 | *Neal v. The Lakes* | (P)nh | |
| 63. Rhode Island | 2004 | *Richardson v. Riverside* | (P)nh | |
| 64. Oklahoma | 2004 | *Peterson v. Peak* | (P)nh | |
| 65. Ohio | 2004 | *Chambers (Dorsett) v. Echo Manor* | (P)nh | |
| 66. Maryland | 2005 | *Leahy v. Genesis* | (P)nh | |
| 67. Arizona | 2005 | *Conklin v. Red Mt. and Life Care Centers* | (P)nh alf | |
| 68. Virginia | 2005 | *Kemmer v. Genesis Williamsburg* | (P)nh | |
| 69. Oklahoma | 2005 | *Ashley v. Frances Streitel Villa* | (P)nh | |
| 70. Florida | 2005 | *Marshall v. I.H.S.* | (P)nh | |
| 71. Washington, D.C. | 2005 | *Byrd (Turner) v. Washington Health Care* | (P)nh | |
| 72. Oklahoma | 2005 | *Denton v. Evergreen* | (P)nh | |
| 73. New Jersey | 2005 | *Budnick (DeGross) v. Regent Care* | (P)nh | |
| 74. Maryland | 2005 | *Kirkendall (Cantymagli) v. Key Point* | (P)nh | |
| 75. California | 2005 | *Morris v. Western Conv. Hospital* | (P)nh | |
| 76. Maryland | 2005 | *Copes v. Deers Head Center* | (P)nh | |
| 77. Arizona | 2005 | *Moreno v. Life Care Centers* | (P)nh | |
| 78. New Jersey | 2005 | *Lauber v. Cornell Hall* | (P)nh | |
| 79. Oklahoma | 2005 | *Henley v. Featherston et al.* | (P)nh | |
| 80. New Jersey | 2005 | *Hunter v. Genesis/ Kennedy Home Health* | (P)nh hh | |
| 81. Rhode Island | 2005 | *Pisini v. Rhode Island Hospital* | (P)hosp | |
| 82. Maryland | 2005 | *Brown v. Manor Care Largo* | (P)NH | |
| 83. New Jersey | 2005 | *Johnson v Jersey Shore Hospital* | (P)hosp | |
| 84. New Jersey | 2005 | *Hoffman v. Hackensack Univ Med Ctr* | (P)hosp | |
| 85. Maryland | 2006 | *White v. Manor Care* | (P)NH | |
| 86. Iowa | 2006 | *Olsen v. Manor Care* | (P)NH | |
| 87. Georgia | 2006 | *Whitlock v. A.G. Rhodes Home* | (P)NH | |
| 88. Virginia | 2006 | *Wehler v. Westport* | (P)NH | |
| 89. Illinois | 2006 | *Chubinski v. Manor Care* | (P)NH | |
| 90. Illinois | 2006 | *Millard (Joyce) v. Manor Care* | (P)NH | |
| 91. New Jersey | 2006 | *Kosobucki v. Care One-Holmdel* | (P)NH | |
| 92. Arizona | 2006 | *Woodruff v. Meadow Park* | (P)NH | |
| 93. South Carolina | 2006 | *Truesdale v. HealthSouth* | (P)Reh | |
| 94. New Jersey | 2006 | *Russick v. Virtua and Mediplax* | (P)H/r | |
| 95. California | 2006 | *Reed v. Northridge/ St. Ann's Hospice* | (P)NH | |
| 96. Oklahoma | 2006 | *Cather v. Oklahoma Christian Home* | (P)NH | |
| 97. Missouri | 2006 | *Holman v. Plaza Manor* | (P)NH | |
| 98. Florida | 2006 | *Kramer v. West Boca Medical Center* | (P)hos | |
| 99. New Jersey | 2006 | *DiStabile v. Pascack Valley Hospital* | (D)hos | |
| 100. Delaware | 2006 | *Pietlock v. St. Francis Hospital* | (P)hos | |
| 101. Illinois | 2006 | *Hodges (Bashara) v. Alden Wentworth* | (P)NH | |
| 102. Kansas | 2007 | *Jakes v. Medicalodges* | (P)NH | |
| 103. New Jersey | 2007 | *Graziano v. Holiday Care Center* | (D)NH | |
| 104. Virginia | 2007 | *Musgrave v. Piney Forest* | (P)NH | |
| 105. California | 2007 | *Sims v. Carehouse* | (P)NH | |
| 106. Washington, DC | 2007 | *Elliot (Monk) v. WNF* | (P)NH | |
| 107. Florida | 2007 | *Loftin v. Woodland Terrace* | (P)NH | |
| 108. New Jersey | 2007 | *D'Onfrio v. St. Joseph Wayne Hosp* | (D)hos | |
| 109. Arizona | 2007 | *Cox v. Freedom Inn* | (P)ALF | |

| | | | |
|---|---|---|---|
| 110. Maryland | 2007 | *Fitzgerald v. Annapolitan* | (P)ALF |
| 111. Maryland | 2007 | *Farren v. Civista* | (P)hos |
| 112. PA (Federal) | 2007 | *Perry v. Manor Care* | (P)NH |
| 113. Virginia | 2007 | *Thomas v. Manor Care* | (P)NH |
| 114. New Jersey | 2007 | *Rucinski v. Merwick Rehab.* | (P)NH- |
| 115. Illinois | 2007 | *Younglove v. Alexian Brothers* | (P)hos |
| 116. Illinois | 2007 | *Cihon (Conroy) v. Advocate Hospital* | (P)hos |
| 117. Maryland | 2007 | *Cuesta v. Sunrise* | (P)ALF |

*9/07*

# Smoke-Free Policies in Facilities Serving Older Persons

## The Center for Social Gerontology

### 2307 Shelby Avenue, Ann Arbor, MI 48103 tel: 734 665-1126 fax: 734 665-2071

tcsg@tcsg.org

While the numbers of elders affected by secondhand smoke are astronomical, little is currently known about smoking policies in facilities serving older persons. A variety of facilities have been specifically created to serve an older clientele almost exclusively, including residential and non-residential facilities. Residential facilities include assisted living facilities (ALFs), nursing homes, rest homes, and related accommodations. Non-residential facilities include senior centers, adult day care facilities, adult foster care, and related types of day program settings.

Except for a 1997 survey by TCSG (see study below) that provided some of the first data on smoke-free policies in community-based Michigan facilities serving elders, few studies have examined smoking policies in non-residential or residential facilities. Yet, such policies have a direct bearing on the smoking habits and health of elders and a direct effect on non-smoking elders' health as a result of secondhand smoke.

Any discussion of smoking policies in these facilities must also address the thorny issues growing out of the fact that the residential facilities are the homes of the older residents, whereas the non-residential facilities are normally occupied during just a portion of the day by the individuals using them. These differences create a need to address the balancing act related to the rights of residents in certain of these facilities versus the rights of other users of these residential facilities. Thus, there may be a need to have different smoking policies for residential and non-residential facilities.

This web site is intended to provide information on and access to materials concerning smoking policies in facilities serving older persons. The site is also intended to spur more study of the issues related to this topic. Since materials on this topic are limited, we have also included below links to TCSG's Bibliography of Tobacco & Older Persons Articles, which lists some related articles, and to TCSG's Smoke-Free Environments Law Project site, which has sections on Secondhand Smoke and Apartments & Condominiums and on Smoke-Free Regulations, Ordinances & Policies which are relevant to this topic.

## POWERPOINT PRESENTATIONS ON SMOKE-FREE ENVIRONMENTS & TOBACCO ISSUES PERTAINING TO OLDER PERSONS

### Smoking Policies in Long-Term Care & Residential Facilities Serving Older Persons

In October, 2003, Jim Bergman, J.D., Co-Director of The Center for Social Gerontology



WAGNER
EXHIBIT NO. 5
4/8/08
C. CRUMP

## Smoking Assessment Form

Date _____

Name _____

**1.** Do you now smoke cigarettes?                    ☐ yes      ☐ no

**2.** Does the person closest to you smoke cigarettes?     ☐ yes      ☐ no

**3.** How many cigarettes do you smoke a day?         _____ cigarettes

**4.** How soon after you wake up do you smoke your first cigarette?
        ☐ within 30 minuntes         ☐ more than 30 minutes

**5.** How interested are you in stopping smoking?
        ☐ not at all    ☐ a little    ☐ some       ☐ a lot       ☐ very

**6.** If you decide to quit smoking completely during the next 2 weeks, how confident are you that you would succeed?
        ☐ not at all    ☐ a little    ☐ some       ☐ a lot       ☐ very

## For Physicians Only

| Visit Date | Quit Date (Y/N) | When | Followup Date & Comments |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
|  |  |  | _____ |
|  |  |  | _____ |
| _____ | _____ | _____ | _____ |
|  |  |  | _____ |
|  |  |  | _____ |
| _____ | _____ | _____ | _____ |
|  |  |  | _____ |
|  |  |  | _____ |
| _____ | _____ | _____ | _____ |
|  |  |  | _____ |

*How to Help Your Patients Stop Smoking, A National Cancer Institute Manual for Physicians*
T. Glynn, Ph.D., M. Manley, M.D., M.P.H.
US Dept. of Health and Humna Services, Public Health Service, NIH



# Resident Smoking Assessment

Completed by Social Services upon resident admission or re-admission.

| | Yes | No |
|---|---|---|
| 1.  Does the resident smoke?        (If **NOT**, skip to  NON-SMOKER check box below) | | |
| 2.  Is resident alert? | | |
| 3.  Is resident physically capable of holding a cigarette, matches/lighter, and lighting and extiguising own cigarette without assistance? | | |
| 4.  Is resident able to extinguish a lit cigarette ash/cigarette which has fallen on his/her person and/or on others? | | |
| 5.  Is resident able to call for help if lit cigarette ash/cigarette falls on his/her person or on others? | | |
| 6.  Is resident able to move without assistance to designated smoking area? | | |
| 7.  Does resident have a past history of poor judgement regarding safety of himself/herself or others? | | |
| 8.  Does resident have any medical containdications to smoking (e.g. syncope, TIA, loss of feeling in fingers, arthritis, etc.)? | | |
| 9.  Has resident been instructed in facility policy regarding safety of himself/herself or others? | | |
| 10. Has resident signed the '_____ Resident Smoking Agreement' and 'Smoker Release of Responsibility Form'? | | |

RESIDENT SMOKING STATUS BASED UPON ABOVE INFORMATION IS:

☐ NON-SMOKER            ☐ SUPERVISED SMOKER            ☐ UNSUPERVISED

_____
Social Worker Signature            Date

INCLUDE IN NURSING CARE PLAN & INTERDISCIPLINARY RESIDENT CARE PLAN

21 Day Assessment:    Resident can smoke unsupervised:
                              ☐ YES      ☐ NO
                                                        _____
                                                        Nurse Signature            Date

60 Day Assessment:    Resident can smoke unsupervised:
                              ☐ YES      ☐ NO
                                                        _____
                                                        Nurse Signature            Date

90 Day Assessment:    Resident can smoke unsupervised:
                              ☐ YES      ☐ NO
                                                        _____
                                                        Nurse Signature            Date

| Resident Name: | Room # | Physician: | Medical Rec. # |
|---|---|---|---|
| | | | |

### Sample Form for
### Assessing Resident's Ability to Smoke Independently

Name of Resident _____     Age _____     File #_____

Date_____     Time _____

---

The *Smoke-Free Ontario Act* specifies several requirements for Controlled Smoking Areas (CSAs):

- **The room must be designated as a controlled smoking area.**

- **Residents must be able, in the opinion of the proprietor or employer, to smoke safely without assistance from an employee.**

- **Employees are not required to enter the controlled smoking area.**

- **Only residents (not staff or visitors) of the facility are allowed to smoke in the controlled smoking area.**

- **The controlled smoking area must be enclosed and fitted with ventilation in compliance with the regulations, is identified as a controlled smoking area by prescribed signs, and meets any other prescribed requirements.**

---

This form is to be completed when the resident is awake and alert, oriented to time, place and person and is able to ambulate independently or propel him- or herself safely in a wheelchair. <u>If the resident does not meet these criteria, they may not smoke.</u>

Information Sources: (check all that apply)
- ☐   Observation
- ☐   Discussion with resident
- ☐   Family caregiver
- ☐   Nursing/Team report
- ☐   Chart review for smoking incidents
- ☐   Staff physician/pharmacist re: medications

1) **Resident Perspective**
   Source of information if not resident: _____

   i)   Would you like to quit smoking?
   - ☐   Yes (set up appointment with NP/MD)
   - ☐   No

   ii)   How many cigarettes do you smoke every day? _____

   iii) When is your first cigarette of the day? _____

   iv) Do you need assistance smoking?
   - ☐   Yes
   - ☐   No

   Explain: _____

27

v) How often have you fallen asleep while smoking a cigarette?

☐ Never    ☐ Number of times: _____

Explain: _____

vi) What would you do if there were an emergency in the smoking room/area?  *(Resident should say, unaided, that they would call for help and leave the area.)*

_____

If resident has fallen asleep more than once while smoking or is unable to answer part vi) correctly, then resident is a fire risk.  Stop questionnaire now.  Refer to NP/MD for assistance with NRT if available.

**Risk Factors**

a) Are there any physical limitations that have implications on the resident's ability to smoke (i.e., arthritis, hand injury, paralysis)?

☐    Yes    ☐    No
If yes, please specify: _____

b) Does the resident use assistive devices that may alter his/her ability to smoke (i.e., splints/neck collar)

☐    Yes    ☐    No
If yes, please specify: _____

c) Is the resident known to engage in the following unsafe smoking practices?

i) Dispose of ashes/cigarette butts in an unsafe manner    ☐ Yes    ☐ No
ii) Burn marks on clothes or self    ☐ Yes    ☐ No

d) Is the resident known to attempt to set fires or use ignition materials unsafely?
☐    Yes    ☐    No

e) Does the resident consume excessive amounts of alcohol?
☐    Yes    ☐    No

f) Does the resident have a history of falling asleep while seated?
☐    Yes    ☐    No

g) Does the resident take any medication that could affect his/her ability to smoke safely (e.g., cause drowsiness)?
☐    Yes    ☐    No
If yes, please specify: _____

**If YES to <u>any</u> of the above: resident is a fire risk and not safe to smoke independently.**

28

**If it appears from the interview that the resident is able to smoke independently, an observation must be done as follows:**

## 2) Direct Observation

Take the resident outdoors and ask them to smoke a cigarette. Did the resident complete the following tasks safely and independently? If no, comment on the resident's action in the space provided. Indicate whether the underlying cause is related to physical, cognitive, perceptual and/or behavioural issues.

a)  Get to smoking room?               ☐ Yes   ☐ No   _____

b)  Obtain cigarettes and lighter?     ☐ Yes   ☐ No   _____

c)  Obtain and use a smoking apron?    ☐ Yes   ☐ No   _____   N/A ☐

d)  Access an ashtray?                 ☐ Yes   ☐ No   _____

e)  Light cigarette?                   ☐ Yes   ☐ No   _____

f)  Hold cigarette securely?           ☐ Yes   ☐ No   _____

g)  Dispose of ashes in ashtray?       ☐ Yes   ☐ No   _____

h)  Put out cigarette?                 ☐ Yes   ☐ No   _____

i)  Return cigarettes and lighter to storage?  ☐ Yes   ☐ No   _____

j)  Able to call for emergency assistance?     ☐ Yes   ☐ No   _____

**If NO to any of the above, the resident is a fire risk and is not able to smoke independently.**
**If yes to all, the resident is able to smoke independently.**

Name of staff member completing assessment:

_____

Signature:

_____

29



Print  |  About Us  |  Search



## Joint Commission International Center for Patient Safety

### Resources

**Patient Safety Link -- The ICPS newsletter**

**Patient Safety Link Archives**

**2006 Patient Safey Link Issues**

**Patient Safety Link, June 2006, Volume 2, Issue 6 - The 2007 National Patient Safety Goals**

**Letter From the Co-Directors**

**Joint Commission Announces 2007 National Patient Safety Goals**

**Tips and Strategies to Reduce the Risk of Suicide**

**Preventing Home Care-- Related Fires**

**Implementing the SBAR Technique**

**Patient Safety Case Studies Wanted**

**Just Released Publications**

# Preventing Home Care–Related Fires

During the winter holidays, it's a good idea for home care organizations to review their home safety assessment process. Decorative candles and electric ornaments may add to the festivities, but they also add a significant fire risk to the home care environment. [Editor's note: This article originally appeared in November 2004.] The same goes for guests who smoke around patients receiving supplemental oxygen services.

