UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARY SANDERS,<br>  Personal Representative of the Estate of<br>    Benjamin Sanders,<br><br>        Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 07-1169 (ESH)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

This FTCA case involves Plaintiff's claim that Benjamin Sanders, a resident of the U.S. Department of Veterans' Affairs Comprehensive Nursing and Rehabilitation Center ("VA"), was improperly assessed as a "safe smoker" during his stay in that facility between January 2005 and March 2006, and was improperly allowed to smoke unsupervised in that facility's smoking room on March 19, 2006, when he caught fire and died as a result of his injuries. See Plaintiff's Opposition to Defendant's Motion to Dismiss or for Summary Judgment ("Plaintiff's Opp."). Defendant's dispositive motion focused on the failure of Plaintiff to establish a standard of care in this case, which under D.C. caselaw is fatal. Because Plaintiff has not carried her burden on this issue, her complaint should be dismissed with prejudice or summary judgment entered in Defendant's behalf.

I. INTRODUCTION

In opposing the United States' motion to dismiss or for summary judgment, Plaintiff files twelve pages of argument and more than 600 pages of supporting papers. Plaintiff's Opp. R. 30

at pp. 9-22 and attachments. Notwithstanding the size of this filing, Plaintiff makes almost no effort to apply the supporting documentation to refute the credible evidence and applicable case law cited by Defendant that demonstrates Plaintiff has failed to establish the first two prongs of the *prima face* case of medical malpractice, i.e.. to show:  (1) a "national" standard of care for assessing the ability to smoke safely or unsafely of a resident of a long term care facility at the time of Mr. Sanders' death, and (2) a deviation from that standard.[1]

Instead of refuting Defendant's arguments, Plaintiff recast her entire case as one involving not one, but four standards of care:

1.  A "pure negligence or a 'reasonable person' standard of care [case] that does not require expert medical testimony." R. 30, p. 3.

2. "A standard [of care] that relies on Defendant's internal [] Smoking Risk Protocol and Smoking Policy . . ." Id.

3. '[T]he Life Safety Code, NFPA 101, Sec. 19.7.4 (2006) standard of care." Id., and

4.  "[An undefined] medical malpractice standard of care that the plaintiff's experts [allegedly] established through their research and deposition testimony: [that would have resulted in] . . .[a] determin[ation] that Benjamin Sanders was a 'high risk' or 'unsafe' smoker, and should have been supervised him while he smoked on March 19, 2006." Id.

As more fully set forth below, Plaintiff has failed to carry her burden of proof.

---

[1] Defendant reserves the right to argue that Plaintiff has failed to establish the third prong of a *prima facie case* of negligence, i.e., a causal relationship between the alleged deviation and the harm complained of should this case continue past the dispositive motion stage.

II.  ARGUMENT

1.  This is Not a Pure Negligence Case as Plaintiff Now Alleges.

Plaintiff's first faulty argument is that this is a "pure" negligence case, not a medical malpractice case.  R. 30, p. 3.

Plaintiff filed this action as a medical malpractice case.  Comp. at R.1, p. 1 and Civil Cover Sheet.  In her opposition, she now argues that a "reasonable person" standard of care is all that is necessary to prove, not a "national standard of care."[2]  R. 30, p. 3.  To support this new position, Plaintiff ignores controlling District of Columbia precedent and instead relies on four cases---from courts in Georgia, Utah, Connecticut and Virginia [Id. at 12-13].  She fails to rely on even one District of Columbia case.

