UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MARY SANDERS,      )<br>                  )<br>   Plaintiff,    )<br>                  )<br>   v.             )<br>                  )<br>UNITED STATES OF AMERICA )<br>                  )<br>   Defendant.    )<br>                  ) | Civil Action No. 07-1169 (ESH) |

## MEMORANDUM OPINION & ORDER

Mary Sanders ("plaintiff"), Personal Representative for the Estate of Benjamin Sanders ("Sanders"), has brought this wrongful death action alleging medical malpractice against the United States of America. Plaintiff claims that the United States Department of Veterans Affairs ("VA") Comprehensive Nursing and Rehabilitation Center ("CNRC") failed to properly assess Mr. Sanders's cigarette smoking ability, which resulted in his burning death on March 19, 2006. Defendant has moved to dismiss the case for failure to state a claim, or in the alternative for summary judgment. For the reasons stated herein, this motion will be denied.

## BACKGROUND

Sanders had a stroke in 1992, which resulted in partial paralysis of his left side. (Def.'s Ex. 1 [Mary Sanders Deposition] at 13:15.) For the first thirteen years after his stroke, Sanders lived at home. (*Id.* at 14:1-6, 22:13-17.) During that time, Sanders came to CNRC twice a year for a period of two weeks at time for "respite care." (Def.'s Ex. 2 [Tamega Sanders Deposition] at 18:7-12.) After Sanders was admitted in January 2005, his wife became ill and was

hospitalized. (*Id.* at 22:12-15, 23:1-18.) At that point, his stay became permanent because his wife was no longer able to care for him. (Def.'s Ex. 1 at 22:13-20.)

Upon his admission in 2005, Sanders was evaluated and a "care plan" was developed for him. (Def.'s Ex. 4 [Excerpts from Medical Records] at 705-22.) At that time, his medical problems included benign hypertension, cerebrovascular effects, chronic kidney failure, diabetes, gout, monoclonal gammopathy, some hearing loss, seizures, and periodontitis. (*Id.* at 716.) Because of his stroke, he could only move the thumb and pointing finger of his left hand. (Def.'s Ex. 7 [Kheirbek Dep.] at 65:2-11.) He had limited use of his left arm,[1] and he could not walk. (Pl.'s Ex. 3 [Phillips Dep.] at 9:20-21.) Sanders had a history of seizures, for which he was taking medication. (Def.'s Ex. 5 [Henderson Dep.] at 112:9-14.) He had a mild cognitive impairment (*id.* at 146:16-18), but was still "able to articulate himself and . . . make his needs known." (Def.'s Ex. 7 at 64:16-17.) He had difficulty speaking, but he had a loud speaking voice. (Def.'s Ex. 6 [Alehossein Dep.] at 27: 10-15.)

The CNRC admission evaluation does not document any assessment of Sanders's smoking risk. (Def.'s Ex. 4 [CNRC Medical Records] at 712.) Frances Henderson, Associate Chief Nurse for Geriatrics and Extended Care, testified that the Interdisciplinary Treatment Team determined that Sanders was not a high risk smoker. (Def.'s Ex. 5 at 38:20-21.) Under the "Safety/Risk Factors" section in his care plan, only "falls" and "seizures" were checked, not smoking. (Def.'s Ex. 4 at 712.) Members of the nursing staff at CNRC testified that Sanders

---

[1] Defendant contends that Sanders had some use of his left arm and "could do passive range of motion with assistance." (Def.'s Ex. 5 at 99:2-5.) Sanders's daughters stated that their father was totally paralyzed on his left side. (Pl.'s Ex. 21 [Tamega Sanders Dep.] 75:18-22; Pl.'s Ex. 1 [Beverly Sanders Dep.] at 14:9-11.)

was able to smoke safely and that he observed the smoking rules. (*See, e.g.*, Def.'s Ex. 6 at 60:9-22; 61:1-8.) However, the nurse practitioner responsible for his care refused to answer the question whether Sanders could "self-manage" in the event of a fire. (Pl.'s Ex. 17 [Alehossein Dep.] at 73:17-76.)