Nearly 43% of all sentinel events reported by home care programs to the Joint Commission were due to a fire in the patient's home. Although the number of fires has decreased since the Joint Commission started analyzing sentinel event data for home care in 1997, the frequency of home fires shows the need for thorough assessments and patient education, notes Maryanne L. Popovich, R.N., M.P.H., executive director of the Joint Commission's home care accreditation program.

Home care organizations should regularly perform a home safety assessment, educate patients on the hazards of smoking, and assess patients for their functionality.

### Home Safety Assessment

A home safety assessment should evaluate risk factors such as sources of open flames, including fireplaces, gas ovens or stoves, space heaters, kerosene heaters, candles, and even lit cigarettes, Popovich says.

A one-page assessment tool used to identify fire risk conditions in the home could be helpful. The form could include the presence or absence of smoke detectors, fire extinguishers, and fire safety plans. The organization may consider involving the local fire department in the assessment, as appropriate.

Although home care staff is obligated to perform assessments in the patient's home, it is ultimately up to the patient or family to put into action any suggestions the staff might recommend.

### Smoke Detectors

The evaluation should include obtaining, testing, and locating smoke detectors. Inform the patient that a smoke detector should be placed on every level of the home. In addition, any smoke detector older than 10 years should be replaced with a new model.

To keep a smoke detector in working order, the following steps should be taken:

- Once a month, the smoke detector should be tested.
- Twice a year, it should be vacuumed to remove cobwebs and dust, both of which can clog the vents.
- Once a year, replace the battery. Also replace the battery when the detector "chirps" to indicate a low battery.

### Electrical/Gas Systems

The safety assessment should include a review of the electrical and gas systems throughout the home. Check electrical cords for fraying or cracking; replace if necessary. Check to ensure that cover plates are on all switches and that no wiring is exposed. Faulty wiring, frayed electrical cords, unsafe holiday decorations, overloaded outlets, and arcing in circuit boxes can all cause electrical fires.

Extension cords should never be tucked under rugs or looped over doorways because friction may wear down their protective coating. Furthermore, small appliances, such as curling irons, electric razors, and hair dryers, should always be unplugged when not in use.

Kitchens are a common place for fires to begin. Because fires are often caused by unattended food left cooking on the stove, the burner should be shut off when leaving the kitchen. Keeping the stove clean helps avoid grease and food residue from catching fire.



ARNER
EXHIBIT NO. 7
4/8/08
C. CRUMP

# MODEL POLICY REGULATING SMOKING IN NURSING HOMES

This policy is intended to be a model for a state regulation to regulate smoking in Nursing Homes. This model regulation would require smoke-free environments inside nursing homes, but would allow for indoor designated smoking areas for use by current and future residents of nursing homes who are smokers. This policy also allows for designated smoking areas outdoors. This model regulation can also be easily adapted for use as state legislation or as a policy for an individual Nursing Home facility.

## Sec. 1000. Title

This regulation shall be titled the Regulation of Smoking in Nursing Homes.

WARNER
EXHIBIT NO. 8
4/8/08
C. CRUMP

## Sec. 1001. Authority

This regulation is hereby adopted by the *[insert State Health Department or other entity]* pursuant to the authority conferred upon the *[insert State Health Department or other entity]* by the *[insert appropriate state law citation]*.

## Sec. 1002. Jurisdiction and Administration

This regulation shall have effect throughout *[insert name of State]*. The *[insert State Health Department or other entity]* shall have responsibility for administering and enforcing this regulation, including all amendments hereafter adopted unless otherwise specifically stated.

## Sec. 1003. Findings and Purpose

The *[insert State Health Department or other entity]* hereby finds that:

The U.S. Surgeon General, National Research Council, and National Academy of Sciences report that environmental tobacco smoke causes lung cancer and poses an increased risk of heart disease in adult nonsmokers. These agencies, as well as the National Institute for Occupational Safety and Health (NIOSH), have also found that separating smokers and nonsmokers within the same air space may reduce, but does not eliminate, a nonsmokerÕs exposure to environmental tobacco smoke. Further, the U.S. Environmental Protection Agency and the National Institute for Environmental Health Sciences have concluded that environmental tobacco smoke is a Group A Carcinogen Ð a category reserved for known cancer-causing agents in humans.

Of the over 416,000 smoking-related deaths annually in the U.S., over 94% are to persons aged 50 and over, while over 70% are to persons aged 65 and over. All the major causes of death among the elderly (cancer, heart disease, and stroke) are associated with smoking or environmental tobacco smoke. Recent research also indicates that smoking is related to a number of health problems and diseases that are generally associated with aging, including hearing loss, dementia, and AlzheimerÕs.

The United States Fire Administration has determined -- based on data from the National Fire Incident Reporting System, the National Fire Protection Association (NFPA), the National Center for Health Statistics and State Fire Marshall's Offices -- that by far the leading cause of residential fires that result in fatalities in older adults is smoking, and that the older adult population represents the highest fire risk group in the United States with a risk of more than twice the national average. The NFPA reports that the risk of fire injury and death increases with age -- persons 75 and over are three times as likely to die in a fire as are younger adults, and persons 85 and over are four times as likely to die as younger adults.

Reports from these agencies document that residential fires include fires in Nursing Homes caused by resident and/or employee smoking.

Accordingly, *[insert State Health Department or other entity]* finds and declares that the purposes of this regulation are 1) to protect the public health and welfare by prohibiting smoking in the enclosed areas that make up Nursing Homes and regulating smoking on the outdoor grounds of Nursing Homes; and 2) to guarantee the right of nonsmokers to breathe smoke-free air, and to recognize that the need to breathe smoke-free air shall have priority over the desire to smoke.

### Sec. 1004. Definitions

A. The following words and phrases, whenever used in this regulation, shall be construed as defined in this section:

1. "Nursing Home" is defined by *[insert state]*'s Medicaid regulations or other statutory law, such as the Public Health Code. *[If your state has a definition for Nursing Homes, use that definition.]* Generally, "Nursing Home" means a place that provides 24-hour services, including room and board, to residents who require nursing care or personal care due to their mental or physical condition.

2. "Employee" means any person who is employed by the Nursing Home in consideration for direct or indirect monetary wages or profit, and any person who volunteers his or her services for a nonprofit entity.

3. "Employer" means any person, partnership, corporation, including a municipal corporation, or nonprofit entity, functioning as a Nursing Home, who employs the services of one or more individual persons.

4. "Enclosed Area" means all space between a floor and ceiling which is enclosed on all sides by solid walls or windows (exclusive of door or passageways) which extend from the floor to the ceiling.

5. "Resident" means an occupant and user of the Nursing Home.

6. "Place of Employment" means any enclosed area under the control of a public or private Nursing Home which employees normally frequent during the course of employment, including, but not limited to, work areas, resident rooms, employee lounges and restrooms, conference and classrooms, employee cafeterias and hallways. A private residence is not a "place of employment" unless it is used as a Nursing Home.

7. "Smoking" means inhaling, exhaling, burning or carrying any lighted cigar, cigarette, pipe, weed, plant, or other combustible substance in any manner or in any form.

### Sec. 1005. Operation and Maintenance of Smoke-Free Nursing Homes

A. It shall be the responsibility of the employer to provide a smoke-free place of employment for all employees and a smoke-free residential setting for all residents of Nursing Homes.

B. REGULATION OF SMOKING INDOORS:

1. Smoking shall be prohibited in all enclosed areas of Nursing Homes, except that a Nursing Home may -- but is not required to -- provide an indoor designated smoking area. If provided, the

indoor designated smoking area shall be separately enclosed and separately ventilated such that tobacco smoke does not enter any other indoor enclosed areas through windows, doors, ventilation systems, or by any other means. Smoking shall be prohibited in all common work areas, resident rooms, hallways, stairs, lobby and reception areas, cafeterias, lounges, elevators, restrooms, motor vehicles owned or leased by the Nursing Home, and any other enclosed areas that are not the indoor designated smoking area(s).

2. Residents may be allowed to utilize the indoor designated smoking area. If it is determined that a resident needs supervision in order to utilize the designated smoking area, employees shall be given the choice whether they wish to supervise the resident and thereby be exposed to secondhand smoke. Employees shall be given the right to refuse to accompany a resident to and in the indoor designated smoking area.

3. Notwithstanding any other provision of this regulation to the contrary, the Nursing Home may establish specific times during which smoking may occur in the designated smoking area. Further, if, after conducting an individual assessment, the Nursing Home determines that smoking by a resident poses a danger to him/herself or others, the Nursing Home may confiscate any and all smoking items and paraphernalia from the resident and make it available for use by the resident only at specific times and/or under the supervision of Nursing Home staff.

## C. REGULATION OF SMOKING OUTDOORS:

1. Notwithstanding the above regulation of smoking in enclosed areas, Nursing Homes shall also prohibit smoking in all outdoor areas, except that a Nursing Home may -- but is not required to -- provide an outdoor designated smoking area that is on the grounds of the Nursing Home. If provided, the outdoor designated smoking area shall be physically accessible, protected from the elements, and located a reasonable distance outside of the Nursing Home to ensure that tobacco smoke does not enter the enclosed areas through entrances, windows, ventilation systems or any other means.

2. Residents may be allowed to utilize the outdoor designated smoking area. If a resident needs supervision in order to utilize the outdoor designated smoking area, employees shall be given the choice whether they wish to supervise a resident and thereby be exposed to secondhand smoke. Employees shall be given the right to refuse to accompany a resident to and in the outdoor designated smoking area.

D. The smoking policy of the Nursing Home shall be communicated by the employer to all current employees and residents at least three (3) weeks prior to its effective date, and at the time of employment for all other employees, and prior to admission and/or prior to the signing of an admission agreement or contract for any new resident.

E. The employer shall supply a written copy of the smoking policy upon request to any existing or prospective employee or resident.

## Sec. 1006. Posting of Signs

A. "No Smoking" signs or the international "No Smoking" symbol (consisting of a pictorial representation of a burning cigarette enclosed in a red circle with a red bar across it) shall be clearly, sufficiently and conspicuously posted at every entrance to the Nursing Home by the employer.

B. The employer shall remove all ashtrays and other smoking paraphernalia from any area where smoking is prohibited by this regulation.

### Sec. 1007. Enforcement

The *[insert State Health Department or other entity]* shall be responsible for enforcing this regulation.

### Sec. 1008. Nonretaliation

The employer shall not discharge, refuse to hire, or in any manner retaliate against any employee, applicant for employment, or resident because such employee, applicant, or resident exercises any right to a smoke-free environment afforded by this regulation.

### Sec. 1009. Other Applicable Laws

This regulation shall not be interpreted or construed to permit smoking where it is otherwise restricted by other applicable laws.

### Sec. 1010. Severability

If any provision, clause, sentence, or paragraph of this regulation or the application thereof to any person or circumstances shall be held invalid, such invalidity shall not affect the other provisions of this regulation which can be given effect without the invalid provision or application, and to this end the provisions of this regulation are declared to be severable.

### Sec. 1011. Effective Date

This regulation shall be effective ninety (90) days from and after the date of its adoption.

Model regulation prepared in March, 2003 by The Center for Social Gerontology, Inc., Ann Arbor, Michigan. http://www.tcsg.org

ATTACHMENT 11

EXCERPTS FROM

DEPOSITION AND EXHIBITS
OF
RICHARD STEFANACCI

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - x
                                :
MARY SANDERS, as Personal       :
Representative of the Estate    :
of BENJAMIN SANDERS,            :
                                :
     Plaintiff,                 :
                                :
                                :  Civil Action
 vs.                            :  No. 071169
                                :
UNITED STATES OF AMERICA,       :
                                :
    Defendant.                  :
                                :
- - - - - - - - - - - - - - x


                Washington, D.C.
                Monday, April 21, 2008


       The deposition of RICHARD STEFANACCI, D.O.,

called for examination by counsel for Defendant in

the above-entitled matter, pursuant to Notice, in the

offices of U.S. Department of Justice, 501 Third

Street, N.W., Fourth Floor, Washington, D.C.,

convened at 10:15 a.m., before Cathy Jardim, a notary

public in and for the District of Columbia, when were

present on behalf of the parties:

Q.    Anything else?

A.    Probably, unfortunately, pediatric oncology, as far as patient treatment goes.

Q.    But you are not using your expertise today in pediatric oncology?

A.    No.

Q.    Today you will be giving expert testimony in the area of geriatric care and long-term care?

A.    Yes.

Q.    Anything else?

A.    Not to my knowledge.

Q.    Let's take a look at your curriculum vitae. It hasn't changed since February 28?

A.    There are a few more publications, and the ones I brought are the updated --

Q.    Do I have a copy of that?

A.    It was in the stack that I brought.

Q.    We will look at this in a moment.  Let's look at what was provided at your 26(a)(2) designation.  It was provided pursuant to court order on February 28, 2008, and it is a document that I have had marked as Exhibit 1.

1       A.    That is even milder.

2       Q.    Can you turn to page 131 of the medical

3   records?  That should be the page where it discusses

4   the MMSE.  Am I correct?

5       A.    No -- yes, 26 over 30.

6       Q.    So, his MMSE was not 19 over 25?

7       A.    Not there.

8       Q.    It is somewhere else?  We won't take the

9   time to find it now.

10      A.    I can get -- I don't think that his Mini-

11  Mental Status Examination was an indication in this

12  case in and of itself.

13      Q.    What do you mean when you say an indication?

14      A.    I don't think -- I am just trying to speed

15  things up, that there were other reasons for him to

16  be an at-risk smoker, not his MMSE.

17      Q.    So you didn't have any issues about whether

18  he had a cognitive deficits?

19      A.    Well, I mean, he had cognitive deficits.  I

20  don't think it was at the level, given the

21  documentation I have read, that would warrant him in

22  and of that self to be an at-risk smoker.  I

61

1    certainly would have concerns if somebody had more

2    significant dementia, I am sure you would, but that

3    is not an issue I am bringing up in this case.

4        Q.    And these -- that particular cognitive

5    deficit issue, the MMSE, was performed on what date?

6    I just want to make sure.

7        A.    This one was performed on February 27, 2006.

8        Q.    So let's look at that -- we don't have to

9    look at that.   That is a monthly medical review?

10       A.    It is titled "Monthly Medical Review," yes.

11       Q.    You talk about the CVA's.   What impact do

12   the CVA's have on his -- what condition do you

13   represent that the CVA's had on his -- you said prior

14   history, three CVA's mild oropharangela dysphagia.

15   What does that mean?

16       A.    It resulted in him having a left hemi-

17   paralysis, difficulty articulating, and difficulty

18   swallowing.

19       Q.    Is there any evidence that he couldn't yell

20   out, that you saw?

21       A.    No.

22       Q.    On page 4 of 39, in the middle of the page,

70

Q.   Are these three requirements that you have
set forth as the standard of care set forth in JCAHO?

A.   Not specifically, no.

Q.   What is set forth in JCAHO?

A.   Again, the same as the Uniform Fire Code,
the Life Safety Code, that if somebody is at risk for
being a smoker, that they should have the
restrictions applied to them.

Q.   And JCAHO is an accrediting organization?

A.   Correct.

Q.   Have you ever had any dealing with them --
or it?

A.   Anybody that has practiced in a hospital has
been involved in it because most hospitals are
accredited through JCAHO.

Q.   And if JCAHO surveys a facility and
accredits it, does that facility therefore meet the
JCAHO standards?

A.   I would assume that is the case.

Q.   Do you know what OBRA '87 is?

A.   Yes.

Q.   What is that?

72

Q.    Is this survey being incorporated as part of your expert testimony in this case?

A.    It can be, yes.

Q.    Is it or is it not?

A.    Yes, and again, it is not a survey.  It is a draft article.

Q.    Did you participate in the survey?

A.    I helped develop the survey.

Q.    So you have the questions?

A.    Right.

Q.    You helped draft the questions?

A.    Correct.

Q.    Where are the questions?

A.    I didn't bring them, but I can get them.

Q.    Okay.  Give them to Mr. Meltmar.  He can forward them to me.

When was the survey conducted?

A.    The approximate timeframe was first quarter of this year.

Q.    So, January to March of 08?

A.    Technically, we haven't put an end to it.  It is an on-line survey.

78

1    facilities, and facilities for the mentally retarded.