A cursory review of District of Columbia law, as recently interpreted by this Circuit, shows that expert testimony is needed in a case, such as this one, where the standard of care is "beyond the ken of the average layperson."  See Briggs v. Washington Metro. Area Transit Authority, 481 F.3d 839, 845 (D.C.Cir 2007).  Citing District of Columbia v. Hampton, 666 A.2d 30, 35-36 (D.C. 1995) and District of Columbia v. Arnold & Porter, 756 A.2d 427, 433 (D.C. 2000), the Briggs Court explained:

> At first blush, there is arguably some . . . appeal to [Briggs'] suggestion that the average juror does not require advice from experts to determine whether lighting must be increased or plywood taken down. Varner [v. District of Columbia], 891 A.2d [260] at 266 [D.C. 2006].  But such a judgment based on bare intuition of this sort would be misguided.  The D.C. Court of Appeals has required expert testimony in a number of cases that, at first, appear to be within the realm of common knowledge.  The

---

[2] This is a surprising turnabout as Plaintiff has hired and paid four different expert witnesses to testify to an "applicable standard of care," including Eileen Warner-Maron, a nursing care expert; Dr. Stephen Stefanacci, a long term care facility manager; Dr. Daniel Lozano, a burn expert; and David Hammerman, a fire safety expert.

3

> Court then gives examples of the kinds of cases that have been held to need expert testimony, e.g.., maintenance of leaning trees, Katkish v. District of Columbia, 763 A.2d 703, 706 (D.C. 2000); application of hair relaxer, Scott v. James, 731 A.2d 399, 400 (D.C. 1999); tightness of handcuffs, Tillman v. WMATA, 695 A.2d 94, 97 (D.C. 1997); cushioning for the ground underneath playground monkey bars, Messina [v District of Columbia], 663 A.2d at [532,] 538 [(D.C. 1995)]; maintenance of street lights to prevent falling light globes, Rajabi v. Potomac Elec. Power Co., 650 A.2d 1319, 1322 (D.C. 1994)); time frame for ordering building materials on a construction project, Lenkin-N Ltd. P'ship v. Nace, 568 A.2d 474, 479 (D.C. 1990); response when an arrestee is found hanging in his cell, Toy v. District of Columbia, 549 A.2d 1, 7 (D.C. 1988); and installation of 'a crosswalk, instead of a stop sign, light, or crossing guard,' District of Columbia v. Freeman, 477 A.2d 713, 719-20 (D.C. 1984).

Briggs, 481 F.3d at 845. In fact, "expert testimony is routinely required 'in negligence cases [in the District of Columbia]. . . which involve issues of safety, security and crime prevention.'" Id., 481 F.3d at 845-46 (*quoting* Varner, 890 A.2d at 267). Moreover, the D.C. Court of Appeals "has recognized a trend in District of Columbia law to require expert testimony to establish the applicable standard of care in an increasing variety of circumstances." See Haney v. Marriott Int'l, Inc., Civil Action No. 05-2501 (JDB), 2007 WL 2936087 at *4 (D.D.C., Oct. 9, 2007).

While smoking itself is within "the realm of common knowledge," the manner in which a healthcare professional(s) assesses the ability of a resident(s) of a long term care facility to smoke safely is not within common knowledge. As established in Briggs, issues of safety and security routinely require expert testimony. See Briggs, 481 F.3d at 846. Moreover, a veteran's right to smoke in VA facilities is protected by law, regardless of disability. 38 U.S.C. § 1715. To restrict this evaluation process to the "unguided resolution by lay persons [in Briggs-a jury, here-a judge] [is] inappropriate." Briggs, 481 F.3d at 846.

Accordingly, based on Plaintiff's own pleading of a claim of medical malpractice and the applicable case law which requires expert testimony to establish a "national standard of care," the Court should reject Plaintiff's argument that this case requires only a "reasonable person" standard of care.

2. <u>Defendant's Smoking Risk Protocol and Smoking Policies are not National Standards.</u>

Next, relying on a 1969 D.C. Circuit case, <u>Lucy Webb Hayes Nat'l Training Sch. for Deaconesses & Missionaries v. Perotti</u>, 419 F.2d 704 (D.C. Cir. 1969), Plaintiff asserts that Defendant was bound to comply with its own guidelines, and because it allegedly did not do so, there was a breach of [its own] standard of care. R. 30, p. 3. This argument has now been rejected in this jurisdiction. In <u>Briggs</u>, a 2007 case, this Circuit concluded that the standard of care as defined in defendant's [WMATA] manuals was not a national standard and could not be interpreted as such. 481 F.3d at 848. As this Circuit stated in <u>Briggs</u>:

> The D.C. Court of Appeals has held that such internal policies-standing alone- cannot demonstrate the applicable standard of care . . , '[t]o hold otherwise would create the perverse incentive for [an agency] to write its internal operating procedures in such a manner as to impose minimal duties upon itself in order to limit civil liability rather than imposing safety requirements upon its personnel that may far exceed those followed by comparable institutions.'