On March 19, 2006, Sanders was in the CNRC designated smoking room talking to nursing assistant Jerry Lee Phillips. (Pl.'s Ex. 3 at 18:19-22.) Phillips left the room for a few minutes. (*Id.* at 19:4-21.) When Phillips again passed the smoking area, he looked into the room and saw Sanders on fire. The flames had totally engulfed him and were above his head. Phillips and other employees put out the fire with wet blankets and a fire extinguisher. (*Id.* at 20:1-4.) Sanders died within minutes due to thermal inhalation injury or asphyxiation due to the fire. (Def.'s Ex. 9 [Compton Report] at 4.)

## ANALYSIS

To establish a medical malpractice claim under District of Columbia law, plaintiff must show: (1) that there was a national standard of care for determining whether a resident of a long term care facility was a safe or unsafe smoker; (2) that the VA deviated from that standard of care; and (3) that the deviation caused the harm to plaintiff. *See Nwaneri v. Sandidge*, 931 A.2d 466, 470 (D.C. 2007). Defendant has moved to dismiss or for summary judgment arguing that plaintiff has failed to show a national standard of care requiring assessment of nursing home patients for smoking risk and that even if plaintiff can show a national standard, it has failed to demonstrate any breach by defendant. The Court disagrees.

The D.C. Court of Appeals has held that "an expert in a medical malpractice case must establish the basis for his knowledge of the applicable national standard of care and link his

opinion to the applicable national standard." *Hill v. Medlantic Health Care Group*, 933 A.2d 314, 325 (D.C. 2007). Through this testimony, the plaintiff must demonstrate the "course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." *Meek v. Shepard*, 484 A.2d 579, 581 (D.C. 1984). "[N]ational standard of care testimony may not be based upon mere speculation or conjecture." *Hawes v. Chua*, 769 A.2d 797, 806 (D.C. 2001). Nor is a expert's personal opinion alone sufficient to prove a national standard of care. *Nwaneri*, 931 A.2d at 473. "Rather, the expert must clearly articulate and reference a standard of care by which the defendant's actions can be measured. *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997) (quotation marks, emphasis, and citation omitted). "[R]eference to a published standard is not required, but can be important." *Hawes*, 769 A.2d at 806 (citing *Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C. 1996)). Additionally, "discussion of the course of action or treatment with doctors outside this jurisdiction, at seminars or conventions, who agree with it; or references to 'specific medical literature' may be sufficient." *Id.* (citing *Travers*, 672 A.2d at 569).

Plaintiff has introduced testimony from Ilene Warner-Maron, an expert in the fields of nursing home managment and nursing, and from Dr. Richard Steffanaci, an expert in geriatric care and long-term care. Both Warner-Maron and Steffanaci testified that the Joint Commission for the Accreditation of Health Care Organizations ("JCAHO") provides national standards for nursing care that an organization like CNRC must follow in order to be accredited. (*See* Pl.'s Ex. 8 [Warner-Maron Dep.] at 15:12-22, 16:1-22; Def.'s Ex. 11 [Steffanaci Dep.] at 70.) JCAHO's regulations provide that its organizations may permit residents to smoke only if they "meet[] criteria developed and approved by the organization's leaders." (Pl.'s Ex. 9 [JCAHO

4

Standard E.C. 130] at EC-9.)  CNRC complied with this directive by implementing the Smoking Risk Protocol, which requires that the staff identify and monitor patients who are "high risk." (*See* Pl.'s Ex. 6 [Smoking Risk Protocol] at 1.)  The Smoking Risk Protocol provides that in making the determination whether a patient is high risk, the nursing staff shall assess a patient's established smoking pattern, his ability to understand smoking regulations; his compliance with the smoking policy; and his ability to handle smoking materials safely.  (*Id.*)