2    CMS has a very specific definition which is not

3    consistent with the industry.

4         Q.    What is CMS?

5         A.    The Centers for Medicare and Medicaid

6    Services, part of Health and Human Services.

7         Q.    Now, the 248, did you actually see the

8    survey responses?

9         A.    I saw the cumulative.

10        Q.    Cumulative meaning what?

11        A.    It is done through a tool called Survey

12   Monkey, so it gives you how many responded to each

13   answer in each particular way.  It is not a paper.

14        Q.    Did you see how many directors of nursing

15   responded to questions about safe and unsafe

16   residents being identified?

17        A.    Yes.

18        Q.    How many safe smokers were identified and

19   how many unsafe smokers were identified?

20        A.    I would have to go back to the survey.

21        Q.    Is it something that I would be able to see?

22        A.    If I could get the information, it would be.

1      Q.   Why don't you just give me whatever

2   information you would be looking at to identify how

3   many safe smokers were identified and how many unsafe

4   smokers were identified?

5      A.   Okay.

6      Q.   Do you have any evidence that the answers

7   that were given in this online survey would be

8   speaking of policies that existed in 2006?

9      A.   Since there hadn't been anything that would

10  warrant a recent change, I would think it would be

11  consistent with those that you would find in 2006.

12     Q.   But you don't know for a fact what each

13  director of nursing, what that person or facility was

14  doing in 2006?

15     A.   Correct.

16     Q.   Did the survey ask how long had the policies

17  been in effect that they were reporting on?

18     A.   I don't believe that was a specific

19  question.

20     Q.   On what do you base your statement in the

21  conclusion of your report, going back to the

22  conclusion, that the majority of nursing homes in the

94

1      A.    Well, that document really spoke to

2   responsibilities on the part of the VA, not the

3   resident.

4      Q.    You speak in your report -- and I am sorry,

5   I made a note of this, but I am not sure if it is in

6   your report or your draft article, that the

7   individual has the right to smoke.  Do you remember

8   that?

9      A.    Yes.

10      Q.    And what did you mean by that?

11      A.    Just what that states,  that individuals

12   that are competent to make their own decisions have a

13   right to smoke in those facilities that allow it.

14   Increasingly, facilities are making them non-smoking

15   facilities.  It is considered that right is given up

16   front, and the resident can choose not to go into

17   that facility.

18      Q.    And that would be like Crescent Hill?

19      A.    No, no.  Those are not non-smoking

20   facilities.  Those are facilities where residents

21   have their smoke controlled.  There are increasingly

22   facilities where they say we are not going to deal

1    with that, we will not allow smoking.

2        Q.    So if Mr. Sanders was designated as a safe

3    smoker, he had a right to smoke, correct?

4        A.    Correct.  Even if somebody is designated an

5    unsafe smoker --

6        Q.    They have the right.

7        A.    Right.

8        Q.    Isn't it true that federal guidelines say

9    that nursing home residents who smoke when admitted

10   must have the right to smoke in areas that are

11   maintained for smoking?

12       A.    Correct.

13       Q.    Was there -- do you know of any evidence

14   that his family brought him cigarettes?

15       A.    Not -- I don't have any opinion in that

16   regard.

17       Q.    Have you ever worked in a VA hospital?

18       A.    No.

19       Q.    Have you ever studied in a VA hospital?

20       A.    No.

21       Q.    Have you ever taken any residency there?  I

22   asked that because you mentioned, my experience in

101

1  assessed an a high-risk smoker was a failure in

2  providing good care.

3    Q.    Now, is it your opinion that a smoking

4  assessment form must be completed in order to

5  classify an individual as a safe smoker?

6    A.    No.

7    Q.    Was there a question on the survey as to how

8  many facilities use assessment forms?

9    A.    I don't believe that was a specific

10  question.

11    Q.    Do you have any opinions as to his

12  medications, the medications he was taking and the

13  effect of those medications on him?

14    A.    I do, but I don't believe any of them were

15  contributing factors in this case.

16    Q.    You mentioned in your report, I believe it

17  is your report, Exhibit 1, you talked about a

18  Pennsylvania survey -- excuse me.  It must be in your

19  new exhibit.  It is on page 4 of your new exhibit.

20  Do you see that?

21    A.    Yes.

22    Q.    Now, you have described what is done in

Q.    The first issue says:  Nursing home residents that are smokers should be assessed to identify smokers for self management of the task of smoking.

Is it your opinion that Mr. Sanders was not assessed for smoking?

A.    Yes.

Q.    What do you base that on?

A.    My failure to find anything in the documentation that says he was assessed for being an at-risk smoker.

Q.    Do you believe that an assessment form should be used?

A.    No.  I think I previously stated that an assessment form does not need to be used, just that an assessment be done and documented in the chart.

Q.    So you do not believe an assessment form is necessary?

A.    No.

Q.    But you do believe that the assessment must contain, and I assume you mean in writing, an -- a discussion of mental acuity, physical restriction and

1  can occur is that a smoker needs to be assessed.

2     Q.  And the same thing with the fire code?

3     A.  Correct.

4     Q.  And the same thing with any of the other --

5     A.  VA policy also, yes.

6     Q.  So, again, let me just ask you, where is

7  this standard of care that you have identified set

8  forth, where is it specifically set forth as a

9  national standard, where?

10     A.  So, again, in my draft article, and the

11  literature we reviewed and the survey results.  Other

12  than that, it is not written anywhere else.

13     Q.  Now, the draft article is what I received on

14  April 13, and the draft article also encompasses the

15  Pennsylvania guidelines which do not say that.  So I

16  guess what I am wondering is, in what jurisdiction is

17  your standard used?

18     A.  Nationally, because the survey was based on

19  national results.

20     Q.  What states?

21     A.  Every state in the United States.

22     Q.  How do I know that?  How can I tell?  I

1  don't have the survey results.  I have your draft

2  survey.  I don't know who the 248 directors are.  I

3  don't know what the questions are.

4      A.   Because by reading it, in the objective it

5  states that it is a nationwide survey.

6      Q.   What are the discrepancies that you

7  mentioned?

8           MR. MELTMAR:  Objection.  I don't know what

9  you are talking about.

10          BY MS. WHITAKER:

11     Q.   You say in the survey -- look at

12 conclusions.  It says:  The result of this national

13 survey of nursing home director of nurses illustrates

14 a fairly uniform standard regarding the policy for

15 resident smoking.

16          A fairly uniform policy, what does that

17 mean?  Does that mean you have extrapolated from what

18 you believe the survey results were to come up with

19 the standard that you have enunciated?

20     A.   No.  The discrepancies are that not

21 everybody requires a fire apron and not everybody

22 requires a fire extinguisher in the smoking room.

123

1  Mr. Sanders while he was smoking in the smoking room

2  on March 19 was inconsistent with the standard of

3  care?

4      A.   So, if Mr. Sanders had been deemed an unsafe

5  smoker and Jerry Lee Phillips' responsibility would

6  be to follow the requirements to hold the smoking

7  materials and to monitor, so that would have been an

8  unsafe situation that he put him in, yes.

9      Q.   Ms. Whitaker asked you whether or not an

10 assessment form needs to be used when a resident is a

11 safe smoker.  Can you elaborate on that?

12     A.   I think what I stated was that a form

13 doesn't have to be used, but clearly documentation

14 needs to be made that that assessment is done.

15     Q.   So what is the basis for saying that

16 documentation needs to be done?

17     A.   The standard in nursing homes as well as all

18 long-term care is that if it is not documented, it is

19 not done, because if it is not in the chart, you have

20 absolutely no leg to stand on in a court of law that

21 you could say that you had done it, but you just

22 didn't document it.

**124**

1    Q.    Outside of a court of law, is there a need

2    to document smoking assessments for the benefit of

3    the residents and other staff members?

4    A.    The only way to communicate that to the

5    interdisciplinary team is through documentation, so

6    there is a requirement there or a need there.

7         MR. MELTMAR:    Thank you.    No further

8    questions.

9         MS. WHITAKER:    I just have a couple and then

10    I want to take a short break to get your resume.

11      FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT

12         BY MS. WHITAKER:

13    Q.    Did you discuss the answers THAT you just

14    gave with Mr. Meltmar during the break?

15    A.    No.

16    Q.    Did you discuss Jerry Lee Phillips and the

17    answer you just gave with regard to Jerry Lee

18    Phillips?

19    A.    No.

20    Q.    Did anyone suggest that you make up this

21    Exhibit 5?

22    A.    No.



UNIVERSITY OF THE SCIENCES IN PHILADELPHIA

Dr. Richard G. Stefanacci, Executive Director
Tel: 215.596.7466
Email: HPI@usip.edu

600 South 43rd Street
Philadelphia, PA 19104
www.uslp.edu

February 23, 2008

Charles Meltmar, Esq.
Cochran Firm
1100 New York Avenue, NW
Suite 250 West
Washington, DC 20005

RE: Benjamin Sanders
Civil Case No. 07 1169

Dear Attorney Meltmar,

I have had the opportunity to review the following documents with regard to the above captioned action:

1. SP Form 95
2. District of Columbia Superior Court Order appointing Mary Sanders as the Personal Representative of the Estate of Benjamin Sanders
3. Retainer agreement between Mary Sanders and The Cochran Firm
4. A supplement of SF Form 95 stating the basis of the Estate of Benjamin Sanders' claim
5. Report from Ilene Warner-Maron.
6. Death certificate
7. Funeral bills
8. Medical records from VA Medical Center's nursing center (CRNC) in Washington, DC
9. Medical records from VA hospital in Washington, DC
10. Fire regulations produced by the VA
11. Autopsy report including photographs
12. District of Columbia Fire & Emergency Medical Services Department Incident Report
13. District of Columbia Metropolitan Police Department Incident-Based Event Report



EXHIBIT NO. 1
4-21-08
C. JARDIM

1

14. Deposition of Frances Henderson
15. Deposition of Dr. Raya Kheirbek
16. Deposition of Jerry Lee Phillips
17. Deposition of Scott Burgoon

The opinions expressed within this report are based upon my education and experience as a licensed Physician licensed in Pennsylvania who practices geriatric medicine after the completion of an internal medicine residency and geriatric fellowship as well as a certified medical director and fellow of the American Geriatric Society. The work completed with regard this case is done as part of my responsibilities as program director for the LTC Management degree program at the University of the Sciences in Philadelphia. In addition the opinions are supported by research with regard the standard of care for resident smoking in nursing facilities in the United States.

**Clinical Review**
Benjamin Sanders who was born on May 21st 1941 was admitted to the Veterans Administration Medical Center Nursing Home (CNRC) on February 7th 2005.

Medical conditions included the following:
- Personal history Tobacco Use
- Chronic Obstructive Pulmonary Disease
- Mild cognitive deficit (MMSE 19/25)
- Mobility deficit related to CVA's, left hemiparesis, contractures
- Urinary incontinence
- Fall risks
- Chronic hypertension
- Diabetes mellitus
- Chronic low back
- Anemia
- Chronic Kidney Failure
- Dysphagia
- Mixed conductive and sensorineural hearing loss
- Benign monoclonal gammopathies
- Partial-complex seizure
- Bullous pemphigold

*Abilities*
The CNRC monthly medical review documented on February 27th 2006 by Ashraf Alehossein noted Mr. Sanders with CVA/DVT – right MCA infarct with left hemiparesis and mild dysarteria, prior history three CVA's mild oropharangela dysphagia. Diet advanced to soft diet. Also in this note is the statement "Patient continues to smoke 3-4 cigarettes a day, has no plan to quit, reinforced the importance of smoke cessation with his comorbidity, continue to educate and encourage patient to attend smoke cessation class."

2

There is no documentation noted in the records reviewed that an assessment of Mr. Sanders with regard his risk of smoking was ever completed. On February 27th 2006 a progress note states that "Vet continues to smoke despite of frequent respiratory infection, he has no plan to quit, continue to reinforce and encourage" In the same note the neuro physical exam noted Mr. Sanders with expressive aphasia, speech understandable when he talks slow.

Neuropsychologist review on January 30th 2006 – "Do you often feel helpless? – Yes" On January 25th 2006 the Nursing Transfer / Acceptance Note classified Mr. Sanders as requiring total care with regard his functional status.

The January 25th 2006 Consult Rehab Medicine Inpt note stated that Mr. Sanders who arrived via a stretcher was unable to follow simple commands and not consistent with his responses. Also of note regarding this document is the comments with regard Mr. Sanders' pain.

Nursing RN Assessment completed on January 25th 2006 documents Safety/Risk Factors as being Falls and Seizures although no mention is made with regard Mr. Sanders Smoking Risks. In the same note Mr. Sanders was noted as having a fair level of understanding. An earlier Nursing RN Assessment noted Mr. Sanders to be completely immobile as well as being functional total care.

On January 24th 2006 the Audiology & Speech CNRC Annual Reassessment noted that Mr. Sanders required assistance in inserting/removing his hearing aids as well as maintaining the devices.

A Chaplain CNC Progress Note on January 23rd 2006 is of interest as it states "Patient should be reminded that he is in a safe and secure environment."

The Nutrition Assessment on January 23rd 2006 notes that Mr. Sanders required meal set up and feeding assistance at this time which was as per RN caring for patient.

CNRC Monthly Medical Review in January and December of 2006 as well as monthly notes in 2005 documents that "Patient continues to smoke 3-4 cigarettes a day, has no plan to quit, reinforced the importance of smoke cessation with his comorbidity, continue to educate and encouraged patient to attend cessation class."

The identification of Mr. Sanders as a smoker is consistent with other notes such as the one by Social Worker Nancy Carol Lee on November 11th 2006 that stated that "Veteran is a smoker and smokes cigarettes in the designated areas."

On October 12th 2005 a CNRC Bed Entrapment Assessment note is completed although again this is no documentation as a similar assessment being completed with regard MR. Sanders risk for smoking without supervision.

3

The AEC Nursing Note states that Mr. Sanders extremity strength in his left arm and leg to be absent. The Nursing RN admission Assessment on January 5th 2005 describes Mr. Sander as needing assistance with mobility, transfer, hygiene, oral care, eating, toileting and dressing.

The AEC Nursing Note on January 3rd 2005 notes that Mr. Sanders required oxygen therapy via nasal cannula.

### Pain
The MICU-Carevue note on January 23rd 2006 notes that Mr. Sanders was moaning and complaining of pain at his IV site.

### Death
On March 19th 2006 Mr. Sanders was found engulfed in flames in the smoking room. The resident and his electric wheel chair were in flames. This realization was first noted by another resident so there is no evidence that Mr. Sanders was being directly monitored.

Mr. Sanders death certificate note his death on March 19th 2006 as the direct results of second and third degree burns. Soot and smoke inhalation are noted as another condition contributing to his death.

## Standard of Care
The standard of care for smoking of residents in skilled nursing facilities is that residents are restricted from smoking if they have any of the following:
- Decreased Mental Acuity (i.e. dementing illnesses)
- Physical restrictions (i.e. stroke or similar limitation that would limit resident's ability to extinguish a fire or remove themselves from a fire)
- Equipment Requirements (i.e. those requiring oxygen)

These restrictions are carried out through the following:
- Direct facility staff supervision from an assigned staff member
- Cigarettes are distributed by nursing staff
- There is a written smoking policy in place
- There is designated staff education available to support the facility policies

This Standard of Care is based on protecting residents from themselves as well as toward the entire residential population. This is based on a residents' ability to manage the active smoking task as well as being able to manage a smoking mishap. The later involves the following:
- Self extinguish cigarette or cigarette ashes
  - Ability to recognize situation and know corrective action
  - Ability to physically extinguish cigarette or ashes

- Remove self from an incendiary situation
  - Ability to recognize situation and know corrective action
  - Ability to physically remove self from scene

4

These standards with regard the classification and process for assessing smoking nursing home residents is consistent even beyond the United States. The Jury recommendation concerning the death of Mr. John Wilson stated that "All smokers "assessed as unsafe" must wear a smoking apron and be supervised in person by staff trained in fire safety." While these recommendations were made by a jury in Ontario Canada that point out that the United States Standards with regarding nursing home residents are consistent with those standards utilized outside of the United States as well.