<u>Id.</u> (*citing* <u>Arnold & Porter</u>, 756 A.2d at 435 (*quoting* <u>Clark v. District of Columbia</u>, 708 A.2d 632, 636 (D.C. 1997) and <u>Varner</u>, 891 A.2d at 272 ("Aspirational practices do not establish the standard of care which the plaintiff must prove in support of an allegation of negligence."))).

Accordingly, to the extent that Plaintiff argues that the VA Smoking Protocol and Smoking Policy establish a standard of care controlling in this case, this argument should be rejected outright.

      3. The Life Safety Code Provision Does Not Apply Because
         <u>Mr. Sanders Was Not Designated as an Unsafe Smoker.</u>

Plaintiff next asserts that unsafe smokers must be supervised under the Life Safety Code, which had been adopted by the VA, and, because Mr. Sanders was not supervised, the VA was negligent. <u>See</u> R. 30 at p. 15. The Life Safety Code provides for the adoption of smoking regulations in health care facilities. <u>See</u> Plaintiff's Opp., Attachment 20, § 19.7.4 (Docket Entry 30-24, p. 3). Subsection (3) provides that "Smoking by patients classified as not responsible shall be prohibited." <u>Id</u>.

Plaintiff's argument is inapposite here. Mr. Sanders was not designated as an unsafe smoker by the VA. Had he been designated as an unsafe smoker, the Life Safety Code provisions may have applied. However, that was not the case. As Frances Henderson, VA Director of Nursing for the Comprehensive Nursing and Rehabilitation Center and the agency's Fed. R. Civ. P. 30(b)(6) witness with regard to the VA's assessment policies and procedures testified, Mr. Sanders was assessed to be a safe smoker and, based on daily observations, that assessment would have been discontinued if he did something that was not appropriate, or if the Interdisciplinary Team that did the quarterly assessments believed he could not longer smoke safely. R. 27, Attachment 5 (Henderson Deposition), pp. 126:6-22, 127:1, 38:17-21; 62:12-22, 75:20-22, 76:1-21, 122:2-10. There was no evidence in the medical records that he could not understand the smoking regulations, lacked the ability to handle the smoking material safely, or that he dropped cigarettes on his clothing or had prior accidents. <u>Id</u>., pp. 102:13-20, 122:16-22.

From the start, Plaintiff's claim of negligence has been based on her allegations that Mr. Sanders was improperly assessed as a "safe smoker" and "allow[ed] to smoke unsupervised in the smoking room of the Defendant's Veterans Affairs' Comprehensive Nursing and

Rehabilitation Center." Plaintiff's Opp., p. 2 and Compl. at ¶¶ 6.5; 7.3(5). Under this scenario, it is the standard of care relating to the assessment process that is at issue in the determination of whether an individual in a long term care facility is a safe or unsafe smoker, not a standard of care relating to unsafe smokers. The Life Safety Code addresses the treatment of patients who have been classified as irresponsible smokers. That is not the case here.

The Court, as the factfinder in this case, is charged with determining whether or not an applicable standard of care was set forth by Plaintiff. Plaintiff, by urging that the Life Safety Code is the appropriate standard of care, is asking the Court to assume that Mr. Sanders was an unsafe smoker and that the VA's determination that he was a safe smoker was improper, then apply the Life Safety Code provision that prohibits smoking without supervision by "patients classified as not responsible." The Court should reject Plaintiff's leap over the burden imposed in this medical malpractice case which amounts to the imposition of a finding of negligence per se.