Defendant does not genuinely contest that JCAHO guidelines require it to assess and identify high risk smokers.[2]  Rather, it contends that there is no national standard for determining how this assessment should be performed, and thus no way for a jury to properly evaluate its assessment efforts.  As Warner-Maron explains, however, it is inherent in the JCAHO assessment requirement that patients are being assessed for their ability to smoke safely.  (*See* Pl.'s Ex. 8 at 84:11-17.)  JCAHO EC.1.10 is entirely dedicated to evaluating how an organization manages safety risks. (*See* Pl.'s Ex. 9.)  The subsection on smoking is intended to reduce the risk of permitting smoking to people who smoke and to others who are exposed to their smoke, as well as to reduce the risk of fire.  (*Id.* at EC-9.)  Thus, it is commonsense that the subsection which requires evaluation of smoking patients requires an assessment of their ability to smoke safely.

Furthermore, Steffanaci's expert report indicates that there is a national standard for assessing the ability to smoke safely, with which CNRC's own internal assessment standard

---

[2] In fact, defendant argues that because it was accredited by JCAHO, it may not be found liable for its treatment of Sanders.  Defendant cites no case law for the proposition that proof of accreditation is a complete defense to liability for negligence in an individual case.  By defendant's logic, no accredited organization could ever be found liable for failure to meet any of the standards by which it is accredited, which is clearly not the case.

(outlined in the Smoking Risk Protocol) is entirely consistent.  In January 2008, Steffanaci performed a study with the National Association Directors of Nursing Administration/Long Term Care (NADONA/LTC) to determine the criteria by which these organizations assess high risk smokers. (*See* Pl.'s Ex. 15 [Nursing Home Resident Smoking Policies].)  "[The] national survey was distributed online through NADONA/LTC and completed by 248 directors of nursing.  The surveys were completed by a national sampling representing an even distribution with regard to geographic distribution as well as for-profit and non-profit facilities."  (*Id.* at 2.)  Over 95% of the survey's respondents assessed the patient's mental acuity, physical limitations, and equipment requirements in determining whether the patient could smoke safely.[3]  (*Id.* at 3.)  This comprehensive study indicates that CNRC's policies are consistent with the national

---

[3] Defendant contends that the survey is meaningless because it began in January 2008, 22 months after Sanders's death, and because Steffanaci was unable to state with certainty that respondents from every single state participated.  Defendant cites no case law for the proposition that this level of proof is required to establish a national standard of care.  Indeed, the Court could not locate a case in which the accepted expert's testimony would meet defendant's proposed interpretation of this standard, nor would such an interpretation be reasonable given the facts in this case.

Plaintiff's experts have shown that a published national standard of care was in the place at the time of Sanders's death, that the national standard had been accepted and implemented at CNRC, and that less than 2 years after Sanders's death, it was accepted and implemented at over 95% of participants in a national survey of similar organizations.  Moreover, Steffanaci's report relied on additional published studies that indicate that this set of parameters for assessment did not after this incident.  For example, a survey of long-term care facilities in San Francisco in 1998 found that in all facilities, "confused, physically incapacitated, or other 'unsafe' smokers" were identified as "high risk" and had limitations on their ability to smoke.  *See* Judith C. Barker & David E. Lewis, Jr., *Smoking Policy in Long-Term Care: A Survey of Administrators in San Francisco*, 10 J. of Health & Soc. Policy 81, 89-91 (1998).  The Court therefore concludes that Steffanci's study is probative evidence on the question of the national standard of care.

standard of care.[4] *See Briggs v. WMATA*, 481 F.3d 839, 847 (D.C. Cir. 2007) ("[A]n expert may support a purported standard by showing that it has been accepted as controlling in facilities and enterprises that are similar to defendants' facilities or enterprises."). Indeed, these parameters were applied by defendant's expert, Dr. Gregory Compton, in making his determination that Sanders was a safe smoker.[5] (*See* Def.'s Ex. 9 [Compton Expert Report] at 4 (noting that Sanders had the ability to physically manage the active smoking task, follow the smoking rules, and manage a smoking mishap).)