In a letter dated January 6th 2006 Mr. William Bordner, Director Division of Nursing Care Facilities – Bureau of Facility License and Certification noted that "Residents that smoke should be assessed for their ability to safely smoke independently." In addition "Residents found to be incapable of smoking safely should have interventions developed to ensure that the resident smokes in a manner and environment that ensure their safety. Adequate supervision while smoking should be provided for those residents that require it." These statements are consistent with those found in nursing home facilities across the nation as they form the basis of the standard of care.

The Uniform Fire Code, NFPA I, Section 20.4.2.4(3) and Life Safety Code, NFPA 101, Section 19.7.4(3) states that smoking by patients classified as not responsible shall be prohibited. CNRC own Smoking Policy No. 19 notes that the staff is obligated to assess smoking habits of patients and identify high risk smokers.

After conducting an individual assessment, the Nursing Home determines that smoking by a resident poses a danger to him/herself or others, the Nursing Home may confiscate any and all smoking items and paraphernalia from the resident and make it available for use by the resident only at specific times and/or under the supervision of Nursing Home staff.

The records reviewed do not contain any individual assessment of Mr. Sanders' risk for smoking – documentation is limited to that of counseling regarding the risks of smoking without documentation of an individual assessment. Based on Mr. Sanders' medical conditions he meets the standard of care for being considered a resident at high risk for a smoking related accident and therefore would require direct supervision.

<u>References</u>
Uniform Fire Code, NFPA I, Section 20.4.2.4(3)
Life Safety Code, NFPA 101, Section 19.7.4(3):

Barker JC, Lewis DE. (1998) Smoking policy in long-term care: A survey of administrators in San Francisco. Journal of Health & Social Policy. 10(1):81-100.

Kochersberger G, Clipp EC. (1996) Resident smoking in long-term care facilities – policies and ethics. Public Health Reports. 111:66-70.

Jury Recommendations Concerning the Death of Mr. John Wilson

Letter to Nursing Home Administrators. From William Bordner, Director Division of
Nursing Care Facilities – Bureau of Facility License and Certification. January 6th 2006
on the Subject of Long Term Care Provider Bullentin No. 59. Elopement, Resident
Smoking and Water Temperatures.

Branigin W. Va. Report criticizes care center in fatal fire. Washington Post. December
22, 2000. Page B1.

Stefanacci RG. (2008) _Standard of Care regarding smoking policy in long-term care:_
_National Survey Data_. The Director. (Under Development)

Model Policy Regulating Smoking in Nursing Homes. Model regulation prepared in
March, 2003 by The Center for Social Gerontology, Inc., Ann Arbor, Michigan.
http://www.tcsg.org  http://www.tcsg.org/tobacco/NHregulating.htm (accessed February
15th 2008)

## Discussion

Nursing home staff has a responsible to provide for the safety of each and every resident.
In the case of Benjamin Sanders this meant not only assessing and developing and
implementing a care plan around his risk for falls, development of pressure sores and
seizures but also with regard his smoking risk. The safe guarding of Mr. Sanders smoking
was not only a precaution for Mr. Sanders himself but for the entire faculty. An unsafe
smoking is not only a danger to himself but to the entire facility because of the risk of
igniting a fire that would cause damage beyond the smoker themselves.

Mr. Sanders was an older adult that was unable to complete a meal set and required
assistance with feeding. In addition Mr. Sanders was unable to complete the relatively
simple task of inserting/removing and caring for his hearing aids. A task that has less
complex tasks as well as risks then those involved with smoking. These needs were the
result of Mr. Sanders physical and mental illnesses that resulting in him being classified
as being functional total care. As a result of these factors Mr. Sanders was a high risk
smoker under the standards utilized by the vast majority of nursing homes across the
nation.

The issues involved in this case were that despite Mr. Sanders meeting the standard of
care for a long term care resident that should be monitored with regard his smoking – Mr.
Sanders was free to smoke independently. Had the standard of care been followed Mr.
Sanders would have been restricted to only receiving smoking materials from facility
staff and that while smoking that besides direct monitoring that he be outfitted with a fire
resistant apron and that an operational fire extinguish be available in the smoking area.

Mr. Sanders' case with regard his smoking illustrates a clear failure on the part of the VA
nursing home staff to identify a high risk behavior and implement a plan to allow for such
an activity in the safest manner possible. In the case of Mr. Sanders' given his severe
limitation secondary to his left hemipariesis this would have involved the nursing home

6

Case 1:07-cv-01169-ESH     Document 15-3     Filed 02/28/2008     Page 7 of 39

staff controlling the access to smoking materials, use of a smoking apron, and direct supervision of nursing home staff to Mr. Sanders when smoking in a designated smoking area. None of these safety measures were following by the VA nursing home staff.

In fact it is surprising that given that during several times during his nursing home admission that Mr. Sanders required oxygen that control over his smoking materials was not required by the VA nursing home staff again to provide for not only Mr. Sanders safety but that of the entire facility.

In summary the following failures by the CRNC staff directed contributed to Mr. Sanders' death.

1. Failure to complete or document an assessment of Mr. Sanders' risk for self managing his smoking while at the same time completing assessment for other risks such as those for falls, seizures, entrapment and pressure sores.

2. Failure to complete or document identification of Mr. Sanders' as a high risk resident for self-managing his smoking despite clear evidences of his risks because of his physical and mental deficits. These deficits resulted in Mr. Sanders being unable to complete a meal set and requiring assistance with feeding. In addition Mr. Sanders was unable to complete the relatively simple task of inserting/removing and caring for his hearing aids.

3. Failure to implement a plan with regard to Mr. Sanders' smoking safety which should have included control of smoking materials, direct supervision as well as wearing of smoking apron.

These failures with regard Mr. Sanders smoking directly contributed to his death and the pain and suffering leading up to that death. Pain and suffering that was not limited because of his medical conditions or age.

## Conclusions

Mr. Sanders' death was the direct result of a deviation from the standard of care with regard the management of nursing home residents' smoking. The staff of VA nursing home deviated from the standard of care with regard resident smoking which calls for assessment and active management of high risk residents just as is done for falls, seizures, entrapment and pressure sores.

These deviations directly resulted in Mr. Sanders' severe burns that were the cause of his death as well as pain and suffering prior to that point. All of the opinions expressed in this report are based on a responsible degree of medical certainty.

Sincerely,

Richard G. Stefanacci, DO, MGH, MBA, AGSF, CMD

7

Editor-in-Chief
        2004 -          *Assisted Living Consult*
        2005 -          *Medicare Patient Management*

Editor
        2004 -          Novartis: Senior Care Source
        2006 -          Wyeth: Medicare Part D Plan Assessment
        2006 -          Eisai: Senior Health Digest

Editorial Board
        2007 -          *American Psychiatry News*
        2007 -          CNS News Neurology
        2005 -          *Managed Care*
        2005-           *LTC Interface*
        2004 -          *Consultant Pharmacist*
        2003 -          *TJC Health Policy Newsletter*
        2000- 2007      *Caring for the Ages*
        2001 - 2005     *The Journal of Quality Healthcare*

Advisory Board
        2000 -          *Journal of American Medical Directors Association*
        2004 -          "To Your Health" Radio Show -- Medical Advisor

Manuscript & Research Reviewer
        2004 -          Albert Einstein Healthcare Research Competition
        2000 -          *Journal of American Medical Directors Association*
        1999 -          *Journal of Clinical Outcomes Management*
        1999 -          *Clinical Geriatrics*

Clinical Trails:
        1997            EHR Lipid Managed (Merck)
        1997-99         LIFE / CHF - Phase IV (Merck)
        1999            Statins -- Post-Marketing (Merck)
        2000 –01        Diabetes - Phase IV (Takeda)

USP Lecturing Teaching Assignments:
Professor:
HP 809 -- Comparative Health System (2006 - active)
Guest Lecturer:
GC 515 – Health Care Quality and Outcomes (2003 - active )
GC 650 – Economic Analysis of Healthcare Interventions (2004 -- active)
HP 707 – Issues and Trends in Health Policy (2005 -- active)
HP 890 – Health Policy Speakers Series (2005 – active)
HP 808 – Health Services and Policy (2006 - active)
HP 765 - Special Topics in Health Policy (2006 -- active)
HP 797 -- Research in Health Policy (2006 -- active)

Peer Reviewed Lectures:
NY Medical Directors Association (11-12-07) CMS Update

Medicare Health Plans of America (11/01/07) Washington, DC. Improving the Treatment of Depression

Wharton Business School (10/9/07) Philadelphia, PA Entrepreneurial Management of Health Care Service Businesses: LTC Elder Care

NCGNP (9/15/07) San Diego, CA. ALF: Past, Present and Future. Opportunities for APNs.

Formulary & Reimbursement Strategies for Effective Product Planning (9/10/07) Philadelphia, PA. Managing Today's Formulary Landscape under the Influence of Medicare

South Carolina ASCP (9/7/07) Charleston, SC. Medication Management in LTC

New York Association of Homes & Services for the Aging (NYAHSA) (5/23/07) Medication Management in LTC

Medical Library Association (5/22/07) Philadelphia, PA. Medicare A, B, C, & D.

Annual Leadership Summit on Medicare (5/8/07) Washington, DC. Medicare Medication Management in LTC.

AGS (5/6/07) Seattle, WA. Assisted Living Facility Clinical Practice Update.

AGS (5/3/07) Seattle, WA. Medicare Update.

CT ASCP "Senior Symposium" (4/27/07) Foxwoods, CT. Keynote: Medicare Part D Update.

AMDA (3/13/07) Hollywood, FL. Alzheimer's Disease.

University of Missouri Annual Geriatrics Conference (8/18/06) Columbia, MO. Medicare Part D in LTC.

National AGS Conference (5/3/06) Chicago, IL. Geriatrician in the Role for National Quality Improvement, Policy Change, and Advancement of the Geriatric Care Agenda

National AGS Conference (5/8/06) Chicago, IL. Optimizing Outcomes for Patients & Practice: Understanding & Affecting Current Health Policy

New Jersey LTC Administrators Conference. (3/21/06) Atlantic City, New Jersey. Medicare Part D: Impact on New Jersey LTC Facilities

American Medical Directors Association Annual Conference. (3/16/06) Dallas, Texas. Assisted Living Facilities: Innovative Models of Care

American Medical Directors Association Annual Conference. (3/16/06) Dallas, Texas. Management of Polypharmacy Issues in the Care of the Elderly

American Medical Directors Association Annual Conference. (3/18/06) Dallas, Texas. Medicare Part D: Impact on LTC

Pharmacy Society of Wisconsin (10/12/05) Madison, WI. Medicare Rx: Prescription drug plan transforming long term care.

Michigan Medical Directors Association (10/01/05) Troy, MI. Update on Medicare Part D.

WHCOA: Optimizing Medication Therapy Management (MTM) Programs (6/30/05) Philadelphia, PA
http://www.whcoa.gov/about/des_events_reports/PER_PA_06_30_05.pdf

AGS Annual Meeting (5/20/05) Orlando, FL. Understanding and Affecting MMA Implementation for Successful Outcomes. CME Available at www.americangeriatrics.org

ALFA Annual Meeting (5/4/05) Atlanta, GA. MMA Impact on ALFs.

AMCP Annual Meeting (4/21/05) Denver, CO. Mobilizing Efforts in Osteoporosis Management

AMDA Annual Meeting (3/18/05) New Orleans, LO. MMA Impact on LTC.

AMDA Annual Meeting (3/18/05) New Orleans, LO. Best Practices in ALFs

NPA Annual Meeting (10/10/04) Miami, FL. MMA's Impact on PACE

TJU: Disease Managed Colloquium (6/28/04) Philadelphia, PA. Chronic Care Improvement Program.

AGS Annual Meeting (5/20/04) Las Vegas, NV. Residential care communities: Problems & Opportunities

ASCP Annual Meeting (5/14/04) Scottsdale, AZ. A Gut Check – Management of Common GI Disorders in Seniors. www.scoup.net

NPA Annual Meeting (11/11/03) Seattle, WA. Changing Health Care Policies and Their Impact on PACE.

AGS Annual Meeting (5/14/03) Baltimore, MD. Assisted Living Facilities: Medicalization, Regulation and the Role of the Geriatric Health Care Professional.

KCOM Primary Care CME Conference (2/22/03) Las Vegas, NV. Geriatric Preventative Care

AGS Annual Meeting (5/10/02) Washington, D.C. A View from the Hill: An Examination on the Making of Medicare Policy.

KCOM CME Primary Care Update (6/25/01) Orlando, FL. Geriatric Medicine Review.

KCOM CME Primary Care Update (6/25/01) Orlando, FL. Innovative Delivery Systems in Medicine.

Peter Lamy Annual Conference. (5/4/01) Baltimore, MD. The PACE Model: Partnering with Geriatric Pharmacotherapy.

National Council on Aging Annual Conference (3/30/01) Washington, D.C. New Models of Health Care Delivery to Promote Community-Based Care.

AMDA Annual Symposium. (3/16/01) Atlanta, GA. Development and Implementation of Clinical Best Practices in LTC.

The National Managed Care Physician Leadership Conference (2/12/97) Washington, DC. Development of Primary Care-Based Ambulatory Medical Center.

Representative Educational Presentations:
AMCP (4/19/07) San Diego, CA. Medication Therapy Management – Presentation of new Research Findings.

AMCP (4/18/07) San Diego, CA. Medicare Part D Update.

Washington Society of Oncologist. MAC & Medicare Rx Issues (3/9/07) Seattle, WA

Medicare Part D – What is the Future? Strategic Research Institute (10/26/06) Washington, DC. Enrollment of Seniors.

Pharmaceutical Supply Chain Conference (9/19/06) Austin, TX. Understanding the impact of Medicare Part D in the overall supply chain management

Exl - Drug Pricing & Reimbursement [Keynote Speaker] (6/6/06) Philadelphia, PA.

ASCP -- Second General Session MMA (11/10/05) Boston, MA.

NJ LTC Association Annual Meeting (11/1/05) Atlantic City, NJ.

PA ASCP – Part D Drug Benefit (6/6/05) King of Prussia, PA

Seniorcare Fellowship Program - MMA Panel (6/2/05) Montréal, Canada

MSNJ - MMA : Interpretive Guidelines (6/1/05) Iselin, NJ

ASCP -- Second General Session MMA (5/17/05) Orlando, FL.

The Society of Pharmaceutical & Biotech Trainers -- MMA Overview (5/11/05) Boston, MA

Third Annual Midwest Geriatrics Symposium -- General Session MMA (5/5/05) Champaign, IL.

LTC Provider Conference - MMA's Impact on LTC (4/2/05) Honolulu, HI

FamiliesUSA: Conference for State Medicaid Directors – MMA's Impact on Dually Eligible LTC Residents (1/28/05) Washington, DC.

ALPhA Keynote Speaker - MMA's Impact on ALFs (1/20/05) Ft. Lauderdale, FL.

AMDA – Advanced Course on Clinical Managed and Medical Direction in LTC [MMA's Impact on LTC, Caring Where Seniors Live] (11/17/04) Houston, TX.

ASCP General Session- MMA impact on Consultant Pharmacist. (11/5/04) San Francisco, CA.

Eisai – MMA (9/21/04) Durham, NC

ASPC – MMA (9/19/04) Lexington, KY

ManorCare – MMA (8/26/04) Toledo, OH.

Omnicare Annual Conference – MMA (8/16/04) Jacksonville, FL

NeighborCare P&T Committee – MMA (7/21/04) Baltimore, MD.

Philadelphia Corporation on Aging – MMA (6/25/04) Philadelphia, PA.

On Lok – MMA (6/23/04) San Francisco, CA.

John Hopkins University Cooper Ridge Institute – MMA (6/23/04) Sykesville, MD.

Managed Healthcare Fellowship – Breaking the Barriers: Fostering Patient-Centered Care (5/21/04) La Jolla, CA. How Managed Care is Preparing for the Potential Influx of Medicare Beneficiaries.

AGS - Developments and Trends in Managing Senior Care (5/16/04) Las Vegas, NV.

ASCP General Session- MMA impact on Consultant Pharmacist. (5/13/04) Scottsdale, AZ.

ALFA - MMA (5/7/04) Chicago, IL. MMA

Pharmaceutical Managed Care Update (5/6/04) Philadelphia, PA.

Omnicare P&T Committee - MMA (4/19/04) Atlanta, GA.

Seniorcare Fellowship (4/16/04) Tucson, AZ. Practical Strategies for Balancing Care and Cost in Senior Care and Where is the Senior Care Continuum Headed?