In sum, before consideration is given to the manner in which "unsafe" smokers are permitted to smoke supervised or unsupervised, Plaintiff must set forth a standard that was violated by the VA in determining that Mr. Sanders was a "safe" smoker. The Life Safety Code addresses the former, not the latter, and is therefore of no assistance to Plaintiff in carrying her burden of proof.

    4. <u>Plaintiff's Experts Have Not Established a National Standard of Care</u>.

Finally, Plaintiff has not established a specific national standard of care that must be articulated by experts in this case.

"[I]f a case such as this were to proceed to trial" in this jurisdiction, the expert testimony presented would be limited to the issues addressed in the experts' reports and deposition

7

testimony.  See Frazza v. United States, 529 F.Supp.2d 61, 70-71 (D.D.C. 2008).  The expert reports must contain, *inter alia*, "a complete statement of all opinions [they] will express and the basis and reasons for them; [and] the data or other information [they] considered . . . in forming them."  Fed. R. Civ. P. 26(a)(2)(B).  Moreover, the experts' reports and depositions must set forth "a specific, articulable (and articulated) standard of care."  Briggs, 481 F.3d at 846-47 (*quoting* District of Columbia v. Carmichael, 577 A.2d 312, 315 (D.C. 1990)); see also Phillips v. District of Columbia, 714 A.2d 768, 773 (D.C. 1998).  This "articulation of a specific standard is essential '[e]specially in circumstances in which . . . the defendant is alleged to have failed to protect the plaintiff from harm.'"  Frazza, 529 F.Supp.2d at 71 (*quoting* Briggs, 481 F.3d at 847 (*quoting* Varner, 891 A.2d at 269)) (alterations in Briggs).

  A review of the record before the Court shows that Plaintiff's own experts could neither identify, nor agree on a nationally-recognized standard for assessing the smoking ability of residents in a long term care facility.   In view of their disparate opinions and the variety of assessment methods put forth, including ones used in Canada and Pennsylvania, but none uniformly used at the time of the accident, there was clearly no one nationally-recognized standard of care.  See e.g., R. 27, Attachment 10 (Warner-Maron Dep.) pp. 51:15-52:2, 82:20-83:1, 84:7-17; R. 27 Attachment 11 (Stefanacci Dep.) Exhibit 3, pp. 4-5, see also Exhibit 1, p. 6.

  Nonetheless, Plaintiff argues that Ms. Warner-Maron and Dr. Stefanacci, Plaintiff's experts, have established a nationally-recognized standard of care through their research and deposition testimony.  R. 30 (Plaintiff's Opp.) at pp. 16-17.   Plaintiff does not define that standard of care in her opposition and Defendant is not required to attempt to articulate one for Plaintiff.  She leaves it to the Court to search through the 600 plus pages of attachments to determine what the national standard of care is.   No wonder, as this was a daunting task even for

her experts. Dr. Stefanacci could point to no regulation or guideline that required a specific method of assessing smokers. He simply related his opinion that an unspecified record was needed for a possible law suit in the future, and recited a standard he developed in 2008 from the preliminary results of a 2008 survey. R. 27, Attachment 11 (Stefanacci Dep.), pp. 123:15-22, 124:1-6, 72:1-22. This type of opinion testimony has been found to be insufficient to establish a standard of care. Travers v. District of Columbia, 672 A.2d 566, 570 (D.C. 1996). Moreover, Stefanacci did not relate this opinion to any literature, discussions with other practitioners, or relevant data, except to cite a survey done two years after the accident. In his report, he admits that his standard of care is "Under Development." R. 27, Attachment 11, Letter of February 23, 2008, p. 6 (Docket page 27-12, p. 23); see also Docket 15-3, p. 6.[3]

Ms. Warner-Maron noted at her deposition that the standards she relied on in her expert report do not expressly state what she reported, but instead her conclusions are "inherently" contained in the guidelines she cites as the standards of care. See R 27, Attachment 10, Warner-Maron Dep. pp. 54:2-20, 84:14; see also id. at 78:3-10.