    The real dispute between the parties in this case turns not on whether there is a national standard for assessing "high risk" smokers, but rather on whether CNRC correctly applied the standard in their assessment of Sanders. Plaintiff's experts both contend that no reasonable medical professional could have concluded that he could smoke safely based on an assessment of his cognitive and physical limitations. (Def.'s Ex. 10 [Warner-Maron Expert Report (Nov. 27, 1996)] at 4; Def.'s Ex. 11 [Steffanaci Expert Report] at 6.) They point to, *inter alia*, Sanders's

---

[4] Contrary to plaintiff's position (*see* Pl.'s Opp'n 14-15), CNRC's policies, while probative, do not provide the applicable standard of care. The D.C. Circuit has explained that "internal policies standing alone cannot demonstrate the applicable standard of care" because "to hold otherwise would create the perverse incentive for [the organization] to write its internal operating procedures in such a manner as to impose minimal duties upon itself in order to limit civil liability rather than imposing safety requirements upon its personnel that may far exceed those followed by comparable institutions." *Briggs*, 481 F.3d at 848 (internal quotation marks and citations omitted).

[5] Significantly, Compton's report does not dispute (or address) the question whether there is a national standard requiring that nursing homes identify high risk patients or that they do so by examining the patient's cognitive and physical abilities to determine whether they can smoke safely and self-manage in the event of an accident. His report states only that "[t]here is no national standard that requires the use of a specialized form to assess hospitel patients or nursing home residents for safe smoking." (Def.'s Ex. 9 [Compton Expert Report] at 3.) This statement, even if true, is irrelevant to whether there is a national standard of care for assessing high risk smokers.

history of seizure disorder, his inability to walk, his limited use of his left arm and hand, his cognitive impairment, and his speech limitations. (*Id.*) Defendant's expert disagrees. He notes that Sanders had been smoking in the CNRC, without incident, for at least one year prior to his death and had followed the rules requiring him to smoke only in designated areas. (*See* Def.'s Ex. 9 [Compton Expert Report] at 4.) He further explains that Sanders had full use of his right arm and hand which would have allowed him to self-manage a smoking mishap or motor into an area where staff were present to seek assistance. (*Id.*) There is thus a disputed question of fact as to whether Sanders was properly assessed as a safe smoker. This is a question for the jury to resolve, with the assistance of expert testimony.[6]

## CONCLUSION

For the reasons stated herein, defendant's motion to dismiss or, in the alternative, for summary judgment [Dkt. 27, 28] is **DENIED**. A status conference is set for September 24, 2008, at 9:30 a.m.

---

[6] The Court rejects plaintiff's contention that expert testimony is not required in this case. In this jurisdiction, "[a] plaintiff must put on expert testimony to establish what the standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson," *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000) (quotation marks and citations omitted), except "if the subject matter is within the realm of common knowledge and everyday experience." *Hill v. Metro. African Methodist Episcopalian Church*, 779 A.2d 906, 908 (D.C. 2001) (quotation marks and citation omitted). The D.C. Court of Appeals has construed the "common knowledge" exception narrowly, *see Briggs*, 481 F.3d at 845 (collecting cases), excusing the expert testimony requirement "only in cases in which everyday experience makes it clear that jurors could not reasonably disagree over the care required." *Id.* This is not such a case. Understanding Sanders's particular cognitive and physical limitations and the impact they had on his ability to smoke safely is not within the everyday experience of the average juror and thus expert testimony will be required.

                                                                /s/
                                        ELLEN SEGAL HUVELLE
                                        United States District Judge

DATE:    August 26, 2008