ASCP Legislative Update (3/16/04) Washington, DC. MMA Impact on LTC.

Assisted Living Pharmacy Association Annual Meeting (1/23/04) Ft. Lauderdale, FL. Medicare Legislation Impact on Assisted Living Pharmacies.

SCAN Health Plan (1/8/04) Long Beach, CA. Medicare Legislation Impact on SHMOs

Graduate Medical Residency Program (10/26/02) Philadelphia, PA Geriatric Medical Case Review

Institute for Nursing (3/11/98), Atlantic City, NJ. Alzheimer's Disease: Assessment and Treatment.

Primary Care Physician Conference (1/30/98). Paraponee, NY. Primary Care Network Development.

Underwood Hospital Staff Conference (11/11/97). Woodbury, NJ. Lipid Managed Clinical Review.

Primary Care Physician Conference (10/24/97). Philadelphia, PA. Primary Care Network Development.

Primary Care Physician Conference (8/19/97). Atlantic City, NJ. Lipid Managed Clinical Review.

Physician Conference (4/11/97) Kirksville College of Osteopathic Medicine, Kirksville, MO. Ambulatory Medical Center Development.

Hospital Staff Conference (4/1/97) Passaic, NJ St. Mary's Hospital.

MMA Specific Lectures:
*Sample Presentation:* http://www.papharmacists.com/MedicareInfoCenter.htm
Providers: *Every state with the exception of VT, NH, ME, AK, MT, WY, ND, NM (8)*
Senior Groups: PA, NJ, CA
Nat. Assoc: ASCP, AMDA, AGS, NoDONA, NPA, ALPhA, LTCPA, AMCP, ALFA
Legislators: LA, CO, NY, PA
Providers: BCBS (multiple States), AlohaCare, Wellpoint, SCAN, United Healthcare, Aetna, Cigna, Humana, VA
Pharma: Eisai, JnJ, Amgen, Genetech, Pfizer, Sanofi-Aventis, Novartis
LTCPP: Pharmerica, Neighborcare, Omnicare, Innovatrix
LTC Administrators: NJ, CT, MA, WI, NY, CA
LTC MD: NY, PA, NJ, WI, MA, CT, IL
Medcom: Pinnacle Healthcare, MediMedia, VoxMedia, Bimark, Zitter Group, Access Communications
Employer Groups: Palmer&Cay.
PBM: MedImpact.

Speaker Program Development:
Unintended Weight Loss *Par Pharmaceuticals*
Mental Health Management *Forest Pharmaceuticals*
MMA in LTC *Pfizer*
MRPs in Elderly *Merck & Company*

<u>Pharmaceutical Product Speaker</u>
Forest Laboratories – Antidepressants (Lexapro)
Par Pharmaceuticals – Weight loss (Megace ES)
Amgen – Anemia (ESA)

<u>Advisory Boards Lead</u>
Neuropathic pain, antidementia agents, antidepressants, diabetes, MTM.

<u>Participant by Invitation:</u>
Strategic Medicare Compliance and Administration Summit. *Medicare's Growing Influence on Physician Prescribing.* (2/11/08) Washington, DC.

Harte-Hanks Annual Pharmaceutical Conference. *Patient Advocacy and Impact on 21st Century Healthcare* (2/5/08) Park City, UT

CEAL – Medication Management in ALF (1/30/08) Washington, DC.

Pain Management in the Elderly – Improving Residents' Quality of Life (11/15/07) Philadelphia, PA

ASCP Product Theater Program: Improving Outcomes in Alzheimer's Disease for LTC-term Care Residents (11/15/07) Philadelphia, PA

The Cost of Alzheimer's Disease to Society. (11/8/07) Washington, DC. Alzheimer's Disease Screening Discussion Group.

Moderator – Politics in Healthcare. (3/22/07) Washington, DC. AstraZeneca's Capital Summit

The Evolving Medicare LTC Pharmaceutical Marketplace. (2/28/07) Orlando, FL. Managed Markets Summit

Evaluating the Effect of Medicare Part D on the Use of Counterfeit Drugs. (1/31/07) Philadelphia, PA. Secure Pharma.

Medicare A,B,C, and D's. (1/14/07) New Brunswick, NJ. University of Medicine and Dentistry of New Jersey Grand Rounds

Medicare A,B,C, and D's. (1/19/07 Philadelphia, PA. University of Pennsylvania Geriatric Grand Rounds

Medicare Part D – What is the Future? Strategic Research Institute (10/26/06) Washington, DC. Enrollment of Seniors.

Eastern Pennsylvania Geriatrics Society. Medicare D: Where Do We Go From Here. (10/14/06)

Pharmaceutical Supply Chain Conference (9/19/06) Austin, TX. Understanding the impact of Medicare Part D in the overall supply chain management

6th Annual Medicare & Medicaid Symposium - Impact of Medicare Part D on LTC (5/12/06) Baltimore, MD

University of Pittsburg: Clinical Update in Geriatric Medicine - Medicare Part D(3/23-3/25/06) Pittsburgh, PA

Chronic Kidney Disease and Anemia (3/16/06) AMDA Annual Meeting, Dallas, TX

ASCP Workgroup on MMA (1/31/05) Washington, DC

FamiliesUSA Health Action - Dual eligibles in LTC and the transition to Part D (1/28/05) Washington, DC

Disease Managed Colloquium – Moderator: Improving Health Outcomes for Medicare Beneficiaries (6/29/04) Philadelphia, PA

Health Policy Update: AGS (5/20/04) Las Vegas, NV

Technical Advisory Group on Physician Practices in Nursing Homes: HHS Office of the Assistant Secretary for Planning and Evaluation (4/29/04) Washington, DC

Clinical Red-Eye-Rounds: AMDA (3/7/04) Phoenix, AZ

Medicare Reform: ASCP (4/5/04) Washington, DC

National Medicare Prescription Drug Congress (2/27/04) Washington, DC

Addressing Racial and Ethnic Disparities in Care: AHRQ (7/9/03). Washington, DC.

Medical Economics Annual Editors Conference (3/24/00). New York, NY. Future Directions of Geriatric Care.

Critical Quotes & Links:
Newsweek, New York Times. Philadelphia Inquirer. Washington Post, Forbes. Investors Business Daily. Kaiser Network ,
<http://www.zware.com/site-news-cfm?newsid=4539675&HKD=2185&PAG=461&dept_id=415898&tri=8 .
www.msnbc.msn.com/id/9712174/site/newsweek/3

Op Editorials
Stefanacci RG. Three simple solutions to cure Medicare prescription-plan ills. Philadelphia Inquirer. April 14, 2006, A15.

Television & Radio Media:
Caucus NJ [PBS NJ NY]. "To Your Health" Philadelphia Talk Radio (Regular guest), Other Talk Radio shows: WI, GA.

White Papers:
The Cost of Being Excluded: Impact of excluded medications under Medicare Part D on the dually eligible nursing home residents (ASCP) 2/16/05.
http://www.ascp.com/medicarerx.docs/ASCP/spec_excluded_meds.pdf
http://www.kaisernetwork.org/daily_reports/rep_index.cfm?DR_ID=25452

http://www.forbes.com/prnewswire/feeds/prnewswire/2005/02/17/prnewswire20050217705PR_NEWS_B_MAT_NY_NYTH158.html

http://www.medicalnewstoday.com/medicalnews.php?newsid=19259

Anemia in Older Adults: Treating Anemia to improve outcomes through Medicare Part D (Amgen) 11/8/05

Gaining Access to Medications for the Treatment and Prevention of DVTs for Medicare Beneficiaries (Sanofi-Aventis) 11/8/05

Fall Prevention: Starting from the Bed - Improving Treatment of Insomnia through the Medicare Part D Program (Sepracor) 10/12/05

Text Books (chapters)
Stefanacci RG, Lofland JH. (2005) The US Regulator's Perspective in Determining and Improving the Value of Healthcare Interventions. Chapter in Pizzi LT, Lofland JH. Economic Evaluation in US health care.

Knight TK, Stefanacci RG. (2005) Pharmacist Involvement in Long-Term Care for Seniors. Chapter in Smith MI, Wertheimer AI, Fincham JE. Pharmacy and the US Health Care System.

Articles (peer reviewed journals):
Stefanacci RG, Kasseroler S. Medicare Reimburse Changes Effect on Geriatric Nurse Practitioners. Geriatric Nursing (in print)

Field RI, Stefanacci RG. Beyond Drug Coverage: The Cumulative Effect of Privatization Reforms in the Medicare Modernization Act. Saint Louis University Journal of Health Law & Policy (in press)

Stefanacci RG (2008) Unlocking Patient Power. American Psychiatry News. (in print) April.

Stefanacci RG (2008) Geriatric Medication Management. American Psychiatry News. (in print) March.

Stefanacci RG (2008) Treating Agitation in Dementia. American Psychiatry News. (in print) February.

Stefanacci RG (2008) Opportunities Beyond Traditional Medicare. CNS News Neurology 1(1):8-10.

Stefanacci RG (2008) Opportunities Beyond Traditional Medicare. American Psychiatry News. 1(1):23-26.

Stefanacci RG (2008) Medicare medication management: Updating issues with Parts A, B, C, and D. Clinical Geriatrics. 16(1):25-27.

Stefanacci RG (2007) Medicare medication management: Updating issues with Parts A, B, C, and D. Clinical Geriatrics. 15(12):13-17.

Stefanacci RG. (2007) Current Implications for the Managed Care of Dementia. American Journal of Managed Care. 13(8):S203-05..

Stefanacci RG (2007) Medication Management in LTC & Beyond. CNS SeniorCare. Fall 2007. 6(4):4-5.

Stefanacci RG (2007) Medicare's LTC Expansion. CNS SeniorCare (in press - August)

Stefanacci RG (2007) Transitions in Transitions of Care. CNS News. November 2007. 9(11):12.

Stefanacci RG (2007) Medicare Access for CNS Prescription. CNS News. October 2007. 9(10): 16-17.

Stefanacci RG (2007) Why Doctors Are Afraid of Needles. CNS News. September 2007. 9(9): 14-15.

Stefanacci RG (2007) Designing a Health System for Good Behavior Annals of Long-Term Care.15(10):42-44.

Stefanacci RG (2007) Designing a Health System for Good Behavior Clinical Geriatrics. 15(10):16-20.

Stefanacci RG (2007) Medicare Part B's Changes Effect on Oncology. Hematology & Oncology News. 6(5): 29-32.
http://www.honionline.com/hon/images/stories/Magazine/May/2007/hon_2007_05_medicare.pdf

Stefanacci RG (2007) Medicare Part D. It Should Be All About Quality....Stupid! JAGS 55(7): 1134-1136.

Stefanacci RG (2007) Why Medicare Matters Allot. CNS News. August 2007. 9(8):13.
http://www.cnsnewsonline.com/index.asp?section_ct=235&show=dept&s=d4&issue_id=312&article_id=8363

Stefanacci RG (2007) The Federal Prescription for Alzheimer's Disease. CNS News. July 2007. 9(7): 12-13.
http://www.cnsnewsonline.com/index.asp?section_id=235&show=dept&s=d4&issue_id=303&article_id=8174

Stefanacci RG (2007) Medicare Part D's Appealing Decisions. CNS News. June 2007. 9(6):11-12.
http://www.cnsnewsonline.com/index.asp?section_id=235&show=dept&s=d4&issue_id=297&article_id=7936

Stefanacci RG (2007) Reporting Medicare's CNS Quality Measures Pays. CNS News. May 2007. 9(5):12.
http://www.cnsnewsonline.com/index.asp?section_id=235&show=dept&s=d4&issue_id=275&article_id=7540

Stefanacci RG (2007) Tying Prescribers' Hands. CNS News. 9;4:10.
http://www.cnsnewsonline.com/index.asp?section_id=116&show=dept&issue_id=283&article_id=7553

Stefanacci RG (2007) Getting Paid through Medicare: Today & Tomorrow. CNS SeniorCare Spring 2007. 6(3): 14.
http://www.cnsseniorcare.com/index.asp?section_id=140&show=dept&issue_id=280&article_id=8087

Stefanacci RG (2007) The Medicare Beneficiary of the 21st Century Clinical Geriatrics. 15(8):27-30.

Stefanacci RG (2007) The Medicare Beneficiary of the 21st Century Annals of LTC. 15(8):26-28.

Bodenheimer T, Goodman J, Isham G, Nash D, Popik WC, Stefanacci RG. What now? Practical advice on how to reduce medical and pharmacy costs. Manag Care. 2007 Apr;16(4):36-7.

Stefanacci RG (2007) Medicare Part B's BIG Changes. Clinical Geriatrics. 15(6): 9-15.

Stefanacci RG (2007) Medicare Part B's BIG Changes. Annals of LTC. 15(6): 22-27.

Stefanacci RG (2007) Medicare Team Building. Clinical Geriatrics. 15(4):9-11.

Zarowitz B, Stefanacci RG, Hollenack K, O''Shea TO, Gruber J, Tangolos E. (2007) The Application of Evidence-Based Principles of Care in Older Persons: Alzheimer's Disease. JAMDA. 8:183-193

Stefanacci RG (2007) Medicare: Overtaxing Healthcare Provider, Clinical Geriatrics. 15(3):22-24.

Stefanacci RG (2007) Medicare: Reimbursement Politics, Clinical Geriatrics. 15(2):9-13.

Stefanacci RG (2007) Medicare: Reimbursement Politics, Annals of Long Term Care. 15(2):12-16.

Stefanacci RG (2007) Medicare: Prescribed Guidance. Clinical Geriatrics. 15(1): 21-24.

Stefanacci RG (2007) Medicare: Prescribed Guidance. Annals of Long Term Care. 15(1):41-44.

Stefanacci RG (2007) Medicare Update: Into the Doughnut Hole. P&T. 32(1) 27-28.

Stefanacci RG (2006) Medicare: Medicare Gets Tough. Clinical Geriatrics. 14(12):9-11.

Stefanacci RG (2006) Medicare: Medicare Gets Tough. Annals of Long Term Care. 14(12):16-17.

Stefanacci RG (2006) Implications of Medicare Part D in CKD Anemia Treatment. JAMDA. 7(9):S13-S16.

Stefanacci RG (2006) Is Racial Profiling Valid in Healthcare Today? A Review in General Medicine and LTC. LTC Interface.7(9):24-27.

Stefanacci RG (2006) Medicare Part D: Filling in the Donut Hole. Clinical Geriatrics.14(11):15-17.

Stefanacci RG (2006) Medicare Part D: Filling in the Donut Hole. Annals of Long Term Care. 14(11):13-15.

Stefanacci RG (2006) Medicare Part D: Preventing Medication Errors. Clinical Geriatrics. 14(10) 9-11.

Stefanacci RG (2006) Medicare Part D: Preventing Medication Errors. Annals of Long Term Care. 14(10) 15-17.

Stefanacci RG (2006) Medicare Part D: Freedom of Speech. Clinical Geriatrics. 14(9):25-28.

Stefanacci RG (2006) Medicare Part D: Freedom of Speech. Annals of Long Term Care. 14(9):12-14.

Stefanacci RG (2006) Medicare Part D: Who Controls the Prescription?. Clinical Geriatrics. 14(8):6-9.

Stefanacci RG (2006) Medicare Part D: Who Controls the Prescription?. Annals of Long Term Care. .14(8):14-17.

Stefanacci RG (2006) Senior Enrollment in Medicare Part D. Managed Care. 15(7) supplement 3:9-13.

Stefanacci RG (2006) Medicare Part D: Why doesn't CMS understand LTC's difference?. Clinical Geriatrics. 14(7):10-12.

Stefanacci RG (2006) Medicare Part D: Why doesn't CMS understand LTC's difference?. Annals of Long Term Care. 14(7):12-14.

Stefanacci RG (2006) Why LTC Residents' Choice of Medicare Prescription Drug Plan Matters.... Allot LTC Interface.

Stefanacci RG (2006) Clarifying Medicare Part D Enrollment Numbers. Clinical Geriatrics. 14(6):6-8.

Stefanacci RG (2006) Clarifying Medicare Part D Enrollment Numbers. Annals of Long Term Care. 14(6): 13-15.

Stefanacci RG (2006) Medicare Part D: Avoiding a New Liability for Nursing Homes. Clinical Geriatrics. 14(5):11-13.