Nevertheless, in an attempt to satisfy her burden, Plaintiff simply refers to the fact that Dr. Stefanacci "referenced 14 medical articles that he relied on in forming his opinion on the national standard of care applicable to the defendant." R. 30 at 17. However, as stated above, no effort was made to relate the content of any article he relied on to the standards he articulated.

---

[3] Moreover, a "draft" article enunciating the standard upon which Plaintiff relies was provided two months after Plaintiff's Fed.R.Civ.P. 26(a)(2) disclosures were made and only one week before the deposition of Dr. Stefanacci was taken. See R. 27, Attachment 11, (Docket page 27-12, pp. 48-53). As noted, it was based on a survey conducted in the first three months of 2008, two years after the accident occurred and at the time the deposition was still ongoing. Id. at Dep. p. 72:17-22. Although this article contains no time references, a review of the references at the end shows that it was prepared after the accident at issue in this case.

Even Hawes v. Chua, 769 A.2d 797, 806 (D.C. 2001), cited by Plaintiff, required "specific medical literature" to support the standard relied on. Plaintiff also urges that Ms. Warner-Maron "referenced the published standards contained in JCAHO Standard EC 1.30 and Federal Regulation 42 C.F.R. 383.25 . . . and relied on literature found in Attachment 13." Id.[4] Again, no effort was made by Plaintiff to relate those references to the standards Ms. Warner-Maron articulated in her opinion(s) and for the first time at her deposition.[5] Under the case law in the District of Columbia, that is simply not enough.

Moreover, as noted above, at his deposition on April 21, 2008, Dr. Stefanacci relied heavily on a survey conducted two years after the accident and two months after the due date for expert disclosures, to state the standard to be applied. i.e., that considerations of three areas are necessary in the assessment process--mental status, physical status and equipment that the patient or resident is using. R. 30, Attachment 14, pp. 119-120. This survey was conducted during the first quarter of 2008, i.e., January-March 2008, and a draft article prepared. R. 27,

---

[4] Although Plaintiff cites §383.25, Defendant believes that this is a mistake and that Plaintiff meant to cite §483.25 of what is commonly called OBRA (Omnibus Budget Reconciliation Act of 1987, Pub.L.100-203).

[5] The "Watermelon Book" referred to by Ms. Warner-Maron at her deposition and numerous other documents were relied on by this expert for the first time at her deposition. See R. 30, Attachments 13 and 16. In the case of the Watermelon Book which Ms. Warner-Maron suggests was guidance from a nursing home group [see R.27, Att.10, 49:18-22, 50:1-22, 51:1-2, 55:15-22, 56:8-18, 60:21-22, 61:1-17] on interpreting the JCAHO standard of care, Plaintiff's counsel had a messenger bring it to the deposition from his office. However, the version brought to the deposition, i.e., the 2007 version, was clearly not applicable to the accident in this case which occurred on March 19, 2006. The 2005 version was never produced during discovery. Now, for the first time, Plaintiff provides the 2005 version of the Watermelon Book as support for her opposition. See Attachment 16. This submission is untimely and should be stricken pursuant to Fed. R. Civ. P. 26(a)(2)(B) and the case law. See Frazza v. United States, 529 F.Supp.2d at 70-71. In any event, Ms. Warner-Maron disclaimed reliance on it as only "helpful to understand what the issues are . . . and what does that regulation actually mean." R.27, Attachment 10, pp. 56:18-22; 57:1-12.

Attachment 11, p. 72:1-22; see also Article, received by Defendant's counsel one week before Dr. Stefanacci's deposition and two months after the due date for expert disclosures. The article appears at Docket 27-12, pp. 48-53; see also id. at Dep,.pp. 71-72.  A post hoc survey and article cannot serve as the basis for the standard of care in this case.  Fed. R. Civ. P. 26(a)(2)(B).