Stefanacci RG (2006) Medicare Part D: Avoiding a New Liability for Nursing Homes. Annals of Long Term Care. 14(5):10-12.

Stefanacci RG (2006) Medicare Part D: How to choose the 'right' prescription drug plan?. Clinical Geriatrics. 14(4):9-11.

Stefanacci RG (2006) Medicare Part D: How to choose the 'right' prescription drug plan? Annals of Long Term Care. 14(4):17-18.

Stefanacci RG (2006) Medicare Part D: The Danger of Being a Deer Caught in the Headlights. Clinical Geriatrics. 14(3):11-12.

Stefanacci RG (2006) Alleviating Confusion and Preventing Fraud in the Medicare Part D Program P&T Journal, 31(3):154-158.

Stefanacci RG (2006) Implementation of the Medicare Prescription Drug Program: Issues & Answers, Clinical Geriatrics. 14(2):6-8.

Stefanacci RG (2006) Implementation of the Medicare Prescription Drug Program: Issues & Answers, Annals of Long-Term Care 14(2)13-15.

Stefanacci RG (2005) Ten Most Asked Questions about the Medicare Prescription Drug Program. Clinical Geriatrics & Annals of Long-Term Care, 13(12):12-15. http://www.hmpcommunications.com/cg/displayArticle.cfm?articleID=article5094

Stefanacci RG (2006) Are You Health Insurance Literate? A Question for Physicians. Journal of the American Geriatrics Society 54(1):166-168.

Zarowitz BJ, Stefanacci RG, Hollenack K, O'Shea T. (2006) The application of evidence-based prinicipals of care in older persons JAMDA (in press)

Zarowitz BJ, Stefanacci RG, Hollenack K, O'Shea T. Management of Osteoporosis (2005) JAMDA (in press)

Stefanacci RG, Phillips S (2005) A real Y2K for Medicaid P&T Committees. P&T. 30(11):670-672. http://www.ptcommunity.com/ptJournal/fulltext/30/11/PTJ3011670.pdf

Stefanacci RG (2005) The Cost of Being Excluded: Impact of excluded medications under Medicare Part D on the dually eligible nursing home residents JAMDA, 6(6):415-420.

Stefanacci RG (2005) Creating Artificial Barriers for Vaccinations, JAMDA. 6(5):357-358.

Stefanacci RG (2005) Implications of the Medicare Modernization Act for the Care of Osteoporosis Managed Care 14(8):13-17.

Stefanacci RG (2005) It's All About Access P&T 30(5): 2, Biotechnology Healthcare; Managed Care

Stefanacci RG (2005) Strategies for Developing a Successful Medicare Part D Formulary P&T 30(5): 3-10; Biotechnology Healthcare, Managed Care http://www.managedcaremag.com/supplements 0505_partd/MC_0505_PartD_suppl.pdf

Stefanacci RG, Cafiero, A (2005) Antidementia Agents: What Is Important in this Class *P&T.* 30(5):11-16; *Biotechnology Healthcare; Managed Care*

Stefanacci RG (2005) Generic Drugs,...Just What the MMA Ordered *P&T Journal*, 30(8):462-466. http://www.ptcommunity.com/ptJournal/fulltext/30/8/PTJ3008462.pdf

Beers MH, Stefanacci RG (2005) The Class Effect: Is It Relevant to Geriatric?, *Journal of the American Geriatrics Society* 53(8): 1402-1405.

Stefanacci RG (2005) The FDA's Advisory Board on Drug Safety: The Right Medicine? *P&T Journal*, 30(3):176-177. http://www.ptcommunity.com/ptjournal/fulltext/30/3/PTJ3003176.pdf

Glass H, Stefanacci R (2005) Follow the Phase III leader *Script* 4:1-3. www.scriptmag.com

Stefanacci RG (2005) Assisted Living Facilities: AGS Position Paper AGS HCSC, *Journal of the American Geriatrics Society* 53(3):536-37.

Stefanacci RG (2005) Assisted Living Facilities: Optimizing Outcomes, *Journal of the American Geriatrics Society* 53(3):538-540.

Stefanacci, R.G. (2004) Medicare Reform's Impact on LTC. *Journal of the American Medical Directors Association* 5(6):418-421. http://download.journals.elsevierhealth.com/pdfs/journals/1525-8610.PIIS1525861004700146.pdf

Stefanacci, R.G. (2004) New Medicare Legislation. *Clinical Geriatrics*; 12(5):14-15. www.mmhc.com

Stefanacci, R.G. (2004) The Implications of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 for P&T Committees. *P&T Journal* 29(2):95-97. http://www.ptcommunity.com/ptjournal/fulltext/29/2/PTJ2902095.pdf

Stefanacci, R.G. (2003) The Expanding Responsibility of P&T Committees in Long-term Care. *P&T Journal*, 28(11):720-723. http://www.ptcommunity.com/ptjournal/fulltext/28/11/PTJ2811720.pdf

Stefanacci, R.G., Gilman, B.A., (2003) Case Study: Optimizing Medication Use in Skilled Nursing Facilities. *Journal of Quality Health Care*: 2(2):1-4

Stefanacci RG, Warden K, Lockett D. (2002) Case Study: Improving Clinical Resource Managed for a Group Practice. *Journal of Quality Health Care* 1(4): 1-4.

Knight TC, Wertheimer AI, Stefanacci RG (2002) Identification of Potentially Inappropriate Medication Use in a Program of All-inclusive Care for the Elderly. *The Consultant Pharmacist*, 17: 1035-39.

Stefanacci RG, Clinger-DiGangi P, Leary D, Ishaq S.(2002) Using Computer-Based Learning to Get to Best Practices. *Journal of Quality Health Care* 1 (2):3-7.

Stefanacci RG (2002) Will Nurse Practitioners replace Physicians as attendings in LTC? *Journal of the American Medical Directors Association*, 2, 222-224. http://download.journals.elsevierhealth.com/pdfs/journals/1525-8610/PIIS152586100470208X.pdf

Stefanacci RG (2001) The Delivery of Geriatric Health Care *Clinical Geriatrics*, 9(6)13-14. http://www.mmhc.com/engine.pl?station=mmhc&template=cgfull.html&id=795


Abstracts (peer reviewed):
Reifsnyder J, Stefanacci RG, Maxwell T, Weschules D, Bain K. (2005) Optimizing medication management: Medicare Part D, MTMS, and Implications for hospice. 20th Annual National Hospice & Palliative Care – Organization Management & Leadership Conference. September 22-24th 2005 Hollywood. Fl..

Brandt, N., Brodeur, M., Stefanacci, R. (2001).  Meeting Pharmaceutical Care Needs of Community Dwelling Older Individuals:  A Managed Care Model.

Chvat, J., Hackworth, E., Brandt, N., Stefanacci, R. (2001).  Megace Used for Weight Gain in the Elderly:  A Retrospective Chart Review of Community Dwelling Individuals presented at the University of Maryland Pharmacy Conference.

Stefanacci R, Cavalieri TA, Flynn J, Forman LJ, Pomerantz S. (1989) Physicians attitudes toward the use of advance directives. *The Gerontologist*, 34(Special Issue 1): 181-182, 1994.

Cavalieri TA, Denny A, Mohammad Z, Stefanacci R, Erde E, Forman LJ. (1989) Impact of the Patient Self Determination Act (PSDA) on adult patients admitted to an acute care facility. *The Gerontologist*, 33(Special Issue 1): 145, 1993.


Clinical Practice Guidelines
GI Disorders in LTC (2006) AMDA [chair]

Dementia (2006) AMDA

Anticoagulation Management in LTC (2006) AMDA

LTC Physician Information Kit: Determination of Medical Necessity of Rehabilitation Therapy Services (2003) AMDA

Multidisciplinary Medication Management (M3) Tool Kit (2003) AMDA

Dehydration and Fluid Maintenance (2002) AMDA


Position Statements Principle Author

Pay-for-performance (2005) AGS
*Under final review*

Managed Care Organizations (2003) AGS
http://www.americangeriatrics.org/products/positionpapers/AGS_MCO_final.shtml

Assisted Living Facilities (2004) AGS
http://www.americangeriatrics.org/products/positionpapers/ags_alf.shtml

Monograms Primary Author
Envisioning the Future of Senior Care: New Models, Improved Outcomes (2004)

The Senior Care Source: Facts, Figures, & Forecasts (2005, 2006)

Website Contributing Author
Philadelphia Inquirer Medicare Part D Q & A (2005)
http://www.philly.com/mld/philly/news/special_packages/phillytalk/qa_forum.htm

AGS Webcast Educational Session (2005) Medicare Part D Overview (in production)
www.americangeriatrics.org

Foundation for Health in Aging: Medicare Modernization Act Q&A (2004)
http://www.healthinaging.org/public_education/medicarePrescDrug_bill.php

Articles (non-peer reviewed journals):

Maxwell T, Stefanacci RG, Bain K, Weschules D. (2008) Evidence Based Prescribing in
End-of-Life Care: The Gaps in Practice. Medicare Patient Management, (in press)

Stefanacci RG. (2008) Extending the Caregivers Reach. *Assisted Living Consult*. (in
press)

Stefanacci RG (2008) Eliminating Barriers to Vaccination, Managed Care Magazine, (in
press)

Stefanacci RG (2008) Implications of the Medicare Modernization Act for the Treatment
of Osteoporosis, Managed Care Magazine, (in press)

Stefanacci RG. (2008) The changing politics of health care, *Assisted Living Consult*.
4(1):7-9.

Stefanacci RG. (2008) More than sticks and stones break bones, *Assisted Living Consult*.
4(1):29-32

Stefanacci RG. (2008) Paying for the Right Stuff *Medicare Patient Management*.3(1):10-
13

Stefanacci RG. (2008) Vaccination Access Today *Medicare Patient Management*.3(1):38-40.

Stefanacci RG. (2007) Medicare Part D: Protection for Those Requiring Mental Health Drugs *ElderCare* 7(2):1-4.

Stefanacci RG. (2007) Who Should Define Us? Assisted Living Consult. 3(5):7-8.

Stefanacci RG. (2007) Quality Matters... In Fact It's All That Matters! *Medicare Patient Management*.2(5):6-7.

Stefanacci RG. (2007) The Rapidly Changing Face of Medicare *Medicare Patient Management*.2(4):6-7.

Stefanacci RG. (2007) Extending the Caregiver's Reach *Assisted Living Consult*. 3;4:6-8.

Stefanacci RG. (2007) Diagnosis and Treatment of DVT: New Guidelines. *Medicare Patient Management*. 2:3:17-21

Corso MT, Stefanacci RG. (2007) An Ounce of Prevention is Worth a Pound of Malpractice. *Medicare Patient Management*. 2;3:36-38.

Stefanacci RG. (2007) Creating a Caring Community. *Medicare Patient Management*. 2;3:8-11.

Stefanacci RG. (2007) Let's Not Lose Sight of Residents' Visual Health. *Assisted Living Consult*. 3;2:23-26.

Stefanacci RG. (2007) Check Please!. *Assisted Living Consult*. 3;2:9-11.

Stefanacci RG. (2007) Why many American children won't being seeing a Geriatrician. *Medicare Patient Management*. 2;2:26-29.

Stefanacci RG. (2007) Consumer Driven Primary Healthcare *Medicare Patient Management* 2;2:8-11.

Stefanacci RG (2007) Catered Living *Assisted Living Consult*. 3(1):8-9.

Stefanacci RG. (2007) Beyond 2007: A Very Different Medicare *Medicare Patient Management* 2;1:6-10.

Stefanacci RG. (2007) Managing the Donut Hole *Medicare Patient Management* 2:1:22-25.

Stefanacci RG (2006) Your Future in Geriatrics. AGS Fellows-in-Training Newsletter. (Fall 2006)

Stefanacci RG (2006) Editorial: Resident Safety is Everyone's Responsibility. *Assisted Living Consult*. 2;6:7-8

Stefanacci RG (2006) Automatic External Defibrillators: Should Your Facility Have One? Assisted Living Consult. 2;6:31-32.

Stefanacci RG (2006) Residents, Facilities, and Providers Benefit from Change in Reimbursements for AL Visits, Assisted Living Consult, 2;6:33-34.

Stefanacci RG. (2006) Medicare's Push for Quality Health Care Medicare Patient Management 1(6):14-18.

Stefanacci RG. (2006) Editorial: Getting Value Medicare Patient Management 1(6):11-12.

Simonson W, Stefanacci RG (2006) Better Ways to Fall Asleep: The Danger of Benzodiazepines. Assisted Living Consult. 2;5:29-33.

Stefanacci RG (2006) Editorial: Good Behavior, Assisted Living Consult, 2;5:6-7.

Stefanacci RG, Pouliot D. (2006) Medicare Part D: Legislative Help for Patients, Pharmacists, and Physicians Medicare Patient Management 1(5):22-27.

Stefanacci RG. (2006) Editorial: Special Opportunity Medicare Patient Management 1(5):6-8.

Stefanacci RG (2006) Medicare Fraud & Confusion. Assisted Living Consult. 2;4:20-23.

Stefanacci RG (2006) Editorial: Impact, Assisted Living Consult, 2;4:6-7.

Stefanacci RG (2006) Medicare Part D: Where Do We Stand? Where Are We Going?, Assisted Living Consult. 2;4:12-16.

Stefanacci RG. (2006) Learning from Experience Medicare Patient Management 1(4):28-30.

Stefanacci RG. (2006) Where is Medicare Part D Headed Now? Medicare Patient Management 1(4):11-16.

Stefanacci RG. (2006) Editorial: End of Life Care Medicare Patient Management 1(4):6-7.

Stefanacci RG (2006) Medicare Part D and Medically Necessary Medications ElderCare 6(1): 10-11.

Stefanacci RG. (2006) Editorial: Really Being Resident Focused Assisted Living Consult 2(3):6-7.

Stefanacci RG. (2006) Medicare's Cliff Medicare Patient Management 1(3):6-7.

Stefanacci RG. (2006) Oh the Places You'll Go... Medicare Patient Management 1(3):8-9.

Stefanacci RG. (2006) From Profession to Business: The Corporatizing of American Medicine *Medicare Patient Management* 1(3):10-13.

Stefanacci RG. (2006) Medicare Finances 101 *Medicare Patient Management* 1(3):15-24.

Stefanacci RG. (2006) Opting Out of Medicare *Medicare Patient Management* 1(3):32-35.

Stefanacci RG. (2006) Reading the Tea Leaves for Medicare Part D *Medicare Patient Management* 1(3):44-48

Stefanacci RG (2006) P4P: Long-Term Care's Needs Are Unique, *Caring for the Ages*, 7(4):15

Stefanacci RG (2006) Preventing Falls Assisted Living Consult, 2(2):6-7.

Stefanacci RG (2006) Fall Prevention Starts in Bed Assisted Living Consult, 2(2):17-19.

Stefanacci RG. (2006) Reading the Tea Leaves for Medicare Part D *Medicare Patient Management* 1(2):44-48.

Stefanacci RG. (2006) Medicare -- Another Etiology for Dizziness. *Medicare Patient Management* 1(2):6-8.

Stefanacci RG. (2006) Medication Rx Coverage: The A, B, C, and Ds *Medicare Patient Management* 1(2):8-17.

Glass H, Stefanacci RG. Sevgen F. Barnett K, Morrow B, Smith W, Resnick J. (2006) The Medicare Modernization Act and Its Implications for Pharmaceutical Marketing. Product Management Today. 17(2):14-21.

Stefanacci RG (2006) Medicare Part D and Your Patient, Pennsylvania Medical Society Journal Newsletter. February 2006.

Stefanacci RG, Connelly SB, Cavallaro B, Gerbino P. (2006) A Primer for Medicare Part D Plan P&T Committees. *Medicare Patient Management* 1(1):31-37.

Stefanacci RG (2006) Disparity in Assisted Living: An Honest Self-Assessment Assisted Living Consult. 2(1):14-17.

Stefanacci RG (2006) Clinical Marketing Assisted Living Consult. 2(1):6-7.

Stefanacci RG. (2006) The Real 800-Pound Gorilla *Medicare Patient Management* 1(1):5-6.

Stefanacci RG. (2006) Medicare Prescription Drug Coverage -- What It Means for Today and Tomorrow *Medicare Patient Management* 1(1):7-12.

Stefanacci RG (2005) Ethical Dilemmas — Caring to Know *(physician attitude about Medicare Part D)*. *Caring for the Ages,* 6(12):26.