      Ms. Warner-Maron comes closer to articulating a standard of care, however she herself admitted that her so-called standard was merely "inherent" in her references and was not specifically articulated.  She references JCAHO and 42 C.F.R 483.25, but fails to "clearly relate [those] standard[s] of care to the practices in fact generally followed by other comparable . . . facilities or to some standard nationally recognized by such units." Briggs, 481 F.3d at 846 (citations omitted).  Nor can she do so because these are "generalized references" and such references are insufficient to establish a national standard of care.  Id.  As set forth below, neither reference provides a basis for a finding of negligence in this case.

      A. JCAHO is not Controlling, but if it is Defendant Met that Standard.

      The JCAHO guidelines do not specify either a method for assessing the safety of individual smokers in long term care facilities or require a specific format to be used.  Indeed, ". . . JCAHO allows facilities to develop their own set of assessments and their own policy of how that assessment, how often it needs to be done, how often a person gets reassessed.  JCAHO allows individual organizations to do that and then they survey them based on their compliance with that JCAHO survey requirement."  R. 27 (Warner-Maron Dep.), Attachment 10, p. 78:4-10.  Although Warner-Maron stated that it is "inherent" in  JCAHO guideline E.C. 1.30(c) that some form of assessment be provided (id. at p. 71:3-4), Warner-Maron admitted that, "JCAHO doesn't require a particular smoking form to be used." Id. at p.128:19-20.  To the extent that Plaintiff complains that the assessment was not properly documented, the JCAHO guidelines do

11

not require a particular record to be made. The VA's method of documenting was to provide a written record only if a person were found to be an "unsafe" smoker. R. 27, Attachment 5 (Henderson Dep.), pp. 76:3-7 & 19-21. In fact, the VA Medical Center, using its own assessment method, was found in full compliance with JCAHO standards concerning long term care activities during Mr. Sanders' residency and continues to meet those standards today. See JCAHO compliance information at http://www.qualitycheck.org/qualityreport.aspx?hcoid=4629] and R 27, Attachment 9 (Compton Dep.), p. 34:11-14; see also p. 32:2-4. As Plaintiff's expert, Dr. Stefanancci, assumes, if JCAHO accredited a facility, that facility met the JCAHO standards. R. 27, Attachment 11, p. 70:6-20.

        B.  42 C.F.R. § 483 is also not Controlling in this Case.

Ms. Warner-Maron also relies on 42 C.F.R. § 483.25 (part of OBRA-87) as a basis for her opinion that the VA breached the standard of care in this case. In doing so, she frequently admitted that this source, like the JCAHO provisions, did not specifically articulate the methods to be used in assessing or supervising smokers in long term care facilities. See, R. 27, Attachment 10 at Warner-Maron Dep., pp. 51:6-52:13, 82:20-83:1, 84:7-17. As Ms. Warner-Maron admits, the regulation refers to the general umbrella of accidents. She states in her testimony that the specific language "doesn't include the word 'fire' or 'smoking. . .'" but pertains to attempting to minimize accidents. Id. at p. 52:2-11. A cursory review of the regulation shows it has no application to the VA at all as it is a regulation governing the administration of Medicare in private long term care facilities, a program in which the VA does not participate. See 42 U.S.C. § 1395(f). Medicare regulations are not controlling in this case because VA provided for Mr. Sanders care without reimbursement. See id. Moreover, the Medicare regulations are "fiscal sort of guidance." R. 27, Attachment 9 (Compton Dep.), p.