Stefanacci RG (2005) Healthcare Tipping Points Assisted Living Consult, 1(6):6-7.

Stefanacci RG (2005) Managing Parkinson's Disease: The impact of Medicare's new prescription drug benefit, *Schwarz Pharma Parkinson's Report,* Winter: 4-6.

Stefanacci RG (2005) The Best ALF Prescription Drug Plans Assisted Living Consult, 1(5)20-22.

Stefanacci RG (2005) Disaster Preparedness: Planning Now Can Prevent Tragedy Later Assisted Living Consult, 1(5):6-7.

Stefanacci RG (2005) Ethical Dilemmas — Donut Holes *(coverage options during gap in Medicare Part D coverage)*. *Caring for the Ages,* 6(11):33.

Stefanacci RG (2005) Caring in Crisis, *Caring for the Ages, 6(11):3.*

Stefanacci RG (2005) Ethical Dilemmas — Boundaries *(nursing facility assistance of resident enrollment in Medicare Part D)*. *Caring for the Ages,* 6(10):24.

Stefanacci RG (2005) Ethical Dilemmas — Benevolent Neglect *(limits of care)*, *Caring for the Ages,* 6(9):23

Stefanacci RG (2005) Really Caring Where Seniors Live Assisted Living Consult, 1(4):6-7 http://www.assistedlivingconsult.com/issues/01-04/ALC1-4_Editor.pdf

Bringewatt R, Stefanacci RG (2005) The Medicare Modernization Act May Help ALFs Assisted Living Consult, 1(4):8-19. http://www.assistedlivingconsult.com/issues/01-04/ALC1-4_MMA.pdf

Stefanacci RG (2005) The New Medicare Prescription Drug Benefit.......What You Need to Know Now Caring Today.

Stefanacci RG (2005) Ethical Dilemmas — News Unworthy *(end of life care)*. *Caring for the Ages, 6(8):9.*

Bringewatt R, Stefanacci RG (2005) Special Needs Plan Provisions of Medicare Modernization Act may help ALFs Assisted Living Consult, 1(3):12-14.

Stefanacci RG (2005) What a Pain! Assisted Living Consult, 1(3):6-7. http://www.assistedlivingconsult.com/issues/01-03/ALC1-3_Editor.pdf

Stefanacci RG (2005) MTMS and the Million Dollar Question: How Will ALF Residents Benefit? Assisted Living Consult, 1(3):19-21. http://www.assistedlivingconsult.com/issues/01-03/ALC1-3_MTMS.pdf

Stefanacci RG (2005) Interview with Dr. Richard Stefanacci, Managed Care, 14(5): 53-58

Stefanacci RG (2005) Caring Where Seniors Live, USP Magazine, 94(4):12-13.

Stefanacci RG (2005) Choosing a Medicare Drug Discount Card and Beyond.......
Senior Resource Guide.

Stefanacci RG (2005) Ethical Dilemmas... You've Got Mail *(physician email)*, *Caring for the Ages*,6(6):13.

Stefanacci RG (2005) Ethical Dilemmas – Weight....Numbers Can Lie *(quality measures)*, *Caring for the Ages*, 6(4): 7.

Stefanacci RG (2005) Moving Beyond Commodity Pricing....Pay-for-Performance. *Jefferson University Health Policy Newsletter*, (in press)

Stefanacci RG (2005) The Benefit of Staying Put, Assisted Living Consult, 1(2):6-7. http://www.assistedlivingconsult.com/issues/01-02/ALC1-2_Editor.pdf

Stefanacci RG (2005) Acute Change of Condition, Assisted Living Consult, 1(2):22-24. http://www.assistedlivingconsult.com/issues/01-02/ALC1-2_AMDA.pdf

Podrazik PM, Stefanacci RG (2005) Negotiating the Complexities of the LTC Continuum, Assisted Living Consult. 1(2):8-17. http://www.assistedlivingconsult.com/issues/01-02/ALC1-2_Negotiating.pdf

Stefanacci RG (2005) As the MMA Storm Moves Toward Us...... Assisted Living Consult. 1(2):15-17. http://www.assistedlivingconsult.com/issues/01-02/ALC1-2_MMAStorm.pdf

Stefanacci RG (2005) Ethical Dilemmas – Pay me now or *later (Provision of non-covered drugs under Medicare Part D)*. *Caring for the Ages*,6(3):19.

Stefanacci RG (2005) Ethical Dilemmas – Driving Miss Daisy *(driving restrictions)*, *Caring for the Ages*, 6(2):11.

Stefanacci RG (2005) Falls & Fall Risk, Assisted Living Consult. 1(1):26-32. http://www.assistedlivingconsult.com/issues/01-01/ALC1-1_FallsRisk.pdf

Stefanacci RG, Bolhack S. (2005) Networking the Assisted Living Facility with the Community, Assisted Living Consult. 1(1):14-18. http://www.assistedlivingconsult.com/issues/01-01/ALC1-1_Networking.pdf

Stefanacci RG (2005) Storm Warning: MMA's Impact on ALFs, Assisted Living Consult. 1(1):19-21. http://www.assistedlivingconsult.com/issues/01-01/ALC1-1_StormWarning.pdf

Stefanacci RG (2005) Assisted Living Consult: What's in a name?, Assisted Living Consult. 1(1):6-7. http://www.assistedlivingconsult.com/issues/01-01/ALC1-1_Editorial.pdf

Stefanacci RG (2005) Ethical Dilemmas – Give me a shot *(restrictions on vaccinations)*, *Caring for the Ages*, 6(1):28.

Stefanacci RG (2004) Ethical Dilemmas - Extortion *(malpractice settlements)*, *Caring for the Ages*, 5(12):25.

Stefanacci RG (2004) Ethical Dilemmas - My Wishes *(following patient end of life care)*, *Caring for the Ages*, 5(11):20.

Stefanacci RG (2004) Ethical Dilemmas - More Hanging Chads *(seniors right to vote)*, *Caring for the Ages*, 5(10)10.

Stefanacci RG (2004) Ethical Dilemmas – Fire Control *(Pharmaceutical representatives' involvement in NFs)*, *Caring for the Ages*, 5(9) 9.

Stefanacci RG (2004) Assuring Individualized Pharmacotherapy for the Elderly, *Jefferson University Health Policy Newsletter*, September 2004; 10. (Reprinted in Senior Care Managed)

Stefanacci RG (2004) The Health Policy Debate Regarding Long-term Care Hospitals, *Jefferson University Health Policy Newsletter*, September 2004; 4.

Stefanacci RG (2004) Ethical Dilemmas – Just a Joke….Right, *Caring for the Ages*, 5(8):19.

Stefanacci RG (2004) Ethical Dilemmas – A Little Something Extra. *Caring for the Ages*, 5(7):22.

Stefanacci RG (2004) Ethical Dilemmas – Disparities, *Caring for the Ages*, 5(6):12.

Stefanacci RG (2004) Ethical Dilemmas - The Oath, *Caring for the Ages*, 5(5):7.

Stefanacci RG (2004) Ethical Dilemmas – Do No Harm, *Caring for the Ages*, 5(4):11.

Stefanacci RG (2004) The Impact of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003. *Jefferson University Health Policy Newsletter*, 17(1): 7. http://www.jefferson.edu/dhp/HPN/HPN-03-04.pdf

Stefanacci RG (2004) Hospital Quality Measures, *Jefferson University Health Policy Newsletter*, 17(1): 4. http://www.jefferson.edu/dhp/HPN/HPN-03-04.pdf

Stefanacci RG (2004) Ethical Dilemmas – Unsafe Discharge. *Caring for the Ages*, 5(3) 25.

Stefanacci RG (2004) Ethical Dilemmas – Adversaries, *Caring for the Ages*, 5(2):18-19.

Stefanacci RG (2004) Ethical Dilemmas – Disagreeable Payers. *Caring for the Ages*, 5(1):4-6.

Stefanacci RG (2003) The Interdisciplinary Team, *Jefferson University Health Policy Newsletter*, 16(3):8-9. http://www.tju.edu/ohp/HPN/HPN-09-03.pdf

Stefanacci RG (2003) CMS Health Policy Scholar Program, *Jefferson University Health Policy Newsletter*, 16(3):4. http://www.tju.edu/ohp/HPN/HPN-09-03.pdf

Stefanacci RG (2002) "Non-Chemical" Therapies Reduce ADRs, *Caring for the Ages*, 3(10) 32-33. http://www.amda.com/caring/october2002/technology.htm [Utilized for the AMDA Curriculum on Geriatric Clinical Practice for LTC Faculty Training Kit]

Stefanacci RG (2002) Bring Your Team Together through Technology, *Caring for the Ages*. 3(60): 18 http://www.amda.com/caring/june2002/technology.htm

Stefanacci RG (2001) Reducing Medical Mistakes with Technology, *Caring for the Ages*, 3, 12. http://www.amda.com/caring/december2001/technology.htm

Stefanacci RG (2001) Technology in LTC: Getting a Jump Start at the Bedside, *Caring for the Ages*, 2, 20.

Stefanacci RG (2001) Time for Technology in LTC, *Caring for the Ages*, 8, 3-4. http://www.amda.com/caring/august2001/technology.htm

Stefanacci, R.G. (2001). Managed Care Principles that Work for LTC. *Caring for the Ages*, 2, 3 - 4.

Stefanacci, R.G. (2001). The EMR Solution. *Physicians and Computers*, 18, 36-27.

Stefanacci, R.G. (2000). Two Doctors Add Spice to Their Careers. *The Medical Economics Audio Digit*, 3.

Stefanacci, R.G. (2000). The Future of Electronic Records. *Physicians and Computers*, 18, 36 –37.

Stefanacci, R.G. (1999). We're a Group, But We Feel Like Soloists. *Medical Economics*, 216-225.

Stefanacci, R.G. (1998). Developing an Ambulatory Medical Center. *Building the Foundations*, 2-8.

Stefanacci, R.G. (1987). From Profession to Business: The Corporatization of American Medicine. *Student Doctor*, 16-18.

Rec'd 4/13/08
by Defendant

## Nursing Home Resident Smoking Policies

Richard G. Stefanacci, DO, MGH, MBA, AGSF, CMS, Paula E. Lester, MD, FACP and Izchak Kohen, MD

*Acknowledgement: The survey that serves as the basis for this report was conducted with the assistance of National Association Directors of Nursing Administration / Long Term Care (NADONA/LTC).*

Objective: To identify nursing home standards related to resident smoking through a nation wide survey of directors of nursing.

Methods: A national survey was distributed online and was completed by 248 directors of nursing. The directors of nurses answered questions concerning resident smoking including the criteria utilized to determine an unsafe resident smoker. For those residents identified as unsafe, the questions asked were specifically related to monitoring, staff involvement, safety precautions and policy.

Results: The results of the survey demonstrated a consistent policy practiced among facilities across the United States. The monitoring of nursing home residents is based on a resident's mental acuity, physical restrictions and equipment requirements. Once a resident was identified as a smoker at risk of harm to self or others, staff involvement ranged from distributing cigarettes to direct supervision. In addition, the majority of facilities required residents to wear fire resistant aprons and provided a fire extinguisher in smoking areas.

Conclusion:  Monitoring policies of nursing home residents who smoke starts with identifying those residents at risk based on an assessment of mental acuity, physical restrictions and equipment requirements. Those that are identified as being at risk smokers have their cigarettes controlled and distributed by nursing staff and are supervised by facility staff when smoking. . This policy is implemented through written policy as well as staff education. Despite some discrepancies in the actual implementation of policies to supervise residents who smoke, the policies for assessment for at-risk smokers requiring monitoring is consistent on a national basis.

## Introduction

It has been estimated that 9.1% of older adults are chronic smokers.[1] Within skilled nursing facilities the numbers reported vary but remain consistent near the 10% mark. That is supported by a study of nursing home administrators that reported the number of smoking residents to be between 2% and 10%.[2] These numbers are somewhat higher for those within a Veterans Affairs (VA) nursing home. In a study of VA homes a range of 5% to 80% with an average of 22% had been reported.[3] The study postulated that the reason for the higher rate of smoking among VA residents was the result of their lower socioeconomic status.[4]

Stefanacci
EXHIBIT NO. 2
4-21-08
C. JARDIM

The risks related to resident smoking in a nursing home is significant, not only for the resident's own safety but for the entire facility. Smoking materials account for 72% of fire related deaths and 43% of fire related injuries in long term care facilities.[5] A very recent case report and literature review published in the Journal of the American Medical Directors Association by Drs. Lester and Kohen noted that residents with cognitive impairment and various physical disabilities may be unsafe smokers and present safety risks.[6] It has also been noted that physical challenges such as tremor, reduced movement, or paresis, as well as cognitive and visual spatial deficits make the smoking resident 2 to 3 times more likely to be severely burned than community based counterparts.[7]

The dangers of smoking in the nursing home setting have led to increased government regulation. Over the past 30 years, Medicaid and Medicare regulations have required that smoking by long-term care residents be supervised and controlled. The regulations include a mandate that residents may not smoke in their sleeping room unless directly observed by staff. The 1994 Joint Commission on Accreditation of Healthcare Organizations standards for long-term care mandated that "the organization disseminate and enforce an organization wide policy that discourages the use of smoking materials by patients/residents."[8] However, when smoking is permitted, policies must "minimize to the greatest extent possible the use of smoking materials, and confine allowed smoking to a designated location(s) that is separated from nonsmoking patients/residents."[8]

Residents with dementia require even greater oversight in this regard. The Centers for Medicare and Medicaid Services (formerly known as Health Care Financing Administration) requires compliance with the National Fire Protection Association's Life Safety Code to restrict smoking by dementia residents because of their increased fire risk.[9]

## Methods

A national survey was distributed online through NDONA/LTC and completed by 248 directors of nursing. The surveys were completed by a national sampling representing an even distribution with regard to geographic distribution as well as for-profit and non-profit facilities. In addition, those completing the survey directed nursing in facilities between 60 and 240 beds which is consistent with most skilled nursing facilities.

The directors of nurses answered questions concerning resident smoking including the criteria utilized to determine an unsafe resident smoker. For those residents identified as unsafe, the questions asked were specifically related to monitoring, staff involvement, safety precautions and policy.

## Results

248 nursing home directors of nursing completed the survey.Below are the responses which aimed at identifying facility policies regarding resident smoking..

Survey results consistently show that any policy regarding nursing home resident smoking starts with identifying those residents at risk based on an assessment of mental acuity, physical restrictions and equipment requirements. Those that are identified as being at risk smokers must be supervised by facility staff as well as having their cigarettes controlled and distributed by nursing staff.

In addition the safety precautions utilized include resident wearing a fire resistant apron as well as have having a fire extinguisher available in the smoking area.
Most facilities do not require physician orders to denote those residents that are allowed to smoke instead choosing to manage this process through the nursing staff. These smoking policies are implemented through written policy as well as staff education.

### Criteria for Monitoring

| | |
|---|---|
| Mental Acuity (i.e. those suffering from dementing illnesses are restricted) | 96.91% |
| Physical restrictions (i.e. those because of stroke or similar limitation would be unable to put out a fire or remove themselves from a fire) | 95.88% |
| Equipment Requirements (i.e. those requiring oxygen | 95.60% |

### Staff Involvement

| | |
|---|---|
| Direct facility staff supervision from any staff member | 73.3% |
| Cigarettes are distributed by nursing staff | 85.8% |

### Safety Precautions

| | |
|---|---|
| Resident wears fire resistant apron | 68.8% |
| There is a fire extinguisher in smoking area | 69.0% |

### Policy

| | |
|---|---|
| There is a written smoking policy in place | 97.4% |
| Physician order is NOT required to allow smoking | 68.9% |
| There is designated staff education available to support the facility policies | 86.3% |

### Discussion

The apparent standard of care for smoking of residents in skilled nursing facilities is that residents have restrictions placed on their smoking if they have any of the following:

- Decreased Mental Acuity (i.e. dementing illnesses)
- Physical restrictions (i.e. stroke or similar limitation that would limit resident's ability to extinguish a fire or remove themselves from a fire)
- Equipment Requirements (i.e. those requiring oxygen)

These restrictions are carried out through the following:

- Direct facility staff supervision from an assigned staff member
- Cigarettes are distributed by nursing staff
- There is a written smoking policy in place
- There is designated staff education available to support the facility policies

Based on these survey results as well as a review of the literature it appears that these restrictions are designed to protect residents from themselves as well as toward the entire residential population. This is based on a residents' ability to manage the active smoking task as well as being able to manage a smoking mishap. The later involves the following:

- o Self extinguish cigarette or cigarette ashes
  - Ability to recognize situation and know corrective action
  - Ability to physically extinguish cigarette or ashes

- o Remove self from an incendiary situation
  - Ability to recognize situation and know corrective action
  - Ability to physically remove self from scene

These standards with regard the classification and process for assessing smoking nursing home residents appear to be consistent even outside the United States. The Jury recommendation concerning the death of a nursing home resident in Ontario Canada illustrates universal points that are consistent with those practiced in United States. This jury recommended that "all smokers 'assessed as unsafe' must wear a smoking apron and be supervised in person by staff trained in fire safety."[10]

In the United States, these same concerns were voiced in a letter dated January 6th 2006 by Mr. William Bordner, Director Division of Nursing Care Facilities – Bureau of Facility License and Certification.[11] He noted that "residents that smoke should be assessed for their ability to safely smoke independently."[11] In addition, he stated that "residents found to be incapable of smoking safely should have interventions developed to ensure that the resident smokes in a manner and environment that ensure their safety. Adequate supervision while smoking should be provided for those residents that require it."[11] These statements are consistent with those found in nursing home facilities across the nation as they form the basis of the standard of care.

Furthermore, the Uniform Fire Code[12] and Life Safety Code[13] state that smoking by patients classified as not responsible shall be prohibited. Comprehensive Nursing and Rehabilitation Center's own Smoking Policy No. 19 notes that the staff is obligated to assess smoking habits of patients and identify high risk smokers.

The findings of this survey are consistent with those identified through literature review as well as those outlined by the Pennsylvania Department of Health in their Provider Bulletin.[14] In that bulletin the Department of Health dictated the following requirements of facilities:

- Pennsylvania Long Term Care Regulations require that policies regarding resident smoking be developed. These policies shall include provisions to protect the rights of the nonsmoking residents as well as the health and safety of all residents residing in the facility.
- Residents that smoke should be assessed for their ability to safely smoke independently.
- Residents found to be incapable of smoking safely should have interventions developed to ensure that the resident smokes in a manner

and environment that ensure their safety. Adequate supervision while smoking should be provided for those residents that require it.

- Staff must be aware of the needs of the resident and must consistently implement the care plan interventions developed to prevent unsupervised smoking to ensure the safety of the residents.

- If a resident that has been assessed as requiring supervised smoking is found without supervision, a complete and thorough investigation should take place immediately to determine how the resident was able to obtain smoking paraphernalia. The investigation should be comprehensive and include other residents that may be at risk as a result of this failure. If during the investigation, it is determined that the facility's lack of action has not corrected the identified situation or that other residents remain at risk, the facility may be assessed to be in an immediate jeopardy situation.

- If a resident that smokes requires oxygen therapy, precautions must be implemented so the oxygen which is highly combustible is not a factor. Weighing the reisdents rights with a safety hazard in communal living must be considered.

Facilities may establish smoke free policies; however, residents who smoke and have resided in the facility prior to the implementation of the smoke free policy can not be prohibited from smoking after the policy is implemented.[14]

The above policy recommendations are consistent with the findings in our survey that outline a process that begins with conducting an individual assessment. From this assessment the facility's staff determines if smoking by a resident poses a danger to him/herself or others. The staff must then restrict access to smoking materials and supervise their use by the resident.

## Conclusion

The results of this national survey of nursing home director of nurses illustrated a fairly uniform standard regarding the policy for resident smoking. However, there were some discrepancies in the actual implementation of policies to supervise residents who smoke. In particular, this was true regarding safety precautions including access to fire resistant apron and fire extinguishers perhaps because it was felt that precautions already in place such as direct monitoring provided superior safety. In addition, this survey as well as a review of literature and websites[15] noted that an increasing number of facilities are becoming smoke-free thereby restricting access to smoking for all residents.

The regional and national standards identified in this literature review and survey remains consistent with the freedom of choice reference in OBRA '87. That regulation states that nursing home residents "have the right to reasonable accommodations of individual needs and preferences, except where the health or safety of the individual or other residents would be endangered."[15] While the law makes clear that smoking must be allowed in long-term care, it does not guarantee an individual resident's right to smoke. Using the standards already being applied in the majority of nursing homes in the United States, a

balance can be reached between the administrative concerns about the safety of nursing home smokers and the promotion of personal autonomy.

[1] Elhassan A, Chow RD. Smoking cessation in the elderly. Clin Geriatr 2007. 1;15:38-45.
[2] Barker JC, Lewis DE JR. Smoking policy in long-term care: A survey of administrators in San Francisco. J Health Soc Policy 1998; 10:81-100.
[3] Kochersberger G, Clipp EC, Resident smoking in long-term care facilities – polices and ehics. Public Health Rep 1996;111:66-70.
[4] Wolfson CR, Barket JC, Mitteness LS. Smoking and health: Views of elderly nursing home residents. J Gerontol Nurs 2001;27:6-12.
[5] Jasper TW. Smoke-free environment protect resident rights, promote safety. Provider 1993;19:45-46.
[6] Lester PE, Kohen I. Smoking in the nursing home: A Case report and literature review. JAMDA 2008;9:2001-2003.
[7] Trier H, Spaaback J. The nursing home patient – a burn-prone person. An epidemiological study. Burns Incl Therm Inj 1987;13:484-487.
[8] Accreditation Manual for Long-Term Care. The Joint Commission for the Accrediation of Healthcare Organizations. Chicago, IL: Joint Commission Resources; 1994.
[9] Nichols D. Clearing the air. Contemp Longterm Care. 1995;18:47-50.
[10] Jury Recommendations Concerning the Death of Mr. John Wilson http://www.mcscs.jus.gov.on.ca/french/pub_safety/office_coroner/verdicts_and_recs/2003%20Inquests/Wilson%20Recommendations.pdf
[11] Pennsylania Department of Health. Divison of Nursing Care Facilities. Provider Bulletin No. 59. Elopement, Resident Smoking and Water Temperatures. January 6, 2006.
[12] Uniform Fire Code, NFPA I, Section 20.4.2.4(3)
[13] Life Safety Code, NFPA 101, Section 19.7.4(3)
[14] Pennsylania Department of Health. Divison of Nursing Care Facilities. Provider Bulletin No. 59. Elopement, Resident Smoking and Water Temperatures. January 6, 2006.
[15] Omibus Budget Reconcilation Act of 1987. Public Law 100-203, Sections 4201(a), 4211(a).

# ATTACHMENT 12

# EXCERPTS FROM

# DEPOSITION OF
# HART KERLIN

DEPOSITION OF HART KERLIN
CONDUCTED ON TUESDAY, MAY 20, 2008

1 (Pages 1 to 4)

---

**1**

1  IN THE UNITED STATES DISTRICT COURT
2  DISTRICT OF COLUMBIA
3  ------------------------------------X
4  MARY SANDERS, as Personal      *
5  Representative of the Estate  *
6  Benjamin Sanders,          *
7      Plaintiff      * Case No.
8      vs            * 1:07-cv-01169
9  UNITED STATES OF AMERICA,    *
10     Defendants    *
11  ------------------------------------X
12      Deposition of HART KERLIN
13      Annapolis, Maryland
14      Tuesday, May 20, 2008
15      10:37 a.m.
16
17
18  Job No.: 1-129338
19  Pages 1 - 150
20  Reported by: Dianna C. Kilgalen, Notary Public.
21      - - - - - -
22

---

**2**

1      Deposition of HART KERLIN held at the offices
2  of:
3      Trident Engineering Associates
4      2010 Industrial Drive
5      Annapolis, Maryland 21401
6
7
8      Pursuant to Notice, before Dianna C. Kilgalen,
9  Notary Public of the State of Maryland.
10
11
12
13
14
15
16
17
18
19
20
21
22

---

**3**

1      A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFF:
3      W. CHARLES MELTMAR, ESQUIRE
4      The Cochran Firm
5      1100 New York Avenue, N.W.
6      West Tower, Suite 340
7      Washington, D.C. 20005
8      202.682.5800
9
10  ON BEHALF OF THE DEFENDANT:
11      CLAIRE M. WHITAKER, ESQUIRE
12      UNITED STATES ATTORNEY'S OFFICE
13      555 4th Street, Northwest
14      Washington, D.C. 20001
15      202.514.7137
16
17
18
19
20
21
22

---

**4**

1      C O N T E N T S
2  Examination of HART KERLIN            PAGE
3  By MR. MELTMAR:              05
4  By MS. WHITAKER:            144
5
6      E X H I B I T S
7      (Attached to transcript)
8  KERLIN DEPOSITION EXHIBIT        PAGE
9  1    Notice of Deposition        08
10  2    Curriculum vitae          31
11  3    Investigation and consultation
12      materials          31
13
14
15
16
17
18
19
20
21
22

---

DEPOSITION OF HART KERLIN
CONDUCTED ON TUESDAY, MAY 20, 2008

12 (Pages 45 to 48)

45

1    A.  I thought there on the front was the Ph.D.
2   who authored it.
3       MR. MELTMAR:  Just so the record is clear, we
4   are looking at the Ignition Handbook, Principles and
5   Applications to Fire Safety Engineering, Fire
6   Investigation, Risk Management, and Forensic Science.
7   It is published by the Fire Science Publishers Society
8   of Fire Protection Engineers, and its copyright date is
9   2003.
10  BY MR. MELTMAR:
11      Q.  So did you rely on this book in formulating
12  your opinions in this case?
13      A.  Yeah, I think I did do some extractions from
14  this as far as my conclusions.
15      Q.  Okay.  All right.  So let's see where in this
16  book you pulled material that was helpful to you.
17      A.  Page 192 of the handbook, section is titled
18  Flash Point and Fire Point, and I read down through
19  this, and, in particular, there are three numbered
20  items.  Do you want me?
21      MR. MELTMAR:  Yes, please.
22      A.  An adequate concentration of the liquid's

46

1   vapor exists above the liquid.  An adequate
2   concentration of an oxidizer is mixed in with the fuel
3   vapors.  A localized heat source of sufficient
4   magnitude is present.
5       MR. MELTMAR:  Okay.
6       A.  And again that was something I related.
7       Q.  How did that -- looking at Page 192?
8       A.  Yes.
9       Q.  How did that section impact your opinion in
10  this case?
11      A.  It relates to my conclusions as far as the
12  cause of the fire.
13      Q.  Being what?
14      A.  The damaged lighter as being the primary
15  cause of this fire.
16      Q.  We are going to get into this in greater
17  detail, but I need to flush this portion of that book
18  out now.  It's your opinion that a BIC lighter, in this
19  case, discharged some fuel, is that correct?
20      A.  That's correct.
21      Q.  And you don't know if it was done
22  intentionally by Mr. Sanders or accidentally by

47

1   Mr. Sanders, is that correct?
2       A.  My opinion would be that it's accidental.
3       Q.  All right.  Is it your opinion that the BIC
4   lighter malfunctioned, that it discharged its fuel
5   without Mr. Sanders using it accidentally or
6   intentionally?
7       A.  That's correct.
8       Q.  So your opinion is that the BIC lighter, for
9   some reason, released its fuel without Mr. Sanders
10  being involved in its operation, is that right?
11      A.  That's correct.
12      Q.  All right.  Now -- and we are going to get
13  into this in greater detail in a minute.  What caused
14  that discharged fuel to ignite?
15      A.  Well, from the experiments that we did here,
16  something as simple as depressing what is a little red
17  button -- would you like me to get a BIC lighter?
18      MR. MELTMAR:  No.
19      A.  Okay.
20      MR. MELTMAR:  You can tell me.
21      A.  Depressing the little red button on it -- I
22  think one of the enclosures in my report is from the

48

1   BIC lighter company; I asked them to send it to me --
2   if you depress that, you can just release the vapors of
3   the isobutane, which is contained in the lighter,
4   without igniting.  You don't have to spark it in order
5   to release that.  So with a pressure against that in
6   his pouch and the conglomerate of stuff he had against,
7   also with, the side of the wheelchair, that it released
8   that.  Or maybe, even beyond that, we are not sure
9   because the parts are missing, the lighter was possibly
10  damaged, too.  But that, something as simple as
11  depressing that, will release the gases into the
12  atmosphere.
13      Q.  What I want to know is what you believe
14  happened.  Do you believe one lighter, one BIC lighter
15  discharged its fuel, and another lighter's fly wheel or
16  spark wheel ignited that fuel?
17      A.  Yes, I do.
18      Q.  Is that the opinion that you hold
19  to a reasonable degree of professional certainty?
20      A.  Yes, sir, it is.
21      Q.  All right.  Would you agree with me that if
22  Benjamin Sanders only had one BIC lighter on him at the

# ATTACHMENT 13

# CNRC SMOKING POLICY NO. 19

GERIATRICS AND EXTENDED CARE
COMPREHENSIVE NURSING AND REHABILITATION CENTER (CNRC)
WASHINGTON, D.C.

CNRC POLICY MEMORANDUM NO. 19                     FEBRUARY 2005

SMOKING POLICY

I.    **PURPOSE**: To identify the smoking policy in the Comprehensive Nursing and Rehabilitation
      Center (CNRC) and to describe tobacco use screening and resident education activities for residents
      who do smoke.

II.   **POLICY**: The CNRC supports the VAMC commitment for a smoke free environment. Smoking
      by CNRC residents is only permitted in designated CNRC and VAMC smoking areas.

III.  **PROCEDURE**:

      A.    Resident smoking is permitted in the following designated areas only:

            **Smoking Shelters** The Smoking Shelter adjoining the CNRC atrium is for CNRC residents
            only. An entrance vestibule and special ventilation reduce the risk of passive smoke to
            other CNRC areas.

            **CNRC Patio** Smoking is permitted on the outside patios, beyond entrances to the CNRC
            (the restricted entrance areas are painted on the ground).

      B.    Smoking is not permitted inside the CNRC. "No smoking" signs are posted at the entrance
            to the facility.

      C.    The CNRC staff (Medical and Nursing Service) assess smoking habits on admission and
            identify those residents considered "High Risk" Smokers. "High Risk" smokers are those
            residents who pose a threat to themselves or others due to their reluctance to follow
            smoking regulations and/or those individuals with a medical condition that prevents them
            from fully understanding the smoking policy.

      D.    The physician/NP will write an order indicating "High Risk Smoker - Supervised Smoking
            Only". A list of "High Risk" residents will be posted on each unit and documented as "high
            risk smoker" in the Interdisciplinary Plan of Care. These High Risk Residents will only
            smoke under direct supervision of CNRC staff or volunteers (or when a family
            member/significant other is present). Cigarettes for high risk residents may be kept at the
            Nursing Station and issued by CNRC staff.

      E.    Tobacco use is screened at least annually and documented under the Clinical Reminder
            section of the Computerized Resident Record System (CPRS). A MD/NP will follow up
            with tobacco use counseling three times for active smokers, as appropriate. Group classes
            on the harmful affects of smoking, the benefits of stopping smoking, and the resources for
            smoking cessation are available on a regular basis in the CNRC and Medical Center.
            Residents are referred to the VAMC Smoking Cessation Program as clinically indicated.

IV.    **REFERENCES**:  Medical Center Policy Memorandum 00-20, Establishment of a Smoke Free Environment.

V.    **RESCISSION**: CNRC Policy Memorandum No. 19, dated February 2002.

VI.    **CANCELLATION DATE**: February 2008

_____
RAYA KHEIRBEK, M.D.
Medical Director, CNRC

_____
EVELYN ROMANO, R.N.
Director, Geriatric & Extended Care Service

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**MARY SANDERS,**                                   )
                                                    )
       **Plaintiff,**     )
                                                    )
    **v.**                       )          **Civil Action No. 07-01169 (ESH)**
                                                    )
**UNITED STATES OF AMERICA,**                       )
                                                    )
      **Defendant.**   )
_____ )

## <u>ORDER</u>

Upon consideration of defendant's motion to dismiss or for summary judgment, the

opposition and reply thereto, and because plaintiff has not established a national standard of care

in this case, it is this _____ day of _____, 2008,

ORDERED, that said motion is granted.  The complaint in this case is dismissed with

prejudice.


                           _____
                           UNITED STATES DISTRICT JUDGE