35:5-6.  In any event, Plaintiff's expert, Dr. Stefanacci admits that the "three requirements that [he] set forth as the standard of care," and developed after a 2008 survey, are not found in either 42 C.F.R. § 483 or the JCAHO guidelines.  R. 27, Attachment 11, pp. 70:1-3; 71:5-8.[6]

In summary, Plaintiff's opposition to Defendant's motion fails to provide a basis for the required national standard of care.  Her newly-minted first and second arguments, *i.e.*, that this is a "pure negligence" case, and/or that Defendant's internal policies are the standard, are refuted by controlling D.C. precedent.  Her third argument that the Life Safety Code is controlling, is based on assumptions and speculation as that Code does not address the the assessment process for smoking in long term care facilities.   Finally, her fourth and last argument, that she has established a national standard of care in this case through expert testimony is not supported by the record.  Plaintiff's experts' reports and deposition testimony demonstrate that no "specific, articulable standard of care" applicable at the time of the accident existed.  Indeed, nothing in the record establishes that the manner in which an assessment is performed is dictated by any nationally-recognized standard and certainly the manner used by the VA met the JCAHO standard or else the VA would not have been certified by that reviewing organization as meeting its standards in October 2005.  As the Plaintiff has failed to establish a national standard in this case and, as the record before the Court illustrates, "[t]here's no national standard that says you must use a form or a certain form or even certain domains of assessment" [R. 27, Attachment 9 (Compton Dep.), p. 59:16-18], dismissal or summary judgment is appropriate.

---

[6] Page 71 of Dr. Stefanacci's deposition was inadvertently omitted from Defendant's Attachment 11 at R. 27.  It is attached to this filing.

III. CONCLUSION

For the reasons set forth herein and in Defendant's Motion to Dismiss or for Summary Judgment (R.27), it is respectfully requested that this matter be dismissed with prejudice or summary judgment entered in Defendant's behalf. A proposed order is attached.

Respectfully submitted,

/s/
JEFFREY A. TAYLOR , D.C. Bar # 498610
United States Attorney

/s/
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

/s/
CLAIRE WHITAKER, D.C. Bar # 354530
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
(202) 514-7137

OF COUNSEL:

PATRICIA TRUJILLO
Staff Attorney
U.S. Department of Veterans Affairs
Regional Counsel Office

Filing of missing page from R. 27 (Defendant's Dispositive Motion),

Attachment 11 (Stefanacci Dep.), p. 71.

ORIGINAL

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
- - - - - - - - - - - - - - - - x
MARY SANDERS, as Personal        :
Representative of the Estate     :
of BENJAMIN SANDERS,             :
                                 :
        Plaintiff,               :
                                 :  Civil Action
    vs.                          :  No. 071169
                                 :
UNITED STATES OF AMERICA,        :
                                 :
        Defendant.               :
- - - - - - - - - - - - - - - - x
```

Washington, D.C.
Monday, April 21, 2008

The deposition of RICHARD STEFANACCI, D.O., called for examination by counsel for Defendant in the above-entitled matter, pursuant to Notice, in the offices of U.S. Department of Justice, 501 Third Street, N.W., Fourth Floor, Washington, D.C., convened at 10:15 a.m., before Cathy Jardim, a notary public in and for the District of Columbia, when were present on behalf of the parties:

1     A.    That is also referenced. Actually, the act
2 is 1987.
3     Q.    Is that why they call it OBRA '87?
4     A.    Right.
5     Q.    Does OBRA '87 have the three specific
6 requirements that you defined as necessary in the
7 standard of care?
8     A.    No.
9     Q.    Now let's look at the survey.
10     A.    Again, you are looking -- you are referring
11 to the draft article?
12     Q.    Yes. The document that you gave me that Mr.
13 Meltmar forwarded to me on April 13. You are
14 incorporating this document, this Exhibit No. 3, a
15 draft article, as part of your opinion in this case,
16 correct?
17     MR. MELTMAR: Objection. That is not what
18 he testified to.
19     Go ahead.
20     THE WITNESS: I don't know what you mean by
21 incorporating.
22     BY MS. WHITAKER:

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARY SANDERS,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 07-01169 (ESH) |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## ORDER

Upon consideration of defendant's motion to dismiss or for summary judgment, the opposition and reply thereto, and because plaintiff has not established a national standard of care in this case, it is this _____ day of _____, 2008,

ORDERED, that said motion is granted.  The complaint in this case is dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE